UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                                :
NICHOLAS BERGON AND BARBARA      :   Case No. 6:20-cv-06283
MYCEK, individually and on behalf of others    :
similarly situated,                                             :
                                                                :
              Plaintiffs,                        :
                                                                :
      v.                                         :
                                                                :
ROCHESTER INSTITUTE OF TECHNOLOGY,   :
                                                                :
              Defendant.                         :
----------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION OF
ROCHESTER INSTITUTE OF TECHNOLOGY'S MOTION TO DISMISS
<u>PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 2

ARGUMENT ......................................................................................................................... 4

I.   PLAINTIFFS HAVE STANDING ..................................................................................... 4

II.  PLAINTIFFS DO NOT ALLEGE EDUCATIONAL MALPRACTICE ............................... 6

III. PLAINTIFFS STATE A CLAIM FOR BREACH OF CONTRACT ................................. 10

   A.  The SFRA Does Not Govern ................................................................................. 10

      1.  The SFRA is Not a Contract ........................................................................... 11

      2.  The SFRA is Ambiguous and Incomplete ....................................................... 13

      3.  Plaintiffs' Claims Fall Outside the Scope of the SFRA................................... 15

      4.  Plaintiffs' Claims Also Fall Outside the Scope of the RIT's "Refund
          Policy"............................................................................................................ 16

   B.  Plaintiffs Have Identified a Legally Specific Contract ......................................... 17

   C.  Plaintiffs Have Alleged Cognizable Damages...................................................... 19

   D.  Defendant's Reliance on Disclaimers Fails ......................................................... 21

IV. PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT ..................................... 24

V.  PLAINTIFFS STATE A CLAIM FOR CONVERSION.................................................... 26

VI. PLAINTIFFS STATE A CLAIM UNDER GBL §§ 349 AND 350.................................... 26

   A.  Plaintiffs Have Pled Consumer-Oriented Conduct ............................................. 27

   B.  Plaintiffs Have Pled That Such Consumer-Oriented Conduct Was Materially
       Misleading .......................................................................................................... 28

   C.  Plaintiffs Have Pled Injury ................................................................................. 29

CONCLUSION...................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Coca-Cola Co.*,
CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156 (S.D.N.Y. July 21, 2010)................... 29

*Acumen Re Mgmt. Corp. v. General Sec. Nat'l Ins. Co.*,
2012 WL 3890128 (S.D.N.Y. Sept. 7, 2012).................................................................................... 20

*Alsides v. Brown Inst., Ltd.*,
592 N.W.2d 468 (Minn. Ct. App. 1999)........................................................................................ 20

*Amusement Bus. Underwriters v. American Intl. Group*,
66 N.Y.2d 878 (1985) ...................................................................................................................... 13

*Bailey v. N.Y. Law Sch.*,
16 Civ. 4283 (ER), 2017 WL 835190 (S.D.N.Y. Mar. 1, 2017)..................................................... 30

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ............................................................................................... 12

*Beukas v. Bd. of Trustees of Fairleigh Dickinson Univ.*,
255 N.J. Super. 420, 605 A.2d 708 (App. Div. 1992) ................................................................. 22

*Brooke Group v. JCH Syndicate 488*,
87 N.Y.2d 530, 663 N.E.2d 635 (1996)........................................................................................ 13

*Carr v. St. John's Univ.*,
17 A.D.2d 632 (2d Dep't 1962)........................................................................................................ 13

*Carrillo v. Wells Fargo Bank NA*,
No. 18-CV-3095 (SJF) (SIL), 2019 U.S. Dist. LEXIS 80634 (E.D.N.Y. May 10, 2019)............ 28

*Chais v Technical Career Insts.*,
2002 N.Y. Misc. LEXIS 2086, 2002 NY Slip Op 30082[U] (Sup. Ct., NY Cty Mar. 1 2002).... 28

*Cobble Hill Nursing Home v. Henry & Warren Corp.*,
74 N.Y.2d 475 (1989) ...................................................................................................................... 15

*Coleman v. System Dialing LLC*,
2016 WL 3387748 (S.D.N.Y. June 17, 2016) ................................................................................ 11

*Cty. of Nassau v. Tech. Ins. Co.*,
174 A.D.3d 847 (2d Dep't 2019)..................................................................................................... 13

*Downey v. Adloox Inc.*,
238 F. Supp.3d 514 (S.D.N.Y. 2017)..................................................................................... 24

*Duran v. Henkel of America, Inc.*,
2020 WL 1503456 (S.D.N.Y. Mar. 30, 2020) ............................................................. 27, 28, 29

*Ebin v. Kangadis Food Inc.*,
No. 13-CV-2311, 2013 U.S. Dist. LEXIS 174174 (S.D.N.Y. Dec. 11, 2013) ............................. 30

*Ericson v. Syracuse Univ.*,
35 F. Supp. 2d 326 (S.D.N.Y. 1999)....................................................................................... 6

*Falconi-Sachs v. LPF Senate Square, LLC*,
142 A.3d 550 (D.C. 2016) ................................................................................................... 25

*Genet v. President of Del. & Hudson Canal*,
136 N.Y. 593 (1893) ........................................................................................................... 17

*Georgia Malone & Co., Inc. v. E & M Assocs.*,
163 A.D.3d 176 (1st Dep't 2018) ......................................................................................... 13

*Gertler v. Goodgold*,
107 A.D.2d 481 (1st Dept 1985).......................................................................................... 17

*Gomez-Jimenez v New York Law Sch.*,
103 A.D.3d 13, 956 N.Y.S.2d 54 (1st Dep't 2012) ............................................................ 20, 28

*Gutkowski v. Steinbrenner*,
680 F. Supp. 2d 602 (S.D.N.Y. 2010)................................................................................... 12

*Harris v. Blockbuster Inc.*,
622 F. Supp. 2d 396 (N.D. Tex. 2009) .................................................................................. 23

*Hunter v. Bd. of Educ. of Montgomery Cty.*,
292 Md. 481, 439 A.2d 582 (1982) ...................................................................................... 20

*In re Knight*,
2017 WL 4410455 (Bankr. D. Conn. Sept. 29, 2017) ............................................................... 5

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) .......................................................................................... 28

*Jallali v. Nova Se. Univ., Inc.*,
992 So. 2d 338 (Fla. Dist. Ct. App. 2008) ............................................................................. 22

iv

*Kaymark v. Bank of America, N.A.,*
783 F.3d 168 (3d. Cir. 2015)................................................................................ 20

*Kel Kim Corp. v. Central Markets, Inc.*,
70 N.Y.2d 900 (1987) .......................................................................................... 23

*Koch v. Acker, Merrall & Condit Co.*,
18 N.Y.3d 940, 944 N.Y.S.2d 452 (2013) ........................................................... 27

*Koenig v. Boulder Brands, Inc.*,
995 F. Supp. 2d 274 (S.D.N.Y. 2014)................................................................... 29

*Lan Sang v. Ming Hai,*
951 F. Supp. 2d 504 (S.D.N.Y. 2013)................................................................... 19

*Lazaroff v. Paraco Gas Corp.*,
38 Misc. 3d 1217[A], 967 N.Y.S.2d 867 (Sup. Ct. Kings Cty 2011) ................... 30

*Legum v. Russo*,
133 A.D.3d 638 (2d Dep't 2015) .......................................................................... 13

*Maas v. Cornell Univ.,*
*94 N.Y.2d 87 (1999)* ........................................................................................... 17

*Mihalakis v. Cabrini Med. Ctr. (CMC)*,
151 A.D.2d 345, 542 N.Y.S.2d 988 (1989) .......................................................... 20

*New York Univ. v. Cont'l Ins. Co.*,
87 N.Y.2d 308, 639 N.Y.S.2d 283 (1995) ............................................................ 28

*Orlander v. Staples, Inc.*,
802 F.3d 289 (2d Cir. 2015).................................................................................. 27

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
85 N.Y.2d 20, 623 N.Y.S.2d 529 (1995) .............................................................. 27

*Paladino v. Adelphi Univ.*,
89 A.D.2d 85, 454 N.Y.S.2d 868 (2nd Dept 1982) ................................................ 7

*Pamela T. v. Marc B.*,
33 Misc.3d 1001 (N.Y. Sup. Ct. N.Y. Cnty. Oct. 7, 2011)...................................... 6

*Papelino v. Albany College of Pharm. of Union Univ.*,
633 F.3d 81(2d Cir. 2011)..................................................................................... 17

*Paynter v. New York Univ.*,
319 N.Y.S.2d 893 (N.Y. App. Div. 1971) ................................................................. 10

*Pelman ex rel. Pelman v. McDonald's Corp.*,
396 F.3d 508 (2d Cir 2005)................................................................................. 27, 30

*Roe v. Loyola Univ. New Orleans*,
2007 WL 4219174 (E.D. La. Nov. 26, 2007) ............................................................ 23

