```
UNITED STATES  DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
----------------------------x          20-CV-6283(CJS)
NICHOLAS BERGERON and BARBARA
MYCEK, individually and on behalf
of others similarly situated,
            Plaintiffs,
vs.
                                       Rochester, New York
ROCHESTER INSTITUTE OF TECHNOLOGY      December 3, 2020
            Defendant.                 2:05 p.m.
----------------------------x
```

**MOTION HEARING**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHARLES J. SIRAGUSA
UNITED STATES DISTRICT JUDGE


FOR PLAINTIFF:       BURSOR & FISHER, P.A.
(Via Zoom)           BY:  PHILIP L. FRAIETTA, ESQ.
                     888 7th Avenue
                     New York, New York 10106
                          -and-
FOR PLAINTIFF:       ANASTOPOULO LAW FIRM
(Via Zoom)           BY:  ROY T. WILLEY, IV, ESQ.
                     32 Ann Street
                     Charleston, South Carolina 29403

FOR DEFENDANT:       HOLLAND & KNIGHT LLP &
(Via Zoom)           BY:  PAUL G. LANNON, JR., ESQ.
                     BY:  QIAN SHEN, ESQ.
                     BY: ROBERT J. BURNS, ESQ.
                     31 West 52nd Street, 12th Floor
                     New York, New York 10019
                          -and-
FOR PLAINTIFF:       SANTIAGO BURGER LLP
(Via Zoom)           BY:  FERNANDO SANTIAGO, ESQ.
                     2280 East Avenue
                     Rochester, New York 14610

RIT:                 ROBERT COLON, ESQ.


COURT REPORTER:      Diane S. Martens, FCRR
                     dimartens55@gmail.com

Bergeron, et al. v. RIT – 20-CV-6283

**P R O C E E D I N G S**

\*               \*               \*

**THE COURT:**  For the record, this is the matter of Bergeron and Mycek versus the Rochester Institute of Technology.

This matter is on today by way of video conferencing utilizing Zoom.

In addition to myself, present are, of course, my court deputy Ms. Allen; our court reporter Ms. Martens; Mr. Lyle with whom I work; Mr. Kehoe with whom I work is on the phone.

And I believe I have appearing on behalf of plaintiffs, Mr. Fraietta, Mr. Willey and I'm not sure if Mr. Poulin is with us.

On behalf of the defendant RIT, it's my understanding we have, it's my understanding, Mr. Lannon.

**MR. LANNON:**  Yes, your Honor, good afternoon.

**THE COURT:**  Mr. Santiago, good afternoon. Mr. Burns, Ms. Shen, and possibly Mr. Colon, although he's not on the docket.

Did I miss anyone who's here participating?

(No response.)

**THE COURT:**  Counsel, I have a number of people who are -- we have attorneys viewing this by Zoom.  My court

Bergeron, et al. v. RIT – 20-CV-6283

reporter Ms. Martens is doing her best to take this down. But please try to make sure that only one person speaks at a time and it may help if you are not speaking, to mute. When you want to say something, then turn off the mute sign but we've found that that may, in fact, help.

This matter is on primarily today based on RIT's motion to dismiss which we will discuss. Bear with me a moment and I apologize for any delays because I'm trying to work through my computer and it is a tad slow.

We have, although we're not dealing with it today, the motion by the plaintiffs for appointment of interim class counsel. One of the things that concerns the Court is in the response by RIT to that application which is titled response in partial opposition to plaintiff's motion for class counsel, RIT brings up the Quattrociocchi case which, for some reason, was assigned to Judge Wolford.

Upon a review of RIT's motion to dismiss in that case, it appears essentially on all fours. The paper, this submission --

(Video frozen.)

Mr. Lannon, I'll ask you because you're number one on the hit parade.

**MR. LANNON:** Thank you, your Honor. I missed a few of your words. You were breaking up.

**THE COURT:** I'm sorry. What I was saying is this.

Bergeron, et al. v. RIT – 20-CV-6283

Here's my concern.  I was referring to the motion to appoint interim class counsel.

MR. FRAIETTA:  Yes.

THE COURT:  I noted RIT -- partial interim --

MR. FRAIETTA:  Yes.

THE COURT:  -- that you did not believe two law firms were appropriate, for example.  But beyond that, I was concerned because it raised a case that I was at least unaware of until we looked at the papers, that there is a similar case pending in front of Judge Wolford and I mentioned RIT's papers in support of its motion to dismiss that case appeared essentially to be on all fours with the papers in this case.

And in that case, in the papers before me, you're referencing an application to consolidate the Bergeron and Quattrociocchi cases.  And I was just wondering:  Was that a motion you made in front of Judge Wolford?

MR. FRAIETTA:  I believe yes, that's right, yes, we did file in front of Judge Wolford, your Honor.  I believe it's still pending.  We have not received an answer yet.

THE COURT:  And my concern, of course, is Judge Wolford has not ruled on your motion to dismiss yet either, is that correct?

MR. FRAIETTA:  That's correct.  We argued at a oral argument.

