# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------- x

NICHOLAS BERGERON and NICK QUATTROCIOCCHI,
individually and on behalf of others similarly
situated,

                    Plaintiffs,

      -against-              Case No. 6:20-cv-06283

ROCHESTER INSTITUTE OF TECHNOLOGY,

                    Defendant.

------------------------------------------------- x

                 REMOTE VIDEOCONFERENCE

                    November 4, 2021
                    10:07 a.m.

     EXAMINATION BEFORE TRIAL of NICHOLAS BERGERON,
the Plaintiff, by the Defendant, in the
above-entitled action, held at the above time, taken
before Joi Rafkind, a shorthand reporter and Notary
Public within and for the State of New York.

                 MAGNA LEGAL SERVICES
                    (866)624-6221
                    www.MagnaLS.com



A.    Yes.

Q.    You graduated high school and received your high school diploma?

A.    Yup.

Q.    When?

A.    2015.

Q.    How were your grades in high school?

A.    They were fine, they were all right.

Q.    Did you receive any academic honors of any sort in high school?

A.    I don't recall.

Q.    Did you participate in any extracurricular activities in high school?

A.    I was in the band.

Q.    Anything else?

A.    I did one year of track and field.

Q.    Anything else?

A.    I think that's it.

Q.    Were you in band for the entirety of your time in high school?

A.    Yes.

Q.    Did you hold any leadership positions in high school?

A.    I was a senior patrol leader in Boy Scouts.



Page 24

Q.    Anything else?

A.    No.

Q.    Were you involved in student government at your high school?

A.    I was not.

Q.    You said you participated in one year of track in high school, what year of your time in high school was that?

A.    My senior year.

Q.    You graduated from high school in June of 2015, correct?

A.    Correct.

Q.    Had your plan in high school been to go straight to college after graduating high school?

A.    Yes.

Q.    When did you begin considering colleges, excuse me, that you might attend?

A.    Probably junior year sometime.

Q.    Describe generally the process that you undertook to consider colleges?

A.    I was looking for tech schools that had cyber security programs.

Q.    Were you looking for anything else?

A.    No, that was primarily what I was looking for.



Page 25

Q.    Cyber security was, as you were in high school cyber security is what you thought your interest would be for a career?

A.    Yes.

Q.    Did you visit colleges?

A.    I did, yes.

Q.    What colleges did you visit?

A.    I visited RIT, I visited the Wentworth Institute of Technology, and I think MCLA.

Q.    Any other colleges that you recall visiting?

A.    No.

Q.    Aside from those colleges were you actively considering other colleges as well?

A.    No.

Q.    When did you visit RIT?

A.    I think it was the summer between junior and senior year of high school.

Q.    Was that the same time period that you were visiting the other schools that you identified?

A.    Yes.

Q.    Can you describe your visit to RIT?

A.    It was so long ago I probably couldn't tell you much.

Q.    Fair enough.  What do you recall about it



MAGNA
LEGAL SERVICES

Page 28

A.     Yes.

Q.     Did you write out this application?

A.     I did.

Q.     Did anyone write any portions of it for you?

A.     I don't believe so.  It's possible that my parent helped me with my application, but I did it myself.

Q.     Flipping to page RIT1106, this indicates that as of January 26, 2015 you had completed your application for admission to RIT and filed it, correct?

A.     Yes.

Q.     Sir, why did you decide to apply to RIT?

A.     From what I can tell it had a great cyber security program, of which there were not many at the time, and the co-op education was, it looked very appealing to me.

Q.     Any other reasons?

A.     Nope, primarily the education.

Q.     When you say primarily the education, you mean the cyber security program and the co-op opportunity?

A.     Yes.

Q.     Anything else?



Page 29

A.    Not that I recall.

Q.    We'll talk a little bit about co-op, but can you describe generally what co-op means in connection with RIT?

A.    Yes, so a co-op is essentially an internship, but it has to be in your field of study, it has to be paid, and it has to be approved by the school.

Q.    Why was that appealing to you?

A.    So it gets students hands-on experience that will kind of like boost their profile when they are looking for jobs after graduation.

Q.    Any other reasons?

A.    Nope.

Q.    Had you in fact participated in several co-ops during your time at RIT, correct?

A.    Yes.

Q.    We'll talk about those in a little bit. Did you review any RIT written materials before you filed your application to RIT?

A.    I don't remember.

Q.    Did you review RIT's website before you applied?

A.    Probably.

Q.    Do you recall what portions of RIT's


MAGNA
LEGAL SERVICES

Page 30

website you recall you reviewed?

A.   Probably within the academic side of the cyber security program.

Q.   Anything else that you remember reviewing?

A.   Probably the tuition schedule.

Q.   Anything else?

A.   Not that I recall.

Q.   Did anything that you reviewed on RIT's website promise that instruction at RIT would be exclusively in person?

A.   No.

Q.   Did you receive any emails from anyone at RIT before you applied?

A.   I don't recall.

Q.   Did you receive any letters from anyone at RIT before you applied?

A.   I don't recall.

Q.   Did you review any RIT brochures or pamphlets before you applied?

A.   Probably.

Q.   What do you recall about that?

A.   I'm just thinking it's likely that I received some type of brochure or pamphlet from RIT, one year approaching at that time.



Q.    Of course.  You don't recall any of the brochures or pamphlets that you did review?

A.    No.

Q.    Do you recall if any of those brochures or pamphlets specifically promised that your instruction at RIT would be exclusively in person?

A.    No.

Q.    Did you review the RIT undergraduate bulletin before you applied to RIT?

A.    Yes.

Q.    What specific sections of the RIT undergraduate bulletin do you recall reviewing before you applied?

A.    I don't recall.

Q.    Do you recall that any of those sections in the RIT undergraduate bulletin made a specific promise that instruction at RIT would be exclusively in person?

A.    No.

Q.    Aside from what you've testified to over the last several minutes, do you recall reviewing any other RIT written materials before you applied?

A.    No.

Q.    Did you review RIT's tuition and fee refund policies before you applied?



A.    I don't recall.

Q.    Did you review RIT's student financial responsibility agreement before you applied?

A.    Probably.

Q.    You said probably, why do you say that?

A.    I wasn't planning on dropping out so it didn't really seem to me that it's something that I needed to pour over.

Q.    But you think you probably reviewed it before you applied?

A.    Probably.

Q.    We're talking about student financial responsibility agreement here, correct?

A.    Yes.

Q.    Did you speak to any RIT representatives before you applied at RIT?

A.    No, I don't believe so.

Q.    Did you speak to any RIT students before you applied to RIT?

A.    My neighbor was I believe was a student or alumni at the time I believe I talked to him.

Q.    What do you recall him saying, or you asking?

A.    Nothing in particular.  I think that he said that he enjoyed the program and that he had a


MAGNA
LEGAL SERVICES

good paying job.

Q.   Anything else that you recall him saying?

A.   No.

Q.   Did you speak, sorry, I'll ask the question even though I think you just answered, did you speak to any RIT alumni before applying, you said your neighbor was an alumni, correct?

A.   Yes.

Q.   Anyone else?

A.   No.

Q.   Did anyone at RIT ever make a specific promise to you before you applied if you enrolled at RIT your instruction would be exclusively in person?

A.   No.

Q.   So you were accepted for, I'm sorry, just one -- just a few follow-up questions on Bergeron deposition Exhibit 3, if you still have that up on your screen?

A.   Sure.

Q.   The first page RIT1097, you received this email, this letter from RIT, correct?

A.   Yes.

Q.   And this is on or about November 12, 2024, 2014, sorry?

A.   Yes.



Q. Did you receive this by mail or email, do you remember?

A. I can't say, don't remember.

Q. And there's nothing in this letter, is there, about in person education, is there?

A. No, I don't believe so.

Q. And then flipping to six or seven pages further to the page Bates RIT1106, are you there?

A. Yes.

Q. This is a letter you received from RIT on or about January 26, 2015, correct?

A. Yes.

Q. And there's nothing in this letter regarding in person education, is there?

A. No.

Q. Okay. So you were accepted for admission to RIT and, I'm sorry, I missed the other school that you were accepted at?

A. MCLA, Massachusetts College of Liberal Arts.

Q. And you ultimately decided to enroll at RIT, correct?

A. Yes.

Q. Why did you choose to apply, why did you choose to enroll at RIT?



Page 35

A.     Over MCLA or just in general?

Q.     In general or over MCLA why did you pick RIT to enroll at?

A.     RIT had, from what I can tell, one of the best cyber security programs in the country at the time.

Q.     Any other reasons?

A.     Nope.

Q.     Aside from the documents that you've already talked about reviewing before you applied to RIT in the period between your application and your enrollment do you recall reviewing any other RIT documents?

