# EXHIBIT 13

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

------------------------------------------X

NICHOLAS BERGERON and NICK

QUATTROCIOCCHI, on behalf of themselves

and on behalf of all others similarly

situated,

                              Plaintiffs,

            -against-    Case No.

                         6:20-cv-06283


ROCHESTER INSTITUTE OF TECHNOLOGY,

                              Defendants.

------------------------------------------X



                    November 5, 2021

                    10:00 a.m.



VIDEOTAPED DEPOSITION of

NICHOLAS QUATTROCIOCCHI, the Plaintiff in

the above-entitled action, pursuant to

Order, held at the above time and place

before Binita Shrestha, a Stenographic

Court Reporter and Notary Public within

and for the State of New York.



Page 4

N. QUATTROCIOCCHI

NICHOLAS QUATTROCIOCCHI,

the witness herein, having first been

duly sworn by a Notary Public of the

State of New York, was examined and

testified as follows:

THE COURT REPORTER:  Please

state your name and address for the

record.

THE WITNESS:  Nicholas

Quattrociocchi, 843 Embury Road,

Penfield, New York.

EXAMINATION BY

MR. BURNS:

Q.  Good morning,

Mr. Quattrociocchi.  My name is Bob

Burns.  I'm with the law firm of Holland

& Knight, and we represent Rochester

Institute of Technology in your lawsuit

against the school.

Going forward, if I refer to

Rochester Institute of Technology as RIT,

you know what that means, correct?

A.  Yes.

Q.  Have you ever been deposed



MAGNA

LEGAL SERVICES

Page 5

N. QUATTROCIOCCHI

before?

A.  I don't know what that means.

Q.  Well, this is a deposition.  You understand that?

A.  Yes.  I have not.

Q.  I'm sorry, yes.  Have you ever sat for a deposition before?

A.  No.

Q.  Okay.  Have you ever testified in court before?

A.  No.

Q.  Have you ever been a party to a lawsuit other than this one?

A.  No.

Q.  Okay.  So let's go over a few ground rules at the outset since this is a new experience here to make sure we're on the same page.

I'm here to ask you some questions about your claims in this. There's a court reporter, as you see, on one of the Zoom boxes.  She's recording my questions to you and your answers to those questions on a stenographic record.



N. QUATTROCIOCCHI

sophomore year, I played football.

          And I don't know if this counts as extracurricular, but I was a teacher's aide in my senior year for four courses. They were half years.

          Q.  Okay.  Over what period of time did you play football?  I think you mentioned it, but I missed it.

          A.  Most of the summer in between freshman and sophomore year.

          Q.  And was this high school varsity team, something else?

          A.  Junior varsity, I believe.

          Q.  Did you hold any leadership positions at high school?

          A.  No.

          Q.  Did you participate in student government at high school?

          A.  No.

          Q.  So you graduated from high school in June of 2015, correct?

          A.  Yes.

          Q.  And had your plan in high school been to go straight to college after



MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

graduating high school?

A.   Yes.

Q.   When did you begin considering colleges that you might attend?

A.   I don't recall an exact date.

Q.   Okay.  In the period around your graduation from high school in 2015, what colleges did you consider attending or applying to?

A.   The ones I recall were St. John Fisher College, Roberts Wesleyan College, RIT.  Those are the ones that I recall.

Q.   And can you describe generally the process that you undertook to consider which schools you might want to apply to?

A.   Well, I was looking for a mechanical engineering program of some form.  So if the college had that, then I went towards it.

Q.   Were all of the schools you were interested back in 2015 local schools, meaning somewhere in or around the Rochester area?



Page 27

N. QUATTROCIOCCHI

A.  Yes.

Q.  Was that important to you as well?

A.  Yes.

Q.  Why was that?

A.  I was working at Optimax during that time.  I wanted to continue working there to build up my resume.

Q.  Okay.  So aside from St. John Fischer, Roberts Wesleyan, and RIT, you can't recall any other schools you were interested in back in the 2015 time period?

A.  I can't recall anymore.

Q.  Okay.  Did you visit any or all of these colleges?

A.  I did not visit Roberts Wesleyan.

Q.  You did visit St. John Fisher and RIT?

A.  Yes.

Q.  When approximately did you visit RIT?

A.  Before I graduated high school,



N. QUATTROCIOCCHI

but I don't have an exact date.

Q.   Was it before or after you applied to RIT?

A.   I can't recall.

Q.   Okay.  What do you recall about your visit to RIT?

A.   I don't recall much.  This was almost seven years ago, maybe even more. But I know that my mom took me around and showed me some things.

Q.   Your mom was -- sorry.  Are you finished with your answer?

A.   My mom was an alum, so she showed me some of the places she went to.

Q.   Okay.  So that was going to be my question.  Your mother was an alum of RIT, correct?

A.   Yes.

Q.   And was this an official campus tour, or your mother was just showing you around the campus and showing you the sites of where she went to school?

A.   My mother was showing me around the campus.



N. QUATTROCIOCCHI

Q. So it wasn't sign up with admissions, have a tour guide, that sort of tour. It was your mother showing you around the campus?

A. I believe so, yes.

Q. Okay. And do you recall anything in particular that your mother showed you or things that she told you during that visit?

A. I don't recall specifics.

Q. Okay. Did you apply to all of the three schools that you previously identified in one of your earlier answers?

A. Yes. I applied to all three schools.

Q. Okay. Did you apply to any online schools or online programs?

A. Not that I recall.

Q. At which colleges were you accepted back in 2015?

A. I was accepted into St. John Fisher for the physics department. I was accepted into Roberts Wesleyan, I don't



N. QUATTROCIOCCHI

recall which college.  I was accepted into RIT's -- not the mechanical engineering department.  That's what I applied for.  There was another department.  I don't recall which one.

Q.  Okay.  You applied to RIT for early admission in 2014-15, correct?

A.  Yes.

Q.  Was that because RIT was your first choice of school?

A.  Yes.

Q.  And you applied for RIT's mechanical engineering program, correct?

A.  Yes.

Q.  Okay.  So if I could ask you to just briefly pull up from the Dropbox deposition Exhibit NQ-1?

A.  That's Ex.1-RIT1200.

Q.  That's right.  This is a document that's been stamped NQ 1, and it has Bates Nos. RIT 1200 through 1207.

Just let me know when you have that up.

A.  One moment.  I -- this was



Page 31

N. QUATTROCIOCCHI

working last night.

(Discussion held off the stenographic record.)

THE VIDEOGRAPHER:  The time is 10:34 a.m.  We're off the record.

(Brief pause.)

THE VIDEOGRAPHER:  The time is now 10:37 a.m.  We're back on the record.

BY MR. BURNS:

Q.  So Mr. Quattrociocchi, do you have in front of you deposition Exhibit NQ 1?

A.  I do.

Q.  And for the record, this is a document bearing Bates numbers 1200 through RIT 1207.

When I refer to Bates numbers, Mr. Quattrociocchi, do you know what that means?

I'll just tell you what it means.  It means on the bottom right-hand corner of the document, it's the number, the alphanumerical number that starts RIT



Page 32

N. QUATTROCIOCCHI

and has some numbers.  Those are just identification numbers that will apply to documents that were produced by either side in this case.  We call them Bates numbers, so we're referring to that for the deposition.

So Mr. Quattrociocchi, do you recognize the document NQ-1?

A.  Yes.

Q.  This is your application that you filed for admission to RIT back in November of 2014, correct?

A.  Yes.

Q.  Why did you decide to apply to RIT for early admission?

A.  When I was in high school, I was told that it beared more weight, and if you tried to apply early admission to the college that you're most desiring to get into, you have a slightly better chance of getting in.

Q.  And so why was it that you most desired to get into RIT?

A.  They were local, and they had



Page 33

N. QUATTROCIOCCHI

the best mechanical engineering program,

hopefully.

Q.   Any other reasons be?

A.   Those are the main ones, no.

Q.   Did you review any RIT written

materials before you applied to RIT back

in 2014?

A.   Not that I can recall.

Q.   Did you review any portions of

RIT's website before you applied to RIT

in 2014?

A.   Not that I recall.

Q.   Did you receive any e-mails from

anyone with RIT before you applied back

in 2014?

A.   No, not that I recall.

Q.   Did you receive any letters from

anyone at RIT before you applied in 2014?

A.   Not that I say specifically.  I

recall some vague -- it could have just

been you applied to RIT, here's -- here's

information or something to that extent

but I don't -- no one -- nothing from a

particular person from RIT.


MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

Q.  When you say "here's some information," what information do you recall being sent to you or reviewing in connection with your 2014 application?

A.  I don't recall specifically.

Q.  Do you recall -- unspecifically, do you recall reviewing RIT information in connection with that application?

A.  I don't recall anything specifically.  It was, like I said, almost seven years ago.

Q.  Do you recall reviewing any RIT brochures or pamphlets before you applied back in 2014?

A.  The only thing that I can recall reviewing was the cost of tuition at that point in time.  I don't remember the specific, but I do remember that being a -- that being a number thrown around.

Q.  So aside from the cost of tuition, you can't recall reviewing any additional RIT materials?

A.  No.

Q.  Did you review the RIT



N. QUATTROCIOCCHI

undergraduate bulletin before you applied in 2014?

A.   Not that I recall.

Q.   Did you review RIT's tuition and fee refund policies before you applied in 2014?

A.   I do not recall reviewing those.

Q.   Did you review RIT's student financial agreement before you applied in 2014?

A.   I don't remember specifically.

Q.   Did you speak with any RIT representatives before you applied to RIT in 2014?

A.   I don't recall speaking to a specific representative, no.

Q.   Just so I understand your answer, you don't recall, or you don't believe you spoke to a representative before you applied?

A.   I do not remember a specific instance in which I spoke to a representative of RIT before attending.

Q.   Do you believe you did speak



Page 36

N. QUATTROCIOCCHI

with an RIT representative?

A.   I don't believe so.  Well, I don't recall.

Q.   Okay.

A.   I'm sorry.  It's seven years ago.

Q.   Fair enough.  Totally understood.  Do you recall speaking to any RIT students before you applied in 2014?

A.   Yes.

Q.   What students do you recall speaking to around that time period?

A.   Justin, Justin Foehner.

Q.   Anyone else?

A.   Not that I can remember.

(Reporter clarification.)

THE WITNESS:  Foehner.  I think it's F-o-e-h-n-e-r, Foehner, I think.

Q.   When about did you speak to Justin?  This was before you applied or around the time you applied?

A.   I don't recall a specific date, but I --



Page 37

N. QUATTROCIOCCHI

Q.  Do you recall -- sorry, I didn't mean to --

A.  I didn't speak to him around the time in which I applied.  I don't recall if he -- he -- he went to Schrader, and I know that he went to RIT after he graduated.

So I contacted him around that time.  I don't know the specific time, but I know it was around the time in which I applied.

Q.  And what do you recall Justin telling you about RIT?

A.  I know when he was not -- I know he was not in the mechanical engineering department.  And I know that he told me about whatever department he was in, but beyond that, I don't recall any specifics.

Q.  Okay.  Do you recall any questions you asked hill him and any concerns that you had that you discussed with him?

A.  I don't recall any specifics.


MAGNA
LEGAL SERVICES

Page 38

N. QUATTROCIOCCHI

Q.   Okay.   Did you speak with your mother about her RIT experience in connection with your interest in RIT?

A.   Yes.

Q.   And what do you recall asking her or her telling you?

A.   She -- well, she told me some stories of teachers -- sorry, that's my cat.

She told me about this one professor that had a whiteboard but never whiteboard markers, so he just used his finger to spell out math, and everyone got frustrated, and this went on for probably three-quarters of the trimester at that point before I think she got frustrated and just bought him whiteboard markers and told him to start writing stuff down.

