# EXHIBIT 24

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

NICHOLAS BERGERON and NICK      )
QUATTROCIOCCHI, on behalf       )
of themselves and on            )
behalf of all others            )
similarly situated,             )
                                )
            Plaintiffs,          )
                                )
V.                              ) Lead Case
                                )
ROCHESTER INSTITUTE OF          ) NO.:  6:20-cv-06283
TECHNOLOGY,                     )
                                )
            Defendant.           )

ZOOM AND VIDEOTAPED DEPOSITION OF

CHARLES D. COWAN, Ph.D.

JULY 20, 2022

VOLUME 1

ZOOM AND VIDEOTAPED DEPOSITION OF
CHARLES D. COWAN, PH.D., produced as a witness at the
instance of the DEFENDANT, and duly sworn, was taken in
the above-styled and numbered cause on July 20, 2022,
from 9:07 a.m. to 3:06 p.m., via Zoom before Wendy
Schreiber, CSR No. 9383, in and for the State of Texas,
reported by machine shorthand, at the address 205 South
Gulf Drive, Santa Rosa Beach, Florida, 32459, pursuant
to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.
Job No. 850422



Page 39

A.   We didn't really require a whole lot.  We required information about the named plaintiffs so that we could do a calculation specific to them.  And with respect to the information about tuitions, I believe we obtained that information ourselves through just research.  I believe that's all we used.  Oh, there was some information we obtained from the Department of Education as you'll see in the materials relied on but we obtained that information, too.  So the only thing we really needed was a copy of the Complaint and the specifics for the two named plaintiffs.

Q.   And to clarify, did -- did you ask the plaintiffs for any other information aside from the items that you've just gone through?

A.   Not that I recall.

Q.   Did the plaintiffs -- or were you offered any other documents or information for your analysis?

A.   Not that I remember.

Q.   And when you -- sorry, just going back for a second, you mentioned that your team gathered information about tuition and fees from publicly-available sources.  Are you referring to first the published tuition and fees prices set by the -- by RIT?

A.   Yes.



Page 40

Q.   Did you receive all of the information that you asked the plaintiffs for?

A.   I received information for Mr. -- and I apologize for mispronouncing his name -- Quattrociocchi. I did not for Mr. Bergeron.

Q.   Was there -- were you given an explanation as to why you did not get information about Mr. Bergeron?

A.   No.  Well, I mean, I asked if they had the information.  They said they hadn't received it and that was the only explanation I got.  I didn't delve further.

Q.   Did you make -- did you ask plaintiffs whether they could get the information that you needed about Mr. Bergeron?

A.   Well, the way the conversation went I understood that they were in the process of obtaining information.  I didn't ask whether they could or not. My impression was simply that they were in the process.

Q.   Approximately -- and did you ever do any follow-up with the plaintiffs about whether they got the information or were able to provide it to you about Mr. Bergeron?

A.   Well, this is -- this activity was performed in about a one-to-two-week-time period so, no.  After the first week we had pretty much completed our report.

Q.   And approximately when did -- when were the two


MAGNA
LEGAL SERVICES

Page 41

weeks when you worked on the report?

A.   4/13 -- April 13th through probably April 27th.

Q.   And that's of 2022?

A.   Yes, ma'am.  I'm sorry.

Q.   Was there any other information that you asked the plaintiff for which was not provided to you?

A.   I believe you asked me this earlier and I -- the answer was no.

Q.   Apart from the information about RIT's published tuition and fees prices and the information from I believe it's the Department of Education's National Center for Education Statistics that you referenced, was there any other publicly-available information that you or your team reviewed in preparing your report?  I'm sorry, I didn't catch that answer.

A.   No.

(Exhibit 4 was marked for identification.)

Q.   (BY MS. SHEN)  I'm going to come back to Exhibit 3, your report, so if you could just keep that document open but for the moment let's move on and mark as Cowan Exhibit 4 Exhibit 3 to your report, Dr. Cowan, which is your sources list.  Let me know when you have that pulled up.

A.   I have it.  Thank you.

Q.   So this document is titled "Materials Relied



Page 42

On."  Were there any other documents that you or your team reviewed which are not disclosed in this Exhibit 4?

