# EXHIBIT 10

(November 4, 2021 Deposition of Nicholas Bergeron)

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

------------------------------------------------ x

NICHOLAS BERGERON and NICK QUATTROCIOCCHI,
individually and on behalf of others similarly
situated,

                    Plaintiffs,

        -against-                Case No. 6:20-cv-06283

ROCHESTER INSTITUTE OF TECHNOLOGY,

                    Defendant.

------------------------------------------------ x


            REMOTE VIDEOCONFERENCE


                November 4, 2021
                10:07 a.m.



    EXAMINATION BEFORE TRIAL of NICHOLAS BERGERON,

the Plaintiff, by the Defendant, in the

above-entitled action, held at the above time, taken

before Joi Rafkind, a shorthand reporter and Notary

Public within and for the State of New York.







                MAGNA LEGAL SERVICES
                   (866)624-6221
                 www.MagnaLS.com




Page 2

APPEARANCES:
ANASTOPOULO LAW FIRM, LLC
Attorneys for Plaintiff
Nicholas Bergeron
32 Ann Street
Charleston, SC 29403
BY:  BLAKE ABBOTT, ESQ.
blake@akimlawfirm.com

HOLLAND & KNIGHT, LLP
Attorneys for Defendant
Rochester Institute of Technology
31 West 52nd Street
New York, NY 10019

BY:  ROBERT J. BURNS, ESQ.
BY:  QIAN (SHEILA) SHEN, ESQ.
robert.burns@hklaw.com
qian.shen@hklaw.com

SANTIAGO BURGER, LLP
Attorneys for Defendant
Rochester Institute of Technology
2280 East Avenue, 2nd Floor
Rochester, NY 14610
BY:  FERNANDO SANTIAGO, ESQ.
fernando@litgrp.com

IN-HOUSE COUNSEL OFFICE OF LEGAL AFFAIRS
Attorneys for Defendant
Rochester Institute of Technology
154 Lomb Memorial Drive
Rochester, NY 14623

BY:  BOBBY COLON, V.P. and
General counsel

xxxxx

Page 3

INDEX
WITNESS          EXAMINATION BY          PAGE
Nicholas Bergeron   Mr. Burns          7

EXHIBITS
DEFENDANT'S  DESCRIPTION          PAGE
Exhibit 1    P-02310E-0003983          142
Exhibit 2    Bergeron000001          142
Exhibit 3    RIT1097-1107 Application          142
Exhibit 4    RIT1155-1158 Transcript          143
Exhibit 5    RIT1886 Signed SFRA          143
Exhibit 6    Bergeron 2nd Interrogatory          143
             Responses

Exhibit 7    RIT343 2019-20 Undergraduate          143
             Brochure
Exhibit 8    RIT1781 Refund Tuition          143
             Adjustment Policies

Exhibit 9    RIT842 2019-20 Undergraduate          143
             Course Descriptions
Exhibit 10   Website Disclaimer          143
Exhibit 11   Bergeron000038 March 15, 2020          143
Exhibit 12   Bergeron000027          144
Exhibit 13   Original Complaint          144
Exhibit 14   Bergeron000014          144

Index continued on next page.

Page 4

INDEX (Cont.)
EXHIBITS (Cont.)
DEFENDANT'S  DESCRIPTION          PAGE
Exhibit 15   P-02310E-0004005          144
Exhibit 16   RIT0001090          144
Exhibit 17   Bergeron000005          144
Exhibit 18   Bergeron 1st Interrogatory          144
             Responses

Page 5

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification, and the same are, hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to by an officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

xxxxx



Page 6

THE VIDEOGRAPHER: We are now on the record. This begins video number one in the continuing deposition of Nicholas Bergeron in the matter of Nicholas Bergeron and Nick -- we are now on the record. This begins -- can you hear me?

MR. BURNS: Yes.

THE VIDEOGRAPHER: We are now on the record. This begins video number one in the deposition of Nicholas Bergeron in the matter of Nicholas Bergeron and Nick Quattrociocchi in the U.S. District Court Western District of New York. Today is Thursday, November 4th, 2021. The time is 10:10 a.m. This deposition is being taken remotely via video conferencing software at the request of Holland and Knight. The videographer is Chris Allen of Magna Legal Services, and our court reporter is Joi Rafkind, also of Magna Legal Services. Will Counsel and all parties present state their appearances and whom they represent.

MR. BURNS: Robert Burns from Holland and Knight for the defendant Rochester Institute of Technology.

MS. SHEN: Qian Shen, Holland and Knight

Page 7

for the defendant Rochester Institute of Technology.

MR. SANTIAGO: Fernando Santiago from Santiago Burger on behalf of the defendant Rochester Institute of Technology.

MR. COLON: Robert Colon, RIT, general counsel.

MR. ABBOTT: Good morning, this is Blake Abbott from the Anastopoulo Law Firm on behalf of plaintiff Nicholas Bergeron.

THE VIDEOGRAPHER: Will the court reporter please swear in our witness.

NICHOLAS BERGERON, the witness herein, having first been duly sworn before the Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. BURNS:

Q. State your name for the record, please.

A. Nicholas Bergeron.

Q. State your address for the record, please.

A. 10 Merrymount Road, Apartment 206, Quincy, Massachusetts 02169.

Q. Good morning, Mr. Bergeron. My name is Bob Burns. I'm with the law firm of Holland and

Page 8

Knight, and I represent Rochester Institute of Technology in your lawsuit against the University. Going forward in this deposition if I refer to Rochester Institute of Technology as RIT, you'll understand what that means, correct?

A. I will, yes.

Q. Mr. Bergeron, have you ever been deposed before?

A. I have not.

Q. Have you ever testified in court?

A. I have not.

Q. Have you ever been a party to any lawsuit other than this one?

A. I have not.

Q. Let's go over the ground rules for a deposition, since this is a new experience for you, just to make sure we're all on the same page. I'll be asking you some questions regarding your claims against RIT in this case. There's a court reporter as you see here on the zoom who is transcribing my questions and your answers to my questions. So that means a few things. First, I'd ask for the sake of the court reporter, sake of the record, that you let me finish my question before you start your answer, and I'll extend the same courtesy back to you.

Page 9

Second, is that your answers need to be verbal. We all communicate with nonverbal signals and nods of the head, that can't -- that won't work here. Your answers need to be yes, no, or actual words. Does that make sense?

A. Yes, it does.

Q. You're entitled to a question from me that you understand, and some of the questions will get gargled inevitably. If you don't understand the question, just let me know and I'll rephrase the question. If you do answer the question, I'll assume that you understood the question. Is that fair?

A. Yes.

Q. If you need a break at any time, just ask. We'll be taking several breaks throughout this proceeding. The only request that I have is that you wait until there's no question pending until you take a break.

A. Sure.

Q. Sir, you understand that although we're on a zoom screen here and not in a courtroom or in a conference room, this is an official proceeding in this case, correct?

A. Yes, I do.

3 (Pages 6 to 9)



Page 10

Q. You just took an oath to tell the truth in this deposition, correct?

A. Yes, I did.

Q. You understand that that is the same oath that you would take if you were actually in a courtroom testifying on the stand, correct?

A. Yes, I do.

Q. You understand that the testimony you provide today may be used at trial in this case?

A. Yes.

Q. Because we're on zoom and not in a conference room together, I ask that you please don't communicate with anyone other than the faces on the zoom screen while we're on the record. That agreed?

A. Yes.

O. That means no texts, no IMs, nothing like that.

A. Okay.

Q. Let's go over some preliminary questions first. How are you feeling today?

A. I'm good.

Q. Are you on any drugs or medication that might affect your ability to understand my questions?

Page 11

A. I am not.

Q. Are you on any drugs or medication that might affect your ability to remember any fact or details?

A. I am not.

Q. Did you drink any alcohol today?

A. I have not.

Q. Is there any reason that you know of that your answers today will not be complete and truthful?

A. Not that I can think of.

Q. Mr. Bergeron, have you ever been found guilty of a crime?

A. No.

Q. Sir, what did you do to prepare for this deposition today?

A. I had multiple meetings with my counsel, Blake Abbott.

Q. When you say multiple, how many was that?

A. I believe three, could be two or three.

Q. Over what period were those two or three meetings held?

A. The last 2 weeks, I believe.

Q. How long were each of these meetings, or these meetings collectively, however you'd like to

Page 12

answer the question?

A. Generally pretty short, I'd say between less than an hour each.

Q. Less than an hour each?

A. Yes.

Q. Okay. Who was present at those meetings?

A. Blake primarily and some other counselors from the law firm I don't remember names of.

Q. Anyone else?

A. No, I believe that was it.

Q. Okay. These were zoom sessions or phone calls, what were they?

A. It was zoom.

Q. Have you spoken to anyone other than your counsel about your deposition today?

A. I believe I have some friends that know about it, yes.

Q. When you say you believe some friends that know about it, why do you believe that?

A. I've told them about it, but I don't know if they know that today is the deposition, they just know that I had one.

Q. What have you told them about the deposition?

A. That I have to answer questions that I'm

Page 13

being asked about the case.

Q. Anything else?

A. That's it.

Q. Who were the names of these friends that you told that to?

A. Jeremy Abby, Dominico Tran, Dominick Taylor, Matthew Martinetti, Corbel Maconin.

Q. Anyone else?

A. No, that's it.

Q. Did you speak to Nick Quattrociocchi, and I apologize for the pronunciation, about your deposition testimony today?

A. No, we didn't get to speak at all.

Q. Have you ever met him?

A. No.

Q. Met him virtually or in person?

A. No.

Q. Did you review any documents in connection with your testimony today?

A. Yes, I have.

Q. What documents did you review?

A. I reviewed the documents that I collected to, that I believe you requested, and the ones that were just given to me by Blake, I believe it's 18, I don't know, pieces of evidence.

4 (Pages 10 to 13)


MAGNA
LEGAL SERVICES

Page 14

Q.   You say 18 pieces of evidence, are you referring to the exhibit set for today's deposition?
A.   Yes, yes, I reviewed them shortly before the call.
Q.   I see, okay.  So in advance of today's deposition, aside from the 18 deposition exhibits you reviewed the documents that you provided for production in this case?
A.   I did, yes.
Q.   Anything else?
A.   No.
Q.   Have you ever made any written statements regarding your claims in this case?
A.   I'm not sure what you mean by that.
Q.   Do you know what an affidavit is?
A.   Yes.
O.   Have you ever sworn an affidavit regarding your claims in this case?
A.   I believe I did.
Q.   What were -- when do you believe you issued, you signed that affidavit?
A.   I'm not entirely sure.  There was a bunch of documents that I signed leading up to this.  I honestly couldn't tell you most of the names.
Q.   What do you remember about this document

Page 15

that you're referring to?
A.   Off my head I really couldn't tell you besides it had details about my like the case and things like that.
Q.   When you say details about the case, what details do you recall being in this document?
A.   I don't remember.
Q.   Did you sign this document before you commenced this lawsuit, or after?
A.   It would be after.
Q.   Was it weeks, months, years after you commenced this lawsuit?
A.   I don't remember the timeline.
Q.   You don't remember whether it was a week, or a month, or was it recently?
A.   So I think it was involved with part of like the data collection and a bunch of other.  I mean not the collection of documents but related to that, I honestly don't know.
Q.   When you say it was in connection with the collection of documents, was it regarding your document collection or something else?
A.   I think so, I'm not sure.
Q.   Mr. Bergeron, you're physically located today at your apartment in Quincy, Massachusetts,

Page 16

correct?
A.   Yes.
Q.   Are you in a private room?
A.   Yes.  I live in a one bedroom apartment alone.
Q.   Is anyone else in your apartment with you here today?
A.   No.
Q.   You gave your current address to the court reporter, how long have you lived at that address?
A.   Since July of this year.
Q.   Where did you live before this apartment in Quincy?
A.   I lived with my parents.
Q.   Whereabout was that?
A.   That would be Adams, Massachusetts.
Q.   What was the address in Adams?
A.   65 Valley Street.
Q.   How long did you live at 65 Valley Street in Adams?
A.   I lived there since I returned home from college after graduation, well, after being sent home.
Q.   And that was in 2020?

Page 17

A.   Yes.
Q.   How old are you?
A.   24.
Q.   Are you currently employed?
A.   I am, yes.
Q.   What is the company that you're currently employed at?
A.   Veson Nautical.  V-E-S-O-N.
Q.   What's your position at Veson Nautical?
A.   I'm an associate site reliability engineer.
Q.   How long have you worked at Veson Nautical?
A.   Since June or July, I don't quite recall.
Q.   June or July of this year?
A.   Recently.
Q.   Over your tenure at Veson Nautical have you been an associate site reliability engineer?
A.   Yes.
Q.   Is there -- is your position at Veson Nautical an in person position, or a remote position, or hybrid position?
A.   I work in the office in person.
Q.   You work in person full-time?
A.   Yes.



Page 18

Q. Before you started at Veson Nautical were you employed?

A. I was, yes.

Q. Where were you employed?

A. A company called Sevatec, S-E-V-A-T-E-C.

Q. When did you start at Sevatec?

A. June of 2020.

Q. What was your position or title at Sevatec?

A. I was an associate devops engineer, D-E-V-O-P-S.

Q. Were you an associate devops engineer for your entire tenure at Sevatec?

A. Yes.

Q. Was your position at Sevatec in office, remote, or hybrid?

A. It was remote.

Q. Fully remote?

A. Yes.

Q. Sir, when did you receive your RIT degree?

A. I received it in I believe August of 2020.

Q. Sir, I've seen some correspondence in the file that will indicate that at the end of the

Page 19

spring 2020 semester you were a few credits short of graduation requirements, is that accurate?

A. Yes.

Q. I take it from the fact that you graduated that you made up that credit shortfall somewhere?

A. I did.

Q. Did you make that credit shortfall up?

A. I took an online art class at MCC, the Minor Community College.

Q. After you completed that online art class you received your RIT degree?

A. I did.

Q. How many credits short were you at the end of the spring 2020 term?

A. Three.

Q. Was your job at Sevatec your first job after graduating from college?

A. Yes.

Q. If I could ask you to take a quick look at Bergeron deposition Exhibit 1.

A. Yup.

Q. This is, sir, do you recognize this document?

A. I do.

Page 20

Q. What is this document?

A. This is me responding to Beth Tuscon about a job search status for all rising seniors that it goes out every year at the end of every semester, and I responded with my job information and she congratulated me.

Q. So part of this email they had that appears about a third of the way down the page from Nick Bergeron sent Wednesday, April 15, 2020 at 11:58 p.m., that's your input?

A. Yes.

Q. You wrote that?

A. Yup.

Q. So as of April 15, 2020 you had landed the job at Sevatec?

A. Yes.

Q. How did you get the job at Sevatec?

MR. ABBOTT: Objection, vague.

Q. You can go ahead and answer, if you understand the question.

A. I applied online and I interviewed.

Q. When did you apply for the Sevatec job?

A. Sometime in the spring semester.

Q. When did you get the offer from Sevatec?

A. I don't recall.

Page 21

Q. When about it was obviously before April 15th, correct?

A. Yes.

Q. Do you know how long before April 15th you received the job offer?

A. It was February maybe.

Q. Did you accept promptly thereafter, or were you looking for other positions as well?

A. I had a couple offers.

Q. Okay. So do you recall when you actually accepted the position at Sevatec?

A. I believe about a week after the offer.

Q. You say you'd a couple of offers -- strike that. Did you utilize any career services at RIT to either learn of the job at Sevatec or get the job at Sevatec?

A. I don't know what you mean by that.

Q. Was RIT career services at all involved in you getting the position at Sevatec?

A. No.

Q. They didn't hook you up with a listing for Sevatec?

A. Nope.

Q. You learned of the position just from an online listing publicly available online listing?

6 (Pages 18 to 21)


MAGNA
LEGAL SERVICES

Page 22

A. Yes.
Q. Do you think that your RIT degree helped you get the job at Sevatec?
A. Yes.
Q. Why?
A. It made me a great engineer.
Q. You think the skills that you learned at RIT helped you to get the job at Sevatec?
A. Yes.
Q. Do you think that the skills that you learned at RIT helped you to do the job at Sevatec?
A. Yes.
Q. Do you think the skills you learned at RIT helped you to do the job that you currently do today --
A. Yes.
O. -- at Veson Nautical?
A. Yes.
Q. Mr. Bergeron, you grew up in Adams, Massachusetts, correct?
A. I did.
Q. Where did you go to high school?
A. Hoosic Valley High, H-O-O-S-I-C.
Q. And you went to Hoosic Valley High School for the entirety of your high school career?

Page 23

A. Yes.
Q. You graduated high school and received your high school diploma?
A. Yup.
Q. When?
A. 2015.
Q. How were your grades in high school?
A. They were fine, they were all right.
Q. Did you receive any academic honors of any sort in high school?
A. I don't recall.
Q. Did you participate in any extracurricular activities in high school?
A. I was in the band.
Q. Anything else?
A. I did one year of track and field.
Q. Anything else?
A. I think that's it.
Q. Were you in band for the entirety of your time in high school?
A. Yes.
Q. Did you hold any leadership positions in high school?
A. I was a senior patrol leader in Boy Scouts.

Page 24

Q. Anything else?
A. No.
Q. Were you involved in student government at your high school?
A. I was not.
Q. You said you participated in one year of track in high school, what year of your time in high school was that?
A. My senior year.
Q. You graduated from high school in June of 2015, correct?
A. Correct.
Q. Had your plan in high school been to go straight to college after graduating high school?
A. Yes.
Q. When did you begin considering colleges, excuse me, that you might attend?
A. Probably junior year sometime.
Q. Describe generally the process that you undertook to consider colleges?
A. I was looking for tech schools that had cyber security programs.
Q. Were you looking for anything else?
A. No, that was primarily what I was looking for.

Page 25

Q. Cyber security was, as you were in high school cyber security is what you thought your interest would be for a career?
A. Yes.
Q. Did you visit colleges?
A. I did, yes.
Q. What colleges did you visit?
A. I visited RIT, I visited the Wentworth Institute of Technology, and I think MCLA.
Q. Any other colleges that you recall visiting?
A. No.
Q. Aside from those colleges were you actively considering other colleges as well?
A. No.
Q. When did you visit RIT?
A. I think it was the summer between junior and senior year of high school.
Q. Was that the same time period that you were visiting the other schools that you identified?
A. Yes.
Q. Can you describe your visit to RIT?
A. It was so long ago I probably couldn't tell you much.
Q. Fair enough. What do you recall about it



Page 26

though?
  A.   A lot of brick.
  Q.   Anything else?
  A.   No, not in particular.
  Q.   You gave a list of three schools that you were interested in and visited, did you apply to all of these schools?
  A.   I did.
  Q.   Did you apply to any of these schools for early admission?
  A.   I don't recall.
  Q.   Did you apply to any online schools or online programs?
  A.   No.
  Q.   At which colleges were you accepted?
  A.   RIT and MCLA.
  Q.   Do you recall when you applied to RIT?
  A.   Sometime in the fall of my senior year.
  Q.   If I could ask you to flip through Bergeron deposition Exhibit 3.
  A.   Yup.
  Q.   This is a composite document that runs from Bates RIT1097 through RIT1107.  Do you generally recognize these documents?
  A.   Yes, they look familiar, as familiar as

Page 27

they can.
  Q.   Looking, when you say as familiar as you can, what do you mean, just given the passage of time?
  A.   Yes, I haven't looked at these in a number of years.
  Q.   Understood.  So these are documents from 2015, 2014, 2015 time period, correct?
  A.   Yes.
  Q.   And they are all connected with your application to RIT?
  A.   It looks like that, yes.
  Q.   Okay.  So the first document with the Bates number RIT1097, when I say Bates number do you know what that means?
  A.   It's the number at the bottom right of the page.
  Q.   Exactly, good, just wanted to make sure we're on the same page.  First page, RIT Bates 1097, that indicated that as of November 12, 2014 you had started your process applying to RIT?
  A.   Yes.
  Q.   And then the next page, RIT1098, and continuing through RIT1105, this is the application that you filed for admission to RIT, correct?

Page 28

  A.   Yes.
  Q.   Did you write out this application?
  A.   I did.
  Q.   Did anyone write any portions of it for you?
  A.   I don't believe so.  It's possible that my parent helped me with my application, but I did it myself.
  Q.   Flipping to page RIT1106, this indicates that as of January 26, 2015 you had completed your application for admission to RIT and filed it, correct?
  A.   Yes.
  Q.   Sir, why did you decide to apply to RIT?
  A.   From what I can tell it had a great cyber security program, of which there were not many at the time, and the co-op education was, it looked very appealing to me.
  Q.   Any other reasons?
  A.   Nope, primarily the education.
  Q.   When you say primarily the education, you mean the cyber security program and the co-op opportunity?
  A.   Yes.
  Q.   Anything else?

Page 29

  A.   Not that I recall.
  Q.   We'll talk a little bit about co-op, but can you describe generally what co-op means in connection with RIT?
  A.   Yes, so a co-op is essentially an internship, but it has to be in your field of study, it has to be paid, and it has to be approved by the school.
  Q.   Why was that appealing to you?
  A.   So it gets students hands-on experience that will kind of like boost their profile when they are looking for jobs after graduation.
  Q.   Any other reasons?
  A.   Nope.
  Q.   Had you in fact participated in several co-ops during your time at RIT, correct?
  A.   Yes.
  Q.   We'll talk about those in a little bit. Did you review any RIT written materials before you filed your application to RIT?
  A.   I don't remember.
  Q.   Did you review RIT's website before you applied?
  A.   Probably.
  Q.   Do you recall what portions of RIT's



MAGNA
LEGAL SERVICES

Page 30

website you recall you reviewed?

A.  Probably within the academic side of the cyber security program.

Q.  Anything else that you remember reviewing?

A.  Probably the tuition schedule.

Q.  Anything else?

A.  Not that I recall.

Q.  Did anything that you reviewed on RIT's website promise that instruction at RIT would be exclusively in person?

A.  No.

Q.  Did you receive any emails from anyone at RIT before you applied?

A.  I don't recall.

Q.  Did you receive any letters from anyone at RIT before you applied?

A.  I don't recall.

Q.  Did you review any RIT brochures or pamphlets before you applied?

A.  Probably.

Q.  What do you recall about that?

A.  I'm just thinking it's likely that I received some type of brochure or pamphlet from RIT, one year approaching at that time.

Page 31

Q.  Of course.  You don't recall any of the brochures or pamphlets that you did review?

A.  No.

Q.  Do you recall if any of those brochures or pamphlets specifically promised that your instruction at RIT would be exclusively in person?

A.  No.

Q.  Did you review the RIT undergraduate bulletin before you applied to RIT?

A.  Yes.

Q.  What specific sections of the RIT undergraduate bulletin do you recall reviewing before you applied?

A.  I don't recall.

Q.  Do you recall that any of those sections in the RIT undergraduate bulletin made a specific promise that instruction at RIT would be exclusively in person?

A.  No.

Q.  Aside from what you've testified to over the last several minutes, do you recall reviewing any other RIT written materials before you applied?

A.  No.

Q.  Did you review RIT's tuition and fee refund policies before you applied?

Page 32

A.  I don't recall.

Q.  Did you review RIT's student financial responsibility agreement before you applied?

A.  Probably.

Q.  You said probably, why do you say that?

A.  I wasn't planning on dropping out so it didn't really seem to me that it's something that I needed to pour over.

Q.  But you think you probably reviewed it before you applied?

A.  Probably.

Q.  We're talking about student financial responsibility agreement here, correct?

A.  Yes.

Q.  Did you speak to any RIT representatives before you applied at RIT?

A.  No, I don't believe so.

Q.  Did you speak to any RIT students before you applied to RIT?

A.  My neighbor was I believe was a student or alumni at the time I believe I talked to him.

Q.  What do you recall him saying, or you asking?

A.  Nothing in particular.  I think that he said that he enjoyed the program and that he had a

Page 33

good paying job.

Q.  Anything else that you recall him saying?

A.  No.

Q.  Did you speak, sorry, I'll ask the question even though I think you just answered, did you speak to any RIT alumni before applying, you said your neighbor was an alumni, correct?

A.  Yes.

Q.  Anyone else?

A.  No.

Q.  Did anyone at RIT ever make a specific promise to you before you applied if you enrolled at RIT your instruction would be exclusively in person?

A.  No.

Q.  So you were accepted for, I'm sorry, just one -- just a few follow-up questions on Bergeron deposition Exhibit 3, if you still have that up on your screen?

A.  Sure.

Q.  The first page RIT1097, you received this email, this letter from RIT, correct?

A.  Yes.

Q.  And this is on or about November 12, 2024, 2014, sorry?

A.  Yes.



MAGNA
LEGAL SERVICES

Page 34

Q. Did you receive this by mail or email, do you remember?

A. I can't say, don't remember.

Q. And there's nothing in this letter, is there, about in person education, is there?

A. No, I don't believe so.

Q. And then flipping to six or seven pages further to the page Bates RIT1106, are you there?

A. Yes.

Q. This is a letter you received from RIT on or about January 26, 2015, correct?

A. Yes.

Q. And there's nothing in this letter regarding in person education, is there?

A. No.

Q. Okay. So you were accepted for admission to RIT and. I'm sorry. I missed the other school that you were accepted at?

A. MCLA, Massachusetts College of Liberal Arts.

Q. And you ultimately decided to enroll at RIT, correct?

A. Yes.

Q. Why did you choose to apply, why did you choose to enroll at RIT?

Page 35

A. Over MCLA or just in general?

Q. In general or over MCLA why did you pick RIT to enroll at?

A. RIT had, from what I can tell, one of the best cyber security programs in the country at the time.

Q. Any other reasons?

A. Nope.

Q. Aside from the documents that you've already talked about reviewing before you applied to RIT in the period between your application and your enrollment do you recall reviewing any other RIT documents?

