# EXHIBIT 9(a)

(March 23, 2022 30(b)(6) Deposition)
(pages 1 -  112)

# In The Matter Of:

*Nicholas Bergeron and Nick Quattrociocchi et al v.*
*Rochester Institute of Technology*

Remote Video deposition via Zoom



Milagros Concepcion 30(b)(6)
March 23, 2022

*Holly Hiott O'Quinn, RPR -- LMOC, Inc.*
*Independent Contractor working in association with*
*Milligan Court Reporting*
*O: 843.224.5211  F: 843.971.6509*
*Email:  schedule@courtreportingsc.com*

Original File 0323 30B6X.txt
**Min-U-Script® with Word Index**

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 3 of 30

Nicholas Bergeron and Nick Quattrociocchi v. Remote Video deposition via Zoom    Milagros Concepcion 30(b)(6)
Rochester Institute of Technology    March 23, 2022

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NICHOLAS BERGERON and            ) CASE NO.: 6:20-CV-06283
NICK QUATTROCIOCCHI,             )
individually and on              ) REMOTE VIDEO DEPOSITION:
behalf of all others             ) 30(b)(6) Witness:
similarly situated,              ) Milagros Concepcion
                                 )
              Plaintiffs,         )
                                 )
v.                               )
                                 )
ROCHESTER INSTITUTE OF           )
TECHNOLOGY,                      )
                                 )
              Defendant.          )
                                 )

DATE:            Wednesday, March 23, 2022

TIME:            10:38 a.m.

REPORTER:        Holly Hiott O'Quinn, RPR

LOCATION:        Remote Via Zoom Videoconferencing

HOLLY HIOTT O'QUINN, RPR
Independent Contractor working in association with

Milligan Court Reporting
Telephone(843)224-5211
Email:  Schedule@courtreportingsc.com

---

Page 3

I N D E X

WITNESS                                              PAGE

MILAGROS CONCEPCION

    By Mr. Doolittle: . . . . . . . . . . . . . . .4

PLAINTIFF EXHIBITS

NO        DESCRIPTION                              ID

1         RIT Online 2019-2020, 2 pages            92

2         RIT Undergraduate 2019-2020              92
          Enrolled prior, 3 pages

3         Notice of Taking Deposition              93
          7 pages

4         RIT Student Health and Wellness          121
          1 page

5         RIT Tuition and Discount                 122
          Spring 2020, 2 pages

6         RIT message from provost to              152
          faculty, 2 pages

---

Page 2

Any court, party, or person who has purchased a transcript, may, without paying a further fee to the reporter, reproduce a copy or portion thereof as an exhibit pursuant to court order or rule or for internal use, but shall NOT otherwise provide or sell a copy or copies to any other party or person.

A P P E A R A N C E S

For Plaintiffs:   Anastopoulo Law Firm
                  By:  Paul Doolittle, Esq.
                       Blake G. Abbott, Esq.
                  32 Ann Street
                  Charleston, SC  29403
                  (843) 614-8888

For Defendant:    Holland & Knight, LLP
                  By:  Robert J. Burns, Esq.
                       Qian (Sheila) Shen, Esq.
                  31 West 52nd Street
                  New York, NY 10019
                  (212) 513-3200

                  Santiago Burger, LLP
                  By:  Fernando Santiago, Esq.
                  2280 East Avenue, 2nd Floor
                  Rochester, NY  14610
                  (585) 563-2400

Also Present:     Bobby Colón, Vice President and
                  General Counsel for RIT

---

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 4

P R O C E E D I N G S

Thereupon, The 30(b)(6) Witness, Milagros Concepcion, was called for examination by Counsel for the Plaintiffs.

THE VIDEOGRAPHER: Now on the record at 10:38 a.m. on March 23rd, 2022.  This is the 30(b)(6) video deposition of Rochester Institute of Technology.  Counsel has waived the reading of the caption.  Counsel, please introduce yourselves for the record.

MR. DOOLITTLE: Paul Doolittle for the plaintiffs.

MR. BURNS: Robert Burns for the defendant RIT.

MR. SANTIAGO: Fernando Santiago, Santiago Burger for Defendant RIT.

MS. SHEN: Sheila Shen, Holland & Knight for the Defendant RIT.

MR. ABBOTT: Blake Abbott, the Anastopoulo Law Firm for the Plaintiffs.

MILAGROS CONCEPCION, being first duly sworn, testified as follows:

EXAMINATION

BY MR. DOOLITTLE:

Q   Good morning, can you give me your name

---

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 5

again.

A   My name is Milagros Concepcion.

Q   Good morning, Ms. Concepcion.  Am I pronouncing that correct?

A   Yes.

Q   I apologize if I mess it up later.  I'm not intending to.

As I understand, you're being offered today by RIT as the 30(b)(6) witness; is that correct?

A   That is correct.

MR. BURNS: And just for the sake of the record, I'll just say that this -- Ms. Concepcion is being produced subject to our objections that are dated January 10, 2022, as modified by our letter dated March 8, 2022.

MR. DOOLITTLE: Yeah, I was going to go over -- I assume some of those are going to impact the actual deposition notice that we have.  So that was the first thing I was going to do, Mr. Burns, to clear up and make sure that we're all on the same page about what the witness is going to testify about.

BY MR. DOOLITTLE:

Q   Do you -- Ms. Concepcion, do you happen to have a copy of the deposition notice?

---

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 6

A   I do not.

Q   Have you seen a copy of the deposition notice before?

A   Yes, I have.

Q   And I'm going to go over each one of the topics listed here so that we have an understanding as we start this deposition about which topics you are or are not going to be able to testify about.

MR. DOOLITTLE: And, Mr. Burns, I'm going from the one that's dated December 23rd.  So to the extent that your subsequent letters and/or response to this notice modifies it, let's just make sure we all have it on the record and we understand.

MR. BURNS: I suppose.  I mean, you can use your time however you want to.  We served detailed objections stating the testimony that we were willing to provide, we were not willing to provide.  We met and conferred with your colleagues on several occasions, and then modified our objections slightly as to several issues raised by your colleagues by letter dated March 8, 2022.

So Ms. Concepcion isn't going to be able to testify to the specific parameters of what she's been designated to testify to.  It's all in the record.  It's all in writing.

---

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 7

BY MR. DOOLITTLE:

Q   Ms. Concepcion, what is your understanding that you're here to testify about today?

A   I'm here to testify on behalf of the university for a suit against the university by Mr. Bergeron and Mr. Quattrociocchi regarding tuition refunds.

Q   What are the topics that you've been instructed you're supposed to testify about?

MR. BURNS: Objection.

THE WITNESS: I don't recall the specific topics.  I -- you know, in general, what was listed in the document that you're referring to.  I mean, if you'd like me to look at the document and repeat them, I can do that.  I don't recall them off the top of my head.

BY MR. DOOLITTLE:

Q   That's not necessary.  We'll just go through them, and as we reach a topic that you feel like is outside of your area of expertise or your preparation, then you can let me know.  In the meantime, we'll just try to move forward.

What is your job title?

A   Associate vice president, controller, and assistant treasurer.

---

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 8

Q   Are those three separate job titles or are they considered to be one title?

A   It's one title.

Q   What are your responsibilities in that role?

A   As a controller of the university, I'm responsible for accounting and financial reporting, payroll and accounts payable, student financial services, accounts receivable, treasury, investments and tax reporting.

Q   Are there any other responsibilities in your job?

A   Those are all my job responsibilities.  I oversee the work in those areas.

Q   How long have you been in this role?

A   I've been at RIT for 22 years, and I've been in this role for 14, 15 months as controller.

Q   What was your previous position?

A   Associate controller.

Q   Am I correct in assuming that associate controller for sake of brevity is kind of a prep for becoming the controller?

A   I was responsible for some of the areas in the controller's office under that title.

Q   And then in your new title, you have assumed additional roles on top of the ones that you had

---

M. CONCEPCION - EX. BY MR. DOOLITTLE                          Page 9

before; is that right?

A   Yes, I oversee the entire organization now, uh-huh.

Q   What was your position before associate controller?

A   Assistant controller.

Q   And what was the position before that?

A   Director of sponsored programs accounting.

Q   And before that?

A   Assistant director of sponsored programs accounting.

Q   And before that?  You can tell where I'm going.

A   Financial analyst for the Saunders College of Business.

Q   And that's Saunders, S-A-U-N-D-E-R-S?

A   Yes, sir.

Q   Where is Saunders College of Business?

A   It's at RIT.

Q   And before you were the financial analyst for Saunders College of Business, what was your job title?

A   I was a gifts accountant.

Q   Did you say gift?

A   Gifts.

Q   G-I-F-S?

M. CONCEPCION - EX. BY MR. DOOLITTLE                          Page 10

A   G-I-F-T-S, gifts.

Q   What is a gifts accountant?

A   Gifts accountant reconciled the gifts that come into the university.

Q   And what was your position prior to the gifts accountant?

A   That was my first position at RIT as an employee.

Q   Had you previously been employed or -- have you previously worked in any capacity whatsoever for RIT other than what we've already discussed?

A   I was a student employee for RIT when I attended RIT as a student.

Q   What did you do as a student employee?

A   I had a variety of jobs.  I was a student custodian.  I was a receptionist.  I was a Spanish tutor.

Q   Prior to -- so is that your complete professional background, work experience, that we've gone over so far, or are there other jobs that have been between RIT and student employee?

A   I had other jobs prior to coming to RIT.

Q   Can you briefly tell me what those were?

A   Prior to coming to RIT, I worked for SIF Davis Education, which was then acquired by Element K,

M. CONCEPCION - EX. BY MR. DOOLITTLE                          Page 11

primarily technology and training organization.  I was a financial analyst there.  And when departed, I was the director of financial reporting.  Prior to that, I worked at the Student Loan Corporation for Citibank.  And I was -- I worked in the federal bill department, and we were responsible for billing interest to the federal government for subsidized student loans.

Q   Any other prior employment history before your RIT employment?

A   No.

Q   And prior to beginning your studies at RIT, did you have any other jobs before that?

A   Yes.

Q   How old were you when you started at RIT as a student employee?

A   I was 18 years old.

Q   Okay.  Is it fair to say that your other jobs prior to your student employee job were typical jobs of your high school students and things of that nature?  Is that what you're referring to?

A   Correct.

Q   Tell me about your current role again.  I need to ask you a few more questions about that.  What are the exact job responsibilities for that?  Let me ask you a different way.  So first of all, do you have

M. CONCEPCION - EX. BY MR. DOOLITTLE                          Page 12

any people working for you as the -- are you controller -- pardon me.  Are you the controller?  How do you call yourself?  What do you tell people what you do?

A   I am the controller and assistant treasurer.

Q   How many people do you have working for you as a controller and assistant treasurer for RIT?

A   There are 105 employees in the controller's organization, and I have six direct reports.  And everyone else reports through the organization through a variety of managers.

Q   Where is the top of the organizational chart with regards to the controller area of the university?

MR. BURNS: Objection.

THE WITNESS: Can you rephrase that question?  I don't really understand what you are asking.

BY MR. DOOLITTLE:

Q   Sure.  Fair enough.  As a controller and assistant, are you the top position in the controller department or is there somebody you report to?

A   That is the top position in my department.  I report to the senior vice president of finance and administration.

Q   And what would be the next level of

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 13

promotion? I noticed you've moved up to the controller area. What would be the next logical area of promotion for you?

A    I don't have that scoped out. I haven't earmarked what my next move will be since I've only been in this role for 13 months.

Q    How long was the person that previously held your position in that job?

A    I don't recall. A number of years.

Q    More than two?

A    Yes.

Q    Less than ten?

A    More than ten.

Q    Okay. Currently right now, you don't have any ambitions for moving into a different position; is that fair?

A    I haven't thought about that for my career.

Q    Gotcha. You have six people reporting directly to you?

A    Yes, sir.

Q    What are their roles? I don't necessarily need their names, but what are their titles?

A    Associate controller. Assistant controller. Executive director for human service. Executive director for accounts payable and payroll. Executive

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 14

director for student financial services. Executive director for technology management and process excellence.

Q    How would you summarize for me your job responsibilities and duties?

