# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

NICHOLAS BERGERON and NICK            )
QUATTROCIOCCHI, on behalf             )
of themselves and on                  )
behalf of all others                  )
similarly situated,                   )
                                      )
            Plaintiffs,               )
                                      )
V.                                    ) Lead Case
                                      )
ROCHESTER INSTITUTE OF                ) NO.:  6:20-cv-06283
TECHNOLOGY,                           )
                                      )
            Defendant.                )

ZOOM AND VIDEOTAPED DEPOSITION OF

CHARLES D. COWAN, Ph.D.

JULY 20, 2022

VOLUME 1

ZOOM AND VIDEOTAPED DEPOSITION OF
CHARLES D. COWAN, PH.D., produced as a witness at the
instance of the DEFENDANT, and duly sworn, was taken in
the above-styled and numbered cause on July 20, 2022,
from 9:07 a.m. to 3:06 p.m., via Zoom before Wendy
Schreiber, CSR No. 9383, in and for the State of Texas,
reported by machine shorthand, at the address 205 South
Gulf Drive, Santa Rosa Beach, Florida, 32459, pursuant
to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.
Job No. 850422



1    Q.   Sorry.  So am I correct in understanding that
2  you've been engaged as an expert in other litigation?
3    A.   Yes.
4    Q.   Apart from those engagements, have you ever
5  been involved as a party to another lawsuit?
6    A.   No.
7    Q.   Aside from any depositions that you might have
8  given while engaged as an expert witness, have you ever
9  been deposed before?
10   A.   Are you asking me if I've ever been -- I'm
11 sorry, I'm going to repeat the question just so I
12 understand it.  Are you asking me if I've ever been
13 deposed before outside of working as an expert witness?
14   Q.   That's correct.
15   A.   Yes.
16   Q.   And when -- how many times have you been
17 deposed outside of working as an expert witness?  I'm
18 sorry, the answer that you -- didn't -- it didn't come
19 through.
20   A.   Once.
21   Q.   And what kind of action was that?
22   A.   The state and city of New York were suing the
23 Census Bureau because of a -- they wanted the census
24 counts adjusted for missed persons in the city and State
25 of New York.  I was deposed as a fact witness.



Page 12

1      Q.   And when, approximately, was that deposition?

2      A.   1982, approximately.

3      Q.   Apart from that action by the State of New York

4   and apart from your expert engagements, have you ever

5   given sworn testimony before?

6      A.   I don't know whether your question includes

7   hearings before regulatory boards.

8      Q.   It does, yes.

9      A.   Okay.  I have a couple of situations involving

10   regulatory challenges.

11      Q.   And were those hearings, did they occur while

12   you were employed by the federal government?

13      A.   No.

14      Q.   What -- in what capacity did you testify at

15   those hearings?

16      A.   I was testifying as an expert witness in those

17   cases, too.

18           (Exhibit 1 was marked for identification.)

19      Q.   (BY MS. SHEN)  Let's mark as Cowan Exhibit 1

20   the -- your C.V. which is Exhibit 1 also to your report.

21   Let me know when you have that pulled up in front of

22   you.

23      A.   I do.  Thank you.

24      Q.   Dr. Cowan, you earned your Ph.D. in 1984,

25   correct?



1      A.   Yes.

2      Q.   What was your dissertation topic?

3      A.   Errors in capture/recapture models and the

4  impact on estimation of the pop -- of the size of the

5  population.

6      Q.   I'm sorry, I'm going to ask you to just to

7  repeat that.  Your audio kind of cuts out it seems like

8  at the end of your sentences.

9      A.   Thank you.  The impact of errors and

10  misclassification on capture/recapture models used to

11  estimate population sizes.

12      Q.   During your Ph.D. candidacy at George

13  Washington University, did you -- did you pay tuition or

14  fees as part of your Ph.D. program?

15      A.   Oh, there were tuition and fees charged.  I

16  paid -- I can't recall any fees.  There were tuitions

17  charged.  Most of those were covered by the federal

18  government.

19      Q.   While you were getting your Ph.D., did you work

20  as well?

21      A.   I did.

22      Q.   What did you do?

23      A.   I was Chief of Survey Design for the Census

24  Bureau.

25      Q.   Was that a full-time position?



Page 14

1      A.  Yes.

2      Q.  Was it typical at George Washington University

3 for a Ph.D. candidate also to work?

