# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NICHOLAS BERGERON AND<br>NICK QUATTROCIOCCHI, on behalf of<br>themselves and on behalf of all others<br>similarly situated, | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | Lead Case No. 6:20-cv-06283<br>Jury Trial Demanded |
| v. | ) <br> ) | |
| ROCHESTER INSTITUTE OF<br>TECHNOLOGY | ) <br> ) <br> ) | |
| Defendant. | ) | |

# EXPERT REPORT OF

# BENJAMIN S. WILNER, Ph.D.

# I.    Introduction

Alvarez & Marsal Disputes and Investigations, LLC ("A&M") has been retained by counsel representing the Defendant, Rochester Institute of Technology ("RIT"), to comment on the alleged damages in the aforementioned matter.   The named Plaintiffs, Nicholas Bergeron and Nick Quattrociocchi, claim that they were economically damaged by RIT's transition to remote classes during the Spring 2020 Semester in response to the pandemic.  I, Benjamin S. Wilner Ph.D., am responding to the April 29, 2022 Expert Report of Charles D. Cowan, Ph.D. (the "Cowan Report"), in which Dr. Cowan claims that the alleged damages of all RIT students can be formulaically determined on a class-wide basis.

As discussed below, I conclude that Dr. Cowan's proposed damages methodology is flawed along multiple dimensions:

- It ignores critical components of damages calculations in class actions and fails to identify the relevant quantities and characteristics of the putative class members.

- It assumes that students would demand to pay less and RIT would charge less for the classes taken/offered during the Online Portion of the Spring 2020 Semester even though RIT students exhibited contradictory behavior by paying full price when confronted with similar situations.[1]

- Even if one assumes that students were financially damaged, such damages would vary widely with the different programs RIT offered and each student's individual credit load. Dr. Cowan's proposed damages methodology only assesses alleged per capita tuition losses for certain putative class members, only in the undergraduate program, who took certain credit loads.  Dr. Cowan disaggregated his assumed putative class of undergraduate students between undergraduate students enrolled in RIT's National Institute for the Deaf ("NTID") and those who are not, with alleged damages calculated only for certain undergraduate students not enrolled in the NTID.  Dr. Cowan also failed to quantify the actual number of class members in each of the aforementioned programs, in any of RIT's programs, or the credit loads they took.

- Dr. Cowan's methodology is further flawed because it erroneously assumes that RIT's distinct online program ("RIT Online") provides a proper benchmark for what tuition should have been but for RIT's classes that were transitioned to a remote format in response to the pandemic and government stay-at-home orders.  This assumption incorrectly asserts that all students would view the RIT Online program as a comparable education environment, which is untrue as, for example, Mr. Quattrociocchi and Mr. Bergeron would not even be eligible to complete their respective majors through the RIT Online platform.[2]  It also incorrectly assumes that RIT would have charged RIT Online

---

[1] The "Online Portion of the Spring 2020 Semester," as referred to in this Report, means the portion of the Spring 2020 Semester after the transition to remote learning in response to the pandemic and related government stay-at-home orders.  RIT transitioned classes to a remote format beginning on March 23, 2020.

[2] As of the Spring 2020 Semester, Mr. Bergeron was pursuing an undergraduate degree in Computing and Information Technologies whereas Mr. Quattrociocchi was pursuing an undergraduate degree in Mechanical Engineering. See

prices during the Online Portion of the Spring 2020 Semester.

- While Dr. Cowan calculated the alleged losses of one named Plaintiff, Mr. Quattrociocchi, he did not calculate alleged losses for the other named Plaintiff, Mr. Bergeron.  As shown below, Dr. Cowan's methodology shows that Mr. Bergeron suffered no damages.

- Dr. Cowan's methodology provides no reasonable explanation for how alleged damages pertaining to fees would be assessed for the entire putative class.

- Dr. Cowan mischaracterizes the value students received from classes they took and ignores the value students received from the services RIT provided during the Online Portion of the Spring 2020 Semester.

- Even if Dr. Cowan was able to demonstrate that RIT's Spring 2020 Semester was less valuable in some way, putative class members were not necessarily financially damaged.

I generated these conclusions based upon my experience and training and as a result of reviewing the documents listed in **Exhibit 1**.  I reserve the right to modify and/or expand my opinions as I obtain and analyze additional information.

A&M is compensated for its services on an hourly basis and is being reimbursed for out-of-pocket expenses.  A&M is compensated at a rate of $745 per hour for my time.  Other individuals from A&M also provided assistance in this matter; their hourly rates range from $325 to $500.[3]

# II.   Qualifications

My curriculum vitae (**Exhibit 2**) details my credentials, testimony, publications and awards. I am a Managing Director at A&M.  I have served as an expert witness and business consultant performing economic and statistical analyses in a great variety of engagements, including financial analysis, contract losses, and a wide range of class action, intellectual property, insurance claim, lost profits and lost income matters.  I also received a special commendation from the Commissioner of U.S. Customs and Border Protection for revising a $2.5 billion annual tariff.

I hold a Bachelor of Arts degree, Magna cum Laude with Distinction in Major in Mathematics and Economics from the University of Pennsylvania as well as a General Course degree in Mathematics & Statistics from the London School of Economics.  I was awarded a Ph.D. in Managerial Economics and Decision Science ("MEDS") from the Kellogg Graduate School of Management at Northwestern University.  MEDS studies how consumers, governments and

---

Deposition of Nicholas Bergeron, p. 88 ("Bergeron Deposition") and Deposition of Nick Quattrociocchi, p. 69 ("Quattrociocchi Deposition").  Neither of these degree programs are available through RIT Online. See https://www.rit.edu/online/study, viewed on 5/2/2022.

[3] No one who has contributed to this engagement has any known financial interest in any party to the matter.  A&M's compensation is neither based nor contingent on the results of this analysis.  This Report is provided solely for use in the matter described in the caption at the top of this Report. This Report is not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose, or in any other document without the express written consent of A&M.

businesses make decisions in a wide variety of economic and other environments.

I served as a professor of economics, finance and statistics at the University of Michigan, the University of Iowa, Northwestern University and the Helsinki School of Economics.

My research has been published in peer reviewed academic journals including the *Journal of Finance*, the leading academic journal on the subject of finance. I have been awarded research grants from multiple universities and the National Science Foundation ("NSF"). My research has been cited by over 800 papers.[2] I also served as a referee for multiple academic journals and textbooks.

One of my areas of research was experimental economics, which is the application of experimental methods to study economic questions that arise in real-world situations. For my NSF grant, my coauthors and I statistically analyzed data from a consumer buying behavior survey we conducted that determined the prices respondents would pay for products that could be sold in bundles. My undergraduate advisor, Colin Camerer, a MacArthur Genius Award Winner, utilizes experimental economics to study psychological forces and their deeper neuroscientific foundations that influence economic decisions involving individuals and markets. The former President of the University of Chicago relied on my undergraduate thesis as the theoretical basis for one of his published research papers on utilizing experimental economics surveys to generate economic conclusions.

As an undergraduate, I spent three years as a research assistant to the 1980 Nobel Prize winner Lawrence R. Klein. Dr. Klein was awarded the Nobel Prize in Economics for economic and statistical forecasting. As a graduate student, I studied under Roger Myerson, who won the 2007 Nobel Prize in Economics for analyzing environments that cause respondents to truthfully and accurately reveal their full preferences, and Dale Mortensen, who won the 2010 Nobel Prize in Economics for his study of labor markets.

# III.  Case Background

COVID-19 caused business and school disruptions throughout the country, especially during the Spring of 2020. RIT was no exception.

Residence halls at RIT opened for the Spring 2020 Semester on Thursday, January 9, 2020, and classes commenced the following Monday, January 13.[4] While RIT students were on Spring Break, the State of New York declared a state emergency because of COVID-19 on March 7, 2020.[5] About a week later, the federal government declared a national emergency.[6] In compliance with these declarations, RIT transitioned all campus-based classes to remote classes for the remainder of the Spring 2020 Semester. Virtual classes began on March 23, 2020. Students were

---

[4] https://www.rit.edu/calendar/1920, viewed on 3/28/2022.
[5]     https://web.archive.org/web/20200309142907/https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york, viewed on 5/26/2022.
[6]     https://www.whitehouse.gov/briefing-room/presidential-actions/2022/02/18/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic-2/#:~:text=On%20March%2013%2C%202020 ,safety%20of%20the%20Nation., viewed on 3/29/2022

instructed to vacate university housing by April 5, 2020,[7] though some students with extenuating circumstances were allowed to remain in their housing after that date.[8]

With the transition to remote classes and the general closing of its residence halls, RIT refunded its students more than $13 million in room and board.[9]  In addition, undergraduate students received approximately $5.0 million from the university in CARES Act related grants.[10]  Neither of the named Plaintiffs applied for CARES Act funding.[11]

The University incurred significant additional expenses during the Spring 2020 Semester in response to COVID-19 to ensure the safety of its students and staff, including installation of bipolar ionization system in campus facilities, touchless paper towel dispensers, touchless entries in restrooms and hand sanitizer dispenser stations among many other facility upgrades.[12]  RIT spent over $7.3 million on COVID-19 related projects from March 2020 through June 2021.[13]  The University did not charge students for these additional expenses.

Mr. Quattrociocchi was a third-year student during the Spring 2020 Semester pursuing a degree in Mechanical Engineering.[14]  Mr. Quattrociocchi learned a sufficient amount and performed academically well enough in his Spring 2020 Semester courses that he was to be admitted to RIT's accelerated dual degree program at the end of the Spring 2020 Semester.  This accelerated program allowed him to receive both a Bachelor's and Master's Degree in five years.[15]  Mr. Quattrociocchi went on to willingly enroll in classes during RIT's Summer 2020 Semester and its Fall 2020 Semester, knowing in advance that classes during both of those semesters would continue remotely in light of the ongoing pandemic.[16]  He continued to take classes in subsequent semesters and expected to graduate after the Spring 2022 Semester with both a Bachelor's and Master's degree.[17]

Mr. Bergeron was a standing Senior during the Spring 2020 Semester pursuing a Bachelor's degree in Computing and Information Technologies.[18]  Mr. Bergeron elected to enroll in a virtual class at RIT at the beginning of the Spring 2020 Semester (*i.e.*, pre-pandemic).  He continued with all of his Spring 2020 Semester classes after the transition and did sufficiently well so as to earn his highest Grade Point Average ("GPA") that Semester.  He went on to graduate and received his

---

[7]          https://www.rit.edu/news/rit-encourages-students-not-return-campus-courses-resume-march-23-through-alternative-modes, viewed on 3/29/2022.
[8] RIT0001510.
[9] RIT0001883.
[10] https://covid-relief-data.ed.gov/report/heer/002223642/2020/apr/student-number, viewed on 5/20/2022.
[11] See Quattrociocchi Deposition, p.  205.  Bergeron Deposition, p. 130.
[12]        https://www.rit.edu/admissions/sites/rit.edu.admissions/files/docs/Remote%20Start%20Online%20Presenation%20Slides-%20Fall%202020%20July%2015%202020.pdf, viewed on 5/11/2022, pp. 5-6.
[13] RIT0002176.
[14] Quattrociocchi Deposition, pp. 53, 67.
[15] RIT offers multiple accelerated dual-degree programs for undergraduates with completion times ranging between 5-6 years. See https://www.rit.edu/study/combined-accelerated-bachelors-masters#accelerated-dual-degrees, viewed on 5/20/2022.
[16] Quattrociocchi Deposition, pp. 88-89.
[17] Id., pp. 69-70.
[18] Bergeron Deposition, p. 36.

Bachelor's degree in August 2020.[19] Mr. Bergeron's RIT education enabled him to receive multiple engineering job offers, and is currently working in a field related to his studies at RIT.[20]

Mr. Quattrociocchi and Mr. Bergeron apparently were not satisfied with the millions of dollars RIT refunded to students and chose to file this lawsuit seeking tuition and fee refunds.  Their Second Consolidated Amended Class Action Complaint (the "Complaint"), dated January 14, 2021, seeks to certify two classes:

(1) **<u>The Tuition Class:</u>** All people who paid tuition for or on behalf of students enrolled in classes at the Institute for the Spring 2020 Semester but were denied live, in-person instruction and forced to use online distance learning platforms for the latter portion of that semester.

(2) **<u>The Fees Class:</u>** All people who paid fees for or on behalf of students enrolled in classes at the Institute for the Spring 2020 Semester.[21]

Section A below summarizes the tuition payments allegedly at issue in this case. Section B summaries the mandatory fees allegedly at issue in this case.  Section C below summarizes Dr. Cowan's proposed damages theories.

As discussed below, RIT did not uniformly charge a single rate of tuition and fees for all students. RIT posted different List Prices for its tuition and fees during the Spring 2020 Semester based upon student status.[22]  For example, part-time undergraduate and graduate students were not charged the same fees, and their tuition rates were both different in price and structure.  I present the List Prices of these tuition and fees for the Spring 2020 Semester below.  Additionally, as noted in Section VI below, the vast majority of students did not pay these List Prices.

## A.    *Tuition Payments*

Plaintiffs within the Tuition Class seek refunds for tuition payments made to RIT for the Spring 2020 Semester. *Figure 1* below shows that the List Price of RIT's tuition varies with enrollment status, education level and whether a student is enrolled in RIT's NTID program, a specialized college for the deaf and hard-of-hearing students.[23]  As discussed below, most students paid

---

[19] Bergeron Deposition, p. 18 & 54 and RIT0001155.

[20] Bergeron Deposition, pp. 18-21.

[21] Second Consolidated Amended Class Action Complaint, paragraph 46.

[22] List Prices refer to the tuition and fees as published in RIT's catalogs and on its website.

[23]    https://www.rit.edu/ntid/about-ntid viewed on April 29, 2022. Tuition List Prices: https://web.archive.org/web/20200115041225/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/undergrad enterfall2018,   https://web.archive.org/web/20200114013239/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ undergradenrolledpriorfall2018,    https://web.archive.org/web/20200115041232/https://www.rit.edu/fa/sfs/billing/ tuitionandfees/1920/graduate,    https://web.archive.org/web/20200115041235/https://www.rit.edu/fa/sfs/billing/ tuitionandfees/1920/undergraduate/parttimeprograms,    https://web.archive.org/web/20200115041238/https: //www.rit.edu/fa/sfs/billing/tuitionandfees/1920/online,    https://web.archive.org/web/20200115041242/https://www .rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/domesticundergraduate, https://web.archive.org/web/20200114194605 /https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/internationalundergraduate,    https://web.archive. org/web/20200115041249/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/domesticgraduate, https://web.archive.org/web/20200115041252/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/internation algraduate, all viewed on 4/26/2022.

substantially less than these List Prices, with some students receiving scholarships or other financial aid covering the full List Price of tuition.

| Figure 1 | | | | | |
|---|---|---|---|---|---|
| List Price of Tuition for Spring 2020 Semester | | | | | |
| Enrollment Time | Enrolled Prior to Fall 2018 | | | Fall 2018 or Later | | |
| Enrollment Status | Full-Time (12-18 Credit Hours) | More than 18 Credit Hours* | Part-Time* | Full-Time (12-18 Credit Hours) | More than 18 Credit Hours* | Part-Time* |
| *Undergraduate* | | | | | | |
| All Other Programs | $21,323 | $1,131 | $1,616 | $22,622 | $1,131 | $1,616 |
| Applied Arts & Sciences Programs | $21,323 | n/a | $1,034 | $22,622 | n/a | $1,034 |
| International NTID | $17,162 | $1,000 | $1,430 | $17,162 | $1,000 | $1,430 |
| Domestic NTID | $8,581 | $500 | $715 | $8,581 | $500 | $715 |
| RIT Online* | $1,034 | n/a | $1,034 | $1,034 | n/a | $1,034 |
| *Graduate* | | | | | | |
| All Other Programs | $23,761 | $1,485 | $1,980 | $23,761 | $1,485 | $1,980 |
| International NTID | $20,034 | $1,252 | $1,670 | $20,034 | $1,252 | $1,670 |
| Domestic NTID | $10,017 | $626 | $835 | $10,017 | $626 | $835 |
| RIT Online* | $1,129 | n/a | $1,129 | $1,129 | n/a | $1,129 |
| *Both part-time and RIT Online values are shown on a per-credit hour basis. | | | | | | |

As discussed below, Dr. Cowan only provided tuition damages calculations for certain undergraduates based on these List Prices, not on actual tuition paid.

## B.    Fee Payments

Mr. Quattrociocchi and Mr. Bergeron also seek refunds for fees relating to the Spring 2020 Semester.

