**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| NICHOLAS BERGERON and NICK QUATTROCIOCCHI, individually and on behalf of others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>ROCHESTER INSTITUTE OF TECHNOLOGY,<br><br>               Defendant. | Case No. 6:20-cv-06283-CJS-MJP |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

SUMMARY OF ARGUMENTS ............................................................................................. 1

LEGAL STANDARD ............................................................................................................. 4

ARGUMENT ........................................................................................................................... 5

    I.    RIT and Plaintiffs Entered into a Valid and Enforceable Contract for an On-Campus Educational Services That RIT Breached. ................................................. 5

        A.    SFRA Does Not Completely Govern the Covenants Between the Parties ............... 7

        B.    The SFRA Does not Govern and Dispel the Covenants in Dispute and Plaintiffs' Have Established an Implied Contract ........................................................................... 10

        C.    RIT's Separate "RIT Online" Program and Its "Reduced Tuition Rate" Implies a Promise of Campus-based, In-Person Instruction ........................................................... 14

        D.    The Student Health Fee and Student Activity Fee Create Reasonable Expectations That Students Will Receive In-Person Access ................................................................... 16

    II.    RIT Is Not Entitled to Summary Judgment on Plaintiffs' Unjust Enrichment Claims ......................................................................................................................... 17

    III.    Plaintiffs Have Established a Viable Damages Theory Which Does Not Trigger the Educational Malpractice Doctrine ...................................................................... 21

        a.    Educational Malpractice Does Not Apply ................................................................ 22

        b.    Dr. Cowan's Methodology is Reliable and Utilizes Accepted Computational Methodologies. ................................................................................................................... 23

        c.    Bergeron Sustained Damages ................................................................................... 25

CONCLUSION ....................................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp.2d 185 (S.D.N.Y. 2009) 18

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ............................................................. 4

*Arredondo v. Univ. of La Verne*, No. 2:20-cv-07665, 2022 WL 3222376 (C.D. Cal. Aug. 2, 2022) ....................................................................................................................... 21, 24

*Bergeron v. Rochester Inst. of Tech.*, No. 20-CV-6283 (CJS), 2020 WL 7486682 (W.D.N.Y. Dec. 18, 2020) ....................................................................................................................... 5

*Blink v. Johnson*, 2015 N.Y. Misc. LEXIS 11906 (N.Y. Sup. Ct., Westchester Cnty., Aug. 21, 2015) ...................................................................................................................................... 6

*Botts v. Johns Hopkins Univ.*, No. CV ELH-20-1335, 2021 WL 1561520 (D. Md. Apr. 21, 2021) ...................................................................................................................................... 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 4

*Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137 (1st Dept. 2008) ....................................... 6

*Emposimato v. CIFC Acquisition Corp.*, 30 Misc. 3d 1233(A) (Sup. Ct. N.Y. County, March 7, 2011) ...................................................................................................................................... 23

*Fiore v. Univ. of Tampa*, 2021 WL 4925562 (S.D.N.Y. Oct. 20, 2021) ..................................... 10

*Flatscher v. Manhattan Sch. of Music*, 551 F. Supp. 3d 273 (S.D.N.Y. 2021) .............................. 5

*Flomenbaum v. New York Univ.*, 71 A.D.3d 80 (1st Dept. 2009) .................................................. 6

*Ford v. Rensselaer Polytechnic Institute*, 507 F.Supp.3d. 406 (N.D.N.Y. 2020) ........................... 21

*Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873 (7th Cir. 2022) ........................................... 22

*Hartz v. Consumer Group, Inc. v. JWC Hartz Holdings, Inc.*, 2005 N.Y. Misc. LEXIS 8534 (N.Y. Sup. Ct. Oct. 27, 2005) ......................................................................................... 6

*In re Bos. Univ. COVID-19 Refund Litig.*, 511 F. Supp. 3d 20 (D. Mass. 2021) ............. 13, 16, 20

*In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*, 524 F. Supp. 3d 1346 (S. D. Fla. 2021) ...................................................................................................................................... 9

*Jones v. Administrators of the Tulane University Educ. Fund,* No. 21-30681, 2022 WL 6693349 (5th Cir. Oct. 11, 2022) ................................................................................................... 9

*Keefe v. New York Law School*, 71 A.D.3d 569 (N.Y. App. Div., 1st Dept. 2010) ........................ 5

*Kraton Chem., LLC v. Graphic Packaging Int'l, LLC*, 2020 N.Y. Misc. LEXIS 124 (Sup. Ct. N.Y. County, Jan. 4, 2020) ........................................................................................................ 23

*Leccese v. Metro. Life Ins. Co.*, No. 05-CV-6345 CJS, 2007 WL 1101096 (W.D.N.Y. Apr. 12, 2007) ................................................................................................................................... 4

*Legurnic v. Ciccone,* 63 F. Supp. 3d 241 (E.D.N.Y. 2014) .......................................................... 18

*Leki Aviation A/S v. B/E Aerospace, Inc.*, 2013 N.Y. Misc. LEXIS 2603 (N.Y. Sup. Ct., June 14, 2013) .................................................................................................................................. 6

*Mangla v. Brown Univ.*, 135 F.3d 80 (1st Cir. 1998) .................................................................. 6

*McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121 (2d Cir. 2002) .................................................... 8

*Ninivaggi v. Univ. of Del.*, 555 F. Supp. 3d. 44 (D. Del. 2021) .................................................. 10

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81 (2d Cir. 2011) ................... 2, 5

*Randall v. Univ. of the Pac.*, 2022 WL 1720085 (N.D. Cal. May 28, 2022) ................................. 7

*Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253 (2d Cir. 1999) ............................................. 18

*Rolph v. Hobart & William Smith Colleges*, 271 F. Supp.3d 386 (W.D.N.Y. 2017) ..................... 5

*Routh v. Univ. of Rochester*, 981 F.Supp.2d 184 (W.D.N.Y. 2013) ............................................. 5

*Schonfeld v. Hilliard*, 215 F.3d 164 (2nd Cir. 2000) .................................................................. 23

*Shaffer v. Geo. Wash. Univ.*, 27 F. 4th 754, 764 (D.C. Cir. 2022) .............................................. 11

*South Road Assoc., LLC v. Int'l Business Machines Corp.*, 2 A.D.3d 829 (2d Dept. 2003), aff'd by 4 N.Y.3d 272 (2005) ......................................................................................................... 6

*Ward v. Nat'l Geographic Soc.*, 208 F.Supp.429 (S.D.N.Y 2002) ................................................ 8

*Willsey v. Gjuraj*, 65 A.D.3d 1228 (N.Y. App. Div., 2d Dept., 2009) .......................................... 5

*Wright v. Target Corp.*, No. 19-CV-6556-FPG-MWP, 2022 WL 1062924 (W.D.N.Y. Apr. 8, 2022) ................................................................................................................................... 4

**Statutes**

Nys UCC § 2-713 ........................................................................................................................ 27

Restatement (Second) of Contracts § 377 (1981) ....................................................................... 22

iv

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................... 4

**INTRODUCTION**

Plaintiffs Nicholas Bergeron and Nick Quattrociocchi (collectively, "Plaintiffs") respectfully submit this memorandum of Law in Opposition to the Motion for Summary Judgment ("MSJ" or "Motion") filed by Rochester Institute of Technology ("RIT" or "Defendant"). As explained herein, Defendant's motion for summary judgment should be denied in its entirety.

