# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

NICHOLAS BERGERON and NICK        )
QUATTROCIOCCHI, on behalf         )
of themselves and on              )
behalf of all others             )
similarly situated,               )
                                  )
          Plaintiffs,             )
                                  )
V.                                ) Lead Case
                                  )
ROCHESTER INSTITUTE OF            ) NO.:  6:20-cv-06283
TECHNOLOGY,                       )
                                  )
          Defendant.              )

ZOOM AND VIDEOTAPED DEPOSITION OF

CHARLES D. COWAN, Ph.D.

JULY 20, 2022

VOLUME 1

ZOOM AND VIDEOTAPED DEPOSITION OF
CHARLES D. COWAN, PH.D., produced as a witness at the
instance of the DEFENDANT, and duly sworn, was taken in
the above-styled and numbered cause on July 20, 2022,
from 9:07 a.m. to 3:06 p.m., via Zoom before Wendy
Schreiber, CSR No. 9383, in and for the State of Texas,
reported by machine shorthand, at the address 205 South
Gulf Drive, Santa Rosa Beach, Florida, 32459, pursuant
to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.
Job No. 850422



1          A.  We didn't really require a whole lot.  We

2     required information about the named plaintiffs so that

3     we could do a calculation specific to them.  And with

4     respect to the information about tuitions, I believe we

5     obtained that information ourselves through just

6     research.  I believe that's all we used.  Oh, there was

7     some information we obtained from the Department of

8     Education as you'll see in the materials relied on but

9     we obtained that information, too.  So the only thing we

10    really needed was a copy of the Complaint and the

11    specifics for the two named plaintiffs.

12         Q.  And to clarify, did -- did you ask the

13    plaintiffs for any other information aside from the

14    items that you've just gone through?

15         A.  Not that I recall.

16         Q.  Did the plaintiffs -- or were you offered any

17    other documents or information for your analysis?

18         A.  Not that I remember.

19         Q.  And when you -- sorry, just going back for a

20    second, you mentioned that your team gathered

21    information about tuition and fees from

22    publicly-available sources.  Are you referring to first

23    the published tuition and fees prices set by the -- by

24    RIT?

25         A.  Yes.



Page 40

1     Q.  Did you receive all of the information that you
2   asked the plaintiffs for?
3     A.  I received information for Mr. -- and I
4   apologize for mispronouncing his name -- Quattrociocchi.
5   I did not for Mr. Bergeron.
6     Q.  Was there -- were you given an explanation as
7   to why you did not get information about Mr. Bergeron?
8     A.  No.  Well, I mean, I asked if they had the
9   information.  They said they hadn't received it and that
10  was the only explanation I got.  I didn't delve further.
11    Q.  Did you make -- did you ask plaintiffs whether
12  they could get the information that you needed about
13  Mr. Bergeron?
14    A.  Well, the way the conversation went I
15  understood that they were in the process of obtaining
16  information.  I didn't ask whether they could or not.
17  My impression was simply that they were in the process.
18    Q.  Approximately -- and did you ever do any
19  follow-up with the plaintiffs about whether they got the
20  information or were able to provide it to you about
21  Mr. Bergeron?
22    A.  Well, this is -- this activity was performed in
23  about a one-to-two-week-time period so, no.  After the
24  first week we had pretty much completed our report.
25    Q.  And approximately when did -- when were the two



Page 41

1   weeks when you worked on the report?

2         A.   4/13 -- April 13th through probably April 27th.

3         Q.   And that's of 2022?

4         A.   Yes, ma'am.  I'm sorry.

5         Q.   Was there any other information that you asked

6   the plaintiff for which was not provided to you?

7         A.   I believe you asked me this earlier and I --

8   the answer was no.

9         Q.   Apart from the information about RIT's

10  published tuition and fees prices and the information

11  from I believe it's the Department of Education's

12  National Center for Education Statistics that you

13  referenced, was there any other publicly-available

14  information that you or your team reviewed in preparing

15  your report?  I'm sorry, I didn't catch that answer.

16        A.   No.

17             (Exhibit 4 was marked for identification.)