*Sawabeh Info. Servs. Co. v. Brody*,
832 F. Supp. 2d 280 (S.D.N.Y. 2011)....................................................................... 21

*Searle v. Regents of Univ. of California*,
23 Cal. App. 3d 448, 100 Cal. Rptr. 194 (Ct. App. 1972) .......................................... 22

*SHLD, LLC v. Hall*,
2016 WL 659109 (S.D.N.Y. Feb. 17, 2016)............................................................... 26

*Stutman v. Chem. Bank*,
95 N.Y.2d 24, 709 N.Y.S.2d 892 (2000) ................................................................... 28

*Thys v. Fortis Secs. LLC*,
74 A.D. 3d 546 (1st Dep't 2010) .............................................................................. 26

*Trizechahn Gateway, LLC v. Oberdick (In re Oberdick)*,
490 B.R. 687 (Bankr. W.D. Pa. 2013) ........................................................................ 5

*Uddin v. New York Univ.*,
6 N.Y.S.3d 900 (N.Y. App. Term 2014)...................................................................... 5

*Varghese v. China Shenghuo Pharmaceutical Holding, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009)....................................................................... 21

*Village Community School v. Adler*,
478 N.Y.S.2d 546 (Civ. Ct. 1984) ............................................................................ 17

*Villareal v. Chamberlain Coll. of Nursing & Health Scis., Inc.*,
No. CV H-19-0300, 2019 WL 4736488 (S.D. Tex. Sept. 27, 2019) ............................ 21

*Wagner Coll. v. Wagner Coll. Faculty Ass'n, NYSUT, AFT, AFL-CIO*,
No. SP 527/79, 1980 WL 112320 (N.Y. Sup. Ct. May 7, 1980) ................................. 22

*Wilson v. Nw. Mut. Ins. Co.*,
625 F.3d 54 (2d Cir. 2010)...................................................................................... 27

*Xcellence, Inc. v. Arkin Kaplan Rice LLP*,
2011 WL 1002419 (S.D.N.Y. Mar. 15, 2011) ........................................................................ 21

*Zumbrun v. Univ. of S. Cal.*,
25 Cal. App. 3d (1972) ....................................................................................................... 5, 10

*Zwiker v. Lake Super. State Univ.*,
No. 1:20-cv-21813-JEM, Dkt. No. 35-1 (Mich. Ct. Cl. Sept. 1, 2020) ........................................ 14

**Statutes**

26 U.S.C. § 152 ............................................................................................................................ 6

GBL § 349 ............................................................................................................ 26, 27, 28, 29, 30

GBL § 350 ............................................................................................................ 26, 27, 28, 29, 30

N.Y. Domestic Relations Law § 240 ....................................................................................... 6

**Other Authorities**

1 Williston, Contracts § 1:5 [4th ed 1990] .................................................................................. 17

Restatement (Second) of Contracts § 4 ...................................................................................... 17

**Rules**

Fed. R. Civ. P. 8 ................................................................................................................... 24, 27

Fed. R. Civ. P. 9 ......................................................................................................................... 27

Fed. R. Civ. P. 12 ....................................................................................................................... 20

Fed. R. Civ. P. 15 ....................................................................................................................... 30

**Analogous Tuition Refund Orders Nationally**

*Cross v. Univ. of Toledo*,
No. 2020-00274JD, 2020 Ohio Misc. LEXIS 121 (Ct. Cl. July 8, 2020) ...................................... 7

*Garland v. Western Michigan Univ.*,
20-0063-MK (Mi. Ct. Cl. Sept. 15, 2020) .................................................................................... 7

*McDermott v. Ohio State Univ.*,
No. 2020-00286JD, 2020 Ohio Misc. LEXIS 127 (Ct. Cl. Aug. 24, 2020) ................................... 7

*Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*,
2020 Ind. Super. LEXIS 854 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) ............................... 7

*Milanov v. Univ. of Mich.*,
Case No. 20-000056-MK, 2020 Mich. Ct. Cl. LEXIS 1 (Ct. Cl. July 27, 2020)........................... 7

*Rosado v. Barry Univ.,*
1:20-cv-21813-JEM, Order Denying Motion to Dismiss (S.D. Fla. Oct. 30, 2020)................. 7, 26

*Salerno v. Fla. S. Coll.,*
No. 8:20-CV-1494-30SPF, 2020 WL 5583522 (M.D. Fla. Sept. 16, 2020)................................... 7

*Smith v. The Ohio State Univ.,*
2020-00321JD (Oh. Ct. Cl. Sept. 9, 2020)...................................................................................... 7

*Waitt v. Kent State Univ.,*
 2020-00392JD (Oh. Ct. Cl. Sept. 28, 2020).................................................................................... 7

*Zahn v. Ohio Univ.,*
2020-00371JD (Oh. Ct. Cl. Oct. 19, 2020)..................................................................................... 7

**INTRODUCTION**

Rochester Institute of Technology ("RIT" or "Defendant") is among the most expensive universities in the country, with annual tuition and fees exceeding $45,000 per year. Even after grants and scholarships, the average net cost of attendance for RIT students is over $33,000 per year, meaning the average student pays more than $132,000 during a four-year enrollment.[1] Yet, the median family income for an RIT student is under $100,000,[2] requiring 3 out of 4 RIT students to finance their RIT education via student loans.[3] The average total indebtedness for the 2019 graduating class was just under $40,000.[4]

In operating, Defendant must attract students to its University, and convince them to pay more than $130,000 over the course of their education, substantially with borrowed money. The student consumers must find Defendant's product compelling enough to borrow and spend this money. To this end, Defendant markets a first-rate student experience, highlighting its campus, "sophisticated facilities", "emphasis on experiential learning," "vibrant campus life," and other benefits of in-person enrollment.

Defendant generates most of its revenues from direct student tuition and fee payments – over $313 million in 2019 alone.[5] Defendant now argues that it promises students essentially nothing in return, besides simply credits and a degree. Instead, Defendant suggests that it does not

---

[1] https://nces.ed.gov/collegenavigator/?q=rochester+institute+of+technology&s=all&id=195003#netprc (Accessed Nov. 2, 2020).

[2] https://www.nytimes.com/interactive/projects/college-mobility/rochester-institute-of-technology (Accessed Nov. 2, 2020).

[3] https://www.usnews.com/best-colleges/rit-2806/paying (Accessed Nov. 2, 2020).

[4] *Id*.

[5] Rochester Institute of Technology, "Consolidated Financial Statements," *available at*, https://www.rit.edu/fa/controller/sites/rit.edu.fa.controller/files/files/docs/FY19%20RIT%20Financial%20Statements_Final.pdf (Nov. 2, 2020).

1

differ from Phoenix University Online (where yearly tuition and fees are just over $10,000). Specifically, Defendant argues that notwithstanding its marketing materials; notwithstanding its catalogs, circulars and bulletins; notwithstanding its registration platform; and notwithstanding its 190-year prior course of conduct, it never offered to provide in-person instruction, never promised to provide access to campus facilities or student activities, and has never obligated itself to do anything in exchange for the hundreds of millions of dollars it has collected from students.  Instead, Defendant contends that it should be free to keep all the money that students pre-paid for the spring 2020 semester, even though Defendant evicted students and closed campus for nearly half the semester.  More troubling, Defendant argues this is just and equitable.  It is not.

## FACTUAL BACKGROUND

Plaintiffs' allegations are straightforward.[6]  The Complaint alleges that students have multiple options when making the decision about enrolling in college.  ¶¶ 19-21.  To persuade prospective students to choose its school over others, Defendant engages in an aggressive marketing campaign, highlighting RIT's on-campus student experience, and Defendant's focus on "experiential learning."  ¶ 26.  In recruiting students, Defendant promises, among many other things, "experiential learning [that] enables students to apply what they've learned through lectures, labs, assignments, and projects to a variety of rich experiences outside the classroom," ¶ 26; "a vibrant, connected community that is home to…sophisticated facilities," ¶ 69; the opportunity to learn "hands-on skills that become the foundation of scientific research," ¶71; "a vibrant campus life," ¶73; "300+ clubs and organizations," ¶ 75; "13,000+ on-campus and off-

---

[6] All references and citations to the "Complaint" and "¶" in this Memorandum refer to Plaintiffs' Consolidated Amended Class Action Complaint, filed September 3, 2020 [ECF 14], which is the operative Complaint in this action.

campus events," *id.*; "27 theatre, dance, music, or other arts organizations perform on campus," *id.*; "21 locations for dining options on campus," *id.*; "31 diverse inter/national social fraternities and sororities," *id.*; "access to some of the finest laboratories, technology and computing facilities available on any university campus, " ¶81; "over 100 recreational opportunities per semester," ¶ 94; and "a post office, laundry rooms, computer labs and game rooms, and fitness facilities." ¶ 96.