THE COURT: Here's the concern from a judicial standpoint. While I hope our reasoning may be similar, as we've all experienced, sometimes it is not. And, of course, the question pops up in my mind if I were to reach a decision in this case on the motion to dismiss, and Judge Wolford came to a different conclusion on the motion in Quattrociocchi on essentially the same issues, that obviously would create an issue, especially if there was a motion to consolidate.

So I don't know quite how to handle that other than it would seem that the motion to consolidate should be determined before the two judges rule on the motion to dismiss.

MR. FRAIETTA: That was our thinking, your Honor. That's exactly -- it was the sequencing that was concerning to us. The sequence that we believe would be most reasonable would be consolidation of all the cases with you and then a ruling on them. To the extent the salient issues are raised in all three cases, you could rule on them.

THE COURT: I'll explore that with Judge Wolford. Typically --

Kathy, you can help me out. If cases are somewhat related, the clerk's office should have assigned them to the same judge?

Although I don't know -- I don't know if counsel, Mr. Lannon, when you filed -- which case was filed first, the

one before me or the one before Judge Wolford?

**MR. FRAIETTA:** The one before you, your Honor. And then when the Wolford case came up, we asked them if they would voluntarily agree to consolidate with these. They declined. So we didn't move to make a motion --

**THE COURT:** Just on a housekeeping matter, did you notify the clerk's office that the cases were somewhat related?

**MR. FRAIETTA:** I believe we did. I don't have the full file in front of me but I believe we did.

**MR. SANTIAGO:** I can address that, your Honor.

**THE COURT:** Yes.

**MR. SANTIAGO:** Pursuant to the local rule, Judge, when the second filed action was assigned to Judge Wolford, we wrote a letter to the clerk under the local rule and requested that it be consolidated with the prior pending action before your Honor and apparently that assignment did not occur, and they would not consent to the consolidation.

**THE COURT:** Then that's a failing on our part and I will...

(Video frozen.)

**THE COURT:** If you can hear me, we'll take it up with the clerk's office to determine why.

Mr. Santiago, I appreciate you sending a letter. I don't know why that action wasn't consolidated. I'll try to

figure that out.

A    Judge, considers roadway wily.  One of the things that would help with your bandwidth is if everyone who is not speaking would turn off their video because your problem is a bandwidth problem.

**THE COURT:**  Okay.  We'll defer to someone with much more technical knowledge.  I hope that helps.

I assume everyone's still hearing me.

What I was indicating is in resolving the pending motion to dismiss before the Court, I just wanted to reference some cases that the Court has found constructive.  Bear with me.  One was cited, I believe, by RIT in its reply brief and that is *Salerno versus Florida Southern College* at 2020 Westlaw 5583522.  The other *Rosado v. Barry University* at 2020 Westlaw 6438684.  And the last one is *Chong v. Northeastern University* at 2020 Westlaw 5847626.

And the district courts in these cases discuss in some detail many of the issues present in the pending application before this Court.

Also at the outset, bear with me, the consolidated complaint was acted on Page 11 -- excuse me, on Page 3 at Paragraph 11 says:  "Plaintiff Mycek is an individual and resident and citizen of the state of Pennsylvania and was a student enrolled at the Rochester Institute of Technology during the spring 2020 term".  And the papers submitted in

opposition to the motion to dismiss the plaintiffs refer to her as the parent. So I'm wondering what's going on. Why in this complaint is she listed as a student?

**MR. FRAIETTA:** Your Honor, I can speak to that and also to the consolidation issue discussed earlier.

As far as Ms. Mycek, that is a typographical error in the complaint. She is, she is, in fact, a parent.

(Video frozen.)

**THE COURT:** I'm frozen. I'm sorry.

You said you could explain the discrepancy?

**MR. FRAIETTA:** Yeah, it's a typographical error and we apologize for that. Ms. Mycek is a parent. She is not a student. In the papers we addressed her as a parent. Ms. Mycek is the parent of an undergraduate student at RIT for the spring 2020 term.

I also can address the consolidation issue, if your Honor would allow.

**THE COURT:** Go ahead.

**MR. FRAIETTA:** As I submitted in our reply papers which we filed on November 16th, I have since met and conferred with lead plaintiff's counsel Jason Sultzer in the other action. And Mr. Sultzer has agreed to consolidate the action with our action so I don't believe there's any opposition to consolidation at this point. There may have been opposition in the past but we've been able to come to an

Bergeron, et al. v. RIT – 20-CV-6283

agreement to consolidate now.

THE COURT: Explain to me how that works. Is counsel in that case, since the issues are essentially the same, is counsel in that case looking for an opportunity to argue these same issues or relying on plaintiff's argument?

MR. FRAIETTA: They would -- we've agreed internally -- obviously subject to approval by your Honor -- that my firm Bursor & Fisher and my colleague's firm, the Anastopoulo firm, would serve as co-lead class counsel with Mr. Sultzer's firm in a supporting role. So we would -- we would take the lead and Mr. Sultzer's firm would be kind of on the bench, so to speak, as a support.

THE COURT: Gotcha. But as far as this proceeding goes, we're not arguing Quattrociocchi, but whatever the rulings, are you suggesting that whatever the rulings would be on this motion would bind Quattrociocchi because the facts are essentially the same?