A.     No.

Q.     I'm not sure, was there an answer to that question, I didn't hear if there was?

A.     No, sorry, no.

Q.     Okay.  Aside from the person I guess that you've told me you applied, you spoke with prior to applying, did you speak with anyone else who was RIT related during the period between your acceptance to RIT and your enrollment at RIT?

A.     No.

Q.     Sir, let's talk a little bit about your time at RIT generally.  You applied for admission to



RIT's computer and security program, correct?

A.    Yes.

Q.    And you were accepted into that program?

A.    I was.

Q.    You changed that program in March of 2017, correct?

A.    Yes.

Q.    From computing security to computing and information technologies, correct?

A.    Yes.

Q.    And that's referred to at RIT as CMIT, correct?

A.    CIT.

Q.    CIT, okay.  Why did you, you effectively changed your major, is that what happened there?

A.    Yes, I stayed within general school.

Q.    What school is that?

A.    Golisano College of Computing and Information Sciences.  G-O-L-I-S-A-N-O, College of Computing and Information Sciences, that might be wrong.  It's close.

Q.    Why did you change your major in March of 2017?

A.    A lot of the computer security course work was things that I wasn't particularly good at



Page 42

A.    I believe ET Precision Objects was through like RIT email list of like they contact the school that we need an intern, they, the school, sends out, you know, an email of like the job description to a list of people looking for internships, and I interviewed for it and I got the job.

Q.    So that was ET, correct?

A.    Yes.

Q.    How about General Dynamics?

A.    I applied online.

Q.    Through RIT or just directly with them?

A.    I think directly with them.

Q.    How about Tesla?

A.    I applied online.

Q.    Any involvement in RIT in that securing that co-op?

A.    No.

Q.    Was the Tesla co-op in person out in California, or no?

A.    It was in person Fremont, California.

Q.    So you moved out there for a semester?

A.    Yup, summer.

Q.    Summer.  And the other two co-ops were also in person?



Page 43

A.    Yup.

Q.    Where did you live while you were studying at RIT?

A.    I lived on campus.

Q.    On campus all, I guess 5 years total?

A.    Yes, give or take with the exception of summers and co-ops, yes.

Q.    So for all the time that you were actually studying at RIT you were, you lived on campus at RIT at least through spring, through part of spring of 2020, correct?

A.    Yup.

Q.    This was on campus housing?

A.    Yes.

Q.    Can you describe how you generally spent your free time while you were at college?

A.    Hanging out with friends, playing video games.

Q.    Anything else that's memorable?

A.    Not in particular.

Q.    Did you join any fraternities?

A.    I did not.

Q.    Did you participate in any extracurricular activities during your time at RIT?

A.    I did not.


MAGNA
LEGAL SERVICES

Page 44

Q.    Were you a member of any campus clubs or organizations at RIT?

A.    I think I was on a cyber security club first semester.

Q.    This would have been early in your tenure at RIT?

A.    I believe so, yes.

Q.    And aside from this club that you participated in early in your RIT career, any other clubs that you were a member of?

A.    No.

Q.    Were you a member of RIT's student government?

A.    I was not.

Q.    Did you play any sports while you were at RIT?

A.    I did not.

Q.    Did you participate in any intramural or club sports at RIT?

A.    I did not.

Q.    Did you attend on campus sporting events at RIT?

A.    I did.

Q.    Which events did you attend?

A.    Primarily hockey.


MAGNA
LEGAL SERVICES

Page 45

Q.   How frequently did you attend, these were games of the RIT varsity team?

A.   Yes, men's hockey.

Q.   How often did you attend RIT's hockey games?

A.   It varied, but when we had a home game I would more times, more times than not I would go.

Q.   Aside from going to hockey games, any other sporting events that you went to as a spectator?

A.   A few, but rarely.

Q.   Did you ever use RIT's student health services?

A.   I believe so, a few times.

Q.   A few times, how many times do you recall using student health services?

A.   Once or twice.

Q.   Were these in person visits to student health services?

A.   Yes.

Q.   Did you ever use any of the RIT student health services tele-medicine health services?

A.   No.

Q.   Did you ever use RIT's counseling and psychological services?



Page 46

A.    No.

Q.    Did you use RIT's recreation or gym facility while you were at RIT?

A.    Sparsely.

Q.    Sparsely, what does that mean?

A.    I would often not go to the gym much but sometimes I would go to the gym for a couple weeks and then stop.

Q.    Familiar.  How about the 2019 or 2020 academic year, was that an on year for the gym or off year for the gym?

A.    It was an off year for the gym.

Q.    Okay.  When you did use the gym, what facility did you use?

A.    Typically the workout room, I called them the machines and such.

Q.    Anything else?

A.    Not that I recall.

Q.    Do you know what SLC stands for at RIT?

A.    Student life center.

Q.    Okay, yes.  Did you use RIT's student life center facility while you were at RIT?

A.    I don't remember.

Q.    Do you remember anything SLC related that you did use during your time at RIT?



Page 47

A.    I don't remember what the SLC offered, so.

Q.    Fair enough.  Did you have an on compass job at RIT while you were a student there?

A.    I did not.

Q.    Did you have an off compass job at RIT while you were a student there?

A.    I did not.

Q.    Taking a specific look at the 2019 through 2020 academic year, this was your senior year at RIT, correct?

A.    Yes.

Q.    And your fifth year of overall enrollment at the school?

A.    Yes.

Q.    From your transcript it looks like this was your most successful year at RIT in terms of grades, correct?

A.    Yup.

Q.    You had your best term GPA to date during the fall 2019 semester it looks like?

A.    Yes, I suppose so.

Q.    And your GPA for the spring 2020 semester was even higher than that, correct?

A.    Yes.



Page 48

Q.    You took 6 credit classes during the spring 2020 semester, correct?

A.    Yes.

Q.    And those are listed on Bergeron Exhibit 4 page RIT1157 under the header 2019 through '20 spring, correct?

A.    Yes.

Q.    And you received credit for all of these classes, correct?

A.    I did.

Q.    And complete credits, correct?

A.    Yes.

Q.    And you elected a pass/fail option for two of those classes, correct?

A.    Yes.

Q.    That was college physics 1 and intro to psych?

A.    Yes.

Q.    And you received As and Bs in the others, correct?

A.    Yes.

Q.    Sir, if you could open up Bergeron deposition Exhibit 5.

A.    Yup.

Q.    Do you recognize this document?



A.    Yes.

Q.    What is this?

A.    Looks like the RIT student financial responsibility agreement.

Q.    This was the student financial responsibility agreement that you executed for the 2019/2020 academic year, correct?

A.    Yes.

Q.    And you agreed to this document electronically, correct?

A.    Yes.

Q.    And that's where it shows at the bottom NGB8373 at the bottom, that's you, correct?

A.    Yes.

Q.    And you agreed to a student financial responsibility agreement at the beginning of every RIT academic year, correct?

A.    Yes, I imagine so.

Q.    What did you understand you were agreeing to in this student financial responsibility agreement?

A.    My understanding was if I dropped out halfway through the semester I'm not entitled to tuition reimbursement because that's my fault.

Q.    And it says in this agreement that you



Page 50

agree when you register at any class at RIT you received any services at RIT it says you agree full responsibility to pay all tuition fees and associated costs, correct?

A.   I don't see where that is, but it sounds right.

Q.   Do you want to check me out, it's on the first substantive paragraph the document right below payment of fees slash promise to pay.

A.   Yes, I see that.  Yes, I'm sorry.

Q.   There's nothing in this document that provides that all classes will be in person, is there?

A.   No.

Q.   And there's nothing in this document that states you're entitled to a refund if classes are canceled or changed, is there?

A.   No.

Q.   And in fact, the only reference to refund is in the second paragraph of this document, correct?

A.   Yes.

Q.   And that paragraph has hyperlink in it, correct?

A.   Yes.



Page 51

Q.     And it's a hyperlink to RIT's tuition refund policies, correct?

A.     I would imagine so.

Q.     Do you know what RIT's tuition refund policies are?

A.     Generally.

Q.     What do you understand to be generally?

A.     I know that if you, if you start dropping classes or school in general the closer you do it to the beginning of the semester it's prorated in terms of tuition reimbursement.