She told me about the tunnels. She walked through those many times, and how the wind whipped through the campus. And I believe she said she enjoyed her time there.   I mean, that's about as much



Page 39

N. QUATTROCIOCCHI

as I remember because those would come up a couple of times, those specific stories.  That's the only reason I remember them.

Q.  Okay.  So Mr. Quattrociocchi, you were accepted for admission to RIT for fall of 2015, correct?

A.  Yes.

Q.  If I could ask you to pull up deposition Exhibit NQ-2.

Do you recognize this document?

A.  Yes.

Q.  What is this?

A.  This is my acceptance letter to RIT for the management -- school of management, something to that extent.

Q.  This is a letter you received from RIT on or about January 14th, 2015, correct?

A.  That is, yes.

Q.  You had applied for mechanical engineering, correct?

A.  Yes.

Q.  And you were accepted into RIT



Page 40

N. QUATTROCIOCCHI

but into their management program,

correct?

    A.  Yes.

    Q.  You didn't enroll at RIT for

fall 2015, correct?

    A.  Correct.

    Q.  Why not?

    A.  I did not get into the

department that I was trying to get into.

    Q.  Any other reasons?

    A.  That was it.

    Q.  And where did you enroll

instead?

    A.  I enrolled in St. John Fisher

College.

    Q.  That's in Rochester, correct?

    A.  Yes.

    Q.  You enrolled as a full-time

student at St. John Fisher effective fall

2015, correct?

    A.  Yes.

    Q.  Why did you choose to enroll at

St. John Fisher?

    A.  I was able to get into the



Page 41

N. QUATTROCIOCCHI

department that I -- it was the department that I desired, which is the physics and pre-engineering department.

I -- the tuition was a bit lower, and I received a financial scholarship that covered a large part of it, and it was local.

Q. Any other reasons?

A. Those were it.

Q. Okay. And you spent one year at St. John Fischer, correct?

A. Yes.

THE WITNESS: Can I have a moment to put my cat somewhere?

MR. BURNS: Absolutely. Yeah, let's go off the record.

THE VIDEOGRAPHER: The time is 10:51 a.m. We're off the record.

(Brief recess taken.)

THE VIDEOGRAPHER: The time is now 10:58 a.m. We're back on the record.

BY MR. BURNS:

Q. So when we left off, we were


MAGNA
LEGAL SERVICES

Page 42

N. QUATTROCIOCCHI

talking about your time at St. John Fisher College.  You left St. John Fisher after one year there, correct?

A.   Yes.

Q.   And why did you leave St. John Fisher?

A.   The physics program was not as well kept, I guess, as I was expecting.  So -- well, there is -- yeah, the physics program was not what I was expecting, and there was not a lot of support for it.

And then when I first applied, they said that RIT was a -- they referred to it as the sister college, so the pre-engineering program was part of the physics department, so you could -- it was similar to an MCC two-plus-two, but it was -- it was like a three plus two.

So if you spent three years at St. John Fisher and two years at an engineering college, you could get a bachelors in physics and a bachelors of some engineering form.

The problem was that they did


MAGNA
LEGAL SERVICES

Page 43

                    N. QUATTROCIOCCHI

not partner with anyone locally by the time I got there.  And I think the -- their subscription -- they said that RIT was one of the colleges that you could transfer to, but by the time I got there, it was not, so I finished a year of physics and transferred out.

        Q.   So is it fair to say that your goal in enrolling at St. John Fisher was eventually to get to RIT?

        A.   Yes he.

        Q.   When you got there do you recalls that was a remote prospect than you had learned to believe?

        A.   Yes.

        Q.   Okay.  What about St. John Fisher physics program was disappointing to you?

        A.   So the failure rate for physics one and physics two was really, really high.  I understand they are very difficult courses but the -- it was just difficult.

                The professors knew what they



Page 44

N. QUATTROCIOCCHI

were teaching, but they couldn't transfer it to their students, and it was somewhat difficult to get information out of the professors.

So once I finished physics one and physics two, and they wanted me to take modern physics, I wasn't going to be able to wrap my head around that too much without much additional help from professors, so I left.

Q.  Okay.  And you enrolled at Monroe Community College as of fall 2016, correct?

A.  Yes.

Q.  And in one of your earlier answers, you said MCC.  That's Monroe Community College?

A.  Yes.

Q.  And why did you choose to enroll at MCC?

A.  They are very cheap, and their two-plus-two program connected to several other schools including RIT.

Q.  Can you tell me what you mean by



Page 45

N. QUATTROCIOCCHI

two-plus-two program?

A.   Oh, sorry.

Q.   It's okay.

A.   Two-plus-two program, I guess it's rather colloquial around here, it refers to spending two years at a community college and then transferring to a larger sometimes private college to finish out your bachelor's degree.

Two-plus-two does not always get you an associates, but if you take an extra course or two usually you can just qualify for the associates and two-plus-two, so that's why I have the associates.

Q.   Okay.  So Monroe Community College at the time you enrolled had and established transfer pathway to RIT, correct?

A.   Yes.

Q.   And it had an established two-plus-two program with RIT, correct?

A.   Yes.

Q.   Was that -- would you say that



Page 46

N. QUATTROCIOCCHI

was the primary reason why you enrolled at MCC?

A.   Not the primary reason, but it was a reason.

Q.   What would you say was the primary reason?

A.   The cost was significantly lower.

Q.   Lower than St. John Fisher?

A.   Lower than just about every college in the area.

Q.   Okay.  At the time you enrolled at MCC, had you decided that you ultimately wanted to transfer to RIT?

A.   Yes.

Q.   And why had you made the decision that you ultimately wanted to transfer to RIT?

A.   RIT's mechanical engineering program.

Q.   Any other reasons?

A.   No.

Q.   What was it about RIT's mechanical engineering program that you



N. QUATTROCIOCCHI

were interested in?

A. Well, it's the best one locally, and it's a very good program. It's -- I know it's -- I know it's up there in the overall rankings, but, yeah.

Q. When you say it was the best one locally, that can mean a lot of things to a lot of people.

What did it mean to you? What did it mean to be the best?

A. Well, to be honest, I didn't have an exact metrics to compare against with other colleges in the area, but I know that U of R was not as known -- it was not really known for their mechanical engineering program but RIT was, so I'm going to use that as a basis of my statement.

Q. Okay. So I guess -- so let me ask the question this way then. So when you were referring to best, are you sort of referring to outward-facing reputation and prestige of the program or something else?



Page 48

N. QUATTROCIOCCHI

A.   That, and I heard from some people that went there that they were taught more useful directly applicable to the outside world topics compared to U of R where they --

Q.   So --

A.   Sorry.

Q.   No, no, please finish your answer?

A.   Where U of R taught more theoretic -- more theory, RIT taught more practical stuff.

Q.   So your understanding was that RIT's program was more practical in approach and had a better reputation?

A.   Yes.

Q.   Anything else?

A.   That covers it.

Q.   Okay.  So you enrolled in Monroe's in MCC's engineering science two-plus-two program, correct?

A.   Yes.

Q.   And you stayed at MCC for two years, correct?



Page 49

N. QUATTROCIOCCHI

A.    Yes.

Q.    Were you a full-time student at MCC for those two years?

A.    For parts of those two years, not every semester.

Q.    What semesters at MCC were you part-time as opposed to full-time?

A.    I don't recall specifics, but I know there was at least one semester where I only signed up for three classes with three credits, where each class had had three credits, so it was technically not full-time.  I was at nine credits.

Q.    And when you were -- for those periods at MCC where you were part-time, why were you part-time as opposed to full-time?

A.    The course offerings at MCC did not really go past the first two years, and since I already spent the year at Fisher, at St. John Fisher, I didn't need to take more nor really could I.

Q.    Okay.  Did you receive a degree from MCC?



Page 50

N. QUATTROCIOCCHI

A.   Yes.

Q.   What degree did you receive?

A.   Associates of engineering science.

Q.   When did you receive that degree from MCC?

A.   Towards the middle of the summer -- middle of the summer 2018, I believe.

Q.   During the time you were at St. John Fisher and MCC, were you in contact with anyone at RIT?

A.   I don't recall if I contacted anyone.

Q.   During the time you were at St. John Fisher and MCC, did you review any materials pertaining to RIT?

A.   I don't recall if I reviewed materials.

Q.   Do you have any specific recollection of any materials you did review pertaining to RIT during this period when you were at St. John Fisher and MCC?

A.   The only thing I could think of,


MAGNA
LEGAL SERVICES

Page 51

N. QUATTROCIOCCHI

and I don't -- I think it was technically an MCC document, but it referred to the two-plus-two program with RIT, and I know I had to review that at least a few times during my time at MCC.

But that's -- I don't -- I don't know if that directly qualifies as a RIT document or if that qualifies as a MCC document.

Q.  So you're referring to some sort of MCC document about the transfer pathway to RIT?

A.  Yes.

Q.  And you reviewed it to make sure you were on track towards the requirement of that program?

A.  Yes.

Q.  Okay.  And aside from this transfer pathway document from MCC, do you recall reviewing any other RIT-related materials during your time at MCC or St. John Fisher?

A.  I do not recall if I did.

Q.  Do you recall any RIT materials



Page 52

                    N. QUATTROCIOCCHI

that you may have reviewed during this time promising you that your education at RIT would be exclusively in person?

A.  I don't recall if I saw that anywhere.

Q.  You don't recall that you did see that anywhere?

Do you recall receiving any materials during this period when you were at St. John Fisher or MCC in which RIT promised that instruction would be exclusively in person?

A.  I do not remember if I received any correspondence that said that it would be -- would or would not be in person.  It was guaranteed to be in person.

Q.  So you have no specific recollection of any promises of that nature having been made to you in any materials you reviewed during that period, correct?

A.  I do not have any specific recollection of any materials that



Page 53

N. QUATTROCIOCCHI

promised me that, no.

Q.   Mr. Quattrociocchi, you applied again to RIT for fall 2018 admission, correct?

A.   Yes.

Q.   And if I could ask you to pull up deposition Exhibit NQ-3.

A.   Yes, I am looking at it.

Q.   Okay.   This is deposition Exhibit NQ 3 starting with Bates RIT 1226 and ending at RIT Bates 1235.

Do you recognize this document?

A.   Yes.

Q.   What is this?

A.   This was the printout of the application to get into RIT, if I remember correctly -- oh, the common application, yes.

Q.   So this is a printout of the common application you filed for admission to RIT for the fall 2018-semester, correct?

A.   Yes.

Q.   Aside from RIT, did you apply to


MAGNA
LEGAL SERVICES

Page 54

N. QUATTROCIOCCHI

any other schools in 2018?

A.   No.

Q.   In the process of applying to RIT for the fall of 2018, did you speak with anyone at RIT?

A.   Yes.

Q.   Who did you speak with?

A.   I don't recall the specific person, but I know that I -- I know that I contacted RIT at least once because I had less than a 3.25 GPA.

So I contacted at least the admissions office to try and figure out how to get into the college.  I don't remember a specific person, or if there is any other departments, but I'm fairly confident I contacted the admissions office.