A.  Not that I'm aware of.

Q.  Looking under the "Depositions" heading in your sources list, you reference the deposition of Edward Lincoln, the deposition of Nicholas Bergeron and the deposition of Nicholas Quattrociocchi.  Were you provided any other deposition transcripts?

A.  I don't believe so, no.

Q.  Were you aware that a deposition of an RIT corporate witness was taken?

A.  Umm.

Q.  I'm sorry, that answer was a little garbled.

A.  That was because I said umm.  That was just a stop.  I don't think I knew it before I read the -- before I wrote my report.  I believe I became aware of it afterwards but I've never seen it.

Q.  After you finished writing your report did you ask for a copy of that deposition transcript of RIT's corporate witness?

A.  No.

Q.  Why not?

A.  My analysis is pretty much based on the published materials from RIT.  It doesn't -- I don't find in any of these cases reading depositions to be


MAGNA
LEGAL SERVICES

Page 43

very helpful with respect to providing a basic calculation for class certification.

Q. And why is that?

A. Sorry, why is it that I don't find it very helpful?

Q. Correct, yes.

A. Well, it's a very straightforward calculation. There is a published charge to students. There is a published rate for online classes. There is a timing component with respect to when the university closed down. Those are -- and typically we don't have information for fees like we did in here. So there isn't a whole lot more than that that I need for doing a basic calculation for the purpose of a class certification.

Q. The three deposition transcripts that you reviewed, did you review the exhibits that were shown during those depositions?

A. I didn't but one of my staff might have.

Q. Looking back at Exhibit 4 under the heading "Websites Cited," when, approximately, did you or your team visit the websites that are listed there?

A. Somewhere in that two-week time period I described earlier.

Q. So that would be April of 2022?



Page 44

A.   Yes.

Q.   And is that the same for the National Center of Education Statistics website?

A.   Yes.

Q.   Did your team do any capture or screen shotting of the NCES information that you reviewed and relied on?

A.   I don't believe so.

Q.   And what information specifically did you rely on from the National Center of Education Statistics?

A.   In my report I state that I rely on information from NCES for knowing the number of -- of students of different types who attended RIT undergraduate.

Q.   Is there any other information that you relied on from the NCES website?

A.   No.

(Exhibit 5 was marked for identification.)

Q.   (BY MS. SHEN)   Let's mark as Cowan Exhibit 5 the document that is titled "NCES-RIT Page."  Dr. Cowan, let me know when you have that up on your screen.

A.   I have it up.

Q.   So I'll represent that this capture of the NCES website was taken yesterday at 7:08 p.m. as shown on the date and timestamp on the upper left-hand corner and I know that this information -- this page includes a lot of information about the 2020 to 2021 academic year but,


MAGNA
LEGAL SERVICES

Page 48

that was provided to you to help prepare your report, correct?

A.   Excuse me, I need to look at something.  Just a minute.  Yes.

Q.   And what was it that you were just looking at, Dr. Cowan?

A.   Materials relied on.

Q.   Turning to it's page 4 of Exhibit 7, it's got a Bates stamp of RIT0001264, that is the -- those are the data points that you've relied on, correct, in calculating Mr. Quattrociocchi's damages under your model?

A.   I believe so, yes.

Q.   And do you see in -- on this page there is a -- there's a line item for scholarships and grants and Mr. Quattrociocchi received $2,000 in an RIT grant during the spring 2020 semester, correct?

A.   Yes.

Q.   And that is a data point that you relied on in your analysis, correct?

A.   I believe so, yes.

Q.   You did -- if I'm understanding your testimony correctly, you did not receive information about Mr. Bergeron's scholarships or financial aid, correct?

A.   Not that I know of, no.


MAGNA
LEGAL SERVICES

Page 49

Q. And you did not personally review Mr. Bergeron -- the deposition exhibits to -- Mr. Bergeron's deposition exhibits to see if there was any information in there about his financial aid, correct?

A. I did not.

Q. Did you have any -- did you ever ask anybody from your team if they had reviewed Mr. Bergeron's deposition exhibits to see if there was information about his financial aid and scholarships?