A. No.

Q. I'm not sure, was there an answer to that question, I didn't hear if there was?

A. No. sorry. no.

Q. Okay. Aside from the person I guess that you've told me you applied, you spoke with prior to applying, did you speak with anyone else who was RIT related during the period between your acceptance to RIT and your enrollment at RIT?

A. No.

Q. Sir, let's talk a little bit about your time at RIT generally. You applied for admission to

Page 36

RIT's computer and security program, correct?

A. Yes.

Q. And you were accepted into that program?

A. I was.

Q. You changed that program in March of 2017, correct?

A. Yes.

Q. From computing security to computing and information technologies, correct?

A. Yes.

Q. And that's referred to at RIT as CMIT, correct?

A. CIT.

Q. CIT, okay. Why did you, you effectively changed your major, is that what happened there?

A. Yes, I stayed within general school.

Q. What school is that?

A. Golisano College of Computing and Information Sciences. G-O-L-I-S-A-N-O, College of Computing and Information Sciences, that might be wrong. It's close.

Q. Why did you change your major in March of 2017?

A. A lot of the computer security course work was things that I wasn't particularly good at

Page 37

and wasn't enjoying, but there were parts of it that primarily overlapped with the CIT course work that I did enjoy so I decided to make the change.

Q. So I think I understand what computer security means, but what does CIT mean, how did that major differ from computer security?

A. It's a lot of like systems, it's systems administration type stuff which I have been doing and enjoyed more.

Q. Were the course work requirements for these two programs different?

A. They were.

Q. How were they different?

A. The cyber security or cyber security course work had a lot of programming which I to this day am not particularly skilled at, so I decided to not do things I was bad at.

Q. Okay. Were you enrolled as a full-time degree seeking undergraduate student at RIT?

A. Yes.

Q. Was that your status throughout your time at RIT?

A. Yes.

Q. Did you receive any academic honors during your time at RIT?



Page 38

A. No.
Q. Did you ever make the dean's list?
A. No.
Q. Honor society academic awards?
A. Nope.
Q. Did you receive any graduation honors that you graduated?
A. Nope.
Q. Were you ever put on academic or disciplinary probation while you were at RIT?
A. Yes.
Q. When was that?
A. I don't recall the semesters.
Q. But it was multiple semesters?
A. It was two.
Q. Was it academic or disciplinary?
A. Academic.
Q. Can you estimate when in your time in RIT you were placed on academic probation?
A. I believe it was one semester, one semester my first year, I think the first semester and then another one during my second year.
Q. That would have been 2015, '16, '17, in that range?
A. Yes.

Page 39

Q. What was the academic probation process, how did you get off of probation?
A. I just continued taking classes and I got better grades I guess.
Q. Was there a moment in which the probation was lifted or I don't know how it works?
A. I believe it's one semester of grades above a certain threshold.
Q. So you got the better grades and then the probation lifted?
A. Yup.
Q. Were you put on academic probation anytime during the 2019/2020 school year?
A. No.
Q. Sir, could I ask you to flip to Bergeron or open Bergeron deposition Exhibit 4.
A. Yes, looking at it.
Q. This is a document that starts at Bates RIT1155 and runs through RIT1158. Do you recognize this document?
A. I do, I'm very familiar with it.
Q. Why is that, what is it?
A. It's my academic transcript.
Q. Is it the official transcript of your undergraduate studies at RIT, correct?

Page 40

A. Yes.
Q. From start to finish, correct?
A. Yup.
Q. We discussed this briefly a little bit earlier, but this indicates that you participated in several co-ops during your time at RIT, correct?
A. Yes.
Q. How many co-ops did you participate in?
A. I had four co-op blocks across three co-ops.
Q. I think I know what that means, but why don't you explain four co-op blocks across three co-ops?
A. So I had one co-op that stretched from the summer all through the summer through the fall two co-op blocks but one job.
Q. Why don't we do it this way. Can you identify the three companies at which you did co-ops?
A. Yes, I worked my first one was at ET Precision Objects in Rochester Institute of Technology, the next one I worked two co-op blocks for General Dynamics Admission Systems, and I had one at Tesla.
Q. Was that the order in which you did the

Page 41

co-ops?
A. Yes, while I was in school.
Q. So two co-op blocks at General Dynamics and one co-op block each at CIT and Tesla, is that correct?
A. Yes.
Q. You described earlier I think you said they needed to be paid --
A. Yes.
Q. -- correct, and approved by RIT?
A. Yes.
Q. Did you receive credit for co-ops?
A. Not exactly, but they are required to graduate.
Q. How many co-ops do you need in order to graduate?
A. Approximately two semesters worth.
Q. Okay. Do you pay RIT tuition when you're on co-op?
A. You do not.
Q. And you actually get paid by the company for which you're doing the co-op, correct?
A. Yes.
Q. How did you, how did you secure these four co-ops, three co-ops across four blocks?

11 (Pages 38 to 41)


MAGNA
LEGAL SERVICES

Page 42

A. I believe ET Precision Objects was through like RIT email list of like they contact the school that we need an intern, they, the school, sends out, you know, an email of like the job description to a list of people looking for internships, and I interviewed for it and I got the job.

Q. So that was ET, correct?

A. Yes.

Q. How about General Dynamics?

A. I applied online.

Q. Through RIT or just directly with them?

A. I think directly with them.

Q. How about Tesla?

A. I applied online.

Q. Any involvement in RIT in that securing that co-op?

A. No.

Q. Was the Tesla co-op in person out in California, or no?

A. It was in person Fremont, California.

Q. So you moved out there for a semester?

A. Yup, summer.

Q. Summer. And the other two co-ops were also in person?

Page 43

A. Yup.

Q. Where did you live while you were studying at RIT?

A. I lived on campus.

Q. On campus all, I guess 5 years total?

A. Yes, give or take with the exception of summers and co-ops, yes.

Q. So for all the time that you were actually studying at RIT you were, you lived on campus at RIT at least through spring, through part of spring of 2020, correct?

A. Yup.

Q. This was on campus housing?

A. Yes.

Q. Can you describe how you generally spent your free time while you were at college?

A. Hanging out with friends, playing video games.

Q. Anything else that's memorable?

A. Not in particular.

Q. Did you join any fraternities?

A. I did not.

Q. Did you participate in any extracurricular activities during your time at RIT?

A. I did not.

Page 44

Q. Were you a member of any campus clubs or organizations at RIT?

A. I think I was on a cyber security club first semester.

Q. This would have been early in your tenure at RIT?

A. I believe so, yes.

Q. And aside from this club that you participated in early in your RIT career, any other clubs that you were a member of?

A. No.

Q. Were you a member of RIT's student government?

A. I was not.

Q. Did you play any sports while you were at RIT?

A. I did not.

Q. Did you participate in any intramural or club sports at RIT?

A. I did not.

Q. Did you attend on campus sporting events at RIT?

A. I did.

Q. Which events did you attend?

A. Primarily hockey.

Page 45

Q. How frequently did you attend, these were games of the RIT varsity team?

A. Yes, men's hockey.

Q. How often did you attend RIT's hockey games?

A. It varied, but when we had a home game I would more times, more times than not I would go.

Q. Aside from going to hockey games, any other sporting events that you went to as a spectator?

A. A few, but rarely.

Q. Did you ever use RIT's student health services?

A. I believe so, a few times.

Q. A few times, how many times do you recall using student health services?

A. Once or twice.

Q. Were these in person visits to student health services?

A. Yes.

Q. Did you ever use any of the RIT student health services tele-medicine health services?

A. No.

Q. Did you ever use RIT's counseling and psychological services?



Page 46

A. No.

Q. Did you use RIT's recreation or gym facility while you were at RIT?

A. Sparsely.

Q. Sparsely, what does that mean?

A. I would often not go to the gym much but sometimes I would go to the gym for a couple weeks and then stop.

Q. Familiar. How about the 2019 or 2020 academic year, was that an on year for the gym or off year for the gym?

A. It was an off year for the gym.

Q. Okay. When you did use the gym, what facility did you use?

A. Typically the workout room, I called them the machines and such.

Q. Anything else?

A. Not that I recall.

Q. Do you know what SLC stands for at RIT?

A. Student life center.

Q. Okay, yes. Did you use RIT's student life center facility while you were at RIT?

A. I don't remember.

Q. Do you remember anything SLC related that you did use during your time at RIT?

Page 47

A. I don't remember what the SLC offered, so.

Q. Fair enough. Did you have an on compass job at RIT while you were a student there?

A. I did not.

Q. Did you have an off compass job at RIT while you were a student there?

A. I did not.

Q. Taking a specific look at the 2019 through 2020 academic year, this was your senior year at RIT, correct?

A. Yes.

Q. And your fifth year of overall enrollment at the school?

A. Yes.

Q. From your transcript it looks like this was your most successful year at RIT in terms of grades, correct?

A. Yup.

Q. You had your best term GPA to date during the fall 2019 semester it looks like?

A. Yes, I suppose so.

Q. And your GPA for the spring 2020 semester was even higher than that, correct?

A. Yes.

Page 48

Q. You took 6 credit classes during the spring 2020 semester, correct?

A. Yes.

Q. And those are listed on Bergeron Exhibit 4 page RIT1157 under the header 2019 through '20 spring, correct?

A. Yes.

Q. And you received credit for all of these classes, correct?

A. I did.

Q. And complete credits, correct?

A. Yes.

Q. And you elected a pass/fail option for two of those classes, correct?

A. Yes.

Q. That was college physics 1 and intro to psych?

A. Yes.

Q. And you received As and Bs in the others, correct?

A. Yes.

Q. Sir, if you could open up Bergeron deposition Exhibit 5.

A. Yup.

Q. Do you recognize this document?

Page 49

A. Yes.

Q. What is this?

A. Looks like the RIT student financial responsibility agreement.

Q. This was the student financial responsibility agreement that you executed for the 2019/2020 academic year, correct?

A. Yes.

Q. And you agreed to this document electronically, correct?

A. Yes.

Q. And that's where it shows at the bottom NGB8373 at the bottom, that's you, correct?

A. Yes.

Q. And you agreed to a student financial responsibility agreement at the beginning of every RIT academic year, correct?

A. Yes, I imagine so.

Q. What did you understand you were agreeing to in this student financial responsibility agreement?

A. My understanding was if I dropped out halfway through the semester I'm not entitled to tuition reimbursement because that's my fault.

Q. And it says in this agreement that you



Page 50

agree when you register at any class at RIT you received any services at RIT it says you agree full responsibility to pay all tuition fees and associated costs, correct?

A.   I don't see where that is, but it sounds right.

Q.   Do you want to check me out, it's on the first substantive paragraph the document right below payment of fees slash promise to pay.

A.   Yes, I see that.  Yes, I'm sorry.

Q.   There's nothing in this document that provides that all classes will be in person, is there?

A.   No.

Q.   And there's nothing in this document that states you're entitled to a refund if classes are canceled or changed, is there?

A.   No.

Q.   And in fact, the only reference to refund is in the second paragraph of this document, correct?

A.   Yes.

Q.   And that paragraph has hyperlink in it, correct?

A.   Yes.

Page 51

Q.   And it's a hyperlink to RIT's tuition refund policies, correct?

A.   I would imagine so.

Q.   Do you know what RIT's tuition refund policies are?

A.   Generally.

Q.   What do you understand to be generally?

A.   I know that if you, if you start dropping classes or school in general the closer you do it to the beginning of the semester it's prorated in terms of tuition reimbursement.

Q.   And there's a certain point at which there would be no refund?

A.   I believe so.

Q.   You knew this before you signed the student financial responsibility -- agreed to the student financial responsibility agreement that is Bergeron deposition Exhibit 5?

A.   Yes.

Q.   Mr. Bergeron, looking specifically at spring 2020, how did you go about choosing which classes you wanted to register for the spring 2020 semester?

A.   I needed to fill my pre-reqs, so I chose the ones that filled my pre-reqs, not my pre-reqs

Page 52

but rather the things I needed to graduate.

Q.   So were all of your spring 2020 classes graduation requirements one way or another?

A.   Yup.

Q.   Anything else aside from checking the boxes to get graduation credits that you used to evaluate which classes you wanted to take in spring of 2020?

A.   Well, I mean, past, you know, just getting the credits and the courses that I needed I chose to elect for the ones that I thought would be interesting or beneficial to my career like storage architectures.

Q.   When did you register for classes for the spring 2020 semester?

A.   I believe it's mid to late fall semester.

Q.   So mid to late fall 2019 semester?

A.   Yes.

Q.   Do you recall whether it was around Thanksgiving time, Christmas time?

A.   Probably Thanksgiving early December.

Q.   How did you register for classes for the spring 2020 semester?

A.   Do you mean how do I go about registering for them?

Page 53

Q.   Yes.  So I'll just ask the question differently.  Did you register by quick enroll, is that how you registered?

A.   I believe I registered on SIS.

Q.   What is SIS?

A.   Student information services, I believe.

Q.   So you logged onto SIS and picked your classes, hit submit, and that was the process?

A.   Yes, pretty much.

Q.   What materials did you review before choosing your spring 2020 classes?

A.   I believe I consulted my academic counselor to see what things I would need to pass my graduation requirements and how to fit them all together.

Q.   Who was your academic counselor at this time?

A.   I don't recall.

Q.   Was this person your academic counselor during your entire tenure at RIT, or did that change?

A.   I think I got a new one senior year, so that's probably why I don't remember her name.

Q.   It was a she?

A.   I believe so.



Page 54

Q.   So aside from having a conversation with your academic counselor, did you review any other, did you review any document in connection with choosing your spring 2020 classes?

A.   No, not that I recall.

Q.   Did you review the official course description document for RIT's classes?

A.   Yes, for some of them, some of them I was just required to take so I didn't really have much of an option, but I also knew some of the professors especially within my school so I would just ask them what the class was like.

Q.   Just so we're clear, which of the classes you registered for in spring 2020 which were, which did you absolutely need to take and which did you have some flexibility on which classes to take?

A.   Let me look at my transcript.

Q.   So you're looking at Bergeron Exhibit 4, correct?

A.   Yes, 1157. I needed to take bowling because I needed a phys ed requirement. I needed psych. I needed physics. I needed philosophy to fill out my last class in my emergen. I needed senior development projects. And I needed storage architectures.

Page 55

Q.   So that leaves prostitution and vice is the only one where you actually made a decision?

A.   Well, okay, like storage architectures I could have chosen something else, but it needed to be credits within my major. And same with philosophy, it had to be a philosophy course.

Q.   So while you have this list on RIT1157 in front of you, just look at these classes and tell me what you remember about what documents you consulted in deciding whether or to register for these classes?

A.   I believe when you're selecting courses there's a description that's generally pretty accurate on what the course will be, so I typically just consulted that.

Q.   This is on SIS?

A.   Yes.

Q.   So just we're clear, I'm not going to ask you substantive questions about this document at this time, but if you can just pull up Bergeron Exhibit 9 really quickly.

A.   Yes.

Q.   This is RIT's undergraduate course descriptions 2019/2020. Did you actually review this document in connection with registering for any

Page 56

of your spring 2020 classes?

A.   No, I don't believe so.

Q.   Okay. Aside from the descriptions that were on the SIS portal themselves, did you review any other document in connection with registering for spring 2020 classes?

A.   No.

Q.   Did you review the syllabi for any courses before you registered for them in spring 2020?

A.   I don't believe so.

Q.   So of the classes you took during spring 2020 semester, one of them, prostitution vice, was actually an online class for the entirety of the semester, correct?

A.   Yes.

Q.   That looks like you got an A in that class, correct?

A.   Yes.

Q.   Are you seeking a refund in this case for the tuition you paid for that class?

A.   I'm not sure.

Q.   Why are you not sure?

A.   I hadn't considered that.

Q.   Did you consider your online prostitution

Page 57

vice class to have been an equivalent value to your other classes for which you received in person instruction?

MR. ABBOTT:  Objection, vague.

Q.   You can answer if you understand.

A.   I don't.

Q.   Why not?

A.   I don't really know how to weigh them.

Q.   But you knew prosecution and vice was going to be online at the time you registered for it, correct?

A.   I did, yes.

Q.   Did you need a break, or are you good?

A.   I'm good.

Q.   Okay. So if I could ask you to pull up Bergeron deposition Exhibit 6?

A.   Sure.

Q.   Do you have it up?

A.   Yes, I do.

Q.   Do you recognize this document?

A.   I do.

Q.   What is this?

A.   This is responses to a set of interrogatories.

Q.   Is it your responses to RIT's second set


MAGNA
LEGAL SERVICES

Page 58

of interrogatories to you, correct?

A. Yes.

Q. They are dated as of September 17, 2021, correct?

A. Yes.

Q. On the final page of this document there's a verification, correct?

A. Yes.

Q. Here you're verifying that the truth and accuracy of these responses?

A. Yes.

Q. That's your signature on the line above Nicholas Bergeron?

A. Yup.

Q. That's a yes?

A. Yes.

Q. Did you review these interrogatory responses before you signed them?

A. Yes, I did.

Q. When you signed them did you consider them to be true and accurate?

A. Yes.

Q. When you signed them did you consider them to be complete?

A. Yes.

Page 59

Q. As you sit here today do you consider these interrogatory responses to be true and accurate and complete?

A. Yes.

Q. Take a moment if you need to review them, but is there anything in here as you testified today that you'd like to change?

A. Not that I can see.

Q. So drawing your attention to your response to interrogatory number 4, if you can just take a moment to review the interrogatory itself and your response to that interrogatory.

A. Yup, okay.

Q. I'm going to ask you a few questions about your response to this interrogatory. So there's an initial objection to this interrogatory and then it says subject to and without waiving the foregoing objections plaintiff Bergeron states, and the first question I have is you state that quote there's a contract that RIT breached, do you see that?

A. Yes.

Q. What contract do you claim that RIT breached?

A. I'm not sure, I sign a lot of contracts.

Page 60

Q. You said you sign a lot of contracts?

A. Yes.

Q. What do you mean by that?

A. You end up signing a lot of stuff when you go to school.

Q. And you claim that RIT breached one of those things that you signed?

A. Yes.

Q. But you don't know what contract you claim RIT breached?

A. Yes, I don't recall which one specifically.

Q. You understand that you're the plaintiff in this lawsuit, correct?

A. Yes.

Q. One of the claims you're bringing against RIT is breach of contract --

A. Yes.

Q. -- correct? But you can't testify to what contract you claim RIT breached?

A. I would imagine it was probably --

MR. ABBOTT: Objection.

Q. You can continue your answer.

A. I don't have an answer.

Q. So you can't testify here today to what

Page 61

contract you're claiming in this case that RIT breached?

MR. ABBOTT: Same objection.

Q. Do you have an answer to that question?

MR. ABBOTT: If you understand the question you may answer this question, but if you don't understand the question please ask Mr. Burns if he can maybe rephrase the question so you can better understand.

A. Do you want to rephrase the question for me, please.

Q. Sure. I'll try it again. So you are the plaintiff, you're suing RIT in this case, correct?

A. Yes.

Q. And one of the causes of action in your lawsuit is you say RIT breached a contract with you, correct?

A. Yes.

Q. And I'm asking you what was that contract?

A. I believe it's the student financial responsibility agreement.

Q. So you believe that RIT breached the student financial responsibility agreement?

A. Yes.

**MAGNA** ❯

Legal Services

Page 62

Q. Are you claiming in this case that RIT breached any other contracts with you?

A. Not that I recall, but I don't know the details of every single contract top of my head.

Q. But I'm just asking you about your claims, you're the plaintiff in this case, you're bringing contract claims against us, you identified one contract that you say RIT breached, the SFRA, correct?

A. Yes.

Q. Any other contracts on which you're basing your claims here?

MR. ABBOTT: Objection, vague.

Q. You can go ahead and answer, Mr. Bergeron.

A. No.

Q. So in what manner do you claim that RIT breached the student financial responsibility agreement?

A. RIT did not provide all the things that were, that were promised to me as part of my on campus education.

Q. So when you say the student financial agreement, you're referring to what we looked at a while back as Bergeron Exhibit 5, correct?

Page 63

A. Yes.

Q. And if you could identify for me the language in this document that you, the agreement in this document that you claim RIT breached?

A. I'll have to pull it up.

Q. Please do.

A. I don't believe that it's the entirety of the contract.

Q. Why do you say that?

A. I believe that I'm entitled to on campus learning.

Q. I'm not sure I understand your response. Do you believe that, do you not believe that Bergeron Exhibit 5 is the entirety of your student financial responsibility agreement with RIT for the spring 2020 semester?

A. I do. but I don't believe it's the entirety of the contracts I signed.

Q. So in addition, tell me if I'm getting this wrong, in addition to the student financial responsibility agreement, you claim that there were other contracts that you had with RIT that RIT breached?

A. Possibly. No. But I don't know what he's talking about.

Page 64

Q. No meaning Bergeron Exhibit 5 is the contract on which you're basing your claims, or there are other contracts out there on which you're basing your claims?

A. This is the only one.

Q. What about Bergeron Exhibit 5 causes you to believe that it an incomplete statement of RIT's contract obligations under this agreement?

A. Because this agreement doesn't really account for RIT not providing their end of the bargain, mostly includes me not holding up my end.

Q. Let's try it this way. So looking back at your -- at Bergeron Exhibit 6, which are your interrogatory responses --

A. Yes.

Q. -- and your response to interrogatory 4 you say that there's a contract that RIT breached and then you say as set forth in the brochures catalogs website advertising social media posts syllabi, et cetera, correct?

A. Yes.

Q. And this list that you have here in your response to Exhibit 4, is this where you claim the terms of this contract can be found?

A. Yes.

Page 65

Q. So looking through this list, we'll spend a little time on working on your way through this list of sources --

A. Okay.

Q. -- you start with brochures, what brochures do you claim contain promises of in person education by RIT?

A. I don't think I can really list all of the brochures that RIT has presented.

Q. Why not?

A. There's probably dozens, hundreds throughout the years.

Q. Sure, but what are you basing your claims on in this case, which brochures are you basing your claims on?

A. All of the brochures that would advertise anything to do with on campus learning events services clubs.

Q. Let's try to get specific. So you believe that these brochures, some of these brochures contain promises of in person education by RIT?

A. Yes.

Q. Which brochures do you contend contain promises of in person education by RIT?

17 (Pages 62 to 65)

MAGNA

Page 66

A.   I don't have any on me that I could reference.

Q.   Do you have -- do you have particular brochures in mind, even if you don't have them physically present with you today?

A.   No.

Q.   So you don't have any specific brochures that you can recall contained promises of in person education by RIT?

A.   No.

Q.   Next on your list is catalogs.  What catalogs do you claim in this case contain promises of in person education by RIT?

A.   Well, the course catalog typically will have all the classes in it and it will say this class will be taught in this classroom, this class will be taught in person, and, you know, this building or what have you.

Q.   Any other -- so you identified the course catalog, any other catalogs that you're referring to in your response to interrogatory 4?

A.   Not that I recall.

Q.   When you say course catalog, are you referring to what is Bergeron Exhibit 9?

A.   Yes, that, and in conjunction to the

Page 67

syllabus, they will typically state what building, what room, what teacher, and details about the class.

Q.   But in terms of catalog, we'll talk about syllabuses --

A.   Sure.

Q.   -- separately, in terms of catalogs, when you refer to catalog in your response to interrogatory 4, you're referring to Bergeron Exhibit 9?

A.   Yes.

Q.   So it's unwieldily document.  Let me just -- let's just walk through, this is Bergeron Exhibit 9 just for the record, sorry.  So in Bergeron Exhibit 9 let's look through the document to take a look at the classes you took in spring 2020, and I'll guide you through it by pages because it's a giant document.

A.   Sure.

Q.   So the first just working through the document chronologically the first of your spring 2020 classes looks like it's on page 58 of the document, which is RIT900, just take your time to get there and let me know when you're there.

A.   What page did you say?

Page 68

Q.   It's page 50 of the document and the Bates number is RIT900.

A.   One second.  Did you say RIT900?

Q.   Yup.

A.   Nevermind, I was on the wrong one.  Okay.  Let's try to find that.  Okay, I see it.

Q.   On this page left column toward the top this is the course description in the undergraduate catalog for your senior development project 2, correct, ISTE501?

A.   Yes.

Q.   This is one of your spring 2020 classes, correct?

A.   Yes.

Q.   Is there any language in this description that you claim promises this class will be exclusively in person?

A.   No, but it was required to take in person.

Q.   Why do you say that?

A.   Because I had to take it in person for the first time.

Q.   Any other reason?

A.   I mean, no.  I took the first part and it was all in person, there was no options to take it

Page 69

remotely.

Q.   But so let's go back to my question though, in this description that's on page RIT900 of your senior development project 2, there's no language in here that you're claiming requires that class to be in person, is there?

A.   There's not.

Q.   So the next of your spring 2020 classes is on page 63 of the document, Bates RIT905.

A.   Yup.

Q.   Storage architecture NSSA422?

A.   Yup.

Q.   Do you see that?  This was one of your spring 2020 classes?

A.   It was.

Q.   Is there any language here that promises that that class would be exclusively in person?

A.   No.

Q.   Next class is on page 120 of the document, RIT962.

A.   Yup, I see it.

Q.   That's your crim 245 class prosecution and vice, correct?

A.   Yup.

Q.   This was one of your classes in the

18  (Pages 66 to 69)



MAGNA

LEGAL SERVICES

Page 70

spring 2020 semester, correct?

A. Yup.

Q. Is there any language in here that you claim promises classes would be exclusively in person?

A. No, but it also doesn't mention that it would be exclusively remote, so.

Q. This class was exclusively remote, correct?

A. It was.

Q. Next is on page 151 of the document, RIT993.

A. I see it.

Q. Philosophy 416 seminar in philosophy, this was one of your spring 2020 classes, correct? Sorry, I missed it, is that a yes?