A    I'm responsible for the external financial reporting for the university including our informational tax returns and our audited financial settlement statements, our uniform guidance audit for federal awards. I'm responsible for anything and all that goes into our financial statements. So fixed assets, investments, all of the components of our balance sheet and statement of activities, those functions reside at the university.

I am also responsible for -- as an -- as the assistant treasurer for our banking relationships and the treasury function. And we also provide a variety of services to our RIT community such as payroll services, accounts payable, accounts receivable, procurement services, and a set of services to our students through our student financial services department.

Q    What is the most difficult part of your job?

A    People management.

Q    Are you familiar with Edward Lincoln?

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 15

A    I am.

Q    What is his role at RIT?

A    He works in the enrollment management division.

Q    Do you know him well?

A    He has worked there some time. I've worked there some time. So I've ran into Ed a few times in my career.

Q    Okay. Does your office interact with his office on a professional nature much? Or what's the relationship between the two?

A    Not often.

Q    Ms. Concepcion, what steps did you take in preparation for today's deposition?

A    I reviewed an extensive number of documents and I met with counsel.

Q    And other than reviewing documents and meeting with counsel, have you done any other preparation for the deposition?

A    I spoke to our senior vice president of financial and administration, Dr. James Waters, in the presence of counsel.

Q    Any other prep?

A    Nope.

Q    Do you recall what documents you reviewed in

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 16

preparation for the deposition?

A    I reviewed a large number of documents. The bulletins, a set of policies for the university. The transcripts for Mr. Quattrociocchi and Mr. Bergeron, their student account information amongst the many documents I've reviewed.

Q    The student account information for the two plaintiffs, you reviewed their documents in the student account for both plaintiffs; is that right?

A    Yes, I reviewed those documents.

Q    Were they printed copies or on the computer?

A    They were electronic copies.

Q    And who provided those to you?

A    They were provided as part of this deposition that were exhibits provided by the university.

Q    Do you recall who exactly provided them to you?

A    Ms. Shen.

Q    Were there any documents that you needed that weren't in -- that you needed, in your opinion, to prepare for the deposition that weren't in the materials that were provided to you by Ms. Shen?

A    I reviewed what was provided to me.

Q    I understand. Were there any documents that you felt like you might need to review that were not

M. CONCEPCION - EX. BY MR. DOOLITTLE | Page 17

provided to you?

A I reviewed what was provided to me. I wasn't making an assessment if there were additional documents. I just reviewed everything that was provided to me to make sure I was familiar with them.

Q Understood. Did you do any independent research or outside of the documents that were provided to you?

A No.

Q Didn't look anybody up on the computer or anything like that?

A No.

Q Are you able just to review the two plaintiff's accounts on your internal computer system? Are they still active?

A I don't have access to the student information system. I reviewed the exhibits that were produced for today's deposition. I don't have access to that system and I cannot log into it and view anyone's student account.

Q Okay. Does your department handle who pays tuition and fees as a student to RIT?

MR. BURNS: Objection.

THE WITNESS: I'm not really exactly sure what your question means. Perhaps you can rephrase

M. CONCEPCION - EX. BY MR. DOOLITTLE | Page 18

it.

BY MR. DOOLITTLE:

Q Sure. If a student pays tuition and/or fees to RIT, does that money then go through your office?

A Our student financial services team collects on all student accounts, yes.

Q And when it collects on the student accounts, are those accounts that you're responsible for, or is that a separate account system?

A We are responsible for billing and collection in student accounts, the student financial services department, which they report through the controller's office.

Q And they ultimately report to you?

A Yes.

Q Okay. Have you ever been deposed before, Ms. Concepcion?

A Not in a 30(b)(6) deposition.

Q What prior depositions did you take part in other than a 30(b)(6) deposition?

A It was a personal matter.

Q Were you the plaintiff or the defendant?

A I don't think I was either. It was a child support matter.

Q And you were deposed in connection with that?

M. CONCEPCION - EX. BY MR. DOOLITTLE | Page 19

A Yes.

Q Is there any other things that you've been deposed about?

A No, sir.

Q Did you assist in answering any of the discovery issues in this case?

A No.

Q Have you ever been asked to gather any documents in connection with this lawsuit?

A No.

Q I think I understand your organization as it's structured, and thank you for explaining it to me. Can you explain to me where that fits in, in the RIT overall organizational structure? And I'm trying to understand -- just so you know, I'm trying to understand where it fits in. I mean, I assume the president is at the top, and then vice president, and then we go down from there. I'm trying to figure out if I work my way back up the hierarchy, where would we find you?

A So the -- my boss is the vice president for finance and administration, and he reports to the president. He has colleagues who are vice presidents at the university.

Q Are you familiar with the marketing

M. CONCEPCION - EX. BY MR. DOOLITTLE | Page 20

communications department at all?

A Yes.

Q Do you know how many people work in that department?

A No, I don't.

Q Do you know who is in charge?

A Yes.

Q Who is that?

A Mr. Trierweiler.

Q Are you familiar with the departments that draft and design the policies and procedures applicable to RIT students?

MR. BURNS: Objection.

THE WITNESS: I'm familiar with a variety of departments at the university; and if they do draft those policies, then I would be familiar with them. If there was something specific, I could try to respond to that.

BY MR. DOOLITTLE:

Q Who would be -- which departments would be drafting policies that would be -- and procedures that would be applicable to RIT students?

A They're typically listed in the policy. So every policy at the bottom lists what departments are involved in the drafting and rendition of the policies.

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 8 of 30
Nicholas Bergeron and Nick Quattrociocchi    Remote Video deposition via Zoom    Milagros Concepcion 30(b)(6)
Rochester Institute of Technology    March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 21

Q   How many different departments are involved in the drafting of the policies?
A   I don't know.
Q   Does every single department at the university have a role in the drafting of the policies?
A   There's a variety of departments.  I'm not sure if every single department.  Probably some are more -- have more responsibility over certain policies than others.  It depends on the policies that you are speaking of.
Q   Let's go directly to the student handbook.  You're familiar with the student handbook, I take it?
A   Yes.
Q   Do you know who's in charge of drafting the student handbook?
A   I believe it's the academic affairs division.  But it is a compilation and it requires multiple departments to contribute to it.
Q   Have you ever participated in drafting of the student handbook?
A   No.
Q   Are you familiar with the student handbook as it existed in the spring of 2020?
A   I've seen it.
Q   Do you know if any changes have been made to

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 22

that student handbook since spring of 2020?
A   Not that I'm aware of.
Q   Can you describe the process used to draft the student handbook?
A   I am not familiar with the process used to draft the student handbook.
MR. BURNS: Can I just interject, Mr. Doolittle.  When you're referring to handbook, are you referring to the bulletin or to something else?
MR. DOOLITTLE: The bulletin, actually.
BY MR. DOOLITTLE:
Q   Ms. Concepcion, when I say the handbook, do you understand that to mean bulletin?
A   Now that you've made that clear, that was very helpful.
Q   What's the difference between a handbook and a bulletin?
A   In this case, none, because it's the same, right?
Q   That's what I'm asking you.  Are they the same?
A   In this case, you indicate that they're the same, that you're referring to the bulletin and the handbook as the same document.

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 23

Q   Right.  Let me ask, when I was asking questions a minute ago, were you answering regarding the bulletin or were you answering regarding something else?
A   I assume it's the handbook.
Q   What is the difference between the handbook and the bulletin?
A   There isn't any because it's the same.
Q   Do you believe the handbook imposes obligations on RIT?
MR. BURNS: Objection.
THE WITNESS: What kind of obligations?
BY MR. DOOLITTLE:
Q   Obligations that would arise from the statements made in the handbook.  Do you think that they're obligated to live up to the statements made in the handbook?
A   As I recall --
MR. BURNS: Objection.  Note just objection.  Bulletin or handbook?  I mean, are we talking about the bulletin?
BY MR. DOOLITTLE:
Q   Ms. Concepcion, what do you understand my question to be about, the bulletin or the handbook?
A   Your -- I am familiar with the bulletin.  The

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 24

graduate and undergraduate bulletin.  If you are referring to the bulletin as the handbook, then I can respond to your question.  I consider the bulletin that you're referring to the bulletin as the handbook.  I'm not familiar with two separate documents.
Q   I'm just trying to understand the definition of bulletin and handbook, Ms. Concepcion.  I'm not really trying to trick you up on it or anything.  Is there a separate document called a handbook and a separate document called the bulletin, or are they the same?
A   I reviewed the undergraduate and graduate bulletin.
Q   And when I say handbook, do you take that to mean the same thing as bulletin?
A   I interpreted that to mean the bulletin.  I'm not aware of a different document called the handbook.
Q   Thank you.  Do you believe the bulletin imposes any obligations on RIT?
A   The bulletin contains a disclaimer that talks about the bulletin not constituting any kind of promises or contracts between what the bulletin says.  It's not representative of that.  It's a planning tool.  It's a guiding tool.
Q   Do you think the handbook imposes any

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 25

obligations on RIT -- excuse me, the bulletin imposes any obligations on RIT?

MR. BURNS: Objection.  Asked and answered.

THE WITNESS: The handbook is intended to be a planning tool for, you know, what are the requirements for the different majors, et cetera.

BY MR. DOOLITTLE:

Q   So within the bulletin, it tells me if I want to be a graduate with a computer degree, pick one, I don't care, an associate of arts, what do you-all have? I mean, what's a good degree that I can use as an example?

MR. BURNS: Objection.

THE WITNESS: (No response.)

BY MR. DOOLITTLE:

Q   Ms. Concepcion, within the bulletin, you just stated, I believe, there are guidelines for achieving your credits for a degree; is that correct?

A   Correct.

Q   Can you think of a degree that we can discuss in detail that you know enough about what the hand -- the bulletin has within it regarding what's needed to complete that degree?

A   I don't have memorized the requirements for any of the degrees in the bulletin.  I could name you a

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 26

degree, but I wouldn't be able to tell you what the requirements are.  There are hundreds of programs listed in the bulletin.

Q   What's the degree you're most familiar with?

A   Do you want to chose a degree and show the requirements?  I mean, because I'm not going to be able to repeat the requirements for a particular degree.

Q   What degree do you have, Ms. Concepcion?

A   I have an MBA and I have a bachelor's in electrical engineering and economics.

Q   So let's just stick with a bachelor of electrical engineering.  Is that what you said?

A   Yes.

Q   So would the handbook contain information within -- excuse me.  Would the bulletin contain information within itself as to what courses I would need to take in order to receive my degree in electrical engineering?

A   It does contain that kind of information.

Q   Is there any other place I would know where to go as a student to figure out what I need to do in order to get my degree in electrical engineering as far as academic work is concerned?

A   I don't know if there are other places where those requirements are listed.

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 27

Q   Does the handbook spell out the number of courses or credits that I need to have in order to receive my electronic -- electrical engineering degree?

MR. BURNS: Objection.

THE WITNESS: I don't know if it specifically lists the numbers.  I know it has, you know, the courses that are required and, you know, for getting a particular degree, the undergraduate or graduate level.

BY MR. DOOLITTLE:

Q   Is there anyplace else a student would go to figure out what they need to do in order to receive their electrical engineering degree?

A   I am -- I'm not aware if there are other places that the students can get that information.

Q   So when you were pursuing your bachelor of electrical engineering, is that where you looked to see what courses you needed to take?

A   That was a very long time ago.  So I probably referred to some sort of a hard copy document at the time.

Q   Do you think the bulletin lays out what a student needs to do in order to receive an electrical engineering degree?

A   It lists requirements for what students need

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 28

to do to obtain a particular degree.

Q   If the students comply with the requirements listed in the bulletin, are they then entitled to get their bachelor of electrical engineering?

MR. BURNS: Objection.

THE WITNESS: You could conclude that.

BY MR. DOOLITTLE:

Q   Do you think RIT has an obligation to provide a student a bachelor of electrical engineering if they have completed the requirements within the handbook?

A   RIT, if a student meets the requirements for a particular degree, then the university would award them that particular degree as long as they meet those requirements.

Q   Those requirements would be found in the student bulletin?

A   They might be found there or in other places.

Q   What other places, Ms. Concepcion?

A   I am not aware of what other places there may be.  I don't know if they are listed elsewhere.

Q   So to your knowledge, the only place it's listed would be in the student bulletin?

A   I am not aware if they are listed in other places.  I am aware they're listed in the bulletin, but I'm not aware if they're listed in other places.