4      A.  Yes.

5      Q.  And while you were a Ph.D. candidate, were

6 there any semesters when you worked on your dissertation

7 only and did not take classes?

8      A.  No.

9      Q.  How long was your Ph.D. program?

10      A.  How many -- how much time did it take?

11      Q.  Correct.

12      A.  Well, I started in 1977 so seven years.

13      Q.  And during those seven years were you enrolled

14 each semester at GW or did you take any time off between

15 semesters?

16      A.  No, I was enrolled full time for the full seven

17 years.

18      Q.  Did you pay tuition and fees for each of those

19 seven semesters -- or seven years, excuse me?

20      A.  I believe the Census Bureau did.

21      Q.  Were you charged tuition and fees for each

22 semester of those seven years?

23      A.  Yes.

24      Q.  In your C.V. it references your employment at

25 the Oregon State University between 1974 and 1975.



Page 15

1   Could you describe what work you did while at Oregon

2   State?

3        A.   Their survey research center.

4        Q.   What kind of work did you do at the survey

5   research center?

6        A.   Conducted surveys.

7        Q.   Into what type of areas?

8        A.   Some were population surveys of human

9   populations.  Some were fish and wildlife-type studies

10  to capture various types of fish within the Columbia

11  River.

12       Q.   And what role did you have in conducting those

13  surveys?

14       A.   I directed how the surveys were to be

15  conducted.  I collected data and summarized it for

16  analysis with computer programs and I wrote reports.

17       Q.   While working at Oregon State University, did

18  you ever work on any valuation models?

19       A.   Evaluation models?

20       Q.   Correct.  Yeah, valuation, I'm sorry.

21       A.   Sorry, could you clarify?  Did you say

22  evaluation or just valuation?

23       Q.   Just valuation.

24       A.   So let me point out that we're -- you're asking

25  me about work that I would have done in the early 1970s



1   which is approximately 50 years ago so I don't remember.

2       Q.  What about your work at the University of

3   Michigan?  What kind of work did you do there?

4       A.  I was an assistant study director and I just

5   helped with data processing of survey data collected by

6   the center.

7       Q.  Do you recall what kind of surveys you were

8   working on at that center?

9       A.  Economic.

10       Q.  When you say "economic," what do you mean?

11       A.  They were surveys that were on economic topics

12   of people in the general population.

13       Q.  Just going back to your Ph.D. program for a

14   minute, when you received -- you -- you mentioned that

15   the federal government paid for your tuition fees.

16   Was -- did they pay the entirety of your tuition and

17   fees while you were at GW?

18       A.  I believe so.  I think there was maybe one fee

19   that was $75 so that I could get a copy of my diploma.

20       Q.  Did you receive any other aid, for example,

21   from GW directly for your Ph.D. program?

22       A.  No.

23       Q.  What about some other courses?

24       A.  No.

25       Q.  And while enrolled at GW, were there any



Page 40

```
 1      Q.  Did you receive all of the information that you
 2   asked the plaintiffs for?
 3      A.  I received information for Mr. -- and I
 4   apologize for mispronouncing his name -- Quattrociocchi.
 5   I did not for Mr. Bergeron.
 6      Q.  Was there -- were you given an explanation as
 7   to why you did not get information about Mr. Bergeron?
 8      A.  No.  Well, I mean, I asked if they had the
 9   information.  They said they hadn't received it and that
10   was the only explanation I got.  I didn't delve further.
11      Q.  Did you make -- did you ask plaintiffs whether
12   they could get the information that you needed about
13   Mr. Bergeron?
14      A.  Well, the way the conversation went I
15   understood that they were in the process of obtaining
16   information.  I didn't ask whether they could or not.
17   My impression was simply that they were in the process.
18      Q.  Approximately -- and did you ever do any
19   follow-up with the plaintiffs about whether they got the
20   information or were able to provide it to you about
21   Mr. Bergeron?
22      A.  Well, this is -- this activity was performed in
23   about a one-to-two-week-time period so, no.  After the
24   first week we had pretty much completed our report.
25      Q.  And approximately when did -- when were the two
```


MAGNA ▶
LEGAL SERVICES

Page 41

1    weeks when you worked on the report?

2        A.   4/13 -- April 13th through probably April 27th.

3        Q.   And that's of 2022?

4        A.   Yes, ma'am.   I'm sorry.

5        Q.   Was there any other information that you asked

6    the plaintiff for which was not provided to you?