There are three potentially relevant fees: the Student Activities Fee, the Student Health Service Fee and unspecified other fees. Proceeds from the Student Activities Fee are used to "support programs, events, and services that enhance the quality of student life at RIT."[24] The Student Health Services Fee provides students with free office visits for "many of the basic services students may need from Counseling and Psychological Services and the Student Health Center."[25] Although not specifically identified in the Complaint, Dr. Cowan asserts that lab fees for specific courses are also at issue in this lawsuit. It is my understanding however, that only a few classes for RIT undergraduates charge a separate lab fee, none of which were taken by the named Plaintiffs. Based on that understanding and Dr. Cowan's failure to identify what lab fees are at issue, I omit an analysis of lab fees in this Report and reserve the right to supplement as

---

[24] https://www.rit.edu/sfs/policies#explanation-of-fees, viewed on 3/29/2022.
[25] https://www.rit.edu/studenthealth/fees-and-payments, viewed on 5/20/2022.

appropriate.

*Figure 2* below shows the List Prices for the Student Activities Fee and Student Health Service Fee.[26]  Part-time undergraduates were not required to, but had the option to pay the Student Health Service Fee.  As discussed below, most students did not pay these List Prices.

| Figure 2[27] | | |
|---|---|---|
| List Price of Fees for Spring 2020 Semester | | |
| Enrollment Status | Full-Time | Part-Time |
| *Undergraduate* | | |
| Student Activities | $148 | $74 |
| Student Health Services | $175 | n/a |
| *Graduate* | | |
| Student Activities | $148 | n/a |
| Student Health Services | $175 | n/a |
| *NTID (part-time graduate students excluded)* | | |
| Student Activities | $148 | $74 |
| Student Health Services | $175 | n/a |

## C.    *Dr. Cowan's Proposed Damages Models*

Dr. Cowan incorrectly alleges that a common damages model could uniformly and formulaically assess the alleged losses supposedly incurred by all putative class members.

Dr. Cowan provided incomplete portions of a damages model in his Report.  Subsections 1 and 2 below briefly describe the broad framework he provided that he incorrectly claims can be used to assess alleged **per capita** tuition and fee damages, respectively.  His proposed damages models do not fully address issues with extrapolating these alleged per capita losses to the entire putative class.  He concedes, for example, that he did not calculate damages for RIT students enrolled in certain programs.[28]

---

[26]    https://web.archive.org/web/20200115041225/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/undergrad enterfall2018,   https://web.archive.org/web/20200114013239/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ undergradenrolledpriorfall2018,          https://web.archive.org/web/20200115041232/https://www.rit.edu/fa/sfs/billing/ tuitionandfees/1920/graduate,          https://web.archive.org/web/20200115041235/https://www.rit.edu/fa/sfs/billing/ tuitionandfees/1920/undergraduate/parttimeprograms,          https://web.archive.org/web/20200115041238/https: //www.rit.edu/fa/sfs/billing/tuitionandfees/1920/online,   https://web.archive.org/web/20200115041242/https://www .rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/domesticundergraduate, https://web.archive.org/web/20200114194605 /https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/internationalundergraduate,          https://web.archive. org/web/20200115041249/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/domesticgraduate, https://web.archive.org/web/20200115041252/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/internation algraduate, all viewed on 4/26/2022.
[27] Graduate students are considered full-time at 9 credit hours while Undergraduate students are considered full-time at 12 credit hours.
[28] For example, per Cowan Report, para. 6, Dr. Cowan says "[f]or purposes of this report, I assume that the NTID students are not part of the class. I exclude those from calculations."

1.    *Dr. Cowan's Proposed Per Capita Pro-Rata Benchmark Tuition Damages Theory*

Dr. Cowan proposed a Per Capita Pro-Rata Benchmark Tuition Damages Theory ("PPT Theory"). While identifying the broad framework for his PPT Theory, he did not perform the full calculation of alleged damages under this PPT Theory.  As a result, he did not explain the difficulties in applying the PPT Theory to all putative class members.  Dr. Cowan only provided an example of how he would calculate the alleged PPT Theory for full-time undergraduates, certain part-time undergraduates and Mr. Quattrociocchi.  He then made several unsupported assumptions that underlie his speculative guesses at what the alleged per capita tuition losses would be for certain putative class members, but not others.

Dr. Cowan stated that he required additional information in order to properly assess alleged tuition damages.  He did not state how he would obtain such information, which is problematic as I understand fact discovery has been completed.

It is standard for damages to be calculated as the difference between each plaintiff's Actual World position and the position they would have been in had the defendant not performed its allegedly improper actions (the "But-For World").

In this matter, the tuition payments each student actually paid RIT are analyzed in the Actual World.  Dr. Cowan assumes that he could estimate these tuition payments by starting with the List Prices for campus-based tuition described in Figure 1 above.  Recognizing that all students do not pay these List Prices, Dr. Cowan planned to subtract any **grants** students received **directly from RIT** from these List Prices, but he purportedly did not have information about the grants RIT provided to each putative class member.  He then incorrectly assumed that this difference equals every putative class member's Actual Payments to RIT.  As discussed below, these "Actual Payments" do not account for any other financial aid students may have received such as subsidized loans, Pell Grants, COVID-related aid, other government aid or scholarships from third-parties, all of which would have reduced the amounts the students actually paid to RIT.[29]  As a result, Dr. Cowan's Actual Payments do not represent what putative class members actually paid RIT for the Spring 2020 Semester.

Dr. Cowan calculated the tuition payments he assumed putative class members should have made in the But-For World in five steps.

First, Dr. Cowan assumed that RIT's transition to remote classes occurred when 50% of the Spring 2020 Semester had already occurred.  Consequently, he segregated the Spring 2020 Semester into two equal portions: the In Person Portion and the Online Portion.  Dr. Cowan did not provide any calculations supporting this 50% assumption, which as shown below in Section VII.B.3 is overstated.

Second, Dr. Cowan attempted to value the In Person Portion of the Spring 2020 Semester.  He assumed without any analysis that the List Price of tuition for the entire Spring 2020 Semester

---

[29] RIT -- Aggregate Damages, UG students 20220427.xlsx & https://nces.ed.gov/collegenavigator/?q=rochester +institute +of+technology&s=all&id=195003#finaid, viewed on 5/10/2022.

could be allocated on a pro-rata basis to each day of the Semester. With such a pro-rata assumption, Dr. Cowan believes that the In Person Portion of the Spring 2020 Semester could be valued by multiplying the Spring 2020 Semester List Prices by 50%.

Third, Dr. Cowan attempted to value the Online Portion of the Spring 2020 Semester. He assumed without any analysis that this value could be obtained by multiplying 1) the List Price per credit hour for RIT Online by 2) the number of credit hours each student took and by 3) his assumed 50% split of the Spring 2020 Semester as between the In Person Portion and the Online Portion. Through this calculation, Dr. Cowan is applying the benchmark method of constructing the But-For World.[30]  In particular, he assumed without any analysis that RIT Online's per credit hour List Price is the appropriate benchmark for what List Price RIT would have charged for this Portion of the Semester for all putative class members. He further assumed that the per credit hour RIT Online's List Prices were a proper benchmark for the per semester List Prices relevant for Full-Time campus-based RIT students. In other words, he assumed that the per semester List Prices could be disaggregated into per credit hour prices. Dr. Cowan, however, did not appear to possess information on the number of credit hours each putative class member took during the Spring 2020 Semester. He assumed without any analysis that all full-time undergraduate putative class members took 15 credit hours on average during the Spring 2020 Semester even though full-time students could take between 12 and 18 credit hours per semester, and Dr. Cowan does not appear to have taken any steps to determine what the actual average credit hours putative class members took during the Spring 2020 Semester. He also assumed that part-time undergraduates took 3, 6 or 9 credit hours during the Spring 2020 Semester even though he had no information about the number of credit hours actually taken by this population, and no information about any actual averages. Additionally, he assumed without any analysis that the List Price of tuition for the entire Spring 2020 Semester could be allocated on a pro-rata basis to each day of the Semester.

Fourth, Dr. Cowan added together his calculation of the values of the In Person Portion and the Online Portions of the Spring 2020 Semester to determine what he calls the "Total Value Received" during the semester. He claims that this Total Value Received should have been RIT's List Price for tuition during the Spring 2020 Semester. Because the List Prices for this But-For World he constructed are lower than the List Prices students actually faced during the Spring 2020 Semester, Dr. Cowan alleges that putative class members were damaged.

Fifth, Dr. Cowan assumed without any analysis that even though students would face lower List Prices for their tuition in his But-For World, RIT would have provided students with the exact same grants that it did when students faced the higher List Prices of the Actual World. He, therefore, incorrectly believes that the But-For Payments all putative class members would have made equals the difference between his List Prices in his But-For World and the grants that RIT gave to students when they faced the Actual World List Prices. Dr. Cowan did not explain the validity of this mismatched assumption. Additionally, as with his incorrect calculation of the Actual Payments he believes putative class members made, Dr. Cowan's analysis only accounts for grants RIT provided; he does not account for any other financial aid students may have received such as subsidized loans, Pell Grants, COVID-related aid, other government aid or scholarships

---

[30] Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits. *AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid* 06-4 (2013), paragraphs 67 – 69.

from third-parties.[31]

After describing this procedure, Dr. Cowan calculated **exemplars** of the But-For Payments and Actual Payments he believes are relevant for two student types: 1) full-time undergraduates in RIT's traditional program who took 15 credit hours and 2) part-time undergraduates in RIT's traditional program who took 3, 6 or 9 credit hours.  He then assumed that the difference between the Actual Payments and But-For Payments are the alleged damages for these student types.  He is silent on what the damages are for other student types including graduate students, undergraduates enrolled in RIT's NTID, full-time undergraduates who did not take 15 credit hours and part-time undergraduates who did not take 3, 6 or 9 credit hours.

Not only did Dr. Cowan ignore other student types, but he only provided calculations for a single exemplar student, Mr. Quattrociocchi.  Notably, Dr. Cowan did not calculate damages for the other named Plaintiff, Mr. Bergeron.   Section IX.B below shows that Dr. Cowan's methodology indicates that Mr. Bergeron was not damaged by RIT's allegedly improper actions.

## 2.    *Dr. Cowan's Proposed Per Capita Pro-Rata Fee Damages Theory*

Dr. Cowan did not identify a specific Per Capita Pro-Rata Fee Damages Theory ("PPF Theory"). He did not specify the exact fees, their amounts or who paid these fees.  As discussed above, he erroneously believes that RIT undergraduates only paid Student Activities Fees, Student Health Services Fees and lab fees.  While both Mr. Quattrociocchi and Mr. Bergeron were charged for the first two fees, neither were charged any lab fees during the Spring 2020 Semester.[32]

Like his PPT Theory, Dr. Cowan's PPF Theory "determines" an Actual World and a But-For World.  The fees RIT actually charged students are used in the Actual World calculations.  Dr. Cowan calculated the fee payments he assumed putative class members should have made in the But-For World in four steps.

First, like his PPT Theory, Dr. Cowan segregated the Spring 2020 Semester into two portions: the In Person Portion and the Online Portion, which he incorrectly assumed without any analysis were both 50% of the Spring 2020 Semester.

Second, Dr. Cowan attempted to value the In Person Portion of the Spring 2020 Semester.  He assumed without any analysis that the List Price of fees for the entire Spring 2020 Semester could be allocated on a pro-rata basis to each day of the Semester.  With such a pro-rata assumption, Dr. Cowan believes that the In Person Portion of the Spring 2020 Semester could be valued by multiplying the Spring 2020 Semester List Prices by 50%.

Third, Dr. Cowan incorrectly assumed without any analysis that all putative class members received **ZERO** value relating to fees during the Online Portion of the Spring 2020 Semester.

Fourth, Dr. Cowan added together his calculation of the values of the In Person Portion and the

---

[31] RIT -- Aggregate Damages, UG students 20220427.xlsx & https://nces.ed.gov/collegenavigator/?q=rochester +institute +of+technology&s=all&id=195003#finaid, viewed on 5/10/2022.

[32] Quattrociocchi Deposition, p. 206 & RIT0001090.

Online Portions of the Spring 2020 Semester to determine what he calls the "Total Value Received" during the semester. He claims that this Total Value Received should have been RIT's List Price for fees during the Spring 2020 Semester. Because the List Prices for this But-For World he constructed are lower than the List Prices students actually faced during the Spring 2020 Semester, Dr. Cowan alleges that putative class members were damaged.

Dr. Cowan did not include any financial aid calculations in his PPF Theory. Consequently, his PPF Theory would overstate alleged damages if the Finder of Fact certifies the putative Fee class, but not the putative Tuition class.

Unlike his PPT Theory, Dr. Cowan did not provide any exemplar calculations for his PPF Theory as they relate to either named Plaintiff, nor did he attempt to extrapolate the resulting alleged damages across the entire putative class. Instead, Dr. Cowan provides a "calculation" of "lab fees," which are not specified in the Complaint.

### 3.    *Dr. Cowan's Proposed Prejudgment Interest*

Dr. Cowan calculated what he believes should be the prejudgment interest on his alleged damages as well. He utilized a 9% compound interest rate and a period of two years to calculate the alleged prejudgment interest.[33] While I reserve the right to comment on his prejudgment interest calculation once a full damages model is presented, I understand that prejudgment interest is calculated with simple, not compound, interest.

# IV.  Summary of Opinions

I continue this Expert Report by critiquing the framework of Dr. Cowan's proposed damages theories. I reserve the right to update my opinions if and when the Plaintiffs put forward a complete damages model.

Section V below demonstrates that irrespective of any model details Dr. Cowan might provide, actual data show that class members were not damaged.

Section VI explains how Dr. Cowan has not put forth a proper or complete damages model nor a proper extrapolation of alleged tuition losses to a portion of the class

Section VII and VIII discuss the fundamental flaws with Dr. Cowan's proposed tuition and fee damages models, respectively.

Section IX shows that even if Dr. Cowan could show that remote classes were less valuable than campus-based classes, class members still might not have been damaged.

Section X shows that a complex analysis would be required to determine if RIT was unjustly enriched, and that such an analysis is not covered by Dr. Cowan's damages theory.

---

[33] Cowan Report, Footnote 21.

# V.   Actual Data Contradict Dr. Cowan's PPT Theory and His PPF Theory and Are Consistent with Class Members Not Being Damaged

It is axiomatic that actual data are generally preferable to hypotheticals as the basis for economic conclusions.  Hypotheticals often involve complex models, which regularly contain a large number of explicit and implicit assumptions that may or may not be accurate.  Actual data often remove such uncertainties.

Without any analysis of actual data, Dr. Cowan hypothesized damages models that he claims show that RIT undergraduates would have paid less if they had known that they would have had remote classes for at least part of the Spring 2020 Semester.  In contrast, actual, contemporaneous data demonstrate that RIT students likely would have paid a similar amount in tuition and fees for remote classes and services during the Spring 2020 Semester as they actually did.

There is no reason to construct such hypothetical damages models in this case. Almost all RIT undergraduates, including Mr. Quattrociocchi, were **actually** confronted with the question underlying Dr. Cowan's hypothetical models. As a result, one only has to look at their actual behavior to determine if there would be a price reaction to students receiving remote classes and services in the middle of a global pandemic. As discussed below, actual behavior indicates that there would not be a material price reduction, if any at all, because of RIT's transition to remote classes in response to COVID-19.

## A.   Putative Class Members Faced the Same List Price for Online and Campus-Based Classes During the Spring 2020 Semester

As an initial matter, even prior to the pandemic, for almost all programs at RIT, including the undergraduate program in which both Mr. Quattrociocchi and Mr. Bergeron were enrolled, the List Price was identical whether classes were campus-based or virtual.  Within its traditional undergraduate program, RIT has historically offered both campus-based and virtual courses at the same List Price.[34]  Before government stay-at-home orders were issued in response to the pandemic, some RIT degree-seeking undergraduates, including Mr. Bergeron, could and did elect to take at least one virtual class during the Spring 2020 Semester.[35]  When RIT undergraduates including Mr. Bergeron elected to take some of their courses virtually, they were charged the same tuition List Price as their classmates whose  courses were all campus-based.  Thus, there has historically been *no difference* in price between the List Prices of campus-based or virtual courses students in RIT's traditional program took even prior to the pandemic.  This conclusion is supported by information gathered through interviews with the Director of RIT Online for the Spring 2020 Semester who confirmed that the differential in List Prices for RIT's campus-based

---

[34] Information obtained based on interview with the former Director of RIT Online, on 5/25/2022. Also see https://www.rit.edu/study/graduate-and-undergraduate-bulletins, viewed on 5/31/2022, which outline various virtual courses offered at RIT as part of its traditional campus-based programs.
[35] Bergeron Deposition, p. 56.

programs and RIT Online is intended to account for the fact that RIT Online students do not qualify for institutional aid, as further discussed in Section VII.A.2.a.