**SUMMARY OF ARGUMENTS**

Defendant's motion is flawed legally and factually for several important reasons.

First, RIT's motion rests almost entirely on the Student Financial Responsibility Agreement ("SFRA"), which it claims is an express contract that governs the entire relationship between the parties. However, the SFRA standing alone does not constitute a contractual agreement – notably because the SFRA does not define the scope of the covenants and promises owed by RIT to students like Plaintiffs. When combined with the Plaintiffs' tuition and fee payments and the governing documents under the totality of the circumstances, the SFRA is at best *part* of the contract between RIT and Plaintiffs. The SFRA must be read in connection with and in alignment with all of the promises (whether expressed or implied) within the standardized policy documents between RIT and its students, like Plaintiffs. If the Court utilizes the proper legal standard for reviewing RIT's policy documents and its standardized contract with students, it will then conclude that in exchange for their payment of tuition and mandatory fees, students like Plaintiffs reasonably expected to receive access to RIT's main campus, including in-person, on-campus instruction and access to campus facilities and services. This promise is expressed as "services" and "registration" in the SFRA and is implied on hundreds, if not thousands, of occasions in the official policy documents from RIT, as well as by the fact that Plaintiffs did not

1

enroll in RIT Online, in which students "receive 36% off the standard part-time undergraduate tuition rate". Ex. 9; SOF ¶ 5, 6. Defendant's motion ignores many of these documents.

Second, RIT argues that even absent an express contract, Plaintiffs have not identified discrete statements that specifically promises in-person instruction or services. Dkt. No. 74 at 11. This is not so. Under New York law, there is no legal obligation for a covenant to be expressly stated to be binding on RIT. Defendant did have a contractual obligation to provide in-person, on-campus services to its students as described in Defendant's policy documents, like websites, catalogs, bulletins, regulations, student code of conduct, and more. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (the terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student. (citations and internal quotation marks omitted)). A student (through five critical contract formation stages – application, admission, enrollment, registration, and payment) reading such material would undeniably have a reasonable expectation that Defendant promised to provide in-person and on-campus educational instruction. This is especially true where a school like RIT offers the same degree at a significantly reduced price if the student agrees to forgo the campus-services and classroom instruction. Here, Plaintiffs did not apply for, accept admission at, register for, or make payments for the cheaper online-only instruction offered at RIT Online. Meanwhile, Defendant provides zero evidence to support any intent at any of these critical contract formation stages that students enrolled in the on-campus program would be receiving an entirely online instruction. Therefore, whether a contract exists between RIT and students is at a minimum a disputed material fact. For that reason alone, Defendant's motion for summary judgment must be denied.

Third, Defendant repeats its flawed theory of damages to argue the educational malpractice doctrine precludes recovery. Defendant is wrong about the law and its mischaracterization on how damages have been properly measured by Plaintiffs' expert here. Contract law in New York is clear that the measure of damages is the difference between what a plaintiff paid and what services they actually received – as sometimes referred to as "market damages." Critically, such analysis is objective, not subjective, and requires no analysis into the pedagogy of the school and its academic decisions. *See* Omori v. Brandeis Univ., 2022 WL 10511039 (D. Mass. Oct. 18, 2022) ("Although plaintiffs may attempt to prove damages in that fashion, their calculation cannot be grounded in a subjective assessment that the quality of online instruction is somehow less than that of in-person instruction. *See* Durbeck, 547 F. Supp. 3d at 139-42 (collecting cases) (describing the application of the educational malpractice doctrine to similar claims). Instead, any purported difference in value between the performance allegedly promised and the performance actually rendered must be supported by objective evidence.") Instead, such a market damage analysis is easy here, where RIT's own internal pricing structure reflects a fundamentally different pricing system: one for campus-based services and one for online-only instruction. Therefore, the Court is only required to analyze the delta between the two, as has been done efficiently by Plaintiffs' expert.  In his report, Dr. Cowan details the methodology used to calculate damages: "RIT offers on-line courses at a lower rate, so I apply this rate to course hours to compute what RIT should charge in tuition for on-line offerings. I use these two numbers to compute damages." Ex. 13 at ¶ 6. As such, RIT's educational malpractice arguments do not warrant summary judgment as a matter of law and must be denied accordingly.

Fourth, RIT argues that because the SFRA governs the contract between the parties, unjust enrichment is not permitted. Dkt. No. 74 at 17. As several courts have recently pointed out, even

if Defendant's closure of campus may have been justified under an impossibility/impracticability of purpose analysis, its refusal to issue tuition and fee refunds for services not provided is unjust – and a matter of restitution, among other methods of damage calculations. This is especially true here, where even if no covenant to provide campus-based services exists, there is still a considerable difference in price between campus-based instruction and online-instruction – as conceded by Defendant's own internal pricing structure. Therefore, Defendant should not retain the benefit of providing the cheaper online product and keeping the greater campus-based price. While Defendant discusses total dollar figures and how exactly it went about its finances, the fact remains that Defendant received money paid by students for tuition and fees and then failed to provide the bargained for in-person, on-the-ground services. Given the retention of the financial benefit (i.e. tuition and fees), and then failing to meet its contractual obligations, Defendant was clearly enriched, and this argument is misplaced.

For the reasons outlined in the Plaintiffs' opposition, Defendant's motion should be denied in its entirety.

## **LEGAL STANDARD**

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (emphasis in original). The moving party bears the burden of demonstrating that

4

the evidence creates no genuine issue of material fact. *Leccese v. Metro. Life Ins. Co.*, No. 05-CV-6345 CJS, 2007 WL 1101096 at \*4 (W.D.N.Y. Apr. 12, 2007) (Siragusa, J.) The non-moving party may defeat a summary judgment motion only by making a showing sufficient to establish that there is a genuine issue of material fact for trial. *Celotex Corp.*, 477 U.S. at 322 (citing *Wright v. Target Corp.*, No. 19-CV-6556-FPG-MWP, 2022 WL 1062924, at \*2 (W.D.N.Y. Apr. 8, 2022).