18        Q.   (BY MS. SHEN)  I'm going to come back to

19  Exhibit 3, your report, so if you could just keep that

20  document open but for the moment let's move on and mark

21  as Cowan Exhibit 4 Exhibit 3 to your report, Dr. Cowan,

22  which is your sources list.  Let me know when you have

23  that pulled up.

24        A.   I have it.  Thank you.

25        Q.   So this document is titled "Materials Relied



Page 42

1   On."  Were there any other documents that you or your

2   team reviewed which are not disclosed in this Exhibit 4?

3        A.  Not that I'm aware of.

4        Q.  Looking under the "Depositions" heading in your

5   sources list, you reference the deposition of Edward

6   Lincoln, the deposition of Nicholas Bergeron and the

7   deposition of Nicholas Quattrociocchi.  Were you

8   provided any other deposition transcripts?

9        A.  I don't believe so, no.

10       Q.  Were you aware that a deposition of an RIT

11  corporate witness was taken?

12       A.  Umm.

13       Q.  I'm sorry, that answer was a little garbled.

14       A.  That was because I said umm.  That was just a

15  stop.  I don't think I knew it before I read the --

16  before I wrote my report.  I believe I became aware of

17  it afterwards but I've never seen it.

18       Q.  After you finished writing your report did you

19  ask for a copy of that deposition transcript of RIT's

20  corporate witness?

21       A.  No.

22       Q.  Why not?

23       A.  My analysis is pretty much based on the

24  published materials from RIT.  It doesn't -- I don't

25  find in any of these cases reading depositions to be



Page 43

 1   very helpful with respect to providing a basic
 2   calculation for class certification.
 3        Q.  And why is that?
 4        A.  Sorry, why is it that I don't find it very
 5   helpful?
 6        Q.  Correct, yes.
 7        A.  Well, it's a very straightforward calculation.
 8   There is a published charge to students.  There is a
 9   published rate for online classes.  There is a timing
10   component with respect to when the university closed
11   down.  Those are -- and typically we don't have
12   information for fees like we did in here.  So there
13   isn't a whole lot more than that that I need for doing a
14   basic calculation for the purpose of a class
15   certification.
16        Q.  The three deposition transcripts that you
17   reviewed, did you review the exhibits that were shown
18   during those depositions?
19        A.  I didn't but one of my staff might have.
20        Q.  Looking back at Exhibit 4 under the heading
21   "Websites Cited," when, approximately, did you or your
22   team visit the websites that are listed there?
23        A.  Somewhere in that two-week time period I
24   described earlier.
25        Q.  So that would be April of 2022?



Page 44

```
 1        A.  Yes.
 2        Q.  And is that the same for the National Center of
 3   Education Statistics website?
 4        A.  Yes.
 5        Q.  Did your team do any capture or screen shotting
 6   of the NCES information that you reviewed and relied on?
 7        A.  I don't believe so.
 8        Q.  And what information specifically did you rely
 9   on from the National Center of Education Statistics?
10        A.  In my report I state that I rely on information
11   from NCES for knowing the number of -- of students of
12   different types who attended RIT undergraduate.
13        Q.  Is there any other information that you relied
14   on from the NCES website?
15        A.  No.
16            (Exhibit 5 was marked for identification.)
17        Q.  (BY MS. SHEN)  Let's mark as Cowan Exhibit 5
18   the document that is titled "NCES-RIT Page."  Dr. Cowan,
19   let me know when you have that up on your screen.
20        A.  I have it up.
21        Q.  So I'll represent that this capture of the NCES
22   website was taken yesterday at 7:08 p.m. as shown on the
23   date and timestamp on the upper left-hand corner and I
24   know that this information -- this page includes a lot
25   of information about the 2020 to 2021 academic year but,
```



Page 48

1  that was provided to you to help prepare your report,

2  correct?

3      A.  Excuse me, I need to look at something.  Just a

4  minute.  Yes.

5      Q.  And what was it that you were just looking at,

6  Dr. Cowan?

7      A.  Materials relied on.

8      Q.  Turning to it's page 4 of Exhibit 7, it's got a

9  Bates stamp of RIT0001264, that is the -- those are the

10  data points that you've relied on, correct, in

11  calculating Mr. Quattrociocchi's damages under your

12  model?