Plaintiff Bergeron was enrolled at RIT for the Spring 2020 semester. ¶ 10. Plaintiff Mycek is the parent of a similarly enrolled student, who paid tuition and fees on behalf of her child. Plaintiffs attended Defendant's institution over many other colleges and universities, and accepted Defendant's offer of admission for the educational experiences promised above. ¶ 27. Plaintiffs paid all required tuition before the start of the Spring 2020 semester. ¶ 18. In its student handbook, Defendant specifically defines "tuition" as not just the cost of academic instruction, but also payments for "an abundance of services" including "academic buildings, library and service departments." ¶ 87. Besides tuition, Defendant charges certain mandatory fees including a student activity fee and a student health services fee. ¶ 30. The student activity fee is specifically charged in exchange for the provision of "programs, events, and services that enhance the quality of student life at RIT." ¶ 31. The student health services fee is specifically charged to provide student access for "office visits and many of the basic [health] services students may need." ¶ 32. Plaintiffs paid all mandatory fees for the Spring 2020 semester. ¶ 30.

When Plaintiffs paid these tuition and fees, they entered into legally binding contracts with Defendant. ¶¶ 59, 144. The parties began performance under the contract. Upon enrollment, Plaintiffs registered for classes through an online portal that specifically identified classes to be taught in physical classroom locations. ¶ 103. Each day for the first half of the semester, Plaintiffs

3

attended in-person classes in physical classrooms on campus. ¶ 107.  Each day for the first half of the semester, Plaintiff had full access to campus. ¶ 109.

However, mid-way through the semester, Defendant breached the contract.  ¶¶ 112, 147. Specifically, Defendant suspended all in-person classes, transitioning to an online-only format, and required students to vacate campus and return to their permanent homes. ¶ 37.  The campus shut-down continued for the remainder of the semester.

When Defendant closed campus and evicted students, Plaintiffs and other similarly-situated students did not receive the on-campus experience they were promised and for which they paid tuition, nor the benefits and services for which they paid additional fees.  ¶¶ 116, 150.  Yet Defendant has refused to reduce or refund the pre-paid tuition and fees accordingly, leaving students and parents like Plaintiffs with no other option but to seek legal relief.

**ARGUMENT**

## I.  PLAINTIFFS HAVE STANDING

Defendant first alleges that Plaintiffs lack standing.  Specific to Plaintiff Bergeron, Defendant argues, that Mr. Bergeron did not actually pay any tuition or fees because "[h]is tuition and fees were paid entirely through an outside scholarship and an RIT grant."  This is simply incorrect.  Plaintiff Bergeron's bill from RIT for the Spring semester was $27,779.[7]  He received a combined $23,242.50 in scholarships and grants.  Accordingly, he was personally responsible for payment of $4,536.50, some of which he paid directly out of pocket and some of which he financed through student loans (for which he is personally responsible and will have to re-pay). Defendant's argument is based upon creative accounting.  Specifically, Defendant's argument presupposes that 100% of the scholarships and grants were applied to tuition and fees.  However,

---

[7] This includes $22,454 in tuition, $413 in fees, and $4,912 for university housing.

4

this is not true. Defendant admittedly applied a significant portion of the RIT grant to Plaintiff

Bergeron's housing costs. Defendant then used this application to reduce his housing refund.[8]

Defendant cannot have it both ways by now arguing the opposite.

As to Plaintiff Mycek, the parent of a student, Defendant argues, "[i]t is axiomatic that

Mycek and other parents of adult RIT students lack standing…" Def. Mem. [ECF 22] at pg. 6.

That is wrong. Courts, including New York courts, have allowed tuition-paying parents to sue

educational institutions for "reimbursement of tuition payments made by [a parent] on behalf of

his son." *Uddin v. New York Univ.*, 6 N.Y.S.3d 900, 900-01 (N.Y. App. Term 2014)(holding

parent plaintiff stated "a viable breach of contract claim"); *Zumbrun v. Univ. of S. Cal.*, 25 Cal.

App. 3d 1, 11 (1972)(recognizing that a non-minimal "departure from a projected course of study"

would "entitle the student (*or his parent who paid for it*) to recover the tuition paid or any part of

it.") (emphasis added). This result makes good sense, as courts recognize that a custom exists in

which parents are expected to pay for the University tuition of their children. *In re Knight*, 2017

WL 4410455, * 4 (Bankr. D. Conn. Sept. 29, 2017)("[College Tuition] payments fulfill a parent's

social obligation to maintain their family unit."); *Trizechahn Gateway, LLC v. Oberdick (In re

Oberdick)*, 490 B.R. 687, 712 (Bankr. W.D. Pa. 2013)(referencing "a societal expectation that

parents will assist with such expense if they are able to do so."). And it is well-established that

college students are typically not financially independent. *See, e.g.*, N.Y. Domestic Relations Law

---

[8] In light of COVID-19, Defendant announced that it would provide students moving out by April 5, 2020 a 50% credit for housing charges. However, Defendant resolved to "adjust" these credits "by the need-based financial aid provided to students." In other words, if a student used institutional aid to help pay for housing costs, their 50% credit would be reduced accordingly. Plaintiff Bergeron moved out prior to April 5, 2020. However, his housing credit was only $1,705.69 (where 50% should have been $2,456). Defendant accomplished this by applying a portion of his RIT grant to his housing charges, as opposed to tuition and fees.

§ 240(1-b)(b)(2) (requiring child support payments through age 21); 26 U.S.C. § 152(c)(3)(A)(ii) (defining "dependent" to include "a student who has not attained the age of 24 at the close of such calendar year"). Indeed, New York courts have the power to "require … the present or future provision of post-secondary … education for the child." N.Y. Domestic Relations Law § 240(1-b)(c)(7); *see also Pamela T. v. Marc B.*, 33 Misc.3d 1001, 1014 (N.Y. Sup. Ct. N.Y. Cnty. Oct. 7, 2011)(requiring father to pay for son's education at Syracuse University). Thus, Defendant knew full well who was paying its students' tuition. Defendant reaped the benefits of these tuition payments made by parents and now attempts to escape liability for the breach of the promises that induced these payments. If a parent can be required to pay tuition, it is logical that a parent should be able to sue a university for a failure to provide the services that were promised in exchange for that tuition. *See, e.g.*, *Ericson v. Syracuse Univ.*, 35 F. Supp. 2d 326, 328, 330-31 (S.D.N.Y. 1999) (Rakoff, J.) (parents of former Syracuse tennis players were permitted to bring claims for alleged sexual harassment of their daughters).

Defendant relies on case law that establishes an implied contract exists between universities and its students, That is not at dispute here. However, Defendant wants this Court to make an unprecedented finding that, because universities can enter implied contracts with students, it somehow prohibits them from entering into implied contracts with any other person, such as the parents paying tuition on behalf of a student. There is no authority for such a finding.

## II. PLAINTIFFS DO NOT ALLEGE EDUCATIONAL MALPRACTICE

Unable to seriously refute Plaintiffs' well-pleaded allegations stating a straightforward claim for breach of contract, Defendant primarily attacks a straw man by mischaracterizing Plaintiffs' claims as raising claims for educational malpractice. In doing so, Defendant advances an argument rejected by every court to have considered similar claims in this context. Indeed, there are approximately 150 lawsuits currently pending throughout the country related to the

failure of colleges and universities to provide appropriate refunds after switching to remote instruction during the spring of 2020.  Although Defendant characterizes these lawsuits as alleging "educational malpractice," no court has yet to agree.  Instead, of the ten cases where these arguments have been advanced and fully adjudicated, all ten motions to dismiss similar complaints have been denied.[9]  Similar to the plaintiffs in those cases, Plaintiff here does not seek remedy for educational malpractice. ¶ 113.

The gravamen of an educational malpractice claim is the allegation that a school failed to provide an effective education. *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998).  Thus, an educational malpractice claim is one that "sound[s] in tort and ask[s] the Court to involve itself in the subjective professional judgments of trained educators." *Id*.