MR. FRAIETTA: Well, I mean, I suppose they wouldn't technically bind but assuming consolidation is granted, I believe they would be, but with the one exception that I would note that RIT in its motion papers in the Quattrociocchi case does not challenge his standing. They do challenge his standing at both of the named plaintiffs in this case but they do not challenge Mr. Quattrociocchi's standing.

Bergeron, et al. v. RIT - 20-CV-6283

**THE COURT:** I may have misread. Didn't RIT concede, you put in your papers that -- I can't remember -- it's Mr. Bergeron actually paid fees.

**MR. FRAIETTA:** Yes, but -- that is correct, your Honor, and they do, in their reply brief they appear to concede that. It's unclear to me if they do or not but Mr. Quattrociocchi, they do not challenge whatsoever. So --

**THE COURT:** Okay.

**MR. FRAIETTA:** -- other than that one distinction.

**THE COURT:** I read that as indicating there is no standing issue any more with respect to Mr. Bergeron. Is that, RIT, is that correct? Incorrect?

**MR. LANNON:** That is correct, your Honor. We've withdrawn that argument with respect to Mr. Bergeron but we do want to press it with respect to Ms. Mycek.

**THE COURT:** Right. And there's a good discussion, I think, in the *Salerno* case that RIT does cite in its reply brief where the Court -- and I can't remember whether it was the Middle or Southern District of Florida -- it determines that a parent does not have standing.

**MR. FRAIETTA:** That's correct, your Honor.

**MR. LANNON:** It was the Middle District. And the holding was "the lack of injury to the parent is clear regardless of whether the parent provided financial support to her daughter -- in this case it's the son.

Bergeron, et al. v. RIT - 20-CV-6283

We believe that holding should apply here.

THE COURT:  The Court is familiar with that holding.  I'll take that issue under consideration.

On the other hand, I guess what's good for the goose is good for the gander.  Isn't it the *Salerno* case that says, as well, this is not educational malpractice?

MR. LANNON:  You win one, you lose one.  On that one we do.  A couple -- actually on that one they also dismissed the conversion claim for a number of well-thought-out reasons which I'm happy to explain here but we do depart from them in their reasoning on the breach of contract and --

THE COURT:  Yes.  Let me tell you where I'm going.  I don't think Ms. Mycek has standing and I don't think this is a educational malpractice case.  I'll tell you where I'm coming from.  Here's what's interesting to me.  I don't know -- did you have a chance to look at the Massachusetts case that I mentioned?

MR. FRAIETTA:  Yes, your Honor.

MR. LANNON:  Yes, your Honor, fortunately, I live -- I'm in Massachusetts as a guest in your court today.

THE COURT:  That has, what is it, I think it's FRA financial agreement, financial responsibility agreement as opposed to --

MR. LANNON:  Yes, your Honor.

Bergeron, et al. v. RIT – 20-CV-6283

**THE COURT:** -- what we have here, student financial responsibility agreement. But it appears, at least from looking at the complaint in that case, they were relying, essentially, the plaintiff was relying on that agreement. It strikes me here that what we have, and counsel can correct me, it's RIT's position that the student financial responsibility agreement controls.

On the other hand, it appears to be the plaintiff's position that, no, it seems pretty settled in New York with respect to the relationship between a student and a university, you can look at a number of things including catalogs, regulations, and et cetera. And the plaintiffs are indicating for purposes of pleading -- and I may have read this wrong -- but plaintiffs aren't denying that the student financial responsibility agreement comes into play but they're suggesting that's only one of the things that comes into play. And while they're arguing that that doesn't really create a contract, they're suggesting, consistent with New York law, that if you look at all these other publications, that for purposes of 12(b)(6) motion, they're certainly -- they pled enough to get by.

Essentially what they're saying, I take it their position is that, look, we contracted for in-person learning. While RIT spends time in their memo detailing the COVID-19 pandemic, the fact that our governor shut down the state, the

fact that the same thing happened in this county, if I'm reading plaintiff's papers correctly, they're saying so what, doesn't matter.  We're not arguing that RIT did anything wrong with respect to their response to the pandemic.  We just didn't get the benefit of our bargain.

Is that what your argument, Mr. Fraietta, is that the allegations in your complaint?

**MR. FRAIETTA:**  Yes, yes, your Honor.  Precisely.  Our argument would be boiled down, like your Honor said, we understand that Governor Cuomo may have ordered RIT to cease in-person operations but Governor Cuomo by no means ordered them to keep the money.

And that's what the allegation is about.  We paid money for in-person learning and all the experiences that come therewith and RIT failed to provide that for at least half the semester and kept that money, so we believe a refund is in order.

That's really the simplest way to boil down the case.

**THE COURT:**  And, clearly, despite the suggestion in the RIT's response, Mr. Lannon, that we had no choice, we were forced to do that, we had no -- correct me if I'm wrong -- there's no affirmative defense of impossibility in New York because it's not an executory contract; in other words, the money was already paid by the students.  I assume

Bergeron, et al. v. RIT – 20-CV-6283

that's why RIT doesn't raise a defense of impossibility.

**MR. LANNON:** We're not raising it as of the 12(b)(6), your Honor. We do reserve the right to raise it as a affirmative defense later on but we're not arguing for purposes of this motion.