Q.     And there's a certain point at which there would be no refund?

A.     I believe so.

Q.     You knew this before you signed the student financial responsibility -- agreed to the student financial responsibility agreement that is Bergeron deposition Exhibit 5?

A.     Yes.

Q.     Mr. Bergeron, looking specifically at spring 2020, how did you go about choosing which classes you wanted to register for the spring 2020 semester?

A.     I needed to fill my pre-reqs, so I chose the ones that filled my pre-reqs, not my pre-reqs


MAGNA
LEGAL SERVICES

Page 52

but rather the things I needed to graduate.

Q.    So were all of your spring 2020 classes graduation requirements one way or another?

A.    Yup.

Q.    Anything else aside from checking the boxes to get graduation credits that you used to evaluate which classes you wanted to take in spring of 2020?

A.    Well, I mean, past, you know, just getting the credits and the courses that I needed I chose to elect for the ones that I thought would be interesting or beneficial to my career like storage architectures.

Q.    When did you register for classes for the spring 2020 semester?

A.    I believe it's mid to late fall semester.

Q.    So mid to late fall 2019 semester?

A.    Yes.

Q.    Do you recall whether it was around Thanksgiving time, Christmas time?

A.    Probably Thanksgiving early December.

Q.    How did you register for classes for the spring 2020 semester?

A.    Do you mean how do I go about registering for them?


MAGNA
LEGAL SERVICES

Q.    So that leaves prostitution and vice is the only one where you actually made a decision?

A.    Well, okay, like storage architectures I could have chosen something else, but it needed to be credits within my major.  And same with philosophy, it had to be a philosophy course.

Q.    So while you have this list on RIT1157 in front of you, just look at these classes and tell me what you remember about what documents you consulted in deciding whether or to register for these classes?

A.    I believe when you're selecting courses there's a description that's generally pretty accurate on what the course will be, so I typically just consulted that.

Q.    This is on SIS?

A.    Yes.

Q.    So just we're clear, I'm not going to ask you substantive questions about this document at this time, but if you can just pull up Bergeron Exhibit 9 really quickly.

A.    Yes.

Q.    This is RIT's undergraduate course descriptions 2019/2020.  Did you actually review this document in connection with registering for any



Page 56

of your spring 2020 classes?

A.   No, I don't believe so.

Q.   Okay.  Aside from the descriptions that were on the SIS portal themselves, did you review any other document in connection with registering for spring 2020 classes?

A.   No.

Q.   Did you review the syllabi for any courses before you registered for them in spring 2020?

A.   I don't believe so.

Q.   So of the classes you took during spring 2020 semester, one of them, prostitution vice, was actually an online class for the entirety of the semester, correct?

A.   Yes.

Q.   That looks like you got an A in that class, correct?

A.   Yes.

Q.   Are you seeking a refund in this case for the tuition you paid for that class?

A.   I'm not sure.

Q.   Why are you not sure?

A.   I hadn't considered that.

Q.   Did you consider your online prostitution



MAGNA
LEGAL SERVICES

Page 57

vice class to have been an equivalent value to your other classes for which you received in person instruction?

MR. ABBOTT:  Objection, vague.

Q.    You can answer if you understand.

A.    I don't.

Q.    Why not?

A.    I don't really know how to weigh them.

Q.    But you knew prosecution and vice was going to be online at the time you registered for it, correct?

A.    I did, yes.

Q.    Did you need a break, or are you good?

A.    I'm good.

Q.    Okay.  So if I could ask you to pull up Bergeron deposition Exhibit 6?

A.    Sure.

Q.    Do you have it up?

A.    Yes, I do.

Q.    Do you recognize this document?

A.    I do.

Q.    What is this?

A.    This is responses to a set of interrogatories.

Q.    Is it your responses to RIT's second set



Page 58

of interrogatories to you, correct?

A.    Yes.

Q.    They are dated as of September 17, 2021, correct?

A.    Yes.

Q.    On the final page of this document there's a verification, correct?

A.    Yes.

Q.    Here you're verifying that the truth and accuracy of these responses?

A.    Yes.

Q.    That's your signature on the line above Nicholas Bergeron?

A.    Yup.

Q.    That's a yes?

A.    Yes.

Q.    Did you review these interrogatory responses before you signed them?

A.    Yes, I did.

Q.    When you signed them did you consider them to be true and accurate?

A.    Yes.

Q.    When you signed them did you consider them to be complete?

A.    Yes.


MAGNA
LEGAL SERVICES

Q.    As you sit here today do you consider these interrogatory responses to be true and accurate and complete?

A.    Yes.

Q.    Take a moment if you need to review them, but is there anything in here as you testified today that you'd like to change?

A.    Not that I can see.

Q.    So drawing your attention to your response to interrogatory number 4, if you can just take a moment to review the interrogatory itself and your response to that interrogatory.

A.    Yup, okay.

Q.    I'm going to ask you a few questions about your response to this interrogatory.  So there's an initial objection to this interrogatory and then it says subject to and without waiving the foregoing objections plaintiff Bergeron states, and the first question I have is you state that quote there's a contract that RIT breached, do you see that?

A.    Yes.

Q.    What contract do you claim that RIT breached?

A.    I'm not sure, I sign a lot of contracts.



A.    Yes.

Q.    And if you could identify for me the language in this document that you, the agreement in this document that you claim RIT breached?

A.    I'll have to pull it up.

Q.    Please do.

A.    I don't believe that it's the entirety of the contract.

Q.    Why do you say that?

A.    I believe that I'm entitled to on campus learning.

Q.    I'm not sure I understand your response. Do you believe that, do you not believe that Bergeron Exhibit 5 is the entirety of your student financial responsibility agreement with RIT for the spring 2020 semester?

A.    I do, but I don't believe it's the entirety of the contracts I signed.

Q.    So in addition, tell me if I'm getting this wrong, in addition to the student financial responsibility agreement, you claim that there were other contracts that you had with RIT that RIT breached?

A.    Possibly.  No.  But I don't know what he's talking about.



Page 64

Q.     No meaning Bergeron Exhibit 5 is the contract on which you're basing your claims, or there are other contracts out there on which you're basing your claims?

A.     This is the only one.

Q.     What about Bergeron Exhibit 5 causes you to believe that it an incomplete statement of RIT's contract obligations under this agreement?

A.     Because this agreement doesn't really account for RIT not providing their end of the bargain, mostly includes me not holding up my end.

Q.     Let's try it this way.  So looking back at your -- at Bergeron Exhibit 6, which are your interrogatory responses --

A.     Yes.

Q.     -- and your response to interrogatory 4 you say that there's a contract that RIT breached and then you say as set forth in the brochures catalogs website advertising social media posts syllabi, et cetera, correct?

A.     Yes.

Q.     And this list that you have here in your response to Exhibit 4, is this where you claim the terms of this contract can be found?

A.     Yes.



MAGNA
LEGAL SERVICES

Page 65

Q.     So looking through this list, we'll spend a little time on working on your way through this list of sources --

A.     Okay.

Q.     -- you start with brochures, what brochures do you claim contain promises of in person education by RIT?

A.     I don't think I can really list all of the brochures that RIT has presented.

Q.     Why not?

A.     There's probably dozens, hundreds throughout the years.

Q.     Sure, but what are you basing your claims on in this case, which brochures are you basing your claims on?

A.     All of the brochures that would advertise anything to do with on campus learning events services clubs.

Q.     Let's try to get specific.  So you believe that these brochures, some of these brochures contain promises of in person education by RIT?

A.     Yes.

Q.     Which brochures do you contend contain promises of in person education by RIT?



Page 66

A.   I don't have any on me that I could reference.

Q.   Do you have -- do you have particular brochures in mind, even if you don't have them physically present with you today?

A.   No.

Q.   So you don't have any specific brochures that you can recall contained promises of in person education by RIT?

A.   No.

Q.   Next on your list is catalogs.  What catalogs do you claim in this case contain promises of in person education by RIT?

A.   Well, the course catalog typically will have all the classes in it and it will say this class will be taught in this classroom, this class will be taught in person, and, you know, this building or what have you.

Q.   Any other -- so you identified the course catalog, any other catalogs that you're referring to in your response to interrogatory 4?

A.   Not that I recall.

Q.   When you say course catalog, are you referring to what is Bergeron Exhibit 9?

A.   Yes, that, and in conjunction to the



Page 67

syllabus, they will typically state what building, what room, what teacher, and details about the class.