Q.   And what do you recall about that?  Was it a phone call?

A.   Yes.

Q.   What do you recall about that phone call?

A.   He recommended a course of


MAGNA
LEGAL SERVICES

Page 55

N. QUATTROCIOCCHI

action applying to a different department

and transferring in once my GPA was

higher.

Q. Do you recall anything else

about that conversation?

A. Specifically, no, I don't

remember anything else.

Q. Okay. Do you recall speaking to

anyone else at RIT in connection with

your fall 2018 application?

A. I don't remember if I contacted

anyone else.

Q. At any time in connection with

your fall 2018 application, did anyone

from RIT that you spoke with ever promise

you that instruction at RIT would be

exclusively in person?

MR. ALESANDRO: Objection.

You can answer.

A. I don't recall if that was

explicitly stated.

Q. You don't have any recollection

of that having been explicitly stated at

any time in connection with your



Page 56

N. QUATTROCIOCCHI

application for the fall of 2018?

A.   I don't remember.  It was years ago, and it was a small -- small point in time.  I'm sorry.

Q.   Sure, but you don't have any -- as you sit here today, you have no specific recollection of a promise of that nature having been made to you, correct?

A.   I don't have any -- I don't remember if that came up in conversation. I don't remember any specific conversations other than the small conversation with the admissions department.

Q.   In the process of applying to RIT for fall of 2018, did you review any RIT materials?

A.   So not -- just that MCC two-plus-two RIT document.  That's the only one I can confidently say I remember.

Q.   So aside from that document, you don't recall reviewing any other


MAGNA
LEGAL SERVICES

Page 57

N. QUATTROCIOCCHI

RIT-related materials in connection with your 2018 application?

A. Can you repeat the question?

Q. Sure. So aside from the transfer pathway document that we previously discussed, you don't recall reviewing any additional RIT-related materials in connection with your 2018 application?

A. I don't remember if I reviewed any other documents aside from that one.

Q. You don't have any recollection today that you did review any additional materials?

A. No. I do not remember if I did.

Q. Did you review any portions of RIT's website in connection with your 2018 application?

A. No. I don't believe I really started going through the website until I was enrolled.

Q. Did you receive any e-mails from anyone at RIT in connection with your 2018 application?



Page 58

N. QUATTROCIOCCHI

A.  I think I received notification that it was submitted.  Beyond that, I don't -- I don't have any recollection of being contacted by anyone at RIT.

Q.  It's probably the same answer to this question, but did you receive any letters from anyone at RIT in connection with your 2018 application?

A.  I did receive a letter of acceptance into the software engineering department.  That was it, so not someone specifically but...

Q.  So the acceptance letter you received is the only letter you recall receiving in connection with your 2018 application?

A.  Yes.

Q.  Did you review any RIT brochures or pamphlets in connection with your 2018 application?

A.  Not that I can recall.

Q.  Did you review the RIT undergraduate bulletin in connection with your 2018 application?



Page 59

N. QUATTROCIOCCHI

A.   Not that I recall.

Q.   Did you review any other RIT written materials in connection with your 2018 application?

A.   Not that I recall.

Q.   Did you review RIT's tuition and fee refund policies in connection with your 2018 application?

A.   Not that I recall.

Q.   Did you review RIT's student financial responsibility agreement in connection with your 2018 application?

A.   Is that the -- is that a page on E services as you're paying for tuition or is that a different page?

Q.   Well, we'll talk about the SFRA in a little while, but do you know what the student financial responsibility agreement is as we speak today?

A.   Not exactly.

Q.   Okay.

A.   No.

Q.   Well, just to refresh your recollection, if you can just open up



MAGNA
LEGAL SERVICES

Page 60

N. QUATTROCIOCCHI

quickly NQ Exhibit 8.  And we'll speak substantively about this document later, but if you can just pull that up and see if that refreshes your recollection?

A.  Yes.

Q.  So this is one copy of one of your student financial responsibility agreements with RIT, correct?

A.  Yes, yes.

Q.  And did you review the text of this agreement in connection with your 2018 application to RIT?

A.  Yes.  At the time, I did.  I did review this.

Q.  At the time of your 2018 application?

A.  The acceptance date here says 2019, so I don't know how to answer.

Q.  That's fair enough.

Just so we're on the same page, NQ Exhibit 8 was -- we'll talk about it later -- was your specific student financial responsibility agreement for one of your academic years at RIT.



Page 61

N. QUATTROCIOCCHI

You signed a similar agreement for all of your years at RIT, correct?

A.  Yes.

Q.  Okay.  And the question is simply:  Did you review the terms of this agreement that you would be signing at RIT annually at the time you applied to RIT back in 2018?

A.  Yes.

Q.  Okay.  So if I could ask you to flip to or open deposition Exhibit NQ-4. Do you have it open?

A.  Yes.

Q.  Okay.  This is a document bearing the Bates number, RIT 1236.  Do you recognize this document?

A.  Yes.

Q.  What is this?

A.  This is my acceptance letter into the software engineering program.

Q.  This is an acceptance letter you received from RIT on or about August 14th, 2018, correct?

A.  Yes.



Page 62

N. QUATTROCIOCCHI

Q.   And you had applied to RIT's mechanical engineering program, correct?

A.   Yes.

Q.   And you were accepted into the software engineering program?

A.   Yes.

Q.   Take a moment to look through NQ-4 and identify anything in here that you think constitutes a promise of in-person education by RIT?

MR. ALESANDRO:  Objection.

THE WITNESS:  Should I still reply?

MR. ALESANDRO:  Yes.

Q.   Oh, you can answer if you understood the question.

A.   Can you repeat the question?

Q.   Sure.  Is there anything in here, NQ Exhibit 4, that you contend constitutes a promise of in-person education?

MR. ALESANDRO:  Objection.

You can answer.

A.   I -- I don't exactly understand



Page 63

N. QUATTROCIOCCHI

the question.

Q.   Do you see anything in here that speaks about in-person education?

A.   It does not explicitly state anything directly about in-person education.

Q.   Okay.  You ultimately enrolled at RIT beginning in the fall 2018-semester, correct?

A.   Yes.

Q.   And why did you choose to enroll in RIT starting in the fall of 2018?

A.   Well, I had a bad experience with the U of R at the mechanical engineering department, so I continued onto RIT in hopes to transferring into the mechanical engineering department after a year.

Q.   You said you had a bad experience with -- and I think you said something about U of R.

A.   Yes, University of Rochester.  Sorry.

Q.   So what are you referring to



Page 64

N. QUATTROCIOCCHI

there?

A.  Well, the long story short, I set up a meeting with the head of the department because Optimax has connections with U of R because of their optics program, so I set up a meeting at a specific time.

Right at the meeting was about to start, some person walked in and hijacked my meeting time for about 25 minutes, and then I just walked out.

And I got a phone call as I was almost to my car saying, "Can you come back?"  And then I did meet.  Still wasn't a good meeting after that, so.

Q.  So just so I understand, had you applied to the U of R?

A.  I was going to pending this meeting, but then...

Q.  I see.  So when about was this? This was during your time at MCC?

A.  I don't recall the specific time, but there was not snow.

Q.  Okay.  You didn't ultimately



Page 65

N. QUATTROCIOCCHI

apply to U of R, correct?

A.   No.

Q.   So in 2018, the only school you applied to was RIT?

A.   Yes.

Q.   I just want to make sure I understand.  Is it accurate that at some point, you had been considering possibly applying to both U of R and RIT, and this meeting sidelined you in the prospect?

A.   Yes.

Q.   And ultimately, you just settled just apply to RIT, and you were accepted, and chose to enroll?

A.   Yes.

Q.   Okay.  Aside from the documents you've already told me about that you reviewed before you applied to RIT, did you review any additional RIT documents or materials during the time between your 2018 admission and your 2018 enrollment?

A.   No.

Q.   And aside from the people that you've already told me about that you



Page 66

N. QUATTROCIOCCHI

spoke to before you applied to RIT, did you speak to any additional people from RIT during the period between your 2018 admission and your 2018 enrollment?

A.  I do not remember speaking to anyone specifically.

Q.  Do you recall speaking to anyone generally?

A.  Very likely chance I contacted admissions a couple of times, but I don't know specifics.

Q.  Why do you say that's very likely?

A.  Because you -- generally, the application process requires a few contacts.  Through personal experience, you have to contact admissions, and financial aid, and some other department like that to get enrolled and have everything sorted out.

So I know I contacted at least one of those departments at some point before -- before enrollment happened.

Q.  Okay.  And during any of these



Page 80

N. QUATTROCIOCCHI

for a lot of homework if nothing to do.

Q.   So is the time you spend at Erdle Commons primarily you're on campus anyway, and you're between classes?  Is that why you find yourself there?

A.   If I don't have a test to explicitly study for or if I don't have -- if I have some homework that I'm fine with knocking out on my laptop versus my desktop, I definitely go to Erdle Commons.

Q.   And has that changed over your time at RIT except in the second half of the spring 2020-semester?

A.   No.  I've spent a lot of time at Erdle.

Q.   Have you joined any fraternities at RIT?

A.   No.

Q.   Do you participate in any extracurricular activities at RIT?

A.   Sometimes study sessions, but aside from that, no.

Q.   When you say study sessions, are



Page 81

N. QUATTROCIOCCHI

you talking about something formal or informal?

A.   It depends on the situation.   So when I was taking thermo, there was some -- when I taking thermodynamics, there was some organized study sessions where every student that was taking it was offered to go to campus at some point in the night, so that was organized.

But there's been many impromptu ones that have popped up over the years.

Q.   Okay.   So in terms of things that you would consider extracurricular, meaning not connected with your classwork, have you participated in any extracurricular activities at RIT?

A.   No, none that I recall.

Q.   Have you been a member of any campus clubs or organizations?

A.   No.

Q.   Have you been a member of RIT's student government?

A.   No.

Q.   Have you played any sports at



Page 82

                    N. QUATTROCIOCCHI

RIT?