A. No.

Q. Let's go back to Cowan Exhibit 3 which is your report, Dr. Cowan, and if you could turn to page 2 of your report, paragraph 4. Let me know when you're there.

A. I'm there.

Q. The first sentence of paragraph 4 says, "At this point detailed information has been produced only with respect to one of the Plaintiff representatives, Mr. Quattrociocchi..." -- and then you say in parentheses "(the 'Lead Plaintiff')."

What do you mean by "detailed information"?

A. Well, the detailed information would be the printouts that we were just reviewing with respect to what tuition was paid, what specific fees were paid, how



much the fees were, the scholarship information, what type of scholarship it was.  Those were all items that you just showed me on Mr. Quattro -- Quattrociocchi's description.

Q.  And when you say "produced" in this sentence, what did you mean by that?

A.  Well, to me.  I meant produced to me.

Q.  All right.  The second sentence of that same paragraph 4 says, "Detailed information similar to that provided for the Lead Plaintiff has not been produced for other class members, including any information on fees."

What did you mean by "any information on fees"?

A.  Pretty much what it says, any information on fees.  I only have information for Mr. Quattrociocchi.  I don't have it for other people who are in the class who are not named plaintiffs.  I don't have any detailed information for any of them.

Q.  And what -- what other information are you -- would you need on the fees in order to complete your analysis?

A.  Well, my analysis to date is -- is complete, however, what the next sentence says is my understanding is that if the class is certified, information about



Page 51

tuition, fees and so on will be made available so that I can calculate damages on a class-member-by-class-member basis.  I can't do that right now.

Q.   I understand what you're saying about calculating damages on a class member basis but -- and I'm sorry if I was unclear but my question is specifically geared towards the fees.  What information do you need with respect to fees in order to conduct the damages analysis?

A.   Well, different people have different fees so I need to know what fees they paid, whether they took a lab or not and paid a lab fee.  I also need to know some information about fees charged with respect to whether or not the student had access to a particular type of activity.  So, for example, if RIT has on-campus healthcare and despite the school being closed down healthcare was still available to all of the students, then I wouldn't consider that to be lost to the student, they had healthcare available the whole time.  So if they paid a fee, they got what they paid for.  So I need some information about what was paid, what it was paid for and I also need to know whether or not certain things were available during the time that the university was closed.

Q.   So would that be the same with respect to the



Page 52

student activity fees; that, for example, if students continued to have access to the types of programs or activities that were intended to be covered by the student-activity fee that your -- your conclusion would be that there would be no refund due?

A.   I can only say that it might be.  That speculation on my part because I don't know right now what activities were covered with that fee.

Q.   And how would you -- how did you typically obtain that information?  So it was just -- let's go back to your -- your student health fee example.  You mentioned that you would need information about whether students continued to have access to healthcare services.  What kind of information would you need to -- to answer that question?

A.   I think the only thing I would need to know is whether or not health clinics were open or alternative -- or was some alternative provided like access -- paid access to urgent care, for example.

Q.   And that information was not provided to you by the plaintiffs as you prepared your report, correct?

A.   It was not.

Q.   Did you or anybody on your team look for that information in publicly-available sources?

A.   Not that I'm aware of.


MAGNA
LEGAL SERVICES

Page 53

Q.   What about -- so let's talk specifically about the student-activity fee.  What kind of information would you need in order to conduct an analysis of whether the student-activity fee -- whether students should be entitled to a refund of any portion of the student-activity fee?

A.   Well, since I don't know what student-activity fees actually cover I'd have to find out what they cover and then once I found out what they cover I have to find out whether or not they were available to the student.

Q.   Did plaintiffs provide you any information about what activities the student-activity fee was meant to cover?

A.   Not that I know of.

Q.   Did you or anybody on your team look for publicly-available information as to what activities those student-activity fees were going to cover?

A.   No.

Q.   And am I correct to assume that your analysis for any partial refunds of lab fees would be similar in that you would need to know what the lab fee was intended to cover and sort of what -- I guess whether those -- those services or activities continued after RIT's transition to distance learning?