A. Yes.

Q. Any language in here that you claim promises classes would be exclusively in person?

A. No.

Q. Next is page 15 of the document RIT997.

A. I see it.

Q. PSYC101, introduction to psychology, this was one of your spring 2020 classes, correct?

A. Yup.

Page 71

Q. Is there any language in this description that you claim promises classes would be exclusively in person?

A. There's not.

Q. Last is page 210 of the document, RIT 1052.

A. I see it.

Q. PHYS111 college physics 1, this was one of your classes for the spring 2020 term, correct?

A. Yup.

Q. Is there any language in this description that you claim promises classes would be exclusively in person?

A. No.

Q. Looking back at your list on Bergeron Exhibit 6, your response to interrogatory 4, that we were just talking about the second item on your list catalogs and we just looked at the undergraduate course catalog, I think I asked you before but I'll ask you again, is this the only catalog that you're referring to as the catalog in response to interrogatory 4?

A. Yes.

Q. The next on your list, next on your list is website, correct?

Page 72

A. Yes.

Q. Are you referring to the RIT website in this response?

A. Yes.

Q. You're referring to sites that are under the RIT dot EDU domain, correct?

A. Yes.

Q. Are you referring to any other website in this response?

A. No.

Q. What part or parts of the RIT website do you claim contain promises of in person education?

A. I don't have the website pulled up in front of me. But there is certainly a lot of advertising about how all the things on campus that you get when you go to school at RIT.

Q. Any other sections of the RIT website that you're referring to in website in your response to interrogatory 4?

A. Not that I recall, but RIT has a lot of pages on the website.

Q. So you say the parts that you're referring to in this response are parts that are advertised that things that you do on campus, correct?

Page 73

A. Yes.

Q. Anything else did I misstate that is that inaccurate or incomplete?

A. No, I'd say it's pretty accurate.

Q. Tell me about what you remember about these things on the RIT website that are advertised as things you can do on campus?

A. I mean, there's hundreds of things to do on campus, so I couldn't name them all, but there's plenty of clubs, activities, there's labs, there's the library, there's the gym, there's the cafeterias, there's student health center, there's events, sports, there's pizza parties, there's tons of stuff.

Q. So tell me, I'll try to summarize that and see if this is accurate or inaccurate, the parts of the website you're referring to are things on the RIT website that describe the things you can do on campus, the attributes of RIT's campus and what's available to students?

A. Yes.

Q. Anything else?

A. No, I'd say that's it.

Q. Do you know whether any of those portions of the RIT website that you're referring to contain

19 (Pages 70 to 73)


MAGNA
LEGAL SERVICES

Page 74

a specific promise of in person instruction at RIT?

A. No.

Q. No, you don't know, or, no, they don't?

A. No, they don't, I believe.

Q. I'd like to ask you to flip to Bergeron Exhibit 10.

A. Yup.

Q. Do you recognize this document?

A. Probably. I don't think I've looked at this in quite a while, so it's possible I've seen it.

Q. Do you recall having ever seen it before?

A. Not that I can think of, but I probably have.

Q. Why do you say you probably have --

A. I spend a lot of time on RIT's website and their online links, their online portals and such.

Q. Title of this document is disclaimer, correct?

A. Yes.

Q. And the URL at the bottom of the page indicates that this is a screen shot from RIT's website, correct?

A. Yes.

Page 75

Q. Do you know whether you saw this document before the spring 2020 semester?

A. I'm not sure.

Q. The fourth sentence of this document states that quote nothing on the RIT dot EDU website is intended to be a representation, offer, inducement, promise, or contract of any kind. Did I read that accurately?

A. Yes, it looks right.

Q. At the time that you enrolled at RIT for the spring 2020 semester do you have an understanding of what that language that I just read meant?

A. Yes.

Q. What's your understanding?

A. That means that just because something is on the RIT website doesn't necessarily mean that I will be getting it.

Q. Doesn't mean it's a contract or a promise, correct?

A. Yes.

Q. Back to your Bergeron Exhibit 6 interrogatory 4 response list. Next to your list is advertising.

A. Yes.

Page 76

Q. What advertising do you claim contains or contained promises of in person education by RIT?

A. When I was applying for schools I'm sure that I got plenty of mail from RIT showing us how beautiful the campus was and all the things you can do on it, although I don't have them at the moment, they are all gone.

Q. So you're referring to advertising in your response to interrogatory Exhibit 4 to mailings you received from RIT in connection with your application process?

A. Yup.

Q. Are you referring to anything else?

A. No.

Q. Describe for me if you can remember what the advertising looked like?

A. Probably orange. Telling me about programs that they had. All the great opportunities to, you know, learn about, you know, the various engineering disciplines, all the labs they had, how advanced they were, all the clubs, all the activities to do on campus.

Q. Do you believe these advertising brochures that you received in connection with your application to RIT contained specific promises of in

Page 77

person instruction?

A. It might, but probably not.

Q. You don't know of any as you sit here today, do you?

A. No.

Q. Next on your list in interrogatory 4, your response to interrogatory 4 is social media posts. Do you see that?

A. Yup.

Q. What social media posts do you claim contain promises of in person education by RIT?

A. Well, I certainly don't have a list of them. But RIT does certainly boast about their wonderful campus and all the things to do on it.

Q. Okay, so you're referring in this response to social media posts from RIT regarding its wonderful campus and things to do on it --

A. Yes.

Q. -- correct? Are you referring to any other social media posts in this response?

A. I couldn't catalog all the social media posts, so.

Q. Right, I'm not asking you to catalog all of RIT's social media posts, I'm asking you what social media posts you're referring to in your



Page 78

response to interrogatory 4?

A.  I suppose that would be it.

Q.  Did you review these social media posts that you're referring to here?

A.  Not recently, not, I don't go over RIT's social media posts that much.

Q.  Did you review them before you either applied to RIT or before you enrolled for spring 2020?

A.  Yes.

Q.  Which social media posts do you recall reviewing at those time periods?

A.  Facebook, Twitter, Instagram.

Q.  Anything else?

A.  Probably it, but, I mean, I get emails from them, but I don't know if that's social media, so.

Q.  Did any of those social media posts that you reviewed either prior to enrolling at RIT or prior to enrolling at RIT for spring 2020 contain specific promises of in person education at RIT?

A.  Not that I recall.

Q.  What social media platforms did you have an account on as of spring 2020?

A.  Facebook, Twitter, Instagram.

Page 79

Q.  Anything else?

A.  Probably Reddit, I don't know, there's lots of social media platforms.

Q.  Right, I'm asking what social media platforms that you yourself have a presence on?

A.  Yes, that's probably most of them.  At least the big ones.

Q.  Facebook, Twitter, Instagram, Reddit?

A.  Yes.

Q.  Anything else?

A.  I think that's it.

Q.  Did you ever post on any of these platforms about RIT?

A.  Rarely, if ever. RIT has an unofficial subreddit where students will post about things going on in school.

Q.  Did you ever post on the subreddit?

A.  Mostly view.

Q.  But post occasionally?

A.  Like maybe one or two, but rarely.

Q.  Did you ever make any posts on the RIT subreddit regarding spring 2020 or your experiences during spring 2020?

A.  I don't believe so, but there were certainly a lot of other people doing so.

Page 80

Q.  Right, I'm just asking about you, you don't believe you actually posted?

A.  No.

Q.  How about on Facebook, or Twitter, or Instagram, did you ever post on any of these platforms regarding your experiences at RIT during the spring 2020 semester?

A.  I don't believe so.

Q.  Back to your interrogatory 4 list of responses, your list, we just talked about social media posts, next on the list is syllabi, do you see that?

A.  Yes.

Q.  What syllabi do you claim contained promises of in person education by RIT?

A.  Pretty much every class I've ever taken will have some type of language saying where the class will be held, that, you know, it's not available to take remotely, otherwise that would be very clearly spelled out such as the case in my prostitution and vice class.

Q.  Are you finished with your answer?

A.  Yes.

Q.  So you just gave me two reasons, I think, why you think syllabi contain promises of in person

Page 81

education by RIT, correct?

A.  Yes.

Q.  The first is that they identify class locations, correct?

A.  Yes.

Q.  And the second, just to make sure I understand it, are you saying that syllabi contained express language that this class is not available to be taken remotely?

A.  No, I'm saying that in the case of remote classes they will very explicitly say this class will be held remotely.  At least that is the case for the classes that I've taken.

Q.  Got it.  So your contention is that by not saying the class is available to be taken remotely, that means the class is in person?

A.  Yes.

Q.  Aside from these two points, the location of the class and the absence of an express remote option, is there anything else in your syllabi that you contend contains an express promise of in person education?

A.  I don't believe so.

Q.  In your response to interrogatory 4 after syllabi you have ETC period, correct?

MAGNA

Page 82

A.   Yes.

Q.   That means et cetera?

A.   Yes.

Q.   What does et cetera mean here?

A.   That it means that there's a lot of places where RIT has advertisements or, you know, things that are sent to students or provided to potential students, that is, I don't know, not exhaustive list.

Q.   So we talked about brochures, catalogs, websites, advertising, social media posts, and syllabi so far, correct?

A.   Yes.

Q.   And that's the list in your interrogatory response to interrogatory 4, correct?

A.   Yes.

O.   So what additional documents are you aware of that you contend contain promises of in person education by RIT?

A.   I don't have any others.

Q.   When you say you don't have any others, you're not aware of any others?

A.   I am not.

Q.   Mr. Bergeron, are you familiar with the RIT undergraduate bulletin?

Page 83

A.   Probably.  I don't think I've read it in a while.

Q.   If I can ask you to pull up Bergeron Exhibit 7.

A.   Okay.

Q.   Do you recognize this document?

A.   Yup.

Q.   What is this?

A.   It's a general schedule of when classes start, when classes end, when there's days off, when there's, you know, major events on campus, things like that.

Q.   This is the undergraduate student bulletin for the 2019/2020 academic year, correct?

A.   Yes.

Q.   Which included by definition the spring 2020 semester, correct?

A.   Yes.

Q.   Did you review, have you reviewed this document before today?

A.   I have not.

Q.   Today is the first time you're seeing this document?

A.   I'm sure I've seen it in the past, but not in a while.

Page 84

Q.   Did you look at this document or did you review this document or parts of it before you registered for classes for the spring 2020 semester?

A.   I don't believe so.  Most of the semesters are generally follow the same framework.

Q.   The undergraduate bulletin you mean looks the same pretty much from year to year?

A.   Yup.

Q.   So at some point prior to enrolling in classes for the spring 2020 semester you reviewed some it, portion of the RIT undergraduate bulletin?

A.   Yes, that is likely.

Q.   And you didn't, you didn't review, you don't recall reviewing the 2019/2020 undergraduate bulletin because you just assumed it was pretty similar to what you had previously seen, correct?

A.   Yes.  I also believe we had some kind of email providing something similar to this.

Q.   What do you mean by that?

A.   Like anytime that there's like first day of classes, or last day to drop classes, or, you know, finals start, or we have a day off, we usually get some type of notification from the school regarding that.

Q.   You're saying some subset of the

Page 85

information in here is provided to you formally or informally by RIT by email?

A.   Yes.

Q.   So you don't have to have this as the bible in front of you throughout the academic year, right, it'll tell you when you need to do certain things?

A.   Yes, I think they know that students are forgetful and busy.

Q.   Got it.  So, sir, are you basing any of your claims in this case on any promises that you contend are contained in Bergeron Exhibit 7, the undergraduate bulletin?

A.   I believe it's quite long, but, yes, I don't think I can really tell you without reading most if not all of it.

Q.   If you can just take a look at the table of contents and see if that refreshes your recollection on whether your claims are based in part on any promises contained in this document?

A.   Not that I can see.  University policies and procedures potentially.

Q.   Anything else?

A.   That's probably it.

Q.   So you don't know whether your claims in

22 (Pages 82 to 85)



Page 86

this case are based on anything in this document, Bergeron Exhibit 7?

A. Yes, I don't know.

Q. As you sit here today you're not aware of any specific promises of in person education that you contend are contained in this document, Bergeron Exhibit 7?

A. No, I do not.

Q. I'd like just a few specific questions about this document, just like the other unwieldily document I'll just give you specific page references to bring you to where I'm looking. So first questions are regarding something on page 1 of the document, which is page 3 of the pdf, it's RIT Bates number RIT345. Are you there?

A. Yup.

Q. The paragraph on the left side of this page, which is headed about this bulletin, do you see where I'm talking about?

A. Yes.

Q. You see that the first sentence of that paragraph reads as follows, this undergraduate bulletin does not contain -- strike that, I'll start again. Quote, this undergraduate bulletin does not constitute a contract between the university and its

Page 87

students on either a collective or individual basis, did I read that accurately?

A. It looks like it to me.

Q. Then two sentences after that the document refers to the possibility of quote course and curriculum changes, do you see that?

A. These are really long sentences, yes.

Q. And it also refers to the possibility of quote unforeseen changes to other aspects of RIT life, correct?

A. Yes.

Q. And the following sentence states quote because of this Rochester Institute of Technology does not assume a contractual obligation with its students for contents of this undergraduate bulletin. Did I read that accurately?

A. Yes.

Q. At the time you enrolled at RIT from the spring 2020 semester did you have an understanding of what the language we just discussed meant?

A. I probably had a general idea.

Q. What was your general idea?

A. That this document is not a contract between the university and student.

Q. Anything else?

Page 88

A. Pretty much sums it up.

Q. If I could ask you to flip to page 55 of the document, that's page 57, I believe, of the pdf, it's RIT398.

A. Yup.

Q. And this is the program overview for computing and information technologies, correct?

A. Yes.

Q. This was the course of study in which you were enrolled in the spring of 2020 semester, correct?

A. Yes.

Q. And the description of your major continues on -- begins on page RIT398 and continues to RIT399, correct?

A. Yes, that looks right.

Q. And do you see any language in either of these two pages that you contend constitutes a promise by RIT of exclusively in person education?

A. No.

Q. If I could ask you to flip way down, scroll way down into the document to page 354 of the document, which is Bates 355 of the pdf, it's RIT697.

A. Okay.

Page 89

Q. There's a section beginning on this page entitled refund policies. Do you see that?

A. I do.

Q. That section continues on to the next page, correct?

A. Yes.

Q. There's nothing in this section that states that RIT students have a right to a refund if RIT cancels classes, is there?

A. Not that I can tell, no.

Q. Or that gives RIT students a right to a refund if RIT changes the manner of class instruction, is there?

A. No.

Q. On page 354 of the document the right column about halfway down under the heading partial refund schedule for tuition. Are you there?

A. One second. Yup.

Q. There's a URL embedded in here page to RIT website, do you see that, if I can ask you to take a look at Bergeron Exhibit 8.

A. Yup.

Q. This is RIT1781 through RIT1789. Do you recognize this document?

A. Yes, I think I've seen this before.



Page 90

Q. When do you think you saw it?

A. Not sure, but definitely during my time at RIT.

Q. Do you believe it was before you enrolled for spring of 2020?

A. Yes.

Q. This document is entitled refund tuition adjustment policies, correct?

A. Yes.

Q. From the URL at the bottom of Bergeron Exhibit 8 looks like it was posted on the RIT student financial services website, correct?

A. Yes, sounds right.

Q. There's nothing in this document that states RIT students have a right to a refund if RIT cancels classes, is there?

A. No, not that I can see.

Q. There's nothing in this document that gives RIT students a right to a refund if RIT changes the manner of instruction, is there?

A. No, not that I can tell.

Q. At anytime during the spring 2020 semester did you ever take a leave of absence from RIT?

A. Nope.

Page 91

Q. At anytime during the spring 2020 semester did you ever withdraw from all of the classes that you were registered for for that semester?

A. Nope.

Q. You continued as a full-time student at RIT throughout the spring 2020 semester, correct?

A. Yes. I was in my last semester, I didn't really have a choice.

Q. You didn't withdraw from any of your spring 2020 classes, did you?

A. No.

Q. So going back, I just have one further question on Bergeron Exhibit 7, which is the undergraduate student bulletin that we were discussing.

A. Sure.

Q. I'm going to ask you to flip to page 369 of the document, that's page 370 of the pdf, it's RIT712.

A. Yup.

Q. The section entitled course registration on the bottom right-hand of the page. Do you see that?

A. Yup.

Page 92

Q. Within that section, that section continues on to the next page, correct?

A. Yes.

Q. If I can ask you to flip to page RIT713, it's the carry-over from the previous section, correct, and the final sentence of that paragraph reads quote RIT reserves the right to alter any of its courses at anytime. Did I read that accurately?

A. Yes.

Q. Do you have an understanding of what this sentence meant when you enrolled at RIT for the spring 2020 semester?

A. Possibly.

Q. When you say possibly, what do you mean?

A. I guess I hadn't really considered what that would mean in reality.

Q. So what was your understanding based on?

A. I mean, it had never happened so there would be no way to know what RIT would mean by that.

Q. What did you understand it to mean?

A. RIT can change classes on a whim.

Q. Sounds good. What time is it now? Your call whether you want to make this restroom or little bit longer lunch-ish break, what do you think?

Page 93

A. I'm fine with either.

Q. Why don't we just call it 12:05 now maybe we can just break for half hour, do whatever anyone needs to do, and then reconvene at 12:35.

A. Sure.

THE VIDEOGRAPHER: The time is 12:05, we are going off the record.

(Luncheon recess taken 12:05-12:37)

THE VIDEOGRAPHER: The time is 12:37, we are back on record.

Q. Good afternoon, Mr. Bergeron.

A. Good afternoon.

Q. I just have one more line of questioning regarding Bergeron 6, which I can pull that up. Your response to interrogatory number 4. We talked about all of the specific sources in your list in your response to interrogatory 4. You also cite in your response to interrogatory 4 the party's course of conduct. Do you see that?

A. Yes.

Q. What do you mean by that?

A. By that I would mean the previous years of on campus education.

Q. Do you mean anything else by that?

A. No, I do not.



Page 94

Q.   What about the previous years of on campus education are you basing your claims on in this case?

A.   In the previous years there was no option or even slight consideration that classes could or had the potential to be remote unless specifically noted. Everything was in person by fault.

Q.   So in referring to prior course of conduct, are you referring to the pre-pandemic normal of RIT?

A.   Yes.

Q.   Are you referring to anything else?

A.   No.

Q.   Prior to spring of 2020 did you ever have a class at RIT change locations or professors?

A.   Not that I recall.

Q.   No changes of class location that you can recall?

A.   Some of them would change like we're going to be down the hall now, but nothing major.

Q.   So some of the classes that you took actually did change location over your time at RIT?

A.   I mean like rarely, and the location change was not significant, it would be on a different floor or in a different classroom.

Page 95

Q.   So was that the class was moved to a different location than that had previously been stated in the syllabus?

A.   Rarely, but it has happened.

Q.   Do you think RIT breached a contract when this occurred?

MR. ABBOTT: Objection, vague.

Q.   You can answer it.

A.   I don't know.

Q.   You didn't sue RIT for breach of contract when this occurred, did you?

A.   No.

MR. ABBOTT: Objection, argumentative.

Q.   The answer is no?

A.   The answer is no.

Q.   Prior to spring of 2020 did you ever have a class at RIT canceled because of snow or weather?

A.   I have.

Q.   How many times prior to spring of 2020 would you estimate that that occurred?

A.   It would be hard to guess, but it would happen a handful of times a semester maybe.

Q.   Handful of times each semester?

A.   Yes.

Q.   Do you think RIT breached a contract when

Page 96

this occurred?

MR. ABBOTT: Objection, vague.

Q.   What was your answer?

A.   The answer is no.

Q.   Why not?

A.   Because they are looking out for the well-being of students.

Q.   Any other reason?

A.   No.

Q.   Prior to spring of 2020 did you ever have a professor cancel class due to illness?

A.   It probably happened. They don't always tell us why classes will be canceled, sometimes they just tell us they won't be there, so I'm sure it's happened.

Q.   So you can recall instances in which class was canceled and it wasn't because of weather?

A.   Yes.

Q.   How many times would you say over your tenure at RIT did that occur?

A.   It would be hard to say.

Q.   More than five?

A.   Sure.

Q.   More than ten?

A.   Yes, maybe.

Page 97

Q.   More than twenty?

A.   I think twenty would be pushing it.

Q.   Do you think RIT breached a contract when this occurred?

MR. ABBOTT: Objection, vague.

A.   I don't know.

Q.   You didn't sue RIT for breach of contract when this occurred in the past, did you?

MR. ABBOTT: Objection, argumentative.

A.   No, I did not sue RIT.

Q.   In the scenario where classes were canceled in the past, how many classes would you say would have needed to be canceled before you think RIT breached a contract?

MR. ABBOTT: Objection, vague, and to the extent it calls for a legal conclusion.

A.   I don't know, there really wouldn't be any way to know without it happening.

Q.   Classes were canceled for a week, would that be a breach of contract?

MR. ABBOTT: Objection, calls for a legal conclusion.

A.   I'm not sure.

Q.   How about a month, would that be a breach of contract?

MAGNA

Page 98

MR. ABBOTT: Same objection.

A. I'm not sure.

Q. Sir, if I could ask you to flip to or open Bergeron Exhibit 2. Let me know when you have it up, do you have it?

A. Yup.

Q. Do you recognize this document?

A. Yes.

Q. What is this?

A. This looks like the message that we all received as RIT altered its schedule at the end of our extended spring break or extending our spring break and then informing us of the changes to the class schedule.

Q. And this was part of your document production in this case, correct?

A. Yes. I believe so.

Q. And we can see that because it has a Bergeron Bates number at the bottom of it, correct?

A. Yes.

Q. You received this document on March 11th, 2020 at your RIT email address, correct?

A. Yes.

Q. And this was a communication to RIT's students from RIT's president David Munson, correct?

Page 99

A. Yes.

Q. You were on spring break when you received this email, correct?

A. Yes.

Q. Where were you physically at the time, were you at RIT or back home?

A. I was back home in Adams, Massachusetts.

Q. Mr. Munson was informing RIT students that spring break would be extended through March 22nd, correct?

A. Yup.

Q. And the classes would resume on March 23rd, correct?

A. Yes.

Q. And when they resumed, classes would be conducted by quote alternative method closed quote until further notice. correct?

A. Yes.

Q. When you received this March 11th email from RIT, what was your reaction?

A. I thought that it was the right thing to do, there was a deadly pandemic going on and it seemed like health takes the most priority over anything else.

Q. So at this point of the pandemic you

Page 100

didn't think that RIT should continue to hold in person classes, did you?

A. No, I did not.

Q. In the several weeks immediately after you received this March 11th email from RIT did you raise any objection to RIT's decision to transition to alternative methods for classes?

A. Could you rephrase the question.

Q. Sure. In say the 2 weeks following receipt of this March 11th email did you raise any objections to anyone at RIT regarding the transition to alternative methods for your classes?

A. No.

Q. When you received this March 11th announcement from RIT did you consider withdrawing from the semester?

A. I knew that it would affect class work. There really wouldn't be any way to know how classes would be affected by that. It had crossed my mind, but I did not withdraw clearly so I was in my last semester it really wasn't much of an option.

Q. So you did consider withdrawing?

A. Well, I didn't seriously consider it, but I knew that classes would be affected by the transition.

Page 101

Q. Why did you know that?

A. Because lack of in person resources. It's hard to conduct a physics lab without a lab, for example.

Q. Do you have other examples?

A. It's hard, it's harder to facilitate like in person like meetings with classmates, for example, in my senior project if I had to coordinate with members of the class it's hard to synthesize that like in person interaction with them, same with professors, well, my bowling class certainly affected. I don't know how relevant that is, but.

Q. Any other examples?

A. No, those are the ones I can think of.

Q. So if you can open up Bergeron Exhibit 11 for me --

A. Yup.

Q. -- do you recognize this document?

A. Yes.

Q. What is this document?

A. This is RIT updating us on the Coronavirus pandemic saying that RIT encourages students not to return to campus, courses will resume March 23rd at alternative modes.

Q. You received this document at your RIT

MAGNA

Page 102

email address on or about March 15, 2020?

A. Yes.

Q. At the time were you still in Adams?

A. I don't know the dates specifically, but if that was during spring break, then, yes, I was.

Q. And this was a further communication to RIT students regarding the pandemic, yes?

A. Yes.

Q. And in this communication RIT informed its students that due to the pandemic there would be no in person face-to-face classes for the remainder of the spring 2020 semester, correct?

A. Yes, that is my understanding.

Q. And that classes would be resuming on March 23rd by quote alternative delivery methods including online, correct?

A. Yes.

Q. When you received this communication, Bergeron Exhibit 11, regarding the method of instruction going forward, what was your reaction?

A. I thought that it was probably for the best. Like I said, safety comes first so.

Q. So you didn't think at that time that you received Bergeron Exhibit 11 that RIT should resume in person classes?

Page 103

A. No.

Q. In the 2 weeks after you received this March 15th announcement from RIT did you raise any objection to RIT's decision to transition to alternative delivery methods for your classes?

A. No.

Q. This March 15th communication from RIT also informed you that RIT would be immediately closing campus spaces that invite large groups of people, correct?

A. Yes.

Q. And that included the SLC and some other spaces, correct?

A. Yes, I believe there was a number of spaces but mostly in fact.

Q. At the time that you received this March 15th communication from RIT did you disagree with that decision to close these spaces?

A. No.

Q. Why not?

A. I think that safety of students, staff, faculty is paramount to keeping a lunch hall open.

Q. And this March 15th communication, Bergeron 11, also informed you that RIT would be closing campus housing except for those students

Page 104

that couldn't leave, correct?

A. Yes, I believe so.

Q. At the time you received this on March 15, 2020 did you disagree with that decision?

A. No.

Q. Why not?

A. I believe that health and safety of faculty, students, and staff was more important than people living in an apartment that they didn't otherwise need to live in if they had the opportunity to leave.