M. CONCEPCION - EX. BY MR. DOOLITTLE     Page 29

Q   So to your knowledge, that's the only place listed where a student would look.  Is that fair?

A   To my knowledge, they are listed in the bulletin.  I don't know if they're listed in other places.

Q   So do you feel like the -- do you feel like the bulletin imposes any obligations on RIT whatsoever?

A   The bulletin is the planning tool.  It helps students plan for how to obtain a degree in a particular major.

Q   Yes, ma'am, I understand that.  Does it impose any obligations on RIT?

MR. BURNS: Objection.

THE WITNESS: I'm just stating what I understand the bulletin to mean.  It's a planning tool.  It's a guide.  It spells out or outlines the requirements for the degrees and the programs that are offered at the university.

BY MR. DOOLITTLE:

Q   So if a student completed the coursework required in the bulletin, would you feel it would be necessary for RIT to then award the corresponding degree for the completion of the work as outlined in the bulletin?

MR. BURNS: Objection.

M. CONCEPCION - EX. BY MR. DOOLITTLE     Page 30

THE WITNESS: If a student meets the requirements for their degree, then the university would award them their degree.

BY MR. DOOLITTLE:

Q   And those requirements would be found in the bulletin; is that correct?

A   They would be --

MR. BURNS: Objection.

THE WITNESS: -- the requirements for the degree that they are pursuing.

BY MR. DOOLITTLE:

Q   Those requirements would be in the bulletin?

A   I'm not aware of other places, but the bulletin is a place where it outlines what the requirements for a degree might be.

Q   What else does the bulletin do, Ms. Concepcion?

A   It contains the degrees offered at the university and what the requirements are for those different degree programs.

Q   I understand.  Does it do anything else other than that, in your opinion?

A   That is what I'm aware of.

Q   Does the student bulletin list where the classes are going to be held?

M. CONCEPCION - EX. BY MR. DOOLITTLE     Page 31

A   I don't recall.

Q   Does the student handbook delineate between online classes and in-person classes?

MR. BURNS: Objection.

THE WITNESS: I don't recall.

BY MR. DOOLITTLE:

Q   So you're not aware whether or not the student bulletin addresses online classes?

A   I don't recall if it lists that information.

Q   You do know for sure it lists the in-person class requirements; is that right?

MR. BURNS: Objection.

THE WITNESS: I don't recall that it says anything like that.  It lists the requirements for the classes.  The requirements for the degree.

BY MR. DOOLITTLE:

Q   Does it list the requirement that a student has to attend a class in order to get credit for the class?

A   It lists the requirements for the degree and what the courses are that the students need to take for a particular degree program.

Q   And I assume the classes that are necessary for a particular degree must be taken at RIT in order to receive a degree from RIT, correct?

M. CONCEPCION - EX. BY MR. DOOLITTLE     Page 32

MR. BURNS: Objection.

THE WITNESS: It lists the requirements for a course for you to obtain a degree in a particular major at RIT.  It would also list something like if you are required to do a co-op, for example.

BY MR. DOOLITTLE:

Q   Okay.  But if I wanted to obtain a degree from RIT, I would actually have to take classes from RIT; is that correct?

A   That's not necessarily accurate.

Q   Why is that not necessarily accurate?

A   Because you could articulate a course and transfer from another university.

Q   Can I transfer in and matriculate -- did you say matriculate or articulate?

A   You could have an -- the university can have an articulation agreement or an agreement with another university, or the students may be able to transfer a course to the university in order to achieve their degree.

Q   Are you familiar with what other schools the university has an articulation agreement with?

A   No.

Q   Is a student capable of transferring all credits in through the articulation process in order to

Nicholas Bergeron and Nick Quattrociocchi Remote Video deposition via Zoom
Rochester Institute of Technology

Milagros Concepcion 30(b)(6)
March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 33

receive an RIT degree?

A    I'm not familiar with the details. I just know that there are possibilities where not all your courses are taken at RIT necessarily, including when you graduate high school if you have credits, advance credits from high school, those come into the university and you receive credit for those.

Q    Is there a possibility that I could articulate all of my credits in order to receive a degree from RIT?

A    I really can't speculate in all the different cases because they can be pretty individual and unique. I just know that it's possible.

Q    So you think it's possible for me to articulate every single course that I have in order to receive a degree from RIT?

MR. BURNS: Objection.

THE WITNESS: I did not say that. I said it's possible to bring courses into RIT for credit.

BY MR. DOOLITTLE:

Q    Right. But I would then still need to take -- as a student, still need to take at least some courses from RIT in order to get my degree; is that correct?

A    I am not familiar with that divide of how

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 34

many courses would be accepted for a program to be transitioned from other universities or other colleges to get your degree from RIT.

Q    Who would be the person most knowledgeable about that?

A    I don't know.

Q    Does the bulletin provide any information about where a class is going to be located?

A    I don't recall that information being in the bulletin.

Q    Where does the student find out the information regarding where a class is going to be located?

A    I am not exactly sure.

Q    Are you aware of the number of classes that RIT conducts online versus in person?

A    No.

Q    Are you familiar with the online accreditation process whatsoever?

MR. BURNS: Objection.

THE WITNESS: I am not really sure what that question means.

BY MR. DOOLITTLE:

Q    Are you familiar with the accreditation process that RIT undergoes before they will offer their

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 35

degrees?

A    I know New York state accredits degree programs for RIT to be able to offer them.

Q    Okay. Are you aware of the accreditation process as it applies to online versus in person?

A    No.

Q    So you're not aware of the differences in the accreditation process for online versus in person?

A    No, sir.

Q    Do you know who would be the person most knowledgeable about that?

A    No, sir.

Q    They mention in the bulletin the -- I don't know what you'd call it. I don't want to put words in your mouth, Ms. Concepcion, but it was a disclaimer of some sort in the bulletin that you mentioned when we first started talking about it?

A    Yes.

Q    Where is that information in the bulletin?

A    It's in the beginning of it, the first few pages.

Q    What does it say in those first few pages?

MR. BURNS: Objection.

THE WITNESS: I don't recall off the top of my head.

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 36

BY MR. DOOLITTLE:

Q    What's your understanding of what that disclaimer means?

MR. BURNS: Objection.

BY MR. DOOLITTLE:

Q    Ms. Concepcion, what's your understanding of what the disclaimer in the student bulletin means?

A    It means it's a planning tool. It's a guide.

Q    Is RIT capable of changing the requirements in the student bulletin regarding the requirements for an electrical engineering degree?

A    The requirements for a degree may change in a future year.

Q    Does that -- any change in those requirements apply to students that are already enrolled, or does it just apply to future students for that degree?

A    It applies to future changes unless the change is in the student's favor.

Q    Okay. And when you say change is in the student's favor, what does that mean?

A    It is exactly what our policies say for degree requirements. So if the degree for which you are enrolled, if the requirements change, then the applicable requirements could be during the entering term or if they change, if they are in the student's

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 37

favor.

Q   And I'm just trying to understand what you mean by in the student's favor?

A   That decision would be made by someone in the academic area if the requirements are in the student's favor.

Q   Can you give me an example?  I'm just not following what you mean by that.

A   I can't because I have not ever evaluated that to say, you know, the requirements change and they are or are not in the student's favor.

Q   I'm trying to understand what -- I'm just trying to understand what you understand to be the statement that unless it changes within the student's favor.  I don't know what you mean by that.

A   It's what the policy, the release says.

Q   And you don't have any idea what that means?

A   It means if it's in the student's favor as deemed by someone with purview of the academic program that they are pursuing, if it's interpreted to be in their favor, then they can choose to abide by those requirements.

Q   Okay.  Can we take a specific example?  So like if a student came in and was enrolled in the electrical engineering department and required two

---

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 38

hours of English, two course credits of English, and then the change was made that it only requires one class of English or one course credit of English, is that a change that would be in the student's favor?

A   Could be perceived to be in their favor.  It depends on what that student has, you know, what courses they have taken.  So if the number of electives is increased or decreased.  If they have a class that previously didn't meet their requirements but now they have room for an additional elective, that might be in their favor.

Q   All right.  So if you change the number of hours required, that would not be in the student's favor; is that fair?

MR. BURNS: Objection.

THE WITNESS: I mean, there are so many different variations of what that could be.  And I've never been in a situation to evaluate a change in requirements and if it is or isn't in a student's favor.

BY MR. DOOLITTLE:

Q   Let's take your instance in particular, Ms. Concepcion.  When you became enrolled for a bachelor of electronic engineering, you understood when you first got to the school these are the requirements

---

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 39

that you have to complete in order to receive that degree; is that correct?

A   That is correct.

Q   And if those requirements changed, would you have to comply with those requirements in order to receive your degree, or would you be grandfathered in, so to speak, under the original terms of your enrollment?

A   The requirements when I entered that term, those would be the applicable requirements to meet.

Q   And those would be found only in the bulletin; is that correct?

MR. BURNS: Objection.

THE WITNESS: I am not aware of any other places where those requirements would be listed, but I do know they are listed in the bulletin.

BY MR. DOOLITTLE:

Q   Okay.  So if a student comes in and enrolls in the electrical engineering degree program in the year 2000 and the requirements change the year 2002, the student would still need to comply with the requirements from year 2000 in order to receive their degree; is that correct?

MR. BURNS: Objection.

THE WITNESS: That is my understanding.

---

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 40

BY MR. DOOLITTLE:

Q   Okay.  So if a student who came in under my hypothetical in the year 2000, complied with the degree requirements at the time, finished his course studies as outlined in the bulletin and yet that bulletin had been changed and the course now required additional studies, the student would still receive their degree pursuant to the year 2000 bulletin requirements for that degree; is that correct?

MR. BURNS: Objection.

THE WITNESS: That is what the policy states.

BY MR. DOOLITTLE:

Q   Okay.  So if a student complies with the course requirements outlined in the bulletin, is RIT then obligated to provide the diploma, a bachelor degree?

MR. BURNS: Objection.

THE WITNESS: If a student meets the requirements that the -- that are required for a particular degree, then the university would award that degree.

BY MR. DOOLITTLE:

Q   Right.  So they would be obligated to provide that degree, correct?

---

Nicholas Bergeron and Nick Quattrociocchi et al.
Rochester Institute of Technology
Remote Video deposition via Zoom
Milagros Concepcion 30(b)(6)
March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 41

MR. BURNS: Objection.

THE WITNESS: It's really the same question. If the student meets the requirements for the degree, they would receive that degree.

BY MR. DOOLITTLE:

Q   And RIT would be wrong to withhold that degree for any reason other than completion of the academic procedures; is that correct?

A   If the students --

MR. BURNS: Objection.

THE WITNESS: If the students met the requirement of their degrees, they would receive it, their degree.

BY MR. DOOLITTLE:

Q   And it would be wrong for RIT to withhold that degree; is that correct?

MR. BURNS: Objection.

THE WITNESS: (No response.)

BY MR. DOOLITTLE:

Q   Ms. Concepcion, if a student has met the requirements that was in the bulletin the year they enrolled at RIT, would it be permissible for RIT to deny the student their degree after completing the requirements outlined in the bulletin?

A   If the student completed the requirements for

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 42

their degree, they would receive their degree.

Q   And it would be wrong for RIT to withhold that degree if they met those requirements; is that correct?

MR. BURNS: Objection.

THE WITNESS: If the student met the requirements of their degree, they would receive their degree.

BY MR. DOOLITTLE:

Q   Yes, ma'am. I'm asking you what happens if the university -- if RIT decided to not award that degree, would that be acceptable?

MR. BURNS: Objection.

THE WITNESS: I mean, that's a speculation. I mean, you're just speculating that. If the student meets the requirements of their degree, they would receive their degree.

BY MR. DOOLITTLE:

Q   Are you familiar with the enrollment admission process?

A   I have familiarity with it.

Q   What's your understanding of the process?

A   Student applies for admission to the university. The enrollment division, the admissions office reviews the materials submitted by the student,

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 43

and they choose to either offer admission or not to a student. And then the student is considered for financial aid, if they applied for such. And the student either accepts their offer to be admitted or they do not.

Q   Do students have to sign any sort of documents once they're admitted?

A   They agree to documents online. So there's an admissions check list and things that they review and complete online. I'm not aware of any actual paper documents.

Q   Do they have to pay any deposit fee or anything like a deposit fee?