7        A.   I believe you asked me this earlier and I --

8    the answer was no.

9        Q.   Apart from the information about RIT's

10   published tuition and fees prices and the information

11   from I believe it's the Department of Education's

12   National Center for Education Statistics that you

13   referenced, was there any other publicly-available

14   information that you or your team reviewed in preparing

15   your report?   I'm sorry, I didn't catch that answer.

16       A.   No.

17            (Exhibit 4 was marked for identification.)

18       Q.   (BY MS. SHEN)   I'm going to come back to

19   Exhibit 3, your report, so if you could just keep that

20   document open but for the moment let's move on and mark

21   as Cowan Exhibit 4 Exhibit 3 to your report, Dr. Cowan,

22   which is your sources list.   Let me know when you have

23   that pulled up.

24       A.   I have it.   Thank you.

25       Q.   So this document is titled "Materials Relied



Page 42

1    On."  Were there any other documents that you or your

2    team reviewed which are not disclosed in this Exhibit 4?

3         A.  Not that I'm aware of.

4         Q.  Looking under the "Depositions" heading in your

5    sources list, you reference the deposition of Edward

6    Lincoln, the deposition of Nicholas Bergeron and the

7    deposition of Nicholas Quattrociocchi.  Were you

8    provided any other deposition transcripts?

9         A.  I don't believe so, no.

10        Q.  Were you aware that a deposition of an RIT

11   corporate witness was taken?

12        A.  Umm.

13        Q.  I'm sorry, that answer was a little garbled.

14        A.  That was because I said umm.  That was just a

15   stop.  I don't think I knew it before I read the --

16   before I wrote my report.  I believe I became aware of

17   it afterwards but I've never seen it.

18        Q.  After you finished writing your report did you

19   ask for a copy of that deposition transcript of RIT's

20   corporate witness?

21        A.  No.

22        Q.  Why not?

23        A.  My analysis is pretty much based on the

24   published materials from RIT.  It doesn't -- I don't

25   find in any of these cases reading depositions to be



Page 43

1    very helpful with respect to providing a basic
2    calculation for class certification.
3           Q.   And why is that?
4           A.   Sorry, why is it that I don't find it very
5    helpful?
6           Q.   Correct, yes.
7           A.   Well, it's a very straightforward calculation.
8    There is a published charge to students.  There is a
9    published rate for online classes.  There is a timing
10   component with respect to when the university closed
11   down.  Those are -- and typically we don't have
12   information for fees like we did in here.  So there
13   isn't a whole lot more than that that I need for doing a
14   basic calculation for the purpose of a class
15   certification.
16          Q.   The three deposition transcripts that you
17   reviewed, did you review the exhibits that were shown
18   during those depositions?
19          A.   I didn't but one of my staff might have.
20          Q.   Looking back at Exhibit 4 under the heading
21   "Websites Cited," when, approximately, did you or your
22   team visit the websites that are listed there?
23          A.   Somewhere in that two-week time period I
24   described earlier.
25          Q.   So that would be April of 2022?



Page 49

1      Q.  And you did not personally review

2   Mr. Bergeron -- the deposition exhibits to --

3   Mr. Bergeron's deposition exhibits to see if there was

4   any information in there about his financial aid,

5   correct?

6      A.  I did not.

7      Q.  Did you have any -- did you ever ask anybody

8   from your team if they had reviewed Mr. Bergeron's

9   deposition exhibits to see if there was information

10  about his financial aid and scholarships?

11     A.  No.

12     Q.  Let's go back to Cowan Exhibit 3 which is your

13  report, Dr. Cowan, and if you could turn to page 2 of

14  your report, paragraph 4.  Let me know when you're

15  there.

16     A.  I'm there.

17     Q.  The first sentence of paragraph 4 says, "At

18  this point detailed information has been produced only

19  with respect to one of the Plaintiff representatives,

20  Mr. Quattrociocchi..." -- and then you say in

21  parentheses "(the 'Lead Plaintiff')."

22               What do you mean by "detailed information"?

23     A.  Well, the detailed information would be the

24  printouts that we were just reviewing with respect to

25  what tuition was paid, what specific fees were paid, how



Page 50

1   much the fees were, the scholarship information, what

2   type of scholarship it was.  Those were all items that

3   you just showed me on Mr. Quattro -- Quattrociocchi's

4   description.