Dr. Cowan's proposed damages theories do not take this crucial fact into account. Counter to his allegations, actual RIT List Price data demonstrates that putative class members were not injured by the transition to remote instruction.

Consequently, actual RIT student behavior shows that remote classes are **NOT** valued less than campus-based classes such that **all** putative class members would pay less for remote classes than campus-based classes. While it is possible that there could be some putative class members who **might** not pay the same price for remote classes as campus-based classes, given that many did pay that amount, an individualized analysis would be required to determine which students, if any, would pay less for remote classes as well as to determine how much less they would pay. Dr. Cowan ignores such individualized issues.

## B.    *Putative Class Members Elected to Pay Higher Prices for Semesters Taught Under Similar Conditions to the Spring 2020 Semester*

Before paying RIT tuition and fees for the Fall 2020 Semester, students knew that some or all of their classes would be conducted remotely and that they would not have access to full campus activities for all or part of that semester.[36]  Students knew no later than July 21, 2020 that many Fall 2020 Semester courses would not be campus-based, RIT sponsored events and buildings had strict occupancy limits and that RIT would switch back to a fully remote format if the need arose.[37] This announced educational environment included components that were similar to the environment that RIT students experienced during the Online Portion of the Spring 2020 Semester at issue in this lawsuit.

Not only was the actual and potential educational environment for the Fall 2020 Semester similar to the one that RIT students experienced during the Online Portion of the Spring 2020 Semester at issue in this lawsuit, but, as shown in *Figure 3* and *Figure 4* below, RIT's tuition List Prices were approximately 3.8% - 5.8% **greater** in the Fall 2020 Semester than in the Spring 2020 Semester.[38] The same was true for RIT Fee List Prices, which were 4.1% - 4.6% **greater** in the Fall 2020 Semester than in the Spring 2020 Semester.[39]

---

[36] https://www.rit.edu/admissions/sites/rit.edu.admissions/files/docs/Remote%20Start%20Online%20Presenation%20Slides-%20Fall%202020%20July%2015%202020.pdf, viewed on 5/11/2022, pp. 2 & 16-18.

[37] Id.

[38] As shown in Figure 1, Spring 2020 Tuition List Prices for full-time and part-time traditional undergraduates students enrolling Fall 2018 or later were $22,622 per semester and $1,616 per credit hour, respectively. Fall 2020 List Prices increased for both full-time and part-time traditional undergraduate students enrolling between Fall 2018 and Summer 2020, to $23,482 and $1,710 per credit hour. Therefore, the List Price for full-time traditional undergraduate students rose 3.8% (= ($23,482 / $22,622) -1) while the List Price for part-time traditional undergraduate students rose 5.8% (= ($1,710 / $1,616) -1).

[39] As shown in Figure 2, Spring 2020 Fee List Prices for full-time traditional undergraduate and graduate students were $323 (= $148 Student Activities Fee + $175 Student Health Services Fee) while part-time undergraduate students were charged $74 (Student Activities). Fall 2020 List Prices for full-time undergraduate and graduate students were $338 (= $153 Student Activities Fee + $185 Student Health Services Fee) and part-time undergraduate students

| Figure 3[40] | | | |
|---|---|---|---|
| **Change In Tuition List Prices** | | | |
| **Description** | **Spring 2020** | **Fall 2020** | **% Change** |
| *Undergraduate* | | | |
| **Full-time** | | | |
| Enrolling Prior to Fall 2018 | $ 21,323 | $ 22,133 | **3.8%** |
| Enrolling Fall 2018 or Later | $ 22,622 | $ 23,482 | **3.8%** |
| **Part-time (all List Prices are per credit hour)** | | | |
| Enrolling Prior to Fall 2018 | $ 1,616 | $ 1,710 | **5.8%** |
| Enrolling Fall 2018 or Later | $ 1,616 | $ 1,710 | **5.8%** |
| Applied Arts & Sciences | $ 1,034 | $ 1,094 | **5.8%** |
| *Graduate* | | | |
| **Full-time** | | | |
| Enrolling Prior to Fall 2018 | $ 23,761 | $ 25,068 | **5.5%** |
| Enrolling Fall 2018 or Later | $ 23,761 | $ 25,068 | **5.5%** |
| **Part-time (all List Prices are per credit hour)** | | | |
| Enrolling Prior to Fall 2018 | $ 1,980 | $ 2,089 | **5.5%** |
| Enrolling Fall 2018 or Later | $ 1,980 | $ 2,089 | **5.5%** |

---

faced a list price of $77 (Student Activities Fee). Therefore, the List Price for full-time traditional undergraduate and graduate students increased 4.6% (= ($338 / $323) -1) while the List Price for part-time undergraduate students increased 4.1% (= ($77 / $74) -1).

[40] https://web.archive.org/web/20200115041225/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/undergrad enterfall2018, https://web.archive.org/web/20200114013239/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ undergradenrolledpriorfall2018,  https://web.archive.org/web/20200115041232/https://www.rit.edu/fa/sfs/billing /tuitionandfees/1920/graduate, https://web.archive.org/web/20200115041235/https://www.rit.edu/fa/sfs/billing/ tuitionandfees/1920/undergraduate/parttimeprograms, https://web.archive.org/web/20201104012314/https://www. rit.edu/fa/sfs/billing/tuitionandfees/2021/undergradenrolledpriorfall2018, https://web.archive.org/web /20201104113652/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/undergradenterfall2018thrusum2020, https://web.archive.org/web/20201104012240/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/undergradenterf all2020, and https://web.archive.org/web/20201104012341/https://www.rit.edu/fa/sfs/billing/tuitionandfees /2021/graduate, all viewed on 4/26/2022.

| Figure 4[41] | | | |
|---|---|---|---|
| **Change In Fee List Prices** | | | |
| **Description** | **Spring 2020** | **Fall 2020** | **% Change** |
| *Undergraduate* | | | |
| **Full-time** | | | |
| Student Activities Fee | $  148 | $  153 | 3.4% |
| Student Health Services Fee | $  175 | $  185 | 5.7% |
| Total | $  323 | $  338 | **4.6%** |
| **Part-time** | | | |
| Student Activities Fee | $  74 | $  77 | 4.1% |
| Total | $  74 | $  77 | **4.1%** |
| *Graduate* | | | |
| **Full-Time** | | | |
| Student Activities Fee | $  148 | $  153 | 3.4% |
| Student Health Services Fee | $  175 | $  185 | 5.7% |
| Total | $  323 | $  338 | **4.6%** |
| **Part-Time (if enrolled in more than 9 credits)\*** | | | |
| Student Activities Fee | n/a | $  185 | n/a |
| Total | n/a | $  185 | n/a |
| *Part-Time graduate students were not charged fees prior to Fall 2020. | | | |

Consequently, all non-graduating Spring 2020 Semester students at RIT, including Mr. Quattrociocchi, had to decide prior to the Fall 2020 Semester whether to enroll at RIT for the Fall 2020 Semester and to be taught in an education environment similar to the one for which the Plaintiffs now claim they were overcharged, knowing that they would face higher List Prices.[42] In particular, all RIT students were, in effect, posed with the following question prior to the Fall 2020 Semester:

> *Will you pay full tuition and fees for the Fall 2020 Semester knowing that you will not have full in-person access to campus facilities and some or all classes will be taught remotely?*

---

[41] https://web.archive.org/web/20200115041225/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/undergradenterfall2018, https://web.archive.org/web/20200114013239/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/undergradenrolledpriorfall2018,  https://web.archive.org/web/20200115041232/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/graduate, https://web.archive.org/web/20200115041235/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/undergraduate/parttimeprograms, https://web.archive.org/web/20201104012314/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/undergradenrolledpriorfall2018, https://web.archive.org/web/20201104113652/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/undergradenterfall2018thrusum2020, https://web.archive.org/web/20201104012240/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/undergradenterfall2020, and https://web.archive.org/web/20201104012341/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/graduate, all viewed on 4/26/2022.

[42] Id & https://www.rit.edu/admissions/sites/rit.edu.admissions/files/docs/Remote%20Start%20Online%20Presenation%20Slides-%20Fall%202020%20July%2015%202020.pdf, viewed on 5/11/2022, pp. 2 & 16-18.

This question is similar to the question necessary to calculate alleged damages in this matter.

RIT enrollment data demonstrate that **most** students, including Mr. Quattrociocchi, **agreed** to be charged full tuition and fee prices to receive an education in an environment similar to the one for which the Plaintiffs now claim they were overcharged.  Specifically, 86% of undergraduates who were in their first year at RIT during the Spring 2020 Semester reenrolled for the Fall 2020 Semester despite the tuition and fee increases.[43]

This fact contradicts the Plaintiffs' claim that **all** putative class members were overcharged.  RIT students' **actual decisions** demonstrate that most did not believe they were overcharged for the education they received during the Online Portion of the Spring 2020 Semester.  Consequently, at a minimum, any student who reenrolled at RIT for the Fall 2020 Semester, like Mr. Quattrociocchi, was not damaged by RIT's alleged actions and should be excluded from the putative class.  Individualized analyses would be required to determine whether any RIT students who did not reenroll for the Fall 2020 Semester were damaged.  For example, students elect to not reenroll in universities for many reasons other than the circumstances at issue in this lawsuit.[44]

# VI.  Dr. Cowan Has Not Quantified The Alleged Class Members Or Their Alleged Per Capita Loss In a Non-Hypothetical Manner

As discussed above, in order to properly calculate damages in a tuition and fee class action, one must at least identify the quantity of class members as well as the losses allegedly suffered by each putative class member.  Dr. Cowan has done neither.  At best, he has provided some elements of information about losses for some undergraduates, but not any information for other class members.  For example, Dr. Cowan did not calculate purported damages sustained by the other named Plaintiff, Mr. Bergeron, and did not calculate purported damages for any students who enrolled at RIT after the Fall 2018 Semester.

First, Dr. Cowan did not properly calculate each putative class member's alleged losses.  He only calculated what he believes is the alleged tuition loss per person for certain traditional undergraduate and certain part-time undergraduate students at RIT that enrolled prior to the Fall of 2018.  He did not calculate what he believes would be the tuition losses allegedly suffered by other putative class members, such as students in RIT's NTID program, who have different tuition List Prices than traditional undergraduate students.

Second, in order to properly implement his PPT Theory, Dr. Cowan requires information on the number of credit hours each full-time undergraduate took during the Spring 2020 Semester.  He did not possess, provide or discuss how such information would be obtained.  In the absence of such information, he incorrectly estimated that full-time undergraduates enrolled in 15 credit hours on average.  This speculative, unsupported assumption for every undergraduate is contradicted by both named Plaintiffs, Mr. Quattrociocchi and Mr. Bergeron, who took 13 and 19 credit hours,

---

[43] https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?unitId=195003&year=2018&surveyNumber=15, viewed on 5/20/2022.
[44] https://collegestats.org/articles/beware-the-top-5-reasons-for-dropping-out-of-college/, viewed on 8/9/2021.

respectively, during the Spring 2020 Semester.[45]

In fact, even if it were proper to utilize per credit hour List Prices to estimate semester-long List Prices (it is not, as discussed in Section VII.B), it is economically incorrect for Dr. Cowan to utilize less than 18 credit hours for a full-time undergraduate in his models. All full-time RIT undergraduates had the option to take 18 credit hours. If they only took 12 credit hours, Dr. Cowan's proposed damages models incorrectly overstated alleged damages. Dr. Cowan's proposed damages models incorrectly imply that students who took less than a full-credit load paid more per credit hour than students who took a full-credit load.

In particular, Dr. Cowan's erroneous credit hours assumption has a sizable effect on his alleged damages. For example, as depicted below in *Figure 5*, if one assumed that Dr. Cowan's overall methodology was appropriate and that all full-time RIT undergraduates took 18 credit hours during the Spring 2020 Semester, Dr. Cowen's models would overstate damages by $14.7 million before prejudgment interest.

| Figure 5 | | | |
|---|---|---|---|
| **Dr. Cowan's Overstated Damages - Full-Time Students (assuming Dr. Cowan's overall methodology is appropriate)** | | | |
| **Actual Payment** | **Ref.** | **Dr. Cowan** | **Corrected** |
| **Value Contracted For** | | | |
| Tuition Paid | $a$ | $202,589,823 | $202,589,823 |
| **Actual Payment** | **$b=a$** | **$202,589,823** | **$202,589,823** |
| **But For Payment** | **Ref.** | **Dr. Cowan** | **Corrected** |
| **Value Received In-Person Portion** | | | |
| Tuition Value Contracted For | $c$ | $202,589,823 | $202,589,823 |
| Percentage In-Person | $d$ | 50% | 50% |
| **Value Received In-Person Portion** | $e=c \times d$ | $101,294,912 | $101,294,912 |
| **Value Received Online Portion** | | | |
| **Number of Credit Hours** | **$f$** | **15** | **18** |
| Number of Full-Time Students | $g$ | 9,501 | 9,501 |
| Price per Credit Hour | $h$ | $1,034 | $1,034 |
| Tuition Value Contracted For | $i=f \times g \times h$ | $147,360,510 | $176,832,612 |
| Percentage Online | $j$ | 50% | 50% |
| **Value Received Online Portion** | $k=I \times j$ | $73,680,255 | $88,416,306 |
| **But For Payment** | **$l=e + k$** | **$174,975,167** | **$189,711,218** |
| **Alleged Damages** | **$m= b-l$** | **$27,614,657** | **$12,878,605** |

Dr. Cowan's proposed damages models imply that full-time RIT students who were enrolled in fewer credit hours have greater alleged damages. Such an implication exposes the logical flaws in Dr. Cowan's proposed Damages Models. In particular, his proposed Damages Models provide lesser recoveries to students who took more classes at RIT. For example, Figure 5 above shows

---

[45] RIT0002062 & RIT0001157.

that the putative class members suffered less damages if they all took 18 versus 15 credit hours during the Spring 2020 Semester.  In other words, Dr. Cowan nonsensically alleges that although students were damaged because campus-based classes transitioned to remote classes, students who experienced more transitions had lower damages.

Third, Dr. Cowan did not obtain or discuss how he would obtain information demonstrating the number of credit hours each part-time undergraduate took during the Spring 2020 Semester, which is required to implement his PPT Theory. As discussed above, he speculatively assumed that part-time undergraduates either all took 3, 6 or 9 credit hours. Alleged damages widely vary depending upon which speculative assumption Dr. Cowan intends to utilize.  In particular, alleged damages would be $1.4 million lower, before prejudgment interest, if part-time undergraduates took 3 versus 9 credit hours during the Spring 2020 Semester.  Therefore, Dr. Cowan's proposed models do not calculate alleged damages with reasonable economic certainty.   Damages could be altered by millions of dollars depending upon the number of credit hours part-time students took.  Dr. Cowan has not provided any method to identify the number of relevant credit hours for each putative class member.  Consequently, his proposed models must be considered undefined and speculative.

Fourth, Dr. Cowan's PPT Theory improperly assumes that institutional financial aid, which he called "RIT Subsidies," would be the same in his Actual and But For Worlds for all undergraduates.  **Critically important, but ignored by Dr. Cowan, is the fact that RIT offers institutional financial aid to its traditional students, whereas RIT Online does not offer any institutional aid.**[46]  As such, institutional financial aid would be different for the vast majority of RIT undergraduates in the But For and Actual Worlds.  This is a significant difference since, during the 2019-2020 academic year 95% of full-time beginning undergraduates in the campus-based program received institutional aid in the amount of $56,115,491, or $21,912 to each student, on average.[47]

Consequently, the RIT Subsidies for the Online Portion of the Spring 2020 Semester in Dr. Cowan's But For World would be zero.  By assuming But For World RIT Subsidies were positive and equal to Actual World RIT Subsidies, Dr. Cowan incorrectly inflates alleged damages by the RIT Subsidies he assumes RIT would have provided students in his hypothetical world.  In other words, the financial aid RIT gave to its students during the Spring 2020 Semester should be deducted from any alleged damages calculated by Dr. Cowan's proposed damages models.  Because the financial aid RIT provided its students sizably exceeds Dr. Cowan's alleged damages, a proper application of Dr. Cowan's methodology implies that the putative class did not suffer any damages. This is further illustrated for Mr. Bergeron in *Figure 9* in Section IX.B.2 of this Report.