<u>**ARGUMENT**</u>

**I.      RIT and Plaintiffs Entered into a Valid and Enforceable Contract for an On-Campus Educational Services That RIT Breached.**

It is well-settled under New York law that there is an implied contract between a student and the college or university he attends. *Rolph v. Hobart & William Smith Colleges*, 271 F. Supp.3d 386, 405 (W.D.N.Y. 2017) (quoting *Routh v. Univ. of Rochester*, 981 F.Supp.2d 184, 207 (W.D.N.Y. 2013)); (*See also Botts v. Johns Hopkins Univ.*, No. CV ELH-20-1335, at \*13 2021 WL 1561520 (D. Md. Apr. 21, 2021)); (*Flatscher v. Manhattan Sch. of Music*, 551 F. Supp. 3d 273, 283 (S.D.N.Y. 2021)) *citing Bergeron v. Rochester Inst. of Tech.*, No. 20-CV-6283 (CJS), 2020 WL 7486682, at \*7-8 (W.D.N.Y. Dec. 18, 2020)). Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree. The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (citations and internal quotation marks omitted). *See Keefe v. New York Law School*, 71 A.D.3d 569 (N.Y. App. Div., 1st Dept. 2010) ("The rights and obligations of the parties, as contained in the university's bulletins, become part of the parties' contract…However, only specific promises set forth in a school's bulletins, circulars, and

5

handbooks, which are material to the student's relationship with the school, can establish the existence of an implied contract…") (internal quotes and cites omitted).

In New York, courts interpret implied covenants in contracts through a reasonableness standard, including reasonable expectations and reasonable intent. *See Willsey v. Gjuraj*, 65 A.D.3d 1228 (N.Y. App. Div., 2d Dept., 2009) ("… giving practical interpretation to the language employed and the parties' reasonable expectations."); *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137 (1st Dept. 2008) ("Not merely literal language, but whatever maybe reasonable implied therefrom must be taken into account…"); *Blink v. Johnson*, 2015 N.Y. Misc. LEXIS 11906 (N.Y. Sup. Ct., Westchester Cnty., Aug. 21, 2015) (J. Schienkman) ("The aim is a practical interpretation of the expression of the parties to the end that there be a realization of their reasonable expectations… [cites omitted]"); *South Road Assoc., LLC v. Int'l Business Machines Corp.*, 2 A.D.3d 829, 833 (2d Dept. 2003), aff'd by 4 N.Y.3d 272 (2005) ("The language of a contract must be interpreted to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized.")(cites omitted); *see also Leki Aviation A/S v. B/E Aerospace, Inc.*, 2013 N.Y. Misc. LEXIS 2603 (N.Y. Sup. Ct., June 14, 2013) ("The tests to be applied in such cases are common speech and the reasonable expectations and purpose of the ordinary business person in the factual context in which terms of art and understanding are used, often also keyed to the level of business sophistication and acumen of the particular parties…"); *Hartz v. Consumer Group, Inc. v. JWC Hartz Holdings, Inc.*, 2005 N.Y. Misc. LEXIS 8534 (N.Y. Sup. Ct. Oct. 27, 2005); *Flomenbaum v. New York Univ.*, 71 A.D.3d 80, FN2 (1st Dept. 2009) ("[T]he [court in *Mangla v. Brown Univ.*, 135 F.3d 80 (1st Cir. 1998)] noted that the proper standard for interpreting contracts is 'reasonable expectation – what meaning the party making the manifestation, the university, should reasonably expect the other party to give it…'").

The SFRA standing alone does not constitute an all-encompassing contractual agreement – with covenants on both parties. It simply provides no covenant on the part of RIT whatsoever. However, when combined with the Plaintiffs' tuition payment and the totality of the circumstances including the official policy documents from RIT, the SFRA becomes part of the contract between RIT and Plaintiffs. Plaintiffs were subject to the same standardized contractual arrangement: In exchange for their payment of tuition and mandatory fees, students would receive access to RIT's main campus, including in-person, on-campus instruction and access to campus facilities and services. Furthermore, as described by Defendant in its publications, course descriptions, handbook, catalog, etc., and through the parties' prior conduct, the reasonable expectation of college students when they pay tuition and fees is to receive in-person, on-campus educational instruction and utilization of on-campus services. RIT breached this contract with students after closing its main campus in March of 2020, suspending in-person instruction, and eliminating access to campus and campus services and refusing to issue partial refunds of tuition and fees.

A.  **SFRA Does Not Completely Govern the Covenants Between the Parties**

RIT argues that there is a fully integrated express contract between RIT and its students, including Plaintiffs, that governs and makes no promise of in-person instruction or services. This argument fails as a matter of law and fact.

In making this argument, RIT relies on the Northern District of California's holding in *Randall v. Univ. of the Pacific*. However, *Randall* is easily distinguishable. In *Randall*, the student financial responsibility agreement at issue specifically stated, "I further understand and agree that my registration and acceptance of these terms constitutes a promissory note agreement ... in which the University of the Pacific is providing me educational services." *Randall v. Univ. of the Pac.*, 2022 WL 1720085, at *4 (N.D. Cal. May 28, 2022). Thus, based on that language, the district court

held that the student financial responsibility agreement "clearly states that the student is responsible for all billed charges and that the student understands that he or she is receiving educational services in exchange for payment. There is no language that requires those educational services to be in-person." *Id.*, at *5.

Here, RIT's SFRA, as opposed to the agreement in *Randall,* does not state that students are being billed tuition and fees in exchange for *educational* services. The applicable section of the SFRA that RIT claims to govern Plaintiffs' claims states:

> I understand and agree that when I register for any class at the Rochester Institute of Technology (RIT; university), or receive any service from RIT including student meals plan and/or housing charges or have deferred payments due or incur any liability for damages, I accept full responsibility to pay all tuition, fees, and other associated costs assessed at any time as a result of my registration and/or receipt of services . . . .

As opposed to RIT's arguments, the SFRA here merely governs students' responsibility to pay tuition and fees to RIT. *See Figueroa v. Point Park University*, 553 F.Supp.3d 259 (W.D. Pa. August 11, 2021)(construing a similar financial responsibility agreement and finding that it could not be the entirety of the agreement between students and the university for lack of material terms and reciprocal obligations on behalf of the university).  The SFRA does not include any language concerning any actual covenant to perform any task, provide any service, provide any instruction, or provide access to any specific facility or instruction. RIT readily admits that the SFRA does "not promise in-person instruction or services" let alone of any kind. Dkt. No. 74, at 10.