13      A.  I believe so, yes.

14      Q.  And do you see in -- on this page there is a --

15  there's a line item for scholarships and grants and

16  Mr. Quattrociocchi received $2,000 in an RIT grant

17  during the spring 2020 semester, correct?

18      A.  Yes.

19      Q.  And that is a data point that you relied on in

20  your analysis, correct?

21      A.  I believe so, yes.

22      Q.  You did -- if I'm understanding your testimony

23  correctly, you did not receive information about

24  Mr. Bergeron's scholarships or financial aid, correct?

25      A.  Not that I know of, no.



Page 49

1          Q.  And you did not personally review

2     Mr. Bergeron -- the deposition exhibits to --

3     Mr. Bergeron's deposition exhibits to see if there was

4     any information in there about his financial aid,

5     correct?

6          A.  I did not.

7          Q.  Did you have any -- did you ever ask anybody

8     from your team if they had reviewed Mr. Bergeron's

9     deposition exhibits to see if there was information

10    about his financial aid and scholarships?

11         A.  No.

12         Q.  Let's go back to Cowan Exhibit 3 which is your

13    report, Dr. Cowan, and if you could turn to page 2 of

14    your report, paragraph 4.  Let me know when you're

15    there.

16         A.  I'm there.

17         Q.  The first sentence of paragraph 4 says, "At

18    this point detailed information has been produced only

19    with respect to one of the Plaintiff representatives,

20    Mr. Quattrociocchi..." -- and then you say in

21    parentheses "(the 'Lead Plaintiff')."

22              What do you mean by "detailed information"?

23         A.  Well, the detailed information would be the

24    printouts that we were just reviewing with respect to

25    what tuition was paid, what specific fees were paid, how



Page 50

1    much the fees were, the scholarship information, what

2    type of scholarship it was.  Those were all items that

3    you just showed me on Mr. Quattro -- Quattrociocchi's

4    description.

5        Q.  And when you say "produced" in this sentence,

6    what did you mean by that?

7        A.  Well, to me.  I meant produced to me.

8        Q.  All right.  The second sentence of that same

9    paragraph 4 says, "Detailed information similar to that

10   provided for the Lead Plaintiff has not been produced

11   for other class members, including any information on

12   fees."

13              What did you mean by "any information on

14   fees"?

15       A.  Pretty much what it says, any information on

16   fees.  I only have information for Mr. Quattrociocchi.

17   I don't have it for other people who are in the class

18   who are not named plaintiffs.  I don't have any detailed

19   information for any of them.

20       Q.  And what -- what other information are you --

21   would you need on the fees in order to complete your

22   analysis?

23       A.  Well, my analysis to date is -- is complete,

24   however, what the next sentence says is my understanding

25   is that if the class is certified, information about



Page 51

1  tuition, fees and so on will be made available so that I

2  can calculate damages on a class-member-by-class-member

3  basis.  I can't do that right now.

4       Q.  I understand what you're saying about

5  calculating damages on a class member basis but -- and

6  I'm sorry if I was unclear but my question is

7  specifically geared towards the fees.  What information

8  do you need with respect to fees in order to conduct the

9  damages analysis?

10      A.  Well, different people have different fees so I

11  need to know what fees they paid, whether they took a

12  lab or not and paid a lab fee.  I also need to know some

13  information about fees charged with respect to whether

14  or not the student had access to a particular type of

15  activity.  So, for example, if RIT has on-campus

16  healthcare and despite the school being closed down

17  healthcare was still available to all of the students,

18  then I wouldn't consider that to be lost to the student,

19  they had healthcare available the whole time.  So if

20  they paid a fee, they got what they paid for.  So I need

21  some information about what was paid, what it was paid

22  for and I also need to know whether or not certain

23  things were available during the time that the

24  university was closed.