Not every action by a student against a school is an educational malpractice claim.  Where the breach of contract claim does not allege that "that the school breached its agreement by failing to provide an effective education," but instead alleges failure to provide other specified services, the action may be properly maintained.  *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 92, 454 N.Y.S.2d 868 (2nd Dept 1982)("[I]f the contract with the school were to provide for certain specified services . . . for example, a designated number of hours of instruction, and the school

---

[9] *See Salerno v. Fla. S. Coll.,* No. 8:20-CV-1494-30SPF, 2020 WL 5583522 (M.D. Fla. Sept. 16, 2020) (Ex. A); *Milanov v. Univ. of Mich.*, Case No. 20-000056-MK, 2020 Mich. Ct. Cl. LEXIS 1 (Ct. Cl. July 27, 2020) (Ex. B); *McDermott v. Ohio State Univ.*, No. 2020-00286JD, 2020 Ohio Misc. LEXIS 127 (Ct. Cl. Aug. 24, 2020) (Ex. C); *Cross v. Univ. of Toledo*, No. 2020-00274JD, 2020 Ohio Misc. LEXIS 121 (Ct. Cl. July 8, 2020) (Ex. D); *Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*, 2020 Ind. Super. LEXIS 854 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) (Ex. E); *Waitt v. Kent State Univ.,* 2020-00392JD (Oh. Ct. Cl. Sept. 28, 2020) (Ex. F); *Garland v. Western Michigan Univ.*, 20-0063-MK (Mi. Ct. Cl. Sept. 15, 2020) (Ex. G); *Smith v. The Ohio State Univ.,* 2020-00321JD (Oh. Ct. Cl. Sept. 9, 2020) (Ex. H); *Zahn v. Ohio Univ.,* 2020-00371JD (Oh. Ct. Cl. Oct. 19, 2020) (Ex. I); *Rosado v. Barry Univ.*, 1:20-cv-21813-JEM, Order Denying Motion to Dismiss (S.D. Fla. Oct. 30, 2020)(Exhibit J).

failed to meet its obligation, then a contract action with appropriate consequential damages might be viable.").

*Ansari v. New York University*, 1997 WL 257473 (S.D.N.Y. May 16, 1997) is instructive. In *Ansari*, the court determined that promotional literature and written and oral communications between defendant and plaintiff comprised the terms of a contract and were the equivalent of promises that bound the university. *Id.* at *3. These materials included promises to provide state-of-the-art facilities, hands-on training, and program activities from 9:00am to 4:00pm every day. *Id.* The plaintiff alleged that defendant failed to deliver the hand-on training and facilities promised. Defendant argued that it delivered substantially what it promised, and the deviations alleged by plaintiff were insubstantial. *Id.* at *4. The court determined that New York law did not require it to review any educational decisions because the fact-finding was limited to whether the promises represented by the institution were provided, and denied the motion to dismiss. *Id.* at *3 ("Plaintiff's claim does not require an evaluation of uniquely professional academic decisions such as the adequacy of the courses or methods of instruction. Rather, plaintiff's claim requires an evaluation of whether defendants promised to provide services and failed to do so."); *see also Deen v. New School University*, 2007 WL 1032295, at *3-4 & n.5 (S.D.N.Y. Mar. 27, 2007) (denying defendant's motion for summary judgment against student plaintiff's breach of contract claims and noting the claims were not rooted in educational malpractice); *Novio v. New York Academy of Art*, 317 F. Supp. 3d 803, 811-14 (S.D.N.Y. 2018) (denying defendant's motion to dismiss student plaintiff's breach of contract claims and finding the claims were not rooted in educational malpractice; *Village Community School v. Adler*, 124 Misc. 2d 817, 820 (N.Y. City Civ. Ct. 1984) (same).

Just as in *Ansari*, *Deen*, *Novio*, and *Adler,* Plaintiffs' claims do not allege educational malpractice. Rather, Plaintiffs allege that they provided payment in the form of tuition and fees and Defendant, in exchange, contracted to provide "live, in-person education, together with a full on-campus experience." ¶ 110. Plaintiffs allege that live, in-person education, together with a full on-campus experience included access to campus buildings (including the buildings where classes were scheduled to ("[m]eet"), participation in on-campus activities, hands-on training and face-to-face instruction, and numerous other services and opportunities, as promised by Defendant. ¶ 25. It is undisputed that Defendant filed to provide these things from March 15, 2020 through the end of the Spring Semester 2020, and instead provided Plaintiffs with online remote learning devoid of any in-person or on-campus experience. ¶¶ 37-38. Plaintiffs' allegations do not ask the Court to review the educational decisions made by Defendant.

Defendant's opposition seems rooted in Defendant's incorrect understanding of Plaintiffs' claims. Plaintiffs are not suing because they claim they received a lower quality education, although they did. Instead, the Complaint alleges that when students pay tens of thousands of dollars to enroll in schools perhaps hundreds or thousands of miles from their home, they are purchasing an on-campus educational experience with multiple appurtenant benefits, services, access and opportunities. And students did not receive that bargained for experience. Once the switch to online learning was mandated, not even the best professor exercising the best academic judgment could have given the students that which they were deprived and that which forms the basis of this lawsuit – the on-campus experience for which they had bargained and paid handsomely – a distinctly non-academic thing.

In ignoring the ten recent decisions issued nationally that are directly on-point (Exhibits A-J), Defendant relies instead upon a fifty-year old appeal of a small claims court decision, *Paynter*

*v. New York Univ.*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971)).  As an initial matter, *Paynter* involves review of a final judgment, not a motion to dismiss.  In *Paynter*, classes were suspended on May 7, 1970 until the examination period after the tragic shooting at Kent State University. The Appellate Term reversed a judgment by the small claims court that held the University was altogether unjustified in cancelling the classes, which is not the issue here. The reversal was a mere two paragraphs and was issued, it seems, in response to a lengthy opinion by the small claims court that could be described only as a misplaced educational manifesto.  In denying relief, the court explained this "***insubstantial change*** made in the schedule of classes does not permit a recovery of tuition." *Id*. at 894.  As explained by the California appellate court analyzing *Paynter*, "whether the partial failure of consideration was minimal so as to render applicable the maxim 'de minimis non curat lex' or whether it justifies refund of a portion of the tuition and fee allocable to the course is a matter of proof, under the present state of the pleadings, at trial in an appropriate forum." *Zumbrun v. Univ. of S. Cal.*, 101 Cal. Rptr. 499, 505 (1972).  Thus, *Paynter* supports Plaintiffs' position that this case should be heard on the merits.  In any event, it differs in that unlike the present case, it involved a suspension of only a few days of courses, not half of a semester.

Despite Defendant's protestations to the contrary, this is a straightforward action subject to well-established principles of contract law.  Ultimately, and after the benefit of discovery, a jury must decide whether Defendant followed through on what it promised, *i.e.* did the students get what they paid for? This Court should not recast Plaintiffs' claims into something that they are not.

## III.PLAINTIFFS STATE A CLAIM FOR BREACH OF CONTRACT

### A.  The SFRA Does Not Govern

Defendant contends that "[t]he only specific promise relevant to this dispute is *Plaintiffs'* promise to pay tuition and fees upon registration or receipt of services." Def. Mem. [ECF 22] at

10

11. Essentially, then, Defendant's position is that this Student Financial Responsibility Agreement ("SFRA") forms an express written contract, and that such contract expresses the entire agreement between the parties, to the exclusion of any other agreement, implied or otherwise.  This argument fails for the following reasons.

### 1.  The SFRA is Not a Contract

As an initial matter, the SFRA cannot be a contract at all because it lacks mutual consideration. "A contract lacks consideration when the obligation of one party is illusory, meaning only one side is bound to perform." *Coleman v. System Dialing LLC*, 2016 WL 3387748, at *3 (S.D.N.Y. June 17, 2016).

Here the SFRA imposes no obligation on Defendant. The SFRA reads, in pertinent part. "I understand that when I register for any class at the Rochester Institute of Technology (RIT; university), or receive any service from RIT . . . I accept full responsibility to pay all tuition, fees and other associated costs assessed at any time as a result of my registration and/or receipt of services." SFRA at 1. While the document purports to bind the student to pay all *associated* costs as a result of receipt of services, the document does not actually require Defendant to provide any benefits or services in exchange for such payment.

There is no indication within the SFRA that the University intends to be bound by any of its terms. Indeed, while the document is styled as an "agreement," it is, in reality, merely a one-sided "acknowledgment" on the part of the student (such as Plaintiffs and Class members) regarding a student's financial obligations, plus additional acknowledgments—*all by the student*—regarding the University's rights to take certain actions in furtherance of collection in the event of a student's delinquency.

Assuming, *arguendo*, that the student's promise to pay costs associated with services actually obligates Defendant to provide those services, the document fails to address numerous

materials terms. "In New York, a contract must be sufficiently definite to be enforceable." *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602 (S.D.N.Y. 2010). "A 'material term' in a contract is a contractual provision dealing with a significant legal issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 392 (E.D.N.Y. 2015).

Here, the SFRA contains no material terms at all. The document fails to address what (if any) services Defendant will provide or the duration that such services will be provided. Furthermore, the document fails to even establish the price that will be paid for the undefined services. Indeed, under the literal reading of the document, once a student registers for classes, Defendant can provide *any* service, no matter how small, and the student then becomes liable to pay *any* amount charged by Defendant as a result.