**THE COURT:** Why? Can I put you on the spot. Why? Because unlike -- I looked at the references in the complaint to the website. There was one website called something RIT, you know, slash March something to resume and if you look at that, it details pretty much the whole story, that remote learning was necessitated by government action. So, I'm confused then. Am I wrong? Isn't impossibility in New York limited to executory contracts?

**MR. LANNON:** I don't know the answer to that, your Honor. I did not brief that for today. The reason we didn't bring up the possibility was really because we were concerned it would raise factual issues that would not be appropriate on a 12(b)(6) motion and we have strong defenses on the contract claim that we think are dispositive. If I may have a moment I can explain those.

I do believe the argument pressed by the plaintiffs is not accurate under New York law and they have not stated a breach of contract claim. Here's why, your Honor, if I may. So, we start with the proposition under New York law that there is a contractual relationship between RIT and its

student.  And so the question is:  What are the terms of that contract?

THE COURT:  All right.  Can I just ask a question.

MR. LANNON:  Yes.

THE COURT:  I just have one question.  Do you agree in New York law that the relationship, contractual relationship (distorted audio) the university can be defined by a number of things, including catalogs, regulations, publications, would you agree with that principle of law in New York?

MR. LANNON:  That it can be.  Not in all cases.  This is one of the cases where it does not.

THE COURT:  Sorry to interrupt you.

MR. LANNON:  Let me explain.  That's okay.  It's a very important question.

So some of the cases that we've seen, like the ones this Florida Salerno, take the position that the contract is one implied by fact and we can look at marketing and advertising and bulletins and things like that to import the terms of the contractual relationship and that certainly can be the case in New York.  The *Vought v. Columbia* case makes that quite clear.

But that doesn't mean we forget other or neglect other contract principles principally where it is an express contract, those terms govern over the general terms.  So here

Bergeron, et al. v. RIT – 20-CV-6283

we say, your Honor, the bulletins and the website information does not import contract terms here because three reasons, really.

One is they're general descriptive terms not contract terms and there's no allegation in the complaint that they relied on any particular statement in those terms.

Second, there are express disclaimers, your Honor, on the website. It expressly disclaims being a contract, and in the bulletin in the student handbook expressly on Page 1 expressly disclaims being a handbook and explains that changes will occur during the year including unforeseen change to student life, which is exactly what happened here. And we shouldn't be held liable because this is not a contract that's subject to change.

The third point is, as you pointed out yourself, your Honor, in *Chong* and similar cases, students have executed a student financial responsibility agreement. That is an express contract that governs this situation. That's what Judge Stearns found in the *Chong v. Northeastern* case. It specifically says when I register for a class and receive courses, I'm then obligated to pay the full amount of tuition and fees. And it specifically says, your Honor, that it supersedes any other prior understandings, representations, negotiations and correspondence.

So this is the governing document (indicating),

your Honor, in our papers, the student financial responsibility agreement. And so then the question for the Court is did any term --

THE COURT: Let me just stop you. Let me just stop you for a second. I'm limited on a 12(b)(6) motion to looking at the items in the complaint for things that are incorporated by reference, correct?

MR. LANNON: Yes.

THE COURT: Is the student financial responsibility agreement referenced specifically in the complaint?

MR. LANNON: Yes.

THE COURT: The complaint's long. What paragraph is it referenced on?

MR. LANNON: It's referenced generally in 59 and 60 and then they're mentioned specifically in the handbook at 86. The handbook is actually called a bulletin at RIT not a handbook.

THE COURT: I'm looking at 59 to 60.

MR. LANNON: And they include all kinds of the contracts that they sign. Entered into a contract to pay tuition and fees. That's this contract. So they didn't use the name but that's exactly what they described. Entered into a contract to pay tuition. This is the tuition contract. And then on 86 they specifically mention the handbook, which in this case is called the bulletin but it's

Bergeron, et al. v. RIT - 20-CV-6283

the same thing, student bulletin.

So, your Honor, it's well within your discretion but I think that issue is a question of law for the Court not a question of fact. What are the terms of this contract? Interpreting those terms is a question of law.

We say, your Honor, that if you look at the student financial agreement, there is no promise in there for in-person education. That was not a promise we made. We said you can register for courses, and you can receive services and, in exchange, you owe us tuition and fees. That was the deal. They have not identified any specific promise to provide exclusively in-person instruction or exclusive on-campus access, particularly in response to an emergency or pandemic like we have here. Even beyond student financial agreement, there's no reference to such a promise in the bulletin or the website. To the contrary --

THE COURT: Let me just --

MR. LANNON: Okay.

THE COURT: Time out. Let me just follow through on this. Let's take the pandemic out of it. Your position is that if RIT decided in a non-pandemic world for the heck of it, we're going to go online and we've decided that we're going to present these courses online, that's fine. Fair statement?

MR. LANNON: For the most part, your Honor. It's a

matter of reasonable expectations.  So you wouldn't expect, for example, the college to say we have a class that is meeting --

THE COURT:  No, I'm not talking about reasonable expectations.  You're talking about -- you're saying, listen, this is clearly defined.  We've reserved our right -- essentially what you're arguing is we have the right to present instruction in any fashion we deem appropriate.