Q.     But in terms of catalog, we'll talk about syllabuses --

A.     Sure.

Q.     -- separately, in terms of catalogs, when you refer to catalog in your response to interrogatory 4, you're referring to Bergeron Exhibit 9?

A.     Yes.

Q.     So it's unwieldily document.  Let me just -- let's just walk through, this is Bergeron Exhibit 9 just for the record, sorry.  So in Bergeron Exhibit 9 let's look through the document to take a look at the classes you took in spring 2020, and I'll guide you through it by pages because it's a giant document.

A.     Sure.

Q.     So the first just working through the document chronologically the first of your spring 2020 classes looks like it's on page 58 of the document, which is RIT900, just take your time to get there and let me know when you're there.

A.     What page did you say?



Page 68

Q.    It's page 50 of the document and the Bates number is RIT900.

A.    One second.  Did you say RIT900?

Q.    Yup.

A.    Nevermind, I was on the wrong one.  Okay. Let's try to find that.  Okay, I see it.

Q.    On this page left column toward the top this is the course description in the undergraduate catalog for your senior development project 2, correct, ISTE501?

A.    Yes.

Q.    This is one of your spring 2020 classes, correct?

A.    Yes.

Q.    Is there any language in this description that you claim promises this class will be exclusively in person?

A.    No, but it was required to take in person.

Q.    Why do you say that?

A.    Because I had to take it in person for the first time.

Q.    Any other reason?

A.    I mean, no.  I took the first part and it was all in person, there was no options to take it



Page 69

remotely.

Q.   But so let's go back to my question though, in this description that's on page RIT900 of your senior development project 2, there's no language in here that you're claiming requires that class to be in person, is there?

A.   There's not.

Q.   So the next of your spring 2020 classes is on page 63 of the document, Bates RIT905.

A.   Yup.

Q.   Storage architecture NSSA422?

A.   Yup.

Q.   Do you see that?  This was one of your spring 2020 classes?

A.   It was.

Q.   Is there any language here that promises that that class would be exclusively in person?

A.   No.

Q.   Next class is on page 120 of the document, RIT962.

A.   Yup, I see it.

Q.   That's your crim 245 class prosecution and vice, correct?

A.   Yup.

Q.   This was one of your classes in the



MAGNA
LEGAL SERVICES

Page 70

spring 2020 semester, correct?

A.   Yup.

Q.   Is there any language in here that you claim promises classes would be exclusively in person?

A.   No, but it also doesn't mention that it would be exclusively remote, so.

Q.   This class was exclusively remote, correct?

A.   It was.

Q.   Next is on page 151 of the document, RIT993.

A.   I see it.

Q.   Philosophy 416 seminar in philosophy, this was one of your spring 2020 classes, correct? Sorry, I missed it, is that a yes?

A.   Yes.

Q.   Any language in here that you claim promises classes would be exclusively in person?

A.   No.

Q.   Next is page 15 of the document RIT997.

A.   I see it.

Q.   PSYC101, introduction to psychology, this was one of your spring 2020 classes, correct?

A.   Yup.


MAGNA
LEGAL SERVICES

Page 71

Q.     Is there any language in this description that you claim promises classes would be exclusively in person?

A.     There's not.

Q.     Last is page 210 of the document, RIT 1052.

A.     I see it.

Q.     PHYS111 college physics 1, this was one of your classes for the spring 2020 term, correct?

A.     Yup.

Q.     Is there any language in this description that you claim promises classes would be exclusively in person?

A.     No.

Q.     Looking back at your list on Bergeron Exhibit 6, your response to interrogatory 4, that we were just talking about the second item on your list catalogs and we just looked at the undergraduate course catalog, I think I asked you before but I'll ask you again, is this the only catalog that you're referring to as the catalog in response to interrogatory 4?

A.     Yes.

Q.     The next on your list, next on your list is website, correct?



A.    Yes.

Q.    Are you referring to the RIT website in this response?

A.    Yes.

Q.    You're referring to sites that are under the RIT dot EDU domain, correct?

A.    Yes.

Q.    Are you referring to any other website in this response?

A.    No.

Q.    What part or parts of the RIT website do you claim contain promises of in person education?

A.    I don't have the website pulled up in front of me.  But there is certainly a lot of advertising about how all the things on campus that you get when you go to school at RIT.

Q.    Any other sections of the RIT website that you're referring to in website in your response to interrogatory 4?

A.    Not that I recall, but RIT has a lot of pages on the website.

Q.    So you say the parts that you're referring to in this response are parts that are advertised that things that you do on campus, correct?



Page 73

A.    Yes.

Q.    Anything else did I misstate that is that inaccurate or incomplete?

A.    No, I'd say it's pretty accurate.

Q.    Tell me about what you remember about these things on the RIT website that are advertised as things you can do on campus?

A.    I mean, there's hundreds of things to do on campus, so I couldn't name them all, but there's plenty of clubs, activities, there's labs, there's the library, there's the gym, there's the cafeterias, there's student health center, there's events, sports, there's pizza parties, there's tons of stuff.

Q.    So tell me, I'll try to summarize that and see if this is accurate or inaccurate, the parts of the website you're referring to are things on the RIT website that describe the things you can do on campus, the attributes of RIT's campus and what's available to students?

A.    Yes.

Q.    Anything else?

A.    No, I'd say that's it.

Q.    Do you know whether any of those portions of the RIT website that you're referring to contain



Page 74

a specific promise of in person instruction at RIT?

A.    No.

Q.    No, you don't know, or, no, they don't?

A.    No, they don't, I believe.

Q.    I'd like to ask you to flip to Bergeron Exhibit 10.

A.    Yup.

Q.    Do you recognize this document?

A.    Probably.  I don't think I've looked at this in quite a while, so it's possible I've seen it.

Q.    Do you recall having ever seen it before?

A.    Not that I can think of, but I probably have.

Q.    Why do you say you probably have --

A.    I spend a lot of time on RIT's website and their online links, their online portals and such.

Q.    Title of this document is disclaimer, correct?

A.    Yes.

Q.    And the URL at the bottom of the page indicates that this is a screen shot from RIT's website, correct?

A.    Yes.


MAGNA
LEGAL SERVICES

Page 75

Q.    Do you know whether you saw this document before the spring 2020 semester?

A.    I'm not sure.

Q.    The fourth sentence of this document states that quote nothing on the RIT dot EDU website is intended to be a representation, offer, inducement, promise, or contract of any kind.  Did I read that accurately?

A.    Yes, it looks right.

Q.    At the time that you enrolled at RIT for the spring 2020 semester do you have an understanding of what that language that I just read meant?

A.    Yes.

Q.    What's your understanding?

A.    That means that just because something is on the RIT website doesn't necessarily mean that I will be getting it.

Q.    Doesn't mean it's a contract or a promise, correct?

A.    Yes.

Q.    Back to your Bergeron Exhibit 6 interrogatory 4 response list.  Next to your list is advertising.

A.    Yes.



Page 76

Q.    What advertising do you claim contains or contained promises of in person education by RIT?

A.    When I was applying for schools I'm sure that I got plenty of mail from RIT showing us how beautiful the campus was and all the things you can do on it, although I don't have them at the moment, they are all gone.

Q.    So you're referring to advertising in your response to interrogatory Exhibit 4 to mailings you received from RIT in connection with your application process?

A.    Yup.

Q.    Are you referring to anything else?

A.    No.

Q.    Describe for me if you can remember what the advertising looked like?

A.    Probably orange.  Telling me about programs that they had.  All the great opportunities to, you know, learn about, you know, the various engineering disciplines, all the labs they had, how advanced they were, all the clubs, all the activities to do on campus.

Q.    Do you believe these advertising brochures that you received in connection with your application to RIT contained specific promises of in



person instruction?

A.    It might, but probably not.

Q.    You don't know of any as you sit here today, do you?

A.    No.

Q.    Next on your list in interrogatory 4, your response to interrogatory 4 is social media posts.  Do you see that?

A.    Yup.

Q.    What social media posts do you claim contain promises of in person education by RIT?

A.    Well, I certainly don't have a list of them.  But RIT does certainly boast about their wonderful campus and all the things to do on it.