A.  No.

Q.  Have you participated in any RIT-sponsored intramural or club sports?

A.  No.

Q.  Do you attend on-campus sporting events at RIT?

A.  I have attended, I think, one hockey game.

Q.  One hockey game over the time you've been at RIT?

A.  Yes.

Q.  Anything else, sporting events?

A.  No.

Q.  Have you ever used RIT's student health services?

A.  Not that I recall.

Q.  Have you ever used RIT's counseling and psychological services?

A.  No.

Q.  Have you ever used RIT's recreation or gym facilities?

A.  Yes.

Q.  What facilities have you used?



MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

A.   I have worked out at the gym a couple of times.

Q.   When you say a couple of times, what does that mean?

A.   More than once, less than ten times.  Somewhere in that range.

Q.   Less than ten times over your time at RIT?

A.   Yeah.

Q.   Do you know what SLC stands for at RIT?

A.   No.

Q.   Do you know if RIT has what it calls a Student Life Center?

A.   I don't know if it has it, but I know I've heard of SLC before or Student Life Center.

Q.   Have you ever used any of the Student Life Center facilities?

A.   I don't know what the Student Life Center is.

Q.   Okay.  Have you ever had an on-campus job at RIT?

A.   No.



MAGNA
LEGAL SERVICES

Page 84

N. QUATTROCIOCCHI

Q. So taking a look back at your transcript, NQ Exhibit 7, you started at RIT in the fall of 2018, correct?

A. Yes.

Q. And looking forward to the spring 2020-semester, that's on page three of the document.

A. Okay.

Q. It appears -- it looks like you took five classes per credit that term, correct?

A. Yes.

Q. And you received credit for all of them, correct?

A. Yes.

Q. Full credits for all of them, correct?

A. Yes.

Q. And you elected a pass/fail option for three of those classes, correct?

A. Yes.

Q. And you received A-minuses in the others, correct?



Page 85

N. QUATTROCIOCCHI

A.  Yes.

Q.  And you received a 3.67 GPA that term, correct?

A.  Yes.

Q.  Looking through the class list, probability and statistics, was that a lecture class?

A.  You say lecture class?

Q.  Yes.

A.  Yes, it was a lecture class.

Q.  Okay.  Second on the list, Strength of Materials Lab, that was a lab class, correct?

A.  Yes.

Q.  Systems dynamic, was that a lecture and a lab class?

A.  Yes, but we didn't get to the lab due to the pandemic.

Q.  And contemporary issues topic mechanical engineering, that was a lecture class, correct?

A.  Yes.

Q.  And intro to optimal design, that was a lecture class, correct?



Page 86

N. QUATTROCIOCCHI

A. Yes.

Q. And you also took two classes during the summer of 2020, correct?

A. At RIT, yes.

Q. When you say "at RIT," did you take classes elsewhere as well?

A. Yes.

Q. Where did you take classes elsewhere during the summer 2020-semester?

A. MCC.

Q. What classes did you take at MCC during the summer of 2020?

A. Linear algebra and discrete mathematics.

Q. Have you continued to take classes at MCC since then?

A. No.

Q. Why did you take these two classes at MCC during the summer of 2020?

A. The cost.

Q. So these were classes that you -- have you received transfer credits from RIT for those classes?



Page 87

N. QUATTROCIOCCHI

A.  For one of the classes, yes.

Q.  And aside from these two classes in the summer of 2020, have you taken other classes at other schools aside from RIT since enrolling at RIT?

A.  I'm sorry.  My dog screamed at that exact moment.  Can you repeat the question?

Q.  Yeah.  Aside from these two classes that you took at MCC during the summer of 2020, have you taken other classes at other schools during the time you've been a student at RIT?

A.  I don't believe so.  Unless if otherwise indicated on my transcript.

Q.  Okay.

A.  I think only discrete math and linear I took since enrolling at RIT.

Q.  Okay.  So the two classes on your RIT transcript under 2019-2020 summer, these were RIT classes, correct?

A.  Yes.

Q.  And you took them during the summer of 2020?



Page 95

N. QUATTROCIOCCHI

(Examination resumed.)

THE VIDEOGRAPHER:  The time is is now 12:47 p.m., we're back on the record.

BY MR. BURNS:

Q.  Good afternoon, Mr. Quattrociocchi.  I'd like you -- if I could ask you to open up Deposition Exhibit NQ-8, please.

Do you have it up?

A.  Yes.

Q.  This is a document with the Bates number RIT 1887.  Do you recognize this document?

A.  Yes.

Q.  And we looked at this earlier in the deposition, correct?

A.  Yes.

Q.  What is this document?

A.  This is the student financial responsibility agreement.

Q.  And this is the student financial responsibility agreement you executed for the 2019-2020 academic year,


MAGNA
LEGAL SERVICES

Page 96

N. QUATTROCIOCCHI

correct?

A.  Yes.

Q.  And you agreed to this electronically, correct?

A.  Yes.

Q.  And where it shows NQ9009 at the bottom, that's you, right?

A.  Yes.

Q.  You agreed to student financial responsibility agreements at the beginning of every RIT academic year, correct?

A.  Yes.

Q.  What did you understand you were agreeing to on this student financial responsibility agreement?

A.  That I would have to pay for the tuition and oh, if I failed to pay, there would be a hold incurred.  I know that one.  Acceptance that a collection agency may contact me if I don't.

Q.  Okay.  And it says in this document that you agree that when you register for any class at RIT or receive



Page 97

N. QUATTROCIOCCHI

any service from RIT, you agree to accept full responsibility to pay all tuition fees and associated costs as a result of the registration, correct?

A. Yes.

Q. And there's nothing in this document that promises that all classes will be in person, is there?

A. It's not explicitly stated that all classes will be in person.

Q. And there is nothing in this document that states that you're entitled to a refund if classes are canceled or changed, is there?

A. Can you repeat the question?

Q. Sure. There is nothing in this document that states you're entitled to a refund if classes are canceled or changed, is there?

A. No.

Q. In fact, the only reference to refund in this document is in the second paragraph of the document, correct?

A. Correct.



Page 98

N. QUATTROCIOCCHI

Q. And that paragraph has a hyperlink to RIT's tuition refund policies, correct?

A. Yes.

Q. And did you know what RIT's tuition refund policies were at the time you signed this agreement?

A. I believe at the time, yes.

Q. So sir, let's take a closer look at spring 2020.

How did you choose which classes you wanted to register for for the spring 2020 term?

A. Well, I needed most of them to graduate. Intro to Computer Science Theory filled out a -- an elective for the minor.

The rest of them -- I think, well, Probability in Statistics II, I think also helped fill part of the minor. But the rest of them were required for either my bachelor's or master's degree.

Q. Did you have any latitude in selecting your classes for spring 2020,



Page 115

N. QUATTROCIOCCHI

classes, and they switched -- they were not by the end of the semester.  So I signed up for and paid for in-person classes, so yes.

Q.  So the answer to my question is yes?

A.  Yes.

Q.  So yes, you do claim that RIT was obligated to provide you with in-person instruction for the spring 2020 term?

A.  Yes.

Q.  And what contracts do you claim impose that obligation?

MR. ALESANDRO:  Objection.

You can answer.

A.  I don't have any specific, off the top of my head, contract.  I don't know how to answer the question.

Q.  Well, you told me that you believe that RIT was obligated to provide you with in-person instruction for spring 2020, correct?

A.  Yes.



N. QUATTROCIOCCHI

Q.  And what I'm asking you is:
What contract imposed that obligation?
Where does that obligation come from?

MR. ALESANDRO:  Objection.

You can answer.

A.  I -- I don't know.  The --
doesn't the response for Interrogatory 5
cover that as it would in that this
request seek legal conclusion effectively
because --

Q.  You're a plaintiff in this case,
correct, sir?

A.  Yes.

Q.  And you're suing RIT, correct?

A.  Yes.

Q.  And one of the claims that
you're suing them for is breach of
contract, correct?

A.  I believe so, yes.

Q.  All I'm asking is:  What
contract do you claim was breached?

MR. ALESANDRO:  Objection.

You can answer to the extent
you know.



Page 117

N. QUATTROCIOCCHI

A.   The specific contract, I don't -- I don't know which specific contract. I'm sorry.

Q.   You said a specific contract. Is there something other than a specific contract that you have in mind?

A.   I -- no, I don't.  I don't know how to answer this question because I don't -- I don't know which -- I don't know the title of the specific contracts.

I don't know which subset would fulfill the question that you asked.  So I don't -- I don't know how to properly answer the question.

Q.   So as you sit here today, you do not know the contracts on which you're basing your breach of contract claim against RIT?

MR. ALESANDRO:  Objection.

You can answer.

A.   Can you repeat the question? I'm sorry.

MR. BURNS:  Could the court reporter read the question back,



N. QUATTROCIOCCHI

please?

(Record read back.)

A.   I do know the contracts.  I don't know the specific one which we were referring to.

Are there not several contracts I have had to electronically sign in order to attend and specify that the courses I would be taking were supposed to be in-person?

Q.   I'm not sure I understand your answers.

You said you do know the contract, but you don't know the specific contract?  Was that your answer?

A.   Yes, but are you -- are you directly referring to a specific contract, or are you referring to just that there's contracts?

Q.   I'm referring to the contracts on which you're basing your breach of contract claim against RIT.

A.   Yes.

Q.   And you know that better than I



N. QUATTROCIOCCHI

do.

A.  So I'm very confused.  I'm sorry.  So I do know which part of the contracts have been violated.  I don't -- I don't know the -- I don't know how to answer this question at this point.  I'm sorry.  I'm just confused running in circles.

Q.  Okay.  But I think you've just said you do know which parts of the contract have been violated, correct?

A.  Yes.

Q.  So which parts of the contract have been violated?

A.  The part in which I was supposed to be provided on-campus amenities, I guess, student services and health -- I forget what the exact name was, but health and wellness, certain -- oh, I forgot what the exact name of it is.

On-campus activities, I was supposed to be provided those, and those were not allowed.

And that's -- I believe that's



Page 120

N. QUATTROCIOCCHI

where the basis of our breach of contract was because I was supposed to be allowed those.

Q.   Have any other parts of the contract been violated according to you?

MR. ALESANDRO:  Objection.

You can answer.

A.   I don't recall.

Q.   So you said one of the parts of the contracts that you believe has been violated was you were supposed to be provided with certain on-campus activities, correct?

A.   Yes.

Q.   And you believe this was a contractual obligation by RIT to provide you with on-campus activities?

MR. ALESANDRO:  Objection.

You can answer.

A.   Yes, I believe so.

Q.   And what are the -- what do you contend are the sources of that contractual obligation?  Where does it come from?



Page 121

N. QUATTROCIOCCHI

MR. ALESANDRO:  Objection.

You can answer.

A.  Does this not come from the student activities fee that I have to pay?  I believe that's exactly what this -- that fee should cover.

Q.  So one of the sources of what you believe is RIT's obligation to provide you with on-campus activities come from the fact of the student activities fee; is that accurate?

MR. ALESANDRO:  Objection.

You can answer.

A.  Yes.

Q.  What other sources of what you believe are RIT's obligation to provide you with on-campus amenities?

A.  Off the top of my head, I can't think of any other specific sections that would follow on those lines.

Q.  Do you claim that RIT was obligated to provide you with in-person instruction during the second half of spring 2020?



Page 122

N. QUATTROCIOCCHI

MR. ALESANDRO:  Objection.

You can answer.

A.  Yes.

Q.  And why do you believe RIT was obligated to provide you with in-campus instruction for the second half of spring 2020?

A.  I signed up for online -- in-person classes, and that was changed as a result of the pandemic, so.

Yeah, I signed up for in-person classes.  That's my response.

Q.  So you believe RIT had an obligation to provide you with in-person classes for the second half of spring 2020, correct?

A.  Yes.

Q.  And the basis for that obligation, the reason why you believe that obligation existed was because you signed up for in-person classes; is that correct?

A.  Yes.

Q.  Is there any other reason why



N. QUATTROCIOCCHI

you believe that obligation existed?

A.  No, not that I recall.

Q.  So, sir, if I could ask you to open up Deposition Exhibit NQ-10?

A.  Okay.

Q.  Do you recognize this document?

A.  Yes.

Q.  What is this?

A.  This is the class action complaint that we filed.

Q.  So this is the second amended class action complaint, correct?

A.  Yes.

Q.  You're one of the two plaintiffs in this case, correct?

A.  Yes.

Q.  And this was a complaint that you filed on January 14th, 2021, correct?

A.  Yes.

Q.  You've seen this document before today, correct?

A.  Yes.

Q.  Did you review it before it was filed?



N. QUATTROCIOCCHI

A.   Yes.

Q.   Now, I would ask you to flip to page 12 of the document and specifically to paragraph 61 of your second amended -- your second consolidated amended class action complaint.