A.   Broadly speaking, yes.


MAGNA
LEGAL SERVICES

Page 54

Q.   Were you provided any of that information by plaintiffs?  I'm sorry, your answer cut out.

A.   No.

Q.   Did you or anybody on your team look for publicly-available information about what the -- what any lab fees were meant to cover?

A.   No.

Q.   Did you or anybody on your team look for publicly-available information as to what classes at RIT actually charged lab fees or if any lab fees were actually charged?

A.   No.

Q.   Did anybody from -- did plaintiffs provide you any information about what classes actually charged lab fees or whether lab fees are actually charged by RIT?

A.   No.

Q.   Turning back to Cowan Exhibit 3, so looking back at your report I'm still at paragraph 4 -- and you kind of alluded to this a little bit earlier -- the third sentence in paragraph 4 says, "My understanding is that, should the class be certified, this information will be made available in production as part of discovery."

How did you come to that understanding?

A.   The attorneys told me that.


MAGNA
LEGAL SERVICES

Page 55

Q.  And just to be clear, did the -- were you told that there would be a second phase of discovery after you submitted your report?

A.  I don't think it was word -- worded quite that way.  I was just told that we would obtain (audio distortion) class members.

Q.  Dr. Cowan, I apologize, I didn't mean to cut you off but the second half of what you said got cut off.

A.  No, I'm sorry.  What I said was what I was told was that information would be provided for the other class members that had been -- that would be identified in this case.  I wasn't told whether or not there was -- I think you're asking me a legal question about whether or not discovery would continue and I can't answer that one.

Q.  In the normal course of your engagements as an expert do you or anybody under -- does anybody on your team ever look at the case docket or look at documents -- you know, like pleadings or anything like that -- orders, decisions -- filed in a case?

A.  Depends on the case.  Sometimes.

Q.  In this case did you or anybody on your team independently review the docket?

A.  No.



Page 56

Q.   Turning back to Exhibit 3 of your report, I'm looking at paragraph 5, the last sentence.  You say, "I do not offer similar calculations for Graduate Students or with respect to fees because I do not have the necessary information to provide such calculations."

Here what is the necessary information that you would need to provide those calculations?

A.   My understanding was that there would be different tuition rates for graduate students in different graduate programs.  I wasn't aware of whether or not graduate students would be charged the same fees or other fees so I just don't have enough information to be able to safely say that I can do a calculation -- an actual calculation for graduate students as opposed to just saying this is the framework that I propose to use.

Q.   Your team was able to pull from publicly-available sources information about the undergraduate tuition and fees charged, correct?

A.   Yes.

Q.   Did anybody on your team or did you look for publicly-available information as to the graduate tuition and fees charged?

A.   I don't know if they did or not.

Q.   Did anybody -- did you -- okay, sorry.  Take that back.  Did you yourself look for publicly-available



MAGNA
LEGAL SERVICES

information about the graduate tuition and fees charged?

A.   No.

Q.   Did you personally look for any publicly-available information about the types and amounts of fees charged to the various RIT student body?

A.   Could you define "student body" because it's not in my report.

Q.   Yeah, sorry, that question was -- was a bit garbled.  Let me maybe just make it a little bit simpler.

Did you personally look for any publicly-available information about the fees that RIT charges its students?

A.   No.

Q.   Do you know if anybody on your team looked for publicly-available information about the fees charged by RIT to its students?

A.   You've been using "fees" and "tuition" sort of interchangeably and sometimes you use the words "tuition fees" so I'm -- I'm going to ask that -- I -- I just want to know, are you asking me about tuition or are you asking me about fees?

Q.   Sorry, yeah, I am asking you about fees and I will -- I will try to be more clear as to whether I'm talking about tuition or talking about fees.  So let me



Page 58

maybe just re ask my question which is whether -- so let's maybe take that back.  Did you personally look for publicly-available information about fees that RIT charges to its students?

A.   No.

Q.   Do you know if anybody on your team looked for publicly-available information about the fees that RIT charges to its students?

A.   Yes.

Q.   And did anybody on your team look for publicly-available information about the fees that RIT charges to its students?