Q. So at the time you received this on March 15, 2020 was all of your stuff still in campus housing?

A. Yes.

Q. Did you eventually vacate your room?

A. Yes, I believe, I couldn't tell you the exact date, but a few days before classes resumed I drove to RIT, spent the night, packed up all my stuff, returned my key, drove back home.

Q. So this would have been before classes resumed on March 23rd?

A. Yes.

Q. Was that the last time you were on RIT's campus?

Page 105

A. Yes.

Q. If I can ask you to flip to, open Bergeron Exhibit 12.

A. Sure.

Q. This is Bergeron 000027, do you recognize this document?

A. Yes.

Q. What is this?

A. This is students financial services giving us information regarding credits and refunds.

Q. And you received this document on or about March 20, 2020, correct?

A. Yes.

Q. And this is a further communication to RIT students regarding the pandemic, yes?

A. Yes.

Q. Was there communication when you first learned of RIT's plans with respect to tuition and fee refunds?

A. Yes, I believe so.

Q. In the period between March 11th, which was the first communication that was looked at, and March 20th, which is this communication, had you asked anyone at RIT about the school's plan for tuition or fee refunds?

27 (Pages 102 to 105)

MAGNA

Page 106

A.  No.

Q.  During that same time period had you expressed any views on the subject to anyone at RIT?

MR. ABBOTT: Objection, vague.

A.  I don't know.

Q.  Well, do you recall anytime during between March 11th and March 20th expressing any opinions to anyone at RIT regarding tuition or fee refunds?

A.  I don't remember doing so, no.

Q.  During this period between March 11th and March 20, 2020 did you have any conversations with anyone, anyone period, regarding tuition or fee refunds?

A.  It's possible. I don't know.

Q.  Do you have any recollection of that occurring?

A.  I probably discussed it with my parent saying I hope RIT gives us some kind of reimbursement. Possibly did it with my friend, I don't know.

Q.  But you don't have a specific -- go ahead.

MR. ABBOTT:  I advise my client not to speculate.  Simply speak to the things you have

Page 107

personal knowledge of, thank you, Robert.

Q.  Yes, absolutely, we're not asking you to guess here.  But you don't have any specific recollection of that occurring, it might have happened, but you don't recall it happening?

A.  No.

Q.  So in this March 20, 2020 communication from RIT, that's Bergeron Exhibit 12, RIT informs students that it would be making pro rata refunds of housing costs, dining plans, and parking fees, correct?

A.  Yes.

Q.  Did RIT make these refunds?

A.  Yes.

Q.  Did you receive the refunds for those costs you had paid?

A.  Yes. I had. I paid for housing and parking pass. Didn't have a meal plan.

Q.  You received pro rata refunds for both your housing costs and parking costs?

A.  Yes.

Q.  And you're not seeking to recover any refund of housing costs or parking costs in this case, are you?

A.  No.

Page 108

Q.  Did classes at RIT resume on March 23rd as had been scheduled?

A.  Yes.

MR. ABBOTT:  Objection.

Q.  That was a bad question, let me do it again. Did classes at RIT resume on March 23rd as had been rescheduled in the wake of the pandemic?

A.  Yes.

Q.  Did all of your classes resume that week?

A.  I believe so.

Q.  Prior to spring break 2020 had you attended all of your spring 2020 classes?

A.  Yes.

Q.  Had you missed any classes prior to spring break 2020 in the spring 2020 semester?

A.  Yes.

Q.  You had missed classes?

A.  A few.

Q.  How many had you missed?

A.  Two or three.

Q.  Two or three total among your classes, or two or three in each class?

A.  Two or three across all of them, I would say.

Q.  Did your professors provide revised

Page 109

syllabuses for all of your classes for the second half of the spring 2020 semester?

A.  I think most of them did.

Q.  Do you recall any professors who didn't?

A.  Well, the online class was essentially unchanged.  And I think philosophy may not have changed, but I don't recall specifically.

Q.  Were any of your courses canceled for the second half of the 2020 semester?

A.  No, but, I mean, bowling was essentially canceled.  We did online, like we had like three homeworks and we did like food permits.

Q.  So aside from bowling, did all of your classes continue in some fashion?

A.  Yes.

Q.  Did you have the same professors for all of your classes in the second half of your spring 2020 semester as you did in the first half?

A.  Yes.

Q.  Did all of your professors make themselves available to students in some fashion, virtually, via email, or some other means in the second half of the 2020 semester?

A.  Yes.

Q.  Mr. Bergeron, you commenced this lawsuit



Page 110

against RIT on May 1st, 2020, correct?

A. I don't recall the date, but that sounds right.

Q. Just to get a clean record, so if you can just pop open Bergeron Exhibit 13, and see if this refreshes your recollection on the date you commenced this lawsuit?

A. The date is at the bottom probably. April 30th.

Q. Yes, it appears that the complaint is dated April 30th. And if you look at the header of the document, which indicates the date on which it was filed, it looks like it was filed on May 1st, 2020?

A. Yes.

Q. Does that refresh your recollection as to the date in which you filed this lawsuit?

A. Yes, it does.

Q. And that was May 1st, 2020, correct?

A. Yes.

Q. When did you first speak with lawyers regarding potentially bringing a lawsuit against RIT?

A. It was after RIT had brought up the partial refunds for, the prorated refunds regarding

Page 111

housing, meal plans, and parking. I believe there may have been an FAQ where it was mentioned that there wouldn't be any financial reimbursements for tuition. I believe RIT had like a Coronavirus like FAQ with, you know, some questions and answers on it, and I think there was a form at the bottom where you could ask more questions. I basically said that it's unacceptable that they are doing that, refunding parts of tuition that is. And after that pretty much went nowhere, I decided to seek new action.

Q. So let's just turn to Bergeron Exhibit 14, because I think this may be what you're referring to?

A. Sure, yes.

Q. Do you recognize this document, Bergeron 14 Bates as Bergeron bunch of zeros 14?

A. Yes.

Q. What is this?

A. This would be what I had just mentioned. This is the -- a response that I had to like RIT helpline about Coronavirus, and I essentially said that there's a lot of things that they are doing poorly, which is not necessarily their fault, but there's a lot of things that I had paid for and I'm

Page 112

not getting and I would like reimbursement for that.

Q. So this is a message you sent on April 9th, 2020, correct?

A. Yes.

Q. And it's hard to tell from the document itself, through what means did you send this message?

A. I think they had a portal where you could fill out like a response that RIT would get to and respond to if you had questions, concerns, et cetera, about Coronavirus as it regarded RIT.

Q. I see you submitted this through the -- through some portal on RIT's website?

A. Yes.

Q. At the time you sent this message on April 9th, 2020 had you been in contact with counsel?

A. No.

MR. ABBOTT: Objection, to the extent it seeks information protected by privilege.

Q. Yes, no, just to be clear, I'm not asking for the substance of any communications with your counsel, I'm just asking for the timeline?

A. No, this would be prior to me contacting any sort of law firm.

Page 113

Q. So at some point subsequent to your sending of this message on April 9th, 2020 you came into contact with counsel?

A. Yes, sounds right.

Q. Did you contact them, or did they contact you?

A. I contacted them.

Q. Do you know whether it was days or weeks after sending this email, sending this message that's Bergeron 14?

A. I'm not sure.

Q. So between -- so you first learned that RIT was not intending to issue tuition or fee refunds on March 20th, correct?

A. Yes.

Q. And we know that because that's what they had told you in Bergeron deposition Exhibit 12, correct?

A. Yes.

Q. Between March 20, 2020 and April 9th, 2020 had you written to anyone at RIT regarding your thoughts on tuition refunds?

A. I don't believe so.

Q. During the same time period, between March 20, 2020 and April 9th, 2020, had you spoken

**M·AGN·A** >

Page 114

with anyone at RIT regarding your thoughts on tuition refunds?

A.   No, I don't believe so.

Q.   Between March 20, 2020 and April 9th, 2020 had you written to anyone regarding your thoughts on how RIT was implementing this transition to virtual classes?

MR. ABBOTT: Objection, vague.

A.   I don't know.

Q.   Do you have any recollection at any point during the time period of between March 20, 2020 and April 9th, 2020 of writing anything to anyone at RIT regarding the transition to virtual learning?

A.   No.

Q.   Between March 20th, 2020 and April 9th, 2020 had you ever spoken with anyone at RIT regarding how RIT was implementing its transition to virtual learning?

A.   I had probably discussed it with some professors, but that's probably the extent of it.

Q.   What do you recall on that subject, what professors do you recall speaking about that subject with?

A.   No one in particular. But the general sentiment was this kind of sucks, but we're going to

Page 115

make the best of it.

Q.   The general sentiment, what do you mean the general sentiment?

A.   Of the transition to online learning.

Q.   Whose general sentiment are you articulating?

A.   Staff, students.

Q.   Do you recall specific conversations you had with professors during the period between March 20, 2020 and April 9th, 2020 where this was discussed?

A.   No, I don't.

Q.   So how are you aware of what you term the general sentiment?

A.   Pretty much every professor and every zoom call would or every like discussion or email or whatever, would, I don't know, like the professors would, I don't know, kind of say like, like this is not how I would do it normally, I know this is not the same way we would do it if we were in person, but this is how we're doing it, blah, blah, blah.

Q.   So you recall that all of your professors, all of your spring 2020 professors made those statements?

A.   I couldn't say if it was all of them.

Page 116

Q.   I'm sorry, I didn't mean to interrupt.

A.   I just couldn't recall if it was all of them, or one didn't, or two didn't.

Q.   Do you recall specific professors that you had in spring 2020 who did make those statements?

A.   No.

Q.   So in this April 9th message, Bergeron Exhibit 14, you wrote quote the professors are handling the transition to remote learning at best poorly, correct?

A.   Yes.

Q.   Which of your spring 2020 professors did you think were handling the transition poorly?

A.   There were cases where, well, some of the obvious ones are like physics, it's really hard to do a physics lab and such without having a lab. Being able to see the things in motion really helps like concrete the ideas. There were cases where I don't remember, you know, physics was definitely a bad one, but there were other cases as well.

Q.   Let's talk about physics first then. How do you think your physics professor was handling the transition poorly?

A.   Just that like it's hard to replace the

Page 117

in person stuff with remote learning. There were no form of teaching necessarily.

Q.   Do you feel your physics professor could have done something differently than he or she did?

A.   No, like I said, I think we were all making the best out of a bad situation.

Q.   How about others of your professors, do you think any of them could have handled the transition differently than they did?

A.   No, probably not.

Q.   So when you're referring in this email to the professors handling the transition to remote learning poorly, this is more an observation about the situation in which everyone was in at the time rather than a criticism regarding how specific professors were doing their jobs?

A.   Yes, probably. I don't really recall the specifics of that email.

Q.   Your April 9th message, Bergeron Exhibit 14, states quote class that you have quote classes that have been deeply devalued because of remote instruction methods. Did I read that accurately?

A.   Yes, sounds right.

Q.   Which of your classes do you think had been quote deeply devalued during the second half of

MAGNA

Page 118

spring 2020?

A.   I would say most, if not all.

Q.   But not just, so I'm clear, but not all, or is your position that all of your classes were deeply devalued?

A.   I haven't really thought about it in a while. But I would say that the majority of them at least.

Q.   Which specific classes can you identify that you were taking in spring of 2020 that you consider to have been deeply devalued by the transition to remote?

A.   There were the senior development class was working on a large project and it's hard to facilitate like the before and after class like discussions with my group on how we're going to do things. You can still do them, but it's not as organic. Storage architectures was still a class, but there wasn't like, I don't know, it wasn't like a social interaction with the professor as much as it was, you know, I'm going to record a lecture and something and throw it up. Physics obviously they would be missing a large chunk of what that class is. I don't recall mishaps with other classes, but there may have been cases there too.

Page 119

Q.   Does your last answer include all of the instances that you can currently recall in which you think that your classes in spring 2020 have been deeply devalued?

A.   Yes.

Q.   Do you consider that your courses in the second half of the spring 2020 semester had any value to you?

A.   I would say that yes, they did have value, but it was definitely less.

Q.   So all of your classes had some value, it was just according to you some of it was diminished, yes?

A.   Yes.

Q.   And what value did your classes in the second half of spring 2020 provide?

MR. ABBOTT: Objection, vague.

A.   I mean, I could read you the syllabus of the classes if you wanted, but it's storage architecture I learned less about storage architecture, philosophy, it's hard to learn about philosophy if you don't have as good interaction with the professor, so.

Q.   Did you learn skills during the second half of spring 2020 that you've used in your

Page 120

postgraduate RIT, postgraduate job?

A.   No, I don't think so.

Q.   No skills during the second half that you use today?

A.   No.

Q.   You identified three instances in an earlier answer where you considered your -- the value of your classes to have been devalued. You said your senior development class, the possibility of before and after class discussions with your team, it was more difficult to organize those discussions, correct?

A.   Yes, I would say so.

Q.   And by what percentage if you had to estimate would you consider that devalued your overall class experience in that class?

MR. ABBOTT: Objection, vague.

A.   I don't know.

Q.   10 percent, 50 percent?

A.   It would be hard to calculate that, I don't know.

Q.   Why would it be hard to calculate that?

A.   I don't know how you would quantify an education in one or the other, so.

Q.   I'm not sure I understood. How it would

Page 121

value an education in one or the other?

A.   Yes, I don't know how one would value an education before or after switching to remote learning, I think it would be almost improbable.

Q.   You yourself haven't tried to undertake that analysis, have you?

A.   No.

Q.   Would that be the same set of answers if I asked you about the alleged diminution in value of your storage architecture or your physics class?

A.   Yes.

Q.   So if I can ask you to flip to Bergeron Exhibit 15.

A.   Sure.

Q.   Do you recognize this document?

A.   Yes.

Q.   I'm sorry, I might have just cut out on my end. Did you say yes?

A.   Yes, I do.

Q.   What is this document?

A.   This is Professor Zilora's response to Exhibit 14. He basically said he can't do anything about money, but, hey, we can help with the education, how can I help, like what can I do. And I realized that RIT was not interested in any kind

MAGNA

Page 122

of financial reimbursement, so.

Q.   Let's unpack that a little bit.  Who is Stephen Zilora?

A.   Looks like he's the professor and director of school's information RIT.

Q.   You say looks like, have you ever taken a class with Professor Zilora?

A.   I did not.

Q.   Do you know that he was the head for your major at RIT?

A.   Yes, I had seen him around.

Q.   So you knew he was the head of the major that you were enrolled in?

A.   Yes.

Q.   And this is an email that Professor Zilora sent to you on April 14, 2020, correct?

A.   Yes.

Q.   This was less than a week after you sent your April 9th message to RIT, correct?

A.   Yes.

Q.   And Professor Zilora asked for your thoughts on what RIT could be doing better, correct?

A.   Yes.

Q.   Did you respond to Professor Zilora's email?

Page 123

A.   I did not.

Q.   Did you speak with Professor Zilora on the subject?

A.   I did not.

Q.   You said earlier that you said this email indicated to you that RIT was not interested, I don't want to put words in your mouth, RIT was not interested in what?

A.   RIT wasn't interested in any kind of financial reimbursement which is what was indicated to me by this email the only way that I saw that RIT could return education to what it was and the quality that it was it would be to return to campus, which wasn't an option.

Q.   So let me make sure I understand that last response, Mr. Bergeron, you said so Professor Zilora is saying he wants to know more about the poor handling of the education piece, correct?

A.   Yes.

Q.   And he's asking for more information about that, correct?

A.   Yes.

Q.   He's asking if there are specific actions that are counterproductive, correct?

A.   Yes.

Page 124

Q.   And he's asking for your thoughts on what RIT could be doing better, correct?

A.   Yes.

Q.   And you didn't respond to him because why?

A.   Because my answer to that is you should return to campus, but obviously that was not an option, so I didn't see there being a way forward with that.

Q.   Does that mean that you couldn't articulate any ideas about what RIT could be doing differently as of April 14, 2020 on the education side of the issue?

A.   I mean --

MR. ABBOTT:  Objection, vague.

A.   No, yes, I don't know.

Q.   Did you have opinions, I'm trying to understand whether your testimony is that the only way -- that the only way that RIT could be doing anything differently is just by reopening the campus, is that your position?

A.   I'm sure that there's things that they could do to improve education while they are remote, I don't know what those would be.

Q.   And you didn't feel at the time you

Page 125

received this email on April 14, 2020 that RIT should reopen the campus, did you?

A.   No.

Q.   So the reason why you didn't respond to Professor Zilora's April 14th email is because you had no suggestions to offer?

A.   Yes.

Q.   I'd like to ask you to flip to Bergeron Exhibit 16.

A.   Yup.

Q.   Let me know when you're there.

A.   Okay.

Q.   Do you recognize this document?

A.   Yes, this looks like my finances for the spring 2019 semester.

Q.   So this is --

A.   Spring 2020 rather.

Q.   So this is a financial statement of your RIT account for the spring 2020 semester, correct?

A.   Yes, that looks right.

Q.   Do you see anything on this document that looks inaccurate to you?

A.   No, it seems right.

Q.   So this statement shows that your tuition for spring 2020 was $22,454, correct?

MAGNA

Page 126

A.   Yes.

Q.   And you also owed some required fees for that semester, correct?

A.   Yes, it was for my sixth class.

Q.   So the activity fee was $148?

A.   Yes.

Q.   $175 for the student health services fee?

A.   Yes.

Q.   And you paid or you owed $195 for alumnus education fee, correct?

A.   Yes.

Q.   And did I hear you correctly to say that that was for your bowling class?

A.   Yes, but I think the wellness education is covered by RIT, so there's a credit on there.  I don't really remember how it breaks down.

Q.   So I was going to ask.  I'll ask the questions anyway, so do you know what the wellness education fee was for?

A.   Yes, I think that is for the class, and it was partially covered by RIT.  I don't really remember the details in that.

Q.   So you don't recall the details of why $105 of that fee was credited back to you in January 2020 either?

Page 127

A.   No, I don't recall.

Q.   Okay.  So you can check my math on this, or you can trust me, so adding up all the tuition and fees for the spring 2020 semester you owed $22,867, does that sound right?

A.   Yes, it looks right.

Q.   This document shows that you received $23,242.50 in scholarships for the spring 2020 semester, correct?

A.   Yup.

Q.   Where did these scholarships come from?

A.   Looks like one was from RIT, and another came from an outside source.

Q.   What was that outside source?

A.   Williams College, my dad works there.

Q.   So you got -- did you receive a scholarship from Williams for your RIT education for all of your semesters at RIT?

A.   All except the first.  He wasn't within the threshold of that yet.

Q.   So the $14,242.50 outside scholarship was your scholarship for Williams?

A.   Yes.

Q.   And do you -- do you owe Williams any money with respect to that scholarship, do you have

Page 128

to repay any part of it?

A.   No, it's a benefit of being an employee of Williams.

Q.   Okay.  So that was an outright scholarship, yes?

A.   Yes.

Q.   And then you also received for spring 2020 an RIT grant in the amount of $9,000, correct?

A.   Yes.

Q.   And that was an outright grant?

A.   Yes.

Q.   So you don't owe anything on that $9,000, do you?

A.   No.

Q.   So for the spring 2020 semester it's accurate that you received more in scholarships than you owed in tuition and fees, correct?

A.   Yes, but I also paid for housing.

Q.   That's right.  So what you paid out-of-pocket for the spring 2020 semester went to your housing costs, yes?

A.   If you want to break it down like that.

MR. ABBOTT:  Objection, vague.

Q.   What do you mean if I want to break it down like that, what does that response mean?

Page 129

A.   I just see it all as one big pool of money that I owe, and then all the tuition grants loans goes towards that.

Q.   Fair enough.  But you don't disagree that the amount of your scholarships and grants for spring 2020 exceeded the amount of your tuition and fees obligations, do you?

A.   No, that's true.

Q.   If I can ask you to flip to Bergeron 17.

A.   I see it.

Q.   Do you recognize this document?

A.   I do.

Q.   This is Bates number Bergeron zeros 5, what is this document?

A.   This looks like the, the notification of RIT dispersing CARES Act emergency grants to students.

Q.   This is a communication you received from RIT on or about June 5th, 2020, correct?

A.   Yes.

Q.   And it notified you that you qualified for CARES Act payment of $500, correct?

A.   Yes.

Q.   And it requested that you contact RIT to make arrangements for the payment, yes?

33  (Pages 126 to 129)

MAGNA⊙
LEGAL SERVICES

## Page 130

A.  Yes.

Q.  Did you ever contact RIT to make arrangement to receive a CARES Act payment?

A.  No, I looked into it further and it looked like I actually was not eligible for it.

Q.  Did you talk to anyone with RIT about the subject, or did you just look at that independently and determine that?

A.  Independently.

Q.  So you never contacted RIT in response to Bergeron 17?

A.  No.

Q.  And you never received the $500 CARES Act grant?

A.  No.

Q.  Mr. Bergeron, your complaints in this case, aside from tuition, demands a partial refund of the fees for the second half of the spring 2020 semester, correct?

A.  Yes.

Q.  What fees are you seeking refunds of in this case?

A.  The activity and health fees.

Q.  Anything else?

A.  Let me look at the exhibit.  No, I

## Page 131

believe that's it.

Q.  So looking at the student health fee, do you have an understandings of what your student health fee paid for?

A.  Yes, I believe it helped paid for the medical staff on campus.

Q.  And helped to pay for the student health center, yes?

A.  Yes, and the associated costs with that.

Q.  Meaning medical supplies and all that?

A.  Sure.

Q.  And personal costs?

A.  Yes, I assume so.

Q.  What services did your student health fee cover, what did your student health fee entitle you to do?

A.  Like I said, I hadn't been there long, but my understanding was I can go there for medical assistance, I can go there for, you know, if I had questions about something, I think we can have some tests run there, or at least sent them off to a lab, things like that.  I didn't utilize it much.

Q.  You utilized it twice, I think you said, over your tenure at RIT, correct?

A.  Yes, I believe so.

## Page 132

Q.  Are you aware that the student health center continued to provide services to students after the transition to distance learning?

MR. ABBOTT:  Objection, vague.

A.  Yes.

Q.  I'm sorry, did you answer the question?

A.  Yes, I was aware.

Q.  It continued to provide in person services for the students who were still on campus, yes?

A.  I actually didn't know that, so if you're saying it's true, then I guess, I wasn't on campus.

Q.  Yes, I'm not asking you to trust me on that.  If you don't know, you don't know.  So you don't know whether it was still open?

A.  I don't.  To my understanding it was exclusively tele-medicine.

Q.  But you did understand that it was continuing to operate in a tele-medicine capacity for the second half of spring 2020?

A.  Yes.

Q.  Did you ever use those health services, those tele-medicine health services, during the second half of the spring 2020 semester?

A.  No.

## Page 133

Q.  Did you know that the cost of running the student health center is almost double the amount that RIT receives from the student health fees?

A.  No.

Q.  You're also seeking a refund for part of the student activity fee you paid, correct?

A.  Yes.

Q.  Are you aware that the student activity program continued to operate virtually during the second half of the spring 2020 semester?

A.  Yes.

Q.  And during the second half of the spring 2020 semester did you attend any virtual student activity programming?

A.  Not that I recall.

Q.  Are you aware that the proceeds from the student activity fee are managed by RIT student government?

A.  No.

Q.  Are you aware that the unused funds from the student activity fee roll over every year into the following year student activity budget?

A.  No.

Q.  Mr. Bergeron, do you know or do you know that RIT has served, through your counsel, with

MAGNA

Page 134

request for production of documents in this case?

A.   Yes.

Q.   Have you seen a copy of those document requests?

A.   Yes, I think so.

Q.   Did you undertake a search for documents responsive to RIT's document request?

A.   Yes.

Q.   Could you describe that search for me?

A.   It was mostly looking through my RIT mail looking for communications from RIT, some of them were RIT like web pages that they posted regarding notifications of how RIT would transition to remote learning.

Q.   So you just told me about you reviewed the RIT website, yes?

A.   Yes.

Q.   And pulled down materials that you thought would be responsive?

A.   Yes.

Q.   And you said you searched your RIT email accounts?

A.   Yes.

Q.   And what did you use search terms for that?

Page 135

A.   Remote learning, Covid 19. I don't recall specifics.

Q.   Did you retain a list of the search terms you used to search your RIT email account?

A.   No.

Q.   Do you use a personal email address, Gmail or anything like that?

A.   Yes.

Q.   What types of accounts do you have other than your RIT email accounts?

A.   I have a personal email account, I have a few personal email accounts.

Q.   Did you search those personal email accounts to determine if they contained responsive documents?

A.   Yes.

O.   How did you undertake that search?

A.   The same way I did the RIT email search.

Q.   Did you locate any responsive documents from your personal email accounts?

A.   I don't recall.

Q.   If there were no emails from your personal email account in the production that you provided, we conclude from that that you located no responsive documents?

Page 136

A.   Yes, sounds right.

Q.   Do you communicate via text message?

A.   Yes.

Q.   You send and receive text messages through your phone?

A.   Yes.

Q.   Do you use any other means to send text messages other than your phone?

A.   No.

Q.   What service provider did you use to send and receive texts in spring of 2020?

A.   Verizon.

Q.   Did you search your text for documents responsive to RIT's document requests in this case?

A.   No, because I knew there wouldn't be any.

Q.   Why did you know that?

A.   Because I get very few text messages in general, and if I do it's from friends and family.

Q.   Did you search your text messages though for any communications of either friends or family regarding the issues surrounding your claims about spring of 2020?