A   There is a deposit. There is an enrollment deposit.

Q   How much is the enrollment deposit?

A   I'm not exactly sure what it is at this moment. I think it's $300. It's a few hundreds.

Q   Do you know what happens with that money once it's received from the students?

A   Yes.

Q   What happens to it?

A   It goes into an enrollment deposit account.

Q   Is that an account you oversee?

A   Yes.

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 44

Q   The enrollment deposit account is used for what?

A   The enrollment deposit is provided as a credit to the students once they enroll into RIT.

Q   So if I pay a $300 deposit, once I enroll into the university, I get my $300 back?

A   It gets credited to your account.

Q   Okay. So tell me accounting-wise, how do y'all do that in actuality?

MR. BURNS: Objection.

THE WITNESS: You want the debits and credits or --

BY MR. DOOLITTLE:

Q   Yeah, I'm just trying to understand how it works.

A   If you have a -- if you've paid a deposit, an enrollment deposit, and you then enroll into RIT, we credit that enrollment deposit against your account. So when charges are generated and applied to your account, it offsets against that $300 deposit.

Q   Does the money actually move around from account to account?

A   Nope.

Q   So when the deposit is made, which account does it go into?

M. CONCEPCION - EX. BY MR. DOOLITTLE                              Page 45

A    It goes into a general institute account, bank account, where the cash is kept.

Q    Do y'all kept separate accounts for deposits versus tuition?

A    No.  There is general ledger accounts, balance sheet accounts where things are kept separately.  But the bank account in the bank, the cash is in the same bank account.

Q    Understood.  Thank you for that.

A    Sure.

Q    Are you familiar with any of the marketing materials that is used by RIT to recruit students?

A    I've seen some of our marketing materials.

Q    Which -- what do you have a recollection of seeing?

A    I've seen some of the marketing materials that go to accept the students.  The e-mail they receive when they're been admitted.  And in general, you know, around the university I've seen posters and things like that that are used to market RIT to students.

Q    Have you seen any of those marketing materials describe what students' experience at RIT would be like?

A    I've seen a variety of marketing materials.

M. CONCEPCION - EX. BY MR. DOOLITTLE                              Page 46

Q    Yes, ma'am, I'm aware of that.  Are you aware of any of the ones that you've received and reviewed, do they describe the students' experience at RIT?

A    They talk about RIT and, you know, what their experience might be like at RIT.

Q    Do they describe the facilities that the students have access to at RIT?

MR. BURNS: Objection.

THE WITNESS: I don't recall specifically what's described in the e-mail.  If that's what you're referring to.

BY MR. DOOLITTLE:

Q    So you're not aware of any marketing materials that you've reviewed that describe any of the facilities that students would have access to at RIT?

MR. BURNS: Objection.

THE WITNESS: There are -- in the e-mail that they receive, it talks about, you know, the university and welcoming them to the university.  I don't recall specifically what it states in terms of the facilities.

BY MR. DOOLITTLE:

Q    Do you recall any of the marketing materials describing the services the students would have access to at RIT?

M. CONCEPCION - EX. BY MR. DOOLITTLE                              Page 47

MR. BURNS: Objection.

THE WITNESS: There is a variety of marketing materials with all sorts of different angles and different things.

BY MR. DOOLITTLE:

Q    Yes, ma'am.  I'm aware there's a lot of variety, and I'm just going to keep asking the question.  Are you aware of any of those marketing materials that say anything regarding the services students should have access to at RIT?

MR. BURNS: Objection.

THE WITNESS: They talk about -- some of the marketing materials refer to, you know, the -- just the RIT instruction and access to qualified faculty and the diversity of our population on campus.

BY MR. DOOLITTLE:

Q    Let's stick with just access to qualified faculty.  What do you understand access to qualified faculty to mean?

A    Access to instructors.

Q    Access in person or on the phone?

A    Access to instruction from qualified faculty.

Q    In person?

A    I don't think there's any specific outline of

M. CONCEPCION - EX. BY MR. DOOLITTLE                              Page 48

how that access is.  It's access to instruction and knowledge from renowned faculty members.

Q    And you think students understand that to be online?

A    I don't know what the students understand that to be.

Q    What did you understand it to be when you were a student at RIT?

A    I understood having access to instruction.  Having access to faculty members and instruction at the time.

Q    Yes, ma'am.  Do you think this access was going to be in person or online when you were enrolled?

A    In 1988, that was the only available option.

Q    So again, the question is --

A    That's when I went to school.

Q    Correct.  Thank you.  In 1988 when you went to school, did you understand your education to be in person, over the phone, online, via e-mail, via mail?  What did you understand it to be, Ms. Concepcion?

MR. BURNS: Objection.

THE WITNESS: I understood it to be instruction.  I didn't have any expectations of one versus the other.  That, you know, it didn't really exist at the time.

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 49

BY MR. DOOLITTLE:

Q    Okay.  So in 1988, did you understand that your professors would be sending you a letter, and that's how you would be getting your education?

A    I didn't really have a lot of expectations for how it was going to go.  I was the first person to go to college in my family, and I lived in Puerto Rico my whole life.  So it was my first time in the United States and my first time at a university in the United States.  So to be perfectly honest, I didn't have a lot great deal of expectations.  I was really grateful for the opportunity to come and learn.

Q    So you grew up in what part of Puerto Rico, ma'am?

A    I grew up in Levittown, Puerto Rico.

Q    When you applied to RIT, were you currently living in Puerto Rico?

A    Yes, sir.

Q    After you were accepted by RIT, did you move to the United States?

A    I did.

Q    Why?

A    Because I wanted to receive an education, and wanted to achieve economic mobility for myself and my family.

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 50

Q    And you understood in order to achieve that education, you had to go to classrooms on campus at RIT; is that correct?

A    I didn't --

MR. BURNS:  Objection.

THE WITNESS:  I didn't really have any expectation of what it would be like.  I have never seen anybody in my family go to college.  So I arrived and I took it as it came.

BY MR. DOOLITTLE:

Q    Yes, ma'am.  I'm asking why did you move?  I mean, I'm just trying to understand, Ms. Concepcion, did you not understand that RIT was requiring you to be present in order to take classes when you enrolled?

A    I was admitted to RIT, and I came to RIT to attend RIT.

Q    Correct.  And you attended in person; is that right?

A    I lived on campus.

Q    Did you attend class in person, Ms. Concepcion?

A    I did attend classes in person.

Q    Did you ever think that you would not have to attend classes in person in order to receive your degree?

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 51

A    I don't know what I thought at the time.

Q    So there is some thought, possibly, in your head that there might have been another way for you to obtain your degree in 1988 without actually attending class at RIT?

MR. BURNS:  Objection.

THE WITNESS:  I don't know what I thought at the time.  It was a long time ago, and I really didn't know very much about going to college.  None of my siblings went to college.  My mother didn't go to college.  My father didn't go to college.  None of their siblings went to college.  Nobody in my high school went to the United States for college.  So I arrived and I just really went with it.  I just really did what was needed for me to get my education.

BY MR. DOOLITTLE:

Q    What was needed for you to get your education, Ms. Concepcion?

A    A lot of studying.

Q    Were you -- was needed for your education for you to go to class on campus at RIT?

A    It helped to go to class.

Q    Were you required to go to class?

A    Not all classes require you to go to class.

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 52

Q    Did you have some classes, Ms. Concepcion, during your tenure at RIT and your educational process that required you to be in attendance in order to receive class credit?

A    I don't recall if it was required for my classes.

Q    Do you recall any of your classes taking attendance back when you attended in the '80s?

A    Some classes probably took attendance and some did not.  It's a very long time ago.  So to pretend that I recall exactly what happened in 1988 is probably not accurate.  I have a recollection that some classes took attendance.  If attendance was or was not required, that was a very long time ago.

Q    Do you think students looking at the bulletin today understand that they can take all of their classes remotely to receive a degree?

MR. BURNS:  Objection.  By today, you mean today?

MR. DOOLITTLE:  Yes, March 23rd, 2022.

THE WITNESS:  It would be really hard for me to really speculate what students expect or not expect of what they deduct when they read the bulletin.

BY MR. DOOLITTLE:

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 16 of 30
Nicholas Bergeron and Nick Quattrociocchi Remote Video deposition via Zoom
Rochester Institute of Technology
Milagros Concepcion 30(b)(6)
March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 53

Q   Is it possible for a student to receive a degree from RIT today without attending any classes in person?

A   Anything is possible.

Q   Are you aware of any degrees that allow any student to obtain a degree from RIT without attending physically in-person class at RIT?

MR. BURNS: Objection.

THE WITNESS: I'm not sure.

BY MR. DOOLITTLE:

Q   So you don't know if there are degrees or are not degrees that allow you to take 100 percent remotely in order to get a degree?

A   I'm not -- I'm not sure.  I'm not aware specifically.

Q   Are you familiar with the online classes that are offered by RIT now?

A   I'm familiar that there are online classes.

Q   Are you aware of any degree that allows you to articulate with a degree without doing online classes 100 percent?

A   There are some degrees that you can obtain on line strictly by attending online classes.

Q   Can you tell me which ones you know of?

A   I don't know them off the top of my head.

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 54

Q   In the marketing materials we were talking about, do they describe the recreational facilities, the student health facilities, the library and things of that nature?

A   I don't recall specifically.

Q   What's the purpose of the marketing materials?

A   To generate interest in the students for RIT.

Q   The overall goal is to entice a student to attend RIT versus another school; is that not correct?

A   Yeah, they're intended to market the university.

Q   In order to get students to go to RIT; is that correct?

A   Yeah.

Q   Do the marketing materials depict what the students can expect if they enroll in MIT [sic]?

A   Definitely not MIT.  But the marketing materials talk about, you know, RIT.

Q   Do they depict what a student can expect to receive?

MR. BURNS: Objection.

THE WITNESS: I don't really recall if it has specifically that kind of information.

BY MR. DOOLITTLE:

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 55

Q   Does the bulletin list whether or not classes are offered online or in person?

A   I don't believe it does.  I don't recall.

Q   How would a student find out if a class can be taken online versus in-person?

A   I'm not aware how the students find out.

Q   Do you think the marketing materials influence a student's decision to attend RIT?

A   They're intended to help students choose RIT or to entice them to chose RIT as their university.

Q   Do you think they work?

A   It worked for at least 16,000 of them, so...

Q   Understood.  Do you think it's reasonable for the students to rely on the marketing materials as truthful?

MR. BURNS: Objection.

THE WITNESS: I'm not sure how much stock students place on the marketing materials.  When I went to RIT, I chose RIT for the financial aid that I received.  Every student chooses RIT probably for a different reason.  Some probably rely on the marketing materials, and some probably rely on other factors in their lives.

BY MR. DOOLITTLE:

Q   For the ones that rely on the marketing

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 56

material, do you think it's reasonable for the student to assume that those marketing materials are, in fact, truthful.

MR. BURNS: Objection.

THE WITNESS: I don't know what they think about the marketing materials, what they assume.

BY MR. DOOLITTLE:

Q   I'm not asking you what they believe.  I'm asking whether or not you think it's reasonable for a student to think that the marketing materials that they have reviewed are, in fact, truthful?

MR. BURNS: Objection.

THE WITNESS: I don't know what they think about the marketing materials.

BY MR. DOOLITTLE:

Q   Ms. Concepcion, do you think it would be reasonable for RIT to market a facility that they do not have in their marketing materials in order to entice a student to attend?

A   I'm not aware that we market a facility we don't have.

Q   Yes, ma'am.  I'm asking you, do you think it would be unreasonable for the university to market to the students a facility that they actually don't have?

A   Anyone who markets something they don't have

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 17 of 30
Nicholas Bergeron and Nick Quattrociocchi—Remote Video deposition via Zoom    Milagros Concepcion 30(b)(6)
Rochester Institute of Technology    March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 57

and say they have it, that would not be accurate marketing.

Q   Not be honest, right?

A   It wouldn't be accurate.

Q   Okay.  Accurate, how is that -- so if the university -- if RIT markets to students that they have the largest aquarium in the entire world and that's just a blatant lie, do you think that that's a reasonable thing for the university to do?

A   It would not be an accurate thing.  It would be inaccurate.

Q   Yes, ma'am.  You think it would be a lie?