5        Q.  And when you say "produced" in this sentence,

6   what did you mean by that?

7        A.  Well, to me.  I meant produced to me.

8        Q.  All right.  The second sentence of that same

9   paragraph 4 says, "Detailed information similar to that

10  provided for the Lead Plaintiff has not been produced

11  for other class members, including any information on

12  fees."

13               What did you mean by "any information on

14  fees"?

15       A.  Pretty much what it says, any information on

16  fees.  I only have information for Mr. Quattrociocchi.

17  I don't have it for other people who are in the class

18  who are not named plaintiffs.  I don't have any detailed

19  information for any of them.

20       Q.  And what -- what other information are you --

21  would you need on the fees in order to complete your

22  analysis?

23       A.  Well, my analysis to date is -- is complete,

24  however, what the next sentence says is my understanding

25  is that if the class is certified, information about



1    tuition, fees and so on will be made available so that I

2    can calculate damages on a class-member-by-class-member

3    basis.  I can't do that right now.

4         Q.  I understand what you're saying about

5    calculating damages on a class member basis but -- and

6    I'm sorry if I was unclear but my question is

7    specifically geared towards the fees.  What information

8    do you need with respect to fees in order to conduct the

9    damages analysis?

10        A.  Well, different people have different fees so I

11   need to know what fees they paid, whether they took a

12   lab or not and paid a lab fee.  I also need to know some

13   information about fees charged with respect to whether

14   or not the student had access to a particular type of

15   activity.  So, for example, if RIT has on-campus

16   healthcare and despite the school being closed down

17   healthcare was still available to all of the students,

18   then I wouldn't consider that to be lost to the student,

19   they had healthcare available the whole time.  So if

20   they paid a fee, they got what they paid for.  So I need

21   some information about what was paid, what it was paid

22   for and I also need to know whether or not certain

23   things were available during the time that the

24   university was closed.

25        Q.  So would that be the same with respect to the



Page 52

1  student activity fees; that, for example, if students

2  continued to have access to the types of programs or

3  activities that were intended to be covered by the

4  student-activity fee that your -- your conclusion would

5  be that there would be no refund due?

6      A.  I can only say that it might be.  That

7  speculation on my part because I don't know right now

8  what activities were covered with that fee.

9      Q.  And how would you -- how did you typically

10  obtain that information?  So it was just -- let's go

11  back to your -- your student health fee example.  You

12  mentioned that you would need information about whether

13  students continued to have access to healthcare

14  services.  What kind of information would you need to --

15  to answer that question?

16      A.  I think the only thing I would need to know is

17  whether or not health clinics were open or

18  alternative -- or was some alternative provided like

19  access -- paid access to urgent care, for example.

20      Q.  And that information was not provided to you by

21  the plaintiffs as you prepared your report, correct?

22      A.  It was not.

23      Q.  Did you or anybody on your team look for that

24  information in publicly-available sources?

25      A.  Not that I'm aware of.



1      Q.   Turning back to Exhibit 3 of your report, I'm

2   looking at paragraph 5, the last sentence.  You say, "I

3   do not offer similar calculations for Graduate Students

4   or with respect to fees because I do not have the

5   necessary information to provide such calculations."

6              Here what is the necessary information that

7   you would need to provide those calculations?

8      A.   My understanding was that there would be

9   different tuition rates for graduate students in

10  different graduate programs.  I wasn't aware of whether

11  or not graduate students would be charged the same fees

12  or other fees so I just don't have enough information to

13  be able to safely say that I can do a calculation -- an

14  actual calculation for graduate students as opposed to

15  just saying this is the framework that I propose to use.

16     Q.   Your team was able to pull from

17  publicly-available sources information about the

18  undergraduate tuition and fees charged, correct?

19     A.   Yes.

20     Q.   Did anybody on your team or did you look for

21  publicly-available information as to the graduate

22  tuition and fees charged?

23     A.   I don't know if they did or not.

24     Q.   Did anybody -- did you -- okay, sorry.  Take

25  that back.  Did you yourself look for publicly-available



Page 81

1    correct?

2        A.  Yes.

3        Q.  And it's possible though that even their

4    overall value contracted for is higher, their value per

5    credit hour may actually be lower depending on how the

6    math works itself out?