# VII. Dr. Cowan's PPT Theory Is Fatally Flawed

Notwithstanding the above, I discuss in this section the flaws in Dr. Cowan's PPT Theory as well as the individualized issues that are required to employ this Theory below.  I separately discuss

---

[46]      https://web.archive.org/web/20200115041238/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/online, viewed on 4/26/2022.

[47] https://nces.ed.gov/collegenavigator/?q=rochester+institute+of+technology&s=all&id=195003#finaid,  viewed on 5/10/2022.

the Benchmark portion and the Pro-Rata Portion of this PPT Theory below in Sections A and B, respectively.

## A.     The Plaintiff's Benchmark Methodology Is Fatally Flawed

As discussed above, the Benchmark portion of Dr. Cowan's PPT Theory assumes that all RIT students would view RIT Online as being comparable to the education they received during the Online Portion of the Spring 2020 Semester.

This assumption is flawed for several reasons.

### 1.     RIT Online Is Not Comparable To and Therefore Not a Suitable Benchmark For RIT's Traditional Program

The Benchmark portion of Dr. Cowan's PPT Theory is an application of the standard Yardstick or Benchmark Method of calculating damages. Under this method, the damages expert must demonstrate that the "comparable" university program (here, RIT Online) is sufficiently comparable to RIT's campus-based classes and that any tuition and fee difference that might exist could not be explained by other factors.[48]

Dr. Cowan did not demonstrate sufficient comparability between RIT Online and RIT's campus-based programs that would make the former a proper benchmark for the latter. Dr. Cowan ignored many material differences between the two programs. Dr. Cowan's analysis just assumed without any analysis that RIT would charge the RIT Online List Price for his hypothetical But For World classes. He ignores the fact that price setting for such classes is an intensive, detailed process. The many differences between RIT Online and RIT's campus-based programs could explain the List Price differences between the programs.

First, RIT Online and RIT's campus-based courses target different students. RIT focuses on traditional, full-time students while RIT Online focuses on part-time and non-traditional students who commit to a fully remote academic education. While 90% of RIT's campus-based undergraduates are full-time students,[49] by contrast, only 11.5% of undergraduate RIT Online students were full-time in the Fall of 2019.[50] While RIT's campus-based course offerings aim to enroll first-time and transfer undergraduate students seeking a Bachelor's degree, RIT Online is designed for non-traditional students, such as working professional adults or people with busy schedules. RIT Online's website states:

> We crush the barriers to getting a degree. We design flexible learning experiences that will have an immediate impact on your career. We've been meeting employer demand and advancing careers since 1944.[51]

---

[48] Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits. *AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid* 06-4 (2013), paragraphs 68 – 69.
[49] https://nces.ed.gov/collegenavigator/?q=rochester+institute+of+technology&s=all&id=195003#finaid, viewed on 5/10/2022.
[50] RIT Online Data Request FINAL 20220512.pdf, p. 2.
[51] https://www.rit.edu/online/, viewed on 5/20/2022.

As the majority of RIT's campus-based undergraduate students have not yet had careers, many of these students would not find RIT Online to be "comparable" university programming.  At a minimum, to assess comparability, individualized analyses would be required to determine for each putative class member whether work, family or other personal factors affected their choice between RIT and RIT Online.

Second, while there were some course and degree overlap, Dr. Cowan failed to mention that RIT's campus-based program offers many more and different classes than RIT Online.  While RIT offered several different campus-based undergraduate classes in 78 different degree programs during the Spring 2020 Semester, RIT Online offered only 6 degree programs, only 1 of which is an undergraduate program.[52]  Further, only 4 of RIT Online's classes could be counted towards an undergraduate degree whereas the remaining were certificate related classes.[53]

Many RIT undergraduate students would not find RIT Online to be a sufficient benchmark because it did not offer the same classes they took during the Spring 2020 Semester, or the same degrees. Traditional, campus-based RIT students have a greater variety of classes and majors compared to RIT Online.  Additionally, the fewer majors offered by RIT Online would prevent many class members, including Mr. Quattrociocchi and Mr. Bergeron, from pursuing their intended degrees at RIT Online, further weakening its comparability.  Consequently, at a minimum, individualized analyses would be required to determine each putative class member's major as well as all of their Spring 2020 Semester classes in order to assess comparability and whether RIT Online would be a proper benchmark.

It is my understanding based on conversations with the former Director of RIT Online that students enrolled solely through RIT Online have limited access to 1) student support services including administrative support, 2) extracurricular programming and 3) health and wellness services, which Dr. Cowan makes no attempt to value.[54]

Consequently, the classes, structure, accessible degrees and value received from RIT Online and RIT's campus-based program are vastly different.  Unlike traditional RIT students, RIT Online students are committed to a fully remote program (they are limited to a maximum of two campus-based classes during their tenure at RIT Online), a very limited selection of courses and programs, no financial aid, and for the most part, no access to RIT's services.  By ignoring these differences, Dr. Cowan's proposed damages theory that claims that the former is a sufficient benchmark for the latter is fatally flawed.  Marketing 101 states that institutions charge different prices when products and services are sold to different consumer types.[55]  The aforementioned differences in the students enrolled in and the services offered by RIT Online and RIT's campus-based program likely explain any price differential that may exist.  RIT likely would have set remote List Prices to be more comparable to campus-based prices if the characteristics of RIT Online classes and students were more similar to those of RIT's campus-based program.  As Dr. Cowan did not

---

[52] https://www.rit.edu/study/undergraduate?keys=&cat=All, viewed on 5/20/2022.
[53] Id.
[54] Information obtained based on interview with the former Director of RIT Online, on 5/25/2022.
[55]   https://www.investopedia.com/ask/answers/042415/what-are-different-types-price-discrimination-and-how-are-they-used.asp, viewed on 1/13/2022.

demonstrate how such factors have been taken into consideration, he did not follow the damage calculation requirements set forth by the American Institute of Certified Public Accountants.

Individualized analyses would be required to determine the proper comparable / benchmark for each student as one might find Boston University Online to be the "best" comparable / benchmark, while another student might prefer Southern New Hampshire University. As a result, Dr. Cowan's formulaic, uniform model would not properly calculate alleged damages for individual members of the putative class.

## 2.    Dr. Cowan Improperly Calculated Financial Aid in His PPT Theory

As mentioned above, Dr. Cowan improperly considered financial aid in his PPT Theory. Dr. Cowan committed at least three errors in his assessment of financial aid in addition to his failure to include specific financial information for most students, a necessary input to his proposed damages model. Subsection a explains how Dr. Cowan improperly assumed that institutional financial aid would be the same in his alleged Actual and But For Worlds. Subsection b discusses how Dr. Cowan improperly excluded non-institutional financial aid. Subsection c highlights the COVID-related aid Dr. Cowan also excluded from his proposed damages models.

If Dr. Cowan properly calculated all financial aid in his PPT Theory, many students receiving financial aid, including Mr. Bergeron, would not be damaged and those who were damaged would have suffered smaller alleged losses. In Section IX.B.2 below, I show how Dr. Cowan's own proposed damages model would show that Mr. Bergeron was not damaged if his financial aid were properly considered.

### a.    Dr. Cowan Improperly Assumed Institutional Financial Aid Would be the Same in His Actual & But For Worlds

Dr. Cowan improperly assumed that institutional financial aid or his alleged "RIT Subsidies" would be the same in his Actual and But For Worlds. In fact, these "RIT Subsidies" would differ.

RIT offers institutional financial aid to its traditional, campus-based students whereas RIT Online does not. In fact, discussions with RIT personnel indicated that the differential List Price between RIT traditional classes and RIT Online is primarily due to traditional students being eligible to receive institutional aid, whereas RIT Online students were not.[56] As a result, most traditional, campus-based RIT undergraduates, including Mr. Bergeron, would not find RIT Online to be a comparable benchmark university because they received substantially more financial aid from RIT than they would from RIT Online. Assuming the financial aid students in RIT's traditional campus-based program would be identical if those students were enrolled in RIT Online demonstrates a further incongruity in Dr. Cowan's proposed damages models. If the List Price of RIT Online's tuition should be a sufficient benchmark for the Online Portion of the Spring 2020 Semester as Dr. Cowan alleges, the institutional financial aid for RIT Online should be a sufficient benchmark for the Online Portion of the Spring 2020 Semester.

---

[56] Information obtained based on interview with former Director of RIT Online, on 5/25/2022.

Correcting for his erroneous RIT Subsidy issue negates damages. For example, had Dr. Cowan calculated alleged damages for Mr. Bergeron his methodology would indicate that Mr. Bergeron suffered approximately $1,400 in damages. RIT provided Mr. Bergeron with $9,000 in RIT Subsidies during the Spring 2020 Semester. Dr. Cowan's model incorrectly assumes that Mr. Bergeron would have continued to receive this $9,000 in his But For World. However, because Mr. Bergeron likely would not have received any RIT Subsidies during the Online Portion of the Spring 2020 Semester under a proper application of Dr. Cowan's proposed Damages Model benchmark all else equal, Mr. Bergeron would only have received $4,500 in subsidies for the entire But-For Spring 2020 Semester. Consequently, Dr. Cowan's assumed $1,400 in damages for Mr. Bergeron overstates alleged damages by $4,500. This implies that Mr. Bergeron suffered negative damages (= $1,400 - $4,500) as a result of RIT's allegedly improper actions. I further discuss the impacts of financial aid to Mr. Bergeron's calculation of alleged damages in Section IX.B.2 of this Report.

At a minimum, individualized analyses would be required to determine each putative class member's financial aid, if it could be obtained by Dr. Cowan, in order to assess the potential applicability of the RIT Online benchmark. Further individualization would be required because as discussed in Section VII.A.2.a, the changes in tuition implied by Dr. Cowan's proposed damages models would cause each student's financial aid to be recalculated. This required recalculation further undermines Dr. Cowan's proposed damages model.

### b.      Dr. Cowan Improperly Excluded Non-Institutional Financial Aid

While he included financial aid students received from RIT, Dr. Cowan improperly failed to consider financial aid from other sources, such as Pell Grants, other government grants, third-party financial aid and subsidized loans, from his proposed damages models. Dr. Cowan did not provide a reason for this exclusion. Dr. Cowan apparently does not possess information on such financial aid for most putative class members.

This exclusion inflates overall damages because like with the RIT Subsidies, much financial aid from these other sources is tied to the overall Cost of Attendance at a university. If the Cost of Attendance would decrease as it would if the putative class would receive damages, so would the need-based financial aid from these other sources. For example, Pell Grants are calculated based upon information from a student's Free Application for Federal Student Aid ("FAFSA"), which includes the relevant Cost of Attendance.[57] Under Dr. Cowan's Proposed Damages Theory, students' Cost of Attendance would have been lower in his But For World than in his Actual World. As a result, students likely would have received less in Pell Grants and other aid in Dr. Cowan's But For World. By ignoring these likely financial aid adjustments, Dr. Cowan further overstated alleged damages.

### c.      Dr. Cowan Improperly Excluded COVID-Related Aid

Dr. Cowan improperly failed to consider COVID-related aid, such as CARES Act funding that RIT distributed to students, from his calculation of alleged damages. Dr. Cowan's proposed model incorrectly assumes that students would have received COVID-related aid in both his Actual and

---

[57] https://studentaid.gov/understand-aid/types/grants/pell, viewed on 5/20/2022.

But For Worlds. At its very core, students' receipt of such funds would not have happened But-For the pandemic and RIT's transition to remote learning. Consequently, putative class members would not have received COVID-related aid in Dr. Cowan's But For World. As a result, Dr. Cowan's damages models overstate alleged damages by at least the $5.0 million in COVID-relief payments RIT made to more than 7,000 undergraduate students.[58]

Dr. Cowan would not be able to properly deduct these COVID-relief payments even if he wanted to as he apparently does not possess information on such payments for most putative class members.

Furthermore, some students had the ability to apply for COVID-related aid, but did not do so, including the two named Plaintiffs. The Finder of Fact could determine that such students did not properly mitigate,[59] and that the COVID-relief funds they could have received had they been more diligent should be further subtracted from damages.

Because students received and could have received different COVID-relief payments, this damages adjustment would also be highly individualized.

### 3.    Properly Evaluating The Benchmark Portion of Dr. Cowan's PPT Theory is Highly Individualized

Notwithstanding the above, I identify additional individualized issues below. In particular, subsection a below discusses the demonstrated value that RIT students received in Spring 2020. Subsection b shows that even if there were some diminishment in value during the Online Portion of the Spring 2020 Semester, that diminishment would be highly individualized.

#### a.    Contemporaneous Data Show That Class Members Received Equivalent Value from the Online Portion of the Spring 2020 Semester

One common reason a student seeks a college education is that a college degree serves as a prerequisite for many careers. Therefore, one way to measure the education a student received during their time at a university is through the job / graduate school placement and starting salaries of graduates.

As discussed above, Mr. Bergeron received job offers after graduating from RIT and Mr. Quattrociocchi was admitted to a graduate program after the Spring 2020 Semester, consistent with the value of their degrees not being harmed by RIT's transition to remote education. Furthermore, *Figure 6* below shows that job placement rates and starting salaries were not impacted by RIT's transition.[60]

---

[58] https://covid-relief-data.ed.gov/report/heer/002223642/2020/apr/student-number, viewed on 5/20/2022.

[59] Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits. *AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid* 06-4 (2013), paragraphs 134 - 135.

[60]    https://www.rit.edu/emcs/oce/sites/rit.edu.emcs.oce/files/Career%20ServicesAnnualReport_2018-2019-min.pdf, https://www.rit.edu/careerservices/sites/rit.edu.careerservices/files/2020-11/CareerServicesAnnualReport

| Figure 6 Outcome Rate & Undergraduate Starting Salaries | | | |
|---|---|---|---|
| **Academic Year** | **2018-2019** | **2019-2020** | **2020-2021** |
| **Job Placement Rate** | 94% | 94% | 93% |
| **Average Undergraduate Starting Salary** | $ 56,249.77 | $ 61,247.45 | $ 64,759.57 |

Such data are consistent with students' education during the Online Portion of the Spring 2020 Semester being comparable to the campus-based education they received in other semesters. In other words, the data in Figure 6 are inconsistent with the Dr. Cowan's proposed damages theories that putative class members received diminished value during the Online Portion of the Spring 2020 Semester.

Second, Dr. Cowan's proposed damages theories that students receive diminished value from remote classes are inconsistent with Nobel Prize-winning research. In 1973, Michael Spence published a paper called "Job Market Signaling" in the *Quarterly Journal of Economics* for which he won the 2001 Nobel Prize in Economics.[61] Dr. Spence, who was Dean of Stanford Business School, concluded that students do not need to learn anything for universities to confer value as completing an education conveys information about a student's inherent abilities. He demonstrated that college completion signals a student's strength even if college did not make them intellectually stronger. This conclusion continues to hold as *New York Magazine* wrote in May 2020 that "no one has really come up with the ability to certify [potential hires] to the same extent that universities[' admissions departments] do."[62]

Because Dr. Cowan has not disputed that a degree from RIT on or after the Spring 2020 Semester still provides a strong signal about and certification of a student's ability that gives them an advantage in obtaining employment, Dr. Cowan cannot claim that students received a diminished value from the Online Portion of the Spring 2020 Semester. In other words, Nobel Prize-winning research **is inconsistent** with Dr. Cowan's proposed damages theories that putative class members received diminished value during the Online Portion of the Spring 2020 Semester. Consequently, Nobel Prize-winning research **is consistent** with the value students received during the remote portion of the Spring 2020 Semester being comparable to the value they received in other semesters.

> ### b.   Even If There Were Some Diminishment in Value During the Online Portion of the Spring 2020 Semester, That Diminishment Would Be Highly Individualized

First, putative class members attended different remote classes that possessed different characteristics. During the Online Portion of Spring 2020 Semester, it is my understanding that some professors taught synchronously via Zoom, while others held classes asynchronously to accommodate students in different time zones. As a result, putative class members were not similarly situated with what their educational environment was during the Online Portion of the

---

20192020.pdf and https://www.rit.edu/marketing/sites/rit.edu.marketing/files/docs/pdfs/Career-Services-Annual-Report-2022.pdf, all viewed on 5/12/2022.
[61] Spence, Michael "Job Market Signaling." *Quarterly Journal of Economics.* 87(3), 1992, pp. 355-374.
[62] Walsh, James D. "The Coming Disruption," *New York Magazine*, May 11, 2020.

Spring 2020 Semester and how the different environments compared to the environments from the In-Person Portion of the Spring 2020 Semester.  Dr. Cowan did not propose any method to measure the associated individualized values putative class members received from the different educational environments they experienced during the Online Portion of the Spring 2020 Semester.