It is well-established, under New York law, that "a contract cannot be implied in fact where there is an express contract covering the subject matter involved." *Ward v. Nat'l Geographic Soc.*, 208 F.Supp.429, 438 (S.D.N.Y 2002). Here, the SFRA, plainly, does not cover the subject matter of this litigation: in-person educational instruction and access to on-campus services. If RIT had intended the SFRA to govern in-person educational instruction and on-campus services, then RIT

would have included such language within the SFRA. *See McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) (Ambiguities in contract are construed against the drafter). By failing to do so, RIT intended the SFRA to only govern the financial obligation of the student to make tuition and fee payments – not to govern the services that RIT would in exchange provide.  Thus, the Court must look to the reasonable expectations of the parties at the critical contract formation stages: (1) application, (2) admission, (3) enrollment, (4) registration, and (5) payment. Just like the SFRA, Defendant's motion does not address any of those stages, the parties' intentions, or expectations.

Other courts have rejected similar arguments regarding schools' financial responsibility agreements. Most recently, the Fifth Circuit held that a SFRA does not control the students' breach of implied contract claims for tuition and fees. *Jones v. Administrators of the Tulane University Educ. Fund,* No. 21-30681, 2022 WL 6693349 (5th Cir. Oct. 11, 2022), In *Tulane*, the students signed an Agreement and Disclosure Statement (A&DS) which is the "statement of the terms and conditions of that account, as well as a statement of [the student's] rights and responsibilities regarding that account." *Id*. at 11. Under the terms of the A&DS, students must pay "all Charges" or "[r]egistration for any semester may be denied." *Id*. The A&DS further states that in order "[t]o obtain a remission of tuition, the student must drop the courses online or complete drop/add form(s) with Academic Advising. Tuition will be reduced based on the date of withdrawal." *Id*.

Tulane argued that this agreement expressly addresses and forecloses the students' claims. The court found:

> [t]he A&DS only purports to create the 'open-end account[, which] is the instrument through which Tulane will process all of [the student's] financial transactions with Tulane University." Its provisions cover "the terms and conditions of that account, as well as a statement of [the student's] rights and responsibilities regarding that account." It does not purport to constitute a contract for educational services at all, much less a fully-integrated contract.

9

> For example, the A&DS nowhere identifies Tulane's commitment to provide educational instruction or the essential terms of that instruction.

*Id.* at 13.

Additionally, courts across the country have also held that SFRAs do not control over students' claims for breach of implied contract for tuition and fees. *See, e.g., In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*, 524 F. Supp. 3d 1346, 1354 (S. D. Fla. 2021) (the financial responsibility statement is not a contract because "it does not address numerous material terms concerning the students' enrollment, including the cost and amount of tuition and fees owed"); *Fiore v. Univ. of Tampa*, 2021 WL 4925562 at *13-*15 (S.D.N.Y. Oct. 20, 2021) (Court reached the same result where, unlike here, the university's financial responsibility statement did contain an integration clause).

Furthermore, without relevance, RIT mentions that Plaintiffs agreed that nothing in the Refund Policy requires RIT to issue refunds if it changes the mode of instruction. ECF No. 74 at 10. Under the heading "PAYMENT OF FEES/PROMISE TO PAY", RIT's Refund/Tuition Adjustment Policies states "I understand and agree that if I drop or withdraw from some or all of the classes for which I register, I will be responsible for paying all or a portion of tuition and fees in accordance with RIT's tuition Refund Policies . . ." Ex. 36. SOF ¶ 1. RIT's Refund Policy is clearly limited to refunds where a student withdraws from some or all of their courses at RIT. The policy has no applicability here, where neither Plaintiff withdrew from their classes. *See Ninivaggi v. Univ. of Del.*, 555 F. Supp. 3d. 44, 52 (D. Del. 2021) (rejecting argument based on the university's tuition refund policy, because "it focuses on the student's decision to drop a class, not U. Delaware's right to cancel or change classes").

**B.  The SFRA Does not Govern and Dispel the Covenants in Dispute and Plaintiffs' Have Established an Implied Contract**

Defendant argues that because the SFRA is an express agreement that governs the subject matter at issue, Plaintiffs cannot prevail on an implied contract theory. ECF No. 74 at 10. Like the argument above, this argument also fails because the SFRA cannot be considered the express agreement governing the entire relationship between the parties. PSUF ¶. There is more than sufficient evidence – under the proper legal standard under New York law – to show an implied contract between Plaintiffs and RIT whereby in exchange for payment of tuition and fees, RIT would provide an in-person, on-campus education. ECF No. 43 15-16; See generally Plaintiffs' Exhibits 1-36. The existence of this agreement is supported by, among other things, statements in RIT's publications and promotional materials, including its website;[1] Plaintiffs' registration in which they chose "In Person" courses; RIT's fee descriptions; RIT's 2019-2020 course catalogs; and Plaintiffs' payment of tuition and fees. Ex. 30, 22. SOF ¶ 30, 31. More foundationally, the fact that Plaintiffs were enrolled in RIT's campus-based program instead of their cheaper online only program demonstrates the intention of the parties and the nature of the covenant. Defendant largely ignores all of its official representations of the "RIT Online" program in which students "receive 36% off the standard part-time undergraduate tuition rate". Ex. 9. Critical to their representations are that "Our online courses and programs have the same objectives, rigorous workload and expert RIT faculty as taught on campus. Yet our online courses are delivered in a flexible manner that allows you to better balance the demands of work, family, and school." *Id*.

Further evidence to support Plaintiffs' claims are found in the following:

- A message from the Provost to Faculty: Preparing for online instruction: "I write to you as we embark on one of the largest field experiments in the history

---

[1] *See Shaffer v. Geo. Wash. Univ*., 27 F. 4th 754, 764 (D.C. Cir. 2022) ("[n]otably, both Universities' communications contain numerous references to the benefits of their on-campus instruction," such as "a focus on experiential learning" and describing the campus as giving students "the advantages of a traditional college setting"); see Abbot Decl., Exhibits A, B, C; Bergeron Decl. ¶ 8; Quattrociocchi Decl. ¶ 7.

of higher education – millions of university students, including those at RIT, are transitioning to online classrooms where we will teach them until the end of the spring semester." "Online instruction is a different way to approach learning…" "It is understandable that students **cannot have the same kind of course experience they had before spring break** but they should still experience a cohesive academic semester." (emphasis added) Ex. 8.