25      Q.  So would that be the same with respect to the



Page 52

1    student activity fees; that, for example, if students
2    continued to have access to the types of programs or
3    activities that were intended to be covered by the
4    student-activity fee that your -- your conclusion would
5    be that there would be no refund due?
6         A.   I can only say that it might be.  That
7    speculation on my part because I don't know right now
8    what activities were covered with that fee.
9         Q.   And how would you -- how did you typically
10   obtain that information?  So it was just -- let's go
11   back to your -- your student health fee example.  You
12   mentioned that you would need information about whether
13   students continued to have access to healthcare
14   services.  What kind of information would you need to --
15   to answer that question?
16        A.   I think the only thing I would need to know is
17   whether or not health clinics were open or
18   alternative -- or was some alternative provided like
19   access -- paid access to urgent care, for example.
20        Q.   And that information was not provided to you by
21   the plaintiffs as you prepared your report, correct?
22        A.   It was not.
23        Q.   Did you or anybody on your team look for that
24   information in publicly-available sources?
25        A.   Not that I'm aware of.



Page 53

1    Q.  What about -- so let's talk specifically about

2    the student-activity fee.  What kind of information

3    would you need in order to conduct an analysis of

4    whether the student-activity fee -- whether students

5    should be entitled to a refund of any portion of the

6    student-activity fee?

7    A.  Well, since I don't know what student-activity

8    fees actually cover I'd have to find out what they cover

9    and then once I found out what they cover I have to find

10   out whether or not they were available to the student.

11   Q.  Did plaintiffs provide you any information

12   about what activities the student-activity fee was meant

13   to cover?

14   A.  Not that I know of.

15   Q.  Did you or anybody on your team look for

16   publicly-available information as to what activities

17   those student-activity fees were going to cover?

18   A.  No.

19   Q.  And am I correct to assume that your analysis

20   for any partial refunds of lab fees would be similar in

21   that you would need to know what the lab fee was

22   intended to cover and sort of what -- I guess whether

23   those -- those services or activities continued after

24   RIT's transition to distance learning?

25   A.  Broadly speaking, yes.



Page 54

1    Q.  Were you provided any of that information by

2    plaintiffs?  I'm sorry, your answer cut out.

3    A.  No.

4    Q.  Did you or anybody on your team look for

5    publicly-available information about what the -- what

6    any lab fees were meant to cover?

7    A.  No.

8    Q.  Did you or anybody on your team look for

9    publicly-available information as to what classes at RIT

10   actually charged lab fees or if any lab fees were

11   actually charged?

12   A.  No.

13   Q.  Did anybody from -- did plaintiffs provide you

14   any information about what classes actually charged lab

15   fees or whether lab fees are actually charged by RIT?

16   A.  No.

17   Q.  Turning back to Cowan Exhibit 3, so looking

18   back at your report I'm still at paragraph 4 -- and you

19   kind of alluded to this a little bit earlier -- the

20   third sentence in paragraph 4 says, "My understanding is

21   that, should the class be certified, this information

22   will be made available in production as part of

23   discovery."

24         How did you come to that understanding?

25   A.  The attorneys told me that.



Page 55

1    Q.   And just to be clear, did the -- were you told

2    that there would be a second phase of discovery after

3    you submitted your report?

4    A.   I don't think it was word -- worded quite that

5    way.  I was just told that we would obtain (audio

6    distortion) class members.

7    Q.   Dr. Cowan, I apologize, I didn't mean to cut

8    you off but the second half of what you said got cut

9    off.

10   A.   No, I'm sorry.  What I said was what I was told

11   was that information would be provided for the other

12   class members that had been -- that would be identified

13   in this case.  I wasn't told whether or not there was --

14   I think you're asking me a legal question about whether

15   or not discovery would continue and I can't answer that

16   one.

17   Q.   In the normal course of your engagements as an

18   expert do you or anybody under -- does anybody on your

19   team ever look at the case docket or look at

20   documents -- you know, like pleadings or anything like

21   that -- orders, decisions -- filed in a case?

22   A.   Depends on the case.  Sometimes.

23   Q.   In this case did you or anybody on your team

24   independently review the docket?

25   A.   No.



Page 56

1        Q.  Turning back to Exhibit 3 of your report, I'm

2    looking at paragraph 5, the last sentence.  You say, "I

3    do not offer similar calculations for Graduate Students

4    or with respect to fees because I do not have the

5    necessary information to provide such calculations."