More troubling, the document fails to set forth the rights or remedies of either party with respect to the services rendered. For example, the document does not even contemplate the conferral of a degree – an important reason students would seek educational services in the first instance. According to Defendant, its students could show up to class every day for four years, follow all the rules, pass all required classes, and just prior to graduation, be denied a degree for no reason at all. This is not only contrary to common sense and well-established contract law, it is contrary to public policy and New York's long-standing educational jurisprudent which has held, "[w]hen a student is duly admitted by a private university . . . there is an implied contract between the student and the university that, if he complies with the terms prescribed by the university, he will obtain the degree which he sought. The university cannot take the student's money, allow him to remain and waste his time in whole or in part . . . and then arbitrarily . . . refuse, when the has completed the required courses, to confer on him that which it promised, namely, the degree."

12

*Carr v. St. John's Univ.*, 17 A.D.2d 632, 633 (2d Dep't 1962). For these reasons, the SFRA is not a contract at all.

### 2.   The SFRA is Ambiguous and Incomplete

Even if the SFRA evidences a *portion* of the overall contract between Defendant and its students, it cannot, as Defendant suggests, form the *complete* agreement, such as to prohibit the consideration of extrinsic evidence. This is true even though the document purports to contain a merger and integration clause.

As noted above, the document fails to define the nature or scope of the services to be offered or the price to be charged therefore. As such, if it forms a contract at all, the terms of the contract are incomplete an ambiguous. "[A] contract is ambiguous when 'read as a whole, [it] fails to disclose its purpose and the parties' intent.'" *Georgia Malone & Co., Inc. v. E & M Assocs.*, 163 A.D.3d 176, 185 (1st Dep't 2018) (citing *Brooke Group v. JCH Syndicate 488*, 87 N.Y.2d 530, 663 N.E.2d 635 (1996)). "Where a contract is ambiguous, extrinsic evidence may be considered to determine the parties' intent." *Legum v. Russo*, 133 A.D.3d 638, 639 (2d Dep't 2015).

Here, the Complaint alleges numerous facts which, if true (as they must be deemed for purposes of this motion), support Plaintiffs' claims. These facts do not contradict the SFRA, but simply resolve its ambiguity and/or fill in its missing essential terms, namely, the type of services for which the students agreed to pay tuition. In interpreting an ambiguous written document where "'the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact.'" *Cty. of Nassau v. Tech. Ins. Co.*, 174 A.D.3d 847, 849 (2d Dep't 2019)(quoting *Amusement Bus. Underwriters v. American Intl. Group*, 66 N.Y.2d 878, 880 (1985)).

Defendant suggests that this case is analogous to the recently issued opinion by the Michigan Court of Claims in *Zwiker v. Lake Super. State Univ.*, No. 1:20-cv-21813-JEM, Dkt. No.

13

35-1 at 9 (Mich. Ct. Cl. Sept. 1, 2020).  However, Defendant's reliance is entirely misplaced. The legal issue before the *Zwiker* court was not akin to the issue before this court. In *Zwiker*, the plaintiffs conceded that a "Tuition Contract" was *the* valid, binding, and controlling agreement between the parties. *See*, *id.* at pg. 9 ("In arguing for a different outcome, plaintiff has not disputed the existence of the Tuition Contract, nor has she disputed that the document controls the parties' relationship.") Here, Plaintiffs concede neither point.

Plaintiffs are aware of other recently issued opinions that track the facts of *Zwiker*.  *See, e.g.*, *Chong v. Northeastern University*, No. 20-cv-10844-RGS, 2020 WL 5847626 (D. Mass. Oct. 1, 2020); *Horrigan v. E. Mich. Univ.*, 2020 Mich. Ct. Cl. LEXIS 4 (Mich. Ct. Cl. Sept. 24, 2020). However, each case bears the same admission from plaintiffs.  For example, in *Chong*, the plaintiff conceded the existence and applicability of a Financial Responsibility Agreement and pled that the Financial Responsibility Agreement was the contract that gave rise to the entitlement for in-person instruction. *Chong* at pg. 6. Then, in opposing the Motion to Dismiss, the *Chong* plaintiff pivoted to an argument more akin to the arguments made here. However, the Court was not permitted to consider those arguments because they were not set forth in the Complaint. *Id.* at pg. 8 ("In their oppositional briefing, plaintiffs attempt to rectify their pleading deficiencies . . . The court cannot consider this evidence, however, because the [Second Amended Complaint] makes no mention [of it]." Importantly, the Court did not reject these arguments. Instead, the dismissal was issued **without prejudice**, indicating the Court's belief that such arguments had merit and that a future complaint on those grounds would not be futile.  As such, and as with *Zwiker*, *Chong* and other cases in which plaintiffs base their allegations upon the existence and governance of a Financial Responsibility Agreement are not instructive to the present action where Plaintiffs' allegations differ dramatically.

14

Finally, it should be noted that even if the SFRA were deemed to be an unambiguous, complete, and enforceable contract, it is undisputed that the document contains no price term. Under that circumstance, New York courts presume a reasonable price was intended. *See Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989). That is exactly what Plaintiffs seek – a partial, pro-rated refund to account for the reasonable value of the product they actually received.

### 3. Plaintiffs' Claims Fall Outside the Scope of the SFRA

For similar reasons as to why the SFRA lacks consideration, so too does the SFRA lack applicability here.  Even Defendant admits that the SFRA contains no obligations under which it could be sued. Def. Memo [ECF 22] at pg. 11. ("Nowhere in the SFRA…is there any promise that RIT would guarantee in-person instruction."). This is not surprising, because RIT guarantees *nothing* in the SFRA.  Said another way, the SFRA is not applicable to Plaintiffs' claims because there are no obligations therein on which a claim for breach can be made. The SFRA contains obligations only of the students, and only as it relates to making payments to the Defendant for tuition and fees.

The scope of the SFRA is limited to an applicant's promise to pay, and nothing further. Indeed, the agreement expressly states that it is an agreement "*with respect to the matters described*." SFRA at 3 (emphasis added). Thus, it is not the sole agreement between the parties. Rather, Defendant's specific promises to students about its educational services are set forth in or implied from other materials like the Course Catalog, its various Policies and Procedures, and its course-specific syllabi.

Furthermore, the SFRA only supersedes an applicant's "*prior* understandings, representations, negotiations and correspondence between the student and RIT." *Id.* (emphasis added). Thus, the text contemplates that all subsequent understandings and representations

15

between the parties (such as those made in the Course Catalog about classes offered in the Spring 2020 semester) are not superseded by the SFRA.  Thus, SFRA is not a bar to Plaintiffs' claims.

### 4.    Plaintiffs' Claims Also Fall Outside the Scope of the RIT's "Refund Policy"

Defendant's "Refund/Tuition Adjustment Policy" is no more instructive, as it has nothing to do with this case.  Instead, the policy sets forth the way that refunds will be handled when a student withdraws from a class or takes a leave of absence from the school.  Plaintiffs have not withdrawn or taken a leave of absence.  This policy contemplates a scenario where the student elects to break the contract.  It speaks nothing of what happens when the Defendant breaches the contract.  The distinction turns on whether the University is willing and able to provide the service and the student just elects not to accept it, or whether the University does not provide the service at all.

Defendant suggests that "RIT made no promise to refund tuition or fees in any other circumstances [besides those set forth in the refund policy]." Def. mem. [ECF 22] at pg. 12. Defendant misses the point.  Defendant was not required to provide for *any* refunds in the face of a breach by its students (i.e. voluntary withdrawal).  That it provided for such refunds under certain circumstances was nice.  However, it does not relieve Defendant of its own obligation to perform. A party to a contract is contractually bound to perform under that contract.  That is the point of a contract.  That Defendant did not "promise" to provide refunds in the face of Defendant's own breach is of no consequence.  Contracting parties rarely make such promises.  This is the purpose of civil law and breach of contract actions such as the one brought by Plaintiffs.  A party need not promise to make the other party whole in the event of a breach for a contract to be enforceable. Such damages operate as a matter of law, not by agreement.

16

## B. Plaintiffs Have Identified a Legally Specific Contract

In New York, and elsewhere, the relationship between a student and university is contractual. *See, e.g., Papelino v. Albany College of Pharm. of Union Univ.*, 633 F.3d 81(2d Cir. 2011). However, there is rarely an express, written, fully integrated contract. Instead, that contractual relationship is in part implied and in part as set forth in the amalgamation of various documents, handbooks, catalogs, agreements, advertisements, and other publications. The terms of the contract will also be implied through spoken words, actions, and course of dealing. *See Village Community School v. Adler*, 478 N.Y.S.2d 546 (Civ. Ct. 1984)(refusing to dismiss Adler's counterclaim for breach of contract based on oral representations from the school's agents); *Maas v. Cornell Univ.,* 94 N.Y.2d 87, 93 (1999)(a contract "may be stated in words either oral or written, or may be inferred wholly or partly from conduct,") (quoting Restatement (Second) of Contracts § 4). The *Maas* Court noted "[a]n implied-in-fact contract would arise from a mutual agreement and an 'intent to promise, when the agreement and promise simply have not been expressed in words'" *Id*. (quoting 1 Williston, Contracts § 1:5, at 20 [4th ed 1990]).