MR. LANNON:  Not only the right, your Honor, Constitutional right.  How to teach a class, the mode of instruction is recognized by the Supreme Court.

THE COURT:  The --

MR. LANNON:  I'm sorry.  Go ahead.

THE COURT:  I was just saying then, forget it then, if I follow you correctly, if this was 2018, and RIT decided you know what, we're going to, for the spring semester in 2018, we're going to present all our classes remotely.  You could do that and there would be no recourse by the students, is that a fair statement?

MR. LANNON:  That is a fair statement, your Honor, provided that there was no express promise to the contrary. That's the difference.

THE COURT:  And there was none.  There's been no express promise --

MR. LANNON:  Correct.

THE COURT:  -- to the contrary?

MR. LANNON:  Yes.

THE COURT:  Let me throw this one at you.  What is the significance of Mr. Fraietta and his colleagues in the complaint pointing out that RIT offers separate online classes at this significantly -- I don't know what the exact language Mr. Fraietta used, but at a significantly reduced rate.  Is that significant in any way at all?

MR. LANNON:  Irrelevant, your Honor, apples and oranges.  As the complaint expressly concedes, these are not interchangeable.  They are apples and oranges.  The online program is not the equivalent and they concede that in the complaint.  They're not interchangeable.  What would be interesting in a different case, your Honor, would be if they had pled that they were the same, same faculty, the same curriculum, the same credits and one was online and much cheaper and one was not.  They did not plead that.  That's not this case.  These are two very different programs.  The costs -- I'm sorry, the price, the tuition for each reflects the costs not the value of the education.

THE COURT:  What about Mr. Fraietta's position as pled in the complaint that, listen, part of the college experience is being on-campus, in-person instruction, interaction and we didn't get that.  We come back to the same fact that you didn't bargain for that.  It seemed to be RIT's

position that, listen, you bargained for an education and you bargained for courses and you bargained to get credits and we provided all those.

MR. LANNON:  That's exactly right, your Honor. *Vought v Columbia* makes that clear.  The contract is for our faculty to teach the courses and give you credit.  That's the core, core promise that forms the contract by fact or by expressly.  That's what happened here.  We retain the authority -- and, in fact, we have a Constitutional right -- as to how we teach those courses.  We can change that based on our own educational and academic discretion, your Honor.

THE COURT:  So how do you explain the Middle District and whatever district of Florida coming to a conclusion that in those cases, the students had pled a caution for breach of contract.

MR. LANNON:  Two reasons.  One, they didn't have a student financial responsibility agreement like this one and they -- and under Florida law it's easier to incorporate terms that are outside.  So I think Florida law is different. But fundamentally, I think they missed the point, your Honor, respectfully.  The point here is that they didn't look at the damages that were being sought.

What do I mean by that?  Here, they said this is like a commercial case.  Plaintiffs argue this is a commercial case.  We didn't get what we paid for, right.  We

Bergeron, et al. v. RIT – 20-CV-6283

paid for services to be rendered and those services were not rendered.

But that's not the case here, your Honor.  The services were the education and the education was delivered. The issue is how it was delivered.  They argue that the mode of instruction -- excuse me, online education for the last month or so of the year was inferior, was less effective, less valuable to them than the in-person instruction they received for the first two-thirds of the year.  So they are asking for the difference in the value of how those courses were instructed, how they were taught.

So by asking that question, to resolve it, your Honor, the Court is going to be forced to assess how those courses were instructed online in that last month of the year.  The value, the effectiveness of that course of instruction.  That is an academic -- core academic issue, your Honor, that New York courts refuse to go into because it's a Constitutional, it's a Constitutional right, as recognized by *Sweezy* in New Hampshire 1957, your Honor.  The Supreme Court held how to teach, the method of instruction is one of the four essential freedoms of a university, one of the four essential freedoms.  And the New York courts have been clear that we don't second-guess those educational decisions on how to teach, how to present a class because three good reasons:  One is the damages are impermissibly

Bergeron, et al. v. RIT – 20-CV-6283

speculative.  There's no way to monetize the change.

**THE COURT:**  Well, let me stop you.  Let me just stop you there.  Because in their papers -- and Mr. Fraietta, we'll give you a speaking part, too, we'll get to you.

But in the papers, Mr. Fraietta suggests that, no, the issue is not the difficulty in computing damages.  There's no issue here.  The damages aren't speculative.  We were damaged.  He said we've alleged damages because we didn't get what we bargained for.  We bargained for in-person classes.  We didn't get that.  So the difficulty in computing damages doesn't mean damages are speculative.

I think that's what you argue, right, Mr. Fraietta?

**MR. FRAIETTA:**  Exactly, your Honor, that's correct.

And if I may I point out that that argument's been accepted by a number of federal courts.  Now you mentioned two of them.  There's two others that came out over the Thanksgiving weekend which we submitted as supplemental authority from the Southern District of Florida and the Northern District of California that both agree with that argument.

And I think it's summarized best at the *Rosado* case from the Southern District of Florida.  What the Court says there is:  If I bargain for a Cadillac and I receive an Oldsmobile, well, they're both cars.  They both drive you from point A to point B but I've still been damaged.  And the

Bergeron, et al. v. RIT - 20-CV-6283

damage is not in the ability of the car to drive. They both may drive the exact same. The damage is in the market value.