Q.    Okay, so you're referring in this response to social media posts from RIT regarding its wonderful campus and things to do on it --

A.    Yes.

Q.    -- correct?  Are you referring to any other social media posts in this response?

A.    I couldn't catalog all the social media posts, so.

Q.    Right, I'm not asking you to catalog all of RIT's social media posts, I'm asking you what social media posts you're referring to in your


MAGNA
LEGAL SERVICES

Page 78

response to interrogatory 4?

A.    I suppose that would be it.

Q.    Did you review these social media posts that you're referring to here?

A.    Not recently, not, I don't go over RIT's social media posts that much.

Q.    Did you review them before you either applied to RIT or before you enrolled for spring 2020?

A.    Yes.

Q.    Which social media posts do you recall reviewing at those time periods?

A.    Facebook, Twitter, Instagram.

Q.    Anything else?

A.    Probably it, but, I mean, I get emails from them, but I don't know if that's social media, so.

Q.    Did any of those social media posts that you reviewed either prior to enrolling at RIT or prior to enrolling at RIT for spring 2020 contain specific promises of in person education at RIT?

A.    Not that I recall.

Q.    What social media platforms did you have an account on as of spring 2020?

A.    Facebook, Twitter, Instagram.



Q.    Anything else?

A.    Probably Reddit, I don't know, there's lots of social media platforms.

Q.    Right, I'm asking what social media platforms that you yourself have a presence on?

A.    Yes, that's probably most of them.  At least the big ones.

Q.    Facebook, Twitter, Instagram, Reddit?

A.    Yes.

Q.    Anything else?

A.    I think that's it.

Q.    Did you ever post on any of these platforms about RIT?

A.    Rarely, if ever. RIT has an unofficial subreddit where students will post about things going on in school.

Q.    Did you ever post on the subreddit?

A.    Mostly view.

Q.    But post occasionally?

A.    Like maybe one or two, but rarely.

Q.    Did you ever make any posts on the RIT subreddit regarding spring 2020 or your experiences during spring 2020?

A.    I don't believe so, but there were certainly a lot of other people doing so.



Page 80

Q.    Right, I'm just asking about you, you don't believe you actually posted?

A.    No.

Q.    How about on Facebook, or Twitter, or Instagram, did you ever post on any of these platforms regarding your experiences at RIT during the spring 2020 semester?

A.    I don't believe so.

Q.    Back to your interrogatory 4 list of responses, your list, we just talked about social media posts, next on the list is syllabi, do you see that?

A.    Yes.

Q.    What syllabi do you claim contained promises of in person education by RIT?

A.    Pretty much every class I've ever taken will have some type of language saying where the class will be held, that, you know, it's not available to take remotely, otherwise that would be very clearly spelled out such as the case in my prostitution and vice class.

Q.    Are you finished with your answer?

A.    Yes.

Q.    So you just gave me two reasons, I think, why you think syllabi contain promises of in person



Page 81

education by RIT, correct?

A.   Yes.

Q.   The first is that they identify class locations, correct?

A.   Yes.

Q.   And the second, just to make sure I understand it, are you saying that syllabi contained express language that this class is not available to be taken remotely?

A.   No, I'm saying that in the case of remote classes they will very explicitly say this class will be held remotely.  At least that is the case for the classes that I've taken.

Q.   Got it.  So your contention is that by not saying the class is available to be taken remotely, that means the class is in person?

A.   Yes.

Q.   Aside from these two points, the location of the class and the absence of an express remote option, is there anything else in your syllabi that you contend contains an express promise of in person education?

A.   I don't believe so.

Q.   In your response to interrogatory 4 after syllabi you have ETC period, correct?



Page 82

A.    Yes.

Q.    That means et cetera?

A.    Yes.

Q.    What does et cetera mean here?

A.    That it means that there's a lot of places where RIT has advertisements or, you know, things that are sent to students or provided to potential students, that is, I don't know, not exhaustive list.

Q.    So we talked about brochures, catalogs, websites, advertising, social media posts, and syllabi so far, correct?

A.    Yes.

Q.    And that's the list in your interrogatory response to interrogatory 4, correct?

A.    Yes.

Q.    So what additional documents are you aware of that you contend contain promises of in person education by RIT?

A.    I don't have any others.

Q.    When you say you don't have any others, you're not aware of any others?

A.    I am not.

Q.    Mr. Bergeron, are you familiar with the RIT undergraduate bulletin?


MAGNA
LEGAL SERVICES

Page 83

A.    Probably.  I don't think I've read it in a while.

Q.    If I can ask you to pull up Bergeron Exhibit 7.

A.    Okay.

Q.    Do you recognize this document?

A.    Yup.

Q.    What is this?

A.    It's a general schedule of when classes start, when classes end, when there's days off, when there's, you know, major events on campus, things like that.

Q.    This is the undergraduate student bulletin for the 2019/2020 academic year, correct?

A.    Yes.

Q.    Which included by definition the spring 2020 semester, correct?

A.    Yes.

Q.    Did you review, have you reviewed this document before today?

A.    I have not.

Q.    Today is the first time you're seeing this document?

A.    I'm sure I've seen it in the past, but not in a while.


MAGNA
LEGAL SERVICES

Page 84

Q.    Did you look at this document or did you review this document or parts of it before you registered for classes for the spring 2020 semester?

A.    I don't believe so.  Most of the semesters are generally follow the same framework.

Q.    The undergraduate bulletin you mean looks the same pretty much from year to year?

A.    Yup.

Q.    So at some point prior to enrolling in classes for the spring 2020 semester you reviewed some it, portion of the RIT undergraduate bulletin?

A.    Yes, that is likely.

Q.    And you didn't, you didn't review, you don't recall reviewing the 2019/2020 undergraduate bulletin because you just assumed it was pretty similar to what you had previously seen, correct?

A.    Yes.  I also believe we had some kind of email providing something similar to this.

Q.    What do you mean by that?

A.    Like anytime that there's like first day of classes, or last day to drop classes, or, you know, finals start, or we have a day off, we usually get some type of notification from the school regarding that.

Q.    You're saying some subset of the



Page 85

information in here is provided to you formally or informally by RIT by email?

A.    Yes.

Q.    So you don't have to have this as the bible in front of you throughout the academic year, right, it'll tell you when you need to do certain things?

A.    Yes, I think they know that students are forgetful and busy.

Q.    Got it.  So, sir, are you basing any of your claims in this case on any promises that you contend are contained in Bergeron Exhibit 7, the undergraduate bulletin?

A.    I believe it's quite long, but, yes, I don't think I can really tell you without reading most if not all of it.

Q.    If you can just take a look at the table of contents and see if that refreshes your recollection on whether your claims are based in part on any promises contained in this document?

A.    Not that I can see.  University policies and procedures potentially.

Q.    Anything else?

A.    That's probably it.

Q.    So you don't know whether your claims in



Page 86

this case are based on anything in this document, Bergeron Exhibit 7?

A.    Yes, I don't know.

Q.    As you sit here today you're not aware of any specific promises of in person education that you contend are contained in this document, Bergeron Exhibit 7?

A.    No, I do not.

Q.    I'd like just a few specific questions about this document, just like the other unwieldily document I'll just give you specific page references to bring you to where I'm looking.  So first questions are regarding something on page 1 of the document, which is page 3 of the pdf, it's RIT Bates number RIT345.  Are you there?

A.    Yup.

Q.    The paragraph on the left side of this page, which is headed about this bulletin, do you see where I'm talking about?

A.    Yes.

Q.    You see that the first sentence of that paragraph reads as follows, this undergraduate bulletin does not contain -- strike that, I'll start again.  Quote, this undergraduate bulletin does not constitute a contract between the university and its



students on either a collective or individual basis, did I read that accurately?

A.     It looks like it to me.

Q.     Then two sentences after that the document refers to the possibility of quote course and curriculum changes, do you see that?

A.     These are really long sentences, yes.

Q.     And it also refers to the possibility of quote unforeseen changes to other aspects of RIT life, correct?

A.     Yes.

Q.     And the following sentence states quote because of this Rochester Institute of Technology does not assume a contractual obligation with its students for contents of this undergraduate bulletin.  Did I read that accurately?

A.     Yes.

Q.     At the time you enrolled at RIT from the spring 2020 semester did you have an understanding of what the language we just discussed meant?