A.   Okay.

Q.   Are you there?

A.   Yes.

Q.   So I'll just read paragraph 61. It says, quote:

"These rights and privileges of student status that comprise the contractual terms are set forth by Defendant through its website, academic catalogs, student handbooks, correspondence, marketing materials and other circulars, bulletins, and publications."

Did I read that accurately?

A.   Yes.

Q.   So let's work our way through this list starting in paragraph 61 starting with the first, website.



N. QUATTROCIOCCHI

What -- are you referring -- preliminary question:  Are you referring here to the RIT website?

A.  Yes.

Q.  And these are websites under the rit.edu domain?

A.  Yes.

Q.  Are you referring to any other website when you talk about website in paragraph 61 of your complaint?

A.  No.

Q.  So what part or parts of the RIT website do you claim contain promises of in-person education by RIT?

A.  Well, the -- I know from the mechanical engineering website, there's several classes that require in-person activities.

There is not really a way to get around not having -- so there is not any way of getting around having in-person activities.  I phrased that badly.

So for some of the classes, they have to be conducted in-person.  There is



Page 126

N. QUATTROCIOCCHI

no way to not have it conducted in person.  So I would vote -- so I would say even from the mechanical engineering department, the whole degree is based off of how things mechanically exist.  Like, you have to be in person for several of those courses.

I would vote that because those courses exist and the contents that need to get covered by those courses, in-person classes have to be required.

Q.  So is it an accurate paraphrase of your answer just then, when I asked you what parts of the RIT website that you believe contain a promise of in-person education, you referenced parts of the mechanical engineering website?

A.  Yes.

Q.  And specifically, you referenced classes that you believe, because of their existence, needed to be in person?

A.  Yes.

Q.  Okay.  What else on the RIT website, do you believe imposes an


MAGNA
LEGAL SERVICES

Page 127

N. QUATTROCIOCCHI

obligation of in-person education by RIT?

A.   The -- there is not also a specific declination between RIT online and the other courses that you can take. They are two separate degree avenues.

Q.   Anything else on the website?

A.   Off the top of my head, I cannot think of any more.

Q.   Okay.  So you gave me two examples:  Mechanical engineering website.  And just so I understand what the second example was, is it the mere fact that RIT online exists as a separate program that you believe imposes an obligation for in-person education for the non-RIT online program?

A.   Yes, the non-RIT online.

So the -- from personal experience, I know mechanical engineering department specifically has several courses that require in -- there is, like, Strength of Materials Lab, you have to rip apart small steel -- small steel pieces to test certain mechanical



Page 128

N. QUATTROCIOCCHI

properties.

I don't know anyone that owns something that can rip apart steel.

I know that there is -- for the electrical engineering department, some of the things to test and set up circuits, those require in-person labs.

A lot of the microfluidics things, little deeper inside the mechanical department, those things don't exist outside of research facilities.

The microelectronics department itself, you have to have a cleanroom. You have to have access to a bunch of the chemicals.  Like, it's completely infeasible to expect to be able to do anything in those classes amongst -- anything in the bio section actually too -- to be able to do those outside of campus.

So I would add those, not just the mechanical engineering department.

Q.  So it sounds like what you're saying is that there are certain aspects



N. QUATTROCIOCCHI

of certain RIT classes that you believe inherently require an in-person component?

A.  Yes.

Q.  And as to those classes, are you aware of any specific express language anywhere on the RIT website that says this class will be conducted exclusively in person?

A.  Explicitly described as that, I don't know any specific courses.  I do know that classes will say you conduct experiments, which you can't conduct an experiment at your house.

Q.  Okay.  So that's helpful.

So your contention or your claim is that where something says an experiment, that is a -- is that a promise of in-person education?

A.  In lots of applications, yes. Like I said, I can't rip apart steel -- steel parts at my -- at my house.

And I can't -- I don't have a cleanroom, a molecular cleanroom or



Page 130

N. QUATTROCIOCCHI

something to that -- nearing that caliber at my house, so yes.

Purely the basis of having courses and -- courses that require those make it intractable to not have it be on campus.

Q. Would you agree with me that certain types of experiments in certain disciplines -- and I'm not suggesting yours -- could be conducted equally well off-campus?

A. Provided that you can supply a lab, I guess, off-campus, having it be off-campus would be viable.

But there is -- you -- it's -- other than that, you're just -- it's not -- you can't do it outside of campus. Like, it's just intractable. It's not -- it's not possible to do those -- to do certain experiments outside of campus.

Like I said, if you could provide a lab environment in which you could do that, and it was checked off by RIT to be functional in that same respect



Page 132

N. QUATTROCIOCCHI

courses incorporating any topics that

I've described before have to be

in-person.

Q.   Okay.   So your contention, your

claim is that classes that incorporate

something physical, there is -- as to

those classes, there is a promise of

in-person education?

MR. ALESANDRO:   Objection.

You can answer.

A.   Yes, under the basis that you

can't perform tests, most of those tests,

at your house.

Q.   So the nature of this obligation

that you're claiming to provide in-person

education comes not from anything that

RIT said but from the nature of what the

class is teaching?

Is that an accurate statement of

what you're saying?

MR. ALESANDRO:   Objection.

You can answer.

A.   Can you repeat the question

again?



Page 133

N. QUATTROCIOCCHI

Q.  Sure.  I'm asking whether this obligation that you believe exists for in-person education with respect to classes that, as you termed it, involved something physical, comes from express words stated by RIT or your assessment of the inherent nature of what's being taught in that class?

MR. ALESANDRO:  Objection.

You can answer.

A.  So I -- I would say since the class description for a lot of labs explicitly state you -- experiments will be done, you will be experimenting something to that extent for labs, that would -- that would imply that those would have to be in person, so I would vote the former, let's say the former.

Q.  Okay.  So "experiment" you say is a word that you believe imposes an obligation of in-person education?

MR. ALESANDRO:  Objection.

You can answer.

A.  "Experiment" and/or "conduct


MAGNA
LEGAL SERVICES

Page 134

N. QUATTROCIOCCHI

tests," or something to that nature, yes.

Q.   What other words do you believe impose an obligation for in-person educational?  "Experiment," "conduct tests."  What else?

A.   That's a very broad question because it depends.  Explicitly, I would definitely say "experiment," "conduct tests."

In certain cases, I could see "evaluate" because that would incur that you had to test something.

I would say -- I have had some -- "determine" can be used to reflect whether or not something -- you had to test something physically.

There is a lot of different verbiage, but if it involves testing something in some form, that would have to require in-person classes.

Q.   What about if it doesn't involve testing something?

A.   Well, then I think that's outside the scope of what I'm directly



Page 135

N. QUATTROCIOCCHI

referring to.

Q.   Okay.   So you were registered for a number of lecture classes in the spring of 2020, correct?

A.   Yes.

Q.   And what can you point to in the course descriptions or other material for those do you believe imposes an obligation for in-person education?

A.   System Dynamics specifically because we -- a lot of -- a lot of information was lost in the process of that because System Dynamics requires -- there is a lab component which you would test and evaluate circuits.

You would do some low-level systems modeling for circuits, for motor systems.   It's been a while since I reviewed the materials.   Don't quote me on the motor systems, but I know circuits.

So the -- being -- well, especially being a mechanical engineering course and requiring access to circuit



N. QUATTROCIOCCHI

analysis tools like a multimeter function generator, a voltage source, stuff like that, those are not equipment that would be within reason something that a mechanical engineer would own, even a mechanical engineering student to shrink it down even further because that's outside the scope of most activities a mechanical engineer would go and do.

Q.  Okay.  That's understood.

So you had five classes in the spring of 2020, correct?

A.  Yes.  Let me see the transcript. I know I was signed up for five.

Q.  And you testified earlier that three of those classes were lecture classes, and two of them either were labs or had lab components, correct?

A.  Strength of Material Lab as well.  That was a big one.

Q.  Of the classes -- of the three of those that were lecture classes, what specific language can you point to anywhere in the course materials that you



Page 137

N. QUATTROCIOCCHI

believe imposes an obligation for in-person education?

MR. ALESANDRO: Objection.

You can answer.

A. Can I pull up the specific course description?

Q. What language do you recall in those?

A. Well, they said I -- so you said this is pertaining to the lecture classes, not the lab classes, correct?

Q. That's correct.

A. Okay. So off the top of my head, I don't recall the specific verbiage. I do remember that in Contemporary Issues, there were several instances where we had to go into a lecture hall and get a large lecture.

But aside from that, I -- if there was anything in the course description that covered that, that's the only thing I could immediately think about.

Q. So you don't have any


MAGNA
LEGAL SERVICES

Page 138

N. QUATTROCIOCCHI

recollection of any language underneath the course descriptions for those three lecture classes that you believe imposed an obligation of in-person education for those?

A.   Immediately off the top of my head, I cannot recall specific words and specific language phrasing that.

Q.   Do you believe that RIT was under an obligation to provide you with in-person education for those three lecture classes?

MR. ALESANDRO:   Objection.

You can answer.

A.   Well, I signed up for them to be in-person classes, so I put that as a basis for it, yes.

Q.   Okay.  So you answered my question on the follow-up.  You said yes, you believe that RIT was under a contractual obligation to provide in-person education for those three lecture classes, correct?

A.   Yes.



Page 139

N. QUATTROCIOCCHI

Q.   And my second question was going to be:  What's the basis for that obligation?  Where does that obligation come from?

A.   They were -- they were explicitly stated to be in-person classes when I signed up for them.

Q.   Where were those explicitly stated to be in-person classes?

A.   The SIS.

Q.   The SIS, you believe, contained express language that this would be an in-person class?

A.   Yes.  It either says the room, or it says online, or to be -- to be determined or -- sorry.

For online classes, it explicitly states that it is online.  And for in-person classes, it gives a room number.

Q.   Okay.  So you're -- what you're saying is the obligation you believe to provide in-person education for these lecture classes comes from the


MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

designation of a room number for these classes?

A. Room number, specific dates, and specific times for each -- for each week, and I can't recall explicitly if it states on there that it's in-person, but I feel like because the declination between online and in-person, that the information is likely there, but I don't explicitly recall if it says in-person on those courses.

Q. Okay. So for the lecture classes, you believe the obligation for in-person education comes from the fact of a room number, a schedule, and if language exists that says this is in person from that as well?

Is that an accurate summary of what you just said?

MR. ALESANDRO: Objection.

A. Yes.

Q. Is that accurate?

A. Yes.

Q. Does it come from anywhere else?


MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

A.   Off the top of my head, I can't recall other than those locations.

Q.   As you sit here today, you're not aware of any other sources for an obligation to provide in-person educational for those lecture classes other than the two or potentially three that you've just identified?

A.   I'm not aware of any other explicit declarations other than the two to three that I've stated prior.

Q.   When we were looking through your list on NQ-12, we were talking -- as part of this discussion, we were talking about your reference to the website, and I think we discussed some course descriptions, some portions of the mechanical engineering website, and the existence of RIT online.

Are there any other portions of RIT's website that you believe contain promises of in-person education by RIT?

A.   I don't recall any other locations.



Page 142

N. QUATTROCIOCCHI

Q.   If I could ask you to flip to Quattrociocchi Deposition Exhibit 11.

A.   Okay.

Q.   Do you recognize this document?

A.   Yes.

Q.   And what do you recognize this document as?

A.   This is a disclaimer for RIT's IP on their website, intellectual property.

Q.   And this is a disclaimer that appears on the rit.edu website?

A.   Yes.

Q.   And the fourth sentence here states that, quote:

"Nothing on the rit.edu website is intended to be a representation, offer, inducement, promise, or contract of any kind."