A.   Yes, they found fee information.

Q.   So what type of fee information did they find?

A.   Well, for example, you in showing me that listing knew -- we knew that there were activity fees, we knew that there were health fees and I believe we knew that there were lab fees.  So we knew that there -- there were different types of fees.  The materials we were -- that we reviewed were quite clear on the fact that fees were charged and I believe we even knew kind of generally what fees were charged.

Q.   Okay.  Aside from the student-activity fee, the student health fee and the lab fee, are there any other fees that you understand to be at issue in this



Page 59

litigation?

A.   I -- I don't know the -- sorry.  I don't know the answer to your question because I'm not aware that I've exhausted the list of fees.  You asked me whether or not we had researched for fees and my answer was yes but I don't think we included all the possible fees and I may not even know all of the possible fees.  I wouldn't know that until I saw that information for all the students as opposed to just Mr. Quattrociocchi.

Q.   Do you -- were you given any direction as to -- as to which type of fees the plaintiffs are seeking in this case on behalf of the putative class?

A.   No.

Q.   In the -- in your review of the types of fees that were charged did you find information of the -- about the price of each fee?

A.   Well, price actually means something different. I believe you're asking me about whether I know what the charges were that were associated with the fees.

Q.   Yes, that's -- that's correct.

A.   Okay.  I found some information, yes.

Q.   And which fees were you able -- for which fees were you able to find information about the amount charged?

A.   As I recall, there was some information about


MAGNA
LEGAL SERVICES

Page 60

each of the fees we discussed before:  -- the student
fee, lab fee, health fee -- because there's a
description of what it costs to go to the university.

Q.  You -- you mentioned a minute ago that you
understood price to be something different than the
amounts charged.  Could you explain what you meant by
that?

A.  In economics I think of a price as being
something that you either voluntarily purchase or you
don't and you base your decision on price.  That's the
basis for supply-and-demand curves.  In this case you
don't get a choice, you're just charged a fee.

Q.  When you say you don't get a choice here, what
do you mean by that?

A.  Everybody has to pay a student-activity fee,
everybody has to pay a health fee and if you take a
course that requires a lab, you have to pay the lab fee.

Q.  Okay.  But you could, for example, choose to
take a different course if you didn't want to pay the
lab fee, correct?

A.  Well, yeah, but now you're getting into
questions about how individual students were making
decisions and prior to them taking a class.  My entire
analysis is based only on what classes they actually did
take.



Page 66

that was ongoing but I didn't get details.

Q.  Got it.  And were you told that by your counsel?

A.  Yes.

Q.  Did you do any independent review of the docket or any information in this case to confirm whether there is a pending discovery dispute?

A.  I've seen dockets in the past and I don't recall ever seeing anything about the docket including statements about a dispute so I don't think that would be very useful.

And No. 2 is, you know, if the attorneys tell me there's a dispute, then I have to take their word for it, you know.  I don't have any way to independently assess whether there's a discovery dispute or not.

Q.  I think you -- I just want to make sure I'm correctly understanding this.  You did not -- did you get any information about what type of discovery dispute or what it might cover from plaintiffs or their counsel?

A.  No.

Q.  Did you ask for any details about the purported discovery dispute?

A.  No.

Q.  Could you turn to page 10 of your report, so


MAGNA
LEGAL SERVICES

Page 67

Cowan Deposition Exhibit 3.  Let me know when you're there.

A.  I'm there.  Thank you.

Q.  So Table 1 here is titled "Calculation of Tuition Damages for the Lead Plaintiff: Mr. Quattrociocchi."  Correct?

A.  Yes.

Q.  Okay.  And Table 1 is -- is your calculation of the tuition that you assert is due to be refunded to Mr. Quattrociocchi, correct?

A.  Correct.  Tuition, yes.

Q.  There is no analysis of what fees you -- you would assert are due to be refunded to Mr. Quattrociocchi in this table, correct?