A.   Yes, I didn't find any.

Q.   How did you undertake the process of searching your text?

Page 137

A.   Searching and iMessage, similar search terms to email.

Q.   So you found no text messages that were responsive to RIT's document request?

A.   Yes. No, I did not.

Q.   Right, yes, you found no emails, no text, okay.  You also communicated via Discord and Group Me, correct?

A.   Yes.

Q.   These are group messaging apps?

A.   Yes.

Q.   Yes.  Do you access Discord and Group Me through your phone, or through other means, or both?

A.   Yes.

Q.   So let me break that down though, so you access Discord and Group Me through your phone?

A.   Yes.

Q.   Do you access it through other methods?

A.   Yes.

Q.   Computer?

A.   Yes.

Q.   And you actually, if I can ask you to pull up Bergeron Exhibit 17 for me.

A.   Sure.  I see it.

Q.   Interrogatory 1 asks you to identify

MAGNA

Page 138

methods or channels of communication you used to communicate with pretty much anyone regarding RIT's response to Covid 19, the transition to distance learning, and your education during spring 2020, correct?

A. Yes.

Q. And you stated in response that you used University email, text messages, Group Me, and Discord to communicate about the issues that were requested in interrogatory 1, correct?

A. Yes.

Q. But I thought you just testified that you had no text messages that were responsive to RIT's document requests, correct?

A. Yes.

Q. So how have you used text messages to communicate regarding these relevant topics where there were no responsive documents?

A. I probably talked to friends, but I didn't, I don't recall getting anything from RIT over text message, which is my understanding of it.

Q. Your understanding of RIT's document requests were limited to communications with RIT?

A. Yes.

Q. So, for example, if you and a friend were

Page 139

talking about how terrible you thought RIT's virtual education platforms were in the second half of spring 2020, you wouldn't think that was responsive to our document request?

A. No.

Q. Or if your friend who are discussing via text how you thought you should or shouldn't get a refund of tuition, you would not think that would be responsive?

A. No, that was not my understanding of it.

Q. Your response to interrogatory 1 Bergeron 17 also identifies Group Me and Discord as channels of communication you used to discuss relevant topics --

A. Yes.

Q. -- topics relevant to this case? Did you search your Discord and Group Me apps for documents responsive to RIT's document request?

A. No.

Q. Why not?

A. Because RIT does not communicate to me through either of those.

Q. So again you understood your discovery obligations in this case to be limited to only communications to or from RIT?

Page 140

A. Yes.

Q. And Group Me, your Group Me and Discord apps would reflect communications with your friends, or your family, or someone else, but not RIT?

A. Yes.

Q. All right. If we can go off the record.

THE VIDEOGRAPHER: The time is 1:40, we are going off the record.

(Recess taken 1:40-1:51)

THE VIDEOGRAPHER: The time is 1:51, we are back on record.

Q. Mr. Bergeron, have you deleted any emails from your RIT email account since you commenced this lawsuit on May 1st, 2020?

A. Not that I recall.

Q. Have you deleted any emails from any of your personal email accounts since you commenced this lawsuit on May 1st, 2020?

A. Probably.

Q. Why do you say probably?

A. I, the answer is probably yes, but I couldn't tell you which emails I deleted. They were unimportant so I deleted them. Certainly not anything regarding the case.

Q. Okay. So your testimony is you have

Page 141

retained all emails that are relevant to the case in your both RIT and personal email accounts?

A. Yes.

Q. Have you deleted any relevant materials from any of your text messages?

A. No.

Q. Have you deleted any of your relevant materials from your group messaging apps?

A. No.

MR. BURNS: So in light of the testimony today we're prepared to suspend but not terminate the deposition. Blake, we'll be in touch with you regarding some of the discovery issues and deficiencies that were identified during today's testimony, and we can discuss follow-up searches and productions in light of today's testimony.

Q. And with that, I'm happy and prepared to suspend and thank you, Mr. Bergeron, for your time here today.

A. Yup, sounds good.

MR. ABBOTT: For the record, Counsel for plaintiff does not consent to multiple depositions. We suggest if you have any questions for your client that you ask them

36 (Pages 138 to 141)



Page 142

now.

MR. BURNS: I asked all the questions that are available to me based on the discovery received to date, but today's testimony has made clear that there are substantial additional areas that we're entitled to and that are within the scope of our pending request for production, so we certainly expect those requests to be complied with before we terminate the deposition. Thank you very much, Mr. Bergeron. Thank you, everyone. I don't know if you need it from us, but Holland and Knight is ordering one copy of the transcript.

MR. ABBOTT: Anastopoulo law firm will do the same, I don't know if you need that or not.

THE VIDEOGRAPHER: The time is 1:54, we are going off the record.

(Time Noted: 1:54 p.m.)

(Whereupon P-02310E-0003983 was marked Defendant's Exhibit 1 for identification as of this date.)

(Whereupon Bergeron000001 was marked Defendant's Exhibit 2 for identification as of this date.)

(Whereupon RIT1097-1107 Application was

Page 143

marked Defendant's Exhibit 3 for identification as of this date.)

(Whereupon RIT1155-1158 Transcript was marked Defendant's Exhibit 4 for identification as of this date.)

(Whereupon RIT1886 Signed SFRA was marked Defendant's Exhibit 5 for identification as of this date.)

(Whereupon Bergeron 2nd Interrogatory Responses was marked Defendant's Exhibit 6 for identification as of this date.)

(Whereupon RIT343 2019-20 Undergraduate Brochure was marked Defendant's Exhibit 7 for identification as of this date.)

(Whereupon RIT1781 Refund Tuition Adjustment Policies was marked Defendant's Exhibit 8 for identification as of this date.)

(Whereupon RIT842 2019-20 Undergraduate Course Descriptions was marked Defendant's Exhibit 9 for identification as of this date.)

(Whereupon Website Disclaimer was marked Defendant's Exhibit 10 for identification as of this date.)

(Whereupon Bergeron000038 March 15, 2020 was marked Defendant's Exhibit 11 for

Page 144

identification as of this date.)

(Whereupon Bergeron000027 was marked Defendant's Exhibit 12 for identification as of this date.)

(Whereupon Original Complaint was marked Defendant's Exhibit 13 for identification as of this date.)

(Whereupon Bergeron000014 was marked Defendant's Exhibit 14 for identification as of this date.)

(Whereupon P-02310E-0004005 was marked Defendant's Exhibit 15 for identification as of this date.)

(Whereupon RIT0001090 was marked Defendant's Exhibit 16 for identification as of this date.)

(Whereupon Bergeron000005 was marked Defendant's Exhibit 17 for identification as of this date.)

(Whereupon Bergeron 1st Interrogatory Responses was marked Defendant's Exhibit 18 for identification as of this date.)

Page 145

ACKNOWLEDGMENT

I, NICHOLAS BERGERON, hereby certify that I have read the transcript of my testimony taken under oath on November 4, 2021; that the transcript is a true, complete and correct record of what was asked, answered and said during my testimony under oath, and that the answers on the record as given by me are true and correct.

------------------------
NICHOLAS BERGERON

Signed and subscribed to before me this          day of
          , 2021.

------------------------------------
Notary Public of the State of



Page 146

CERTIFICATE

I, JOI RAFKIND, a shorthand reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

- - - - - - - - - - - - -

JOI RAFKIND

Page 147

ERRATA SHEET

PAGE/LINE          CORRECTION



38 (Pages 146 to 147)

**A**

**a.m** 1:13 6:14
**Abbott** 2:5 7:8,9 11:18 20:18 57:4 60:22 61:3,5 62:13 95:7,13 96:2 97:5,9,15,21 98:1 106:4,24 108:4 112:19 114:8 119:17 120:17 124:15 128:23 132:4 141:22 142:14
**Abby** 13:6
**ability** 10:24 11:3
**able** 116:18
**above-entitled** 1:17
**absence** 81:19 90:23
**absolutely** 54:15 107:2
**academic** 23:9 30:2 37:24 38:4,9,16 38:17,19 39:1,12 39:23 46:10 47:10 49:7,17 53:12,16 53:19 54:2 83:14 85:5
**accept** 21:7
**acceptance** 35:21
**accepted** 21:11 26:15 33:15 34:16 34:18 36:3
**access** 137:12,16,18
**account** 64:10 78:24 125:19 135:4,11,23 140:13
**accounts** 134:22 135:9,10,12,14,20 140:17 141:2
**accuracy** 58:10
**accurate** 19:2 55:14 58:21 59:3 73:4,16 128:16

**accurately** 75:8 87:2,16 92:8 117:22
**Act** 129:16,22 130:3,13
**action** 1:17 61:15 111:11 146:10
**actions** 123:23
**actively** 25:14
**activities** 23:13 43:24 73:10 76:22
**activity** 126:5 130:23 133:6,8,14 133:17,21,22
**actual** 9:4
**Adams** 16:17,18,21 22:19 99:7 102:3
**adding** 127:3
**addition** 63:19,20
**additional** 82:17 142:6
**address** 7:20 16:9 16:11,18 98:22 102:1 135:6
**adjustment** 3:15 90:8 143:16
**administer** 5:15
**administration** 37:8
**admission** 26:10 27:25 28:11 34:16 35:25 40:23
**advance** 14:5
**advanced** 76:21
**advertise** 65:16
**advertised** 72:24 73:6
**advertisements** 82:6
**advertising** 64:19 72:15 75:24 76:1 76:8,16,23 82:11
**advise** 106:24
**AFFAIRS** 2:19
**affect** 10:24 11:3 100:17

**affidavit** 14:15,17 14:21
**afternoon** 93:11,12
**against-** 1:6
**ago** 25:23
**agree** 50:1,2
**agreed** 5:3,9,13 10:15 49:9,15 51:16
**agreeing** 49:19
**agreement** 32:3,13 49:4,6,16,21,25 51:17 61:22,24 62:19,24 63:3,15 63:21 64:8,9
**ahead** 20:19 62:14 106:23
**alcohol** 11:6
**alleged** 121:9
**Allen** 6:17
**alter** 92:7
**altered** 98:11
**alternative** 99:16 100:7,12 101:24 102:15 103:5
**alumni** 32:21 33:6 33:7
**alumnus** 126:9
**amount** 128:8 129:5,6 133:2
**analysis** 121:6
**Anastopoulo** 2:2 7:9 142:14
**Ann** 2:3
**announcement** 100:15 103:3
**answer** 8:24 9:11 12:1,25 20:19 35:15 57:5 60:23 60:24 61:4,6 62:14 80:22 95:8 95:14,15 96:3,4 119:1 120:7 124:6 132:6 140:21
**answered** 33:5 145:7

**answers** 8:21 9:1,4 11:9 111:5 121:8 145:8
**afternoon** 93:11,12
**anytime** 39:13 84:20 90:22 91:1 92:8 106:6
**anyway** 126:18
**apartment** 7:22 15:25 16:4,6,13 104:9
**apologize** 13:11
**appealing** 28:18 29:9
**appearances** 6:21
**appears** 20:8 110:10
**application** 3:9 27:11,24 28:2,7 28:11 29:20 35:11 76:11,25 142:25
**applied** 20:21 26:17 29:23 30:14 30:17,20 31:9,13 31:22,25 32:3,10 32:16,19 33:12 35:10,19,25 42:11 42:15 78:8
**apply** 20:22 26:6,9 26:12 28:14 34:24
**applying** 27:21 33:6 35:20 76:3
**approaching** 30:25
**approved** 29:7 41:10
**Approximately** 41:17
**apps** 137:10 139:17 140:3 141:8
**April** 20:9,14 21:2 21:4 110:9,11 112:3,16 113:2,20 113:25 114:4,12 114:15 115:10 116:8 117:19 122:16,19 124:12 125:1,5

**architecture** 69:11 119:20,21 121:10
**architectures** 52:13 54:25 55:3 118:18
**areas** 142:6
**argumentative** 95:13 97:9
**arrangement** 130:3
**arrangements** 129:25
**art** 19:9,11
**articulate** 124:11
**articulating** 115:6
**Arts** 34:20
**aside** 14:6 25:13 31:20 35:9,18 44:8 45:8 52:5 54:1 56:3 81:18 109:13 130:17
**asked** 13:1 71:19 105:24 121:9 122:21 142:2 145:6
**asking** 8:18 32:23 61:19 62:5 77:23 77:24 79:4 80:1 107:2 112:21,23 123:20,23 124:1 132:13
**asks** 137:25
**aspects** 87:9
**assistance** 131:19
**associate** 17:10,18 18:10,12
**associated** 50:4 131:9
**assume** 9:12 87:14 131:13
**assumed** 84:15
**attend** 24:17 44:21 44:24 45:1,4 133:13
**attended** 108:12
**attention** 59:9
**attorneys** 2:2,8,14 2:20 5:4

attributes 73:19
August 18:22
authorized 5:15
available 21:25
  73:20 80:19 81:8
  81:15 109:21
  142:3
Avenue 2:15
awards 38:4
aware 82:18,22
  86:4 115:13 132:1
  132:7 133:8,16,20

**B**

back 8:25 62:25
  64:12 69:2 71:15
  75:22 80:9 91:13
  93:10 99:6,7
  104:20 126:24
  140:11
bad 37:17 108:5
  116:21 117:6
band 23:14,19
bargain 64:11
based 85:19 86:1
  92:17 142:3
basically 111:7
  121:22
basing 62:12 64:2,4
  65:13,14 85:10
  94:2
basis 87:1
Bates 26:23 27:14
  27:14,19 34:8
  39:18 68:2 69:9
  86:14 88:23 98:19
  111:17 129:13
beautiful 76:5
bedroom 16:4
beginning 49:16
  51:10 89:1
begins 6:2,5,9
  88:14
behalf 1:4 7:4,9
believe 11:20,23
  12:10,16,18,19

13:23,24 14:19,20
18:22 21:12 28:6
32:17,20,21 34:6
38:20 39:7 42:1
44:7 45:14 51:14
52:16 53:4,6,12
53:25 55:12 56:2
56:11 61:21,23
63:7,10,13,13,17
64:7 65:20 74:4
76:23 79:24 80:2
80:8 81:23 84:4
84:17 85:14 88:3
90:4 98:17 103:14
104:2,7,17 105:20
108:10 111:1,4
113:23 114:3
131:1,5,25
beneficial 52:12
benefit 128:2
Bergeron 1:3,15
  2:3 3:3,12 4:7 6:3
  6:4,10,11 7:10,13
  7:19,24 8:7 11:12
  15:24 19:21 20:9
  22:19 26:20 33:16
  39:15,16 48:4,22
  51:18,20 54:18
  55:20 57:16 58:13
  59:18 62:15,25
  63:14 64:1,6,13
  66:24 67:9,13,15
  71:15 74:5 75:22
  82:24 83:3 85:12
  86:2,6 89:21
  90:10 91:14 93:11
  93:14 98:4,19
  101:15 102:19,24
  103:24 105:3,5
  107:8 109:25
  110:5 111:12,16
  111:17 113:10,17
  116:8 117:19
  121:12 123:16
  125:8 129:9,13
  130:11,16 133:24

137:23 139:11
  140:12 141:19
  142:11 143:9
  144:20 145:3,11
Bergeron000001
  3:8 142:22
Bergeron000005
  4:6 144:17
Bergeron000014
  3:22 144:8
Bergeron000027
  3:20 144:2
Bergeron000038
  3:19 143:24
best 35:5 47:20
  102:22 115:1
  116:10 117:6
Beth 20:2
better 39:4,9 61:9
  122:22 124:2
bible 85:5
big 79:7 129:1
bit 29:2,18 35:24
  40:4 92:24 122:2
blah 115:21,21,21
Blake 2:5 7:8 11:18
  12:7 13:24 141:12
blake@akimlawf...
  2:5
block 41:4
blocks 40:9,12,16
  40:22 41:3,25
blood 146:10
boast 77:13
Bob 7:25
BOBBY 2:22
boost 29:11
bottom 27:16 49:12
  49:13 74:22 90:10
  91:23 98:19 110:8
  111:6
bowling 54:20
  101:11 109:10,13
  126:13
boxes 52:6
Boy 23:24

breach 60:17 95:10
  97:7,20,24
breached 59:20,24
  60:6,10,20 61:2
  61:16,23 62:2,8
  62:18 63:4,23
  64:17 95:5,25
  97:3,14
break 9:15,19
  57:13 92:24 93:3
  98:12,13 99:2,9
  102:5 108:11,15
  128:22,24 137:15
breaks 9:16 126:16
brick 26:2
briefly 40:4
bring 86:12
bringing 60:16
  62:7 110:22
brochure 3:14
  30:24 143:13
brochures 30:19
  31:2,4 64:18 65:5
  65:6,9,14,16,20
  65:21,24 66:4,7
  76:24 82:10
brought 110:24
Bs 48:19
budget 133:22
building 66:18 67:1
  82:25 83:14 84:6
  84:11,15 85:13
  86:18,23,24 87:16
  91:15
bunch 14:22 15:17
  111:17
Burger 2:14 7:4
Burns 2:10 3:3 6:7
  6:22,22 7:17,25
  61:8 141:10 142:2
busy 85:9

**C**

C 2:1 145:1 146:1,1
cafeterias 73:12

calculate 120:20,22
California 42:20,21
call 14:4 92:23 93:2
  115:16
called 18:5 46:15
calls 12:12 97:16,21
campus 43:4,5,10
  43:13 44:1,21
  62:22 63:10 65:17
  72:15,24 73:7,9
  73:19,19 76:5,22
  77:14,17 83:11
  93:23 94:2 101:23
  103:9,25 104:13
  104:25 123:13
  124:7,21 125:2
  131:6 132:9,12
cancel 96:11
canceled 50:17
  95:17 96:13,17
  97:12,13,19 109:8
  109:11
cancels 89:9 90:16
capacity 132:19
career 21:14,18
  22:25 25:3 44:9
  52:12
CARES 129:16,22
  130:3,13
carry-over 92:5
case 1:6 8:19 9:24
  10:9 13:1 14:8,13
  14:18 15:3,5
  56:20 61:1,13
  62:1,6 65:14
  66:12 80:20 81:10
  81:12 85:11 86:1
  94:3 98:16 107:24
  130:17,22 134:1
  136:14 139:16,24
  140:24 141:1
cases 116:15,19,21
  118:25
catalog 66:14,20,23
  67:4,8 68:9 71:19
  71:20,21 77:21,23

catalogs 64:19 66:11,12,20 67:7 71:18 82:10
causes 61:15 64:6
center 46:20,22 73:12 131:8 132:2 133:2
certain 39:8 51:12 85:6
certainly 72:14 77:12,13 79:25 101:11 140:23 142:8
certification 5:6
certify 145:3 146:4 146:9
cetera 64:20 82:2,4 112:11
change 36:22 37:3 53:21 59:7 92:21 94:15,19,22,24
changed 36:5,15 50:17 109:7
changes 87:6,9 89:12 90:20 94:17 98:13
channels 138:1 139:12
Charleston 2:4
check 50:7 127:2
checking 52:5
choice 91:9
choose 34:24,25
choosing 51:21 53:11 54:4
chose 51:24 52:11
chosen 55:4
Chris 6:17
Christmas 52:20
chronologically 67:21
chunk 118:23
CIT 36:13,14 37:2 37:5 41:4
cite 93:17
claim 59:23 60:6,10

60:20 62:17 63:4 63:21 64:23 65:6 66:12 68:16 70:4 70:18 71:2,12 72:12 76:1 77:10 80:14
claiming 61:1 62:1 69:5
claims 8:18 14:13 14:18 60:16 62:6 62:7,12 64:2,4 65:13,15 85:11,19 85:25 94:2 136:21
class 19:9,11 50:1 54:12,23 56:14,18 56:21 57:1 66:16 66:16 67:3 68:16 69:6,17,19,22 70:8 80:16,18,21 81:3,8,11,15,16 81:19 89:12 94:15 94:17 95:1,17 96:11,17 98:14 100:17 101:9,11 108:22 109:5 117:20 118:13,15 118:18,23 120:9 120:10,16,16 121:10 122:7 126:4,13,20
classes 39:3 48:1,9 48:14 50:12,16 51:9,22 52:2,7,14 52:22 53:8,11 54:4,7,13,16 55:8 55:11 56:1,6,12 57:2 66:15 67:16 67:22 68:12 69:8 69:14,25 70:4,15 70:19,24 71:2,9 71:12 81:11,13 83:9,10 84:3,10 84:21,21 89:9 90:16 91:3,11 92:21 94:5,21 96:13 97:11,12,19

99:12,15 100:2,7 100:12,18,24 102:11,14,25 103:5 104:18,21 108:1,6,9,12,14 108:17,21 109:1 109:14,17 114:7 117:20,24 118:4,9 118:24 119:3,11 119:15,19 120:8
classmates 101:7
classroom 66:16 94:25
clean 110:4
clear 54:13 55:18 112:21 118:3 142:5
clearly 80:20 100:20
client 106:24 141:25
close 36:21 103:18
closed 99:16
closer 51:9
closing 103:9,25
club 44:3,8,19
clubs 44:1,10 65:18 73:10 76:21
CMIT 36:11
co-op 28:17,22 29:2 29:3,5 40:9,12,14 40:16,22 41:3,4 41:19,22 42:17,19
co-ops 29:16 40:6,8 40:10,13,19 41:1 41:12,15,25,25 42:24 43:7
collected 13:22
collection 15:17,18 15:21,22
collective 87:1
collectively 11:25
college 16:23 19:10 19:18 24:14 34:19 36:18,19 43:16 48:16 71:8 127:15

colleges 24:16,20 25:5,7,10,13,14 26:15
Colon 2:22 7:6,6
column 68:7 89:16
come 127:11
comes 102:22
commenced 15:9 15:12 109:25 110:7 140:13,17
communicate 9:2 10:13 136:2 138:2 138:9,17 139:21
communicated 137:7
communication 98:24 102:6,9,18 103:7,17,23 105:14,17,22,23 107:7 129:18 138:1 139:13
communications 112:22 134:11 136:20 138:23 139:25 140:3
Community 19:10
companies 40:18
company 17:6 18:5 41:21
compass 47:3,6
complaint 3:21 110:10 144:5
complaints 130:16
complete 11:9 48:11 58:24 59:3 145:6
completed 19:11 28:10
complied 142:9
composite 26:22
computer 36:1,24 37:4,6 137:20
computing 36:8,8 36:18,20 88:7
concerns 112:10
conclude 135:24

conclusion 97:16 97:22
concrete 116:19
conduct 93:19 94:9 101:3
conducted 99:16
conference 9:23 10:12
conferencing 6:15
congratulated 20:6
conjunction 66:25
connected 27:10
connection 13:19 15:20 29:4 54:3 55:25 56:5 76:10 76:24
consent 141:23
consider 24:20 56:25 58:20,23 59:1 100:15,22,23 118:11 119:6 120:15
consideration 94:5
considered 56:24 92:15 120:7
considering 24:16 25:14
constitute 86:25
constitutes 88:18
consulted 53:12 55:9,15
Cont 4:1,2
contact 42:2 112:16 113:3,5,5 129:24 130:2
contacted 113:7 130:10
contacting 112:24
contain 65:6,21,24 66:12 72:12 73:25 77:11 78:20 80:25 82:18 86:23
contained 66:8 76:2,25 80:14 81:7 85:12,20 86:6 135:14

MAGNA

**contains** 76:1 81:21
**contend** 65:24
  81:21 82:18 85:12
  86:6 88:18
**contention** 81:14
**contents** 85:18
  87:15
**continue** 60:23
  100:1 109:14
**continued** 3:24
  39:3 91:6 132:2,8
  133:9
**continues** 88:14,14
  89:4 92:2
**continuing** 6:3
  27:24 132:19
**contract** 59:20,23
  60:9,17,20 61:1
  61:16,20 62:4,7,8
  63:8 64:2,8,17,24
  75:7,19 86:25
  87:23 95:5,10,25
  97:3,7,14,20,25
**contracts** 59:25
  60:1 62:2,11
  63:18,22 64:3
**contractual** 87:14
**conversation** 54:1
**conversations**
  106:12 115:8
**coordinate** 101:8
**copy** 134:3 142:13
**Corbel** 13:7
**Coronavirus**
  101:22 111:4,22
  112:11
**correct** 8:5 9:24
  10:2,6 16:1 21:2
  22:20 24:11,12
  27:8,25 28:12
  29:16 32:13 33:7
  33:21 34:11,22
  36:1,6,9,12 39:25
  40:2,6 41:5,10,22
  42:8 43:11 47:11
  47:18,24 48:2,6,9

48:11,14,20 49:7
49:10,13,17 50:4
50:21,24 51:2
54:19 56:15,18
57:11 58:1,4,7
60:14,19 61:13,17
62:9,25 64:20
68:10,13 69:23
70:1,9,15,24 71:9
71:25 72:6,25
74:20,24 75:20
77:19 81:1,4,25
82:12,15 83:14,17
84:16 87:10 88:7
88:11,15 89:5
90:8,12 91:7 92:2
92:6 98:16,19,22
98:25 99:3,10,13
99:17 102:12,16
103:10,13 104:1
105:12 107:11
110:1,19 112:3
113:14,18 116:11
120:12 122:16,19
122:22 123:18,21
123:24 124:2
125:19,25 126:3
126:10 127:9
128:8,17 129:19
129:22 130:19
131:24 133:6
137:8 138:5,10,14
145:6,9
**CORRECTION**
  147:2
**correctly** 126:12
**correspondence**
  18:24
**cost** 133:1
**costs** 50:4 107:10
  107:16,20,20,23
  107:23 128:21
  131:9,12
**counsel** 2:19,23
  6:20 7:7 11:17
  12:15 112:17,23