A   It would not be accurate because we don't have it.

Q   An aquarium.  So that would be a lie, correct?

A   It would be inaccurate.

Q   What's the difference between inaccurate and a lie?

A   A lie has the intent to deceit.  And I'm not sure that I would state an intent to deceit, unless I really understood that that's what someone did.  So an inaccurate statement and a lie are very different.

Q   Why so?

A   I just explained it to you.  Because --

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 58

Q   Do you think it's --

A   -- a lie is intentionally trying to deceive someone.  An inaccurate statement can be made if someone simply did not have accurate information for whatever reason.

Q   Does the university in their marketing materials publish inaccurate statements?

A   I'm not aware.  I have not reviewed every statement and evaluated for accuracy, but I am not aware of any inaccurate statements based on what I've reviewed.

Q   So in all the materials you've reviewed, you have not found any inaccuracies?

MR. BURNS: Objection.

THE WITNESS: I have not made that evaluation of every statement to determine if it's accurate or inaccurate.

BY MR. DOOLITTLE:

Q   So of the materials that you reviewed, did you run across any statements that you thought, wow, that's inaccurate, that's not correct?

A   Not that I recall.

Q   Do you think it's reasonable for the students to rely on the marketing materials as being accurate?

MR. BURNS: Objection.

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 59

THE WITNESS: I think it's reasonable for the students to use the marketing materials in making their decisions about where they want to go to school.

BY MR. DOOLITTLE:

Q   Do you think it's reasonable for the students to rely on those marketing materials?

MR. BURNS: Objection.

THE WITNESS: It's reasonable that they would look at the materials and it would be a factor in their decision.

BY MR. DOOLITTLE:

Q   Do you think it is unreasonable for a student to rely on those materials?

MR. BURNS: Objection.

THE WITNESS: I think that's the same question.

BY MR. DOOLITTLE:

Q   Yeah, I'm just trying to get an answer.

A   It's reasonable for them to use the marketing materials as a factor in their decision-making process.

Q   Is it also reasonable for them to rely upon them?

MR. BURNS: Objection.

THE WITNESS: It's reasonable for them to

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 60

use the marketing materials as part of their decision-making process.

BY MR. DOOLITTLE:

Q   Yes, ma'am.  And I'm asking you, is it reasonable for them to rely upon those marketing materials in order to make their decision process?  And you keep --

MR. BURNS: Objection.

BY MR. DOOLITTLE:

Q   -- cannot not rely on your answer.  And I'm just trying to ask, is there any particular reason they may not fully rely?

MR. BURNS: Objection.

THE WITNESS: I don't know what the students are relying or not relying on.  It's reasonable for them to use the materials as part of their decision-making process.  What every student relies on to choose to come to RIT is individual to them, and I can't really speculate on, you know, the weight that they put on the materials versus not.

BY MR. DOOLITTLE:

Q   Yes, ma'am.  And if a student said that I, in fact, relied upon the marketing materials, do you think that that would be a reasonable reliance on behalf of the student?

M. CONCEPCION - EX. BY MR. DOOLITTLE   Page 61

MR. BURNS: Objection.

THE WITNESS: It's what they said.

BY MR. DOOLITTLE:

Q   Yes, ma'am.  I'm asking, do you think it would be a reasonable position for the student to say, I'm relying upon the marketing materials?

A   It's their position.  I can't opine on what their position is or isn't.

Q   So you don't have any opinion whether or not you think it would be reasonable or unreasonable for a person to rely on the university's marketing materials?

MR. BURNS: Objection.

THE WITNESS: I think it's responsible to think that the students use the marketing materials as part of their decision-making process to come to the university.

BY MR. DOOLITTLE:

Q   If a student is using those marketing materials, then they should be able to use truthful statements from the university; is that true?

A   What's the question again?

Q   If the students are going to rely on the marketing materials, do you think it would be reasonable for the student to understand and assume that those marketing materials were, in fact, truthful?

M. CONCEPCION - EX. BY MR. DOOLITTLE   Page 62

MR. BURNS: Objection.

THE WITNESS: Marketing materials have information about the university.  I am not aware of anything in those materials that is not accurate.

BY MR. DOOLITTLE:

Q   Yes, ma'am.  My question is, do you think it would be reasonable for a student to assume that the marketing materials were, in fact, accurate and truthful?

MR. BURNS: Objection.

THE WITNESS: I mean, I don't know what each individual student assumes the marketing materials to be or if the information as portrayed in the marketing materials is the exact as depicted, you know.  I just really can't opine on what someone thinks of the marketing materials when they receive them and what they interpret that information to mean, but it probably varies across all of the students.  That's why your question is very difficult to answer, from my perspective.  Because, you know, you're asking me to really interpret what 16,000 students think when they see an image or they read a statement.  And I just can't.

BY MR. DOOLITTLE:

Q   No, ma'am, I'm asking you to -- if they read

M. CONCEPCION - EX. BY MR. DOOLITTLE   Page 63

a statement that's within the marketing materials, is it reasonable for them to assume that that statement is, in fact, truthful?

A   I mean, they're reading the statement.  What they understand the statement to be can be very varied and can be very different.

Q   I'm only --

A   I don't know.

Q   I'm only asking whether or not they understand the statement to be truthful.  I mean, there can only be two variants there.  They can either think the university lied to them in the marketing materials or they think they're providing truthful and accurate material.  I'm asking you, is it reasonable for them to assume that what they read -- it's published by the university, is it reasonable for them to assume it's truthful?

MR. BURNS: Objection.

THE WITNESS: It's reasonable for them to think it's accurate.

May I have a bathroom break, please?

MR. DOOLITTLE: Sure.

THE VIDEOGRAPHER: Off the record 11:58 a.m.

(A recess transpired.)

M. CONCEPCION - EX. BY MR. DOOLITTLE   Page 64

THE VIDEOGRAPHER: Back on the record 12:10 p.m.

BY MR. DOOLITTLE:

Q   Ms. Concepcion, once a student accepts RIT's offer of admission, do you believe a student has any duties to RIT?

A   I'm sorry, can you repeat that last part.  I didn't catch the last part of it.

Q   Sure.  Once a student accepts RIT's offer of admission, do you believe there's any -- do you believe the students owe RIT any duty whatsoever?

MR. BURNS: Objection.

THE WITNESS: Once the students are admitted to RIT, there are fees to go to RIT, so those are owed.

BY MR. DOOLITTLE:

Q   So the student would have a duty to pay those fees once they enrolled in RIT and was accepted; is that correct?

A   Yes.

Q   Can you think of any other duties a student might have to RIT once accepted for enrollment?

MR. BURNS: Objection.

THE WITNESS: There are duties as a citizen of the RIT community to be --

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 65

BY MR. DOOLITTLE:

Q   Can you explain what you mean by --

A   -- things like that.

Q   I'm sorry, I spoke when you were talking.  I apologize.

A   There is a code of conduct, so you have a responsibility to be respectful of others and things like that.  I think of those as, you know, responsibilities.  So all of us as RIT community members.

Q   Understood.  Do you think that RIT owes any duties to the students once a student has been accepted?

MR. BURNS: Objection.

THE WITNESS: RIT is providing instruction, and if the student resides on campus, then they are residing there and receiving housing or accommodations.  And if they're eating on campus, then, you know, they're receiving food.  So...

BY MR. DOOLITTLE:

Q   All right.  So if the student pays the housing fee, then RIT would have a duty to provide the housing for the fee that was paid; is that correct?

MR. BURNS: Objection.

THE WITNESS: If the student selected to

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 66

live on campus and pay their housing fee, then housing would be provided to the student.

BY MR. DOOLITTLE:

Q   And that would be a duty that RIT would have once the housing fee is paid; is that correct?

MR. BURNS: Objection.

THE WITNESS: Once the housing fee is paid, then RIT would provide housing based on that to the student.

BY MR. DOOLITTLE:

Q   Right.  And they would do that because they would owe the student that promise that they had made when they paid the housing fee; is that correct?

MR. BURNS: Objection.

THE WITNESS: They would provide that to the student because they paid for that service.  They paid for housing and they would receive housing.

BY MR. DOOLITTLE:

Q   Right.  And if they paid for housing and didn't receive housing, that would be not correct for the university to do; is that correct?

A   If the student paid for housing, they would receive housing.

Q   If the student paid for housing and did not receive housing, would the university be wrong in that

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 67

situation?

MR. BURNS: Objection.

THE WITNESS: I can't foresee any situation in which that would occur.  If I went to the cafeteria and paid for lunch, I would receive my lunch.

BY MR. DOOLITTLE:

Q   Right.  So if a student paid for housing and then did not receive housing, would that be wrong for the university to do?

MR. BURNS: Objection.

THE WITNESS: I'm not aware that that's ever happened.

BY MR. DOOLITTLE:

Q   Yes, ma'am, and I'm not asking you if you're aware of it ever happening.  I'm asking you if it did happen tomorrow, would that be wrong for the university to do --

MR. BURNS: Objection.

BY MR. DOOLITTLE:

Q   -- to take a student's money for housing and not provide housing?

MR. BURNS: Objection.

THE WITNESS: I mean, you're asking me to speculate on something that hasn't happened.  It's

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 68

really a far-fetched speculation.  If the student paid for housing, they would receive housing.

BY MR. DOOLITTLE:

Q   Yes, ma'am.  Would it be wrong for the university to deny housing to a student that had paid for housing?

MR. BURNS: Objection.

THE WITNESS: If the student paid for housing, they would receive housing accommodations so they could reside based on their payment for housing.

BY MR. DOOLITTLE:

Q   Yes, ma'am.  Would it be wrong for the student -- for the university to not provide the housing that the student had paid for?

MR. BURNS: Objection.

THE WITNESS: If the student paid for housing, they would receive housing.

BY MR. DOOLITTLE:

Q   And if the university did not provide that housing, then it would be wrong for the university to do; is that correct?

MR. BURNS: Objection.

THE WITNESS: If a student paid for housing, they would receive housing.

BY MR. DOOLITTLE:

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 69

Q   Yes, ma'am.  Under my hypothetical, if the student paid for housing and did not receive housing and did not receive a refund of housing from the university, would that be wrong for the university to do?

MR. BURNS: Objection.

THE WITNESS: It's your hypothetical.  In your hypothetical, it didn't happen.  I mean, you're asking me to answer to something that didn't occur.

BY MR. DOOLITTLE:

Q   I'm asking you to answer to something that might possibly occur; and if it did occur, would it be incorrect or correct for the university to do it?  It's a simple matter of that.

MR. BURNS: Objection.

BY MR. DOOLITTLE:

Q   If the university accepted the money for the housing and did not refund the housing and did not provide housing, do you think the university would be correct in doing such?

MR. BURNS: Objection.

THE WITNESS: If the student paid for housing, they would receive housing.

BY MR. DOOLITTLE:

Q   That's not my question.  My question was, if

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 70

they did not receive housing, would that be wrong for the university to do?

MR. BURNS: Objection.

THE WITNESS: I can't speculate on something that hasn't happened and I don't know the probability of it happening, so.  If the university [sic] paid for housing, they would receive housing, a housing accommodation.  I'm not aware of any instance where that has not occurred, nor can I speculate if that is going to occur or the probability of that occurring.

BY MR. DOOLITTLE:

Q   When you came from Puerto Rico, did you pay for housing at RIT, ma'am?

A   I did pay for housing.

Q   If when you showed up they told you that there was no housing for you and you don't get any refund, do you think the university would have been correct in doing such?

A   That did not occur.  I received housing.

Q   If, in fact, you did not receive housing, ma'am, would that have been wrong for the university to not refund your money?

MR. BURNS: Objection.

THE WITNESS: I received housing when I

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 71

arrived on campus, which I paid for and I lived there.

BY MR. DOOLITTLE:

Q   That's not my question.  That's not my question, ma'am.  My question is very simple.  If you paid for the housing and you didn't get the housing, would the university be right in keeping the money or should they give your money back?

MR. BURNS: Objection.

THE WITNESS: Your question is based on a speculation that did not occur.  I'm answering your question based on what did actually, factually happen.  I paid for housing, I received housing and I resided there.

BY MR. DOOLITTLE:

Q   Yes, ma'am.  You're required to answer my question.  If you're not going to answer my question, then you just say, I'm not answering it.  I mean, I'm asking you in a hypothetical situation in your particular situation, if you arrive from Puerto Rico and they did not provide you housing and did not provide you a refund, would you think that that would be a good thing for the university to do?