7        A.  Yes.

8        Q.  Sticking with Table 1 of your report, the --

9    there's a line item here for total RIT subsidies and,

10   you know, for Mr. Quattrociocchi I think we can agree

11   that it was $2,000.  What does -- what is included under

12   the umbrella of RIT subsidies?

13       A.  You mean, what is included that's offered by

14   RIT or are you asking me what it is that I use?

15       Q.  What it is that you use.

16       A.  If the payment goes directly to offset the

17   tuition, then I use it as an offset to the tuition

18   because it's an amount that the student doesn't pay out

19   of pocket.  On the other hand, if it's a payment to the

20   student from some type of grant let's say where the

21   money just goes directly to the student and they can

22   spend it on anything, then I don't consider that an

23   offset because I don't know if they applied it to

24   tuition or not.

25       Q.  Did you have any information as to how I'm



Page 82

1    going to call it generally student financial aid is

2    credited into a student's account at RIT?

3         A.   I must have had some information since I used

4    the subsidy to offset the tuition.   I'm not sure I have

5    all of the information that I need for every single type

6    of grant, scholarship or whatever.

7         Q.   Did you ask plaintiffs or their counsel for

8    that information?

9         A.   When I said that I'm not sure I know, I just

10   mean that I don't remember.   It could be that I've got

11   that information but, you know, I collected that

12   information months ago and just don't recall now.

13        Q.   In -- in your definition of "RIT subsidies"

14   did -- did you consider the source of the funding?   And

15   what I mean by that is did you make any further

16   segregation as between institutional aid from RIT versus

17   government aid versus other third-party aid?

18        A.   Well, for this report that wasn't necessary.   I

19   already had the information I needed for

20   Mr. Quattrociocchi and I described how I was going to

21   deal with this in general so I don't believe I had that

22   information but, on the other hand, for a report for

23   class certification it's not necessary.

24        Q.   Why do you say that?

25        A.   I already laid out my -- my general



1  methodology.  What I have is information for one of the
2  two named plaintiffs and I used that specific to that
3  named plaintiff.  Later when I talk about general
4  calculations, I talk about subtraction of subsidies but
5  I don't have all the information regarding the source,
6  whether the source makes any difference, whether there's
7  something unique about some sources that specifies that
8  the money goes to the student versus other sources that
9  go to the university.  All that can be resolved after a
10 class certification but it's not relevant to this one
11 calculation or to the general methodology that I laid
12 out.
13      Q.  I -- I just want to make sure I'm understanding
14 you correctly.  So if you were to evaluate this on a
15 putative class-wide basis, you would need to know the
16 source of the funding, correct?
17      A.  I don't know if I need to know the source of
18 the funding.  It could be just that the information I
19 receive tells me it's a tuition offset and not a tuition
20 offset in which case I don't care where the money came
21 from.
22      Q.  Okay.  Would you care about whether -- I think
23 you've answered this already but I just want to make
24 sure I'm understanding correctly -- you would care about
25 whether there are directives as to how that funding can



Page 84

1    be applied, correct?

2        A.  Well, I may or may not if I need that

3    information to be able to tease out whether or not with

4    tuition but as I said in my previous answer, it might be

5    that the information I get just tells me indirectly it's

6    a tuition offset in which case the directives don't

7    matter.

8        Q.  Sure.  You know, maybe -- maybe this will be a

9    little easier if we look at Mr. Quattrociocchi's student

10   ledger so why don't we pull back up -- yeah, if you

11   could pull back up Exhibit 7.  This was the document

12   with Bates stamp RIT0001261.

13       A.  I'm there.  Thank you.

14       Q.  Okay.  So looking at -- at Exhibit 7 -- I'm at

15   page Bates stamp RIT0001264 -- we looked previously at

16   the scholarship and grants and there's a $2,000 RIT

17   grant increase.  Are you able to tell from this data

18   whether -- whether that RIT grant increase is

19   specifically a tuition offset or not?

20       A.  In the accounting that is listed here -- sorry,

21   I need to go to a different page.  Could you remind me

22   which page we're looking at?

23       Q.  Yes, I'm looking at RIT0001264.

24       A.  Thank you.  So the way that the accounting

25   works here at least within this ledger is that the



1      A.   I don't see how that makes any difference at

2   all to my calculation.   My calculation only applies to

3   people who took on-campus classes.   So now you're asking

4   me about something regarding the RIT online but they're

5   not part of the class so I don't -- I don't see how it

6   matters how those prices are set.   They are just the

7   prices that are charged to students who opt for that

8   program.