Second, Mr. Quattrociocchi testified that he believed that different classes were impacted differently by the transition to remote education.[63]  Assuming this statement accurately reflected RIT's classes overall for all putative class members, his testimony implies that the value students allegedly lost by RIT's transition to remote education varied from class to class.  Therefore, in order to determine alleged damages, one must investigate each class that each putative class member took.  Students who took classes that were not that impacted by the transition (for example, students who were enrolled in classes that had a virtual modality from the beginning of the Spring 2020 Semester) would have suffered less alleged damages than students who took other classes.

Given the variety inherent in each student's class schedules, Mr. Quattrociocchi's testimony implies that individualized analyses would need to be performed in order to calculate alleged damages.  Even if such individualized analyses could be performed, Dr. Cowan did not propose any method to measure the allegedly lower values each putative class member received from their remote classes.

Third, Dr. Cowan did not demonstrate that there was any diminishment in teacher student interaction after RIT's campus-based programs transitioned to a remote format for the second portion of the Spring 2020 Semester.  While students still interacted with teachers and with their peers during Zoom classes, any diminishment in classroom interaction that might have occurred would be highly individualized as discussed in nationwide studies.  For example, about half of the total course hours at universities across the country deliver are high volume courses like Sociology 101.[64]  The classroom interaction in such classes likely could be less impacted by a move to remote classes than specialized seminars.[65]  Consequently, RIT students who attended large lecture classes at the beginning of the Spring 2020 Semester might not have had much classroom interaction in the first place.  On the other hand, some students in small seminars might opt not to participate in classroom discussions irrespective of teaching environment.  Teacher student interactions can also differ by major.  While the number of full-time faculty members in majors like comparative literature and physics in general exceed the number of undergraduate degrees they annually award, other majors such as psychology award 4 to 5 undergraduate degrees per faculty member.[66]  Additionally, classroom discussion, which could vary by class and student makeup, greatly affects learning.[67]

Fourth, Dr. Cowan's proposed damages models ignore the individualized benefits class members

---

[63] Quattrociocchi Deposition, p. 200.

[64] Ruth, Stephen, Can MOOC's and Existing E-Learning Efficiency Paradigms Help Reduce College Costs? (June 18, 2012), p. 6.

[65] Faculty without Students: Resource Allocation in Higher Education. William R. Johnson and Sara Turner *Journal of Economic Perspectives*: 23(2), 2009, p. 177.

[66] Id., p. 172.

[67] Emanuel, Jeff and Lamb, Anne, "Open, Online, and Blended: Transactional Interactions with MOOC Content by Learners in Three Different Course Formats," working paper, 2015, p. 15-16 and author's personal teaching experience.

might have received from remote classes.  For example, one study showed that students obtained increased family time and additional free time to either get a job, sleep, exercise, pursue hobbies, personally or professionally develop and pursue other enjoyments of life.[68]  In addition, having the ability to go through lectures at your own pace is a benefit of remote learning, which appears to be especially true for Mr. Bergeron as he received his highest ever GPA at RIT during the Spring 2020 Semester.  This, again, further necessitates individualized inquiry amongst class members in order to calculate alleged damages.

Fifth, Dr. Cowan incorrectly assumed that all students are similarly situated.  This is incorrect as some students including Mr. Bergeron enrolled in virtual classes for the Spring 2020 Semester prior to the pandemic.[69]  Dr. Cowan has not shown why students who voluntarily enrolled in remote classes before the transition to remote classes suffered similar alleged damages to students who had not enrolled in remote classes prior to the transition.

## B.    *Dr. Cowan's Pro-Rata Methodology Is Fatally Flawed*

Even if some pro-rata methodology were viable, it is economically improper to try to value portions of a semester.  Students purchased learning over an entire semester that is comprised of multiple days.  As a result, they purchased a bundle of days of learning.  As discussed in subsection 1 below, it is improper to assume what the price of components of that bundle are as Dr. Cowan attempts to do in his proposed damages methodology.

Even if some prorated methodology were viable, it is economically incorrect to assume that the putative class members' diminished value would be proportional to the number of days of the remote class portion of the Spring 2020 Semester as Dr. Cowan attempts to do.  Dr. Cowan's assumption implies that each day in the Semester was equally valuable to all students.  While such an assumption might be convenient, it is not economically correct.  Not only does each student's marginal utility differ between putative class members as discussed in subsection 2, but the number of days students are on campus also varies on an individualized basis as discussed in subsection 3.

### 1.    *Dr. Cowan Incorrectly Equates Different Pricing Methods in His Proposed Prorated Damages Methodology*

Institutions can employ different pricing methodologies when selling their products and services. For example, an institution can opt to sell a single product or bundled set of products.  Different pricing methodologies could be employed for each.  For example, a grocery store could sell a six-pack of soda for $3.00 and an individual can for $1.00.  A consumer cannot claim that the grocery store overcharged them for the individual can.  Because different consumer types might desire an individual can over a six-pack, the grocery store utilizes different pricing methodologies that are fine-tuned to the characteristics of the consumers that tend to purchase the product in question.  As a result, one cannot look at the price of the six-pack and assume that because six cans cost $3.00,

---

[68] Patricia Aguilera-Hermida, A.. "College students' use and acceptance of emergency online learning due to COVID-19." International Journal of Educational Research Open vol. 1 (2020): 100011. doi:10.1016/j.ijedro.2020.100011.
[69] Bergeron Deposition, p. 56.

each can must cost $0.50 (= $3.00 / 6), which is effectively what Dr. Cowan does in his damages models.

As discussed in my *Journal of Economic Behavior and Organization* paper, which was derived from my NSF funded research,[70] whether the implied price of an individual product in a bundle is more or less than the price of the individual product if it was individually sold depends on the characteristics of the product and bundle. For example, convenience could cause consumers to purchase a bundle of a product and servicing of that product (e.g., extended warranty) even though it would be monetarily cheaper to purchase the product and servicing separately.

Current U.S. Treasury Secretary Janet Yellen co-authored with William James Adams one of the seminal economic articles on bundling in 1976.[71] They concluded that one cannot draw conclusions about the prices of individual components of a bundle from the bundled price as Dr. Cowan does. The infinite set of possible individual component prices that could be derived from the bundled price "seriously complicates public appraisal of …. [and] affects certain conclusions that may be drawn."[72] As another author wrote regarding the possible individual component prices can be derived from a bundled price, "nearly anything can happen with bundling."[73]

Dr. Cowan's proposed damages methodology violates these economic maxims. In particular, he incorrectly assumes that the List Price RIT charged for an entire semester could be translated into a daily List Price. In other words, his proposed Damages Model incorrectly attempts to calculate individual component daily List Prices from a bundled semester List Price. For the reasons discussed above, there are an infinite set of possible daily List Prices that could be derived from the List Prices that span an entire semester. Subsections 2 and 3 below provide some possible reasons for different daily prices. Dr. Cowan did not consider these possible differences in their proposed Prorated Damages Methodology.

As a result, it is economically improper for Dr. Cowan to translate RIT's List Prices that span an entire semester into a daily List Price in his proposed Prorated Damages Methodology.

Furthermore, it is questionable whether it is proper to analyze per semester List Prices to assess alleged damages. While students pay on a semester basis, most are pursuing degrees that span multiple semesters. Consequently, one could contend that it is proper in this lawsuit to analyze the overall cost of a degree, not the cost of an individual semester. This contention implies that it is improper to investigate the costs students incurred for a particular semester; rather, one would have to investigate the costs for all semesters needed to complete a degree. As Dr. Cowan did not analyze the cost of a RIT degree, his proposed methodology did not address the question of interest under this scenario.

---

[70] Manelli, Alejandro, Martin Sefton and Benjamin Wilner "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" *Journal of Economic Behavior and Organization*, 61(2), pp. 304 – 323, October 2006
[71] Adams, William James and Janet Yellen (1976) "Commodity Bundling and the Burden of Monopoly" *Quarterly Journal of Economics*, 90: ("Adams and Yellen"), p. 475-98.
[72] Id., p. 477 & 497.
[73] Varian, Hal R. "Price Discrimination," Working Paper, July 1987, p. 24.

## 2.      Marginal Utility Is Different For Each Student

One standard economic maxim is that people generally obtain decreasing marginal utility for consuming products.[74] In other words, the additional benefits one receives from consuming an additional unit of a product decreases as one consumes more. For example, a person generally obtains greater benefits from consuming the first slice of pizza than the tenth slice.

Dr. Cowan's proposed pro-rata methodology does not consider whether students received greater benefits from campus-based classes during the first part of the Spring 2020 Semester than they would have in the second part if classes remained campus-based. There are an enumerable number of individualized reasons why such an economic phenomenon could occur.  For example, graduating seniors who had secured early employment or graduate school admission might view the second part of the Spring 2020 Semester differently than other students.  In fact, Mr. Bergeron testified that he received a job offer before the transition.[75]

Consequently, the degree to which class members experienced decreasing marginal utility during the Spring 2020 Semester would be individualized. Therefore, Dr. Cowan cannot value class members' alleged losses with his pro-rata assumption.

## 3.      The Number of Relevant Days Is Individualized

Even if each day in the Spring 2020 Semester were equally valuable to all putative class members, the number of relevant days is highly individualized.  Dr. Cowan suggests that his prorated percentage could be calculated by taking the number of days that RIT only offered remote classes divided by the total number of relevant days in the Spring 2020 Semester.  However, individualized analyses would be required to determine both the numerator and denominator of this proportion.

As discussed above in Section VII.B.1, such an assumption incorrectly implies that the List Prices for a semester-long bundle of days could be translated into a daily List Price.  Additionally, Dr. Cowan's assumption incorrectly implies that each day in the Semester was equally valuable to each student.  While such assumptions might be convenient, they are not economically correct. Not only is it economically improper to calculate individual component prices from a bundled price and to assume the marginal utility received from each day of learning is the same for all putative class members, but the number of days students are **actually** on campus also varies on an individualized basis.

Dr. Cowan ignored this individualized issue by just asserting that the In-Person Portion and Online Portion were both 50% of the Spring 2020 Semester; he demonstrated no calculations support this unsupported claim.

Analyzing semester details shows that the In-Person Portion and Online Portion of the Spring 2020 Semester varies from student to student.  For example, the start date of the Spring 2020 Semester is individualized.  As discussed above, RIT's residence halls opened 4 days prior to the day classes commenced.  The In-Person Portion of the Spring 2020 Semester would be greater for students

---

[74]      https://corporatefinanceinstitute.com/resources/knowledge/economics/law-of-diminishing-marginal-utility/, viewed on 5/11/2022.
[75] Bergeron Deposition, p. 20-21.

who arrived on campus prior to the start of classes. Consequently, to assess the In-Person Portion of the Spring 2020 Semester one would have to analyze the arrival date of each putative class member.

The end date of the Spring 2020 Semester is also individualized. This semester was scheduled to end with commencement, which was scheduled to occur on May 8, 2020 and May 9, 2020.[76] Not only did classes end prior to RIT's commencement, but classroom teaching ended earlier as the Spring 2020 Semester had a finals week after classroom teaching ended. These dates cause the end date of the Spring 2020 Semester to be different for different students. Students whose finals ended early in finals week might have left campus early, decreasing the length of their semester relative to students whose finals ended later.

Additionally, the number of relevant days and the value of those days would vary by numerous factors including, but not limited to:

- Days where students did not have any classes;
- Students who had more classes on a given day;
- Students who had off-campus externships;
- Students who had on-campus internships;
- Commuter students;
- Students who went home for some or all weekends;
- Students who infrequently attended professor office hours; and
- Students who remained on campus after the transition.

For example, if only total instructional days were considered and a given student had classes on every one of those days, the Online Portion of the Spring 2020 Semester would only comprise 43% of that semester as compared to the 50% that Dr. Cowan claims.

The aforementioned logistical issues make the claimed formulaic calculation of damages highly individualized. Consequently, contrary to Dr. Cowan's unsupported assumption, any decreased price RIT might charge for the tuition and fees would be highly individualized and not necessarily tied to the number of days as alleged.

# VIII.    Dr. Cowan's PPF Theory Is Fatally Flawed

Dr. Cowan claims that students received **no value** from the services associated with the Fees at issue in this lawsuit during the Online Portion of the Spring 2020 Semester.[77] As a result, his PPF Theory incorrectly alleges that students should receive a refund equal to the entirety of the List Price of the Spring 2020 Semester Fees multiplied by the portion of that Semester that he believes was associated with the Online Portion.

Contrary to such a damages theory, RIT students did **not** receive **zero** value from the services associated with the Fees at issue in this lawsuit during the Online Portion of the Spring 2020 Semester. As discussed in subsection A below, students received value from the associated

---

[76] https://www.rit.edu/calendar/1920, viewed on 3/28/2022.
[77] Cowan Report, paragraphs. 17 & 29.

services during this time.  Dr. Cowan's proposed Fee Damages Model does not properly address the individualized issues required to demonstrate that a given student received reduced value and, if so, what that value was.

Even if the services were "limited" in some way as the Plaintiffs assert, Dr. Cowan ignored these individualized limitations in his damages theory.  Furthermore, Dr. Cowan did not assess the value of the multiple "added" services that RIT provided students during the Spring 2020 Semester.

Even if Dr. Cowan could somehow show that he could calculate a value diminishment during a portion of the Spring 2020 Semester in a uniform, class-wide basis, subsection B shows that such a diminishment would not necessarily be proportional to the number of days after RIT allegedly closed or reduced its services.  If such a calculation needed to be performed, the relevant number of days would be highly individualized.

## A.     Students Received Value from the Portion of the Spring 2020 Semester After RIT Allegedly Closed or Reduced Its Services

RIT students arguably received similar value from the services associated with the "Mandatory Fees" (as the Plaintiffs term it) after the transition to remote classes. If a student experienced a value diminishment in any way, an individualized analysis on a student-by-student basis would be required to determine the value that that student received.  Even if some services were reduced or different in some way, individualized analyses would be required to assess the added / different services students received.

### 1.     Contemporaneous Data Show That Class Members Received Value from the Portion of the Spring 2020 Semester After  RIT Transitioned to Online Classes

RIT continued to provide its students with services supported by the Student Activities Fee and Student Health Fee during the Online Portion of the Spring 2020 Semester, including varying student activity programming and telemedicine services.[78] Further, RIT incurred roughly $8.5 million of expenses in 2020 relating to its services covered under the Student Health Services Fee while the corresponding fee revenue was only $4.7 million.[79]  Dr. Cowan did not address any of these continued services in his Report, nor did he attempt to disaggregate the value of remote services from campus-based services as he did in his calculation of alleged tuition damages.

### 2.     Even If There Were Some Diminishment in Value During the Time RIT Allegedly Closed or Reduced Its Services, That Supposed Diminishment Would Be Highly Individualized

The Plaintiffs' own testimony shows the individualized nature of alleged loss in services associated with each fee.  Not only did they choose not to access many of the allegedly relevant services (even pre-pandemic), but they were unaware of what many of the services and resources available to

---

[78] Bergeron Deposition, p. 46 and p. 133.
[79] RIT0001884.

RIT students were.  For example, Mr. Quattrociocchi testified that he did not know what was covered by the Student Health Services fee and that he has never used the Student Health Center.[80]  Mr. Bergeron testified that he only utilized the Student Health Center, which was covered by his Student Health Services fee, twice over his tenure at RIT.[81]  Mr. Bergeron also testified that he was aware that student activity programing continued to operate virtually during the second half of the Spring 2020 Semester, but he voluntarily chose not attend any of this programming.[82]

This testimony demonstrates the need for both (1) an individualized student-by-student analysis to verify what fees each student were assessed and paid for and (2) a further individualized inquiry to assess if there were any losses related to those fees.

Even if certain services were discontinued because it was impossible to transition them to a remote modality, students would value that access differently depending upon their usage. Nobel Prize-winning options theory states that the value of an option to access certain services depends upon the likelihood of that person utilizing the services.[83] An option would be worthless to someone who would never exercise it.

Therefore, RIT students who did not utilize and had no plans to utilize on-campus services, such as physical visits to the Student Health Center, were not damaged by RIT's transition to the Online Portion of the Spring 2020 Semester.   This includes one of the named Plaintiffs, Mr. Quattrociocchi, who testified he did not recall ever using RIT's Student Health Services or the school's Counseling and Psychological Services.[84]  Mr. Quattrociocchi and Mr. Bergeron also testified that they did not participate in most student activities offered by RIT.[85]  The option to access services they would not use would be worthless.  Such students would have been in the same economic position even if the transition had not occurred.  Thus, any transition of services covered by the Student Activities Fee and Student Health Fee or any discontinuation of a particular service that could not be moved to a remote format did not reduce the value of this option to any student who would not have used the services in any event.