- RIT's 2019-2020 Undergraduate and Graduate Bulletins 2019-20, which is communicated to all students and contains over 140 references to "campus", Ex. 22; Ex. 30.

- RIT's standardized tuition and fees pricing applied to all students at RIT's main campus. Ex. 21.

- When Plaintiff Bergeron was accepted to RIT, he received an admission letter that stated: "Our students **have access** to some of the finest laboratories, technology and computing facilities available on any university campus," "**On campus** you will find that just about everything you need is available to provide you with a rich and well-rounded college experience, "The diverse array of students, faculty and quality of residential life contribute in many ways to a rewarding campus experience." "We are confident that your years **on campus** will be challenging and rewarding." (emphasis added). Ex. 32.

- When Plaintiff Quattrociocchi was accepted to RIT, similarly, he received an admission letter that states "We are confident that your years **on campus** will be challenging and rewarding." (emphasis added) Ex. 31.

- RIT's online registration portal, Student Information System (SIS), through which, for the Spring 2020 semester, RIT listed for all students each class by description, meeting time, and physical classroom location, Bergeron Decl. ¶ 15; Quattrociocchi Decl. ¶ 16; (Quattrociocchi Dep.) at 101:6 – 101:12 (Q. "Okay. How, meaning how specifically did you register for classes for the spring 2020 term? A. Through RIT's SIS."); (Bergeron Dep.) at 55:12 – 55:17 (A. I believe when you're selecting courses there's a description that's generally pretty accurate on what the course will be, so I typically just consulted that. Q. This is on SIS? A. Yes.")"

- All Class Members enrolled at RIT's main campus, not "RIT Online". SOF ¶ 26-28.

- All Class Members did not receive the "reduced tuition rate" offered to RIT Online enrollees because Class Members were enrolled in "on-campus classes". Ex. 1, 3.

12

- All Class Members failed to receive a refund when RIT unilaterally converted all programs and instruction to online only instruction in or around March 15, 2020. Ex. 29 (Concepcion Dep.) at 124:7-124:12.

- RIT's states "[a]t RIT, experiential learning enables students to apply what they've learned through lectures, labs, assignments, and projects to a variety of rich experiences outside of the classroom."[2] Ex. 20.

- RIT's "Student Life" webpage has links to "Campus Events and Traditions", "Athletics and Recreation", "Dining and Retail", and "Living on Campus." Ex. 15, 16, 17, 18, and 19.

Defendant's argument further fails because it has not met the summary judgment standard. Defendant fails to show that there is no evidence that Plaintiffs enrolled at RIT because it promised them in-person instruction or services. Defendant, in Relevant Fact No. 1, supports its position by discussing Plaintiffs' testimony, where each testify to believing in-person instruction was implied by the documents RIT provided to them, while ignoring the plethora of promises that Plaintiffs have brought forth. Dkt. No. 74 at 12; SOF ¶ 15-38. Plaintiffs expected to receive campus-based educational services, including access to campus, its technologies, labs, libraries, in-person instruction, and in-person opportunities. The same types of campus-based in-person services were conveyed to them through numerous documents and materials they saw during the application process. Bergeron Decl. ¶ 4; Quattrociocchi Decl. ¶ 4. Without pointing to evidence to show that there is no dispute, Defendant has failed to meet its burden of proof, as required for summary judgment.

Moreover, Defendant's official publications and descriptions, coupled with the payment of tuition and fees, create a "reasonable expectation" that when a student formed their contract with the University, they expected to receive an in-person, on-campus education complete with access to all of the advertised in-person and on-campus services and facilities. Quattrociocchi Decl. ¶ 7,

---

[2] *See* Ex. 20. http://web.archive.org/web/20200229183851/https://www.rit.edu/experiential-learning

11; Bergeron Decl. ¶ 4, 8. It would make no sense for RIT to require students to choose between "in person" and "online" when registering for classes, describe courses as being offered "traditionally," and reasonably think that students would not expect the class to be taught on-campus. SOF ¶ 1. Thus, when taken in the aggregate of the college admission and enrollment process along with Defendant's fee descriptions, Defendant created a reasonable expectation that students would receive in-person instruction and access to campus. *See, e.g., In re Bos. Univ. COVID-19 Refund Litig.*, 511 F. Supp. 3d 20, 24 (D. Mass. 2021) (the court found that description identifying specific locations, registering for on-campus courses, and the payment of tuition and fees could reasonably lead a student to expect on-campus, in-person instruction).

Thus, when accounting for the entirety of the circumstances, Defendant's official publications, materials, and descriptions became part of the contract for in-person on-campus instruction and access to on-campus services once students reviewed the two options provided by Defendant (in-person or RIT online), chose to enroll in in-person classes, and paid RIT the higher tuition and fees for such. Therefore, summary judgment should be denied.

## C. RIT's Separate "RIT Online" Program and Its "Reduced Tuition Rate" Implies a Promise of Campus-based, In-Person Instruction

Defendant argues that "the mere fact that a distinct body of RIT students were enrolled in a distinct wholly online program provides no basis for an inference that the classes in RIT's campus-based program would be conducted exclusively in-person in all circumstances." ECF No. 74 at 14. However, it is not the mere existence of and entirely online program that creates an implied promise of in-person instruction. It is the fact that Defendant offers two entirely separate products, with two entirely separate applications and admission – and critically pricing structures. Quattrociocchi Decl. ¶ 6; Bergeron Decl. ¶ 6; Ex. 9, 11. When a student applies to the traditional program, they are not enrolled in RIT Online, and vice versa.

14

On RIT's "Why Choose RIT Online" webpage, it states that "Our online courses and programs have the same objectives, rigorous workload and expert RIT faculty as taught on campus … Graduate students enrolled in most degree programs receive a 43% discount off the standard graduate tuition rate, and undergraduate students enrolled in most degree programs receive a 36% discount off the standard part-time undergraduate tuition rate. Students not enrolled in a degree program are not eligible for the RIT Online tuition rate." Ex. 11. On another RIT Online webpage, RIT states "RIT has discounted the tuition rate to new students to make an online education affordable." Ex. 9. RIT represents in such documents to perspective students that RIT Online has "affordable tuition" and "reduced tuition rate[s]" when compared with RIT's main campus program and "You will take classes with the same distinguished faculty to teach on-campus classes, and receive the same esteemed degree as your on-campus peers." Ex. 11. Further, RIT states: The same faculty that teach on-campus also teach our online courses. You will receive the same RIT credential as traditional on-campus graduates, **yet you will pay a lower online tuition rate**." (emphasis added) *Id*.