6              Here what is the necessary information that

7    you would need to provide those calculations?

8        A.  My understanding was that there would be

9    different tuition rates for graduate students in

10   different graduate programs.  I wasn't aware of whether

11   or not graduate students would be charged the same fees

12   or other fees so I just don't have enough information to

13   be able to safely say that I can do a calculation -- an

14   actual calculation for graduate students as opposed to

15   just saying this is the framework that I propose to use.

16       Q.  Your team was able to pull from

17   publicly-available sources information about the

18   undergraduate tuition and fees charged, correct?

19       A.  Yes.

20       Q.  Did anybody on your team or did you look for

21   publicly-available information as to the graduate

22   tuition and fees charged?

23       A.  I don't know if they did or not.

24       Q.  Did anybody -- did you -- okay, sorry.  Take

25   that back.  Did you yourself look for publicly-available



Page 57

 1    information about the graduate tuition and fees charged?

 2         A.  No.

 3         Q.  Did you personally look for any

 4    publicly-available information about the types and

 5    amounts of fees charged to the various RIT student body?

 6         A.  Could you define "student body" because it's

 7    not in my report.

 8         Q.  Yeah, sorry, that question was -- was a bit

 9    garbled.  Let me maybe just make it a little bit

10    simpler.

11              Did you personally look for any

12    publicly-available information about the fees that RIT

13    charges its students?

14         A.  No.

15         Q.  Do you know if anybody on your team looked for

16    publicly-available information about the fees charged by

17    RIT to its students?

18         A.  You've been using "fees" and "tuition" sort of

19    interchangeably and sometimes you use the words "tuition

20    fees" so I'm -- I'm going to ask that -- I -- I just

21    want to know, are you asking me about tuition or are you

22    asking me about fees?

23         Q.  Sorry, yeah, I am asking you about fees and I

24    will -- I will try to be more clear as to whether I'm

25    talking about tuition or talking about fees.  So let me



Page 58

1   maybe just re ask my question which is whether -- so
2   let's maybe take that back.  Did you personally look for
3   publicly-available information about fees that RIT
4   charges to its students?
5       A.  No.
6       Q.  Do you know if anybody on your team looked for
7   publicly-available information about the fees that RIT
8   charges to its students?
9       A.  Yes.
10      Q.  And did anybody on your team look for
11  publicly-available information about the fees that RIT
12  charges to its students?
13      A.  Yes, they found fee information.
14      Q.  So what type of fee information did they find?
15      A.  Well, for example, you in showing me that
16  listing knew -- we knew that there were activity fees,
17  we knew that there were health fees and I believe we
18  knew that there were lab fees.  So we knew that there --
19  there were different types of fees.  The materials we
20  were -- that we reviewed were quite clear on the fact
21  that fees were charged and I believe we even knew kind
22  of generally what fees were charged.
23      Q.  Okay.  Aside from the student-activity fee, the
24  student health fee and the lab fee, are there any other
25  fees that you understand to be at issue in this



Page 59

1    litigation?

2         A.   I -- I don't know the -- sorry.  I don't know

3    the answer to your question because I'm not aware that

4    I've exhausted the list of fees.  You asked me whether

5    or not we had researched for fees and my answer was yes

6    but I don't think we included all the possible fees and

7    I may not even know all of the possible fees.  I

8    wouldn't know that until I saw that information for all

9    the students as opposed to just Mr. Quattrociocchi.

10        Q.   Do you -- were you given any direction as to --

11   as to which type of fees the plaintiffs are seeking in

12   this case on behalf of the putative class?

13        A.   No.

14        Q.   In the -- in your review of the types of fees

15   that were charged did you find information of the --

16   about the price of each fee?

17        A.   Well, price actually means something different.

18   I believe you're asking me about whether I know what the

19   charges were that were associated with the fees.

20        Q.   Yes, that's -- that's correct.

21        A.   Okay.  I found some information, yes.

22        Q.   And which fees were you able -- for which fees

23   were you able to find information about the amount

24   charged?

25        A.   As I recall, there was some information about



Page 60

1   each of the fees we discussed before:  -- the student

2   fee, lab fee, health fee -- because there's a

3   description of what it costs to go to the university.