Promises may be implied "where [the court] may rightfully assume that it would have been made if attention had been drawn to it…and that it is to be raised only to enforce a manifest equity, or to reach a result which the unequivocal acts of the parties indicate they intended to effect." *Gertler v. Goodgold*, 107 A.D.2d 481, 485 (1st Dept 1985)(quoting *Genet v. President of Del. & Hudson Canal*, 136 N.Y. 593, 609 (1893)).

Here, there is no doubt that the parties unequivocally intended for students to take classes in person and on Defendant's physical campus. This is clear not only from the specific statements set forth in the Complaint and summarized in the Factual Background above, but also from the parties' prior course of conduct as likewise set forth. The Court may rightfully assume that Defendant would have made the specific promise had attention been drawn to it. It would be

17

disingenuous for Defendant to suggest that, prior to COVID-19, its official response to students asking if classes were provided in-person would have been "no." Indeed, prior to COVID-19, traditional students were *prohibited* from registering for online classes. ¶ 22. This action also seeks to prevent the manifest inequity where the Plaintiffs, on the one hand, paid tens or hundreds of thousands of dollars (mostly by incurring debt) to attend RIT, and the Defendant, on the other hand, is secured by a nearly $1 billion endowment.

Defendant argues that Plaintiffs cannot prevail because they have failed to identify a contract whereby "RIT would exclusively provide in-person instruction and on-campus activities *despite the on-set of a global pandemic and government stay-at-home orders*." Def. Mem. [ECF 22] at pg. 13. Here, Defendant seeks to require an absurd level of specificity not required by law with respect to contract formation.

That absurdity aside, Defendant's argument actually conflates multiple legal issues. For example, Defendant misconstrues the distinction between disclaimers and contractual expressions. Plaintiffs do not allege that they entered into a contract whereby they would pay tuition and fees and, in exchange, Defendant would provide an on-campus educational experience *despite the on-set of a global pandemic and government stay-at-home orders*. Plaintiffs simply allege that they and entered into a contract whereby they would pay tuition and fees and, in exchange, Defendant would provide an on-campus educational experience. That the on-set of a global pandemic occurred after the fact does not change the terms of the contract. Parties do not "disclaim" in the affirmative, they can only "disclaim" in the negative. Here, Defendant did not do so, which is exactly the point entitling Plaintiffs to relief under the law.

Likewise, Defendant confuses the issues of contract formation and contract enforceability. If an event occurring after contract formation renders the contract impossible or impracticable to

18

perform, such impossibility or impracticability does not negate the fact that a contract otherwise was formed. Instead, such events simply create for the Defendant an affirmative defense to argue for avoidance of its performance under the terms of the contract. The issue of impossibility is discussed in greater detail in Section IV, but in short, this is a question of fact, on which Defendant bears the burden of proof. Therefore, it could never be a basis for dismissal based on the legal standard under which Defendant brings its motion. Even in the case of contractual avoidance, equitable remedies remain available to Plaintiffs, such as restitution. Even if Defendant could prove avoidance, and prevail on that issue, Defendant does not get to keep all the money. Nonetheless, these affirmative avoidance defenses have nothing to do with the actual creation or existence of the contract to begin with.

### C. Plaintiffs Have Alleged Cognizable Damages

Defendant next argues that Plaintiffs' "alleged damages are impermissibly speculative." Def Mem. [ECF 22] at pg. 23. This argument is both incorrect and pre-mature. In making this argument, Defendant attempts, yet again, to suggest that Plaintiffs' claims sound in educational malpractice, and that the damages stemming therefrom would require this Court to value the quality of the education received. *Id.* As aforementioned, there is a clear distinction between the claims brought forth by Plaintiffs, i.e., paying for one product and receiving something materially different, as compared to an educational malpractice claim in regard to the quality of education provided.

In any event, the argument is premature. "At the pleading stage, a plaintiff alleging breach of contract" need only "allege the terms of the contract, each element of the alleged breach and the resultant damages *in a plain and simple fashion*." *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 527 (S.D.N.Y. 2013) (emphasis added). In fact, "[t]hat damages are uncertain, or may not even exist, is an insufficient reason under New York law to grant Defendant's motion for summary judgment,"

19

let alone a motion to dismiss. *Acumen Re Mgmt. Corp. v. General Sec. Nat'l Ins. Co.*, 2012 WL 3890128, at \*11 (S.D.N.Y. Sept. 7, 2012).

As courts across the country have noted, particularly at the 12(b)(6) stage, "[t]he test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages.... Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the *amount.*" *Kaymark v. Bank of America, N.A.,* 783 F.3d 168, 181 (3d. Cir. 2015)(original emphasis). The cases cited by Defendant bear this out, as each case was dismissed not because the amount of damages was found to be speculative, but because the existence of damage itself was not evident.[10]

Here, Plaintiffs allege that they paid for a product (¶¶ 18, 30), that Defendant provided a materially different product (¶ 116), and that they were damaged as a result, in as much as they were deprived of the value of the benefits, services and/or programs for which he paid (¶¶ 119, 150). Moreover, the Complaint establishes that Defendant, itself, values the products differently,

---

[10] *See Gomez-Jimenez v New York Law Sch.*, 103 A.D.3d 13, 956 N.Y.S.2d 54 (1st Dep't 2012), aff'd, 103 A.D.3d 13, 956 N.Y.S.2d 54 (2012)(involved a GBL and fraud action, not breach of contract. Court held, "plaintiffs' [GBL] claim fails to satisfy the statute's requirement that the actual injury each plaintiff sustained as a result of the misleading statements be identified. In other words, the existence of damage was not evident.); *Mihalakis v. Cabrini Med. Ctr. (CMC)*, 151 A.D.2d 345, 542 N.Y.S.2d 988 (1989)(breach of contract action dismissed due to NLRA pre-emption, not speculative damages. Fraud action dismissed because "[the complaint] not allege facts from which can be inferred any pecuniary, out-of-pocket losses as a direct result of the wrong."); *Hunter v. Bd. of Educ. of Montgomery Cty.*, 292 Md. 481, 439 A.2d 582 (1982)(pure educational malpractice claim dismissed because "no reasonable degree of certainty that ... plaintiff suffered injury…and no perceptible connection between the defendant's conduct and the injury suffered.); *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468 (Minn. Ct. App. 1999)(same, noting "the inherent uncertainties about causation and the nature of damages in light of such intervening factors as a student's attitude, motivation, temperament, past experience, and home environment.").

20

and charges 36%-43% less for the product it provided vs. the product for which Plaintiffs contracted.  ¶ 24.  Nothing more is required. *See Xcellence, Inc. v. Arkin Kaplan Rice LLP*, 2011 WL 1002419, at \*5 (S.D.N.Y. Mar. 15, 2011). ("Arkin alleges that it was 'damaged in an amount to be determined at trial' and specifies that it paid two invoices. This general pleading that Arkin suffered damages is sufficient to withstand a motion to dismiss.") *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 309-10 (S.D.N.Y. 2011) (same); *Varghese v. China Shenghuo Pharmaceutical Holding, Inc.*, 672 F. Supp. 2d 596, 611 (S.D.N.Y. 2009) (same).

### D.  Defendant's Reliance on Disclaimers Fails

In a final attempt to evade responsibility, Defendant relies upon two all-encompassing yet strikingly ambiguous and unenforceable disclaimers.  First, Defendant argues that its website contains a general disclaimer stating, "nothing on the rit.edu website is intended to be a … contract of any kind." Def. Mem [ECF 22] at pg. 13.  Of course, Defendant ignores the fact that Plaintiffs' claims are premised not only on statements from the website, but also statements from the student handbook and the course catalog, together with descriptions in the registration portal and the parties' prior course of dealing.  Even so, this general disclaimer as to the website offers Defendant no protection.  As the Court stated in *Gally*, "[t]he Court rejects defendant's argument that no contract existed between plaintiff and [the school] because the [school] bulletin contained a contract disclaimer.  While [the school] could disclaim the existence of a specific promise through the use of such a disclaimer, it could not unilaterally disclaim all contractual relations." *Gally*, 22 F.Supp.2d at n. 7.  *See also Villareal v. Chamberlain Coll. of Nursing & Health Scis., Inc.*, No. CV H-19-0300, 2019 WL 4736488 at \*3 (S.D. Tex. Sept. 27, 2019) (holding that catalog might not form a binding contract where catalog reserves the right to change terms and conditions, but finding "the terms of the Academic Catalog form the foundation of the parties' contractual

21

relationship regardless of whether it is the actual contract...or whether it sets forth the terms of an implied contract.").