RIT is able to market at a significantly higher price than some of its online-only competitors based, in part, on its ability to promise an elite in-person experience. And they've been doing that for over a hundred years. So we think, frankly, it's a bit absurd that any student would enroll in RIT's in-person program and expect that halfway through the semester the university can say the courses are going to be online and you're not even allowed to access the campus -- which is another part of the case we haven't even talked about yet -- but RIT has many facilities on campus for its students including libraries and study halls and dormitory and so on and so forth.

**THE COURT:** Yeah. Let me interject. I understand we have the complaints and we have the fees class, the tuition class and the fees class. Let me just shift gears --

I'm confused over your general business law claim. Where's the false advertising? RIT was delivering what they were supposed until the pandemic. How does that claim have any merit?

**MR. FRAIETTA:** Because they didn't deliver what they promised to deliver, your Honor. And under the GBL, the New York General Business Law, intent to deceive is not an element. The Supreme Court -- not the Supreme Court. I

Bergeron, et al. v. RIT - 20-CV-6283

apologize. The Court of Appeals held that the *Oswego Labor*, and I'll give you the cite. That's 85 New York --

THE COURT: But you would agree they were delivering it until the pandemic --

MR. FRAIETTA: Yes but then they ceased to deliver it.

THE COURT: -- correct?

MR. FRAIETTA: And, as your Honor said, and impossibility is not a defense to a non-executory contract in New York. And that's covered by the GBL as well.

THE COURT: We're not talking --

MR. FRAIETTA: I believe that's covered by the GBL, as well, your Honor. The case is they made a promise. They misled students into believing that they were going to receive an in-person education and they failed to deliver it. Now maybe they failed to deliver it because of outside public health concerns and government orders but, again, it does not permit them to keep the money.

And the New York General Business Law does not require an intent to deceive. The New York Court of Appeals has held that, and that's *Oswego Labor*, 85 New York 2d 20 at 26, 1995, proof of scienter is not an element under the General Business Law.

So, RIT may have not intended -- and we believe this to be the case. As your Honor said, in January of 2020,

I believe RIT intended to offer a full spring semester in-person like they've done for every semester for the past hundred years.  But the pandemic happened.  We understand that.  It prevented them from doing so.

And that's why this case boils down to, well, who should bear the financial responsibility for that.  Should it be the students who already gain tens of thousands of dollars in debt who, by no fault of their own, no longer will receive what they bargained for or should it be the university who is clearly the party in a better economic position and is the party that has the money.

If the students didn't pay the money, this would be a very different case, your Honor.  Had we not paid the money yet and we were seeking to avoid our obligation and that's why the student financial responsibility agreement is not relevant.  That agreement simply says -- we disagree that it's an agreement.  I think that's a misnomer.

**THE COURT:**  Let me just stop you then.  Mr. Lannon compared it to the financial responsibility agreement in the Massachusetts case.  What's the distinction?

**MR. FRAIETTA:**  We challenged (phonetic) Chong in our papers but the distinction is simple.  In the *Chong* case, the plaintiffs conceded the applicability of that agreement. We don't do that here.  But, moreover, what the plaintiffs then tried to do, what they then tried to change their tune

at oral argument. They went against what their complaint had pled and tried to argue that actually it's not an agreement and that's why in *Chong*, the Court dismissed the case without prejudice and allowed an amended complaint.

So I believe that *Chong* is going to now find that this agreement is not enforceable in the manner Mr. Lannon's saying. And if the Court were to look at the agreement, the agreement doesn't obligate RIT to provide anything. It simply says that a student has the responsibility to pay upon receipt of services. Well, what services? Could RIT bring students to campus and give them a hair cut and say that cost $50,000, thank you? We think obviously not. And that's why this contract -- or I don't even want to call it a contract; agreement to agree, I'll say -- is not applicable here.

But, again, the big difference in this case -- and we point this out in our papers -- is we are not seeking to avoid paying. We are seeking a refund of what we already paid.

**THE COURT:** Yeah, I understand what you're... A couple points. First, how is it -- how do you have a conversion claim? I mean, you could have it for money but it has to be an identifiable sum.

**MR. FRAIETTA:** They can --

**THE COURT:** How is there a conversion claim?

**MR. FRAIETTA:** We think that the cases that we

cited including -- I don't have the name of the case in front of me but it's in our papers from the First Department -- makes clear that you can have conversion claim for money. And what you do is you have to just earmark the amount of money that was separated for in-person learning. We think that we can do that based on the, especially with the fees because the fees go to specific services. So --

**THE COURT:** Are we saying you can do it with the fees but not with the tuition because it wasn't an identifiable sum?

**MR. FRAIETTA:** No, I --

**THE COURT:** Let's face it. If you got to trial, you'd have some experts trying to cull out the difference between online and in-person classes, unless -- I don't know -- unless the online programs, unless RIT offered the same online programs as in-person programs. I don't know if they did.

**MR. FRAIETTA:** Well, and, and, and I disagree with what Mr. Lannon said there in one respect. So I'm glad your Honor brought that up.

I don't think that that is really -- he described it as an inquiry into whether the value of in-person education is different than the value of online education but I think the more appropriate term is the market value. We view this case as a simple -- I gave you the example the

Cadillac and the Oldsmobile and I'll go back to that.