A.     I probably had a general idea.

Q.     What was your general idea?

A.     That this document is not a contract between the university and student.

Q.     Anything else?



Page 88

A.      Pretty much sums it up.

Q.      If I could ask you to flip to page 55 of the document, that's page 57, I believe, of the pdf, it's RIT398.

A.      Yup.

Q.      And this is the program overview for computing and information technologies, correct?

A.      Yes.

Q.      This was the course of study in which you were enrolled in the spring of 2020 semester, correct?

A.      Yes.

Q.      And the description of your major continues on -- begins on page RIT398 and continues to RIT399, correct?

A.      Yes, that looks right.

Q.      And do you see any language in either of these two pages that you contend constitutes a promise by RIT of exclusively in person education?

A.      No.

Q.      If I could ask you to flip way down, scroll way down into the document to page 354 of the document, which is Bates 355 of the pdf, it's RIT697.

A.      Okay.



Page 89

Q.     There's a section beginning on this page entitled refund policies.  Do you see that?

A.     I do.

Q.     That section continues on to the next page, correct?

A.     Yes.

Q.     There's nothing in this section that states that RIT students have a right to a refund if RIT cancels classes, is there?

A.     Not that I can tell, no.

Q.     Or that gives RIT students a right to a refund if RIT changes the manner of class instruction, is there?

A.     No.

Q.     On page 354 of the document the right column about halfway down under the heading partial refund schedule for tuition.  Are you there?

A.     One second.  Yup.

Q.     There's a URL embedded in here page to RIT website, do you see that, if I can ask you to take a look at Bergeron Exhibit 8.

A.     Yup.

Q.     This is RIT1781 through RIT1789.  Do you recognize this document?

A.     Yes, I think I've seen this before.



Page 90

Q.    When do you think you saw it?

A.    Not sure, but definitely during my time at RIT.

Q.    Do you believe it was before you enrolled for spring of 2020?

A.    Yes.

Q.    This document is entitled refund tuition adjustment policies, correct?

A.    Yes.

Q.    From the URL at the bottom of Bergeron Exhibit 8 looks like it was posted on the RIT student financial services website, correct?

A.    Yes, sounds right.

Q.    There's nothing in this document that states RIT students have a right to a refund if RIT cancels classes, is there?

A.    No, not that I can see.

Q.    There's nothing in this document that gives RIT students a right to a refund if RIT changes the manner of instruction, is there?

A.    No, not that I can tell.

Q.    At anytime during the spring 2020 semester did you ever take a leave of absence from RIT?

A.    Nope.


MAGNA
LEGAL SERVICES

Page 92

Q.   Within that section, that section continues on to the next page, correct?

A.   Yes.

Q.   If I can ask you to flip to page RIT713, it's the carry-over from the previous section, correct, and the final sentence of that paragraph reads quote RIT reserves the right to alter any of its courses at anytime.  Did I read that accurately?

A.   Yes.

Q.   Do you have an understanding of what this sentence meant when you enrolled at RIT for the spring 2020 semester?

A.   Possibly.

Q.   When you say possibly, what do you mean?

A.   I guess I hadn't really considered what that would mean in reality.

Q.   So what was your understanding based on?

A.   I mean, it had never happened so there would be no way to know what RIT would mean by that.

Q.   What did you understand it to mean?

A.   RIT can change classes on a whim.

Q.   Sounds good.  What time is it now?  Your call whether you want to make this restroom or little bit longer lunch-ish break, what do you think?



MAGNA
LEGAL SERVICES

Page 93

A.    I'm fine with either.

Q.    Why don't we just call it 12:05 now maybe we can just break for half hour, do whatever anyone needs to do, and then reconvene at 12:35.

A.    Sure.

THE VIDEOGRAPHER:  The time is 12:05, we are going off the record.

(Luncheon recess taken 12:05-12:37)

THE VIDEOGRAPHER:  The time is 12:37, we are back on record.

Q.    Good afternoon, Mr. Bergeron.

A.    Good afternoon.

Q.    I just have one more line of questioning regarding Bergeron 6, which I can pull that up. Your response to interrogatory number 4.  We talked about all of the specific sources in your list in your response to interrogatory 4.  You also cite in your response to interrogatory 4 the party's course of conduct.  Do you see that?

A.    Yes.

Q.    What do you mean by that?

A.    By that I would mean the previous years of on campus education.

Q.    Do you mean anything else by that?

A.    No, I do not.


MAGNA
LEGAL SERVICES

Page 94

Q.    What about the previous years of on campus education are you basing your claims on in this case?

A.    In the previous years there was no option or even slight consideration that classes could or had the potential to be remote unless specifically noted.  Everything was in person by fault.

Q.    So in referring to prior course of conduct, are you referring to the pre-pandemic normal of RIT?

A.    Yes.

Q.    Are you referring to anything else?

A.    No.

Q.    Prior to spring of 2020 did you ever have a class at RIT change locations or professors?

A.    Not that I recall.

Q.    No changes of class location that you can recall?

A.    Some of them would change like we're going to be down the hall now, but nothing major.

Q.    So some of the classes that you took actually did change location over your time at RIT?

A.    I mean like rarely, and the location change was not significant, it would be on a different floor or in a different classroom.



Q.    So was that the class was moved to a different location than that had previously been stated in the syllabus?

A.    Rarely, but it has happened.

Q.    Do you think RIT breached a contract when this occurred?

MR. ABBOTT:  Objection, vague.

Q.    You can answer it.

A.    I don't know.

Q.    You didn't sue RIT for breach of contract when this occurred, did you?

A.    No.

MR. ABBOTT:  Objection, argumentative.

Q.    The answer is no?

A.    The answer is no.

Q.    Prior to spring of 2020 did you ever have a class at RIT canceled because of snow or weather?

A.    I have.

Q.    How many times prior to spring of 2020 would you estimate that that occurred?

A.    It would be hard to guess, but it would happen a handful of times a semester maybe.

Q.    Handful of times each semester?

A.    Yes.

Q.    Do you think RIT breached a contract when


MAGNA
LEGAL SERVICES

A.    No.

Q.    During that same time period had you expressed any views on the subject to anyone at RIT?

MR. ABBOTT:  Objection, vague.

A.    I don't know.

Q.    Well, do you recall anytime during between March 11th and March 20th expressing any opinions to anyone at RIT regarding tuition or fee refunds?

A.    I don't remember doing so, no.

Q.    During this period between March 11th and March 20, 2020 did you have any conversations with anyone, anyone period, regarding tuition or fee refunds?

A.    It's possible.  I don't know.

Q.    Do you have any recollection of that occurring?

A.    I probably discussed it with my parent saying I hope RIT gives us some kind of reimbursement.  Possibly did it with my friend, I don't know.

Q.    But you don't have a specific -- go ahead.

MR. ABBOTT:  I advise my client not to speculate.  Simply speak to the things you have



Page 107

personal knowledge of, thank you, Robert.

Q.   Yes, absolutely, we're not asking you to guess here.  But you don't have any specific recollection of that occurring, it might have happened, but you don't recall it happening?

A.   No.

Q.   So in this March 20, 2020 communication from RIT, that's Bergeron Exhibit 12, RIT informs students that it would be making pro rata refunds of housing costs, dining plans, and parking fees, correct?

A.   Yes.

Q.   Did RIT make these refunds?

A.   Yes.

Q.   Did you receive the refunds for those costs you had paid?

A.   Yes, I had, I paid for housing and parking pass.  Didn't have a meal plan.

Q.   You received pro rata refunds for both your housing costs and parking costs?

A.   Yes.

Q.   And you're not seeking to recover any refund of housing costs or parking costs in this case, are you?

A.   No.



Page 108

Q.     Did classes at RIT resume on March 23rd as had been scheduled?

A.     Yes.

MR. ABBOTT:  Objection.

Q.     That was a bad question, let me do it again.  Did classes at RIT resume on March 23rd as had been rescheduled in the wake of the pandemic?

A.     Yes.

Q.     Did all of your classes resume that week?

A.     I believe so.

Q.     Prior to spring break 2020 had you attended all of your spring 2020 classes?

A.     Yes.

Q.     Had you missed any classes prior to spring break 2020 in the spring 2020 semester?

A.     Yes.

Q.     You had missed classes?

A.     A few.

Q.     How many had you missed?

A.     Two or three.

Q.     Two or three total among your classes, or two or three in each class?

A.     Two or three across all of them, I would say.

Q.     Did your professors provide revised



Page 109

syllabuses for all of your classes for the second half of the spring 2020 semester?

A.    I think most of them did.

Q.    Do you recall any professors who didn't?

A.    Well, the online class was essentially unchanged.  And I think philosophy may not have changed, but I don't recall specifically.