Do you see that?

A.   Yes.

Q.   At the time you enrolled at RIT for the spring 2020-semester, did you have an understanding of what this



N. QUATTROCIOCCHI

language that I just read meant?

A. Yes.

Q. What was that understanding?

A. Well, I guess that the website -- anything, I guess, explicitly on the rit.edu website would not be a -- read part of it -- representation, offer, promise, or contract of any kind, but -- well, yeah.

Q. All right. Looking back at NQ-10, page 13, the list of -- the list in your second amended complaint.

A. Mm-hmm.

Q. We just discussed website. The second item on your list is academic catalogs. Do you see that?

A. You said paragraph 13, correct?

Q. No. We're talking about NQ-10, the second amended complaint.

A. Oh, sorry.

Q. It's on page 13 of that document.

A. Okay.

Q. And this is the list that you



Page 144

N. QUATTROCIOCCHI

provide or you set forth in paragraph 61 of your complaint.  And we just discussed website, the first item on the list.

The second item on the list is academic catalogs.  Do you see that?

A.  Yes.

Q.  Okay.  What academic catalogs do you claim contain a promise of in-person education by RIT?

A.  The SIS, RIT's SIS if that counts as an academic catalog.  I believe it does because it's a catalog of all the courses that you can sign up for each semester.

Q.  Okay.  What other academic catalogs are you referring to here, if any?

A.  Well, I mean, the only other set of academic catalogs that, I guess, I would know of is on each department's page, they have a list of courses -- well, sometimes -- so I know in minors, they have a list of courses that you can take that count towards the minor.



N. QUATTROCIOCCHI

And then for the majors, there's a list of required courses for each degree, certain ones of which are required, which I guess could be an academic catalog, but they are subsets and not a full description that I know of.

Q.  So what you're referring to now are lists of courses and -- lists of courses that appear on departmental portions of RIT's website?

A.  Yes.

Q.  Okay.  And aside from SIS and these lists of courses on departmental sub-pages of RIT's website, what other academic catalogs are you referring to in paragraph 61 of your complaint?

A.  I do not recall of other ones aside from those.

Q.  And what language in SIS do you contend imposes an obligation of in-person education by RIT?

A.  I think we covered this with the existence of certain types of courses,



Page 146

N. QUATTROCIOCCHI

like anything with electronics, lab, or circuit testing, anything with mechanical properties lab, like materials lab 204, those -- like I've stated prior, there's -- it's intractable to believe that accurate testing of those properties of those items are capable to be done at a person's house.

Q.  Okay.  So you believe that the mere existence of certain types of labs on SIS necessarily carries with it a promise of in-person education for those labs; is that what you're saying?

A.  Yes.

Q.  Okay.  And aside from that, what other language on SIS do you believe imposes an obligation of in-person education by RIT?

A.  I do not recall of other -- I can't remember any other ones.

Q.  Okay.  You also said -- in reference to academic catalogs in your complaint, you said there are lists of courses on departmental websites,



N. QUATTROCIOCCHI

correct?

A.   Yes.

Q.   Okay.  And what language in those lists of course on departmental websites do you believe imposes an obligation of in-person education by RIT?

A.   So that falls -- that is in direct correlation with some of the -- with the prior stated existence of courses as I know if -- if in the -- you have to take Strength of Materials Lab for mechanical engineering.  So I'm going to use that as a basis.

So I know that they have to explicitly state that on the mechanical engineering website, the department website.  So if -- if under the same basis that the existence of those labs is on those websites, those would count as the same -- those -- the existence of those on those websites would count as a requirement for in-person classes.

Q.   Okay.  So the existence of labs that you believe by their very nature can



Page 148

N. QUATTROCIOCCHI

only be performed in an RIT lab on these departmental websites carries with it a promise of in-person education for those labs; is that accurate?

A.   Yes.

Q.   Okay.  And what else on the list of courses on departmental websites, what other language do you contend contains a promise of in-person education?

A.   I do not recall specifics. Sorry.

Q.   Could you recall anything -- do you recall generalities?

A.   Not off the top of my head really, no.

Q.   So we've talked about websites. We've talked about academic catalogs.

The next item on your list in paragraph 61 of your complaint is student handbooks.  Do you see that?

A.   Yes.

Q.   What student handbooks do you claim contain promises of in-person education by RIT?


MAGNA
LEGAL SERVICES

Page 149

N. QUATTROCIOCCHI

A.  Off the top of my head, I do not recall specifics.

Q.  Do you recall generalities?

A.  Off the top of my head, I do not recall generalities either.

Q.  The next item on the list is correspondence.

What correspondence do you claim contains promises of in-person education by RIT?

A.  I do not recall specifics.

Q.  Do you recall generalities regarding what correspondence you claim contains promises of in-person education by RIT?

A.  I do not recall generalities either.

Q.  I'm sorry.  I missed the last -- I'm not sure if the court reporter did but I missed the last two words of your answer.

A.  Oh, sorry.  I do not recall generalities either.

Q.  Either.  Okay.  Got it.


MAGNA
LEGAL SERVICES

Page 150

N. QUATTROCIOCCHI

So in reference to correspondence, you can't point me to any correspondence today that you believe contains promises of in-person educational background by RIT, can you?

A.   Immediately off the top of my head, anything that explicitly states in-person classes, off the top of my head, I cannot think of anything, yeah.

Q.   The next item on your list in your complaint is marketing materials and other circulars.  Do you see that?

A.   Yes.

Q.   What marketing materials and other circulars do you claim contain promises of in-person education by RIT?

A.   I don't have -- I cannot recall immediately, but I do have some generalities.

Q.   Okay.  Tell me what you know about what marketing materials and other circulars you're referring to here that you believe contain promises of in-person education by RIT?


MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

A.   So there are -- as far as marketing goes, I know that a couple of years back, I was -- I attended a 3D printing conference that RIT hosted, and I know that there are -- I've seen somewhere, in general, the -- aiding in -- something to the extent of aiding in research within those state-of-the-art 3D printers.

Some of the -- I call it the glue printers because I can never remember the specific type of material, but it uses a set of different basically UV, ultraviolet glues to go and create shapes.

And you can use that for 3D printing.  They print it off a guitar. They did a bunch of dice for the conference.  And I know I've seen some of those -- some stuff like that inside of advertisements -- in advertisements for RIT as a generality, not as a specific, but...

Q.   Using what you just said, what


MAGNA
LEGAL SERVICES

Page 152

N. QUATTROCIOCCHI

in there contains a promise of in-person education by RIT?

A.   So that's a state-of-the-art machine.  So there's -- there -- I know there are 3D printing courses that you can take at RIT, and I know that there are some that involves use of some of those upper-level -- well, those kind of state-of-the-art machines, state-of-the-art 3D printing machines.

So the existence of those and marketing towards them would lead me to believe that there has to be some form of in-person education on how to use those.

They made it in-house, and it does some crazy stuff that no one else has done or something nearing that extent, and that has to be an in-person thing because you have to interact with the machine.

Q.   Okay.  So marketing materials that contain depictions or references to state-of-the-art 3D printing machines, you believe carries with it a promise



Page 153

N. QUATTROCIOCCHI

that there must be in-person education

pertaining to those machines?

A. Yes.

Q. Okay. In this one document that

you're referring to the marketing

material that you recall seeing, aside

from the existence of this sophisticated

3D printing machine, was there any

language that said we promise of

in-person education by RIT or language to

that specific?

A. I do not recall specifics.

Q. You do not recall that that

language was in there?

A. I do not recall that there was

-- I do not recall if there was

explicitly -- explicit statements stating

that there would be in-person classes

detailing out the -- how to operate with

the machines.

But I know -- I know that

students can go and operate those

machines. They would have to have

in-person -- have to be some form of --



Page 154

N. QUATTROCIOCCHI

some form of a class, or training, or something to that extent to operate that machine which would be in person.

Q. Okay. So aside from this one piece of marketing material regarding sophisticated 3D printers, what other marketing materials and other circulars do you claim contain promises of in-person education by RIT?

A. I cannot recall specifics.

Q. Can you recall any additional generalities?

A. Off the top of my head, no. I cannot recall additional generalities.

Q. So the only marketing material or rather circular you can point me today that you believe contains a promise of in-person education by RIT is this brochure regarding state-of-the-art 3D printers?

A. I believe so, yes.

Q. The next item on your list in the complaint is bulletins. Do you see that?



N. QUATTROCIOCCHI

A.   Yes.

Q.   What bulletins do you claim contain promises of in-person education by RIT?

A.   I cannot recall specifics.

Q.   So you can recall no specific bulletins that you believe contain promise of in-person education by RIT?

A.   Off the top of my head, I cannot recall any specifics.  Sorry.

Q.   Do you recall, in general, general types of bulletins that you believe contain promises of in-person education by RIT?

A.   Explicitly stating that, no.  I cannot think -- I cannot think of any that would promise in-person activities, in-person classes.

Q.   I would ask you to take a quick look at Deposition Exhibit NQ-12.

A.   Yeah.

Q.   Yeah, it's a giant document.  Hopefully, it doesn't crash your -- crash your Adobe?



Page 156

N. QUATTROCIOCCHI

A.   Chrome hasn't died yet, so --

Q.   So do you have in front of you what's been marked as NQ-12?

A.   Yes.

Q.   And this -- for the record, this is a document that starts with the Bates range Bates No. RIT 343 and continues thereafter.

Do you recognize this document?

A.   Yes.

Q.   What is this document?

A.   This is the undergrad list of courses broken up -- program of study, correct?  Oh, and looks like there is a bunch of other programs, yes.

Q.   Okay.  This is the undergrad student bulletin for RIT for the 2019-2020 academic year, correct?

A.   Yes.

Q.   And that would have included the spring 2020-semester also, correct?

A.   Yes.

Q.   Do you believe that anything in this undergrad student bulletin contains


MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

a promise of in-person education by RIT?

MR. ALESANDRO:  Objection.

Are you asking him to read through all 385 pages?

MR. BURNS:  I'm asking if any of his claims are based on any promises that are derived from this document.

MR. ALESANDRO:  Go ahead.

You can answer.

A.  Well, I -- I can't explicitly search through this because it's not rendering as a searchable PDF, but -- I -- yeah, actually, for the mechatronics section, a significant -- I'm on page, I think, 12 of the program overview.  A significant --

Q.  Can I just -- I'm sorry to interrupt, Nick.  You're on page 12 of the document?

A.  Yeah.

Q.  Can you just describe the page you're looking at because my 12 says, "Industrial Design BFA"?



N. QUATTROCIOCCHI

A.   Oh, sorry.   This is -- oh, no, I guess 96.   Sorry.   I don't -- 12 would be documents.   So page 96, mechatronics engineering certificate, top right.   You're looking at the same page?

Q.   I'm there, yeah.

A.   Mechatronics, it's a cross between mechanical engineering and electrical engineering because there's a lot of overlap.

So that's kind of why I was looking in there a little bit.   But actually, right in here it explicitly states "significant laboratory experience that completes the curriculum and facilitates the transfer of new cross-disciplinary non-professional practice" in the middle of the paragraph.