A.  That's correct.

Q.  And you did not do any analysis of what fees might arguably have to be refunded to Mr. Quattrociocchi, correct?

A.  I could not so I didn't.

Q.  Could you explain the methodology and formulas that you applied in your analysis here?

A.  Yes.  Okay, so the tuition fees charged to Mr. Quattrociocchi was the -- in the first line -- so -- that he contracted for is what he paid in tuition.  The second line is for the same hours using the rate from



MAGNA
LEGAL SERVICES

Page 68

RIT online we've computed a rate what would be charged for these classes if everything was taken through RIT online.  So that's the $13,442.  The difference between that -- so there's a 50 percent -- we said that the time period for the in-person classes versus the time period for the online classes split approximately fifty-fifty so if you take the value contracted for and divide it by two to get the 50 percent, the value contracted for and received -- because that would be the first half of the semester -- was $11,311.  In the second half of the term it would be value received based on the online pricing for total hours taken so that would be half of the $13,442 which came out to the $6,721.  So the overall value received would be the value of the first half of the semester plus the value of the second half so it's the sum of the $11,000 plus the 6.7 thousand dollars to get you to $18,000.  So what we are arguing is in terms of the pricing for the regular tuition and then for the pricing for the online cases what he -- what he received was $18,000 in terms of the value received using the but-for pricing.  Now we said but he got subsidies from RIT that applied to the tuition so we're going to subtract $2,000 and that makes it $16,000 which is what he received.  And then the amount that he actually paid was the $22,000 minus the $2,000 because of the RIT



Page 69

subsidies so that makes it $20,000 -- it's $20,622.  If I take the difference between the amount paid and not subsidized versus the -- the payment he would have made in the but-for analysis which is $16,322 that difference is $4,590 which is the amount that we say are the damages for Mr. Quattrociocchi that are based on his relationship with RIT and then we calculated prejudgment interest and that came out to be $863 so if I sum those two up, I get the total damages plus the prejudgment interest of $5,450, approximately.

Q.  Let's -- let's kind of just break this down a bit.  So the top-line number in your Table 1 is titled the value contracted for.  How do you define "value"?

A.  I didn't define "value."  What I did was I took whatever the tuition charge was and let the university define value.  They thought that the educational experience for Mr. Quattrociocchi was $20,622 by being on the campus and taking the courses, charging that tuition which Mr. Quattrociocchi paid.  So to me the value is whatever it was that was charged that both parties agreed to.

Q.  So I want to make sure I'm understanding that your top-line number here, what you've -- what you've named the value contracted for, that's the published tuition rate for Mr. Quattrociocchi, correct?



Page 70

A.   Yes.

Q.   Why not use the terminology "tuition rate" or "published tuition rate"?

A.   Oh, I think we took that phrase from the Complaint.

Q.   Did you consider anything else in making this decision to use the phrase "value contracted for"?

A.   So under the rule of parallel construction later on I'm going to talk about in lines 3 and 4 and 5 the value that was received based on RIT charging the tuition rate, you know, that is for one half to determine the value received based on the RIT online charges for the same classes or classes in general as the second part and you sum those two and you get value received.  So the choice in the word "value" simply has to do with all of the pricing that was set by RIT for either in-person or online classes.  I'm not making a judgment about whether -- what type of value it is or what the value is to individuals.  I'm just looking at this as a arm's-length transaction where RIT said here's the tuition rate.  Mr. Quattrociocchi -- Quattrociocchi agreed to that and paid it.  It's kind of like buying a car.

Q.   Does price always equal value?

A.   So I would say no but the value is -- the



MAGNA
LEGAL SERVICES

Page 153

FOR THE DEFENDANT:

FERNANDO SANTIAGO, ESQ.  (Attending Remotely)
SANTIAGO BURGER LLP
2280 East Avenue, 2nd Floor
Rochester, New York 14610
Tel: (585) 563-2400
Fax: (585) 563-7526
Fernando@litgrp.com
 - and -
QIAN (SHEILA) SHEN, ESQ.  (Attending Remotely)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Tel: (212) 513-3200
Fax: (212) 385-9010
qian.shen@hklaw.com

That a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk pursuant to Rule 203.3.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 29th day of July, 2022.

*Wendy Schreiber*
Wendy Schreiber, Texas CSR 9383
Expiration Date:  05/30/24
MAGNA LEGAL SERVICES
Magna Registration No. 631
16414 San Pedro, Suite 900
San Antonio, Texas 78232
Job No. 850422          Phone:  (866) 672-7880