113:3 133:25
141:22
**counseling** 45:24
**counselor** 53:13,16
  53:19 54:2
**counselors** 12:7
**counterproductive**
  123:24
**country** 35:5
**couple** 21:9,13 46:7
**course** 3:17 31:1
  36:24 37:2,10,15
  54:6 55:6,14,23
  66:14,19,23 68:8
  71:19 87:5 88:9
  91:22 93:18 94:8
  143:19
**courses** 52:10
  55:12 56:9 92:8
  101:23 109:8
  119:6
**court** 1:1 5:17 6:12
  6:18 7:11 8:10,19
  8:23 16:10
**courtesy** 8:25
**courtroom** 9:22
  10:6
**cover** 131:15
**covered** 126:15,21
**Covid** 135:1 138:3
**credit** 19:5,8 41:12
  48:1,8 126:15
**credited** 126:24
**credits** 19:1,14
  48:11 52:6,10
  55:5 105:10
**crim** 69:22
**crime** 11:13
**criticism** 117:15
**crossed** 100:19
**current** 16:9
**currently** 17:4,6
  22:14 119:2
**curriculum** 87:6
**cut** 121:17
**cyber** 24:22 25:1,2

28:15,22 30:3
35:5 37:14,14
44:3

**D**

**D** 145:1
**D-E-V-O-P-S**
  18:11
**dad** 127:15
**data** 15:17
**date** 47:20 104:18
  110:2,6,8,12,17
  142:4,21,24 143:2
  143:5,8,11,14,17
  143:20,23 144:1,4
  144:7,10,13,16,19
  144:22
**dated** 58:3 110:11
**dates** 102:4
**David** 98:25
**day** 37:16 84:20,21
  84:22 145:13
**days** 83:10 104:18
  113:8
**deadly** 99:22
**dean's** 38:2
**December** 52:21
**decide** 28:14
**decided** 34:21 37:3
  37:16 111:10
**deciding** 55:10
**decision** 55:2 100:6
  103:4,18 104:4
**deeply** 117:21,25
  118:5,11 119:4
**defendant** 1:8,16
  2:8,14,20 6:23 7:1
  7:4
**Defendant's** 3:6 4:3
  142:20,23 143:1,4
  143:7,10,13,16,19
  143:22,25 144:3,6
  144:9,12,15,18,21
**deficiencies** 141:14
**definitely** 90:2
  116:20 119:10

**definition** 83:16
**degree** 18:21 19:12
  22:2 37:19
**deleted** 140:12,16
  140:22,23 141:4,7
**delivery** 102:15
  103:5
**demands** 130:17
**deposed** 8:7
**deposition** 5:14 6:3
  6:10,14 8:3,16
  10:2 11:16 12:15
  12:21,24 13:12
  14:2,6,6 19:21
  26:20 33:17 39:16
  48:23 51:18 57:16
  113:17 141:12
  142:10
**depositions** 141:24
**describe** 24:19
  25:22 29:3 43:15
  73:18 76:15 134:9
**described** 41:7
**description** 3:6 4:3
  42:5 54:7 55:13
  68:8,15 69:3 71:1
  71:11 88:13
**descriptions** 3:17
  55:24 56:3 143:19
**details** 11:4 15:3,5
  15:6 62:4 67:2
  126:22,23
**determine** 130:8
  135:14
**devalued** 117:21,25
  118:5,11 119:4
  120:8,15
**development** 54:24
  68:9 69:4 118:13
  120:9
**devops** 18:10,12
**differ** 37:6
**different** 37:11,13
  94:25,25 95:2
**differently** 53:2
  117:4,9 124:12,20



difficult 120:11
diminished 119:12
diminution 121:9
dining 107:10
diploma 23:3
directly 42:12,13
director 122:5
disagree 103:17
  104:4 129:4
disciplinary 38:10
  38:16
disciplines 76:20
disclaimer 3:18
  74:19 143:21
Discord 137:7,12
  137:16 138:9
  139:12,17 140:2
discovery 139:23
  141:13 142:3
discuss 139:13
  141:15
discussed 40:4
  87:20 106:18
  114:19 115:11
discussing 91:16
  139:6
discussion 115:16
discussions 118:16
  120:10,12
dispersing 129:16
distance 132:3
  138:3
District 1:1,2 6:12
  6:12
document 14:25
  15:6,8,22 19:24
  20:1 26:22 27:13
  39:18,20 48:25
  49:9 50:8,11,15
  50:20 54:3,7
  55:19,25 56:5
  57:20 58:6 63:3,4
  67:12,15,18,21,23
  68:1 69:9,20
  70:11,21 71:5
  74:8,19 75:1,4

83:6,20,23 84:1,2
  85:20 86:1,6,10
  86:11,14 87:5,23
  88:3,22,23 89:15
  89:24 90:7,14,18
  91:19 98:7,15,21
  101:18,20,25
  105:6,11 110:12
  111:16 112:5
  121:15,20 125:13
  125:21 127:7
  129:11,14 134:3,7
  136:14 137:4
  138:14,22 139:4
  139:18
documents 13:18
  13:21,22 14:7,23
  15:18,21 26:24
  27:7 35:9,13 55:9
  82:17 134:1,6
  135:15,19,25
  136:13 138:18
  139:17
doing 37:8 41:22
  79:25 106:10
  111:8,23 115:21
  117:16 122:22
  124:2,11,19
domain 72:6
Dominick 13:6
Dominico 13:6
dot 72:6 75:5
double 133:2
dozens 65:11
drawing 59:9
drink 11:6
Drive 2:21
drop 84:21
dropped 49:22
dropping 32:6 51:8
drove 104:19,20
drugs 10:23 11:2
due 96:11 102:10
duly 7:14 146:6
Dynamics 40:23
  41:3 42:10

| E |
| --- |
E 2:1,1 145:1,1
  146:1,1
earlier 40:5 41:7
  120:7 123:5
early 26:10 44:5,9
  52:21
East 2:15
ed 54:21
EDU 72:6 75:5
education 28:17,20
  28:21 34:5,14
  62:22 65:7,21,25
  66:9,13 72:12
  76:2 77:11 78:21
  80:15 81:1,22
  82:19 86:5 88:19
  93:23 94:2 120:24
  121:1,3,24 123:12
  123:18 124:12,23
  126:10,14,19
  127:17 138:4
  139:2
effect 5:16
effectively 36:14
either 21:15 78:7
  78:19 87:1 88:17
  93:1 126:25
  136:20 139:22
elect 52:11
elected 48:13
electronically
  49:10
eligible 130:5
email 20:7 33:21
  34:1 42:2,4 84:18
  85:2 98:22 99:3
  99:19 100:5,10
  102:1 109:22
  113:9 115:16
  117:11,18 122:15
  122:25 123:5,11
  125:1,5 134:21
  135:4,6,10,11,12
  135:13,18,20,23

137:2 138:8
  140:13,17 141:2
emails 30:13 78:15
  135:22 137:6
  140:12,16,22
  141:1
embedded 89:19
emergen 54:23
emergency 129:16
employed 17:4,7
  18:2,4
employee 128:2
encourages 101:22
engineer 17:11,18
  18:10,12 22:6
engineering 76:20
enjoy 37:3
enjoyed 32:25 37:9
enjoying 37:1
enroll 34:21,25
  35:3 53:2
enrolled 33:12
  37:18 75:10 78:8
  87:18 88:10 90:4
  92:11 122:13
enrolling 78:19,20
  84:9
enrollment 35:12
  35:22 47:13
entire 18:13 53:20
entirely 14:22
entirety 22:25
  23:19 56:14 63:7
  63:14,18
entitle 131:15
entitled 9:7 49:23
  50:16 63:10 89:2
  90:7 91:22 142:6
equivalent 57:1
ERRATA 147:1
especially 54:11
ESQ 2:5,10,11,17
essentially 29:5
  109:5,10 111:22
estimate 38:18
  95:20 120:15

et 40:20 42:1,8
  64:20 82:2,4
  112:10
evaluate 52:7
events 44:21,24
  45:9 65:17 73:13
  83:11
eventually 104:16
evidence 13:25
  14:1
exact 104:18
exactly 27:18 41:13
EXAMINATION
  1:15 3:2 7:16
examined 7:15
example 101:4,8
  138:25
examples 101:5,13
exceeded 129:6
exception 43:6
exclusively 30:11
  31:6,17 33:13
  68:17 69:17 70:4
  70:7,8,19 71:2,12
  88:19 132:17
excuse 24:17
executed 49:6
exhaustive 82:9
exhibit 3:7,8,9,10
  3:11,12,13,15,16
  3:18,19,20,21,22
  4:4,5,6,7 14:2
  19:21 26:20 33:17
  39:16 48:4,23
  51:18 54:18 55:21
  57:16 62:25 63:14
  64:1,6,13,23
  66:24 67:10,14,15
  71:16 74:6 75:22
  76:9 83:4 85:12
  86:2,7 89:21
  90:11 91:14 98:4
  101:15 102:19,24
  105:3 107:8 110:5
  111:12 113:17
  116:9 117:19

121:13,22 125:9 130:25 137:23 142:20,23 143:1,4 143:7,10,13,17,20 143:22,25 144:3,6 144:9,12,15,18,21
**exhibits** 3:5 4:2 14:6
**expect** 142:8
**experience** 8:16 29:10 120:16
**experiences** 79:22 80:6
**explain** 40:12
**explicitly** 81:11
**express** 81:8,19,21
**expressed** 106:3
**expressing** 106:7
**extend** 8:25
**extended** 98:12 99:9
**extending** 98:12
**extent** 97:16 112:19 114:20
**extracurricular** 23:13 43:24

**F**

**F** 146:1
**face-to-face** 102:11
**Facebook** 78:13,25 79:8 80:4
**faces** 10:13
**facilitate** 101:6 118:15
**facility** 46:3,14,22
**fact** 11:3 19:4 29:15 50:19 103:15
**faculty** 103:22 104:8
**fair** 9:13 25:25 47:3 129:4
**fall** 26:18 40:15 47:21 52:16,17
**familiar** 26:25,25 27:2 39:21 46:9

82:24
**family** 136:18,20 140:4
**FAQ** 111:2,5
**far** 82:12
**fashion** 109:14,21
**fault** 49:24 94:7 111:24
**February** 21:6
**fee** 31:24 105:19,25 106:8,13 113:13 126:5,7,10,19,24 131:2,4,14,15 133:6,17,21
**feel** 117:3 124:25
**feeling** 10:21
**fees** 50:3,9 107:10 126:2 127:4 128:17 129:7 130:18,21,23 133:3
**Fernando** 2:17 7:3
**fernando@litgrp...** 2:17
**field** 23:16 29:6
**fifth** 47:13
**file** 18:25
**filed** 27:25 28:11 29:20 110:13,13 110:17
**filing** 5:5
**fill** 51:24 54:23 112:9
**filled** 51:25
**final** 58:6 92:6
**finals** 84:22
**finances** 125:14
**financial** 32:2,12 49:3,5,15,20 51:16,17 61:21,24 62:18,23 63:15,20 90:12 105:9 111:3 122:1 123:10 125:18
**find** 68:6 136:23
**fine** 23:8 93:1

**finish** 8:24 40:2
**finished** 80:22
**firm** 2:2 7:9,25 12:8 112:25 142:14
**first** 7:13 8:22 10:21 19:17 27:13 27:19 33:20 38:21 38:21 40:20 44:4 50:8 59:19 67:20 67:21 68:22,24 81:3 83:22 84:20 86:12,21 102:22 105:17,22 109:18 110:21 113:12 116:22 127:19
**fit** 53:14
**five** 96:22
**flexibility** 54:16
**flip** 26:19 39:15 74:5 88:2,21 91:18 92:4 98:3 105:2 121:12 125:8 129:9
**flipping** 28:9 34:7
**floor** 2:15 94:25
**follow** 84:5
**follow-up** 33:16 141:16
**following** 87:12 100:9 133:22
**follows** 7:15 86:22
**food** 109:12
**force** 5:16
**foregoing** 59:18 146:7
**forgetful** 85:9
**form** 5:10 111:6 117:2
**formally** 85:1
**forth** 64:18 146:6
**forward** 8:3 102:20 124:8
**found** 11:12 64:24 137:3,6
**four** 40:9,12 41:25

41:25
**fourth** 75:4
**framework** 84:5
**fraternities** 43:21
**free** 43:16
**Fremont** 42:21
**frequently** 45:1
**friend** 106:20 138:25 139:6
**friends** 12:16,18 13:4 43:17 136:18 136:20 138:19 140:3
**front** 55:8 72:14 85:5
**full** 50:2
**full-time** 17:24 37:18 91:6
**Fully** 18:18
**funds** 133:20
**further** 5:9,13 34:8 91:13 99:17 102:6 105:14 130:4 146:9

**G**

**G** 145:1
**G-O-L-I-S-A-N-O** 36:19
**game** 45:6
**games** 43:18 45:2,5 45:8
**gargled** 9:9
**general** 2:23 7:6 35:1,2 36:16 40:23 41:3 42:10 51:9 83:9 87:21 87:22 114:24 115:2,3,5,14 136:18
**generally** 12:2 24:19 26:24 29:3 35:25 43:15 51:6 51:7 55:13 84:5
**getting** 21:19 52:10 63:19 75:18 112:1

138:20
**giant** 67:18
**give** 43:6 86:11
**given** 13:24 27:3 145:8 146:8
**gives** 89:11 90:19 106:19
**giving** 105:10
**Gmail** 135:7
**go** 8:15 10:20 20:19 22:22 24:13 45:7 46:6,7 51:21 52:24 60:5 62:14 69:2 72:16 78:5 106:22 131:18,19 140:6
**goes** 20:4 129:3
**going** 8:3 45:8 55:18 57:10 59:14 79:16 91:13,18 93:7 94:20 99:22 102:20 114:25 118:16,21 126:17 140:8 142:17
**Golisano** 36:18
**good** 7:8,24 10:22 27:18 33:1 36:25 57:13,14 92:22 93:11,12 119:22 141:21
**government** 24:3 44:13 133:18
**GPA** 47:20,23
**grades** 23:7 39:4,7 39:9 47:18
**graduate** 41:14,16 52:1
**graduated** 19:5 23:2 24:10 38:7
**graduating** 19:18 24:14
**graduation** 16:23 19:2 29:12 38:6 52:3,6 53:14
**grant** 128:8,10 130:14

grants 129:2,5,16
great 22:6 28:15
  76:18
grew 22:19
ground 8:15
group 118:16 137:7
  137:10,12,16
  138:8 139:12,17
  140:2,2 141:8
groups 103:9
guess 35:18 39:4
  43:5 92:15 95:21
  107:3 132:12
guide 67:17
guilty 11:13
gym 46:2,6,7,10,11
  46:12,13 73:11

**H**

H-O-O-S-I-C 22:23
half 93:3 109:2,9
  109:17,18,23
  117:25 119:7,16
  119:25 120:3
  130:18 132:20,24
  133:10,12 139:2
halfway 49:23
  89:16
hall 94:20 103:22
handful 95:22,23
handled 117:8
handling 116:10,14
  116:23 117:12
  123:18
hands-on 29:10
Hanging 43:17
happen 95:22
happened 36:15
  92:18 95:4 96:12
  96:15 107:5
happening 97:18
  107:5
happy 141:18
hard 95:21 96:21
  101:3,6,9 112:5
  116:16,25 118:14

119:21 120:20,22
harder 101:6
head 9:3 15:2 62:4
  122:9,12
headed 86:18
header 48:5 110:11
heading 89:16
health 45:12,16,19
  45:22,22 73:12
  99:23 104:7 126:7
  130:23 131:2,4,7
  131:14,15 132:1
  132:22,23 133:2,3
hear 6:6 35:16
  126:12
held 1:17 11:22
  80:18 81:12
help 121:23,24
helped 22:2,8,11,14
  28:7 131:5,7
helpline 111:22
helps 116:18
hereinbefore 146:6
hey 121:23
high 22:22,23,24,25
  23:2,3,7,10,13,20
  23:23 24:4,7,7,10
  24:13,14 25:1,18
higher 47:24
hit 53:8
hockey 44:25 45:3
  45:4,8
hold 23:22 100:1
holding 64:11
Holland 2:7 6:16
  6:22,25 7:25
  142:12
home 16:22,24 45:6
  99:6,7 104:20
homeworks 109:12
honestly 14:24
  15:19
Honor 38:4
honors 23:9 37:24
  38:6
hook 21:21

Hoosic 22:23,24
hope 106:19
hour 12:3,4 93:3
housing 43:13
  103:25 104:14
  107:10,17,20,23
  111:1 128:18,21
hundreds 65:11
  73:8
hybrid 17:22 18:16
hyperlink 50:23
  51:1

**I**

idea 87:21,22
ideas 116:19
  124:11
identification
  142:20,23 143:1,4
  143:7,11,14,17,20
  143:22 144:1,3,6
  144:9,12,15,18,22
identified 25:20
  62:7 66:19 120:6
  141:14
identifies 139:12
identify 40:18 63:2
  81:3 118:9 137:25
illness 96:11
imagine 49:18 51:3
  60:21
iMessage 137:1
immediately 100:4
  103:8
implementing
  114:6,17
important 104:8
improbable 121:4
improve 124:23
IMs 10:17
IN-HOUSE 2:19
inaccurate 73:3,16
  125:22
include 119:1
included 83:16
  103:12

includes 64:11
including 102:16
incomplete 64:7
  73:3
independently
  130:7,9
Index 3:1,24 4:1
indicate 18:25
indicated 27:20
  123:6,10
indicates 28:9 40:5
  74:23 110:12
individual 87:1
individually 1:4
inducement 75:7
inevitably 9:9
informally 85:2
information 20:5
  36:9,19,20 53:6
  85:1 88:7 105:10
  112:20 122:5
  123:20
informed 102:9
  103:8,24
informing 98:13
  99:8
informs 107:8
initial 59:16
input 20:10
Instagram 78:13
  78:25 79:8 80:5
instances 96:16
  119:2 120:6
Institute 1:7 2:8,15
  2:20 6:23 7:1,5
  8:1,4 25:9 40:21
  87:13
instruction 30:10
  31:6,17 33:13
  57:3 74:1 77:1
  89:13 90:20
  102:20 117:22
intended 75:6
intending 113:13
interaction 101:10
  118:20 119:22

interest 25:3
interested 26:6
  121:25 123:6,8,9
  146:11
interesting 52:12
intern 42:3
internship 29:6
internships 42:6
interrogatories
  57:24 58:1
interrogatory 3:12
  4:7 58:17 59:2,10
  59:11,12,15,16
  64:14,16 66:21
  67:9 71:16,22
  72:19 75:23 76:9
  77:6,7 78:1 80:9
  81:24 82:14,15
  93:15,17,18
  137:25 138:10
  139:11 143:9
  144:20
interrupt 116:1
interviewed 20:21
  42:6
intramural 44:18
intro 48:16
introduction 70:23
invite 103:9
involved 15:16
  21:18 24:3
involvement 42:16
issue 113:13 124:13
issued 14:21
issues 136:21 138:9
  141:14
ISTE501 68:10
it'll 85:6
item 71:17

**J**

J 2:10
January 28:10
  34:11 126:25
Jeremy 13:6
job 19:17,17 20:3,5

MAGNA

20:15,17,22 21:5
21:15,16 22:3,8
22:11,14 33:1
40:16 42:4,7 47:4
47:6 120:1
**jobs** 29:12 117:16
**Joi** 1:18 6:18 146:2
146:14
**join** 43:21
**July** 16:12 17:14,15
**June** 17:14,15 18:7
24:10 129:19
**junior** 24:18 25:17

**K**

**K** 145:1
**keeping** 103:22
**key** 104:20
**kind** 29:11 75:7
84:17 106:19
114:25 115:18
121:25 123:9
**knew** 51:15 54:10
57:9 100:17,24
122:12 136:15
**Knight** 2:7 6:16,23
6:25 8:1 142:13
**know** 9:10 11:8
12:16,19,20,21,22
13:25 14:15 15:19
21:4,17 27:15
39:6 40:11 42:4
46:19 51:4,8 52:9
57:8 60:9 62:3
63:24 66:17 67:24
73:24 74:3 75:1
76:19,19 77:3
78:16 79:2 80:18
82:6,8 83:11
84:22 85:8,25
86:3 92:19 95:9
97:6,17,18 98:4
100:18 101:1,12
102:4 106:5,15,21
111:5 113:8,16
114:9 115:17,18

115:19 116:20
118:19,21 120:18
120:21,23 121:2
122:9 123:17
124:16,24 125:11
126:18 131:19
132:11,14,14,15
133:1,24,24
136:16 142:12,15
**knowledge** 107:1

**L**

**L** 5:1 145:1
**lab** 101:3,3 116:17
116:17 131:21
**labs** 73:10 76:20
**lack** 101:2
**landed** 20:14
**language** 63:3
68:15 69:5,16
70:3,18 71:1,11
75:12 80:17 81:8
87:20 88:17
**large** 103:9 118:14
118:23
**late** 52:16,17
**law** 2:2 7:9,25 12:8
112:25 142:14
**lawsuit** 8:2,12 15:9
15:12 60:14 61:16
109:25 110:7,17
110:22 140:14,18
**lawyers** 110:21
**leader** 23:24
**leadership** 23:22
**leading** 14:23
**learn** 21:15 76:19
119:21,24
**learned** 21:24 22:7
22:11,13 105:18
113:12 119:20
**learning** 63:11
65:17 114:13,18
115:4 116:10
117:1,13 121:4
132:3 134:14

135:1 138:4
**leave** 90:23 104:1
104:11
**leaves** 55:1
**lecture** 118:21
**left** 68:7 86:17
**legal** 1:24 2:19 6:17
6:19 97:16,21
**let's** 8:15 10:20
35:24 64:12 65:19
67:13,15 68:6
69:2 111:12
116:22 122:2
**letter** 33:21 34:4,10
34:13
**letters** 30:16
**Liberal** 34:19
**library** 73:11
**life** 46:20,22 87:10
**lifted** 39:6,10
**light** 141:10,16
**limited** 138:23
139:24
**line** 58:12 93:13
**links** 74:17
**list** 26:5 38:2 42:2,5
55:7 64:22 65:1,3
65:8 66:11 71:15
71:17,24,24 75:23
75:23 77:6,12
80:9,10,11 82:9
82:14 93:16 135:3
**listed** 48:4
**listing** 21:21,25,25
**little** 29:2,18 35:24
40:4 65:2 92:24
122:2
**live** 16:4,13,20 43:2
104:10
**lived** 16:10,15,22
43:4,9
**living** 104:9
**LLC** 2:2
**LLP** 2:7,14
**loans** 129:3
**locate** 135:19

**located** 15:24
135:24
**location** 81:18
94:17,22,23 95:2
**locations** 81:4
94:15
**logged** 53:7
**Lomb** 2:21
**long** 11:24 16:10,20
17:12 21:4 25:23
85:14 87:7 131:17
**longer** 92:24
**look** 19:20 26:25
47:9 54:17 55:8
67:15,16 84:1
85:17 89:21
110:11 130:7,25
**looked** 27:5 28:17
62:24 71:18 74:9
76:16 105:22
130:4,5
**looking** 21:8 24:21
24:23,24 27:2
29:12 39:17 42:5
51:20 54:18 64:12
65:1 71:15 86:12
96:6 131:2 134:10
134:11
**looks** 27:12 47:16
47:21 49:3 56:17
67:22 75:9 84:6
87:3 88:16 90:11
98:10 110:13
122:4,6 125:14,20
125:22 127:6,12
129:15
**lot** 26:2 36:24 37:7
37:15 59:25 60:1
60:4 72:14,20
74:16 79:25 82:5
111:23,25
**lots** 79:3
**lunch** 103:22
**lunch-ish** 92:24
**Luncheon** 93:8

**M**

**M** 145:1
**machines** 46:16
**Maconin** 13:7
**Magna** 1:24 6:17
6:19
**mail** 34:1 76:4
134:10
**mailings** 76:9
**major** 36:15,22
37:6 55:5 83:11
88:13 94:20
122:10,12
**majority** 118:7
**making** 107:9
117:6
**managed** 133:17
**manner** 62:17
89:12 90:20
**March** 3:19 36:5,22
98:21 99:10,13,19
100:5,10,14
101:24 102:1,15
103:3,7,17,23
104:4,13,22
105:12,21,23
106:7,7,11,12
107:7 108:1,6
113:14,20,25
114:4,11,15
115:10 143:24
**marked** 142:19,22
143:1,4,6,10,13
143:16,19,21,25
144:2,5,8,11,14
144:17,21
**marriage** 146:11
**Martinetti** 13:7
**Massachusetts** 7:23
15:25 16:17 22:20
34:19 99:7
**materials** 29:19
31:22 53:10
134:18 141:4,8
**math** 127:2

matter 6:4,10 146:12
Matthew 13:7
MCC 19:9
MCLA 25:9 26:16 34:19 35:1,2
meal 107:18 111:1
mean 14:14 15:18 21:17 27:3 28:22 37:5 46:5 52:9,24 60:3 68:24 73:8 75:17,19 78:15 82:4 84:6,19 92:14,16,18,19,20 93:21,22,24 94:23 109:10 115:2 116:1 119:18 124:10,14 128:24 128:25
meaning 64:1 131:10
means 8:5,22 10:17 27:15 29:3 37:5 40:11 75:16 81:16 82:2,5 109:22 112:6 136:7 137:13
meant 75:13 87:20 92:11
media 64:19 77:7 77:10,16,20,21,24 77:25 78:3,6,11 78:16,18,23 79:3 79:4 80:11 82:11
medical 131:6,10 131:18
medication 10:23 11:2
meetings 11:17,22 11:24,25 12:6 101:7
member 44:1,10,12
members 101:9
memorable 43:19
Memorial 2:21
men's 45:3

mention 70:6
mentioned 111:2 111:20
Merrymount 7:22
message 98:10 112:2,7,15 113:2 113:9 116:8 117:19 122:19 136:2 138:21
messages 136:4,8 136:17,19 137:3 138:8,13,16 141:5
messaging 137:10 141:8
met 13:14,16
method 99:16 102:19
methods 100:7,12 102:15 103:5 117:22 137:18 138:1
mid 52:16,17
mind 66:4 100:19
Minor 19:10
minutes 31:21
mishaps 118:24
missed 34:17 70:16 108:14,17,19
missing 118:23
misstate 73:2
modes 101:24
moment 39:5 59:5 59:11 76:6
money 121:23 127:25 129:2
month 15:15 97:24
months 15:11
morning 7:8,24
motion 116:18
mouth 123:7
moved 42:22 95:1
multiple 11:17,19 38:14 141:23
Munson 98:25 99:8