MR. BURNS: The witness has answered the question as well as she can as many times as you've

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 72

asked it.  Objection.  Answer it again.

MR. DOOLITTLE: She hasn't answered the question.

BY MR. DOOLITTLE:

Q   Go ahead, ma'am.

A   I paid for housing, I received housing and I resided there.  So I can't speculate on something that did not happen.  Nor do I have the opportunity to think what if that didn't happen 20-some years ago.  It did happen as expected.  And that's to the extent that I can answer your question.

Q   Have you ever rented an apartment before?

A   I have rented an apartment before.

Q   If you paid your deposit and you paid your monthly rent and they didn't give you access to the apartment, do you think that that would be correct on the apartment owner?

MR. BURNS: Objection.

THE WITNESS: That has never happened to me.  I rented the apartment.  I paid my deposit and I resided in the apartment.

BY MR. DOOLITTLE:

Q   Yes, ma'am.  I'm asking you if a person -- let's take it outside of your context maybe.  If a person pays a deposit, pays for the rent, and the

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 73

person does not provide the housing, do you think that would be the correct thing to do?

A   I'm not aware of any situation as such.

Q   I'm not asking if you're aware of one, ma'am. I'm asking if you think it would be right or wrong?

MR. BURNS: Objection.

THE WITNESS: I'm not aware of the specific circumstances in which that would transpire, so I'm unable to answer that.

BY MR. DOOLITTLE:

Q   If you pay for a service and you don't receive that service, do you think that the person that you paid would be incorrect for holding your money?

MR. BURNS: Objection.

THE WITNESS: I mean, if you want to go back to the example of housing, I mean, I paid for housing. I received housing. In my experience, I've paid for a service and received that service.

BY MR. DOOLITTLE:

Q   Let's go to the students spring of 2020. They paid for housing. Is that fair, yes or no?

A   Some did.

Q   Let's take a student that paid for housing --

A   Yes.

Q   -- in the spring of 2020. Did they receive

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 74

housing for the entire time that they paid for spring of 2020 housing?

A   They receive housing when they arrived, and there was a time where they moved out of housing in the spring of 2020.

Q   Did they get any refunds for the portion of the time that they were not in the housing?

A   They received a refund.

Q   Okay. Why was that?

A   They were no longer residing there in the RIT-provided housing.

Q   You think it would be have been okay if RIT just kept their housing money and didn't give them any refund whatsoever?

MR. BURNS: Objection.

THE WITNESS: That's not what occurred.

BY MR. DOOLITTLE:

Q   I'm not asking you --

A   They received a refund.

Q   I'm asking you, would it have been reasonable for RIT to refuse a refund?

MR. BURNS: Objection.

THE WITNESS: But that didn't occur. It's very hard to really answer a question about something that didn't happen, because it didn't happen, and

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 75

you're asking me to have an opinion about an event that did not occur.

BY MR. DOOLITTLE:

Q   Yes, ma'am. That's exactly what I'm asking you to do.

A   Yeah.

Q   I'm asking you to say whether or not that would be wrong to not issue a refund if the housing wasn't provided?

MR. BURNS: Objection.

THE WITNESS: The event didn't occur, so I'm unable to really answer your question.

BY MR. DOOLITTLE:

Q   So you're unable to answer any hypothetical question from anything that didn't actually occur?

MR. BURNS: No, the witness is unable to give you the legal conclusion that you're asking her for and you've been asking for, for the last 20 minutes.

MR. DOOLITTLE: Noted.

BY MR. DOOLITTLE:

Q   So, again, ma'am, do you think that there's any answer to a question in the hypothetical that you can provide, or do you have to have it actually occur in order for you to answer it?

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 76

MR. BURNS: Objection.

THE WITNESS: I'm here to answer actual, factual questions to the best of my ability, and I am doing my very best to understand your question and factually respond to it. If something did not occur, it is difficult for me to really ascertain the probability of that occurring or not occurring. And if it is likely that it would have occurred, would something be my view or not view, and would that view represent that of 16,000 students. So that is -- that is a stretch.

BY MR. DOOLITTLE:

Q   Are you unable to answer hypothetical questions, ma'am?

A   Hypothetical questions? I'm able to answer factual questions or questions about facts and things that happened. So when you ask me a question, you know, if you pay for housing and you receive -- would you receive housing, and I said yes, that would be the expectation, then I responded to that question. Speculative questions are very difficult because they never happened. So you're asking me to imagine that they did happen.

BY MR. DOOLITTLE:

Q   Exactly, that's the nature of a hypothetical;

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 22 of 30
Nicholas Bergeron and Nick Quattrociocchi Remote Video deposition via Zoom    Milagros Concepcion 30(b)(6)
Rochester Institute of Technology    March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 77

is it not, Ms. Concepcion?

A   I can answer questions about things that occurred.  I can't speculate if something might have happened, could have happened, because you do understand that that can run a gamut, right, so everything that happened is, you know, finite.  Everything that could have happened is endless.  The possibilities of what could have or could not have happened are really very, very varied.  So it is kind of hard to really answer with precision a question of something that did not occur or that might have occurred, because the possibility of what might occur is really a very long list.

BY MR. DOOLITTLE:

Q   Do you understand what a hypothetical question is?

A   I do.

Q   How would you define a hypothetical question, Ms. Concepcion?

A   A hypothetical question is if something happened, what might or might not have been the outcome of that happening.

Q   Do you not understand a hypothetical question on the premises itself upon things that did not happen?

A   I don't understand your question.  Do you

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 78

believe I don't understand what a hypothetical question is?

Q   I'm just trying to understand what a hypothetical question is in your mind, ma'am.  I'm not trying to make you feel bad or anything at all, I'm just trying to make sure --

A   Oh, you're not making me feel bad.  You're not making me feel bad at all.  I do know what a hypothesis is.  I do know what a hypothetical question is.  Just because I'm not answering your hypothetical question, it doesn't mean that I don't understand what a hypothetical question is.

Q   But you agree with me you're not answering my hypothetical question?

MR. BURNS: Objection.

THE WITNESS: I can't opine on something that didn't occur or answer a question of something that didn't occur.

BY MR. DOOLITTLE:

Q   So if I ask you a hypothetical question about something that did not occur, you won't answer it?

MR. BURNS: Objection.

THE WITNESS: I will give you the best factual answer.

BY MR. DOOLITTLE:

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 79

Q   Is a factual answer going to assume a hypothetical, or is it going to lower the parameters of the hypothetical question?

A   I don't know.

MR. BURNS: Objection.

BY MR. DOOLITTLE:

Q   Do you think it's reasonable for students to expect to receive what they pay for?

A   It's reasonable for students to receive what they pay for.

Q   Thank you.  Do you think the students paid for in-person classes?

A   The students paid for instruction.

Q   Yes, ma'am.  Do you think the students paid for in-person instruction?

A   The students paid for instruction.  The modality of the instruction can vary, as we have -- as we saw.

Q   Yes, ma'am.  Prior to the spring of 2020, do you think the students expected that their classes would be online?

A   The students expected to receive instruction.  Classes are sometimes in person and sometimes online.

Q   Are you purporting to say what the 16,000 students understood they would receive, or you are

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 80

saying that that's what you understood?  I'm just trying to understand what you're saying.

A   I can't testify for what 16,000 students think.  I'm just stating the facts that some classes are in person and some classes are online.

Q   And how do you find out which classes are in person and which classes are online?

A   I'm not familiar with the places exactly where they find out where those are.  When I went to school, I -- when I enrolled in a class, the very old-fashioned way, I did take some classes that were online, particularly in my master's degree program.

Q   Is there a price difference for taking online and in-person classes prior to the spring of 2020?

A   There is -- the classes that are offered through -- that are solely for online programs, there is a pricing differential.  There are courses that are offered online and in person, and there's no price differential for those.

Q   So there are classes that are offered online and in person, and there's no price difference between the two?

A   Correct.

Q   Which courses?

A   I can only speak to -- I took a course when I

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 23 of 30
Nicholas Bergeron and Nick Quattrociocchi/Remote Video deposition via Zoom    Milagros Concepcion 30(b)(6)
Rochester Institute of Technology    March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 81

was in graduate school, and that course happened to be online for that particular -- the term that I took the class, it was offered online, and that class was offered in person during other terms.

Q   That was in the late '80s and early '90s?

A   No, I went for my graduate degree later than that.

Q   What year are we talking?

A   2000s.

Q   Okay.

A   Yeah.

Q   Are you aware whether or not there's a price difference between online and in-person classes as of the fall of 2019?

A   If you are registered as an online student, there is a pricing differential versus if you are registered as not an online student.

Q   And is it cheaper to attend as an online student versus in person?

A   It's not necessarily cheaper.  So because students who are not part of the online program receive significant financial aid from the university.  So it varies per student, and it might be the case that a student enrolled on our traditional offering would be paying a lower price than a student that is enrolling

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 82

strictly in an online degree program.

Q   Say that for me again.

A   A student who is enrolled in the RIT traditional offering versus a student that is enrolled in the RIT online degree program, one of the handful of online degree programs, may actually pay less because of the financial aid package that they receive.

Q   Right.  They pay less, you're talking about the net out of their pocket, correct?

A   So therefore, you know, you can't really ascertain that one is cheaper than the other, because every student's situation is different and it could be that someone is actually paying less because of the financial aid that they received.

Q   The charge to the student doesn't depend on the financial aid received; is that correct?

A   Are you referring --

MR. BURNS: Objection.

THE WITNESS: Are you referring to the sticker price?

BY MR. DOOLITTLE:

Q   You know, I don't know what a sticker price is, ma'am.  What do you mean by sticker price?

A   The price to attend the university prior to any financial aid being applied or scholarships.

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 83

Q   Yes, ma'am, that's what I'm asking, the sticker price, I guess.

A   Okay.  So the sticker --

Q   Sticker price for online education is cheaper than it is for in-person; is that fair?

A   The sticker price for a strictly online degree is less than the sticker price for if you have -- you know, enroll in a traditional degree, but that doesn't translate in what the student will eventually pay.

MR. DOOLITTLE: Madam Court Reporter, can you pull up Exhibits RIT online 2019-2020 first?

THE VIDEOGRAPHER: Mr. Doolittle, if it's okay, I will go ahead and pull it up.  Can you repeat which one you need?

MR. DOOLITTLE: Absolutely.  It says -- I believe it's titled RIT online 2019 dash 2020.

THE VIDEOGRAPHER: Student financial services?  After that?  Let me see.  Make sure I have the right one here.

MR. DOOLITTLE: Yes, at the top of it, RIT online at the top, student financial services, then it's a big blackish square that says --

THE VIDEOGRAPHER: Okay.

MR. DOOLITTLE: That's it.

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 84

THE VIDEOGRAPHER: Can everyone see this?

MR. DOOLITTLE: Can you see that, Ms. Concepcion?

THE WITNESS: Yes.

MR. DOOLITTLE: Okay.  And is that the RIT online -- can we scroll up or shrink it maybe so we can see the whole thing?

THE VIDEOGRAPHER: Yes, sir.  Stand by.

BY MR. DOOLITTLE:

Q   Are you familiar with this document, Ms. Concepcion?

A   I've seen this website before.

Q   Okay.  And --

A   I'm sorry, can you make it just a tad bigger?

THE VIDEOGRAPHER: Yes, ma'am, stand by.

THE WITNESS: Thank you.

Okay.

BY MR. DOOLITTLE:

Q   And whenever we're looking at these documents, I apologize, do feel free to tell them whatever size you need to do or scroll up or scroll down to make sure you can see, whatever you need to see.

So my question for you on this document is, this is the tuition charge, so I guess the sticker

Nicholas Bergeron and Nick Quattrociocchi, etc.
Rochester Institute of Technology
Remote Video deposition via Zoom
Milagros Concepcion 30(b)(6)
March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 85

price, as you referred to it, I believe, if I'm correct, would be for online -- 2019-2020 undergraduate RIT online is $1,034 per credit hour; is that correct?

A    Yes, that's what it says.

Q    You don't have any reason to dispute that; do you?

A    No.

Q    Okay.