9      Q.   But the -- like you said before though, the

10   price that is set is the result of some sort of value

11   proposition, correct?

12      A.   Well, it might be but I don't care what the --

13   the negotiation is to get to the value proposition.

14   It's -- it's the final price that is set.

15      Q.   But that price is reflective of certain

16   attributes of the RIT online program that may be

17   different from attributes of the RIT sort of in-person

18   experience, correct?

19            MR. DOOLITTLE:   Object to form.

20            THE WITNESS:   The whole case was about the

21   fact that there's a difference between in-person

22   education versus online.   I don't know what the

23   differences are.   I just know that there are differences

24   because there are different prices paid.   You're asking

25   me whether or not there's a differential in price paid,



Page 94

1  you know, for cars with four cup holders versus six cup

2  holders.

3       Q.  (BY MS. SHEN)  And -- well, so following your

4  hypothetical, the -- the price differential between a

5  car with four cup holders versus a car with six cup

6  holders, is in your example two cup holders, correct?

7       A.  No, that's not the price differential.  That's

8  just the difference between the two cars.  You could

9  charge the same for both.

10      Q.  Okay, sure.  I think I -- I think understand

11  what you're saying but in -- so let's stick with that

12  example for a second.  If the -- if there is a price

13  difference between a car with four cup holders and a car

14  with six cup holders, one of the reasons there could be

15  a price difference is the difference in the number of

16  cup holders, correct?

17                MR. DOOLITTLE:  Object to form.

18                THE WITNESS:  That is a possibility.

19      Q.  (BY MS. SHEN)  Okay.  And so it is possible in

20  our case that one of the reasons for the difference

21  between the price for RIT online versus the price of

22  tuition for RIT's clinical in-person students is the

23  availability of institutional aid, correct?

24                MR. DOOLITTLE:  Object to the form.

25                THE WITNESS:  But I don't know that just



Page 95

```
 1    like I don't know that that's the reason that there's a
 2    price differential due to solely the existence of two
 3    cup holders.  There could be other differences, too,
 4    that aren't clear to me and so you're asking me about
 5    now a number of hypotheticals but they're incomplete
 6    hypotheticals.  I can't answer as to whether or not the
 7    online price is a function of whether or not student aid
 8    is available.  I only know what the final online price
 9    is.  So, again, you know, you're asking me about
10    something that has nothing to do with the numbers that I
11    see.  It has to do with some machination at the
12    university where they made a decision and it's opaque to
13    everybody and -- but the only thing -- I don't care that
14    it's opaque but what I do care about is that the only
15    number I've got is this is what I'm paying for online
16    classes.
17        Q.  (BY MS. SHEN)  And -- and so you chose to use
18    the RIT online rate as the benchmark for your analysis,
19    correct?
20                MR. DOOLITTLE:  Object to form.
21                THE WITNESS:  I did.
22        Q.  (BY MS. SHEN)  I'm sorry, your answer was cut
23    out a little bit.
24        A.  I did.
25        Q.  And in using the RIT online rate as your
```



Page 96

1    benchmark, wouldn't -- isn't it important to consider

2    what that benchmark covers?  And what I mean by that is

3    isn't it important to consider what you are getting as

4    when you pay for the RIT online program versus what you

5    are getting if you pay for the RIT in-person program?

6        A.  So are you asking me whether or not the

7    university should have considered that when they

8    switched everybody to online classes and then didn't

9    compensate them?

10       Q.  No, I'm asking whether you considered that in

11   choosing the RIT online tuition rate as your benchmark.

12       A.  No, it's just the price that was paid in the

13   but-for world that I've created and it is the estimate

14   that I have based on what are RIT charges for online

15   training which they claim is as good as the training

16   that is offered in person but there's a large price

17   differential.

18       Q.  So you decided that the RIT online tuition rate

19   was an appropriate benchmark to use because of a

20   statement that the RIT online training is just as good

21   as in-person training?

22       A.  Well --

23           MR. DOOLITTLE:  Object to the form.

24           THE WITNESS:  -- it was RIT's statement so

25   the only thing I could rely on is what RIT says about



Page 97

1    its programs.  It's offering an education.  It offers

2    classes.  It says specifically it's the same professors

3    offering these classes so at this point the only thing I

4    know is is that people wound up in the (audio

5    distortion) their choice and the university had

6    originally said they were going to be charging, you

7    know, tuition for in-person classes.