Even though students do not directly receive value from unutilized campus services, one educator found that "the majority of students agree that they should fund programs they may never utilize with student fees."[86]

Furthermore, because students utilize the campus in different ways, any losses they might have suffered because they were allegedly denied access to certain on-campus services would also be individualized. Utilizing options-pricing terminology, because the likelihood a given student would utilize a given service as well as the value that student would receive if it were utilized

---

[80] Quattrociocchi Deposition, pp.206-207.
[81] Bergeron Deposition, p. 131.
[82] Id., p. 133.
[83] Black, Fischer, and Myron Scholes. "The Pricing of Options and Corporate Liabilities." *Journal of Political Economy*, vol. 81, no. 3, University of Chicago Press, 1973, pp. 637–654, http://www.jstor.org/stable/1831029. On p. 638, it states "...if the price of the stock is much less than the exercise price, the option is almost sure to expire without being exercised, so its value will be near zero."
[84] Quattrociocchi Deposition, p. 82.
[85] Bergeron Deposition, pp. 43-47.  Quattrociocchi Deposition, pp. 81-83.
[86] Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011, ("Sterritt"), p. 20.

varies from student-to-student, so would the value of access to those services if utilized. Therefore, any alleged diminishment in campus use also would be highly individualized, which Dr. Cowan ignored.

Individualized analyses would be required to determine the likelihood of a given student utilizing certain services. For example, studies have even shown that certain demographics (e.g., commuter students) tend to not utilize certain on-campus services, like certain student clubs.[87] Also, some students may attend club events weekly; others might have different social outlets, including going to their primary residence on weekends. Freshmen might utilize the clubs in different ways than upperclassmen. Additionally, studies have shown that students who pay fees themselves (as opposed to parents or other third-parties) are more likely to utilize the services associated with those fees.[88]

Even if RIT denied students access to some services, it is questionable if students would have accessed those services but for RIT's change to remote learning in response to the pandemic. For example, during the Spring 2020 Semester, many RIT students likely would have voluntarily opted not to congregate with other people for fear of catching COVID-19. Such students likely would not have utilized the campus-based student activities or labs even if they occurred on campus. Mr. Bergeron also testified that the cessation of campus-based courses was the "right thing to do."[89] As a result, RIT's change in modality or discontinuance of certain services did not harm such COVID-careful students.

Furthermore, Mr. Quattrociocchi and Mr. Bergeron were not damaged because of the alleged denial of access because they did not utilize or plan to utilize many of the services associated with the allegedly relevant fees.

Even if RIT did deny students access to some physical services, RIT provided replacement remote services. For example, while on-campus meetings & events, face-to-face counseling and medical appointments might have been limited, students had access to remote meetings, events and appointments.[90] Even if these remote replacements would be considered part performance of what students believed or expected they should have received, the value of that part performance needs to be accounted for in a damages calculation,[91] which Dr. Cowan did not do. Dr. Cowan has not valued these remote replacements. He has not demonstrated that the remote replacements RIT provided were less valuable than the physical access that they claim putative class members were denied or the degree to which they allegedly were less valuable. Given student differences, these valuations likely would be highly individualized.

Consequently, it is incorrect for Dr. Cowan to assert that the alleged losses due to the denial of access to some physical services could be measured by the total fees paid pro-rated for the portion

---

[87] Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", *Academy of Educational Leadership Journal*, Vol 15, 2011, ("Newbold"), p. 142.
[88] For example, see a discussion of how payment methodology could affect consumption in Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" *Harvard Business Review*, September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on 5/31/2022.
[89] Bergeron Deposition, p. 99.
[90] Bergeron000041
[91] Restatement (Second) of Contracts, Section 377. *AICPA Lost Profits Guide*, paragraph 4.

of the semester for which access was unavailable.  The value of the remote replacement services needs to be deducted.

If access was a proper means to assess damages as Dr. Cowan alleges, the different ways students utilize campus services and the value they receive from their use, especially amidst COVID-19, would cause alleged damages to be highly individualized, which he did not consider.

Even if there were some decreased services during the Spring 2020 Semester, it is my understanding that RIT utilized unused funds in subsequent semesters.  As a result, the transferred funds are akin to renovation expenditures where students bore construction costs and might be prevented from accessing a certain building during one semester, but reap the benefits of the renovations in subsequent semesters.  Consequently, tuition / fee payments or university expenditures students might make in one semester are not necessarily tied to potential benefits student might have received in that same semester.  It is therefore necessary to analyze payments, costs and benefits over multiple semesters, which Dr. Cowan did not do.

## B.   The Number of Days Cannot Be Utilized to Calculate Pro-Rata Fee Damages

Even if some pro-rata methodology were viable, it is economically incorrect to assume that the putative class members' diminished value would be proportional to the number of days of the Online Portion of the Spring 2020 Semester.

As discussed above in Section VII.B.1, such an assumption implies that the List Prices for a semester-long bundle of days could be translated into a daily List Price.  Additionally, Dr. Cowan's assumption incorrectly implies that each day in the Semester was equally valuable to each student.  While such an assumption might be convenient, it is not economically correct.  Not only is it economically improper to calculate individual component prices from a bundled price and to assume the marginal utility received from each day of learning is the same for all putative class members, but the number of days students are on campus also varies on an individualized basis.

Section VII.B.2 shows that each student's marginal utility is different for tuition. This also holds for the services associated with the fees allegedly at issue in this matter. It is possible that some students received greater benefits from access to campus services during the first part of the Spring 2020 Semester than they would have in the second part if RIT had not closed campus or moved to remote services.  For example, students with a New Year's resolution may be motivated to use the gym at the beginning of the semester, but lose motivation and no longer go to the gym by mid-March, when the gym physically closed, or workout outside once the weather became nicer in New York.  Students may also study more and utilize fewer services as finals approach.  Conversely, there could be some students who would work out more in the gym as a stress relief during finals.

Additionally, as discussed in Section VII.B.3, the number of relevant days to utilize in Dr. Cowan's PPF Theory is highly individualized. The number of relevant days and the value of those days would vary by numerous factors including, but not limited to:

- Days where students did not participate in any on-campus activities;
- Students who had more on-campus activities on a given day; and

- Students who went home for some or all weekends.

The aforementioned logistical issues make the claimed formulaic calculation of damages highly individualized. Consequently, contrary to Dr. Cowan's unsupported assumption, any decreased price RIT might charge for the fees would be highly individualized and not necessarily tied to the number of days as alleged.

# IX.   Even if Dr. Cowan Were Able to Demonstrate that RIT's Spring 2020 Semester Was Less Valuable in Some Way, Class Members Were Not Necessarily Damaged

Notwithstanding the aforementioned, even if Dr. Cowan was able to demonstrate students received less value because of the transition to remote classes, they might not have been damaged for multiple reasons.

## A.    Students Receiving Financial Aid Might Not Be Damaged

University officers dispensing federal and institutional need-based financial aid at least partially base their aid recommendations on the school's Cost of Attendance and the student's Expected Family Contribution.[92]

Financial aid officers regularly address situations where a student's Cost of Attendance or Expected Family Contribution changes during a term.  In such an instance, RIT's Office of Financial Aid could reduce the grants or scholarships it awarded.

In this lawsuit, students are seeking a refund of tuition and fees.  If such a refund were to occur, every student's Cost of Attendance could change.  As a result, RIT's Office of Financial Aid could recalculate its institutional grants, scholarships and subsidized loans it provided to all students. For example, as shown in ***Figure 7*** below, suppose that RIT's List Prices for tuition and fees were $25,000, and that RIT's Office of Financial Aid determined that a given student's family should only contribute $10,000 toward the student's education in that year.  In this situation, RIT could provide this student with a $15,000 scholarship.

---

[92] The Cost of Attendance is the amount it will cost a student to attend a university. The COA includes an estimate of tuition and fees; the cost of room and board (or living expenses for students who do not contract with the school for room and board); the cost of books, supplies, transportation, loan fees, and miscellaneous expenses (including a reasonable amount for the documented cost of a personal computer); an allowance for child care or other dependent care; costs related to a disability; and/or reasonable costs for eligible study-abroad programs.

The Expected Family Contribution is determined from the Federal government's Free Application for Federal Student Aid ("FAFSA") form. Students provide detailed family financial information as well as information about the schools students are considering attending on the FAFSA form. RIT's Office of Financial Aid utilizes the information reported on the FAFSA form to calculate the EFC, which is how much money a student's family could contribute if the student were to attend RIT. The formula includes information on the student's/family's taxed and untaxed income, assets, and benefits (such as unemployment or Social Security), as well as demographic characteristics such as the student's family size and the number of family members who will attend college during the year. See https://studentaid.gov/complete-aid-process/how-calculated viewed on 1/17/2022.

Confidential

Assume that the Finder of Fact in this lawsuit determines that the combined List Prices for RIT's tuition and fees should have been $1 lower.  This would cause the total List Prices for tuition and fees to fall to $24,999.  The Office of Financial Aid **might** still determine that the given student's family should only contribute $10,000.  In this revised situation, RIT would provide this student with a $14,999 scholarship.

In this example, the student would not be damaged by the supposed tuition and fee overcharge.  The student actually paid $10,000 and would have paid $10,000 if the tuition and fees were "properly" priced.  Therefore, this student incurred no out-of-pocket losses from RIT's alleged actions.

Even if RIT did not adjust this student's scholarship amount, the Plaintiffs likely could not claim damages as this hypothetical student paid $10,000 to receive something that had $24,999 in value.

| Figure 7 | | |
|---|---|---|
| Exemplar Alleged Damages with Need-Based Financial Aid | | |
| | Actual World | Hypothetical But For World |
| Expected Family Contribution Determined by RIT | $10,000 | $10,000 |
| List Price | $25,000 | $24,999 |
| Payments Made by Family | $10,000 | $10,000 |
| Potential RIT Institutional Aid | $15,000 | $14,999 |
| **Overpayment Family Made because List Price Was Allegedly Overstated** | **$ 0** | |
| **Change in Potential RIT Institutional Aid** | **$ 1** | |

Additionally, COVID-19 could further affect students' available finances.  While some families could have been adversely affected by COVID-19, others saw their financial positions greatly improved during the Spring 2020 Semester.  As a result, students' Expected Family Contribution could also change, which could add additional individualized potential modifications to the financial aid RIT provides its students.  For example, as discussed below, many students received COVID-relief funds from the university during the Spring 2020 Semester.

Therefore, if it is determined that RIT's tuition and fees should have been lower, at a minimum, RIT's Office of Financial Aid could have to recalculate all the aid it provided students.  To determine the amount that students were damaged by RIT's allegedly improper tuition and fees, one would have to, at a minimum, calculate the supposed tuition overcharge and subtract out any financial aid changes caused by Cost of Attendance and other COVID-related changes.  Because the aid the Office of Financial Aid provides is highly individualized, any aid recalculation also would be highly individualized.  Consequently, properly determining any economic loss students might have suffered because of any alleged tuition and fee overcharge would also be highly individualized.  As a result, I do not know how any economically proper refunds of these net prices could be calculated on a uniform formulaic, class-wide basis as Dr. Cowan proposes.

Essentially, the Plaintiffs are claiming that had they, and all other RIT students, known that COVID were going to occur during the Spring 2020 Semester, they would have paid less for tuition than they actually did. However, with such a claim, one must fully analyze all of the economic effects on the students; one cannot isolate one's analysis to just tuition and fees. For example, as mentioned above, RIT distributed $5.0 million in COVID-relief payments made by RIT to more than 7,000 undergraduate students who applied for assistance during the pandemic.[93] Because these COVID-relief payments, like the alleged tuition and fee overcharges, would not have happened But-For this issues in the lawsuit, any COVID-relief money students received would have to be subtracted from any damages award. As Plaintiffs have a duty to mitigate,[94] the COVID-relief money that students would have received had they applied also needs to be subtracted from damages.

Consequently, individualized analyses would be required to determine any resulting losses class members might have allegedly suffered during the Spring 2020 Semester. While Dr. Cowan employed his methodology to calculate the alleged damages of Mr. Quattrociocchi, he did not employ his methodology to calculate the alleged damages of Mr. Bergeron. I perform such a calculation relating to Mr. Bergeron below in Section IX.B.2. As that section shows that Mr. Bergeron suffered no damages according to Dr. Cowan's proposed Damages Model, Dr. Cowan's methodology implies that damages would be highly variable and individualized.

## B.    The Named Plaintiff, Mr. Bergeron, Was Not Damaged

I discuss Mr. Bergeron's RIT costs in Spring 2020 in Section 1. Section 2 shows how Dr. Cowan overstated Mr. Bergeron's alleged damages by properly accounting for the financial aid the latter received. Such corrections demonstrate that Mr. Bergeron suffered no damages.

### 1.    Named Plaintiff's RIT Costs in Spring 2020 Semester

*Figure 8* below displays Mr. Bergeron's tuition, fees and financial aid for the Spring 2020 Semester.[95]

---

[93] https://covid-relief-data.ed.gov/report/heer/002223642/2020/apr/student-number viewed on 5/20/2022
[94] Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits. *AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid* 06-4 (2013), paragraphs 134 - 135.
[95] RIT0001090.

| Figure 8 | |
|---|---|
| **Mr. Bergeron's Spring 2020 Semester Tuition, Fees and Financial Aid** | |
| **Description** | **Amount** |
| Tuition (18 credit hours) | $21,323 |
| Overload Tuition (1 credit hour) | $1,131 |
| **Subtotal – Tuition** | **$22,454** |
| **Fees** | |
| Student Activity Fee | $148 |
| Health Fee | $175 |
| Wellness Fee | $195 |
| **Subtotal – Fees** | **$518** |
| **Total - Tuition & Fees** | **$22,972** |
| **Financial Aid** | |
| RIT Grant | $(9,000) |
| Outside Scholarship | $(14,243) |
| **Subtotal - Financial Aid** | **$(23,243)** |
| **COVID-Related Aid** | |
| CARES Act Fund for Students [96] | $0 |
| Refunds | $(1,686) |
| Wellness Fee Credit | $(105) |
| **Subtotal - COVID-Related Aid** | **$(1,791)** |
| **Subtotal - Financial & COVID-Related Aid** | **$(25,034)** |
| **Net Price (Tuition & Fees less Financial Aid)** | **$(2,061)** |
| **Other Costs, Net of Refunds Already Received** | |
| Dining | $0 |
| Housing | $3,206 |
| Parking | $20 |
| Late Fees | $50 |
| **Subtotal - Other Costs, Net of Credits** | **$3,276** |
| **Net Price (Tuition & Fees less Financial Aid plus Non Disputed Costs)** | **$1,215** |

There are several things to note about his account statement.

First, Mr. Bergeron was a full-time undergraduate student during the Spring 2020 Semester, taking 19 credit hours.

---

[96] Bergeron000005 indicates that Mr. Bergeron qualified for $500 in CARES Act funding. However, I conservatively exclude these funds as Mr. Bergeron testified that he independently determined that he was not eligible for CARES Act funds and, therefore, did not apply. Bergeron Deposition, pp. 129-130.

Second, Mr. Bergeron was assessed the Student Health Services and the Student Activity Fee as well a Wellness Fee.  Mr. Bergeron was not assessed "lab fees" that were addressed in Dr. Cowan's Report and as noted above, very few RIT classes charged a separate "lab fee."[97]

Third, Mr. Bergeron received a substantial amount of institutional financial aid to offset the List Price of tuition and fees. Financial aid grants/scholarships accounted for 109% of Mr. Bergeron's tuition and fees and 95% of Mr. Bergeron's total cost of attendance. The remaining 5%, or $1,215 is due to room and board, parking and other miscellaneous charges which to my understanding are not damages being sought by the Plaintiffs.  In other words, **Mr. Bergeron did not pay any tuition or fees out of pocket for the Spring 2020 Semester**.

In the next section, these facts demonstrate that Mr. Bergeron was not damaged under the Dr. Cowan's PPT  Theory and his PPF Theory.