Plaintiffs did not apply for, accept admission at, or enroll in the Institute's "RIT ONLINE" program. SOF ¶ 18-29. When enrolling and registering for classes at RIT's main campus, Plaintiffs did not receive the "reduced tuition rate" as promised to students of RIT Online program because Plaintiffs were enrolled in the "on-campus classes." SOF ¶ 27, 28. Rather, Plaintiffs registered for classes using the Student Information System (SIS). SIS was the registration portal used for Spring 2020 semester classes and each class is listed not only by description, but also by meeting time and physical classroom location, and makes students choose between "In Person" and "Online" under "Mode of Instruction". PSUF ¶ 2; Bergeron Decl. ¶ 15; Quattrociocchi Decl. ¶ 16.

15

Therefore, because of the two distinctly different application processes, it is entirely illogical to reasonably expect students who submitted common applications to RIT's in-person on-campus programs to think that they could be transferred to an online program at will by RIT. Plaintiffs specifically did not apply for a remote instructional program with reduced tuition. When Defendant unilaterally switched Plaintiffs to a remote and off-campus instructional program, Defendant breached the original contract which Plaintiffs had submitted applications for, e.g., on-campus and in-person instruction at RIT. Therefore, for the reasons mentioned above, summary judgment should be denied.

### D. The Student Health Fee and Student Activity Fee Descriptions Create Contractual Obligations Of In-Person Access

Defendant argues that even if the SFRA were not dispositive of the Student Health Fee and Student Activity Fee, Plaintiffs have not identified any specific promises that the services provided by each of the fees would be delivered in an exclusively in-person format. ECF NO. 74 at 16. This argument fails.

RIT's website states that the Student Activity Fee "supports programs, events, and services that enhance the quality of student life at RIT."[3] Ex. 1. The Student Health Services Fee provides "support for programs and services offered by the Student Health Center, Student Counseling and Psychological Services and for health promotion initiatives."[4] By paying these fees, Plaintiffs reasonably expected to have access to all the on-campus facilities and services for the entire semester. Bergeron Decl. ¶ 4, 8; Quattrociocchi Decl. ¶ 4, 7.

The court had a similar finding in an analogous case: "BU describes the fees in general terms of "support[ing]" programs or "offset[ting] costs." [internal citations omitted] . . .the

---

[3] http://web.archive.org/web/20200130050820/https://www.rit.edu/fa/sfs/explanation-fees
[4] *Id.*

descriptions in this case also refer to specific activities occurring at specific locations, and . . . BU "dramatically curtailed" or no longer provided these activities after March 22, 2020. Under the circumstances . . . plaintiffs could . . . have reasonably expected that their payment of mandatory fees would grant them access to at least some of the on-campus facilities and resources shut down by BU on March 22, 2020." *In re Bos. Univ. COVID-19 Refund Litig.,* 511 F. Supp. 3d 20, 24 (D. Mass. 2021).

Similarly, here, Plaintiffs lost the options to use on-campus facilities, such as access to the student life center, transportation, libraries,[5] could not participate in student activities and events; and were not able to seek basic on-campus health and treatment services after RIT closed its campus. Ex. 3. It cannot be disputed that RIT closed its campus and access to facilities and services in March of 2020 and when that happened, on-campus events were cancelled or subject to severe restrictions. Bergeron Decl. ¶ 19, Quattrociocchi Decl. ¶ 20. As such, Plaintiffs did not have access to facilities and services for which they had already paid and to which they had a reasonable expectation of access. Bergeron Decl. ¶ 15, Quattrociocchi Decl. ¶ 18. Therefore, summary judgment must be denied because there is a genuine issue as to whether RIT fee descriptions promise students access to specific facilities, services, and amenities.

## II.     RIT Is Not Entitled to Summary Judgment on Plaintiffs' Unjust Enrichment Claims.

Defendant argues that because they did not receive a massive financial windfall due to Covid-19, they are now relieved of contractual duties that they were obligated to fulfill. RIT contends that it was not unjustly enriched because its "continued provision of instruction and services came at a tremendous cost." ECF No. 74 at 18. This argument is flawed legally and

---

[5] RIT0001946

factually. RIT primarily relies on claims that (1) RIT had fixed costs throughout the pandemic, (2) RIT lost a substantial portion of its auxiliary revenues from housing and meal plan fees after provided pro rata refunds for each, (3) RIT spent approximately $450,000 in additional funds between March 1, 2020, and June 30, 2022, for equipment, licenses, and other health and safety measures. ECF. No. 74 at 18-19. The Defendant's additional costs deriving from its own breach are not the responsibility of Spring 2020 students; if anything, the Defendant incurring additional costs demonstrate that they modified the original agreement between Plaintiffs and RIT. Defendant's explanations as to why it should retain the paid tuition and fee monies are nothing more than circular explanations in which Defendant rely on its own financial statements rather than an actual explanation of legal concepts that excuse its breach and fails to consider the monies lost by its students.

Under New York law, "the elements of unjust enrichment are '(1) the defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.'" *Legurnic v. Ciccone,* 63 F. Supp. 3d 241, 248 (E.D.N.Y. 2014) (internal quotations omitted). However, a plaintiff may seek damages on alternative – and "mutually exclusive" – theories of breach of contract and unjust enrichment where "there is a dispute over the existence, scope, or enforceability of the putative contract." *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999). *See also Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp.2d 185, 195 (S.D.N.Y. 2009). Further, if one party has performed the non-performing party may owe it restitution. *See* Restatement (Second) of Contracts § 377, cmt. A ("[I]n cases of impracticability or frustration the other party is also ordinarily relieved of any obligation [to perform] . . . [and] is also entitled to restitution.").

18

Plaintiffs have proved the required three elements of unjust enrichment. Defendant clearly received a financial benefit in which they were not otherwise entitled when it closed campus and transitioned to online courses without providing students with a pro rata refund. While Defendant discusses total dollar figures and how exactly it went about its finances, the fact remains that Defendant received money paid by students for tuition and fees and then failed to provide the bargained for in-person, on-the-ground services. Given the retention of the financial benefit (i.e. tuition and fees), and then failing to meet its contractual obligations, Defendant was clearly enriched, and this argument is misplaced.