4        Q.  You -- you mentioned a minute ago that you

5   understood price to be something different than the

6   amounts charged.  Could you explain what you meant by

7   that?

8        A.  In economics I think of a price as being

9   something that you either voluntarily purchase or you

10  don't and you base your decision on price.  That's the

11  basis for supply-and-demand curves.  In this case you

12  don't get a choice, you're just charged a fee.

13       Q.  When you say you don't get a choice here, what

14  do you mean by that?

15       A.  Everybody has to pay a student-activity fee,

16  everybody has to pay a health fee and if you take a

17  course that requires a lab, you have to pay the lab fee.

18       Q.  Okay.  But you could, for example, choose to

19  take a different course if you didn't want to pay the

20  lab fee, correct?

21       A.  Well, yeah, but now you're getting into

22  questions about how individual students were making

23  decisions and prior to them taking a class.  My entire

24  analysis is based only on what classes they actually did

25  take.



Page 66

1   that was ongoing but I didn't get details.

2       Q.  Got it.  And were you told that by your

3   counsel?

4       A.  Yes.

5       Q.  Did you do any independent review of the docket

6   or any information in this case to confirm whether there

7   is a pending discovery dispute?

8       A.  I've seen dockets in the past and I don't

9   recall ever seeing anything about the docket including

10  statements about a dispute so I don't think that would

11  be very useful.

12              And No. 2 is, you know, if the attorneys

13  tell me there's a dispute, then I have to take their

14  word for it, you know.  I don't have any way to

15  independently assess whether there's a discovery dispute

16  or not.

17      Q.  I think you -- I just want to make sure I'm

18  correctly understanding this.  You did not -- did you

19  get any information about what type of discovery dispute

20  or what it might cover from plaintiffs or their counsel?

21      A.  No.

22      Q.  Did you ask for any details about the purported

23  discovery dispute?

24      A.  No.

25      Q.  Could you turn to page 10 of your report, so



Page  67

1    Cowan Deposition Exhibit 3.  Let me know when you're
2    there.
3         A.  I'm there.  Thank you.
4         Q.  So Table 1 here is titled "Calculation of
5    Tuition Damages for the Lead Plaintiff:
6    Mr. Quattrociocchi."  Correct?
7         A.  Yes.
8         Q.  Okay.  And Table 1 is -- is your calculation of
9    the tuition that you assert is due to be refunded to
10   Mr. Quattrociocchi, correct?
11        A.  Correct.  Tuition, yes.
12        Q.  There is no analysis of what fees you -- you
13   would assert are due to be refunded to
14   Mr. Quattrociocchi in this table, correct?
15        A.  That's correct.
16        Q.  And you did not do any analysis of what fees
17   might arguably have to be refunded to
18   Mr. Quattrociocchi, correct?
19        A.  I could not so I didn't.
20        Q.  Could you explain the methodology and formulas
21   that you applied in your analysis here?
22        A.  Yes.  Okay, so the tuition fees charged to
23   Mr. Quattrociocchi was the -- in the first line -- so --
24   that he contracted for is what he paid in tuition.  The
25   second line is for the same hours using the rate from



Page 68

1    RIT online we've computed a rate what would be charged
2    for these classes if everything was taken through RIT
3    online.  So that's the $13,442.  The difference between
4    that -- so there's a 50 percent -- we said that the time
5    period for the in-person classes versus the time period
6    for the online classes split approximately fifty-fifty
7    so if you take the value contracted for and divide it by
8    two to get the 50 percent, the value contracted for and
9    received -- because that would be the first half of the
10   semester -- was $11,311.  In the second half of the term
11   it would be value received based on the online pricing
12   for total hours taken so that would be half of the
13   $13,442 which came out to the $6,721.  So the overall
14   value received would be the value of the first half of
15   the semester plus the value of the second half so it's
16   the sum of the $11,000 plus the 6.7 thousand dollars to
17   get you to $18,000.  So what we are arguing is in terms
18   of the pricing for the regular tuition and then for the
19   pricing for the online cases what he -- what he received
20   was $18,000 in terms of the value received using the
21   but-for pricing.  Now we said but he got subsidies from
22   RIT that applied to the tuition so we're going to
23   subtract $2,000 and that makes it $16,000 which is what
24   he received.  And then the amount that he actually paid
25   was the $22,000 minus the $2,000 because of the RIT