Defendant's reliance on RIT Bulletin 491 fares no better. There, Defendant purports to "reserve the right to alter any of its courses at any time." Def. Mem. [ECF 22] at pg. 14. The disclaimer is plainly unenforceable in this situation. Defendant relies upon four cases, each of which deal with changes made before or after a semester.[11] This case involves changes made during *the middle of a semester*, after the contract had already been formed, after students had already pre-paid tuition and fees, and after the deadline had passed for students to withdraw.

The disclaimer cannot be relied upon to suggest Defendant can fundamentally and unilaterally alter the nature of its contract mid-stream and without recourse. Providing online only classes for approximately 50% of the semester is not a discreate change to policy or procedure, nor is it a short-term cancellation as a result of isolated weather or emergency. The change to online only classes was a fundamental change altering the identity of contractual bargain. Defendant's ambiguous disclaimers cannot shield Defendant from its contractual relationship with Plaintiffs and the putative classes. *See Deen v. New Sch. Univ.*, 2007 WL 1032295 at *4 (S.D.N.Y.

---

[11] *See Wagner Coll. v. Wagner Coll. Faculty Ass'n, NYSUT, AFT, AFL-CIO,* No. SP 527/79, 1980 WL 112320 (N.Y. Sup. Ct. May 7, 1980)(college was within its rights to notify 21 faculty members of projected dismissal **upon the expiration of their collective bargaining agreement**); *Searle v. Regents of Univ. of California*, 23 Cal. App. 3d 448, 100 Cal. Rptr. 194 (Ct. App. 1972)(school was within its right to notify students "**well before the opening of fall quarter**" that a certain class would not be offered for credit.); *Jallali v. Nova Se. Univ., Inc.*, 992 So. 2d 338 (Fla. Dist. Ct. App. 2008)(school was within its rights to require a competency test prior to graduation where student was only a freshman at the time the requirement was added and "**received adequate notice** that he would be required to take the exam."); *Beukas v. Bd. of Trustees of Fairleigh Dickinson Univ.*, 255 N.J. Super. 420, 605 A.2d 708 (App. Div. 1992)(where dental program was discontinued **between academic calendar years**. Every student who had pre-paid tuition and fees for the final semester received that full semesters' worth of instruction and credit and school went above and beyond by helping to arrange the transfers of younger students and offering to subsidize any differences in tuition).

Mar. 27, 2007)(discussion the ambiguous nature of a university defendant's disclaimer provision and how "it could mean that New School reserves the right to change aspects of the degree programs but not the program's fundamental identity").

Furthermore, the disclaimer does not allow Defendant to unjustly withhold funds as a result of its failure to perform under the contract. *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 902 (1987) ("[O]nce a party to a contract has made a promise, that party must perform or respond in damages for its failure, even when unforeseen circumstances make the performance burdensome.") Here, even if the provision of in-person classes was impossible due to the coronavirus pandemic, Defendant nevertheless retained the full value of the tuition and fees paid by Plaintiffs and class members. CAC ¶ 118. This is impermissible even under Defendant's cited provisions.  It is black letter law that a disclaimer purporting to grant a party unfettered discretion to modify the contract without repercussion is illusory and, therefore, not enforceable.  *See*, *e.g.*, *Harris v. Blockbuster Inc.*, 622 F. Supp. 2d 396 (N.D. Tex. 2009) (holding terms and conditions agreement stating "Blockbuster may at any time, and at its sole discretion, modify these Terms and Conditions of Use, including without limitation the Privacy Policy, with or without notice. Such modifications will be effective immediately upon posting" illusory and unenforceable.).

Defendant's reliance on *Roe v. Loyola Univ. New Orleans*, 2007 WL 4219174 (E.D. La. Nov. 26, 2007) is equally misplaced.  Loyola University did not unilaterally decide to transfer its students to other universities in the aftermath of Hurricane Katrina, but rather, "developed a policy whereby Loyola and Tulane students would be able to attend classes, without payment of tuition, at other ABA-accredited law schools and receive full credit for those courses towards their Loyola and Tulane degrees, provided the students paid their tuition for the Fall 2005 semester to their home universities." Id. at *2. In other words, Loyola provided *the option* for its students to attend

other accredited law schools as visiting students (in-person and on-campus) without application to those other schools and without paying tuition to those schools, so long as they paid tuition to Loyola. Id. at *2-3. In dismissing his claim, the court explained "[p]laintiff has pointed to no provision of the student bulletin or Handbook that would entitle him to a free semester of law school." Id., at *5-6. Further, the unjust enrichment claim failed because "if he hadn't paid tuition to Loyola, he would have been required to pay SMU's tuition, which was more expensive than that of Loyola." Id.

Contrasting to the situation at hand, Plaintiffs were not given the option when Defendant shut down its campus mid-semester-they were forced to either accept a product that was not bargained for (online education) or receive no education at all and forfeit the tuition and fees they had already paid in full. Moreover, Plaintiffs are not seeking a tuition free semester; they only seek a prorated refund of the fees for access and services for which they did not receive the benefit.

## IV. PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT

Defendant argues that "Plaintiffs' unjust enrichment claims must be dismissed because Plaintiffs' claims arise out of and are governed by a contract." Def. Mem. [ECF 22] at pg. 18.  In advancing this argument, Defendant ignores the plain language of Fed. R. Civ. P. 8(D)(2) which provides, "[a] party may state as many separate claims or defenses as it has **regardless of consistency**." (emphasis added).  Likewise, "[u]njust enrichment may be pleaded in the alternative where there is a bona fide dispute as to whether a relevant contract exists or covers the disputed issue." *Downey v. Adloox Inc.*, 238 F. Supp.3d 514, 526 (S.D.N.Y. 2017).

As an initial matter, Defendant has disputed both the existence and scope of the contract Plaintiff seeks to enforce.  Additionally, Defendant has argued that it did not breach the contract because its move to online classes was "Required by Governor Cuomo's executive order." Def. Mem. [ECF 22] at pg. 17.  Impossibility is an avoidance defense which, if proven, renders an

24

otherwise valid contract unenforceable.  If the finder of fact (or the Court at a later stage) finds

that Defendant's performance was excused under the doctrine of impossibility, Plaintiffs' claims

for equitable relief are not only viable, but appropriate.  Indeed, in the cases of impossibility,

impracticability, and frustration of purpose, **both** parties are excused from performance and the

law seeks to restore both parties to their pre-contract position.  In a case such as this, where

Plaintiffs have already fully performed (by pre-paying tuition and fees), equitable disgorgement is

required to accomplish this result.  *See Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550,

556 (D.C. 2016).[12]  Here, even if the parties agreed on the existence and terms of the contract,

there is a clear dispute over its enforceability.

Not only are Plaintiffs permitted to plead unjust enrichment in the alternative to their

contract claims, but they have done so plausibly.  Defendant contends that "because Plaintiffs

received RIT academic credits for their spring 2020 courses, Plaintiffs cannot establish that they

were impoverished by paying tuition to RIT in exchange for those credits." Def. Mem. [ECF 22]

at pg. 19.  However, Defendant, by its own admission, did not charge tuition solely in exchange

for academic credits.  ¶ 87.  Plaintiffs paid substantial consideration in the form of tuition and fees

in exchange for numerous promises above and beyond the ability to simply earn credits.  As the

Southern District of Florida ruled just last week in an analogous COVID-19 tuition/fee refund

case, "[t]his is kind of like purchasing a Cadillac at full price and receiving an Oldsmobile.

Although both are fine vehicles, surely it is no consolation to the Cadillac buyer that the 'Olds'

---

[12] "Judicial statements to the effect that 'there can be no unjust enrichment in contract cases' can be misleading if taken casually. Restitution claims of great practical significance arise in a contractual context, but they occur at the margins, when a valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations. Applied to any such circumstance, the statement that there can be no unjust enrichment in contract cases is plainly erroneous."

25

can also go from Point A to Point B.  That is Barry's argument and the Court declines to consider it further." *Rosado,* 1:20-cv-21813 at pg. 7 (Exhibit J).

## V.  PLAINTIFFS STATE A CLAIM FOR CONVERSION

Defendant argues that Plaintiff's conversion claim is barred by the economic loss rule.  But that argument fails because, like Plaintiffs unjust enrichment claim, "[w]here the defendant disputes contractual liability, a conversion claim can proceed in the alternative." *SHLD, LLC v. Hall*, 2016 WL 659109, at *9 (S.D.N.Y. Feb. 17, 2016).

Defendant also argues that Plaintiffs have failed to allege facts establishing the essential elements of an actionable conversion. Defendant's arguments are without merit. "An action for conversion of money may be made out where there is a specific identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Thys v. Fortis Secs. LLC*, 74 A.D. 3d 546, 547 (1st Dep't 2010). Thus, "allegations that specified funds were entrusted to [the defendants'] custody only for a particular purpose . . . and that instead defendants improperly retained the funds without making [use of them for that purpose], state a cause of action for conversion. *Id.* Here, Plaintiffs allege that he had identifiable legal rights to an in-person, on-campus experience when they paid tuition and fees in exchange for that particular purpose. ¶¶ 110-11, 144, 146. Accordingly, Plaintiffs state a claim for conversion.