All we -- all I believe we're going to need, and we'll put this up at the appropriate time which clearly is not in a Rule 12(b)(6) motion.  But we're just going to have experts who are going to be able to identify the price, what I'll call premium, to an in-person education versus an online education and that's easy to do, your Honor, I believe, because there's a market for it.

There are, there are literally hundreds of universities, if not thousands, across this country.  Some offer classes exclusively online.  Some offer hybrid programs.  Some offer both like RIT.  And in every single case, the online program is substantially cheaper.  And it's not a coincidence.  It's because the market, the market for educational services demands a premium for in-person learning and we think that --

**THE COURT:**  So let me put you on the spot -- Mr. Lannon on the spot.  He suggests if this was 2018 and RIT did the same thing, tough luck, they have the right to do this.

**MR. LANNON:**  If you could repeat your question, your Honor, we missed --

**THE CLERK:**  Judge, you froze up.

**THE COURT:**  What I said was I put Mr. Lannon on the spot.  Mr. Lannon suggested that if this was 2018 and RIT

Bergeron, et al. v. RIT – 20-CV-6283

went to remote learning.

Can everybody hear me?  Everybody's like stuck.

(Participants say yes.)

THE COURT:  And suggested that if this was 2018 and RIT went remote, they can do that because they reserve the right and there would be no recovery by the students.

On the other hand, Mr. Fraietta, you're suggesting, I take it, that in any educational setting where the students went into it with the idea that there would be in-person instruction, be it colleges, universities, grammar schools, private grammar schools or high schools, there could be recovery in these circumstances; is that a fair statement?

MR. FRAIETTA:  I'm not sure that's a fair statement, your Honor.  We're not -- we're not talking about high schools and things of that sort.  And I think the distinction there is that the students and high school and below are not adults.  But in the college situation, these students are adults.  These are people who contracted to pay tens of thousands of dollars to attend specific private institutions, which I think is another difference.  The high school context and the grammar school context, oftentimes you're limited to whatever public school your zip code is assigned to.  That's not the case here.  People from RIT can come from all over the country, whether it's California, New York or anything in between.  So these are students who

Bergeron, et al. v. RIT - 20-CV-6283

make --

THE COURT:  I'm talking --

MR. FRAIETTA:  The decision to attend RIT.

THE COURT:  I'm talking about a private school.

MR. FRAIETTA:  I think that that potentially with a private school you may be able to have a similar type of case, your Honor.  But that's not the case that's in front of us here.

What's in front of us here is a private university, one of thousands in the United States that charges the price that they're able to charge because they promise students an in-person experience.

THE COURT:  I don't understand your distinction. If I sent my kid to a private Catholic high school and pay ten grand a year with the idea they were going to get in-person instruction and the same thing happened.

MR. FRAIETTA:  You froze, your Honor.

THE COURT:  Why couldn't I recover?

MR. FRAIETTA:  I'm sorry, your Honor, you're frozen.

THE COURT:  I was just saying.  I don't see your distinction in the fact that what difference does it make whether it's a college or university if --

THE CLERK:  Judge, you're freezing up again.

THE COURT:  -- if someone --

**MR. FRAIETTA:** I'm sorry, your Honor, you froze again in the middle of your question. I'd like to answer your question.

**THE COURT:** I'm sorry. I don't know why. Can you hear me now?

**MR. FRAIETTA:** Yes.

**THE COURT:** My question was I don't understand the distinction with respect to the level of education. If someone contracts with a private high school, for example, for in-person instruction and they don't get it, under your theory, wouldn't they be entitled to recover?

**MR. FRAIETTA:** Yes, they would under, under that circumstance, yes, we believe they would, although that -- that's not what this case is. This case is about universities.

**THE COURT:** I understand that. I'm just playing out the logic of what you're saying. What you're saying essentially comes down to this: We didn't get what we bargained for. That's essentially what it comes down to: We didn't get what we bargained for. We bargained for in-person instruction. With respect to college, it may be more than in-person instruction. It's the ambience of the campus.

But I understand, you know, I understand the positions.

**MR. FRAIETTA:** Correct, and our -- if I may. Our

Bergeron, et al. v. RIT - 20-CV-6283

argument -- and this is where RIT differs -- what they argue this isn't the case.

Our argument is that educational institutions are in these types of relationships, these purely commercial relationships where I bargain for X, in this case in-person learning. They are no different than any other participant in a market setting. So it's no different than the car dealer selling me an Oldsmobile when I paid for a Cadillac.

**THE COURT:** Mr. Lannon, let me go back to you on Page 3 of your memo. It says neither plaintiff asserts that they qualify for a refund and then you emphasis this language: "RIT expressly reserves the right to alter any of its courses at any time. Accordingly, no refunds are promised for changes in the location or mode of instruction."

I mean, I'm looking, you're referring to an RIT bulletin at 491. That's not in the -- and I'm a little confused by that because you seem to be saying, no, we don't need to look any further than the student financial responsibility agreement. I thought that's what you were saying: Listen, we don't need to look any further than that agreement because that's the operative agreement. So --

**MR. LANNON:** Your Honor, first, there is a typographical error. That quote actually is on Page 371 of the exhibit. This is Page 370 of document bulletin, not 491. It's a typo.