Q.    Were any of your courses canceled for the second half of the 2020 semester?

A.    No, but, I mean, bowling was essentially canceled.  We did online, like we had like three homeworks and we did like food permits.

Q.    So aside from bowling, did all of your classes continue in some fashion?

A.    Yes.

Q.    Did you have the same professors for all of your classes in the second half of your spring 2020 semester as you did in the first half?

A.    Yes.

Q.    Did all of your professors make themselves available to students in some fashion, virtually, via email, or some other means in the second half of the 2020 semester?

A.    Yes.

Q.    Mr. Bergeron, you commenced this lawsuit



against RIT on May 1st, 2020, correct?

A.   I don't recall the date, but that sounds right.

Q.   Just to get a clean record, so if you can just pop open Bergeron Exhibit 13, and see if this refreshes your recollection on the date you commenced this lawsuit?

A.   The date is at the bottom probably. April 30th.

Q.   Yes, it appears that the complaint is dated April 30th.  And if you look at the header of the document, which indicates the date on which it was filed, it looks like it was filed on May 1st, 2020?

A.   Yes.

Q.   Does that refresh your recollection as to the date in which you filed this lawsuit?

A.   Yes, it does.

Q.   And that was May 1st, 2020, correct?

A.   Yes.

Q.   When did you first speak with lawyers regarding potentially bringing a lawsuit against RIT?

A.   It was after RIT had brought up the partial refunds for, the prorated refunds regarding



make the best of it.

Q.    The general sentiment, what do you mean the general sentiment?

A.    Of the transition to online learning.

Q.    Whose general sentiment are you articulating?

A.    Staff, students.

Q.    Do you recall specific conversations you had with professors during the period between March 20, 2020 and April 9th, 2020 where this was discussed?

A.    No, I don't.

Q.    So how are you aware of what you term the general sentiment?

A.    Pretty much every professor and every zoom call would or every like discussion or email or whatever, would, I don't know, like the professors would, I don't know, kind of say like, like this is not how I would do it normally, I know this is not the same way we would do it if we were in person, but this is how we're doing it, blah, blah, blah.

Q.    So you recall that all of your professors, all of your spring 2020 professors made those statements?

A.    I couldn't say if it was all of them.



Q.    I'm sorry, I didn't mean to interrupt.

A.    I just couldn't recall if it was all of them, or one didn't, or two didn't.

Q.    Do you recall specific professors that you had in spring 2020 who did make those statements?

A.    No.

Q.    So in this April 9th message, Bergeron Exhibit 14, you wrote quote the professors are handling the transition to remote learning at best poorly, correct?

A.    Yes.

Q.    Which of your spring 2020 professors did you think were handling the transition poorly?

A.    There were cases where, well, some of the obvious ones are like physics, it's really hard to do a physics lab and such without having a lab. Being able to see the things in motion really helps like concrete the ideas.  There were cases where I don't remember, you know, physics was definitely a bad one, but there were other cases as well.

Q.    Let's talk about physics first then.  How do you think your physics professor was handling the transition poorly?

A.    Just that like it's hard to replace the



in person stuff with remote learning.  There were no form of teaching necessarily.

Q.    Do you feel your physics professor could have done something differently than he or she did?

A.    No, like I said, I think we were all making the best out of a bad situation.

Q.    How about others of your professors, do you think any of them could have handled the transition differently than they did?

A.    No, probably not.

Q.    So when you're referring in this email to the professors handling the transition to remote learning poorly, this is more an observation about the situation in which everyone was in at the time rather than a criticism regarding how specific professors were doing their jobs?

A.    Yes, probably.  I don't really recall the specifics of that email.

Q.    Your April 9th message, Bergeron Exhibit 14, states quote class that you have quote classes that have been deeply devalued because of remote instruction methods.  Did I read that accurately?

A.    Yes, sounds right.

Q.    Which of your classes do you think had been quote deeply devalued during the second half of



spring 2020?

A.   I would say most, if not all.

Q.   But not just, so I'm clear, but not all, or is your position that all of your classes were deeply devalued?

A.   I haven't really thought about it in a while.  But I would say that the majority of them at least.

Q.   Which specific classes can you identify that you were taking in spring of 2020 that you consider to have been deeply devalued by the transition to remote?

A.   There were the senior development class was working on a large project and it's hard to facilitate like the before and after class like discussions with my group on how we're going to do things.  You can still do them, but it's not as organic.  Storage architectures was still a class, but there wasn't like, I don't know, it wasn't like a social interaction with the professor as much as it was, you know, I'm going to record a lecture and something and throw it up.  Physics obviously they would be missing a large chunk of what that class is.  I don't recall mishaps with other classes, but there may have been cases there too.



Page 119

Q.    Does your last answer include all of the instances that you can currently recall in which you think that your classes in spring 2020 have been deeply devalued?

A.    Yes.

Q.    Do you consider that your courses in the second half of the spring 2020 semester had any value to you?

A.    I would say that yes, they did have value, but it was definitely less.

Q.    So all of your classes had some value, it was just according to you some of it was diminished, yes?

A.    Yes.

Q.    And what value did your classes in the second half of spring 2020 provide?

MR. ABBOTT:  Objection, vague.

A.    I mean, I could read you the syllabus of the classes if you wanted, but it's storage architecture I learned less about storage architecture, philosophy, it's hard to learn about philosophy if you don't have as good interaction with the professor, so.

Q.    Did you learn skills during the second half of spring 2020 that you've used in your



Page 120

postgraduate RIT, postgraduate job?

A.    No, I don't think so.

Q.    No skills during the second half that you use today?

A.    No.

Q.    You identified three instances in an earlier answer where you considered your -- the value of your classes to have been devalued.  You said your senior development class, the possibility of before and after class discussions with your team, it was more difficult to organize those discussions, correct?

A.    Yes, I would say so.

Q.    And by what percentage if you had to estimate would you consider that devalued your overall class experience in that class?

MR. ABBOTT:  Objection, vague.

A.    I don't know.

Q.    10 percent, 50 percent?

A.    It would be hard to calculate that, I don't know.

Q.    Why would it be hard to calculate that?

A.    I don't know how you would quantify an education in one or the other, so.

Q.    I'm not sure I understood.  How it would


MAGNA
LEGAL SERVICES

value an education in one or the other?

A.    Yes, I don't know how one would value an education before or after switching to remote learning, I think it would be almost improbable.

Q.    You yourself haven't tried to undertake that analysis, have you?

A.    No.

Q.    Would that be the same set of answers if I asked you about the alleged diminution in value of your storage architecture or your physics class?

A.    Yes.

Q.    So if I can ask you to flip to Bergeron Exhibit 15.

A.    Sure.

Q.    Do you recognize this document?

A.    Yes.

Q.    I'm sorry, I might have just cut out on my end.  Did you say yes?

A.    Yes, I do.

Q.    What is this document?

A.    This is Professor Zilora's response to Exhibit 14.  He basically said he can't do anything about money, but, hey, we can help with the education, how can I help, like what can I do.  And I realized that RIT was not interested in any kind



Page 122

of financial reimbursement, so.

Q.   Let's unpack that a little bit.  Who is Stephen Zilora?

A.   Looks like he's the professor and director of school's information RIT.

Q.   You say looks like, have you ever taken a class with Professor Zilora?

A.   I did not.

Q.   Do you know that he was the head for your major at RIT?

A.   Yes, I had seen him around.

Q.   So you knew he was the head of the major that you were enrolled in?

A.   Yes.

Q.   And this is an email that Professor Zilora sent to you on April 14, 2020, correct?

A.   Yes.

Q.   This was less than a week after you sent your April 9th message to RIT, correct?

A.   Yes.

Q.   And Professor Zilora asked for your thoughts on what RIT could be doing better, correct?

A.   Yes.

Q.   Did you respond to Professor Zilora's email?


MAGNA
LEGAL SERVICES

Page 124

Q.     And he's asking for your thoughts on what RIT could be doing better, correct?

A.     Yes.

Q.     And you didn't respond to him because why?

A.     Because my answer to that is you should return to campus, but obviously that was not an option, so I didn't see there being a way forward with that.

Q.     Does that mean that you couldn't articulate any ideas about what RIT could be doing differently as of April 14, 2020 on the education side of the issue?

A.     I mean --

MR. ABBOTT:  Objection, vague.

A.     No, yes, I don't know.

Q.     Did you have opinions, I'm trying to understand whether your testimony is that the only way -- that the only way that RIT could be doing anything differently is just by reopening the campus, is that your position?