So I mean, that does explicitly state that there is going to be laboratory experience.   So that would have to -- I felt that at least that if there is one example, in mechatronics, and that's completely aside from the



Page 159

N. QUATTROCIOCCHI

mechanical engineering, that there has to be documentation in here that explicitly -- that would at least lead me to believe that there should be in-person experience because I don't have the laboratory capable of facilitating mechatronics certificate or subsections of mechatronics available to me aside from on campus.

Q. So actually it looks like your mechanical engineering major is just a few pages prior to the page you're looking at.

A. Yeah.

Q. Seems like it starts on page 92 of the document. When I say 92, I'm referring to the actual printed page number, not page of the PDF. They may not entirely line up.

A. Okay. Yeah, it's one off.

MR. ALESANDRO: Just a suggestion, can we use the Bates stamp numbers just for clarity?

MR. BURNS: Yes, so I'm looking



Page 160

N. QUATTROCIOCCHI

at page RIT 43 -- I'm sorry, 435.

MR. ALESANDRO:  Thank you.

A.  Okay.  Yes.  I see where that is.

Q.  So this is your -- this is your program, right, Mr. Quattrociocchi?

A.  Yes.

Q.  Okay.  And just -- I'm not going to ask you to do a deep dive through all 300 pages of the document, but why don't you do a deep dive through this section and identify for me all the language that you contend creates a promise by RIT of in-person education for your actual major?

A.  Okay.  Well, for the first -- well, the second sentence, "RIT's mechanical engineering degree provides students with broad academic base complimented with hands-on laboratory activities and cooperative educational experience.  The hands-on activities would start to" --

Q.  So the language -- the first



Page 161

                    N. QUATTROCIOCCHI

piece of language you're citing is

"hands-on laboratory activities"?

         A.   Yes.

         Q.   Okay.  You can continue.

         A.   In this document, under "Plan of

Study," it also does mention in the first

line, "Mechanical engineering majors

provide -- sorry -- the mechanical

engineering major provide students with a

broad academic base complemented by

hands-on laboratory activities and

cooperation educational experience."

              So I guess that's almost a

verbatim statement from the program

overview, but it does highlight twice

that hands-on laboratory activities.  And

then --

         Q.   So if I could just -- just so

we're clear, so the sentence that you

just recited, the first sentence under

"Plan of Study" on page RIT 435, the

language you're highlighting in

particular is "complemented by hands-on

laboratory activities."  Is that correct?



N. QUATTROCIOCCHI

A.   Yes.

Q.   Is there anything else in that sentence that you believe imposes an obligation of in-person education?

A.   No.  That's the main one.

Q.   Okay.  You can continue.  The section for your major continues onto, I think, the next two and a half or three pages.

If you could just review that and let me know if anything else in there imposes, according to you, an obligation of in-person education by RIT?

A.   So under the mechanical engineering BS degree, this just really coincides what I was stating prior to where the existence of labs, at least explicitly the Strength of Materials Laboratory, I guess, the Bates No. 436, if I'm saying that right.

So there is not explicit description of these courses, but in conjunction with the prior statements of the existence of Strengths and Materials



Page 163

N. QUATTROCIOCCHI

Lab and engineering apps labs --

engineering applications labs -- sorry,

those are very much -- require in-person

-- require in-person instruction because

the tests that you have to conduct, you

can't really do from your house.

Q.   Okay.   Just to summarize what I

think your answer just was there, within

the curriculum listing, there is a list

of classes, correct, within certain

sub-curricular, correct?

A.   Yes.

Q.   And I think your testimony is

that certain of those classes by their

nature of being a lab and by the nature

of being a certain type of lab, you

believe necessarily carry a promise of

in-person education for those labs?

A.   Yes.   That's all within

specifically the mechanical engineering

degree that I can see, especially for

excluding the mechatronics engineering

certificate.

Q.   Okay.   So if I could ask you to



Page 164

N. QUATTROCIOCCHI

stay on the same document and flip back
to page 1 of the document -- page
numbered one, numbered RIT 345, which is
I think the third page of the PDF.

A.  Yes.

Q.  And the paragraph on the left
side of that page headed "About This
Bulletin."  Do you see that?

A.  Yes.

Q.  Do you see the first sentence of
that paragraph reads as follows:

"This undergraduate bulletin
does not constitute a contract between
the university and its students on either
a collective or individual basis."

Did I read that accurately?

A.  Yes.

Q.  And two sentences after that,
the document -- that paragraph refers to
the possibility that there may be, quote:
"Course and curriculum changes."

Do you see that?

A.  Yes.

Q.  Or quote:  "Unforeseen changes



Page 165

N. QUATTROCIOCCHI

and other aspects of RIT life."

Do you see that?

A.   Yes.

Q.   And on the following sentence, it states that:  "Because of this, Rochester Institute of Technology does not assume a contractual obligation with its students for the contents of this undergrad bulletin."

Do you see that?  Did I read that accurately?

A.   Yes.

Q.   At the time you enrolled at RIT for the spring 2020-semester, did you have an understanding of what this language that I just read to you meant?

MR. ALESANDRO:  Objection.

You can answer.

A.   Yes.

Q.   What did you understand it to mean?

MR. ALESANDRO:  Objection.

You can answer.

A.   So do you want me to summarize



Page 166

N. QUATTROCIOCCHI

all three or four that you just stated or just the last one?

Q.   To summarize your understanding at the time you -- you said you had an understanding of what this language that I read meant at the time you registered for spring 2020 classes.

And I'm asking you what that understanding -- what that understanding was.

MR. ALESANDRO:   Objection.

You can answer.

A.   So I guess -- I mean the first sentence covers a large part of it.  I guess the undergrad bulletin does not constitute a contract.  I guess that's -- yeah, I -- that it doesn't constitute a contract, yeah.

Q.   Did you have any other understanding of what that language meant other than it didn't constitute a contract?

A.   Well, that's -- the course and curriculum changes can occur.  Yes.  So I

MAGNA

LEGAL SERVICES

Page 167

N. QUATTROCIOCCHI

guess under the graduate bulletin does

not constitute a contract between RIT and

students and the course descriptions are

subject to change, it covers most of it.

Q.   I'm going to ask you to flip

forward to page 354 of the document,

which is page 353 of the PDF or RIT Bates

697.

A.   Okay.

Q.   And there is a section on this

page that is entitled, "Refund Policies."

Do you see that?

A.   Yes.

Q.   And that section continues onto

the following page, correct?

A.   Yes.

Q.   And there is nothing on this

section that states that RIT students

have a right to a refund if RIT cancels

classes, is there?

A.   There is -- I do not read

anything in this document in regards to a

refund if RIT cancels classes.

Q.   Okay.  And there is nothing in



Page 168

N. QUATTROCIOCCHI

this section that states that RIT students have a right to a refund if RIT changes the manner of class instruction, is there?

A.   There is nothing explicitly in this document that states that.

Q.   Okay.   The first page of the section that we're looking at, page 354, Bates RIT 697, on the right-hand column under "partial refund schedule for fee tuition," do you see that?

A.   Yes.

Q.   And there is a -- there's an embedded URL on the first sentence.   Do you see that?

A.   Yes.

Q.   And if I could ask you to open Deposition Exhibit NQ-13.

A.   Okay.

Q.   Do you know what that document is?   Have you seen it before?

A.   Yes.   I've seen this before.

Q.   And this is RIT's refund tuition adjustment policy, correct?



N. QUATTROCIOCCHI

A.   Yes.

Q.   And had you seen this document before you enrolled for spring 2020?

A.   Yes.

Q.   And from the URL that's printed at the bottom of this document NQ-13, this document is posted on RIT's student financial services website, correct?

A.   Yes.

Q.   There is nothing in this document, is there, sir, that states that RIT students have a right to a refund if RIT cancels classes; is that accurate?

A.   Give me a moment.

Q.   Of course.

A.   I did not explicitly see anything regarding RIT offering refunds if they canceled classes.

Q.   And there is nothing in this document that states that RIT students have a right to a refund if RIT changes the manner of class instruction, is there?

A.   That is not explicitly stated in



Page 170

N. QUATTROCIOCCHI

this document.

Q.   At any time during the spring 2020 semester, did you ever take a leave of absence from RIT?

A.   No, no. I was on vacation during the spring break, but I don't think that counts, correct?

Q.   It's your understanding that counts, but did you ever request a formal leave of absence from the school?

A.   No.

Q.   At any time during the spring 2020-semester, did you ever withdraw from all of the classes you were registered for?

A.   No.

Q.   You continued as a full-time student at RIT throughout the spring 2020-semester; is that correct?

A.   Yes.

Q.   And you didn't withdraw from any of your spring 2020-semester classes, did you?

A.   No.



N. QUATTROCIOCCHI

Q.   So looking back at NQ Deposition Exhibit 12, this is the undergraduate student bulletin.  I just have one additional question on this document before we leave it for good.

If you could flip to page 369 of this document, which is Bates RIT 712, and let me know when you're there.

A.   What was the Bates number again?

Q.   RIT 712.

A.   Okay.  I'm here.

Q.   You're there?

A.   Yes.

Q.   And I'm looking specifically in the section entitled "Course Registration," which is on the bottom right-hand part of that page.

A.   Yes.

Q.   And now that you've gone to that page, I'll ask you to flip to the next page where that section continues over to page RIT 713.

A.   Yeah.

Q.   And the final sentence of the



Page 174

N. QUATTROCIOCCHI

does it?

A.  No.

Q.  It just says RIT reserves its right to alter any of its courses at any time, correct?

A.  Correct.

Q.  So you didn't have an understanding that that sentence was just limited to reserving the right to alter course content but to alter any of its courses at any time, correct?

A.  Correct.

Q.  All right.  If you could flip back to NQ-10.  This is your second amended complaint.

A.  Okay.

Q.  Paragraph 61 on page 13 of the document, this is the list that we've been making our way through slowly.

A.  Yes.

Q.  And we're almost at the end. We've done student -- we've done website, academic catalogs, student handbooks, correspondence, marketing materials and



N. QUATTROCIOCCHI

other circulars, bulletins, and now it is
time for publications.

What publications do you claim
contain promises of in-person education
by RIT?

A.  I cannot recall explicit
examples.

Q.  Can you recall general
categories of publications that you claim
contain promises of in-person education
by RIT?

A.  I can't recall generalities
either.

Q.  Aside from what we've just spent
the better part of two hours working our
way through, are there any other
documents on which you're basing your
claim that RIT made a promise of
in-person education?

A.  None that I can explicitly
recall.

Q.  And aside from what we've been
discussing over the last several hours,
the documents, and other material you've



Page 176

N. QUATTROCIOCCHI

identified, are there any other

statements by RIT in which you're basing

your claim that RIT made a promise of

in-person education?

A.  I cannot recall specifics.

Q.  Can you recall generalities?

A.  I cannot -- I cannot recall

generalities much either.

Q.  You can't recall generalities

much.  Can you recall any general

statements on which you're basing your

claims in this case other than what we've

discussed up to this point at your

deposition?

A.  Nothing other than what was gone

over in this discussion.

Q.  Sorry.  Was that answer nothing

other than what was gone over in this

discussion?

A.  Yes.  Sorry.  My throat is a

little dry.

Q.  Do you want to take a break?

We're about a half-hour away from the

finish line here.  I don't know if you

MAGNA

LEGAL SERVICES

Page 177

N. QUATTROCIOCCHI

want to keep on trucking or just take a

quick break.

A.   A quick break would be helpful.

THE VIDEOGRAPHER:  The time is

3:00 p.m.  We're off the record.