N

N 2:1 5:1 145:1,1
name 7:18,24 53:23 73:9
names 12:8 13:4 14:24
Nautical 17:8,9,13 17:17,21 18:1 22:17
necessarily 75:17 111:24 117:2
need 9:1,4,15 41:15 42:3 53:13 54:15 57:13 59:5 85:6 104:10 142:12,15
needed 32:8 41:8 51:24 52:1,10 54:20,21,21,22,22 54:23,24 55:4 97:13
needs 93:4
neighbor 32:20 33:7
never 92:18 130:10 130:13
Nevermind 68:5
new 1:2,19 2:9 6:12 8:16 53:22 111:10 146:3
NGB8373 49:13
Nicholas 1:3,15 2:3 3:3 6:3,4,10,11 7:10,13,19 58:13 145:3,11
Nick 1:3 6:4,11 13:10 20:9
night 104:19
nods 9:2
nonverbal 9:2
Nope 21:23 28:20 29:14 35:8 38:5,8 90:25 91:5
normal 94:10
normally 115:19
Notary 1:18 7:14 145:16 146:3
noted 94:7 142:18

notice 99:17
notification 84:23 129:15
notifications 134:13
notified 129:21
November 1:12 6:13 27:20 33:23 145:5
NSSA422 69:11
number 6:2,9 27:6 27:14,14,16 59:10 68:2 86:15 93:15 98:19 103:14 129:13
NY 2:9,16,21

O

O 5:1 145:1
oath 5:15 10:1,4 145:4,7
objection 20:18 57:4 59:16 60:22 61:3 62:13 95:7 95:13 96:2 97:5,9 97:15,21 98:1 100:6 103:4 106:4 108:4 112:19 114:8 119:17 120:17 124:15 128:23 132:4
objections 5:10 59:18 100:11
Objects 40:21 42:1
obligation 87:14
obligations 64:8 129:7 139:24
observation 117:13
obvious 116:16
obviously 21:1 118:22 124:7
occasionally 79:19
occur 96:20
occurred 95:6,11 95:20 96:1 97:4,8
occurring 106:17

107:4
offer 20:24 21:5,12 75:6 125:6
offered 47:1
offers 21:9,13
office 2:19 17:23 18:15
officer 5:15
official 9:23 39:24 54:6
okay 10:19 12:6,11 14:5 21:10 27:13 34:16 35:18 36:14 37:18 41:18 46:13 46:21 55:3 56:3 57:15 59:13 65:4 68:5,6 77:15 83:5 88:25 125:12 127:2 128:4 137:7 140:25
old 17:2
Once 45:17
ones 13:23 51:25 52:11 79:7 101:14 116:16
online 19:9,11 20:21 21:25,25 26:12,13 42:11,15 56:14,25 57:10 74:17,17 102:16 109:5,11 115:4
open 39:16 48:22 98:4 101:15 103:22 105:2 110:5 132:15
operate 132:19 133:9
opinions 106:8 124:17
opportunities 76:18
opportunity 28:23 104:11
option 48:13 54:10 81:20 94:4 100:21 123:14 124:8



options 68:25
orange 76:17
order 40:25 41:15
ordering 142:13
organic 118:18
organizations 44:2
organize 120:11
Original 3:21 144:5
out-of-pocket
  128:20
outcome 146:12
outright 128:4,10
outside 127:13,14
  127:21
overall 47:13
  120:16
overlapped 37:2
overview 88:6
owe 127:24 128:12
  129:2
owed 126:2,9 127:4
  128:17

**P**

P 2:1,1 5:1
P-02310E-0003983
  3:7 142:19
P-02310E-0004005
  4:4 144:11
p.m 20:10 142:18
packed 104:19
page 3:2,6,24 4:3
  8:17 20:8 27:17
  27:19,19,23 28:9
  33:20 34:8 48:5
  58:6 67:22,25
  68:1,7 69:3,9,19
  70:11,21 71:5
  74:22 86:11,13,14
  86:18 88:2,3,14
  88:22 89:1,5,15
  89:19 91:18,19,23
  92:2,4
PAGE/LINE 147:2
pages 34:7 67:17
  72:21 88:18

  134:12
paid 29:7 41:8,21
  56:21 107:16,17
  111:25 126:9
  128:18,19 131:4,5
  133:6
pamphlet 30:24
pamphlets 30:20
  31:2,5
pandemic 99:22,25
  101:22 102:7,10
  105:15 108:7
paragraph 50:8,20
  50:23 86:17,22
  92:6
paramount 103:22
parent 28:7 106:18
parents 16:15
parking 107:10,18
  107:20,23 111:1
part 15:16 20:7
  43:10 62:21 68:24
  72:11 85:20 98:15
  128:1 133:5
partial 89:16
  110:25 130:17
partially 126:21
participate 23:12
  40:8 43:23 44:18
participated 24:6
  29:15 40:5 44:9
particular 26:4
  32:24 43:20 66:3
  114:24
particularly 36:25
  37:16
parties 5:5 6:20
  73:13 146:10
parts 37:1 72:11,22
  72:23 73:16 84:2
  111:9
party 8:12
party's 93:18
pass 53:13 107:18
pass/fail 48:13
passage 27:3

patrol 23:24
pay 41:18 50:3,9
  131:7
paying 33:1
payment 50:9
  129:22,25 130:3
pdf 86:14 88:3,23
  91:19
pending 9:18 142:7
people 42:5 79:25
  103:10 104:9
percent 120:19,19
percentage 120:14
period 11:21 25:19
  27:8 35:11,21
  81:25 105:21
  106:2,11,13
  113:24 114:11
  115:9
periods 78:12
permits 109:12
person 13:16 17:21
  17:23,24 30:11
  31:6,18 33:13
  34:5,14 35:18
  42:19,21,25 45:18
  50:12 53:19 57:2
  65:6,21,25 66:8
  66:13,17 68:17,19
  68:21,25 69:6,17
  70:5,19 71:3,13
  72:12 74:1 76:2
  77:1,11 78:21
  80:15,25 81:16,21
  82:19 86:5 88:19
  94:7 100:2 101:2
  101:7,10 102:11
  102:25 115:20
  117:1 132:8
personal 107:1
  131:12 135:6,11
  135:12,13,20,23
  140:17 141:2
philosophy 54:22
  55:6,6 70:14,14
  109:6 119:21,22

phone 12:11 136:5
  136:8 137:13,16
phys 54:21
PHYS111 71:8
physically 15:24
  66:5 99:5
physics 48:16 54:22
  71:8 101:3 116:16
  116:17,20,22,23
  117:3 118:22
  121:10
pick 35:2
picked 53:7
piece 123:18
pieces 13:25 14:1
pizza 73:13
placed 38:19
places 82:6
plaintiff 1:16 2:2
  7:10 59:18 60:13
  61:13 62:6 141:23
Plaintiffs 1:5
plan 24:13 105:24
  107:18
planning 32:6
plans 105:18
  107:10 111:1
platforms 78:23
  79:3,5,13 80:6
  139:2
play 44:15
playing 43:17
please 7:12,18,21
  10:12 61:7,11
  63:6
plenty 73:10 76:4
point 51:12 84:9
  99:25 113:1
  114:10
points 81:18
policies 3:15 31:25
  51:2,5 85:21 89:2
  90:8 143:16
pool 129:1
poor 123:18
poorly 111:24

116:11,14,24
  117:13
pop 110:5
portal 56:4 112:8
  112:13
portals 74:17
portion 84:11
portions 28:4 29:25
  73:24
position 17:9,20,21
  17:22,22 18:8,15
  21:11,19,24 118:4
  124:21
positions 21:8
  23:22
possibility 87:5,8
  120:9
possible 28:6 74:10
  106:15
possibly 63:24
  92:13,14 106:20
post 79:12,15,17,19
  80:5
posted 80:2 90:11
  134:12
postgraduate 120:1
  120:1
posts 64:19 77:8,10
  77:16,20,22,24,25
  78:3,6,11,18
  79:21 80:11 82:11
potential 82:8 94:6
potentially 85:22
  110:22
pour 32:8
pre-pandemic 94:9
pre-reqs 51:24,25
  51:25
Precision 40:21
  42:1
preliminary 10:20
prepare 11:15
prepared 141:11
  141:18
presence 79:5
present 6:20 12:6


MAGNA

66:5
**presented** 65:9
**president** 98:25
**pretty** 12:2 53:9
  55:13 73:4 80:16
  84:7,15 88:1
  111:10 115:15
  138:2
**previous** 92:5
  93:22 94:1,4
**previously** 84:16
  95:2
**primarily** 12:7
  24:24 28:20,21
  37:2 44:25
**prior** 35:19 78:19
  78:20 84:9 94:8
  94:14 95:16,19
  96:10 108:11,14
  112:24
**priority** 99:23
**private** 16:3
**privilege** 112:20
**pro** 107:9,19
**probably** 24:18
  25:23 29:24 30:2
  30:6,21 32:4,5,9
  32:11 52:21 53:23
  60:21 65:11 74:9
  74:13,15 76:17
  77:2 78:15 79:2,6
  83:1 85:24 87:21
  96:12 102:21
  106:18 110:8
  114:19,20 117:10
  117:17 138:19
  140:19,20,21
**probation** 38:10,19
  39:1,2,5,10,12
**procedures** 85:22
**proceeding** 9:17,23
**proceeds** 133:16
**process** 24:19
  27:21 39:1 53:8
  76:11 136:24
**production** 14:8

98:16 134:1
  135:23 142:8
**productions** 141:16
**professor** 96:11
  115:15 116:23
  117:3 118:20
  119:23 121:21
  122:4,7,15,21,24
  123:2,16 125:5
**professors** 54:10
  94:15 101:11
  108:25 109:4,16
  109:20 114:20,22
  115:9,17,23,23
  116:4,9,13 117:7
  117:12,16
**profile** 29:11
**program** 28:16,22
  30:3 32:25 36:1,3
  36:5 88:6 133:9
**programming**
  37:15 133:14
**programs** 24:22
  26:13 35:5 37:11
  76:18
**project** 68:9 69:4
  101:8 118:14
**projects** 54:24
**promise** 30:10
  31:17 33:12 50:9
  74:1 75:7,20
  81:21 88:19
**promised** 31:5
  62:21
**promises** 65:6,21
  65:25 66:8,12
  68:16 69:16 70:4
  70:19 71:2,12
  72:12 76:2,25
  77:11 78:21 80:15
  80:25 82:18 85:11
  85:20 86:5
**promptly** 21:7
**pronunciation**
  13:11
**prorated** 51:10

110:25
**prosecution** 57:9
  69:22
**prostitution** 55:1
  56:13,25 80:21
**protected** 112:20
**provide** 10:9 62:20
  108:25 119:16
  132:2,8
**provided** 14:7 82:7
  85:1 135:24
**provider** 136:10
**provides** 50:12
**providing** 64:10
  84:18
**PSYC101** 70:23
**psych** 48:17 54:22
**psychological**
  45:25
**psychology** 70:23
**Public** 1:19 7:14
  145:16 146:3
**publicly** 21:25
**pull** 55:20 57:15
  63:5 83:3 93:14
  137:23
**pulled** 72:13
  134:18
**pushing** 97:2
**put** 38:9 39:12
  123:7

_____
**Q**
_____
**Qian** 2:11 6:25
**qian.shen@hkla...**
  2:12
**qualified** 129:21
**quality** 123:13
**quantify** 120:23
**Quattrociocchi** 1:3
  6:11 13:10
**question** 5:10 8:24
  9:7,10,11,11,12
  9:18 12:1 20:20
  33:5 35:16 53:1
  59:19 61:4,6,6,7,8

61:10 69:2 91:14
  100:8 108:5 132:6
**questioning** 93:13
**questions** 8:18,21
  8:21 9:8 10:20,25
  12:25 33:16 55:19
  59:14 86:9,13
  111:5,7 112:10
  126:18 131:20
  141:25 142:2
**quick** 19:20 53:2
**quickly** 55:21
**Quincy** 7:23 15:25
  16:14
**quite** 17:14 74:10
  85:14
**quote** 59:19 75:5
  86:24 87:5,9,12
  92:7 99:16,16
  102:15 116:9
  117:20,20,25

_____
**R**
_____
**R** 2:1 146:1
**Rafkind** 1:18 6:19
  146:2,14
**raise** 100:6,10
  103:3
**range** 38:24
**rarely** 45:11 79:14
  79:20 94:23 95:4
**rata** 107:9,19
**reaction** 99:20
  102:20
**read** 75:8,12 83:1
  87:2,16 92:8
  117:22 119:18
  145:4
**reading** 85:15
**reads** 86:22 92:7
**reality** 92:16
**realized** 121:25
**really** 15:2 32:7
  54:9 55:21 57:8
  64:9 65:8 85:15
  87:7 91:9 92:15

97:17 100:18,21
  116:16,18 117:17
  118:6 126:16,21
**reason** 11:8 68:23
  96:8 125:4
**reasons** 28:19
  29:13 35:7 80:24
**recall** 15:6 17:14
  20:25 21:10 23:11
  25:10,25 26:11,17
  29:1,25 30:1,8,15
  30:18,22 31:1,4
  31:12,14,15,21
  32:1,22 33:2
  35:12 38:13 45:15
  46:18 52:19 53:18
  54:5 60:11 62:3
  66:8,22 72:20
  74:12 78:11,22
  84:14 94:16,18
  96:16 106:6 107:5
  109:4,7 110:2
  114:21,22 115:8
  115:22 116:2,4
  117:17 118:24
  119:2 126:23
  127:1 133:15
  135:2,21 138:20
  140:15
**receipt** 100:10
**receive** 18:20 23:9
  30:13,16 34:1
  37:24 38:6 41:12
  107:15 127:16
  130:3 136:4,11
**received** 18:22
  19:12 21:5 23:2
  30:24 33:20 34:10
  48:8,19 50:2 57:2
  76:10,24 98:11,21
  99:3,19 100:5,14
  101:25 102:18,24
  103:2,16 104:3,12
  105:11 107:19
  125:1 127:7 128:7
  128:16 129:18

130:13 142:4
**receives** 133:3
**recess** 93:8 140:9
**recognize** 19:23
 26:24 39:19 48:25
 57:20 74:8 83:6
 89:24 98:7 101:18
 105:5 111:16
 121:15 125:13
 129:11
**recollection** 85:19
 106:16 107:4
 110:6,16 114:10
**reconvene** 93:4
**record** 6:2,5,9 7:18
 7:20 8:23 10:14
 67:14 93:7,10
 110:4 118:21
 140:6,8,11 141:22
 142:17 145:6,8
 146:7
**recover** 107:22
**recreation** 46:2
**Reddit** 79:2,8
**refer** 8:3 67:8
**reference** 50:19
 66:2
**references** 86:11
**referred** 36:11
**referring** 14:2 15:1
 62:24 66:20,24
 67:9 71:21 72:2,5
 72:8,18,23 73:17
 73:25 76:8,13
 77:15,19,25 78:4
 94:8,9,12 111:14
 117:11
**refers** 87:5,8
**reflect** 140:3
**refresh** 110:16
**refreshes** 85:18
 110:6
**refund** 3:15 31:25
 50:16,19 51:2,4
 51:13 56:20 89:2
 89:8,12,17 90:7

90:15,19 107:23
 130:17 133:5
 139:8 143:15
**refunding** 111:9
**refunds** 105:10,19
 105:25 106:9,14
 107:9,13,15,19
 110:25,25 113:14
 113:22 114:2
 130:21
**regarded** 112:11
**regarding** 8:18
 14:13,18 15:21
 34:14 77:16 79:22
 80:6 84:24 86:13
 93:14 100:11
 102:7,19 105:10
 105:15 106:8,13
 110:22,25 113:21
 114:1,5,13,17
 117:15 134:12
 136:21 138:2,17
 140:24 141:13
**register** 50:1 51:22
 52:14,22 53:2
 55:10
**registered** 53:3,4
 54:14 56:9 57:10
 84:3 91:3
**registering** 52:24
 55:25 56:5
**registration** 91:22
**reimbursement**
 49:24 51:11
 106:20 112:1
 122:1 123:10
**reimbursements**
 111:3
**related** 15:18 35:21
 46:24 146:9
**relevant** 101:12
 138:17 139:13,16
 141:1,4,7
**reliability** 17:10,18
**remainder** 102:11
**remember** 11:3

12:8 14:25 15:7
 15:13,14 29:21
 30:4 34:2,3 46:23
 46:24 47:1 53:23
 55:9 73:5 76:15
 106:10 116:20
 126:16,22
**remote** 1:11 17:21
 18:16,17,18 70:7
 70:8 81:10,19
 94:6 116:10 117:1
 117:12,21 118:12
 121:3 124:23
 134:13 135:1
**remotely** 6:15 69:1
 80:19 81:9,12,16
**reopen** 125:2
**reopening** 124:20
**repay** 128:1
**rephrase** 9:10 61:8
 61:10 100:8
**replace** 116:25
**reporter** 1:18 6:18
 7:12 8:19,23
 16:10 146:2
**represent** 6:21 8:1
**representation**
 75:6
**representatives**
 32:15
**request** 6:16 9:17
 134:1,7 137:4
 139:4,18 142:8
**requested** 13:23
 129:24 138:10
**requests** 134:4
 136:14 138:14,23
 142:9
**required** 41:13
 54:9 68:18 126:2
**requirement** 54:21
**requirements** 19:2
 37:10 52:3 53:14
**requires** 69:5
**rescheduled** 108:7
**reserved** 5:11

**reserves** 92:7
**resources** 101:2
**respect** 105:18
 127:25
**respective** 5:4
**respond** 112:10
 122:24 124:4
 125:4
**responded** 20:5
**responding** 20:2
**response** 59:10,12
 59:15 63:12 64:16
 64:23 66:21 67:8
 71:16,21 72:3,9
 72:18,23 75:23
 76:9 77:7,16,20
 78:1 81:24 82:15
 93:15,17,18
 111:21 112:9
 121:21 123:16
 128:25 130:10
 138:3,7 139:11
**responses** 3:12 4:7
 57:23,25 58:10,18
 59:2 64:14 80:10
 143:10 144:21
**responsibility** 32:3
 32:13 49:4,6,16
 49:20 50:3 51:16
 51:17 61:22,24
 62:18 63:15,21
**responsive** 134:7
 134:19 135:14,19
 135:25 136:14
 137:4 138:13,18
 139:3,9,18
**restroom** 92:23
**resume** 99:12
 101:24 102:24
 108:1,6,9
**resumed** 99:15
 104:18,22
**resuming** 102:14
**retain** 135:3
**retained** 141:1
**return** 101:23

123:12,13 124:7
**returned** 16:22
 104:20
**review** 13:18,21
 29:19,22 30:19
 31:2,8,24 32:2
 53:10 54:2,3,6
 55:24 56:4,8
 58:17 59:5,11
 78:3,7 83:19 84:2
 84:13
**reviewed** 13:22
 14:3,7 30:1,9 32:9
 78:19 83:19 84:10
 134:15
**reviewing** 30:5
 31:12,21 35:10,12
 78:12 84:14
**revised** 108:25
**right** 23:8 27:16
 50:6,8 75:9 77:23
 79:4 80:1 85:6
 88:16 89:8,11,15
 90:13,15,19 92:7
 99:21 110:3 113:4
 117:23 125:20,23
 127:5,6 128:19
 136:1 137:6 140:6
**right-hand** 91:23
**rising** 20:3
**RIT** 7:6 8:4,19
 18:20 19:12 21:15
 21:18 22:2,8,11
 22:14 25:8,16,22
 26:16,17 27:11,19
 27:21,25 28:11,14
 29:4,16,19,20
 30:10,14,17,19,24
 31:6,8,9,11,16,17
 31:22 32:15,16,18
 32:19 33:6,11,13
 33:21 34:10,17,22
 34:25 35:3,4,11
 35:12,20,22,22,25
 36:11 37:19,22,25
 38:10,18 39:25

MAGNA

| | | | | |
|---|---|---|---|---|
| 40:6 41:10,18 | 123:6,7,9,11 | 143:6 | **saying** 32:22 33:2 | 137:1 |
| 42:2,12,16 43:3,9 | 124:2,11,19 125:1 | **RIT343** 3:13 | 80:17 81:7,10,15 | **second** 9:1 38:22 |
| 43:10,24 44:2,6,9 | 125:19 126:15,21 | 143:12 | 84:25 101:22 | 50:20 57:25 68:3 |
| 44:16,19,22 45:2 | 127:12,17,18 | **RIT345** 86:15 | 106:19 123:17 | 71:17 81:6 89:18 |
| 45:21 46:3,19,22 | 128:8 129:16,19 | **RIT398** 88:4,14 | 132:12 | 109:1,9,17,23 |
| 46:25 47:4,6,11 | 129:24 130:2,6,10 | **RIT399** 88:15 | **says** 49:25 50:2 | 117:25 119:7,16 |
| 47:17 49:3,17 | 131:24 133:3,17 | **RIT697** 88:24 | 59:17 | 119:24 120:3 |
| 50:1,2 53:20 | 133:25 134:10,11 | **RIT712** 91:20 | **SC** 2:4 | 130:18 132:20,24 |
| 59:20,23 60:6,10 | 134:12,13,16,21 | **RIT713** 92:4 | **scenario** 97:11 | 133:10,12 139:2 |
| 60:17,20 61:1,13 | 135:4,10,18 | **RIT842** 3:16 | **schedule** 30:6 83:9 | **section** 89:1,4,7 |
| 61:16,23 62:1,8 | 138:20,23 139:21 | 143:18 | 89:17 98:11,14 | 91:22 92:1,1,5 |
| 62:17,20 63:4,15 | 139:25 140:4,13 | **RIT900** 67:23 68:2 | **scheduled** 108:2 | **sections** 31:11,15 |
| 63:22,22 64:10,17 | 141:2 | 68:3 69:3 | **scholarship** 127:17 | 72:17 |
| 65:7,9,22,25 66:9 | **RIT's** 29:22,25 | **RIT905** 69:9 | 127:21,22,25 | **secure** 41:24 |
| 66:13 71:5 72:2,6 | 30:9 31:24 32:2 | **RIT962** 69:20 | 128:5 | **securing** 42:16 |
| 72:11,16,17,20 | 36:1 44:12 45:4 | **RIT993** 70:12 | **scholarships** 127:8 | **security** 24:22 25:1 |
| 73:6,18,25 74:1 | 45:12,24 46:2,21 | **RIT997** 70:21 | 127:11 128:16 | 25:2 28:16,22 |
| 75:5,10,17 76:2,4 | 51:1,4 54:7 55:23 | **Road** 7:22 | 129:5 | 30:3 35:5 36:1,8 |
| 76:10,25 77:11,13 | 57:25 64:7 73:19 | **Robert** 2:10 6:22 | **school** 22:22,24,25 | 36:24 37:5,6,14 |
| 77:16 78:8,19,20 | 74:16,23 77:24 | 7:6 107:1 | 23:2,3,7,10,13,20 | 37:14 44:3 |
| 78:21 79:13,14,21 | 78:5 98:24,25 | **robert.burns@h...** | 23:23 24:4,7,8,10 | **see** 8:20 14:5 50:5 |
| 80:6,15 81:1 82:6 | 100:6 103:4 | 2:11 | 24:13,14 25:2,18 | 50:10 53:13 59:8 |
| 82:19,25 84:11 | 104:24 105:18 | **Rochester** 1:7 2:8 | 29:8 34:17 36:16 | 59:20 68:6 69:13 |
| 85:2 86:14 87:9 | 112:13 134:7 | 2:15,16,20,21 | 36:17 39:13 41:2 | 69:21 70:13,22 |
| 87:18 88:19 89:8 | 136:14 137:4 | 6:23 7:1,5 8:1,4 | 42:3,3 47:14 51:9 | 71:7 73:16 77:8 |
| 89:9,11,12,20 | 138:2,13,22 139:1 | 40:21 87:13 | 54:11 60:5 72:16 | 80:11 85:18,21 |
| 90:3,11,15,15,19 | 139:18 | **roll** 133:21 | 79:16 84:23 | 86:19,21 87:6 |
| 90:19,24 91:7 | **RIT0001090** 4:5 | **room** 9:23 10:12 | **school's** 105:24 | 88:17 89:2,20 |
| 92:7,11,19,21 | 144:14 | 16:3 46:15 67:2 | 122:5 | 90:17 91:23 93:19 |
| 94:10,15,22 95:5 | **RIT1097** 26:23 | 104:16 | **schools** 24:21 25:20 | 98:18 110:5 |
| 95:10,17,25 96:20 | 27:14 33:20 | **rules** 8:15 | 26:5,7,9,12 76:3 | 112:12 116:18 |
| 97:3,7,10,14 | **RIT1097-1107** 3:9 | **run** 131:21 | **Sciences** 36:19,20 | 124:8 125:21 |
| 98:11,22 99:6,8 | 142:25 | **running** 133:1 | **scope** 142:7 | 129:1,10 137:24 |
| 99:20 100:1,5,11 | **RIT1098** 27:23 | **runs** 26:22 39:19 | **Scouts** 23:25 | **seeing** 83:22 |
| 100:15 101:21,22 | **RIT1105** 27:24 | | **screen** 9:22 10:14 | **seek** 111:10 |
| 101:25 102:7,9,24 | **RIT1106** 28:9 34:8 | ——————— | 33:18 74:23 | **seeking** 37:19 |
| 103:3,7,8,17,24 | **RIT1107** 26:23 | **S** | **scroll** 88:22 | 56:20 107:22 |
| 104:19 105:15,24 | **RIT1155** 39:19 | ——————— | **sealing** 5:5 | 130:21 133:5 |
| 106:3,8,19 107:8 | **RIT1155-1158** 3:10 | **S** 2:1 5:1,1 | **search** 20:3 134:6,9 | **seeks** 112:20 |
| 107:8,13 108:1,6 | 143:3 | **S-E-V-A-T-E-C** | 134:24 135:3,4,13 | **seen** 18:24 74:10,12 |
| 110:1,23,24 111:4 | **RIT1157** 48:5 55:7 | 18:5 | 135:17,18 136:13 | 83:24 84:16 89:25 |
| 111:21 112:9,11 | **RIT1158** 39:19 | **safety** 102:22 | 136:19 137:1 | 122:11 134:3 |
| 113:13,21 114:1,6 | **RIT1781** 3:15 | 103:21 104:7 | 139:17 | **selecting** 55:12 |
| 114:12,16,17 | 89:23 143:15 | **sake** 8:22,23 | **searched** 134:21 | **semester** 19:1 20:5 |
| 120:1 121:25 | **RIT1789** 89:23 | **Santiago** 2:14,17 | **searches** 141:16 | 20:23 38:20,21,21 |
| 122:5,10,19,22 | **RIT1886** 3:11 | 7:3,3,4 | **searching** 136:25 | 39:7 42:22 44:4 |
| | | **saw** 75:1 90:1 | | |
| | | 123:11 | | |