MR. DOOLITTLE: Can you pull up the document, Mr. Court Reporter, RIT undergraduate 2019-2020 enrolled.

THE VIDEOGRAPHER: Is this correct?

MR. DOOLITTLE: Yes, sir.

BY MR. DOOLITTLE:

Q    And if you can scroll to the bottom of that one, Ms. Concepcion, I'm looking at the part here that reads:  Students enrolled in more than 18 credit hours are charged $1,131 for each additional credit hour; is that correct?

A    Yes.

Q    And this is for full-time on-campus students; is that correct?

A    Traditional, yeah.

Q    Okay.  Do know how a student would choose to select to be online or in person?

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 86

MR. BURNS: Objection.

THE WITNESS: What do you mean by how they would choose?

BY MR. DOOLITTLE:

Q    I mean how they go about the process of enrolling online versus in-person.

A    It depends on what -- it depends on what degree you choose.  So there is a handful of degrees -- probably ten or 12 -- that are offered strictly online.  They're online degrees.  They're approved by New York state to be online degrees.  And if you choose to enroll in one of those degrees, then you're limited to how many classes you can take in person.  So you're required to complete your degree requirements online through online courses.

Q    And you pointed out that the online degrees were approved by New York; is that correct?

A    All our degrees have to be approved by New York state.

Q    When you say approved by New York state, what -- I don't know what you mean by that.

A    The New York State Department of Education approves our degree, our credit-bearing degree offerings.

Q    Okay.  And they have to approve online versus

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 87

in-person differently?

A    I'm not familiar with the process of how they approve the degrees and if it's the same or different.

Q    Do you know whether or not New York state approved the remote classes the students received in the spring of 2020?

MR. BURNS: Objection.

THE WITNESS: I'm not aware there was any approval or request for approval.

BY MR. DOOLITTLE:

Q    So you're not aware that they requested approval for the in-person classes to be taught remotely?

A    I'm not aware of any kind of the process if there was or wasn't a process of interacting.  I am only aware of the New York state on pause order that prohibited congregation of individuals.

Q    Who's the person who handles the accreditation with New York State?

A    I'm not familiar who specifically is responsible for the accreditation process.

Q    How many students were enrolled for traditional on-campus at RIT in the spring of 2020 semester?  I believe about --

COURT REPORTER: I'm sorry, Mr. Doolittle,

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 88

can you repeat your question?

MR. DOOLITTLE: Yes, ma'am.  I apologize.

BY MR. DOOLITTLE:

Q    How many students were enrolled for traditional on-campus education at RIT for the spring of 2020 semester?

MR. BURNS: I'll object to that question too.

THE WITNESS: I recall in one of the exhibits, it was about 12,000.

BY MR. DOOLITTLE:

Q    Do you know how many of those students paid tuition and fees?

A    I do not.

Q    Is it safe to assume that all the students that were participating in the class had paid their tuition and fees?

A    No, sir.

Q    It's not?

A    It is not.

Q    Okay.  Why is that?

A    Because some students do not pay their tuition and fees.

Q    Is that because of financial aid, ma'am?

A    No, it's simply because they do not pay their

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 89

tuition and fees.

Q    So if a student doesn't pay tuition and fees, RIT allows them to continue to come to classes and take classes and go to the health center and physical ed center?

A    They are prevented from enrolling the following semester.  So if a student does not pay tuition and fees in the current semester and their account goes on hold, they are prevented from enrolling in a future semester.

Q    Do they get credit for the classes that they took but did not pay for?

A    They can complete that semester and they receive grades for those courses.

Q    So they would be able to get a transcript that says they completed those classes satisfactorily from RIT despite the fact they didn't pay for them; is that right?

A    They are unable to get a transcript.

Q    Okay.  If they're unable to get a transcript, then what effect does that have for a student?  If they're unable to get a transcript, then it's not -- did it, in fact, happen?

A    Well, if they pay their student account balance, then they will get their trans- -- they would

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 90

get a transcript at any time in the future.

Q    Okay.  So the student who doesn't pay for tuition and fees can keep going for the rest of the semester but they won't get any credit for the classes they do until they pay the fees; is that correct?

A    They do receive their credits and their grades.

Q    But how do they get proof that they received their credit and grades?

A    When they pay their balance, they can request a transcript.

Q    Right.  But if they don't pay the balance, then they don't get the credits; is that correct?

A    They are -- they do have the credit, it's in their account.  If they pay the balance ten years from now, that grade is there, it's recorded.

Q    But until they pay the balance, they don't have any way to prove that they have the credit; is that fair?

A    The fact that they didn't have any way to prove it does not mean they did not receive the credit.  They received the credit and the grade, and it's recorded in their student record.

Q    Yes, ma'am.  What I'm asking you is, they don't have any way to show that that grade was, in

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 91

fact, received; is that correct?

A    They cannot receive a transcript.

Q    Is there another way for a student to prove that they actually, in fact, received a course credit other than a transcript?

A    They might have received an e-mail indicating what the grade was in the class.  If they printed that, they could probably show that they completed that course.

THE VIDEOGRAPHER: Mr. Doolittle, are you still reviewing this document or would you like it down?

MR. DOOLITTLE: Sorry.  Thanks.  You can take that down.

THE VIDEOGRAPHER: Yes, sir.

MR. BURNS: What are you thinking, Paul, in terms of lunch break?

MR. DOOLITTLE: I'm hungry is what I'm thinking.

MR. BURNS: Do you want to call it now, Milagros, or --

MR. DOOLITTLE: Now is fine.

THE WITNESS: That's fine.

MR. DOOLITTLE: Ms. Concepcion is probably hungry too; aren't you?  We can do lunch now.  How

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 92

long you want to take, Robert?

MR. BURNS: Up to you, Milagros.  Half hour or 45 minutes?  What -- you make the call.

THE WITNESS: Yeah, half hour is fine.

MR. DOOLITTLE: Okay.  That's great.  Thank you.

THE VIDEOGRAPHER: Off the record 12:44 p.m.

(A recess transpired.)

THE VIDEOGRAPHER: Back on the record 1:18 p.m.

MR. DOOLITTLE: Let me start by making sure I clean up the record.  I don't think I marked either one of the exhibits that we've talked about.  So if we can mark the one that we first talked about, which was the RIT online, as Plaintiff's Exhibit Number 1.  And the RIT undergraduate, the one we talked about next, as Plaintiff's Number 2.

(WHEREUPON, Plaintiff's Exhibit Nos. 1 and 2 were marked for identification only.)

MR. DOOLITTLE: And do either one of you, Mr. and Mrs. Court Reporter, have the deposition exhibit notice -- excuse me, the deposition notice?

THE VIDEOGRAPHER: Let's see.

COURT REPORTER: I do.

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 26 of 30
Nicholas Bergeron and Nick Quattrociocchi  Remote Video deposition via Zoom      Milagros Concepcion 30(b)(6)
Rochester Institute of Technology                                                March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 93

THE VIDEOGRAPHER: Do you want to pull it up?

MR. DOOLITTLE: I was just about to ask you, do you have a copy of it, Mr. Videographer?

THE VIDEOGRAPHER: Yes, sir, I do.

MR. DOOLITTLE: We can mark that as Number 3 and we'll read that next.

(WHEREUPON, Plaintiff's Exhibit No. 3 was marked for identification only.)

THE VIDEOGRAPHER: Okay.  Let me make sure it's the right one here as I pull it up, though. Stand by.  And...

MR. DOOLITTLE: That's the correct one.

BY MR. DOOLITTLE:

Q   Ms. Concepcion, I hope you had a good lunch. Concepcion, pardon me.

Are you familiar with the exhibit we're showing on the screen now which has now been marked as Plaintiff's Exhibit Number 3 which is the 30(b)(6) deposition notice?

A   I am familiar with that document.

Q   Okay.  Do you recall this one in particular dated January 11th?

A   Can you scroll down a little bit.

Q   Sure.

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 94

THE VIDEOGRAPHER: Yes, ma'am.  How far? About there?

THE WITNESS: Just keep going.  Is this the original document, or is this the one that contains the objections from RIT counsel?

MR. DOOLITTLE: This is the original one.

THE WITNESS: Okay.

BY MR. DOOLITTLE:

Q   That is the original one dated -- yes, ma'am, it's the original one dated January 11th.  And what I was going to do is go through this document to see which one of these topics you are prepared to talk about.  So if we can take the first one, number one, defendant's investigation into the claims remaining in the plaintiff's complaint and any subsequent pleading. Are you able to testify about those today?

MR. BURNS: She is not.

MR. DOOLITTLE: Okay.  Robert, is it easier for you to tell me which one she is instead of me going through?

MR. BURNS: Well, I mean, it's pretty -- we can do that, it's going to take awhile, because there are so many topics and we can -- I mean, it was all set out in our objections dated January 10th, 2022, as modified by our later dated March 8th, 2022.  It's

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 95

all there in black and white.  I don't know how it advances the ball to go through one by one for me to just read our objection into the record.  I'm happy to do it if you want to take the time to do it, but --

MR. DOOLITTLE: I don't have yours, and that's why -- I don't have it in front of me.  And I'm just trying to figure out which ones she's here to talk about.  You know which ones it is, so we can do it that way.

MR. BURNS: Well, it's many of them as limited by our objections.  I mean, she's here to testify to a number of these subject to what we stated that RIT was willing to produce testimony on for this 30(b)(6) deposition.

MR. DOOLITTLE: Okay.  I'll just go one by one, then, if we can.

MR. BURNS: Okay.

BY MR. DOOLITTLE:

Q   So, Ms. Concepcion, you're not here for number one.  Is that fair?

MR. BURNS: That's correct.  I'll testify for her if that's what we're doing.

MR. DOOLITTLE: Sure.  Number two?

MR. BURNS: She is here to testify to, and

M. CONCEPCION - EX. BY MR. DOOLITTLE                    Page 96

I'll read it.  Quote, RIT will produce a witness to testify only concerning which RIT administrators were involved in the decision not to issue tuition and fee refunds after the transition to distance learning during the spring 2020 semester, which RIT departments have responsibility for drafting RIT's academic bulletin, student financial responsibility agreement, and marketing communications in which RIT administrators were involved in compiling the data RIT produced concerning its enrollment numbers and tuition and fees collected for the spring 2020 semester.

MR. DOOLITTLE: She's here to testify about number four, all contracts and agreements relating between defendant and plaintiff?

MR. BURNS: She's here to testify, as we stated in our objections.  RIT will produce a witness to testify concerning only Plaintiff Bergeron student financial responsibility agreement covering the spring 2020 semester.

MR. DOOLITTLE: How about number six?

THE WITNESS: Pursuant to our objection, she is here to testify concerning only the number of requests it received for tuition and fee refunds by students made during the spring 2020 semester in

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 27 of 30
Nicholas Bergeron and Nick Quattrociocchi v.    Remote Video deposition via Zoom    Milagros Concepcion 30(b)(6)
Rochester Institute of Technology                                                  March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 97

response to RIT's transition to distance learning.

MR. DOOLITTLE: Okay. Is she here to testify about number 18?

MR. BURNS: Pursuant to our objections, she is here to testify concerning the deposition topic 18 only as it relates to the spring 2020 semester.

MR. DOOLITTLE: Is she here to talk about number 20?

MR. BURNS: Pursuant to our objections as modified by our March 8, 2020, letter following the meet-and-confers that we had with your colleagues regarding the 30(b)(6) objections, she is here to testify concerning RIT's receipt and use of CARES Act funding as it relates to spring 2020 semester and the students impacted by RIT's transition to distance learning during the spring 2020 semester.

BY MR. DOOLITTLE:

Q   Ms. Concepcion, how does RIT collect fee payments from students?

A   How does RIT collect tuition and fees? Is that what you said? I'm sorry, I didn't catch the end of your question.

Q   I was just talking about fees to begin with.

A   Oh.

Q   How does RIT collect fee payments from

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 98

students?

A   So fees, university assessed fees are collected via the student account. So they're added to the student account and collected through the student financial services office.

Q   And you're in charge of the student financial services office or does it not fall under you? I can't remember.

A   I oversee the student financial services office in my controller role, yes.

Q   Okay. So the fees that are received, are they all received via online or does anybody ever send checks, or how does it work?

A   There is a variety of ways. So students bring cash to our office. They can also mail checks. We also provide credit card, ability for customers to pay via credit card or ACH.