8         Q.  (BY MS. SHEN)  You didn't consider whether the

9    classes offered through the RIT online program are the

10   same as the classes offered through RIT's

11   on-campus-based programs, correct?

12        A.  I don't know that and I also don't know whether

13   they change from term to term.  I just know that there

14   was a blanket statement that this is the price that RIT

15   charges for the courses that are offered online.

16        Q.  You didn't consider, for example, whether RIT

17   online offers any of the undergraduate programs that it

18   offers in its campus-based programs, correct?

19        A.  It's immaterial.  What happened at the end was

20   that everybody wound up taking online classes so whether

21   or not they were previously offered, they were offered

22   after the university closed.

23        Q.  You didn't consider whether the classes in the

24   RIT online program were conducted in the same manner as

25   the classes RIT transitioned online in response to



Page 98

1  COVID, correct?  So like, for example, you didn't

2  consider whether classes are the same -- same class

3  length or whether they are synchronous or asynchronous,

4  whether they involve class student participation.  You

5  didn't consider any of those factors, correct?

6      A.  No.

7      Q.  You didn't consider the student-teacher ratio

8  in the RIT online classes as opposed to the COVID

9  transition classes, correct?

10      A.  I did not.

11      Q.  And you didn't consider what support services

12  might be available to RIT online students versus

13  students who had their classes transitioned online in

14  response to COVID, correct?

15      A.  No.

16      Q.  You also didn't consider the -- whether the

17  course syllabi or the course workload was the same for

18  students who enrolled in the RIT online program versus

19  students who were transitioned on line as a result of

20  COVID, correct?

21      A.  Did not.

22      Q.  And you did not consider whether the RIT online

23  program is designed for students who are employed or,

24  you know, are pursuing professional degrees and whether

25  that is similarly applicable to the student body that



Page 99

1  was transitioned to online classes as a result of COVID,

2  correct?

3     A.  There's nothing in the course catalog that says

4  that there's a limitation of taking RIT online only for

5  those people who are already fully employed.  You're

6  asking me about hypotheticals that have nothing to do

7  with what actually is stated by RIT regarding the -- the

8  program.  So RIT online is available to everybody, not

9  just, you know, some subset of people.  So, you know,

10 what you're asking me is a hypothetical that doesn't

11 apply to the calculations that I've -- I've conducted.

12    Q.  Did you review the list of degree programs

13 offered through the RIT online program?

14    A.  I did at the time that I looked at it several

15 months ago.

16    Q.  And in that review did you -- are you aware

17 that the RIT online program only offered one degree

18 program for undergraduate students?

19    A.  Yes.

20    Q.  Did you review the course list offered through

21 the RIT online program?

22    A.  I can't remember.  I looked at the degree

23 program but I'm not sure I looked at the specific

24 courses.

25    Q.  Would you be surprised to learn that the number



Page 110

1   service -- or accessibilities?

2      A.  Well, even if there is, they don't state that

3   there is so how would anybody know that?

4      Q.  Did you review RIT's financial -- audited

5   financial statements?

6      A.  No.

7      Q.  All right.  Going back to your report, I'm now

8   looking at paragraph 27, here you state, "Likewise, the

9   calculations here can be easily adjusted to account for

10   any partial refunds that have been already been issued

11   by RIT."

12            Is it fair to say that you did not consider

13   in your model any refunds that may have already been

14   issued by RIT?

15      A.  Well, you left out the next sentence so let me

16   read it into the record.  "I expect information on

17   refunds, if any, will be provided by Defendants."  So,

18   no, I didn't include it because I didn't have any

19   information on which to base and include.  I don't even

20   know if they gave any refunds.

21      Q.  Did you ask plaintiffs or their counsel to

22   provide you that information?

23      A.  I asked if they gave refunds and the answer I

24   got was I don't know.

25      Q.  If you were to adjust your model for any



Page 111

1    refunds that were issued, how would you do that?

2         A.  Subtract the refunds off of the -- well, I

3    haven't fully considered this so it's a hypothetical but

4    we're keeping in mind that it's a hypothetical, if there

5    were refunds that related to the COVID epidemic and the

6    closure of the school, then I would subtract that off

7    from the damages.