### 2. Mr. Bergeron's Alleged Tuition Damages in Spring 2020 Under Dr. Cowan's Method With Corresponding Corrections Shows He Was Not  Damaged

*Figure 9* below displays the results of Dr. Cowan's PPT Theory and his PPF Theory had he used Mr. Bergeron's account statement. Figure 9 demonstrates that even if RIT Online were a proper comparable to RIT and the pro-rata damages approach were proper, which as shown above, they are not, Mr. Bergeron would not be damaged if his financial position was properly analyzed.[98]

---

[97] Further, it is my understanding that RIT rarely assesses additional course fees such as lab fees.
[98] RIT0001090 & Bergeron000005.

| Figure 9 | | | |
|---|---|---|---|
| **Calculation of Mr. Bergeron's Alleged Tuition Losses Using Dr. Cowan's Overall Methodology** | | | |
| **Actual Payment** | *Ref.* | **Dr. Cowan** | **Corrected** |
| Undergraduate Tuition | *a* | $22,454 | $22,454 |
| **Subsidies** | | | |
| RIT Grant | *b* | $(9,000) | $(9,000) |
| Outside Scholarship | *c* | $0 | $(14,243) |
| Federal Pell Grant | *d* | $0 | $0 |
| **Subtotal - Subsidies** | *e+b+c+d* | **$(9,000)** | **$(23,243)** |
| **COVID-Related Aid** | | | |
| CARES Act Fund for Students | *f* | $0 | $0 |
| RIT Emergency Fund Award / COVID-Related Aid | *g* | $0 | $0 |
| **Subtotal - COVID-Related Aid** | *h=f+g* | **$0** | **$0** |
| **Subtotal - Subsidies & COVID-Related Aid** | *i=e+h* | **$(9,000)** | **$(23,243)** |
| **Actual Payment** | *j=a-i* | **$13,454** | **$(789)** |
| **But For Payment** | *Ref.* | **Dr. Cowan** | **Corrected** |
| **Value Received In-Person Portion** | | | |
| Tuition Value Contracted For | *k* | $22,454 | $22,454 |
| Percentage In-Person | *l* | 50% | 50% |
| **Value Received In-Person Portion** | *m=k x l* | **$11,227** | **$11,227** |
| **Value Received Online Portion** | | | |
| Tuition Value Contracted For | *n* | $19,646 | $19,646 |
| Percentage Online | *o* | 50% | 50% |
| **Value Received Online Portion** | *p=n x o* | **$9,823** | **$9,823** |
| **Subtotal - Value Received** | *q=m+p* | **$21,050** | **$21,050** |
| **Subsidies** | | | |
| RIT Grant | *r* | $(9,000) | $(4,500) |
| Outside Scholarship | *s* | $0 | $(14,243) |
| Federal Pell Grant | *t* | $0 | $0 |
| **Subtotal - Subsidies** | *u=r+s+t* | **$(9,000)** | **$(18,743)** |
| **COVID-Related Aid** | | | |
| CARES Act Fund for Students [99] | *v* | $0 | $0 |
| RIT Emergency Fund Award / COVID-Related Aid | *w* | $0 | $0 |
| **Subtotal - COVID-Related Aid** | *x=v+w* | **$0** | **$0** |
| **Subtotal - Subsidies & COVID-Related Aid** | *y=u+x* | **$(9,000)** | **$(18,743)** |
| **But For Payment** | *z=q-y* | **$12,050** | **$2,308** |
| **Amount Overpaid** | *Ref.* | **Dr. Cowan** | **Corrected** |
| **Actual Payment minus But For Payment** | *aa=j-z* | **$1,404** | **$(3,096)** |

---

[99] See footnote 96.

As mentioned above in Section VII.A.2, Dr. Cowan committed at least three other errors in his calculation related to financial aid.

First, Dr. Cowan improperly calculated the "RIT Subsidies" in his But For World. He improperly assumed that the "RIT Subsidies" would be the same in his Actual and But For Worlds. However, for the reasons discussed above, these "RIT Subsidies" in the But For World would be lower than the "RIT Subsidies" in the Actual World because RIT does not grant institutional aid to its RIT Online students. Therefore, Mr. Bergeron would not have received as much institutional financial aid in Dr. Cowan's But For World.

Mr. Bergeron's institutional financial aid in Dr. Cowan's But For World potentially would be reduced to 50% during the Online Portion of the Spring 2020 Semester. Thus, under Dr. Cowan's damages theory, he would have only received $4,500 ($9,000 x 50%) in "RIT Subsidies", increasing his But For Payment by $4,500.

Second, as discussed above in Section VII.A.2.b, Dr. Cowan improperly excluded non-institutional financial aid from sources other than RIT, such as outside scholarships, from his calculations.

Considering the non-institutional financial aid and conservatively assuming that such aid would not be altered if his Cost of Attendance changed as would be implied by Dr. Cowan's damages theory, financial aid would have increased by $14,243 for Mr. Bergeron during Spring 2020 semester.

Third, as discussed above in Section VII.A.2.c, Dr. Cowan improperly excluded COVID-related aid, such as CARES Act funding that RIT distributed to students. Although Mr. Bergeron did not receive CARES Act funds, many other students did.  Further, Mr. Bergeron testified that RIT notified him that he qualified for $500 in CARES Act funding, but he independently determined that he was not eligible and, therefore, did not apply for CARES Act funds – without confirming with anyone at RIT whether he was eligible.[100]

I conservatively do not include the impact of potential CARES Act funds when assessing Dr. Cowan's overstated alleged tuition damages.  Nevertheless, if one combined the effects of just these three issues and assuming that non-institutional financial aid were unchanged, Dr. Cowan overstated alleged tuition damages by at least $4,500. The overstatement would be even greater if his Pell Grants were adjusted.

Reducing his But For Payment by $9,742 would cause Mr. Bergeron to have negative damages based upon Dr. Cowan's methodology.

---

[100] Bergeron Deposition, pp. 129-130 and Bergeron000005.

# X.  Dr. Cowan's Proposed Damages Theory Does Not Demonstrate That RIT Was Unjustly Enriched

It is my understanding that the Plaintiffs also seek damages pertaining to alleged unjust enrichment. However, neither the Plaintiffs nor Dr. Cowan have put forth an alleged damages calculation for either the Tuition or Fee Class as it relates to unjust enrichment.  I reserve the right to update my opinions if and when a complete unjust enrichment calculation is put forward as damages modeling is complex, making a complete identification of all required steps difficult without a baseline calculation.

In evaluating unjust enrichment, one cannot only look at the alleged benefits the defendant received.  One must also look at the costs and lost benefits simultaneously incurred.  Dr. Cowan's proposed damages theory only "addresses" the tuition and fees RIT students paid.  However, other items need to be analyzed in order to determine if RIT was unjustly enriched. Any proper unjust enrichment analysis must, at least, analyze whether RIT incurred significant costs and sacrificed revenue, which RIT did.

RIT's costs of providing remote instruction are vital to such an analysis.  Like many universities, RIT's transition to remote classes caused it to forgo a large amount of income. For example, RIT incurred nearly $39,000 in additional Zoom licensure expenses in order to provide remote learning to its students during the second half of the Spring 2020 Semester. [101] The University also incurred more than $7 million of additional costs to make the campus safer for when students returned including the purchase of facemasks, COVID tests, air purification systems, retrofitting buildings, and the establishment of a COVID call center.[102] Even though students might not have reaped the benefits of such modifications during the Spring 2020 Semester, those costs were borne or identified during that semester.  These costs are akin to the costs students pay for to renovate a campus building.  If a portion of the building is closed during renovations, students bear the costs in one semester, but reap the benefits of the renovation in subsequent semesters.  Again, students are not similarly situated in this respect either, as the value of these investments is greater for more junior students and lesser for those students closer to graduating.

RIT's lost revenue is also vital to any unjust enrichment analysis.  RIT also lost millions of dollars in revenue pertaining to its sales and services of auxiliaries. For example, as mentioned above, RIT refunded students money they paid for housing and room & board.  The return of room and board was an unexpected expense that needs to be deducted from any unjust enrichment calculation.  Even though it did not earn revenue from these items during the campus closure, RIT still incurred expenses relating to building costs, staffing and other items.[103] As discussed above, other analyses are likely required, which are difficult to identify without a baseline calculation.

As Dr. Cowan does not contemplate such revenue and fees, his proposed Damages Theory cannot be utilized to analyze RIT's alleged unjust enrichment.

---

[101] RIT0002177.
[102]  RIT0002177.  See also, https://www.rit.edu/ready/news/rit-strategically-upgrades-campus-prevent-spread-coronavirus, viewed on 5/31/2022.
[103] RIT0001892 demonstrates that RIT lost more than $20 million in sales and services auxiliary revenue between its FY2019 and FY 2020.

# XI.  Conclusion

Dr. Cowan's proposed damages methodology is flawed along multiple dimensions.

- He incorrectly assumes that students would demand to pay less for remote classes even though they actually exhibited contradictory behavior by paying similar amounts, and in some instances even more, when confronted with similar situations.

- Contemporaneous data show that class members received equivalent value from the Online Portion of the Spring 2020 Semester and any possible diminishment would be highly individualized.

- At best, his proposed damages methodology assesses alleged per capita tuition, but not fee, losses for one type of class member: non-NTID, undergraduates who were charged tuition for a certain number of credit hours, nor does he properly quantify the number of class members of each type.

- His proposed damages methodology is further flawed because it assumes that all students would view RIT Online as a comparable education environment even though it has a different purpose and different students have different views.

- Not only did Dr. Cowan incorrectly assume that RIT Online students receive the same financial aid as students enrolled in RIT's traditional programs, but he ignored all non-RIT provided grants including COVID-related aid from his financial aid analysis.  Properly analyzing financial aid shows that many students including Mr. Bergeron were not damaged.

- Dr. Cowan's proposed damages methodology ignores the variability of relevant days amongst class members during Spring 2020 that would contribute to alleged damages and the value students place on those days.

- Dr. Cowan ignored the values and services, which are highly individualized, that RIT did provide when it offered remote classes.

- Even if Dr. Cowan were able to demonstrate that RIT's Spring 2020 Semester was less valuable in some way, class members were not necessarily damaged.

- Dr. Cowan did not show that RIT was unjustly enriched.


May 31, 2022

_____

Benjamin S. Wilner, Ph.D.

**Nicholas Bergeron & Nick Quattrociocchi vs. Rochester Institute of Technology**
**Documents Considered**

| I. Legal Filings |
|---|
| Answer to Second Consolidated Amended Class Action Complaint. |
| Defendant's Responses to Plaintiff's First Set of Requests for Interrogatories. |
| Defendant's Responses to Plaintiff's First Set of Requests for Production. |
| Deposition of Nicholas Bergeron & Exhibits, Dated 11/4/2021 ("Bergeron Deposition"). |
| Deposition of Nicholas Quattrociocchi & Exhibits, Dated 11/5/2021 ("Quattrociocchi Deposition"). |
| Plaintiff Nicholas Bergeron's Amended Responses to Defendant Rochester Insitute of Technology's Third Set of Interrogatories to Plaintiff Nicholas Bergeron. |
| Plaintiff Nicholas Bergeron's Objections and Responses to Defendant Rochester Institute of Technology's First Requests for Admission. |
| Plaintiff Nicholas Bergeron's Objections and Responses to Defendant Rochester Institute of Technology's First Requests for Production. |
| Plaintiff Nicholas Bergeron's Responses to Defendant Rochester Insitute of Technology's Second Set of Interrogatories to Plaintiff Nicholas Bergeron. |
| Plaintiff Nicholas Bergeron's Responses to Defendant Rochester Insitute of Technology's Second Set of Requests for production to Plaintiff Nicholas Bergeron. |
| Plaintiff Nicholas Bergeron's Responses to Defendant's Second Set of Interrogatories. |
| Plaintiff Nicholas Bergeron's Supplemental Responses to Defendant Rochester Insitute of Technology's Third Set of Interrogatories. |
| Plaintiff Nicholas Bergeron's Supplemental Responses to Defendant's First Set of Interrogatories. |
| Plaintiff Nick Quattrociocchi's Amended Responses to Defendant Rochester Institute of Technology's of Interrogatories. |
| Plaintiff Nick Quattrociocchi's First Objections and Responses to Defendant Rochester Institute of Technology's Second Requests for Production. |
| Plaintiff Nick Quattrociocchi's First Objections and Responses to Defendant Rochester Institute of Technology's Second Set of Interrogatories. |
| Plaintiff Nick Quattrociocchi's First Supplemental Objections and Responses to Defendant Rochester Institute of Technology's First Set of Interrogatories. |
| Plaintiff Nick Quattrociocchi's Objections and Responses to Defendant Rochester Institute of Technology's First Requests for Admission. |
| Plaintiff Nick Quattrociocchi's Objections and Responses to Defendant Rochester Institute of Technology's First Requests for Production. |
| Plaintiff Nick Quattrociocchi's Objections and Responses to Defendant Rochester Institute of Technology's First Set of Interrogatories. |
| Plaintiff Nick Quattrociocchi's Supplemental Responses to Defendant's First Set of Interrogatories. |
| Plaintiff's Notice of Taking Deposition of Defendant Rochester Institute of Technology Representative(s) Pusuant to Fed. R. Civil. P. 30(B)(6). |
| Second Consolidated Amended Class Action Complaint. |

| II. Plaintiff's Expert Report |
|---|
| Expert Report of Dr. Charles D. Cowan & Exhibits, Dated 4/29/2022 ("Cowan Report"). |
| RIT -- Aggregate Damages, UG students 20220427.xlsx. |
| RIT -- Example for Class Representative (Nicholas).xlsx. |

| III. Documents Received from Counsel |
|---|
| Bergeron000001 - Bergeron000005 |
| Bergeron000014 - Bergeron000014 |
| Bergeron000027 - Bergeron000031 |
| Bergeron000038 - Bergeron000045 |
| Final FY20 SAFs Allocation Doc for OLA.pdf |
| NQuattrociocchi001681 - NQuattrociocchi001696 |
| Quattrociocchi000017 - Quattrociocchi000020 |
| Quattrociocchi000037 - Quattrociocchi000044 |
| RIT Online Data Request FINAL 20220512.pdf |
| RIT0000013 - RIT0000024 |
| RIT0000033 - RIT0000063 |
| RIT0000070 - RIT0000070 |
| RIT0000072 - RIT0000078 |
| RIT0000082 - RIT0000092 |
| RIT0000148 - RIT0000726 |
| RIT0000842 - RIT0001076 |
| RIT0001090 - RIT0001090 |
| RIT0001097 - RIT0001159 |
| RIT0001193 - RIT0001193 |
| RIT0001200 - RIT0001273 |
| RIT0001399 - RIT0001399 |
| RIT0001403 - RIT0001407 |
| RIT0001411 - RIT0001417 |
| RIT0001434 - RIT0001435 |
| RIT0001442 - RIT0001447 |
| RIT0001450 - RIT0001452 |
| RIT0001464 - RIT0001468 |
| RIT0001486 - RIT00014889 |
| RIT0001509 - RIT0001511 |
| RIT0001514 - RIT0001517 |