Secondly, Defendant was enriched at the expense of the Plaintiffs. Plaintiffs paid significant sums of money for in-person education and on-campus services and did not receive either for the entire contract length. In RIT's own parlance, Plaintiffs did not receive the "Reduced Tuition Rate" when they were forced into receiving online-only instruction. SOF ¶ 27, 28. Instead, RIT provided Plaintiffs, and all students, with un-contracted for services that costs significantly less than the service Plaintiff actually paid for. Although Defendant elaborates on their fixed costs "did not evaporate because there was a pandemic ongoing" (Dkt. No. 74 at 18), the services provided after RIT cancelled in-person instruction and closed campus were simply not what was bargained for by the Plaintiffs. If Plaintiffs are not allowed to recover on Defendant's argument, then unjust enrichment law in New York should be rewritten as to include a provision stating that unjust enrichment is only allowed when recovery is financially acceptable to the Defendant. While it is financially understandable that Defendant would want to retain its funds, simply stating that it is against RIT's financial interests to refund students does not suddenly make RIT's retention now just and equitable.

19

Third, equity and good conscience militate against permitting RIT to retain what the Plaintiffs are seeking to recover. Plaintiffs reasonably expected to receive an in-person education and access to campus for reasons stated herein, including RIT's promotion of the classroom and campus experience, the fact that all of their classes were in-person prior to the shutdown, Plaintiffs' payment of tuition and fees, and their deliberate selection of in-person classes as part of the registration process. Bergeron Decl. ¶ 9, 10; Quattrociocchi ¶ 9, 10. Even though the pandemic was unforeseen, it does not negate the simplicity of the argument that Plaintiffs rightly deserved all of the services they and other students paid for. Given that such services were not rendered, equity and good conscience requires that students are refunded for such payments.

Additionally, when both parties are excused from performance, the law seeks to restore both parties to their pre-contract position. *See* Restatement (Second) of Contracts § 377 (1981) ("A party whose duty of performance . . . is discharged as a result of impracticability of performance . . . is entitled to restitution for any benefit he has conferred on the other party by way of part performance or reliance"); *id*. at cmt. A ("Furthermore, in cases of impracticability . . . the other party . . . is also entitled to restitution."); *id*. at cmt. B ("after the occurrence of a disrupting event that was ordinarily unforeseeable when the contract was made . . . . restitution is all that is required"); *Hiatt*, 512 F. Supp. 3d at 1188 ("Even if it was impossible for BYU to provide in-person education, BYU could still be required to provide restitution"). Since RIT did not perform on the contract due to COVID-19, as the breaching party, it may have the value of the remote instruction it provided as substitute performance. However, RIT has provided little evidence of the value of the remote instruction provided during the Spring 2020 semester. *See generally* ECF 74. In fact, RIT prices its online courses much lower than its on-campus courses, and offers "36% off the standard part-time undergraduate tuition rate". Ex. 9. RIT simply does not get to keep students'

20

money even if its performance is excused – and RIT does not get to price its online and on-campus classes differently and keep the money after transitioning all of its courses online during the Spring 2020 semester. RIT was free to charge more for other semesters if it was losing money, however, it does not get to change the terms of service during the middle of the effected semester and keep student's money so that it wouldn't lose money later on. Thus, Plaintiffs would be entitled to restitution for the amounts they paid in advance for tuition and fees, potentially less the value of the online education provided by RIT. *See In re Boston Univ. COVID Refund Litig*., No. 1:20-cv-10827-RGS [ECF 72] (D. Mass. Aug. 20, 2021) (noting "[l]iability will hinge on whether the contract required provision of in-person instruction, not on the value of educational services ultimately received.").

Lastly, RIT's argument that Plaintiffs continued to receive instruction and access to services is inapposite. Dkt. No. 74 at 18. While course credits and grades are a benefit promised by RIT, that was not all that Plaintiffs paid tuition and fees to receive. The fact that Plaintiffs continued to take classes does not mean that they receive the full value for what they paid and suffered no detriment.[6] RIT going to "great lengths" to provide that Plaintiffs education does not make its failure to provide in-person education and on-campus services "just." As such, and because there is a genuine dispute about whether the SFRA is a valid and enforceable contract, RIT has failed to establish that there is no genuine issue of material fact as to Plaintiffs' unjust enrichment claim.

### III.   Plaintiffs Have Established a Viable Damages Theory Which Does Not Trigger the Educational Malpractice Doctrine

---

[6] "Even if Plaintiff received a substantial benefit from his payments of tuition and fees, it may still be inequitable for Defendant to retain their full value." *Rhodes v. Embry-Riddle Aeronautical Univ., Inc*., 2021 WL 140708 at *7 (M.D. Fla. Jan. 14, 2021)

### a. Educational Malpractice Does Not Apply

This case continues to be one which does not trigger the educational malpractice doctrine. Just as the vast majority of courts across this country rejected this argument on motion to dismiss, they are now rejecting it at the summary judgment phase.[7] As stated by the Northern District of New York, "plaintiff's claims seeking recompense from their tuition payments do not by necessity fall under the heading of educational malpractice, and if plaintiffs successfully prove out their claims of breach based on the Plan and the catalog, they will be able to recover from RPI a portion of the amount they paid in tuition." *Ford v. Rensselaer Polytechnic Institute*, 507 F.Supp.3d. 406, 417 (N.D.N.Y. 2020); *See Arredondo v. Univ. of La Verne*, No. 2:20-cv-07665, 2022 WL 3222376, at *6 (C.D. Cal. Aug. 2, 2022) ("Defendant argues the educational malpractice doctrine bars some or all of the damages in this action. The Court previously rejected these arguments, and it does so again here for the same reasons."); *See Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 882–883 (7th Cir. 2022) )"[h]ere, the students do more than allege that the remote education was not good enough. Rather, the students point to an identifiable contractual promise that the university failed to honor—the promise to provide in-person classes and access to on-campus facilities and resources…. Deciding whether the university contractually promised to provide students an in-person educational experience, and whether the university breached that promise, does not require a court to evaluate the reasonableness of the university's conduct in providing remote educational services during the pandemic, or second-guess the professional judgment of the university. Neither does it require a court to decide whether the students received the same level of instruction through online classes, nor analyze the nature and quality of the educational experience the students received.").

---

[7] *See In re Bos. Univ. COVID-19 Refund Litig.*, No. CV 20-10827-RGS, 2022 WL 3154670 (D. Mass. Aug. 8, 2022).