Page 69

1  subsidies so that makes it $20,000 -- it's $20,622.  If

2  I take the difference between the amount paid and not

3  subsidized versus the -- the payment he would have made

4  in the but-for analysis which is $16,322 that difference

5  is $4,590 which is the amount that we say are the

6  damages for Mr. Quattrociocchi that are based on his

7  relationship with RIT and then we calculated prejudgment

8  interest and that came out to be $863 so if I sum those

9  two up, I get the total damages plus the prejudgment

10  interest of $5,450, approximately.

11      Q.  Let's -- let's kind of just break this down a

12  bit.  So the top-line number in your Table 1 is titled

13  the value contracted for.  How do you define "value"?

14      A.  I didn't define "value."  What I did was I took

15  whatever the tuition charge was and let the university

16  define value.  They thought that the educational

17  experience for Mr. Quattrociocchi was $20,622 by being

18  on the campus and taking the courses, charging that

19  tuition which Mr. Quattrociocchi paid.  So to me the

20  value is whatever it was that was charged that both

21  parties agreed to.

22      Q.  So I want to make sure I'm understanding that

23  your top-line number here, what you've -- what you've

24  named the value contracted for, that's the published

25  tuition rate for Mr. Quattrociocchi, correct?



Page 70

1        A.   Yes.

2        Q.   Why not use the terminology "tuition rate" or

3   "published tuition rate"?

4        A.   Oh, I think we took that phrase from the

5   Complaint.

6        Q.   Did you consider anything else in making this

7   decision to use the phrase "value contracted for"?

8        A.   So under the rule of parallel construction

9   later on I'm going to talk about in lines 3 and 4 and 5

10  the value that was received based on RIT charging the

11  tuition rate, you know, that is for one half to

12  determine the value received based on the RIT online

13  charges for the same classes or classes in general as

14  the second part and you sum those two and you get value

15  received.  So the choice in the word "value" simply has

16  to do with all of the pricing that was set by RIT for

17  either in-person or online classes.  I'm not making a

18  judgment about whether -- what type of value it is or

19  what the value is to individuals.  I'm just looking at

20  this as a arm's-length transaction where RIT said here's

21  the tuition rate.  Mr. Quattrociocchi -- Quattrociocchi

22  agreed to that and paid it.  It's kind of like buying a

23  car.

24       Q.   Does price always equal value?

25       A.   So I would say no but the value is -- the



Page 153

```
 1   FOR THE DEFENDANT:
 2        FERNANDO SANTIAGO, ESQ.  (Attending Remotely)
          SANTIAGO BURGER LLP
 3        2280 East Avenue, 2nd Floor
          Rochester, New York 14610
 4        Tel: (585) 563-2400
          Fax: (585) 563-7526
 5        Fernando@litgrp.com
 6         - and -
 7        QIAN (SHEILA) SHEN, ESQ.  (Attending Remotely)
          HOLLAND & KNIGHT LLP
 8        31 West 52nd Street
          New York, New York 10019
 9        Tel: (212) 513-3200
          Fax: (212) 385-9010
10        qian.shen@hklaw.com
11        That a copy of this certificate was served on all
12   parties shown herein on _____ and filed
13   with the Clerk pursuant to Rule 203.3.
14        I further certify that I am neither counsel for,
15   related to, nor employed by any of the parties or
16   attorneys in the action in which this proceeding was
17   taken, and further that I am not financially or
18   otherwise interested in the outcome of the action.
19        Certified to by me this 29th day of July, 2022.
20
21
                     _Wendy Schrieber_____
22                   Wendy Schreiber, Texas CSR 9383
                     Expiration Date:  05/30/24
23                   MAGNA LEGAL SERVICES
                     Magna Registration No. 631
24                   16414 San Pedro, Suite 900
                     San Antonio, Texas 78232
25   Job No. 850422  Phone:  (866) 672-7880
```