## VI. PLAINTIFFS STATE A CLAIM UNDER GBL §§ 349 AND 350

New York General Business Law (GBL) § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

To assert a claim under *either* GBL § 349 or GBL § 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that

26

(3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citing *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 944 N.Y.S.2d 452 (2013)).

"The standard for recovery under [GBL] § 350, while specific to false advertising, is otherwise identical to Section 349." *See Duran v. Henkel of America, Inc.*, 2020 WL 1503456, at *4 (S.D.N.Y. Mar. 30, 2020). Due to this overlap, courts have found that the scope of a GBL § 350 claim is as broad as that of GBL § 349 claim and that their essential elements are the same. *Id.*

Claims under GBL §§ 349 and 350 are not subject to the heightened particularity requirements of FRCP Rule 9(b), but need only meet the bare-bones notice-pleading requirements of FRCP Rule 8(a). *See Id.*; *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir 2005). Plaintiffs have clearly met these requirements.

## A. Plaintiffs Have Pled Consumer-Oriented Conduct

Consumer-oriented conduct consists of "acts or practices [that] have broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 532 (1995). Plaintiffs may satisfy the consumer-oriented conduct requirement by showing that the conduct at issue "potentially affects similarly situated consumers." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (quoting *Oswego*, *supra*, 85 N.Y.2d at 27, 623 N.Y.S.2d at 532-33).

Here, Plaintiffs have properly pled that Defendant, in presenting itself as an institution of higher learning for students to attend in exchange for payment of tuition, is engaged in consumer-oriented conduct. *See* ¶¶ 185-186.

These GBL §§ 349 and 350 claims are more than a mere private contract dispute that is unique to the parties in this lawsuit; Defendant's conduct affects the consuming public at large, including, without limitation, prospective students that are considering attending the Defendant's university. *See New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283 (1995); *see also Chais v Technical Career Insts.*, 2002 N.Y. Misc. LEXIS 2086, 2002 NY Slip Op 30082[U], at *11-12 (Sup. Ct., NY Cty Mar. 1 2002); and *Gomez-Jimenez v New York Law Sch.*, 103 A.D.3d 13, 956 N.Y.S.2d 54 (1st Dep't 2012).

### B. Plaintiffs Have Pled That Such Consumer-Oriented Conduct Was Materially Misleading

The inquiry regarding whether an act or practice is materially misleading is whether, objectively, Defendant's acts are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *See Duran*, *supra*, 2020 WL 1503456, at *4. GBL § 349 does not require a deceptive practice to "reach the level of common law fraud to be actionable," nor does it require proof of reliance. *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 896 (2000).[13] Fraudulent intent is not required, the material must only be misleading. *Chais*, LEXIS 2086, at *16.

Further, "[c]ourts have generally held that since the materially misleading conduct factor requires a reasonableness analysis best suited for a jury, it cannot be resolved on a motion to dismiss." *Carrillo v. Wells Fargo Bank NA*, No. 18-CV-3095 (SJF) (SIL), 2019 U.S. Dist. LEXIS 80634, (E.D.N.Y. May 10, 2019), *report and recommendation adopted*, 2019 U.S. Dist. LEXIS

---

[13] GBL §§ 349 and 350 do not contain a reliance requirement, and a proper claim does not require proof that a consumer actually relied on the misrepresentation. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015) ("neither Section 349 nor 350 require proof of reliance"); *Stutman*, *supra*, 95 N.Y.2d at 29, 709 N.Y.S.2d at 896 ("[A]s we have repeatedly stated, reliance is not an element of a section 349 claim." (citations omitted)).

141227 (E.D.N.Y. Aug. 20, 2019) (citation and quotation marks omitted). Accordingly, the issue of whether Defendant's acts were materially misleading cannot be resolved at this stage.

Regardless, Defendant's acts were materially misleading. Defendant advertises its in-person, on campus product to the *public at large* with the intent to induce prospective students to enroll at the University in order to receive its on-campus product through its website, academic catalogs, student handbooks, marketing materials and other circulars, bulletins, and publications. ¶ 188. Further, Defendant's material representations and omissions were advertised to all prospective students, and Plaintiffs and other members of the Classes were entitled to a reasonable expectation of the same when they enrolled at Defendant's university. ¶¶ 186 & 202.

### C. Plaintiffs Have Pled Injury

"An actual injury claim under [s]ection[s] 349 [and 350] typically requires a plaintiff to 'allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.'" *See Duran*, *supra*, 2020 WL 1503456, at *7. Plaintiffs have clearly alleged that, due to Defendant's inaccurate representations, they paid substantial sums of money to Defendant for the right to attend Defendant's University in-person and did not receive the full value of what they purchased.

Had Plaintiffs known that Defendant's claims regarding the provision of the on-campus experience were false or subject to change, Plaintiffs would not have paid the price for in-person, on-campus learning or the campus related fees. *See* ¶¶ 27. These allegations are sufficient to state an injury under GBL §§ 349 and 350 because they "claim that [P]laintiff paid a premium for a product based on [Defendant's] inaccurate representations." *See Ackerman v. Coca-Cola Co.*, CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156 (S.D.N.Y. July 21, 2010); *see also Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288-89 (S.D.N.Y. 2014) (finding a sufficiently-pled

GBL § 349 injury where the plaintiff alleged that he would not have paid the price charged for "fat-free" milk had he known it contained fat); *Ebin v. Kangadis Food Inc.*, No. 13-CV-2311, 2013 U.S. Dist. LEXIS 174174 (S.D.N.Y. Dec. 11, 2013) (deeming the plaintiff's allegations sufficient to state a claim under GBL 349 where "[t]he deception is the false and misleading label, and the injury is the purchase price"); *Lazaroff v. Paraco Gas Corp.*, 38 Misc. 3d 1217[A], 967 N.Y.S.2d 867 (Sup. Ct. Kings Cty 2011) (finding a sufficiently-pled § 349 injury where plaintiff alleged that he would not have paid the price for a "[twenty] pound" propane cylinder had he known it contained only fifteen pounds of propane).

Plaintiffs have alleged specific facts in the Complaint that Defendant engaged in false and misleading practices that impacted the entire student body at Defendant's university. ¶ 187. Further, Defendant's material representations and omissions were advertised to all prospective students. Plaintiffs and other members of the Class were entitled to reasonably expect that the representations were true when they enrolled at Defendant's university.  ¶ 185.

As stated above, the allegations for GBL §§ 349 and 350 claims need only meet the bare-bones notice-pleading requirements of FRCP Rule 8(a) and are not subject to heightened particularity.  *See Pelman ex rel. Pelman*, *supra*, 396 F.3d at 511; *see also Bailey v. N.Y. Law Sch.*, 16 Civ. 4283 (ER), 2017 WL 835190 (S.D.N.Y. Mar. 1, 2017). Plaintiffs have clearly met this requirement.  Accordingly, Counts VI & VII should not be dismissed.

## CONCLUSION

For the reasons provided above and for good cause shown, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss in its entirety.  Should the Court grant any aspect of Defendant's motion, Plaintiffs request that any such decision be without prejudice and with leave to amend under the liberal provisions of Fed. R. Civ. P. 15(a).

30

Dated November 5, 2020

Respectfully Submitted,


**ANASTOPOULO LAW FIRM, LLC**

 /s/ Eric M. Poulin
Eric M. Poulin**
Roy T. Willey, IV**
32 Ann Street
Charleston, SC 29403
Tel: (843) 614-8888
Fax: (843) 494-5536
Email: eric@akimlawfirm.com
          roy@akimlawfirm.com


**BURSOR & FISHER, P.A.**
Philip L. Fraietta
Alec M. Leslie**
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com
          aleslie@bursor.com


**BURSOR & FISHER, P.A.**
Sarah N. Westcot**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (925) 407-2700
Email: swestcot@bursor.com


**MOREA SCHWARTZ BRADHAM
FRIEDMAN & BROWN LLP**
John M. Bradham**
444 Madison Ave., 4th Floor
New York, New York 10022
Tel: (212) 695-8050
Email: jbradham@msbllp.com
          pkatzman@msbllp.com


**TOPTANI LAW, PLLC**
Edward Toptani**
375 Pearl Street, Suite 1410
New York, New York 10038
Tel: (212) 699-8930
Email: edward@toptanilaw.com

31

**FERR & MULLIN, P.C.**
Robert L. Mullin
7635 Main Street Fishers
P.O. Box 440
Fishers, NY 14453
Tel: (585) 869-0210
Fax: (585) 869-0211
Email: rlmullin@ferrmullinlaw.com

\*\*Admitted Pro Hac Vice

*ATTORNEYS   FOR   PLAINTIFFS   AND
THE PROPOSED CLASS*

32