Bergeron, et al. v. RIT – 20-CV-6283

**THE COURT:** Okay.

**MR. LANNON:** So that's a three.

And the second point is that, your Honor, if you look at just -- we believe the express contract governs and we think the law is quite clear on that. It is, of course, a contract. It was consideration. It says it's a promissory note, in fact, and it has all the indicia of a contract.

If you just look at that contract, there is no express promise for in-person instruction so there was no breach as a matter of law. There was no breach.

The second argument we're making is if you go beyond that -- so if you buy the plaintiff's argument and go beyond that and say go look at other -- including the student bulletin -- the student bulletin doesn't help them because it specifically reserves the right for us to make changes in the course of instruction. As I pointed out, we actually have Constitutional right to do that. Supreme Court has agreed that how to teach a course, the mode of instruction is a Constitutional right, an essential freedom of all universities. We underscore that by putting it in writing so that there's no reasonable expectation.

And it's consistent with having -- comports with common practice, your Honor. Classes change. We move buildings. We move from different buildings. We close buildings for renovations. We don't give a refund, your

Honor, right, if a building is closed for renovations. We don't give a refund if a sports team was canceled and somebody really wanted -- was a big fan of that sports team. We don't give a refund if the school is closed for a snowstorm or wildfire or things like that or even a program that's a discontinued situation. Say you start off a English major and we cancel English as a program, you don't get a refund. That's part of the deal. We have the discretion to do that.

And you trust in it because it's not a commercial relationship as Mr. Fraietta says. This is a special unique relationship. As the Supreme Court and the courts of New York have said this is a very different kind of situation.

Just quickly on the Cadillac, I've heard this several times now in oral arguments. That's not an apt analogy. It's not getting an Oldsmobile or a Buick for a Cadillac. A more apt analogy, your Honor, would be this. You rent a Cadillac from a rental dealer. You travel two-thirds of your way to the destination and then there's a flood and the road is flooded and the police tell you you can't go any further. You're prevented from going further. The rental company then gets you a ferry, a different mode of transportation. You take the ferry and make it to your destination, you don't get a refund in that circumstance. In

Bergeron, et al. v. RIT - 20-CV-6283

fact, you should be applauding the rental company for taking care of you. That's what happened here. They made it two-thirds of the way through the year in-person and on-campus. Then RIT took extraordinary measures to complete their service, deliver their education by a different mode.

THE COURT: Okay. Let me just go back. So, again, we start with the premise that I'm limited to the complaint and anything that's incorporated by reference. And you're indicating -- it's RIT's position that incorporated by reference in the complaint is the student financial responsibility whatever account --

MR. LANNON: Yes, your Honor.

THE COURT: And you're saying, listen, you look at that, that's an express contract between RIT and the student. And that express contract gives RIT the right to deliver an education and credits in any mode or modality it deems appropriate.

Secondly, you're saying that, okay, even if you disagree with that, even if you buy plaintiff's argument that there's no express contract with the F, whatever, FRA doesn't create an express contract, and you buy RIT's argument that there is an -- excuse me, the plaintiff's argument there's an implied contract, then you're suggesting the language from the bulletin that says "reserves the right to alter any of its courses" includes the right not just to say we're

canceling Economics 101 because we don't have enough students, you're saying it also includes the right to determine how a class will be delivered; fair statement?

**MR. LANNON:** That's exactly -- well stated, your Honor. That's exactly right.

**THE COURT:** And I understand the plaintiff's position.

Counsel, I think I have a good grasp on the issues. I'll reserve. In the meantime, I don't know how we -- I guess I'll contact Judge Wolford.

Is there going to be some document presented from cracks's counsel agreeing to a consolidation of the cases and I take it RIT doesn't oppose that?

**MR. LANNON:** No, RIT does not oppose. We actually are in favor of consolidation, your Honor.

**MR. FRAIETTA:** We're happy to submit a stipulation, if that would work.

**THE COURT:** Yeah. Why don't you submit a stipulation. I'll discuss it with Judge Wolford and we'll go from there.

And, Mr. Fraietta, on behalf of Quattrociocchi counsel, I just want to be clear: Quattrociocchi counsel isn't going to ask for his own oral argument on these same points?

**MR. FRAIETTA:** My understanding is no, your Honor.

Bergeron, et al. v. RIT – 20-CV-6283

We will make sure to clarify that in the stipulation.

**THE COURT:** Yes, if you could put that in the stipulation, I would appreciate it.

Counsel, I think I have a good grasp. I appreciate your -- sorry for the all the delays but I hope everyone remains safe and we'll issue a decision.

Thank you very much.

**MR. FRAIETTA:** Thank you, your Honor.

**MR. LANNON:** Thank you, your Honor.

(**WHEREUPON**, proceedings were adjourned.)

Bergeron, et al. v. RIT – 20-CV-6283

\*          \*          \*

### CERTIFICATE OF REPORTER

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court of the Western District of New York before the Honorable Charles J. Siragusa on December 3, 2020.

S/ Diane S. Martens

Diane S. Martens, FCRR
Official Court Reporter