A.     I'm sure that there's things that they could do to improve education while they are remote, I don't know what those would be.

Q.     And you didn't feel at the time you


MAGNA
LEGAL SERVICES

received this email on April 14, 2020 that RIT should reopen the campus, did you?

A.    No.

Q.    So the reason why you didn't respond to Professor Zilora's April 14th email is because you had no suggestions to offer?

A.    Yes.

Q.    I'd like to ask you to flip to Bergeron Exhibit 16.

A.    Yup.

Q.    Let me know when you're there.

A.    Okay.

Q.    Do you recognize this document?

A.    Yes, this looks like my finances for the spring 2019 semester.

Q.    So this is --

A.    Spring 2020 rather.

Q.    So this is a financial statement of your RIT account for the spring 2020 semester, correct?

A.    Yes, that looks right.

Q.    Do you see anything on this document that looks inaccurate to you?

A.    No, it seems right.

Q.    So this statement shows that your tuition for spring 2020 was $22,454, correct?



Page 126

A.    Yes.

Q.    And you also owed some required fees for that semester, correct?

A.    Yes, it was for my sixth class.

Q.    So the activity fee was $148?

A.    Yes.

Q.    $175 for the student health services fee?

A.    Yes.

Q.    And you paid or you owed $195 for alumnus education fee, correct?

A.    Yes.

Q.    And did I hear you correctly to say that that was for your bowling class?

A.    Yes, but I think the wellness education is covered by RIT, so there's a credit on there.  I don't really remember how it breaks down.

Q.    So I was going to ask, I'll ask the questions anyway, so do you know what the wellness education fee was for?

A.    Yes, I think that is for the class, and it was partially covered by RIT.  I don't really remember the details in that.

Q.    So you don't recall the details of why $105 of that fee was credited back to you in January 2020 either?


MAGNA
LEGAL SERVICES

Page 127

A.     No, I don't recall.

Q.     Okay.  So you can check my math on this, or you can trust me, so adding up all the tuition and fees for the spring 2020 semester you owed $22,867, does that sound right?

A.     Yes, it looks right.

Q.     This document shows that you received $23,242.50 in scholarships for the spring 2020 semester, correct?

A.     Yup.

Q.     Where did these scholarships come from?

A.     Looks like one was from RIT, and another came from an outside source.

Q.     What was that outside source?

A.     Williams College, my dad works there.

Q.     So you got -- did you receive a scholarship from Williams for your RIT education for all of your semesters at RIT?

A.     All except the first.  He wasn't within the threshold of that yet.

Q.     So the $14,242.50 outside scholarship was your scholarship for Williams?

A.     Yes.

Q.     And do you -- do you owe Williams any money with respect to that scholarship, do you have


MAGNA
LEGAL SERVICES

Page 128

to repay any part of it?

A.    No, it's a benefit of being an employee of Williams.

Q.    Okay.  So that was an outright scholarship, yes?

A.    Yes.

Q.    And then you also received for spring 2020 an RIT grant in the amount of $9,000, correct?

A.    Yes.

Q.    And that was an outright grant?

A.    Yes.

Q.    So you don't owe anything on that $9,000, do you?

A.    No.

Q.    So for the spring 2020 semester it's accurate that you received more in scholarships than you owed in tuition and fees, correct?

A.    Yes, but I also paid for housing.

Q.    That's right.  So what you paid out-of-pocket for the spring 2020 semester went to your housing costs, yes?

A.    If you want to break it down like that.

MR. ABBOTT:  Objection, vague.

Q.    What do you mean if I want to break it down like that, what does that response mean?


MAGNA
LEGAL SERVICES

Page 129

A.    I just see it all as one big pool of money that I owe, and then all the tuition grants loans goes towards that.

Q.    Fair enough.  But you don't disagree that the amount of your scholarships and grants for spring 2020 exceeded the amount of your tuition and fees obligations, do you?

A.    No, that's true.

Q.    If I can ask you to flip to Bergeron 17.

A.    I see it.

Q.    Do you recognize this document?

A.    I do.

Q.    This is Bates number Bergeron zeros 5, what is this document?

A.    This looks like the, the notification of RIT dispersing CARES Act emergency grants to students.

Q.    This is a communication you received from RIT on or about June 5th, 2020, correct?

A.    Yes.

Q.    And it notified you that you qualified for CARES Act payment of $500, correct?

A.    Yes.

Q.    And it requested that you contact RIT to make arrangements for the payment, yes?



Page 130

A.    Yes.

Q.    Did you ever contact RIT to make arrangement to receive a CARES Act payment?

A.    No, I looked into it further and it looked like I actually was not eligible for it.

Q.    Did you talk to anyone with RIT about the subject, or did you just look at that independently and determine that?

A.    Independently.

Q.    So you never contacted RIT in response to Bergeron 17?

A.    No.

Q.    And you never received the $500 CARES Act grant?

A.    No.

Q.    Mr. Bergeron, your complaints in this case, aside from tuition, demands a partial refund of the fees for the second half of the spring 2020 semester, correct?

A.    Yes.

Q.    What fees are you seeking refunds of in this case?

A.    The activity and health fees.

Q.    Anything else?

A.    Let me look at the exhibit.  No, I



Page 131

believe that's it.

Q.    So looking at the student health fee, do you have an understandings of what your student health fee paid for?

A.    Yes, I believe it helped paid for the medical staff on campus.

Q.    And helped to pay for the student health center, yes?

A.    Yes, and the associated costs with that.

Q.    Meaning medical supplies and all that?

A.    Sure.

Q.    And personal costs?

A.    Yes, I assume so.

Q.    What services did your student health fee cover, what did your student health fee entitle you to do?

A.    Like I said, I hadn't been there long, but my understanding was I can go there for medical assistance, I can go there for, you know, if I had questions about something, I think we can have some tests run there, or at least sent them off to a lab, things like that.  I didn't utilize it much.

Q.    You utilized it twice, I think you said, over your tenure at RIT, correct?

A.    Yes, I believe so.



Page 132

Q.    Are you aware that the student health center continued to provide services to students after the transition to distance learning?

MR. ABBOTT:  Objection, vague.

A.    Yes.

Q.    I'm sorry, did you answer the question?

A.    Yes, I was aware.

Q.    It continued to provide in person services for the students who were still on campus, yes?

A.    I actually didn't know that, so if you're saying it's true, then I guess, I wasn't on campus.

Q.    Yes, I'm not asking you to trust me on that.  If you don't know, you don't know.  So you don't know whether it was still open?

A.    I don't.  To my understanding it was exclusively tele-medicine.

Q.    But you did understand that it was continuing to operate in a tele-medicine capacity for the second half of spring 2020?

A.    Yes.

Q.    Did you ever use those health services, those tele-medicine health services, during the second half of the spring 2020 semester?

A.    No.


MAGNA
LEGAL SERVICES

Page 133

Q.    Did you know that the cost of running the student health center is almost double the amount that RIT receives from the student health fees?

A.    No.

Q.    You're also seeking a refund for part of the student activity fee you paid, correct?

A.    Yes.

Q.    Are you aware that the student activity program continued to operate virtually during the second half of the spring 2020 semester?

A.    Yes.

Q.    And during the second half of the spring 2020 semester did you attend any virtual student activity programming?

A.    Not that I recall.

Q.    Are you aware that the proceeds from the student activity fee are managed by RIT student government?

A.    No.

Q.    Are you aware that the unused funds from the student activity fee roll over every year into the following year student activity budget?

A.    No.

Q.    Mr. Bergeron, do you know or do you know that RIT has served, through your counsel, with



Page 134

request for production of documents in this case?

A.    Yes.

Q.    Have you seen a copy of those document requests?

A.    Yes, I think so.

Q.    Did you undertake a search for documents responsive to RIT's document request?

A.    Yes.

Q.    Could you describe that search for me?

A.    It was mostly looking through my RIT mail looking for communications from RIT, some of them were RIT like web pages that they posted regarding notifications of how RIT would transition to remote learning.

Q.    So you just told me about you reviewed the RIT website, yes?

A.    Yes.

Q.    And pulled down materials that you thought would be responsive?

A.    Yes.

Q.    And you said you searched your RIT email accounts?

A.    Yes.

Q.    And what did you use search terms for that?



Page 146

C E R T I F I C A T E

I, JOI RAFKIND, a shorthand reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

JOI RAFKIND



MAGNA
LEGAL SERVICES