(Discussion held off the

record.)

THE VIDEOGRAPHER:  The time is

3:08 p.m. We're back on the record.

BY MR. BURNS:

Q.   Mr. Quattrociocchi, prior to

spring 2020, did you ever have a class at

RIT change locations or professors?

A.   No.

Q.   Prior to spring 2020, did you

ever have a class at RIT canceled because

of snow or weather?

A.   Not that I recall.

Q.   Prior to spring 2020, did you

ever have a professor cancel class due to

illness?

A.   I don't know.

Q.   You can't recall that occurring?

A.   No, I cannot recall that


MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

would be starting.

Q.  Okay.  And at some point, did the Materials Lab also contact you with information regarding restarting?

A.  Yes.

Q.  And at some point in time, either during the week of March 23rd or thereafter, your classes for the second half of spring 2020 recommenced?

A.  Yes.

Q.  Okay.  Did all of your professors provide revised syllabuses for all of your classes for the second half of the spring 2020-semester?

A.  I don't recall.

Q.  Prior to spring break 2020, had you attended all of your spring 2020 classes?

A.  Yes.

Q.  Had you missed any?

A.  I don't recall if I missed any.

Q.  Did you have the same professors for all of your classes in the second half of the spring 2020-semester as you



Page 193

N. QUATTROCIOCCHI

had during the first half?

A.  Yes.

Q.  And all of your classes for the second half of the spring 2020-semester resumed in some fashion for the remainder of the semester, correct?

A.  Yes.

Q.  During the second half of the spring 2020-semester, did you ever come to campus?

A.  I don't recall.  I'm very confident I did not attend campus at all.

Q.  Mr. Quattrociocchi, do you have an opinion as to how RIT implemented its transition to virtual classes in spring of 2020?

MR. ALESANDRO:  Objection.

You can answer.

A.  Not -- I think given the circumstances, they did.  They executed reasonably.  The labs were a little sad because they just handed us data to go crunch.  And it just felt very disconnected from the problem.


MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

But aside from that, I don't have too much of an opinion.

Q. So putting the labs aside, do you have any opinion as to how RIT implemented its transition to virtual learning in spring -- in the second half of spring 2020 for other than your lab classes?

MR. ALESANDRO: Objection. Asked and answered.

You can answer.

A. Not really that I recall.

Q. Do you think that RIT did a poor job or a subpar job in transitioning to virtual classes for the second half of the spring 2020-semester?

MR. ALESANDRO: Objection.

You can answer.

A. I don't recall, at that point in time, if I had any heavy opinions leaning one way or the other.

Q. Okay. But as you sit here today and looking back at your time during the second half of spring 2020, do you think



N. QUATTROCIOCCHI

courses -- one of his professors -- it's either him or one of my other friends, but I know I heard a lot of complaints about some professors just, like, almost -- they just -- they just did not know how to teach, and in certain cases, they would --  not that they didn't know how to teach.

They didn't know how to teach online, and they didn't -- and a large basis for that was not knowing how to operate Zoom appropriately, getting frustrated with it, and stuff like that.

And it just -- it -- in certain -- and I guess, therefore, in certain cases, they definitely could have executed better with some better training towards all the teachers in how to use some of the software that would facilitate communication and education between the students.

But luckily, the mechanical engineering department was -- at least the courses that I took, they were



N. QUATTROCIOCCHI

equipped enough to be able to learn and handle a lot of it.  So I didn't -- I personally did not experience a lot of issue transitioning, but there was definitely some of my friends really, really had a tough time with some of those courses.

Q.  So you've identified Mr. Kennard.

What other friends do you recall speaking with who were displeased with their experience?

A.  I don't recall specifically which people, but I know that some of my friends, some of the people that I was talking to, some of my friends, obviously, they complained about it a bit just because, like, some -- like I said, some of their teachers just did not know how to use some of the software that was provided to them, and it just made it way harder than it needed to be.

Q.  Do you have an opinion as to the value of the education you received



N. QUATTROCIOCCHI

during the second half of the spring

2020-semester?

MR. ALESANDRO:  Objection.

You can answer.

A.  It definitely wasn't as good as

it was prior to the in-person classes.

That's it.  But that's -- other than

that, not a lot.

Q.  So aside from that, you think

that the value wasn't as good as what it

had been previously.

Do you have any other opinions

on the subject of value?

A.  No, not really.

Q.  Do you have an opinion as to the

extent to which your education, the

second half, was devalued?

MR. ALESANDRO:  Objection.

You can answer.

A.  I know -- I guess I don't know

the extent in which it was devalued, but

I know that it definitely impacted the

following spring semester -- no, the

following fall semester, I think, because


MAGNA
LEGAL SERVICES

Page 200

N. QUATTROCIOCCHI

that's when I took Classical Controls.

So System Dynamics was a prerequisite for Classical Controls, and the theoretical content, I was fine with because that was still able to transfer fine, but the hands-on content was not.

Because the labs didn't occur, I was not able to transfer that information well to the next proceeding course.

Q.   Do you think that all of your spring 2020 classes were devalued as a result of the transition to online in the second half?

MR. ALESANDRO:  Objection.

You can answer.

A.   Yeah, yeah.

Q.   Is it fair to say that some were devalued more than others?

A.   Yes.

Q.   Which of your fall 2020 classes do you think were devalued a little as opposed to a lot?

A.   Fall of 2020?

Q.   I'm sorry.  I'll ask the


MAGNA
LEGAL SERVICES

N. QUATTROCIOCCHI

question again.

Which of your spring 2020 classes do you consider to have been devalued by a little?

A. By a little? Let me pull up my transcript. Contemporary Issues went down a little bit. Some of the presentations were changed as a direct result of the closing of the campus. But the rest of them definitely got hit rather hard. I was saddened by that.

Q. So is it your testimony that other than -- can you hear me?

A. A little bit.

Q. Sorry. I don't want to go off the record. Just give me a moment until I repair another pair of ear pods.

(Brief pause.)

Q. You identified one of your classes that you consider to have been devalued by a little. Were the rest devalued by more than a little?

A. Yes.

Q. Were they all devalued by



Page 202

N. QUATTROCIOCCHI

approximately the same amount in your

opinion?

A.   No.   They were -- some more than

others.

Q.   So let's do it this way:   What

was your -- one of your fall 2020 classes

do you consider to have been most

devalued?

A.   By far, Strength of Materials

Lab.   The whole point was to be a lab,

and you would go in, and you would test

mechanical properties of materials.

And after the pandemic hit, I

think we were just handed some data sets,

and somebody was, like, go make a report.

I'm, like, that's -- it just -- it wasn't

-- it was -- it was very, very devalued

after -- after the pandemic.

Q.   And what's next on the list

going down from most devalued to least?

A.   System Dynamics, because the lab

was the same -- it operated under the

same conditions.   Then after that --

Q.   And if I could just interrupt



N. QUATTROCIOCCHI

you, so and System Dynamics had a lab and a lecture component, correct?

A. Yes.

Q. So would you say that the lab component was devalued by more than the electric component was devalued?

A. Yes.

Q. Okay.

A. The lecturer was great. She was a fantastic person.

Q. Okay. So the lecturer component wasn't very devalued or wasn't devalued?

A. No. That -- honestly, that one was very, very good.

Q. So it's the lab component of System Dynamics that you consider to have lost a lot of value?

A. Oh, yes.

Q. Okay. So what's next on the list working our way down?

A. I probably put Probability in Statistics and Intro to Optimal Design tied because Probability in Statistics, it was just way, way harder to learn and



N. QUATTROCIOCCHI

understand the material, you know, once it became online.

And then Intro to Optimal Design, she dropped the final project because she just couldn't get to it.

So I was kind of hoping because it was a -- Intro to Optimal Design was a theoretical course. So she just -- you finally got to a point where you could implement a -- something that had a direct application to the real world, but she had to drop it because she couldn't -- she couldn't facilitate teaching the course and helping everyone debug their real-life problem with some optimization script.

Q. Okay. So is it your fair summary of your testimony that some of your classes were devalued by more than others?

A. Yes.

Q. Were you ever advised by RIT that you qualified for a CARES Act payment?



Page 205

N. QUATTROCIOCCHI

A.  I do not recall.

Q.  Did you ever receive a CARES Act payment?

A.  I do not recall.

Q.  Did you ever request a CARES Act payment?

A.  I don't -- I don't recall.

Q.  Okay.  So Mr. Quattrociocchi, your complaint in this case also seeks a partial refund of fees attributable to the second half of the spring 2020 semester, correct?

A.  Yes.

Q.  What fees are you seeking refunds of?

A.  So this would be -- if I remember correctly the -- so -- the fees that went towards utilizing campus facilities.

Q.  So would that include the student health fee?

A.  I believe so, yes.

Q.  Would it include the student activity fee?



N. QUATTROCIOCCHI

A.   Yes.

Q.   Would it include anything else?

A.   I do not recall if it discussed other than those.

Q.   As you sit here today, your recollection is that you're seeking recovery of student health fee, student activity fee, and that's it?

A.   I believe so, yes.

Q.   Do you recall paying any fees for the spring 2020-semester other than those two?

A.   Off the top of my head, I do not recall.

Q.   Looking first at the student health fee, do you have an understanding of what your student health fees paid for?

A.   Off the top of my head, I don't know explicitly what the student health fee covers.

Q.   Did it allow you to use the services of the student health center?

A.   That makes sense.


MAGNA
LEGAL SERVICES

Page 207

N. QUATTROCIOCCHI

Q.  And did it also pay for those activities at the student health center?

A.  Yes.

Q.  Did it also pay for medical supplies and people to staff the student health center?

A.  That would make sense, yes.

Q.  I think I asked you this question earlier, but I forgot your answer and don't have the record here.

Did you ever use the student health center during your time at RIT?

A.  No.

Q.  Are you aware that the student health center continued to provide services to students during the second half of the spring 2020-semester?

A.  Did you ask if I was aware that that occurred?

Q.  Yes.

A.  I -- I did not know whether they did or did not continue.

Q.  Did you know that -- I'm sorry. I didn't mean to interrupt.



N. QUATTROCIOCCHI

A. Sorry. I said I did not know whether or not they would continue that as the campus was closing.

Q. Okay. Are you aware that the student health center in fact remained open through the second half of the spring 2020-semester?

A. I do not directly remember reading that it was or would be open.

Q. Okay. Are you aware that RIT's students actually remained on campus for the second half of the spring 2020-semester, specifically international student and folks who couldn't safely leave? Did you know that?

A. Yes.

Q. Okay. But you don't know that the student health center remained open during the second half of spring 2020?

A. I -- I guess I didn't put two and two together. No. I'm sorry.

Q. Okay. Do you know that the student health center continued providing telemedicine services during the second



Page 224

A C K N O W L E D G M E N T

STATE OF NEW YORK )

                    ss:

COUNTY OF NEW YORK)


          I, NICHOLAS QUATTROCIOCCHI,

hereby certify that I have read the

transcript of my testimony taken under

oath in my deposition on the 5th day of

November, 2021, that the transcript is a

true, complete and correct record of what

was asked, answered and said during this

deposition, and that the answers on the

record as given by me are true and

correct except for the corrections or

changes in form or substance, if any,

noted in the attached Errata Sheet.


          _____
          NICHOLAS QUATTROCIOCCHI


Subscribed and sworn to before me

this _____ day of _____, 2021.


_____
     NOTARY PUBLIC