MAGNA ◉

47:21,23 48:2
49:23 51:10,23
52:15,16,17,23
56:13,15 63:16
70:1 75:2,11 80:7
83:17 84:3,10
87:19 88:10 90:23
91:2,4,7,8 92:12
95:22,23 100:16
100:21 102:12
108:15 109:2,9,18
109:23 119:7
125:15,19 126:3
127:4,9 128:15,20
130:19 132:24
133:10,13
**semesters** 38:13,14
  41:17 84:5 127:18
**seminar** 70:14
**send** 112:6 136:4,7
  136:10
**sending** 113:2,9,9
**sends** 42:4
**senior** 23:24 24:9
  25:18 26:18 47:10
  53:22 54:24 68:9
  69:4 101:8 118:13
  120:9
**seniors** 20:3
**sense** 9:5
**sent** 16:23 20:9
  82:7 112:2,15
  122:16,18 131:21
**sentence** 75:4 86:21
  87:12 92:6,11
**sentences** 87:4,7
**sentiment** 114:25
  115:2,3,5,14
**separately** 67:7
**September** 58:3
**seriously** 100:23
**served** 133:25
**service** 136:10
**services** 1:24 6:18
  6:19 21:14,18
  45:13,16,19,22,22

45:25 50:2 53:6
65:18 90:12 105:9
126:7 131:14
132:2,9,22,23
**sessions** 12:11
**set** 14:2 57:23,25
  64:18 121:8 146:6
**Sevatec** 18:5,6,9,13
  18:15 19:17 20:15
  20:17,22,24 21:11
  21:15,16,19,22
  22:3,8,11
**seven** 34:7
**SFRA** 3:11 62:8
  143:6
**SHEET** 147:1
**SHEILA** 2:11
**Shen** 2:11 6:25,25
**short** 12:2 19:1,14
**shortfall** 19:5,8
**shorthand** 1:18
  146:2
**shortly** 14:3
**shot** 74:23
**showing** 76:4
**shows** 49:12 125:24
  127:7
**side** 30:2 86:17
  124:13
**sign** 15:8 59:25
  60:1
**signals** 9:2
**signature** 58:12
**signed** 3:11 5:14,16
  14:21,23 51:15
  58:18,20,23 60:7
  63:18 143:6
  145:13
**significant** 94:24
**signing** 60:4
**similar** 84:16,18
  137:1
**similarly** 1:4
**Simply** 106:25
**single** 62:4
**sir** 9:21 11:15 18:20

18:24 19:23 28:14
35:24 39:15 48:22
85:10 98:3
**SIS** 53:4,5,7 55:16
  56:4
**sit** 59:1 77:3 86:4
**site** 17:10,18
**sites** 72:5
**situated** 1:4
**situation** 117:6,14
**six** 34:7
**sixth** 126:4
**skilled** 37:16
**skills** 22:7,10,13
  119:24 120:3
**slash** 50:9
**SLC** 46:19,24 47:1
  103:12
**slight** 94:5
**snow** 95:17
**social** 64:19 77:7,10
  77:16,20,21,24,25
  78:3,6,11,16,18
  78:23 79:3,4
  80:10 82:11
  118:20
**society** 38:4
**software** 6:16
**sorry** 33:4,15,24
  34:17 35:17 50:10
  67:14 70:16 116:1
  121:17 132:6
**sort** 23:10 112:25
**sound** 127:5
**sounds** 50:5 90:13
  92:22 110:2 113:4
  117:23 136:1
  141:21
**source** 127:13,14
**sources** 65:3 93:16
**spaces** 103:9,13,15
  103:18
**speak** 13:10,13
  32:15,18 33:4,6
  35:20 106:25

110:21 123:2
**speaking** 114:22
**specific** 31:11,16
  33:11 47:9 65:19
  66:7 74:1 76:25
  78:21 86:5,9,11
  93:16 106:22
  107:3 115:8 116:4
  117:15 118:9
  123:23
**specifically** 31:5
  51:20 60:12 94:6
  102:4 109:7
**specifics** 117:18
  135:2
**spectator** 45:10
**speculate** 106:25
**spelled** 80:20
**spend** 65:1 74:16
**spent** 43:15 104:19
**spoke** 35:19
**spoken** 12:14
  113:25 114:16
**sporting** 44:21 45:9
**sports** 44:15,19
  73:13
**spring** 19:1,15
  20:23 43:10,11
  47:23 48:2,6
  51:21,22 52:2,7
  52:15,23 53:11
  54:4,14 56:1,6,9
  56:12 63:16 67:16
  67:21 68:12 69:8
  69:14 70:1,15,24
  71:9 75:2,11 78:8
  78:20,24 79:22,23
  80:7 83:16 84:3
  84:10 87:19 88:10
  90:5,22 91:1,7,11
  92:12 94:14 95:16
  95:19 96:10 98:12
  98:12 99:2,9
  102:5,12 108:11
  108:12,15,15
  109:2,17 115:23

116:5,13 118:1,10
119:3,7,16,25
125:15,17,19,25
127:4,8 128:7,15
128:20 129:6
130:18 132:20,24
133:10,12 136:11
136:22 138:4
139:3
**staff** 103:21 104:8
  115:7 131:6
**stand** 10:6
**stands** 46:19
**start** 8:24 18:6 40:2
  51:8 65:5 83:10
  84:22 86:23
**started** 18:1 27:21
**starts** 39:18
**state** 1:19 6:20 7:18
  7:20 59:19 67:1
  145:16 146:3
**stated** 95:3 138:7
**statement** 64:7
  125:18,24
**statements** 14:12
  115:24 116:6
**states** 1:1 50:16
  59:18 75:5 87:12
  89:8 90:15 117:20
**status** 20:3 37:21
**stayed** 36:16
**Stephen** 122:3
**STIPULATED** 5:3
  5:9,13
**stop** 46:8
**storage** 52:12 54:24
  55:3 69:11 118:18
  119:19,20 121:10
**straight** 24:14
**Street** 2:3,9 16:19
  16:20
**stretched** 40:14
**strike** 21:14 86:23
**student** 24:3 32:2
  32:12,20 37:19
  44:12 45:12,16,18



45:21 46:20,21
47:4,7 49:3,5,15
49:20 51:16,17
53:6 61:21,24
62:18,23 63:14,20
73:12 83:13 87:24
90:12 91:6,15
126:7 131:2,3,7
131:14,15 132:1
133:2,3,6,8,13,17
133:17,21,22
**students** 29:10
32:18 73:20 79:15
82:7,8 85:8 87:1
87:15 89:8,11
90:15,19 96:7
98:25 99:8 101:23
102:7,10 103:21
103:25 104:8
105:9,15 107:9
109:21 115:7
129:17 132:2,9
**studies** 39:25
**study** 29:6 88:9
**studying** 43:3,9
**stuff** 37:8 60:4
73:14 104:13,20
117:1
**subject** 59:17 106:3
114:21,22 123:3
130:7
**submit** 53:8
**submitted** 112:12
**subreddit** 79:15,17
79:22
**subscribed** 145:13
**subsequent** 113:1
**subset** 84:25
**substance** 112:22
**substantial** 142:5
**substantive** 50:8
55:19
**successful** 47:17
**sucks** 114:25
**sue** 95:10 97:7,10
**suggest** 141:24

**suggestions** 125:6
**suing** 61:13
**summarize** 73:15
**summer** 25:17
40:15,15 42:23,24
**summers** 43:7
**sums** 88:1
**supplies** 131:10
**suppose** 47:22 78:2
**sure** 8:17 9:20
14:14,22 15:23
27:18 33:19 35:15
56:22,23 57:17
59:25 61:12 63:12
65:13 67:6,19
75:3 76:3 81:6
83:24 90:2 91:17
93:5 96:14,23
97:23 98:2 100:9
105:4 111:15
113:11 120:25
121:14 123:15
124:22 131:11
137:24
**surrounding**
136:21
**suspend** 141:11,19
**swear** 7:12
**switching** 121:3
**sworn** 5:14,16 7:14
14:17 146:6
**syllabi** 56:8 64:20
80:11,14,25 81:7
81:20,25 82:12
**syllabus** 67:1 95:3
119:18
**syllabuses** 67:5
109:1
**synthesize** 101:9
**systems** 37:7,7
40:23

---
**T**
---
**T** 5:1,1 145:1 146:1
146:1
**table** 85:17

**take** 9:19 10:5 19:4
19:20 43:6 52:7
54:9,15,16,20
59:5,11 67:16,23
68:18,21,25 80:19
85:17 89:21 90:23
**taken** 1:17 6:15
80:16 81:9,13,15
93:8 122:6 140:9
145:4
**takes** 99:23
**talk** 29:2,18 35:24
67:4 116:22 130:6
**talked** 32:21 35:10
80:10 82:10 93:15
138:19
**talking** 32:12 63:25
71:17 86:19 139:1
**taught** 66:16,17
**Taylor** 13:7
**teacher** 67:2
**teaching** 117:2
**team** 45:2 120:11
**tech** 24:21
**technologies** 36:9
88:7
**Technology** 1:7 2:8
2:15,20 6:24 7:2,5
8:2,4 25:9 40:22
87:13
**tele-medicine** 45:22
132:17,19,23
**tell** 10:1 14:24 15:2
25:24 28:15 35:4
55:8 63:19 73:5
73:15 85:6,15
89:10 90:21 96:13
96:14 104:17
112:5 140:22
**Telling** 76:17
**ten** 96:24
**tenure** 17:17 18:13
44:5 53:20 96:20
131:24
**term** 19:15 47:20
71:9 115:13

**terminate** 141:12
142:10
**terms** 47:17 51:10
64:24 67:4,7
134:24 135:3
137:2
**terrible** 139:1
**Tesla** 40:24 41:4
42:14,19
**testified** 7:15 8:10
31:20 59:6 138:12
**testify** 60:19,25
**testifying** 10:6
**testimony** 10:8
13:12,19 124:18
140:25 141:10,15
141:17 142:4
145:4,7 146:5,8
**tests** 131:21
**text** 136:2,4,7,13,17
136:19,25 137:3,6
138:8,13,16,21
139:7 141:5
**texts** 10:17 136:11
**thank** 107:1 141:19
142:10,11
**Thanksgiving**
52:20,21
**thing** 99:21
**things** 8:22 15:4
36:25 37:17 52:1
53:13 60:7 62:20
72:15,24 73:6,7,8
73:17,18 76:5
77:14,17 79:15
82:7 83:11 85:7
106:25 111:23,25
116:18 118:17
124:22 131:22
**think** 11:11 15:16
15:23 22:2,7,10
22:13 23:18 25:9
25:17 32:9,24
33:5 37:4 38:21
40:11 41:7 42:13
44:3 53:22 65:8

71:19 74:9,13
79:11 80:24,25
83:1 85:8,15
89:25 90:1 92:25
95:5,25 97:2,3,13
100:1 101:14
102:23 103:21
109:3,6 111:6,13
112:8 116:14,23
117:5,8,24 119:3
120:2 121:4
126:14,20 131:20
131:23 134:5
139:3,8
**thinking** 30:23
**third** 20:8
**thought** 25:2 52:11
99:21 102:21
118:6 134:19
138:12 139:1,7
**thoughts** 113:22
114:1,6 122:22
124:1
**three** 11:20,20,21
19:16 26:5 40:9
40:12,18 41:25
108:20,21,22,23
109:11 120:6
**threshold** 39:8
127:20
**throw** 118:22
**Thursday** 6:13
**time** 1:17 5:11 6:14
9:15 23:20 24:7
25:19 27:4,8
28:17 29:16 30:25
32:21 35:6,25
37:21,25 38:18
40:6 43:8,16,24
46:25 52:20,20
53:17 55:20 57:10
65:2 67:23 68:22
74:16 75:10 78:12
83:22 87:18 90:2
92:22 93:6,9
94:22 99:5 102:3



102:23 103:16
104:3,12,24 106:2
112:15 113:24
114:11 117:14
124:25 140:7,10
141:19 142:16,18
**timeline** 15:13
112:23
**times** 45:7,7,14,15
45:15 95:19,22,23
96:19
**title** 18:8 74:19
**today** 6:13 10:9,21
11:6,9,16 12:15
12:21 13:12,19
15:25 16:7 22:15
59:1,6 60:25 66:5
77:4 83:20,22
86:4 120:4 141:11
141:20
**today's** 14:2,5
141:15,17 142:4
**told** 12:20,23 13:5
35:19 113:17
134:15
**tons** 73:13
**top** 62:4 68:7
**topics** 138:17
139:14,16
**total** 43:5 108:21
**touch** 141:13
**track** 23:16 24:7
**Tran** 13:6
**transcribing** 8:20
**transcript** 3:10
39:23,24 47:16
54:17 142:13
143:3 145:4,5
146:7
**transition** 100:6,11
100:25 103:4
114:6,13,17 115:4
116:10,14,24
117:9,12 118:12
132:3 134:13
138:3

**trial** 1:15 5:11 10:9
**tried** 121:5
**true** 58:21 59:2
129:8 132:12
145:5,9 146:7
**trust** 127:3 132:13
**truth** 10:1 58:9
**truthful** 11:10
**try** 61:12 64:12
65:19 68:6 73:15
**trying** 124:17
**tuition** 3:15 30:6
31:24 41:18 49:24
50:3 51:1,4,11
56:21 89:17 90:7
105:18,25 106:8
106:13 111:4,9
113:13,22 114:2
125:24 127:3
128:17 129:2,6
130:17 139:8
143:15
**turn** 111:12
**Tuscon** 20:2
**twenty** 97:1,2
**twice** 45:17 131:23
**Twitter** 78:13,25
79:8 80:4
**two** 11:20,21 37:11
38:15 40:16,22
41:3,17 42:24
48:14 79:20 80:24
81:18 87:4 88:18
108:20,21,22,23
116:3
**type** 30:24 37:8
80:17 84:23
**types** 135:9
**typically** 46:15
55:14 66:14 67:1

___ **U** ___

**U** 5:1
**U.S** 6:12
**ultimately** 34:21
**unacceptable** 111:8

**unchanged** 109:6
**undergraduate**
3:13,16 31:8,12
31:16 37:19 39:25
55:23 68:8 71:18
82:25 83:13 84:6
84:11,14 85:13
86:22,24 87:15
91:15 143:12,18
**understand** 8:5 9:8
9:9,21 10:4,8,24
20:20 37:4 49:19
51:7 57:5 60:13
61:5,7,9 63:12
81:7 92:20 123:15
124:18 132:18
**understanding**
49:22 75:12,15
87:19 92:10,17
102:13 131:18
132:16 138:21,22
139:10
**understandings**
131:3
**understood** 9:12
27:7 120:25
139:23
**undertake** 121:5
134:6 135:17
136:24
**undertook** 24:20
**unforeseen** 87:9
**unimportant**
140:23
**UNITED** 1:1
**university** 8:2
85:21 86:25 87:24
138:8
**unofficial** 79:14
**unpack** 122:2
**unused** 133:20
**unwieldily** 67:12
86:10
**updating** 101:21
**URL** 74:22 89:19
90:10

**use** 45:12,21,24
46:2,13,14,21,25
120:4 132:22
134:24 135:6
136:7,10
**usually** 84:22
**utilize** 21:14 131:22
**utilized** 131:23

___ **V** ___

**V-E-S-O-N** 17:8
**V.P** 2:22
**vacate** 104:16
**vague** 20:18 57:4
62:13 95:7 96:2
97:5,15 106:4
114:8 119:17
120:17 124:15
128:23 132:4
**Valley** 16:19,20
22:23,24
**value** 57:1 119:8,10
119:11,15 120:8
121:1,2,9
**varied** 45:6
**various** 76:19
**varsity** 45:2
**verbal** 9:1
**verification** 58:7
**verifying** 58:9
**Verizon** 136:12
**Veson** 17:8,9,12,17
17:20 18:1 22:17
**vice** 55:1 56:13
57:1,9 69:23
80:21
**video** 6:2,9,15
43:17
**VIDEOCONFE...**
1:11
**videographer** 6:1,8
6:17 7:11 93:6,9
140:7,10 142:16
**view** 79:18
**views** 106:3
**virtual** 114:7,13,18

133:13 139:1
**virtually** 13:16
109:22 133:9
**visit** 25:5,7,16,22
**visited** 25:8,8 26:6
**visiting** 25:11,20
**visits** 45:18

___ **W** ___

**W** 145:1
**wait** 9:18
**waived** 5:7
**waiving** 59:17
**wake** 108:7
**walk** 67:13
**want** 50:7 61:10
92:23 123:7
128:22,24
**wanted** 27:18 51:22
52:7 119:19
**wants** 123:17
**wasn't** 32:6 36:25
37:1 96:17 100:21
118:19,19 123:9
123:14 127:19
132:12
**way** 20:8 40:17
52:3 64:12 65:2
88:21,22 92:19
97:18 100:18
115:20 123:11
124:8,19,19
135:18 146:11
**we'll** 9:16 29:2,18
65:1 67:4 141:12
**we're** 8:17 9:21
10:11,14 27:19
32:12 54:13 55:18
94:19 107:2
114:25 115:21
118:16 141:11
142:6
**weather** 95:17
96:17
**web** 134:12
**website** 3:18 29:22


MAGNA

30:1,10 64:19
71:25 72:2,8,11
72:13,17,18,21
73:6,17,18,25
74:16,24 75:5,17
89:20 90:12
112:13 134:16
143:21
websites 82:11
Wednesday 20:9
week 15:14 21:12
97:19 108:9
122:18
weeks 11:23 15:11
46:7 100:4,9
103:2 113:8
weigh 57:8
well-being 96:7
wellness 126:14,18
went 22:24 45:9
111:10 128:20
Wentworth 25:8
West 2:9
Western 1:2 6:12
Whereabout 16:16
whim 92:21
Williams 127:15,17
127:22,24 128:3
withdraw 91:2,10
100:20
withdrawing
100:15,22
witness 3:2 7:12,13
146:5,8
wonderful 77:14,17
words 9:4 123:7
work 9:3 17:23,24
36:25 37:2,10,15
100:17
worked 17:12
40:20,22
working 65:2 67:20
118:14
workout 46:15
works 39:6 127:15
worth 41:17

wouldn't 97:17
100:18 111:3
136:15 139:3
write 28:2,4
writing 114:12
written 14:12 29:19
31:22 113:21
114:5
wrong 36:21 63:20
68:5
wrote 20:12 116:9
www.MagnaLS.c...
1:25

**X**

x 1:2,9
xxxxx 2:25 5:19

**Y**

year 16:12 17:15
20:4 23:16 24:6,7
24:9,18 25:18
26:18 30:25 38:21
38:22 39:13 46:10
46:10,11,12 47:10
47:11,13,17 49:7
49:17 53:22 83:14
84:7,7 85:5
133:21,22
years 15:11 27:6
43:5 65:12 93:22
94:1,4
York 1:2,19 2:9
6:13 146:3
Yup 19:22 20:13
23:4 26:21 39:11
40:3 42:23 43:1
43:12 47:19 48:24
52:4 58:14 59:13
68:4 69:10,12,21
69:24 70:2,25
71:10 74:7 76:12
77:9 83:7 84:8
86:16 88:5 89:18
89:22 91:21,25
98:6 99:11 101:17

125:10 127:10
141:21

**Z**

zeros 111:17
129:13
Zilora 122:3,7,16
122:21 123:2,17
Zilora's 121:21
122:24 125:5
zoom 8:20 9:22
10:11,14 12:11,13
115:16

**0**

000027 105:5
02169 7:23

**1**

1 3:7 19:21 48:16
71:8 86:13 137:25
138:10 139:11
142:20
1:40 140:7
1:40-1:51 140:9
1:51 140:10
1:54 142:16,18
10 3:18 7:22 74:6
120:19 143:22
10:07 1:13
10:10 6:14
10019 2:9
105 126:24
1052 71:6
1097 27:19
11 3:19 101:15
102:19,24 103:24
143:25
11:58 20:10
1157 54:20
11th 98:21 99:19
100:5,10,14
105:21 106:7,11
12 3:20 27:20 33:23
105:3 107:8
113:17 144:3

12:05 93:2,6
12:05-12:37 93:8
12:35 93:4
12:37 93:9
120 69:19
13 3:21 110:5 144:6
14 3:22 111:13,17
111:17 113:10
116:9 117:20
121:22 122:16
124:12 125:1
144:9
14,242.50 127:21
142 3:7,8,9
143 3:10,11,12,13
3:15,16,18,19
144 3:20,21,22 4:4
4:5,6,7
14610 2:16
14623 2:21
148 126:5
14th 125:5
15 3:19 4:4 20:9,14
70:21 102:1 104:4
104:13 121:13
143:24 144:12
151 70:11
154 2:21
15th 21:2,4 103:3,7
103:17,23
16 4:5 38:23 125:9
144:15
17 4:6 38:23 58:3
129:9 130:11
137:23 139:12
144:18
175 126:7
18 4:7 13:24 14:1,6
144:21
19 135:1 138:3
195 126:9
1st 4:7 110:1,13,19
140:14,18 144:20

**2**

2 3:8 11:23 68:9

69:4 98:4 100:9
103:2 142:23
20 48:5 105:12
106:12 107:7
113:20,25 114:4
114:11 115:10
2014 27:8,20 33:24
2015 23:6 24:11
27:8,8 28:10
34:11 38:23
2017 36:6,23
2019 46:9 47:9,21
48:5 52:17 125:15
2019-20 3:13,16
143:12,18
2019/2020 39:13
49:7 55:24 83:14
84:14
2020 3:19 16:25
18:7,23 19:1,15
20:9,14 43:11
46:9 47:10,23
48:2 51:21,22
52:2,8,15,23
53:11 54:4,14
56:1,6,10,13
63:16 67:17,22
68:12 69:8,14
70:1,15,24 71:9
75:2,11 78:9,20
78:24 79:22,23
80:7 83:17 84:3
84:10 87:19 88:10
90:5,22 91:1,7,11
92:12 94:14 95:16
95:19 96:10 98:22
102:1,12 104:4,13
105:12 106:12
107:7 108:11,12
108:15,15 109:2,9
109:18,23 110:1
110:14,19 112:3
112:16 113:2,20
113:21,25,25
114:4,5,11,12,15
114:16 115:10,10



115:23 116:5,13 118:1,10 119:3,7 119:16,25 122:16 124:12 125:1,17 125:19,25 126:25 127:4,8 128:8,15 128:20 129:6,19 130:18 132:20,24 133:10,13 136:11 136:22 138:4 139:3 140:14,18 143:24

**2021** 1:12 6:13 58:3 145:5,14

**2024** 33:24

**206** 7:22

**20th** 105:23 106:7 113:14 114:15

**210** 71:5

**22,454** 125:25

**22,867** 127:5

**2280** 2:15

**22nd** 99:10

**23,242.50** 127:8

**23rd** 99:13 101:24 102:15 104:22 108:1,6

**24** 17:3

**245** 69:22

**26** 28:10 34:11

**29483** 2:4

**2nd** 2:15 3:12 143:9

---
**3**
---

**3** 3:9 26:20 33:17 86:14 143:1

**30th** 110:9,11

**31** 2:9

**32** 2:3

**354** 88:22 89:15

**355** 88:23

**369** 91:18

**370** 91:19

---
**4**
---

**4** 1:12 3:10 39:16

48:5 54:18 59:10 64:16,23 66:21 67:9 71:16,22 72:19 75:23 76:9 77:6,7 78:1 80:9 81:24 82:15 93:15 93:17,18 143:4 145:5

**416** 70:14

**4th** 6:13

---
**5**
---

**5** 3:11 43:5 48:23 51:18 62:25 63:14 64:1,6 129:13 143:7

**50** 68:1 120:19

**500** 129:22 130:13

**52nd** 2:9

**55** 88:2

**57** 88:3

**58** 67:22

**5th** 129:19

---
**6**
---

**6** 3:12 48:1 57:16 64:13 71:16 75:22 93:14 143:10

**6:20-cv-06283** 1:6

**63** 69:9

**65** 16:19,20

---
**7**
---

**7** 3:3,13 83:4 85:12 86:2,7 91:14 143:13

---
**8**
---

**8** 3:15 89:21 90:11 143:17

**866)624-6221** 1:24

---
**9**
---

**9** 3:16 55:21 66:24 67:10,14,15 143:20

**9,000** 128:8,12

**9th** 112:3,16 113:2 113:20,25 114:4 114:12,15 115:10 116:8 117:19 122:19