Q   Which one do most people do? Is there a preference you think that you see?

A   I don't know off the top of my head. I think probably credit card and ACH. Not as many cash or check lately, you know.

Q   Right. That was just a side question. I was only curious. Thank you.

Do they receive an actual bill via e-mail?

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 99

So I'm just trying to figure out the mechanics involved here. I mean, do they get billed via e-mail or do they see a bill when they fill out the online registration portal? Do they see a bill per credit hour, or how does it work?

A   They receive a bill via their e-mail account.

Q   Okay. And the one -- so they have one invoice for each semester, or is there one invoice for a year? How does it work?

A   They receive multiple bills per term. And that contains information about tuition and fees and also aid and payments.

Q   Okay.

A   Basically anything that effects their student account.

Q   Understood. And y'all go by terms there; is that right?

A   Yes. There is a fall term, a spring term, and a summer term.

Q   Thank you. I'll try to remember that.

A   Sure.

Q   If I use term, then I apologize.

How are the fees determined for each term? Is it by the university or is it by department or -- just trying to understand in general.

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 100

A   So the fees are -- the university assessed fees are determined by the university. So not by individual departments necessarily.

Q   Does that come from the president's office? Or who sets the fees?

A   So typically the budget office designs a budget for the following year. And it goes through the senior leadership as to what the budget is going to be and what the budget assumptions. And then decisions are made as to if the fees are going to remain the same or if there is going to be an increase to those fees.

Q   Does RIT have any policies or procedures to determine how much fees to a charge to a student?

A   I'm not aware of any.

Q   Are all the students charged the same fees regardless of major or does it vary?

A   I am not sure. There are some fees that are standard for all students. There might be other fees that I'm not aware of.

Q   Are online students and traditional on-campus students charged the same fees?

MR. BURNS: Objection.

THE WITNESS: The traditional students are charged some fees that the online students would not be charged.

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 28 of 30
Nicholas Bergeron and Nick Quattrociocchi Remote Video deposition via Zoom    Milagros Concepcion 30(b)(6)
Rochester Institute of Technology    March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 101

BY MR. DOOLITTLE:

Q    Do you know which ones?

A    The student health fee, one of them, and the student activity fee would be another.

Q    Any other ones?

A    Not that I'm aware of.

Q    Why are they not -- so let's just stick with the student health fees. So an online student is charged less than a traditional on-campus student for the student health fee; is that right?

MR. BURNS: Objection.

THE WITNESS: The traditional students are assessed as student health fee.

BY MR. DOOLITTLE:

Q    And the online students are not?

A    I don't believe they are charged a student health fee.

Q    And why is there a difference between the online students and the traditional in-person student?

MR. BURNS: Objection.

THE WITNESS: The student health fee covers the cost to operate the student health center on campus.

BY MR. DOOLITTLE:

Q    Okay. I understand that. But why are the

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 102

online students not charged a student health fee?

A    I'm not sure.

Q    Do online students have access to the health center?

A    They do not utilize the health center. They are not residentially there.

Q    Are they -- do they have access to it? Are they allowed?

A    I don't know.

Q    And the students are -- online students are not charged a student activity fee; is that right?

A    I don't believe they are.

Q    And why is that?

A    I'm not sure. I know they're not.

Q    But you don't know why they're not charged the online student health -- the online students are not charged the student activity fee?

A    The specific reason, no. I just know they're not.

Q    Rather than any specific reason, are you aware of any general reasons?

A    Not really.

Q    Okay. Then I'm sorry, not really to me indicates -- if you say not really, I think that you may still have something that you're thinking about

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 103

that may be applicable. Is there anything else that you -- I don't know what not really --

A    So the student health fee is intended to defray cost related to the Center for Campus Life and other student activities.

Q    My question was about the student activity fee, ma'am.

A    That's what I was referring to as well.

Q    You said health fee. Or maybe you misspoke. You said health fee in that answer.

A    Yeah, the student activity fee.

Q    And so are you aware of any reason that online students are not charged a student activity fee?

A    I'm not aware of the reason why. I just know they're not.

Q    Are there any fees that are charged to online students that are not charged to traditional in-person students?

MR. BURNS: Objection.

THE WITNESS: I don't know.

BY MR. DOOLITTLE:

Q    Are online students paid any additional fees whatsoever?

A    I don't know.

Q    Do you know what fees the online students

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 104

pay?

A    I don't know.

Q    Is your office in charge of online fees, or is somebody else in charge of students that are online and collecting their fees?

A    We bill all students.

Q    Okay. So y'all would be in charge of collecting for online students as well?

A    Yes, all students.

Q    So you're not aware of any fees charged to online students at all?

A    I don't know if they are charged specific fees.

Q    Do you know what fees are charged other than the two we've talked about to on-campus students?

A    Those are the university-assessed fees.

Q    And that's the only two you're aware of, correct?

A    Yes.

Q    How do the students know which fees they're required to pay?

A    They're in their student bill.

Q    That's the one we talked about earlier they get via e-mail?

A    Yes. Their student account. They're posted

Case 6:20-cv-06283-CJS-MJP   Document 76-3   Filed 09/21/22   Page 29 of 30
Nicholas Bergeron and Nick Quattrociocchi Remote Video deposition via Zoom          Milagros Concepcion 30(b)(6)
Rochester Institute of Technology                                                                                      March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 105

on their student account and they are contained within their bill.

Q   Do the students have access to their -- to an account online?

A   Yes.

Q   Does the student account identify all the fees charged to an individual?

A   Yes.

Q   Does it vary per student?

A   Yes.

Q   Why would it vary?

A   Lots of different reasons.

Q   Yes, ma'am. I'm sure there are. And that's what I'm here to ask you today is what are those different reasons?

A   They are a lot of reasons. I mean.

Q   Yes, ma'am. I need to go over each one of the reasons.

A   Oh, we would be here for three days. I mean, there is just a lot of different reasons why one bill might look a little different than another bill. So if you are the -- you know, if you are the son or daughter of an employee, you might receive a tuition benefit for that. So your bill will look different. If you're an international student, your bill might look a little

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 106

different. So there are a lot of different reasons, a lot.

Q   Okay. That's two. I'm ready for a lot. So I need to go over each one of the different reasons that the fee can vary per student. So I understand the two that you've explained so far. And you said there's a lot that we can go over for three days, so I'm assuming we can go for a while. I'm willing to listen, yes, ma'am.

MR. BURNS: Just to clarify for me, are we talking about tuition or fees here? I want to make sure that we're talking about the same thing.

MR. DOOLITTLE: I was -- my question was fees.

MR. BURNS: Okay.

THE WITNESS: Yeah, so, I mean, your fees, it depends on, you know, what particular wellness class you might be taking. There might be a different fee.

BY MR. DOOLITTLE:

Q   There might be or there is a different fee for each one of those classes?

A   There are different fees for different classes.

Q   Okay. So a wellness class has different fees

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 107

charged for a wellness class versus -- I'm not following you.

A   Some classes have a different fee than others.

Q   Okay. Can you give me an example?

A   So if you have a wellness class that has a component, for example, if you're taking horseback riding and you're going to go horseback riding, there might be an additional fee associated with that class.

Q   Okay. And just to make sure I clarify your answer, earlier you said that -- I believe you said -- and correct me if I'm wrong, you said something about if I was a student who had some connection with the university like my parents work there or something, I might pay less fees because of that? Were you talking about tuition or fees?

A   I was speaking of tuition, yes.

Q   The fees don't vary as far as whether or not my family works there or does not work there; is that correct?

A   That's correct.

Q   Okay. What are the other reasons the fees may vary per classes?

A   For tuition? Are we back to tuition or are we still on fees?

M. CONCEPCION - EX. BY MR. DOOLITTLE                Page 108

Q   What are the other reasons for the fee variation between students?

A   But not tuition, just fees?

Q   Fees. I didn't say tuition at all.

A   Okay.

Q   I haven't said tuition at all since we've been back on. So just to be clear.

A   Okay. Other than the example I gave you, I can't think of any.

Q   So when you said that we could be here talking for days about the difference between one student's fees -- one student to another, you were talking about tuition?

A   I was specifically talking about tuition, yes.

Q   Okay. So all student fees should be the same across the board except for the example you just gave us about the horseback riding class?

A   They should be.

Q   Okay. The additional fee for the horseback riding class, does the student know about it before registering for the class?

A   Yes.

Q   Once RIT receives a fee payment from a student, what does it do with the fee payment then?

Case 6:20-cv-06283-CJS-MJP    Document 76-3    Filed 09/21/22    Page 30 of 30
Nicholas Bergeron and Nick Quattrociocchi Remote Video deposition via Zoom    Milagros Concepcion 30(b)(6)
Rochester Institute of Technology    March 23, 2022

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 109

A   It's credited against the student account.

Q   Yes, ma'am.  But what does the RIT actually do with the cash money?

A   Well, so the fee that someone may pay goes to cover a variety of costs.  So, you know, the cost of administratively offering a particular activity, if it's an activity fee.  And it also might cover, you know, the -- it will cover the instructor and other administrative expenses associated with offering a particular class or a particular activity.

Q   And that's just the fee portion of the student's payment; is that right?

A   You know, it's not segregated, you know, each individual person.  So, you know, when RIT collects fees, it uses it to defray all the expenses associated with providing, you know, the wellness courses and instruction.  It could be a wellness course just a little bit more expensive than a different wellness course, and those two combined, you know, might offset.  So it's not every dollar goes specifically to that one thing.  If that makes sense to you.

Q   Sure.  So when a student health fee comes in and is received by RIT, is it then used for however RIT wants to use it, or is it not used for the student health activities?

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 110

A   The student health fee covers the expenses to offer student health services to students, but those costs are in excess of what we receive in student health fees.  So the university uses other revenue streams to cover, you know, what that difference is.

Q   And to be clear, so when we talked earlier about the balance sheets and when the money is deposited into an account and you've got your balance sheets that you have to do with regards to your accounts.  When a student health fee is received, does it go into a separate account or does it go into the general account?

A   It goes into the same bank account.  So all the cash is in the same bank account.  We do have a statement of activities line item that is entitled student health fee and student activities fee.

Q   Okay.  And when the student activity fee is paid, what does the university do with that balance on its ledger?

A   It is used to cover university expenses.  And in general, the student health fee is used to defray the expenses required to run our student health center.  But every dollar -- you know, so when a student pays a dollar for a course, that one dollar is not earmarked to go towards that course.  So it's, you know, RIT

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 111

receives revenues.  RIT has expenses.  And through the budget process, we ensure that we have enough funds to cover the expenditures that we incur for the year.

Q   Right.  And that doesn't include the health center, right?

MR. BURNS: Objection.

THE WITNESS: Well, the health center is part of RIT, so we do cover the expenses related to our health center.

BY MR. DOOLITTLE:

Q   Okay.  But again, I'm going back to the student -- a student pays a student health fee.

A   Yes, sir.

Q   I'm trying to figure out where that actual dollar goes.  So let's say the student health fee is $20.  The university takes that money.  Does it go into an account specifically earmarked for the health center, or does the university just use that specific $20 bill for anything it wants to use?

A   A single dollar bill is not earmarked for a specific thing.  So we are collecting the health fees and we have run the student health center.  And where those dollars, if -- you know, you really can't tell where that cash came from, but we do know that we need to operate our student health center.  And we do know

M. CONCEPCION - EX. BY MR. DOOLITTLE    Page 112

that the totality of the student health fee does not cover all the costs of the student health center, to run the student health center, to pay the doctors and the nurses and to run that building.

Q   Right.  And so the individual dollars collected for the student health fee don't actually go specifically to the health fee, they go to the general ledger; is that right?

A   I wouldn't state that as an accountant.  I would not think that that is an accurate statement.  Every dollar is not earmarked exactly and follows that purpose throughout.  We know that we collect that fee to operate the center, and we do operate the center.  And the cost of operating the center exceed the student health fee.  And other dollars the university raises are used to cover that deficit or delta.

Q   And, Ms. Concepcion, I understand that the student health center cost more to run than the fees collected.  Is that what you're trying to tell me?

A   Yes.

Q   Okay.  I want to take a specific student's payment of the student health fee and ask you what happens to the actual money once it's deposited.  Does it go towards the health center or does it go towards the general university expenses?