8         Q.  So am I understanding you correctly that that

9    would sort of be the last -- I guess last step in -- in

10   your analysis?

11        A.  Yes.

12        Q.  You also do not consider the impact of any

13   terrorist act funding or other sort of COVID relief

14   funding that was provided to students, correct?

15        A.  I apologize, Ms. Shen, but I missed the first

16   half of your question so I didn't -- I also did not

17   consider --

18        Q.  Sorry.  Yeah, I'll repeat it.  You also did not

19   consider any terrorist attack funding or other COVID

20   relief provided to students, correct?

21        A.  I did not.

22             (Exhibit 9 was marked for identification.)

23        Q.  (BY MS. SHEN)  Let's mark as Cowan Exhibit 9 a

24   document titled RIT0001155.  Dr. Cowan, let me know when

25   you have that up.



Page 120

1    don't think it needed that level of detailed analysis.

2         Q.  So -- so nobody did such an independent

3    investigation, correct?

4         A.  No.  It's a time.

5         Q.  And did anybody on your team do an independent

6    investigation to confirm whether 15 credit hours was an

7    appropriate average for full-time students?

8         A.  No.

9         Q.  Going back up to the row that's got a title or

10   a heading "Grant & Scholarship Aid, All Undergraduate

11   Students (2019 - 2020)," it has a numerical qualifier of

12   $229,832,759.  Do you see where I'm at?

13        A.  No.  I'm sorry, I'm at "Scholarships and

14   Grants" which is in row 7.

15        Q.  Oh, I'm actually looking further down.  I'm

16   looking at row 33 of the Excel.

17        A.  Oh, you said higher up so, sorry, I went all

18   the way up.  Oh, yes, I now see it.

19        Q.  Okay.  And it looks like this information was

20   pulled from IPEDS AY 2019 through 2020.  Is that the

21   data collected from the NCES website?

22        A.  Yes.

23        Q.  Let me direct your attention to -- well,

24   actually, let me ask you first, the data that your

25   team -- you and your team were reviewing from the NCES



Page 125

1   financial aid award was issued to the NTID students?

2       A.   No.

3       Q.   Sticking with Exhibit 13, the next row in that

4   Excel spreadsheet is for Pell grants only.  And if I am

5   reading your Excel -- your model correctly, up in row 7

6   you back -- you subtract the amount of Pell grants

7   issued to students from the -- from the grants and

8   scholarships.  Why is that?

9       A.   I'm not aware that Pell grants are used to

10  offset tuition.

11      Q.   What is the basis for that understanding?

12      A.   I'm just saying I'm not aware of it.  I didn't

13  say I had an understanding.

14      Q.   Well, what is your understanding of what Pell

15  grants are issued for?

16      A.   I don't recall right off the top of my head but

17  we excluded Pell grants I believe it's because they go

18  to the student but I don't know that 100 percent.

19      Q.   So if -- if I'm understanding you correctly,

20  you excluded them because you -- because of beliefs that

21  the Pell grants paid directly to the student, correct?

22      A.   No.  What I said was I think it may be that and

23  I just don't know what the reason is.

24      Q.   So if a Pell grant --  I'm sorry, I didn't mean

25  to cut you off.



Page 130

1    they signed up for the online programs.  They -- they

2    weren't subject to the -- the full tuition or the -- or

3    the issue that's raised in the Complaint.

4         Q.  Did you do anything to confirm that those

5    students who took some but not all of their courses

6    online paid the RIT online rate?

7         A.  No, I didn't have a means of doing so.  So

8    here, once again, this is an example.  It's not meant to

9    be, you know, an exact calculation.  What I did was I

10   assumed that those people who are in the online programs

11   were not included in the class.  I don't know exactly

12   what they paid so this is just a general assumption just

13   like I took out people in the NTID program.  So I took

14   two groups out that I felt weren't subject to -- or

15   wouldn't be included in the class and offered this as an

16   example of full-time and part-time students but I

17   understand you keep asking me about these exact

18   calculations and I keep trying to explain this is an

19   example.  It's not meant to be an exact calculation.

20   It's just an example of how we would proceed and I based

21   it mostly on information from IPEDS and as we discussed

22   before, even the information from IPEDS is incomplete

23   because I don't know how much of grant and scholarships

24   went in part to the NTID program.

25        Q.  Under this sort of carveout of the 16 percent