Nicholas Bergeron & Nick Quattrociocchi vs. Rochester Institute of Technology
Documents Considered

| III. Documents Received from Counsel (cont.) |
| --- |
| RIT0001548 - RIT0001548 |
| RIT0001554 - RIT0001555 |
| RIT0001781 - RIT0001789 |
| RIT0001854 - RIT0001857 |
| RIT0001868 - RIT0001875 |
| RIT0001882 - RIT0001923 |
| RIT0001934 - RIT0001936 |
| RIT0001945 - RIT0001948 |
| RIT0002056 - RIT0002066 |
| RIT0002068 - RIT0002069 |
| RIT0002072 - RIT0002072 |
| RIT0002082 - RIT0002083 |
| RIT0002087 - RIT0002130 |
| RIT0002137 - RIT0002177 |

| IV. Texts |
| --- |
| "Calculating Lost Profits," AICPA & CIMA, Forensic & Valuation Services Practice Aid, 2020. |
| Adams, William James and Janet Yellen (1976) "Commodity Bundling and the Burden of Monopoly" Quarterly Journal of Economics, 90: ("Adams and Yellen"). |
| Black, Fischer, and Myron Scholes. "The Pricing of Options and Corporate Liabilities." Journal of Political Economy, vol. 81, no. 3, University of Chicago Press, 1973, pp. 637–654, http://www.jstor.org/stable/1831029. |
| Emanuel, Jeff and Lamb, Anne, "Open, Online, and Blended: Transactional Interactions with MOOC Content by Learners in Three Different Course Formats," working paper, 2015. |
| Faculty without Students: Resource Allocation in Higher Education. William R. Johnson and Sara Turner Journal of Economic Perspectives: 23(2), 2009. |
| Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" Harvard Business Review, September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on 5/31/2022. |
| Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", Academy of Educational Leadership Journal, Vol 15, 2011, ("Newbold"). |
| Patricia Aguilera-Hermida, A.. "College students' use and acceptance of emergency online learning due to COVID-19." International Journal of Educational Research Open vol. 1 (2020): 100011. doi:10.1016/j.ijedro.2020.100011. |
| Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits. AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid 06-4 (2013). |
| Ruth, Stephen, Can MOOC's and Existing E-Learning Efficiency Paradigms Help Reduce College Costs? (June 18, 2012). |
| Spence, Michael "Job Market Signaling." Quarterly Journal of Economics. 87(3), 1992. |
| Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011, ("Sterritt"). |
| Varian, Hal R. "Price Discrimination," Working Paper, July 1987. |
| Walsh, James D. "The Coming Disruption," New York Magazine, May 11, 2020. |

| V. Other Documents Considered |
| --- |
| https://collegestats.org/articles/beware-the-top-5-reasons-for-dropping-out-of-college/, viewed on 8/9/2021. |
| https://corporatefinanceinstitute.com/resources/knowledge/economics/law-of-diminishing-marginal-utility/, viewed on 5/11/2022. |
| https://covid-relief-data.ed.gov/report/heer/002223642/2020/apr/student-number, viewed on 5/20/2022. |
| https://nces.ed.gov/collegenavigator/?q=rochester+institute +of+technology&s=all&id=195003#finaid, viewed on 5/10/2022. |
| https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?unitId=195003&year=2018&surveyNumber=15, viewed on 5/20/2022. |
| https://studentaid.gov/complete-aid-process/how-calculated viewed on 1/17/2022. |
| https://studentaid.gov/understand-aid/types/grants/pell, viewed on 5/20/2022. |
| https://web.archive. org/web/20200115041249/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/domesticgraduate, viewed on 4/26/2022. |
| https://web.archive.org/web/20201104113652/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/undergradenterfall2018thrusum2020, viewed on 4/26/2022. |
| https://web.archive.org/web/20200114013239/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/undergradenrolledpriorfall2018, viewed on 4/26/2022. |
| https://web.archive.org/web/20200114194605 /https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/ntid/internationalundergraduate, viewed on 4/26/2022. |
| https://web.archive.org/web/20200115041225/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/undergradenterfall2018, viewed on 4/26/2022. |
| https://web.archive.org/web/20200115041232/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/graduate, viewed on 4/26/2022. |
| https://web.archive.org/web/20200115041235/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/undergraduate-parttimeprograms, viewed on 4/26/2022. |
| https://web.archive.org/web/20200115041238/https://www.rit.edu/fa/sfs/billing/tuitionandfees/1920/online, viewed on 4/26/2022. |
| https://web.archive.org/web/20200115041242/https://www .rit.edu/fa/sfs/billing/tuitionandfees/1920/domesticundergraduate, viewed on 4/26/2022. |
| https://web.archive.org/web/20200309142907/https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york, viewed on 5/26/2022. |
| https://web.archive.org/web/20201104012240/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/undergradenterfall2020, viewed on 4/26/2022. |
| https://web.archive.org/web/20201104012314/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/undergradenrolledpriorfall2018,viewed on 4/26/2022. |
| https://web.archive.org/web/20201104012341/https://www.rit.edu/fa/sfs/billing/tuitionandfees/2021/graduate, viewed on 4/26/2022. |

**Nicholas Bergeron & Nick Quattrociocchi vs. Rochester Institute of Technology**
**Documents Considered**

| V. Other Documents Considered (cont.) |
| --- |
| https://www.bls.gov/opub/ted/2021/consumer-price-index-2020-in-review.htm, viewed on 5/13/2022. |
| https://www.investopedia.com/ask/answers/042415/what-are-different-types-price-discrimination-and-how-are-they-used.asp, viewed on 1/13/2022. |
| https://www.rit.edu/admissions/sites/rit.edu.admissions/files/docs/Remote%20Start%20Online%20Presenation%20Slides-%20Fall%202020%20July%2015%202020.pdf, viewed on 5/11/2022. |
| https://www.rit.edu/calendar/1920, viewed on 3/28/2022. |
| https://www.rit.edu/careerservices/sites/rit.edu.careerservices/files/2020-11/CareerServicesAnnualReport20192020.pdf, viewed on 5/12/2022. |
| https://www.rit.edu/emcs/oce/sites/rit.edu.emcs.oce/files/Career%20ServicesAnnualReport_2018-2019-min.pdf, viewed on 5/12/2022. |
| https://www.rit.edu/marketing/sites/rit.edu.marketing/files/docs/pdfs/Career-Services-Annual-Report-2022.pdf, viewed on 5/12/2022. |
| https://www.rit.edu/news/rit-encourages-students-not-return-campus-courses-resume-march-23-through-alternative-modes, viewed on 3/29/2022. |
| https://www.rit.edu/ntid/about-ntid viewed on April 29, 2022. |
| https://www.rit.edu/online/, viewed on 5/20/2022. |
| https://www.rit.edu/online/study, viewed on 5/2/2022. |
| https://www.rit.edu/ready/news/rit-strategically-upgrades-campus-prevent-spread-coronavirus, viewed on 5/31/2022. |
| https://www.rit.edu/sfs/policies#explanation-of-fees, viewed on 3/29/2022. |
| https://www.rit.edu/studenthealth/fees-and-payments, viewed on 5/20/2022 |
| https://www.rit.edu/study/combined-accelerated-bachelors-masters#accelerated-dual-degrees, viewed on 5/20/2022. |
| https://www.rit.edu/study/graduate-and-undergraduate-bulletins, viewed on 5/31/2022. |
| https://www.rit.edu/study/undergraduate?keys=&cat=All, viewed on 5/20/2022. |
| https://www.whitehouse.gov/briefing-room/presidential-actions/2022/02/18/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic-2/#:~:text=On%20March%2013%2C%202020 ,safety%20of%20the%20Nation., viewed on 3/29/2022. |



Alvarez & Marsal
**Disputes and Investigations, LLC**
540 West Madison Street – Suite 1800
Chicago, IL 60661
Phone: +1 312 601 4220
Fax: +1 312 332 4599

### Benjamin S. Wilner, Ph.D.
Managing Director – Disputes and Investigations
bwilner@alvarezandmarsal.com

540 West Madison St.
Suite 1800
Chicago, IL 60661
Tel: (312) 470-8450

**Education**
Kellogg Graduate School
of Management,
Northwestern University
Ph.D.
Managerial Economics
and Decision Science

University of
Pennsylvania
BA magna cum laude
with distinction in major
Economics &
Mathematics

London School of
Economics
General Course Degree
Mathematics & Statistics

Dr. Benjamin Wilner has more than twenty years of advisory, valuation, and general economic & financial services experience as a consultant, academic & testifier. He is a Ph.D. economist and statistician who regularly serves as a consultant and testifying expert witness on financial damages, economic & statistical issues.

Dr. Wilner's disputes experience encompasses many industries and a broad range of single plaintiff, class action and criminal disputes including antitrust liability & damages, business interruption, business valuations, economic analyses, intellectual property, labor, lost income, product liability, statistical data analyses, and other corporate and litigation related matters.

In his consulting practice, Dr. Wilner advises corporations and governments on economic and statistical issues. For example, in addition to redesigning statistical aspects of an automobile manufacturer's warranty process, Dr. Wilner received a special commendation from the Commissioner of US Customs & Border Protection for building an economic model to restructure a $2.5 billion tariff, which has won praise by a Cabinet member, Congressional officials, and the industry.

Prior to joining Alvarez & Marsal, Dr. Wilner worked at other multinational consulting firms. He also has been a professor in the business schools at the University of Michigan, University of Iowa, Northwestern University, and the Helsinki School of Economics. Dr. Wilner was a research assistant for a Nobel Prize–winning economist and studied under two other Nobel Laureates. His work has been published in leading academic journals and textbooks as well as regularly cited in the academic and popular press. Dr. Wilner won several awards for teaching and research including a grant from the National Science Foundation.

**Testimony before a Trier of Fact**

- Employment Hearing Testimony in Scott Coren v. Ronald Pieri, Board of Fire and Police Commissioners, Highwood, Illinois, October 2019 & January 2020

- Sentencing Hearing Testimony in United States v. Mark Hazelwood, United States District Court, Eastern District of Tennessee, September 2018

- Arbitration Testimony in Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, November 2017

- Trial Testimony in Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2017

- Trial Testimony in Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017

- Trial Testimony in The People of the State of Illinois v. Ronald A. Pieri, State of Illinois, Circuit Court of Lake County, October 2015

- Trial Testimony in Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, May – June 2012 & July 2015

- Trial Testimony in Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, March 2015

- Trial Testimony in Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, March 2014

- Trial Testimony in Sharon P. Clark, Commissioner of the Kentucky Department of Insurance, in her Capacity as Rehabilitator of AIK Comp v. TransAmerica Insurance Company and TIG Insurance Company, Commonwealth of Kentucky, Franklin Circuit Court, Division Two, October 2012

- Trial Testimony in Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, July 2011

- Trial Testimony in Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, April 2010



- Trial Testimony in Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, November 2009
- Trial Testimony in NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, June 2009
- Arbitration Testimony in Global Link Logistics, Inc., GLL Holdings, Inc., and Golden Gate Logistics, Inc., v. Olympus Growth Fund III, L.P., et al., American Arbitration Association, October 2008
- Arbitration Testimony in Sarah Sanford v. Society of Actuaries & Bruce Schobel, American Arbitration Association, August 2008
- Hearing Testimony in Chinitz v. Chinitz, State of Michigan, Circuit Court for the County of Oakland, May 2008
- Arbitration Testimony in BP Products North America, Inc. v. Laidlaw Educational Services, JAMS Arbitration, October 2007

### Deposition Testimony

- Jennifer Pennington and Josh Pennington v. Memorial Hospital of South Bend, Inc. d/b/a Beacon Health and Fitness, Spear Corporation and Panzica Building Corporation, State of Indiana, St. Joseph Superior Court, April 2022
- Honeywell International Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust, United States Bankruptcy Court, Western District of Pennsylvania, March 2022
- Astria Health v. Cerner Corporation and Cerner Revenue Cycle, LLC., United States Bankruptcy Court, Eastern District of Washington, March 2022
- Paul E. Dubuque v. Dubuque Coffee Co., LLC and Charles T. Dubuque, State of Illinois, Circuit Court of Cook County, October 2021
- Winamac Southern Railway Company v. Irving Materials, Inc., State of Indiana, County of Howard, October 2021
- Brooke Smith v. The Ohio State University, Court of Claims for the State of Ohio, September 2021
- H&T Fair Hills, Ltd., et al. v. Alliance Pipeline L.P., United States District Court, District of Minnesota, April 2021
- Thomas P. Gorczynski, et al. v. Electrolux Home Products, Inc., et al., United States District Court, District of New Jersey, Camden Division, February 2020



- Thomas Allegra, et al. v. Luxottica Retail North America, United States District Court, Eastern District of New York, Brooklyn Division, December 2019

- Sdahrie Howard, et al. v. Cook County Sheriff's Office and County of Cook, United States District Court, Northern District of Illinois, Eastern Division, April 2019

- In re: Whole Foods Market Group, Inc. Overcharging Litigation, United States District Court, Southern District of New York, January 2019

- WHB International, Inc. and WHB Fundição, S/A v. Allison Transmission, Inc., Marion Superior Court, Indiana Commercial Court, December 2018

- Teresa Elward, et al. v. Electrolux Home Products, Inc., United States District Court, Northern District of Illinois, Eastern Division, August 2018

- Roger Coffelt, Jr., et al. v. The Kroger Co., The Pictsweet Company and CRF Frozen Foods LLC., et al., United States District Court, Central District of California, Riverside Division, May 2018

- Rick Lindsey v. Officer Michael Orlando, Officer Jamie Falardeau, the City of Chicago, Delta Airlines, Thomas Steinfels, and Marcella Pirvu, United States District Court, Northern District of Illinois, Eastern Division, March 2018

- Syncora Guarantee Inc. v. Alinda Capital Partners, LLC, American Roads LLC, Macquarie Securities (USA) Inc., and John S. Laxmi, Supreme Court of the State of New York, County of New York, December 2017

- Kelley Antekeier v. Laboratory Corporation of America, United States District Court, Eastern District of Virginia, Alexandria Division, November 2017

- Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, October 2017

- Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017

- Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2016

- In re: Hardieplank Fiber Cement Siding Litigation, United States District Court, District of Minnesota, February 2016

- In re: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation, United States District Court, Northern District of Georgia, December 2015



- Churchill Downs Incorporated v. Illinois Department of Revenue, Brian Hamer, as Director of The Illinois Department of Revenue, and Dan Rutherford as Treasurer of the State of Illinois, State of Illinois, Circuit Court of Cook County, August 2014

- Victor Tracy, Power of Attorney for Anne Tracy and Victor Tracy, Individually v. Robert K. Erickson, M.D., Lake County Neurosurgery, LLC, Advocate Condell Medical Center, State of Illinois, Circuit Court of Cook County, July 2014

- Marylee Arrigo v. Link Stop, Inc., et al., United States District Court, Western District of Wisconsin, October 2013

- Andrew C. Dillon v. Transportation Solutions Group, LLC, Freight Exchange of North America, LLC, 3PLogic, LLC, Transportation Solutions Enterprises, LLC and Todd Berger, United States District Court, Northern District of Illinois, Eastern Division, September 2013

- Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, September 2013

- Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, February 2012 & October 2009

- Continental Datalabel, Inc. v. Avery Dennison Corporation, United States District Court, Northern District of Illinois, Eastern Division, December 2011

- Ross v. Ross, Circuit Court of the Nineteenth Judicial Circuit, Waukegan, Lake County, Illinois, September 2011

- In re: IKO Roofing Shingle Products Liability Litigation, United States District Court, Central District of Illinois, Urbana Division, August 2011

- Jessica Ellen Legens, et al. v. Mark Alan Ikerman and Manheim Services Corporation, d/b/a Manheim Gateway St. Louis, et al., State of Illinois, Circuit Court of Madison County, November 2010

- Ronald Seymour v. Wausau Signature Agency, et al., United States District Court, Northern District of Illinois, Eastern Division, May 2010

- Neil Simon and Clarissa Simon v. Heritage Title Company, State of Illinois, Circuit Court of Cook County, December 2009

- Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, December 2009

- Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, October 2009



- Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, July 2009
- Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, September 2008
- NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, May 2008
- Maria Belbis, et al. v. County of Cook, United States District Court, Northern District of Illinois, Eastern Division, January 2008
- Bucyrus International, Inc. v. Price Erecting Company and Kentucky Rebuild Corp., State of Wisconsin, Circuit Court of Milwaukee County, October 2007
- Mark A. Sindecuse, M.D. v. Dean M. Katsaros, Katsaros & Associates, and CIB Marine Bancshares, Inc., United States District Court, Eastern District of Missouri, Eastern Division, June 2007
- Quentin Bullock et al., v. Michael Sheahan and Cook County, United States District Court, Northern District of Illinois, Eastern Division, September 2006

### Awards
- National Science Foundation Grant, 1998
- Old Gold Research Fellowship, University of Iowa, Summer 1997
- Outstanding Professor, University of Iowa Panhellenic Council, Fall 1996
- Doctoral Teaching Award, Kellogg Graduate School of Management, 1994

### Professional Memberships
- American Bar Association (Associate Status)
- American Statistical Association
- Credit Research Foundation (Research Fellow)

### Publications
- "Sampling is Harder and Cheaper than You Think" *Raising the Bar*, January 2021
- "Does (Sample) Size Matter" *For the Defense*, February 2019
- "The U.S. Federal Crop Insurance Program in 2012 and Beyond," (with Frank Schnapp) *Trébol*, July 2013
- "Profitability & Effectiveness of the Federal Crop Insurance Program," (with Laura Carolan & Frank Schnapp), *Crop Insurance Today*, 44(2), pp. 28 – 32, May 2011



- "Economic and Accounting Analyses in Post-Acquisition Disputes," (with Allen Burt and Matthew Paye) *The SRR Journal*, Spring 2010

- "Statistical Analyses Relation to Reductions In Force," *The SRR Journal*, Spring 2009

- "Antitrust Analyses in Horizontal Mergers," (with Thomas R. Jackson) *The SRR Journal*, Fall 2007

- "Options Backdating: The Latest Corporate Imbroglio," (with Idris Raja) *The SRR Journal*, Spring 2007 (reprinted on mondaq.com)

- "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" (with Alejandro Manelli and Martin Sefton), *Journal of Economic Behavior and Organization*, 61(2), pp. 304 – 323, October 2006

- "The Exploitation of Relationships in Financial Distress: The Case of Trade Credit," *Journal of Finance*, February 2000

- "Everything you always wanted to know about discounting, but were afraid to ask: A Finance 101 Primer," *Credit and Financial Management Review*, Summer 1999

- "Paying Your Bills: The Effect of Corporate Quality" September 1996

- Refereed for the *American Economic Review*, *American Real Estate Society*, *Journal of Finance*, the *Journal of Business, Finance and Accounting*, and John Wiley Publishers