Here, Plaintiffs' subjective opinions about specific classes and professors does not trigger the educational malpractice doctrine. All Plaintiffs argue is that they had a contract pursuant to which they paid tuition and fees to RIT to attend in-person classes and participate in in-person activities and that RIT breached that contract by moving to online classes and closing campus while refusing to provide Plaintiffs with a portion of their tuition and fees. Plaintiffs are by no means asking the Court to involve itself of the professional judgments of trained educators. As such, RIT's educational malpractice arguments do not warrant summary judgment as a matter of law and must be denied accordingly.

   b.  **Dr. Cowan's Methodology is Reliable and Utilizes Accepted Computational Methodologies.**

Defendant inappropriately dedicates a section of its motion to argue that Plaintiffs' expert opinion is fatally flawed because "critical differences" between RIT Online and in-person courses were ignored. Dkt. No. 74 at 22-24. Pursuant to RIT's own records, RIT charged a higher price for its in-person and on-campus program than the RIT Online program. Ex. 9, 12. Dr. Cowan applied this rate to course hours to compute what RIT should charge in tuition for on-line offerings. Dr. Cowan Expert Report, Ex. 13 at 6.

Contract law in New York is clear that the measure of damages is the difference between what a plaintiff paid and what services they actually received – as sometimes referred to as "market damages." Such analysis is objective, not subjective, and requires no analysis into the pedagogy of the school and its academic decisions. Instead, such a market damage analysis is easy here, where RIT's own internal pricing structure reflects a fundamentally different pricing system: one for campus-based services and one for online-only instruction. Therefore, the Court is only required to analyze the delta between the two, as has been done efficiently by Plaintiffs' expert.

23

*See Schonfeld v. Hilliard*, 215 F.3d 164, 175 (2nd Cir. 2000) ("General damages are sometimes called market damages because, when the promised performance is the delivery of goods, such damages are measured by the difference between the contract price and the market value of the goods at the time of the breach."); *see also Emposimato v. CIFC Acquisition Corp.*, 30 Misc. 3d 1233(A) (Sup. Ct. N.Y. County, March 7, 2011); *Kraton Chem., LLC v. Graphic Packaging Int'l, LLC*, 2020 N.Y. Misc. LEXIS 124 (Sup. Ct. N.Y. County, Jan. 4, 2020); Nys UCC § 2-713 ("[T]he measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach ...").

Plaintiffs' expert appropriately accounts for these costs. Cowan Report Ex. 13. In his report, Dr. Cowan details the methodology used to calculate damages: "RIT offers on-line courses at a lower rate, so I apply this rate to course hours to compute what RIT should charge in tuition for on-line offerings. I use these two numbers to compute damages." Ex. 13 at ¶ 6. Although Dr. Cowan does not presently have all the information necessary to calculate damages specific to each class members, his methodology can easily be repeated for every student, including Nicholas Bergeron, even if there may be some differences in the in-person tuition prices arising from differences in the classification of students. Ex. 13 at ¶ 10.

Lastly, Plaintiffs' theory for damages is objective and quantifiable. It represents the loss in economic value between the in-person education paid for and the online education not contemplated and carrying a lesser market value. Indeed, Plaintiffs have submitted a clear and objective plan, quantified, and supported by an expert report by well-regarded economist, Dr. Charles Cowan. (Dr. Cowan Report) Ex. 13. *See also Arredondo*, 2022 WL 3222376, at *6 (denying motion to decertify and granting summary judgment in the class' favor in a case utilizing a damages report prepared by Dr. Cowan: "An appropriate damages calculation takes into account

tuition offsets for the calculation of in-person and online tuition costs. Plaintiff's expert appropriately accounts for these costs.").

As such, Plaintiffs expert opinion is not fatally flawed, and Defendant is not entitled to summary judgment.

### c. Bergeron Sustained Damages

RIT attempts to argue that because Plaintiff Bergeron received scholarships and grants for the Spring 2020 semester, that he was not injured. It is entirely illogical to think that he is no longer capable of being injured simply because he received some aid. RIT still used the monies paid by students and failed to provide adequate refunds when closing campus and switching to online learning. As such, Plaintiff Bergeron's claims cannot be dismissed. *See Arredondo v. Univ. of La Verne*, Case No. 2:20-cv-07665-MCS-RAOx, 2021 WL 1588995 (C.D. Cal. Apr. 21, 2021) (Court held that even though the Plaintiff received a scholarship, that did not negate their ability to recover damages for the University's breach of contract in analogous factual situation).

Plaintiff Bergeron's bill from RIT for the Spring semester was $27,779.7 He received a combined $23,242.50 in scholarships and grants. Accordingly, he was personally responsible for payment of $4,536.50, some of which he paid directly out of pocket and some of which he financed through student loans (for which he is personally responsible and will have to re-pay). Defendant's argument is based upon creative accounting. Specifically, Defendant's argument presupposes that 100% of the scholarships and grants were applied to tuition and fees. However, Defendant does not provide evidence detailing such.

### CONCLUSION

Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment in its entirety.

Dated: October 28, 2022

Respectfully Submitted,

**POULIN | WILLEY | ANASTOPOULO, LLC**

BY: */s/*
Roy T. Willey IV*
Eric M. Poulin*
Blake G. Abbott*
Paul J. Doolittle*
32 Ann Street
Charleston, SC 29403
Telephone: (843) 614-8888
Email: eric@akimlawfirm.com
roy@akimlawfirm.com
blake@akimlawfirm.com
pauld@akimlawfirm.com

-and-

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

**LEEDS BROWN LAW, P.C.**

Michael A. Tompkins, Esq.
Anthony M. Alesandro
One Old Country Road, Suite 347
Carle Place, NY 11514
(516) 873-9550
aalesandro@leedsbrownlaw.com
mtompkins@leedsbrownlaw.com

**CO-LEAD INTERIM COUNSEL FOR THE PUTATIVE CLASS**

-and-

26

**FERR & MULLIN, P.C.**
Robert L. Mullin
7635 Main Street Fishers
P.O. Box 440
Fishers, NY 14453
Telephone: (585) 869-0210
Facsimile: 95850 869-0211
Email: rlmullin@ferrmullinlaw.com

-and-

**MOREA SCHWARTZ BRADHAM
FRIEDMAN & BROWN LLP**

John M. Bradham*
444 Madison Avenue, 4th Floor
New York, NY 10022
Telephone: (212) 695-8050
Email: jbradham@msbllp.com

-and-

**TOPTANI LAW PLLC**

Edward Toptani*
375 Pearl Street, Suite 1410
New York, NY 10038
Telephone: (212) 699-8930
Email: edward@toptanilaw.com

-and-

**THE SULTZER LAW GROUP, P.C.**

Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Mindy Dolgoff, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
dolgoffm@thesultzerlawgroup.com

-and-

27

**\*Admitted via *Pro Hac Vice***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 28, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


Date: October 28, 2022                    */s/Blake G. Abbott*

29